# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| Newell Rubbermaid Inc. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Scott T. Bosgraaf, d/b/a Kirsch Lofts, LLC, )<br>    -and- )<br>Kirsch Lofts, LLC, )<br>)<br>Defendants. ) | **COMPLAINT**<br>Civil Action No. 1-cv-15-00597 |
| | SCHIFF HARDIN LLP<br>Gabriel M. Rodriguez<br>J. Michael Showalter<br>Erin E. Guffey<br>233 South Wacker Drive<br>Suite 6600<br>Chicago, IL 60606<br>312.258.5500 (Telephone)<br>312.258.5600 (Facsimile) |

## COMPLAINT

Now comes Plaintiff, Newell Rubbermaid Inc. ("Newell") by its undersigned counsel, and for its Complaint against Defendants, Scott T. Bosgraaf, d/b/a Kirsch Lofts, LLC and Kirsch Lofts, LLC, says as follows:

### I. NATURE OF THE ACTION

1. This is a civil action for cost recovery, declaratory and injunctive relief arising out of the release and/or threatened release of hazardous substances into the environment from a former Kirsch manufacturing facility (the "Facility") located on a parcel of real estate at 308 N. Prospect Street, in the City of Sturgis, Michigan (the "Property"). The Property and Facility are

now owned, controlled, managed, and operated by Scott T. Bosgraaf ("Bosgraaf"), doing business as Kirsch Lofts, a Michigan limited liability company ("Kirsch Lofts") (collectively, "Defendants").

2. As set forth in detail in Paragraphs 16 through 32 herein, Newell's obligations with respect to contamination on the Property are related to a larger and more comprehensive cleanup obligation for which Newell assumed responsibility as part of a business transaction in the 1990s. Since assuming responsibility for these obligations, Newell has taken significant actions to investigate, monitor and remediate historical contamination on or about the Property from 1998 through 2014. As set forth in detail in Paragraphs 48 through 69, Defendants have threatened to prevent Newell's access to conduct future necessary remedial activities unless they are paid extraordinary sums to compensate for a real estate investment decision that they claim has resulted in significant losses. Despite several offers of fair compensation for access, Defendants have refused to accept any reasonable offer, instead demanding – for access – an amount in excess of ten times the Property's current estimated value. Finally, as set forth in detail in Paragraphs 70 through 78, beginning in September 2014 and continuing through the date of this filing, Defendants have refused Newell access to two existing groundwater monitoring wells located on the Property, thereby significantly restricting Newell's ability to mitigate the risk that contamination will spread undetected to new areas of groundwater and soil.

3. Accordingly, Newell brings this action under the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Section 324.20135a of the Michigan Compiled Laws.

4. Newell has incurred and will continue to incur substantial response costs relating to environmental investigation, remediation, and monitoring of the Property. Newell seeks a judgment against Defendants awarding response costs for Defendants' share of such past and future costs under 42 U.S.C. § 9607(a).

5. Further, Newell seeks an order of this court allowing it access to the Property to conduct remedial work as permitted by Michigan state law.

## II. PARTIES

6. Kirsch Lofts, LLC is a Michigan single-member limited liability company[1] that owns the Property and the Facility. Kirsch Lofts previously stated an intention to convert the Facility's buildings to residential and commercial real estate.

7. Scott T. Bosgraaf is an experienced real estate developer in the State of Michigan, and the Manager of Kirsch Lofts.

8. Newell is a Delaware corporation with a primary place of business in Georgia, and assumed responsibility for completing certain cleanup obligations related to the Property pursuant to the 1997 Purchase and Sale Agreement between Cooper Industries, Inc. and Newell Co. (the "1997 Agreement").

## III. JURSIDICTION & VENUE

9. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 9607, 28 U.S.C. §§ 1331 & 1332.

10. Kirsch Lofts and its sole identified manager/member Bosgraaf are citizens of Michigan for diversity jurisdiction purposes.

---

[1] Kirsch Lofts, LLC has an active Michigan business license, but has not been in good standing with the State of Michigan since February 24, 2014.

11. Newell is a Delaware corporation with a primary place of business in Georgia, and is accordingly a citizen of these states for diversity purposes.

12. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the damages in this case exceed $75,000.00, exclusive of interests and costs. 28 U.S.C. § 1332(a).

13. The Court has the authority to issue a declaratory judgment concerning the rights and liabilities of the parties pursuant to 42 U.S.C. § 9613(g)(2) and 28 U.S.C. § 2201.

14. Because diversity jurisdiction exists between the parties, this Court has jurisdiction over Newell's state law claim for access. In addition, Newell has a valid CERCLA claim, and the state claim for access arises from the same nucleus of operative fact, so this Court has supplemental jurisdiction over this claim even if diversity did not exist.

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Property and the Circuit Court of St. Joseph County are located within the district.

## IV. BACKGROUND & ALLEGATIONS OF FACT

A. The History of the Property

16. The Property transferred hands several times before Bosgraaf purchased it through Kirsch Lofts, LLC, in 2009. This section gives an overview of the historical ownership of the Property to illustrate the relationship between Defendants and Newell.

17. The Property was at one time part of the Kirsch Plant No. 1, a facility that manufactured curtain rods and window treatments. Cooper Industries, Inc. (which is not a party to this dispute) came to own the Kirsch business and owned and operated Kirsch Plant No. 1 through its Kirsch division.

18. Upon information and belief, Kirsch Plant No. 1 used industrial solvents for many years. The use of these solvents resulted in releases of contaminants into the soil and groundwater in and near Kirsch Plant No. 1 including on and around the Property.

19. In 1982, the United States Environmental Protection Agency ("EPA") discovered contamination in the soil and groundwater at the Kirsch Plant No. 1, including the Property, and also discovered that the contamination had affected other properties and the drinking water supply of the City of Sturgis.

20. In 1984, the EPA placed the Sturgis Municipal Well Field Site ("the Site") on the National Priorities List ("NPL"), the list of the highest priority Superfund sites in the nation. The Site includes Kirsch Plant No. 1 and the Property, as well as adjacent parcels of land and the affected aquifer beneath the City of Sturgis.

21. In 1991, the EPA issued a Record of Decision ("ROD") which identified the selected remedy for the Site. The selected remedy included extracting and treating contaminated groundwater. It also included treatment of soils by a method called soil vapor extraction ("SVE"), and excavation of the remaining contaminated soils that could not be effectively treated by SVE; these two treatment components were collectively referred to as "the soil remedy." As is further detailed in Paragraph 26 below, the soil remedy did not include soils on the Property but those on an adjacent parcel or parcels.

22. In 1992, EPA issued a Unilateral Administrative Order to Cooper Industries, Inc., entitled "Administrative Order under Section 9606(a) of CERCLA for the Remedial Design and Remedial Action of an Interim Ground Water Extraction Treatment System" (the "UAO"). The UAO ordered Cooper Industries, Inc. to conduct an interim remedial action to extract and treat contaminated groundwater.

23. In November 1992, Cooper Industries, Inc. was required to and did record against the title records a Notice indicating that the Property had been impacted by hazardous substances and was subject to the UAO.

24. During much of 1996, the MDEQ negotiated with Cooper Industries, Inc. for Cooper Industries, Inc.'s takeover of all remediation activities at the Site, including the soil remedy, under the direction of the MDEQ.

25. On or about October 25, 1996, Cooper Industries, Inc. entered into a Consent Decree with the Michigan Attorney General and the MDEQ in the U.S. District Court for the Western District of Michigan (Case No. 5-96-cv-157) ("Consent Decree"). Under the Consent Decree, Cooper Industries, Inc. agreed to complete the soil and groundwater remedy.

26. Work on the soil remedy was completed in April 1997. At that time, the soils at the Property were not thought to be contaminated, and therefore were not a part of the area to be addressed by the soil remedy. However, the Property did serve as the location for a groundwater extraction well and a water treatment system which together served as the main features of the groundwater remedy for the Site at that time.

27. In 1997, pursuant to a 1997 stock purchase agreement (the "1997 Agreement"), Newell Co. purchased the stock of Kirsch Inc. from Cooper Industries, Inc. Kirsch Inc. was a spin-off company created by Cooper Industries, Inc. to divest the assets and liabilities of the Kirsch division, including Kirsch Plant No. 1 and the Property.

28. Through the 1997 Agreement, Newell Co. assumed the obligations of Cooper Industries, Inc. under the Consent Decree.

29. In 1998, Newell Co. sold the Property to WMU Properties, a Michigan co-partnership, for a total price of $190,000.00. Prior to the sale, Newell Co. disclosed that the

Property had been impacted by contaminants and was part of a Superfund Site. WMU Properties specifically acknowledged in its purchase agreement that they purchased the Property "As-Is-Where-Is." The sale was subject to a recorded easement allowing Newell Co. access to the groundwater extraction well and water treatment system (the "1998 Easement") which were located on the Property. The 1998 Easement gave Newell Co. access to operate, monitor and maintain the groundwater extraction well and water treatment system for as long as those elements were in operation.

30. Newell Co. changed its name to Newell Rubbermaid Inc. in 1999.

31. In November 2006, Rose Land and Finance Corporation purchased the Property by Sherriff's Deed on a mortgage sale.

32. In July 2007, 1983 Finance Company LLC purchased the Property via quitclaim deed.

B. <u>The Transfer of the Property to Kirsch Lofts</u>

33. In July 2009, Kirsch Lofts purchased the Property from the 1983 Finance Company LLC. At the time of purchase, Kirsch Lofts planned to re-develop the Property into residential loft apartments or condos and commercial retail space.

34. Kirsch Lofts was aware that the Property was a Superfund site, as is demonstrated by its Application for Brownfield Redevelopment Grants and Loans dated December 2007 ("Brownfield Application"), which states, "[t]o the knowledge of the Brownfield Redevelopment Authority there are no legal impediments to the redevelopment of the property with the exception of restrictions resulting from the Superfund site." See Exhibit A.

35. Prior to its purchase, Kirsch Lofts was not only on notice of the environmental status of the Property as a Superfund site, but also of the environmental condition of the Property.

36. Before completing its purchase of the Property, Kirsch Lofts conducted its own environmental investigation, which included (i) limited soil and groundwater testing; (ii) a title search; and (iii) interviews with former Kirsch Inc. and Cooper Industries employees.

37. The results of the limited soil and groundwater investigation conducted by the Defendants were reported in a Phase II Environmental Site Assessment report dated August 2008 ("Phase II Report"). The Phase II Report reported levels of contaminants on the Property higher than the applicable cleanup standards. The Phase II Report was issued nearly a year prior to Defendants' closing on the purchase of the Property.

38. In late 2008 and early 2009, the Defendants conducted additional soil testing confirming high levels of contamination, prior to closing on the purchase of the Property.

39. At the time of the purchase by Kirsch Lofts, the Property and the adjacent property at 415 E. Main Street had a combined Current State Equalized Value (SEV) of $104,800.00. Defendant Kirsch Lofts invested $30,000.00.

40. Kirsch Lofts received ample incentives to develop the Property, including Brownfield Tax Increment Financing ("TIF"), tax abatement, and a Brownfields grant.

41. Despite knowing that the Property was part of a Superfund site and contained high levels of contamination, Kirsch Lofts closed on the purchase of the Property in July 2009.

C. Additional Environmental Investigation & Remedial Activities

42. The soil investigations described in Paragraphs 36 through 38, above, were conducted by the Defendants prior to the closing of the acquisition. The investigations did not define the full extent of the contamination on the Property. They only revealed that the Property was contaminated above cleanup standards.

43. In early 2010, MDEQ requested that Newell conduct an expanded soil investigation pursuant to the Consent Decree to determine the full extent of the contamination above cleanup standards. The investigation also covered properties in addition to the Property. Newell completed that investigation in December 2010.

44. By the fall or winter of 2010, Bosgraaf and Kirsch Lofts, LLC had already ceased all development efforts, although there was no regulatory reason that all development activities needed to halt.

45. To date, Bosgraaf has not resumed his development activities.

46. The results of the soil investigation conducted by Newell confirmed that the Property was contaminated with high levels of TCE and PCE, as were other areas of the Site. The results were set out in a report entitled "Pre-Design Investigation Report, Former Kirsch Plant No. 1 Source Area, Sturgis Municipal Well Field Superfund Site, Sturgis, Michigan" (Dec. 2, 2010) ("Pre-Design Investigation Report").

47. On April 14, 2011, MDEQ formally issued a "Notice of Additional Response Activities" pursuant to authority of the Consent Decree, which required additional testing, pilot studies, and the development of plan and schedules for additional remedial activities to address the soils at the Site. Newell commenced work on significant plans for additional investigation and remediation for Site soils.

D. Efforts to Acquire Access

48. In the meantime, within a month after Newell submitted the Pre-Design Investigation Report to Michigan DEQ, Bosgraaf notified Newell by letter dated January 27, 2011 that "[Newell] will no longer be given access to our property, except to the extent provided by the 1998 Easement [i.e., access to the extraction well and water treatment system on the Property]."

The letter stated that Newell was required under the Consent Decree to use "best efforts" to obtain access and asserted it had not done so. The letter went on to say that only when Newell compensated Defendants for "any 'loss of use' of the [P]roperty or other damages that may result from [Newell's remediation activities," would access be granted. The letter went on to claim that "best efforts" were limited to one of three options. In Bosgraaf's view, Newell could:

   a. Purchases the property,
   b. become the leveraged lender for the construction of the rental property, or
   c. compensate Bosgraaf for the "carrying costs and other damages resulting from the delay in development."

See Exhibit D.

49. Newell responded to Bosgraaf's January 27 letter on February 3, 2011, noting it "would very much like to work out the details of access by agreement," but that it did not view "best efforts" as requiring any of the three options in the January 27 letter. The letter noted that Newell was prepared to pay "reasonable compensation" for access to the Property, but that it did not view its obligation to extend to bailing Defendants out from an investment in a residential development located in a contaminated and active Superfund site. Newell concluded its letter by reiterating that it "wants to work cooperatively with Kirsch Lofts LLC to work out a reasonable access agreement" so that it could continue to implement the remedy at the Site, including the Property. See Exhibit C.

50. In the meantime, Newell continued working with MDEQ on a plan to address the soil contamination in accordance with the MDEQ's Notice of Additional Response Activities. Those negotiations culminated with Newell submitting a final "Revised Plan for Additional Response Activities at Sturgis Municipal Well Field Superfund Site, Sturgis, Michigan" (the "Revised Plan") on August 22, 2012.

51. On September 11, 2012, MDEQ approved the Revised Plan.

52. With an approved Revised Plan in hand, Newell sent letters to Bosgraaf on three occasions seeking access to conduct groundwater and soil testing required under the Revised Plan. These letters were dated October 12, 2012, December 18, 2012 and January 10, 2013. See Exhibits D, E, and F.

53. Bosgraaf finally responded by rejecting Newell's request for access, stating instead he wanted a resolution "global in scope." See Exhibits G.

54. On March 29, 2013, Newell sent a letter of intent to Kirsch Lofts, offering to purchase the Property for $200,000.00, which Newell believes to be approximately equal to, or greater than, the fair market value for comparable ***uncontaminated*** industrial property in the area.

55. Bosgraaf rejected Newell's offer on April 10, 2013, and counteroffered to sell the Property for $2,000,000.00. As an alternative, Bosgraaf offered a lease under which Newell would be obligated to reimburse Bosgraaf for building maintenance and improvement projects for the Property due to the "interruption" in development that Bosgraaf attributed to Newell's remedial activities (see Exhibit H), but which in truth was the result of other factors.

56. On May 21, 2013, Newell made a counteroffer to purchase the Property for $250,000.00, which Bosgraaf also rejected. Indeed, Bosgraaf ended discussion of a sale, and requested that Newell offer a proposal of specific terms for access pursuant to an access agreement. See Exhibit I.

57. On June 3, 2013, Newell set out specific terms for access limited in scope, offering to pay Kirsch Lofts $2,300.00 for 15 days of access solely to install five soil borings, since its need for any additional physical access to the Property remained many months or years into the future.

As an alternative, Newell kept open its offer to purchase the Property for $250,000.00. See Exhibit J.

58. Bosgraaf rejected Newell's offer to purchase, and for an access agreement limited in scope; instead, he wanted a "global" access agreement addressing all access issues. See Exhibit K.

59. On June 25, 2013, Newell responded to Bosgraaf's request, by providing a draft of a comprehensive access agreement, and offering payment of a $120,000.00 license fee for access to complete the required monitoring and remedial work under the Revised Plan and Consent Decree. See Exhibit L.

60. In late 2013, Bosgraaf agreed to give Newell access limited in scope, but also looking for the de-commissioning of the groundwater extraction well and water treatment system, as those components were being retired and re-located. The agreement allowed Newell 30 days to complete additional soil testing as well as the decommissioning activities, in exchange for a cash payment. Newell also was required to release the 1998 Easement (the "2013 Limited Access Agreement").

61. The release of the 1998 Easement was recorded on June 17, 2014.

62. After conducting the testing allowed under the 2013 Limited Access Agreement, Newell again contacted Defendants looking to reach agreement for access for the remaining phases of the remedy. By letter dated August 21, 2014, Newell offered the outline of a comprehensive access agreement identifying the future phases of work that would require physical access to the Property, and proposing a schedule extending to the end of the project. See Exhibit M.

63. On September 3, 2014, Bosgraaf and representatives of Newell had a conference call during which Newell made its engineers available to discuss Bosgraaf's questions and concerns. The matters discussed during the September 3 conference call where summarized in a letter from Newell to Bosgraaf dated October 2, 2014.

64.

65. On October 6, 2014, Bosgraaf responded to Newell's October 2 letter by stating that the conference call was a "helpful first step", but that he "did not see the benefit to flyspecking" Newell's letter. Instead, he wanted to see the details in a draft of a comprehensive access agreement. See Exhibit N.

66. On February 26, 2015, Newell sent Bosgraaf a draft of a comprehensive access agreement.

67. Bosgraaf responded to the draft access agreement on March 23, 2015, proposing a license fee of $2.5 million for temporary non-exclusive access.

68. On April 1, 2015, Newell responded to Defendants by pointing out that the fair market value of the Property was $100,000.00-$200,000.00, without consideration of the contamination. In that same email, Newell offered to rent the property for $12,000.00 annually, or to purchase the property for $300,000.00. See Exhibit O.

69. Bosgraaf rejected both alternatives on April 13, 2015, responding that the amount of compensation must reflect the lost value due to delay in development, and that the rental rate must reflect investment costs, carrying costs, loss of revenue, and loss of verifiable tax incentives. See Exhibit P.

E.  Denial of Access for Groundwater Monitoring

70. In the meantime, Newell has been unable to monitor the condition of the groundwater beneath the Property. MDEQ requires that Newell monitor the condition of the groundwater in the City of Sturgis via a groundwater monitoring program that includes a network of 38 monitoring wells. It samples the well network four times per year. Two of the monitoring wells are located on the Property.

71. With the release of the 1998 Easement in June 2014, Newell no longer had a right to enter the Property. On August 21, 2014, Newell sent Bosgraaf a letter requesting limited access to the Property for a total of 4 hours and 30 minutes over a three-day period in order to collect samples from the two existing monitoring wells. See Exhibit Q.

72. By letter dated September 10, 2014, Kirsch Lofts denied Newell access to the Property because Newell had not offered him "reasonable compensation for the access it needs." The letter states that "Newell offered to buy the entire Property for a pittance of what [Kirsch Lofts] (and the DEQ via its grant) has invested into this development." See Exhibit R.

73. On February 26, 2015, Newell sent Bosgraaf a letter again requesting limited access to the Property to sample the two monitoring wells. See Exhibit S.

74. On March 23, 2015, Bosgraaf responded to Newell's request for access to sample the two monitoring wells with an email attaching a proposed agreement with a $59,780.00 fee. Subsequent communications between the Parties on that day indicated the amount was not open to negotiation.

75. The two monitoring wells located on the Property have not been sampled in more than six months due to the refusal of access.

76. Defendants' unreasonable demands for compensation have rendered it effectively impossible for Newell to gain access to the Property to conduct necessary groundwater monitoring activities. As a result of the denial of access, there is at least the potential that the existing contamination will spread and that future remedial activities will be prevented.

77. By preventing monitoring, Defendants have permitted the existing contamination to threaten new areas of groundwater and soil.

78. Even if Defendants originally qualified as "Bona Fide Prospective Purchasers" at the time of purchase, they have since lost that status because they are intentionally preventing monitoring and remedial activities.

## COUNT I (CERCLA § 107(A))

79. Plaintiff hereby incorporates by reference all of the preceding allegations.

80. Defendant Bosgraaf is a "person" as defined in CERCLA, 42 U.S.C. § 9601(21).

81. Defendant Kirsch Lofts is a "person" as defined in CERCLA, 42 U.S.C. § 9601(21).

82. Each of the Property and the Facility is a "facility" within the meaning of CERCLA.

83. Defendant Kirsch Lofts is the current "owner" and "operator" of the Property and Facility within the meaning of CERCLA. 42 U.S.C. §9601(20(A)).

84. Defendant Bosgraaf is the current "operator" of the Property and Facility within the meaning of CERCLA. 42 U.S.C. §9601(20(A)).

85. Newell has incurred and will continue to incur substantial response costs in the investigation, remediation, monitoring, and restoration of the Property.

86. These costs qualify as "costs of response" within the meaning of CERCLA and are "necessary" and "consistent with the National Contingency Plan." 42 U.S.C. § 9601(25); 42 U.S.C. § 9605.

87. As the current owner and/or operator of the Property and the Facility, Defendants are liable to Newell for the costs of response incurred by Newell at the Property pursuant to 42 U.S.C. § 9607(a).

88. Defendants do not qualify as "Bona fide prospective purchasers" ("BFPP"), which is defined in CERCLA as a person that acquires ownership of a facility after January 11, 2002, and that establishes each of the following by a preponderance of the evidence:

   a. All disposal of hazardous substances at the facility occurred before the person acquired the facility;
   b. The person made all appropriate inquiries into the previous ownership and uses of the facility;
   c. The person provided all legally required notices regarding the discovery or release of any hazardous substances at the facility;
   d. The person exercised reasonable care with respect to hazardous substances at the facility by taking reasonable steps to stop or prevent any continuing release;
   e. The person provides full cooperation, assistance, and access to persons that are authorized to conduct response actions or natural resource restoration at a vessel or facility, including cooperation and access necessary for the installation and maintenance of any complete or partial response actions.

42 U.S.C.A. § 9601(40).

89. While owning, and controlling, and managing the Property and the Facility, Defendants have failed to take reasonable steps to stop or prevent any continuing release of hazardous substances.

90. While owning, and controlling, and managing the Property and the Facility, Defendants have failed to provide full cooperation, assistance, and access to Newell, a person that is authorized to conduct response actions at the Property and Facility.

### COUNT II (Federal and CERCLA Declaratory Judgment)

91. Plaintiff hereby incorporates by reference all of the preceding allegations as if set forth fully at length herein.

92. During the period that Defendants owned, managed, directed and controlled the Property and its operations, hazardous substances have remained in the environment.

93. Defendants' actions give rise to the threat that additional releases of hazardous substances to the environment will go undetected.

94. In accordance with applicable federal and state statutes and regulations and the Consent Decree, Newell has incurred and will continue to incur substantial costs in taking actions to investigate, remediate, and monitor the hazardous substances, and to restore the Property.

95. The determination of the party responsible for these remedial costs represents an actual controversy pursuant to 28 U.S.C. §2201.

96. In accordance with the provisions of 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2)(B), Newell seeks a declaration that Defendants are liable to Newell for future response costs under 42 U.S.C. 9607(a).

97. Plaintiff specifically requests a declaration that Defendants are not or no longer enjoy the status of a CERCLA Bona Fide Prospective Purchaser, as defined in 42 U.S.C. § 9601(40), and that any such status they may have had as such is null and void as of the date of its initial denial of access to Newell.

### COUNT III (CLAIM FOR ACCESS UNDER MCL 324.20135a)

98. Plaintiff hereby incorporates by reference all of the preceding allegations as if set forth fully at length herein.

99. Section 324.20135a (1) of the Michigan Compiled Laws provides that "[a] person who is liable under section 20126 or a lender that has a security interest in all or a portion of a facility may file a petition in the circuit court of the county in which the facility is located seeking access to the facility in order to conduct response activities approved by the department."

100. Because diversity jurisdiction exists between the parties, Newell has brought this claim in the Federal District Court in the District in which the Circuit Court of St. Joseph County sits.

101. In addition, as a result of Newell's CERCLA claim in count I, this Court has supplemental jurisdiction of the state claim for access as the state claim arises from the same nucleus of operative fact as the CERCLA claim.

102. Newell is a "person liable under section 20126."

103. Newell is bound by the Consent Decree to complete all monitoring and remedial actions, including those required by the Revised Plan ("Remedial Obligations").

104. The Property is a "facility" within the meaning of Sections 324.20101 and 324.20135a.

105. Defendants are the owners and managers of the Property, which is subject to the Consent Decree and Revised Plan.

106. Newell has actively pursued negotiations with Defendants in good faith to gain access to the Property without filing suit in this Court.

107. Without access to the Property, Newell is at substantial risk of becoming unable to perform the Remedial Obligations.

108. Due to the Defendants' unwillingness to grant access despite Newell's reasonable best efforts, Newell requests that the Court issue an order granting Newell and its consultants and the MDEQ access to the Property in order to conduct the Remedial Obligations.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Newell Rubbermaid respectfully prays for judgment as follows:

1. The judge award Defendants costs for remediation pursuant to 42 U.S.C. § 9607(a);

2. A declaration that Defendants are liable to Plaintiff for response costs under 42 U.S.C. 9607(a);

3. A declaration that Defendants do not qualify as a Bona Fide Prospective Purchaser as defined in 42 U.S.C. § 9601(40);

4. The judge grant Newell access to the Property located at 308 N. Prospect Street, Sturgis, Michigan, to conduct the Remedial Obligations at the Property;

5. Costs, reasonable attorneys' fees, consulting fees, expert witness fees, and other fees and expenses incurred in seeking access; and

6. Any further relief as the Court deems just and necessary.

Dated: this 9th day of June, 2015

Respectfully submitted,

SCHIFF HARDIN LLP,

By: /s/ J. Michael Showalter
Gabriel M. Rodriguez
J. Michael Showalter
Erin E. Guffey
Schiff Hardin LLP
Attorneys for Plaintiff
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Telephone: 312.258.5500

10808-1130
CH2\16733833.2