**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| Newell Rubbermaid Inc., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1-cv-15-00597-RJJ |
| | ) | |
| v. | ) | **NEWELL'S MEMORANDUM IN** |
| | ) | **SUPPORT OF ITS MOTION FOR** |
| Kirsch Lofts, LLC, | ) | **SUMMARY JUDGMENT ON** |
| | ) | **DEFENDANT'S COUNTERCLAIM** |
| Defendants. | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ................................. 2

    A.    Kirsch Knew the Property was Contaminated and Bought it Anyway.................. 2

    B.    Post-Purchase Environmental Testing .................................................. 4

    C.    The Development Project and Access Negotiations ............................. 6

    D.    Kirsch's Claimed Damages Exceed the Value of the Property and its Proposed Development Is Unlikely To Succeed ........................................ 6

    E.    Kirsch's Alleged Losses Far Exceed the Property's Value and What is Recoverable Under Michigan Law ........................................................ 8

III.    ARGUMENT ........................................................................................ 10

    A.    Standard of Review........................................................................... 10

    B.    The Access Statute's Remedies are Equitable, Not Legal .................. 11

    C.    Equity Precludes Granting Kirsch "Compensation" Stemming from Foreseeable Problems .......................................................................... 11

    D.    Kirsch's "Interpretation" of the Access Statute Fundamentally Alters Its Meaning ........................................................................................ 13

        1.    A plain reading Section 324.20135a(1) supports that Kirsch's claims are outside the scope of permissible compensation.................... 14

        2.    The context in which Section 324.20135a(1) was enacted likewise renders Kirsch's claimed damages outside those which are available ........................................................................................ 17

    E.    Kirsch's Alleged Lost Profits and Incentives Damages Are Too Speculative to be Awarded as a Matter of Law .................................. 19

    F.    The Court Should Enter Judgment in Newell's Favor Because Kirsch Has Failed to Present Any Evidence of Recoverable Damages................................. 24

IV.    CONCLUSION .................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Bayley Prods., Inc. v. Am. Plastic Prods. Co.*,
    30 Mich. App. 590, 598 (1971) ............................................................................ 18

*Bennett v. City of Eastpointe*,
    410 F.3d 810, 817 (6th Cir. 2005) ....................................................................... 10

*Blunt v. Brown*,
    37 N.W.2d 671, 673 (Mich. 1949) ....................................................................... 12

*Bonelli v. Volkswagen* ,
    166 Mich. App. 483, 511 (1988) .......................................................................... 19

*Booker v. Ralston Purina Co.*,
    699 F.2d 334, 336 (6th Cir. 1983) ....................................................................... 20

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*,
    494 U.S. 558, 570 (1990) ..................................................................................... 11

*City of Lansing v. Twp. of Lansing*,
    97 N.W.2d 804, 809 (Mich. 1959) ....................................................................... 14

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249, 254 (1992) ..................................................................................... 15

*Dehna v. Jacob*,
    179 Mich. App. 545, 549 (1989) .......................................................................... 19

*Feld v. Robert & Charles Beauty Salon*,
    435 Mich. 352, 362 (1990) ................................................................................... 15

*Ford Motor Co. v. Woodhaven*,
    475 Mich. 425, 438, 716 N.W.2d 247 (2006) ..................................................... 14

*Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.*,
    No. 12-CV-1005, 2014 WL 3573723 (W.D. Mich. July 18, 2014) ............. 19, 20, 22

*Hoerstman Gen. Contracting Inc. v. Hahn*,
    474 Mich. 66, 74 (2006) ...................................................................................... 15

*Joerger v. Gordon Food Serv., Inc.*,
    568 N.W.2d 365, 369-70 (Mich. App. 1997) ...................................................... 20

# TABLE OF AUTHORITIES

**Page**

*Kent v. Klein*,
   91 N.W.2d 11, 13-14 (Mich. 1958). ........................................................ 12

*Kratze v. Indep. Order of Oddfellows,*
   *Garden City Lodge No. 11*,
   442 Mich. 136 (1993) ........................................................ 18, 19, 21

*Manuel v. Gill*,
   481 Mich. 637, 647-48 (2008) ........................................................ 11

*Murray v. Wolverine Pipe Line Co.*,
   No. 257121, 2005 WL 3556148 (Mich. Ct. App. Dec. 29, 2005) ........................ 19,22

*Nation v. W.D.E. Elec. Co.*,
   454 Mich. 489, 504 (1997) ........................................................ 17

*Robinson v. City of Lansing*,
   486 Mich. 1, 21 (2010) ........................................................ 17

*SEC v. Quinlan*,
   373 F. App'x 581, 587 (6th Cir. 2010) ........................................................ 11

*Szymanski v. Brown*,
   221 Mich. App. 423, 430-31, 562 N.W.2d 212, 216 (1997)........................................ 19

*Waltz v. Wyse*,
   460 Mich. 642, 665-66 (2004) ........................................................ 16

*Wheaton v. McCarthy*,
   800 F.3d 282, 287 (6th Cir. 2015) ........................................................ 16

## Other Authorities

MCL § 324.20135a ........................................................ 1, 9, 11, 13, 14, 17

Sands, Sutherland Statutory Construction
   [4th ed.] § 47.24 ........................................................ 15

Newell Brands Inc. f/k/a Newell Rubbermaid Inc. ("Newell") submits this Memorandum in Support of its Motion for Summary Judgment.

## I.   PRELIMINARY STATEMENT

Defendant Kirsch Lofts, LLC ("Kirsch") seeks damages under the Michigan statute, Mich. Comp. Law § 324.20135(a)(1)(a) (the "Access Statute").[1]  Kirsch claims lost profits, lost tax credits, lost incentives, carrying costs, and lost return on investment under the Access Statute, which allows only compensation to the land owner "***for damages related to the granting of access to the property*** . . . . "  Mich. Comp. Laws § 324.20135a(1)(a) (emphasis added).

As set forth more fully below, Kirsch is not entitled to an award of damages for at least three main reasons:  First, the Access Statute does not provide for recovery of damages from just any cause.  Rather, by its plain terms, it allows only for compensation resulting from the Court's order allowing an invasion of Kirsch's possessory interest.  Kirsch has not presented any evidence that its alleged injury resulted from the Court's 2015 order allowing Newell to access the Property.  Second, there is no disputed issue of fact that the injury of which Kirsch complains results from a risk it voluntarily assumed.  The Access Statute's remedies, being equitable in nature, should not respond in instance where the "injured" party could have foreseen the risk of harm.  Third, even if the Kirsch theory of damages could fit within the statute, the damages it claims are too speculative and therefore not recoverable.  Accordingly, judgment should be entered in Newell's favor on Kirsch's counterclaim.  If the Court decides that Kirsch is entitled to compensation, then the Court should enter an order providing for phased compensation (to be paid as access occurs) for an amount totaling $72,964.

---

[1]      *See infra* at 8-10.

1

II.     **FACTUAL AND PROCEDURAL BACKGROUND**

A.     **Kirsch Knew the Property was Contaminated and Bought it Anyway.**

The Property is a portion of a former Cooper Industries facility located in Sturgis, Michigan.  The facility was operated by the Kirsch Division of Cooper Industries and was known as Kirsch Plant No. 1.  *See* ECF No. 1 ¶ 1.  The Kirsch Plant No. 1 was divided by Prospect Street into two parcels.  The Property is the western parcel and has a street address of 308 N. Prospect Street.  The eastern parcel has a street address of 309 N. Prospect Street.  The former Kirsch Plant No. 1 is a federal Superfund site listed on the EPA's National Priorities List ("NPL").  *See* ECF No. 1 ¶ 34; ECF No. 8 ¶ 34.

Kirsch acquired the Property on July 10, 2009 with a plan to redevelop the Property into mixed residential and commercial development.  ECF No. 1 ¶ 33; ECF No. 8 ¶ 33.  Kirsch knew when it bought the Property that it was on a federal Superfund site.  ECF No. 1 ¶ 34; ECF No. 8 ¶ 34.  Kirsch also had done enough due diligence to establish that the Property was contaminated, thus qualifying it as a "facility" under state law, and as such, a brownfield site which qualified it for Brownfield Redevelopment Grants and Loans, as well as favorable tax treatment.  *See* Ex. A, Scott Bosgraaf Apr. 13, 2016 Dep. Tr. ("Bosgraaf Day 1") at 38:12-14 ("we found enough contamination to determine it to be a facility so I could go after my Brownfield credits that I needed."); *id*. at 50:18-20 ("I think that we all knew that there was obviously soil contamination . . . which it needed to be in my world.").

The pre-acquisition due diligence testing, however, also showed that the soils on the Property were significantly contaminated to a degree that would require additional testing and remediation.  The majority of the soil samples analyzed by ERE (Kirsch's first environmental due diligence consultant) exceeded the cleanup level for TCE, a primary chemical of concern at

the Sturgis NPL site.  Ex. C, Mark Westra Dep. Tr. ("Westra Dep.") at 59:10-18.[2] The ERE

testing reported a value for TCE of 14,000 ppb, a result that was an order of magnitude higher

than any other sample ever collected on the site, including the testing done by the Michigan

Department of Environmental Quality ("MDEQ")  in the early days of the Superfund project.  *Id*.

at 59:23:60-1; Ex. D, Expert Rep. of Scott Hayter ("Hayter Rep.") at 3.

Rose & Westra was retained by Kirsch to replace ERE, and reviewed the ERE pre-

acquisition test results.  Ex. C, Westra Dep. at 55:16-19; 56:12-15.  Rose & Westra conducted its

own testing of the site soils on the Property prior to Kirsch's acquisition of the Property.  *Id*. at

61:19-62:2.  Seven of the ten initial samples collected by Rose & Westra likewise exceeded the

Superfund cleanup level, with six of the samples exceeding the relevant cleanup level by a factor

of ten.  *Id*. at 63:15-64:1.  The testing done by Kirsch's consultants revealed significant soil

contamination, but did not fully define the lateral or vertical extent of contamination on the

Kirsch Property.  *Id*. at 64:8-12; 70:12-20.  Kirsch's consultant understood – prior to Kirsch's

acquisition of the Property – that significant additional testing and data evaluation would be

necessary, followed by remediation activity as part of the Superfund remedy.  *See* Ex. C, Westra

Dep. at 79:7-9; 80:23-25; 82:18-83:1; 85:6-14; 89:20-23.[3]

---

[2]      Newell understands that Kirsch intends to present Arthur Siegal, Mark Westra and Scott Bosgraaf as expert witnesses with respect to various topics.  Newell does not concede, and reserves the right to contest, the admissibly of Siegal's, Westra's and Bosgraaf's testimony under Fed. R. Evid. 702.

[3]      Newell's pursuit of documents related to this topic has been catalogued elsewhere, most recently in its Motion to Compel Production filed yesterday.  Summarized here, Kirsch retained Rose & Westra to perform pre-closing investigation and diligence and, represented in litigation that all such documents had been produced.  *See* ECF No. 79-2 ¶ 7.  Westra, in turn, testified that he maintained a file about the site and it **had not** been collected or produced.  *Id*.  Likewise, the law firm of Warner Norcross & Judd LLP advised Kirsch on various issues.  *See, e.g*., Ex. A, Bosgraaf Day 1 at 12:12-17.  Kirsch testified that its consultants and attorneys had conversations with regulators that to which Scott Bosgraaf was not a party.  *See id*.; *see also id*. at 40:18-41:25.

Despite the results of the environmental testing indicating that there was significant soil contamination that would require additional testing and remediation under the Superfund process, Kirsch closed on its purchase of the Property on July 10, 2009.  There is no dispute that Kirsch possessed sufficient information prior to closing to determine that the soil contamination detected on the Property would require significant and lengthy response actions under CERCLA. Ex. D, Hayter Rep. at 5; Ex. A, Bosgraaf Day 1 at 38:8-10; 39:18-24; 124:14-20;162:4-9.

B.      **Post-Purchase Environmental Testing.**

After acquiring the Property in July 2009, Kirsch submitted a Baseline Environmental Assessment ("BEA") prepared by Rose & Westra in fall 2009 to the MDEQ.  The BEA was dated September 4, 2009, but was not submitted to the MDEQ until late October 2009.  *See* Westra Dep. at 66:7-14,  The BEA submitted all of the pre-acquisition soil test data that Kirsch collected during due diligence.  Ex. C, Westra Dep. at 68:10-19; Ex. E, Baseline Environmental Assessment.  The data showed the soil contamination exceeded Michigan Part 201 objectives for the pathway of Residential Drinking Water Protection. *See supra* at 2-4; *see also* Ex. D, Hayter Rep. at 4.

In early 2010, the MDEQ asked Newell to conduct an expanded soil investigation to determine the full extent of contamination above remediation standards.  ECF No. 1 ¶ 43; ECF No. 8 ¶43; Hayter at 4.  Kirsch allowed Newell access to conduct the expanded soil investigation.  *See* ECF No. 1 ¶ 48, ECF No. 8 ¶ 48; Ex. F, David Meiri June 3, 2016 Dep Tr. ("Meiri Day 1"), at 23:1-10, 26:20-23.

---

Other than a stray comment in Kirsch's deposition that John Byl had advised it "early on . . . that Newell [] will decide when you're going to build the project, and it may be with no delay and it may be a long time," *id*. at 162:4-9, Newell has been deprived of any opportunity to meaningfully understand what Kirsch knew about site conditions and when.

4

Based on the results of the 2010 testing, on April 14, 2011 MDEQ issued a Notice of Additional Response Activities, which required that Newell submit a plan for addressing the newly discovered conditions.  *See* Ex. H, Notice of Additional Response Activities, Ex. F, Meiri Day 1 at 87:19-88:9.  MDEQ approved Newell's plan in September 2012.  *Id.* at 88:5-9; 98:2-14; 98:23-99:18.  The first step in the MDEQ-approved plan was to design a leachate study that could support the development of alternative cleanup criteria for TCE in soils.  *See* Ex. I, Aug. 22, 2012 Revised Plan For Additional Response Activities, at DEQ0000529.  MDEQ approved the leachate study work plan in 2013.  *See* Ex.J, May 8, 2013 MDEQ Approval of Revised Plan for Soil Leach Testing in the Former Kirsch Plant No. 1 Source Area.  Kirsch and Newell entered into an access agreement allowing access to conduct the leachate study data collection. *See* ECF No. 8 ¶ 60.

The final leachate study report was submitted to MDEQ in November 2015.  *See* Ex. K, Nov. 9, 2015 URS – Final Leach Testing Report, Former Kirsch Plant No. 1 Source Area, Sturgis Municipal Well Field, Superfund Site, Sturgis Michigan; *see also* Ex. G, David Meiri June 9, 2016 Dep. Tr. ("Meiri Day 2") at 178: 4-15.  Thereafter, MDEQ tentatively approved alternative cleanup objectives for the site.  *Id.* at 178:20-25.

###        C.        The Development Project and Access Negotiations.

Kirsch commenced work on the development project in 2009.  Ex B, Scott Bosgraaf June 9, 2013 Dep. Tr. ("Bosgraaf Day 2") at 58:20-59:8.  Kirsch stopped its construction on the Property by September 2010.  ECF No. 1 ¶ 44; ECF No. 8 ¶ 44; Ex. A, Bosgraaf Day 1 at 101:14-103:02.

While Kirsch had allowed Newell access to the Property on two occasions in 2010 to conduct the comprehensive soil investigation, in January 2011 Kirsch notified Newell that it

would no longer allow access to the Property, except for access granted under a 1998 easement. ECF No. 1 ¶ 48; ECF No. 8 ¶ 48.  Newell tried to negotiate with Kirsch for access while it continued working with the MDEQ on its plan for additional response activities.  *See* ECF No. 8 ¶¶ 48-50.

As noted above, in 2013, the parties entered into a limited access agreement allowing for testing to support the leachate study, the compensation for which is subject to a confidentiality clause.  ECF No. 1 ¶¶ 49, 52-68; ECF No. 8 ¶¶ 49, 52-68.  But after years of trying to negotiate a global access agreement, the parties remained far apart, with Newell offering to pay for access in an amount tied to the value of the Property, and Kirsch demanding compensation for its lost business opportunity, including lost investment and carrying costs, similar to the categories of damages it now claims in this action.  *See* ECF No. 1 Ex. P; ECF No. 8 ¶¶ 65-68.

Newell filed its Complaint in 2015, seeking a court order for access to perform its government-mandated remediation activities.  ECF No. 1.  The parties stipulated to an order granting Newell access to the Property, which the Court entered on September 8, 2015.  ECF No. 20.

### D.  Kirsch's Claimed Damages Exceed the Value of the Property and its Proposed Development Is Unlikely To Succeed.

Kirsch's claims are premised on the assumption that it could have successfully completed the proposed development plan – a plan that is entirely inconsistent with the needs of the community and is unlikely to succeed.  Kirsch's proposed development would occur in three phases: (1) Residential; (2) commercial space; and (3) more residential.  Ex. L, Expert Report of Jeffrey Genzink ("Genzink Rep.") at 23.  Kirsch proposed building 35 to 50 condominiums on the Property and selling those units for, on average, $125,000.  *Id.* at 30; *see also* Ex. M, Kirsch Lofts, LLC Brownfield Redevelopment MBT Credit Application, at KIRSCHLOFTS000814.

6

Newell retained Jeffrey Genzink ("Genzink"), a professional appraiser, to evaluate

Kirsch's proposed development plans. His unrebutted conclusions include:

- The population of Sturgis is 11,007 and the median income is $36,444 (Genzink Rep. at 25);

- There is minimal demand for condominiums in Sturgis, comparable condominium units in Sturgis sell for prices ranging from $12,000 to $39,000, and the median sales price of single family residences in Sturgis is $67,000 (*Id*. at 30);

- The population, a primary driver of housing demand, is unlikely to grow significantly (*Id*.); and

- The highest and best use of the Property "is to hold for future redevelopment." (*Id*. at 39-40).

Beyond this, Kirsch's claimed losses are far more than the Property is currently worth or

will likely be worth in the future, even if the development was finished as proposed.  *Compare*

Ex. L, Genzink Rep. at 45 with Ex. P, Kirsch's Third Suppl. 26(A) Disclosures ("Third Suppl.

Disclosures").

Kirsch's claimed losses also greatly exceed what could be reasonably claimed as

compensation for Newell's access to the Property for environmental remediation.  Kirsch paid

$57,544.25 for the Property in 2009.  Ex. L, Genzink Rep. at 7.  The building on the Property is

an approximately 103,337-square-foot "shell" without interior finish, windows, heating/cooling,

plumbing fixtures or electrical fixtures.  *Id*. at 18.  The "market value" of the Property, using the

"sales comparison approach"[4] is $390,000.  *Id*. at 45.

Based on the market value of the Property, a reasonable estimate of the compensation for

a license for Newell to access the Property for 65 months to perform the planned environmental

---

[4]     In common terms, calculating the value by comparing the Property to similar properties.

remediation is **$72,964**.[5]  Ex. L, Genzink Rep. at. 47-49. Newell expects the remediation to take place in phases and, if the Court decides that Kirsch has been or will be injured by Newell accessing the Property and that it has suffered or will suffer damages as a result of Newell accessing the Property, a reasonable estimate of the costs of a license to access the Property is as follows:

| | | |
|---|---|---|
| Engineering and Design | | $148 |
| Phase 1 | | $18,056 |
| Phase 2 | | $44,992 |
| Phase 3 | + | $9,768 |
| Total | | $72,964 |

### E.   Kirsch's Alleged Losses Far Exceed the Property's Value and What is Recoverable Under Michigan Law.

Despite the realities of the Sturgis market, described above, Kirsch continues to pursue categories of damages that are unmoored from the Court's grant of access and are exponentially higher than the Property's appraised value.  *See supra* at 7.  On December 7, 2015, Kirsch served its Supplemental Rule 26(a)(1) Initial Disclosures, identifying claimed damages totaling nearly $8.5 million, including the following "potential losses resulting from Newell's ongoing need to access the Property":

**Lost Tax Credits/Incentives**

| | |
|---|---|
| Brownfield Redevelopment MBT Credit | $1,690,000.00 |
| New Markets Tax Credit (39% of total allocation) | $4,212,000.00 |
| Brownfield TIF Reimbursement (6 years off the end of payment period) | $1,011,901.00 |

---

[5]      Kirsch has not presented any evidence whatsoever as to the value of the Property, or as to the reasonable rate for a license to access it.  Kirsch has explicitly disclaimed costs associated with access for tasks like groundwater monitoring. Ex A, Bosgraaf Day 1 at 118:5-119:3.

**Loss of Profits / Carrying Costs**

| | |
|---|---|
| Return on investment for a six-year delay | $1,070,487.23 |
| Carrying costs for 6 years | $  150,000.00 |
| Depreciation on buildout for 6 years (roof, media blasting, etc.) | $  240,000.00 |

*See* Ex. N, Kirsch's Supp. R. 26(a)(1) Initial Disclosures, at 1-2.  This disclosure make clear that Kirsch's compensation claim extends for the nearly six years prior to the Court's grant of access under MCL § 324.20135a(1)(A).

Kirsch's claimed categories and amounts of losses have shifted substantially in the weeks leading up to the filing of this Motion.  In March 2016, Kirsch added a category called "Increase in Construction Costs for 6 year delay," claiming that construction costs for the development project had increased $2,181,220.00 since 2010, despite a global recession and a near-collapse of the real estate and construction industries during those years.  *See* Ex. O, Second Suppl. Rule 26(a)(1) Disclosures.  Kirsch "supplemented" its disclosures a third time on April 11, 2016, in conjunction with the service of its expert reports, reducing some categories of damages substantially, increasing others, and adding a new categories of damages for "Loss of DEQ Grant Funds" resulting in an slight overall increase in damages.  *See* Ex. P, Third Suppl. Disclosures.

Over the course of a two-week time period, Kirsch's alleged losses fluctuated by millions of dollars.  On June 12, 2016, Kirsch adjusted its claims downward, after Newell's expert established that Kirsch had miscalculated the amounts it could receive in Brownfield TIF Reimbursement, DEQ Grants, and New Markets Tax Credit Allocations.  *See* Ex. Q, Expert Report of Richard A. Barr (Barr Rep.) at 5-6, 12, 28; Ex. T, June 12, 2016 Expert Report of Arthur Siegal ("Second Siegal Rep.") at 5-11. As of June 12, 2016, Kirsch claimed $4,626,908 in

lost tax credits and incentives and $4,571,219.31 in lost profits and carrying costs, for a total of

$9,198,127.31.  *See* Ex. T, Second Siegal Rep at 11.

## III.   ARGUMENT

Newell is entitled to summary judgment because there is no material *factual* dispute

between the parties on the issue of compensation available under the Access Statute.  Instead, the

parties have a *legal* dispute on the issue of compensation:

- **Newell's position:** The Access Statute does not require the Court to make a
  compensation award; instead the statutory language is permissive, indicating the
  Court has discretion to make an award so the remedy is equitable in nature. Even
  then, the compensation available under the Access Statute is limited to compensation
  caused by the court's order granting access; *i.e.*, it is akin to damages available under
  the tort of trespass, with the Court's inquiry focused on (a) the value of the Property;
  and (b) what percentage of the property's value is affected by the access ***granted*** by a
  Court; and

- **Kirsch's position:** The Access Statue provides compensation for any injury, delay, or
  disruption to the development of the property that arises from the Potentially
  Responsible Party's need to remediate.

Kirsch's theory is legally unsupportable and, for the reasons set forth in greater detail

below, Newell is entitled to summary judgment.

### A.   Standard of Review.

Summary judgment is appropriate when the record evidence establishes that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law.  Fed. R. Civ. P. 56(a).  The burden is on the moving party to show that no genuine issue of

material fact exists, but that burden may be discharged by pointing out the absence of evidence

to support the nonmoving party's case.  Fed. R. Civ. P. 56(c)(1); *Bennett v. City of Eastpointe*,

410 F.3d 810, 817 (6th Cir. 2005).

**B.     The Access Statute's Remedies are Equitable, Not Legal.**

The Access Statute is primarily concerned with injunctive relief, *i.e.* to allow a liable

party to petition a court for "access to the facility in order to conduct response activities."  MCL

§ 324.20135a(1).  When such a petition is granted, the relief is an injunction establishing what

amounts to a temporary and limited easement on the property.  To prevent obstruction or

interference with this quasi-easement, the legislature included Subsection (b) of the Access

Statute which provides for injunctive relief to "[e]njoin interference with the response activities."

MCL § 324.20135a(1)(b).  So far, everything about the Access Statute is equitable, not legal.

Compensation under the Access Statute is also equitable – not legal – because it merely

seeks to restore the status quo at the time of the grant of access and not meant to be punitive.  *See*

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 570 (1990); *SEC v.*

*Quinlan*, 373 F. App'x 581, 587 (6th Cir. 2010).  The compensation provision of the Access

Statute exists to limit what otherwise could be an extraordinary power provided under the

preceding grant of an eminent-domain like authority to a Court.  This choice to establish an

equitable vehicle is emphasized by the Legislature's choice to use the word "may" in Subsection

(1) ("the court may . . . provide compensation").  "May," in contrast to "shall," is a permissive

word choice, which demonstrates that the Legislature intended for courts to utilize discretionary,

and thereby equitable powers, when it crafted the Access Statute.  *See, e.g*., *Manuel v. Gill*, 481

Mich. 637, 647-48 (2008) (stating "may" is "permissive," whereas "shall" is "mandatory")

(citations omitted).

**C.     Equity Precludes Granting Kirsch "Compensation" Stemming from**
         **Foreseeable Problems.**

Principles of equity compel the Court to consider the level of diligence Kirsch exercised

leading up to the transaction as part of its examination of what Kirsch could reasonably have

11

anticipated at the time the transaction closed.  This is particularly true given that Kirsch's development plans apparently hinged on there being virtually no interruption to its development activities, notwithstanding the contamination that Kirsch itself highlighted in its pre-closing investigation activities.[6]

Kirsch offers no testimony to rebut Newell's evidence that Kirsch knew or should have known that remediation of the Property would be complex and time-consuming at the time it purchased the Property.  Indeed, Kirsch's experts – to the extent they have opined – testified that delays incidental to the CERCLA investigation, characterization, or remediation are predictable. Kirsch's environmental consultant admits that Kirsch knew before closing on the Property that the majority of the soil samples taken by Kirsch's first environmental consultant exceeded the cleanup level for TCE for the Superfund site. Ex. C, Westra Dep. at 59:10-18.  Once Rose & Westra was retained, seven of the ten initial samples it took likewise exceeded the Superfund cleanup level, with six of the samples exceeding the relevant cleanup level by a factor of ten.  *Id.* at 63:15-64:1.  Westra testified that he could not recall reviewing the Sturgis NPL Record of Decision ("ROD") to understand whether ongoing Superfund work could complicate site redevelopment.  *Id*. at 75:25-76:8.  He further testified that he "probably" advised Kirsch that there would be additional investigation performed on the Property as a result of the testing, but

---

[6]        "A court of equity will not relieve a party from the [legal] consequences of a risk which he voluntarily assumes . . . ." *Blunt v. Brown*, 37 N.W.2d 671, 673 (Mich. 1949) (internal citation omitted).  Equity "will not permit one to enrich himself at the expense of another by closing his eyes to what is clear to the rest of mankind.  Equity . . . regards that as seen which ought to be seen, and having so seen, as done that which ought to be done."  *Kent v. Klein*, 91 N.W.2d 11, 13-14 (Mich. 1958).

that he could not recall having done so. *Id.* at 83:12-84:2.[7] Kirsch had information before closing that soil contamination would require significant and lengthy CERCLA response actions similar to those which had occurred elsewhere at the Sturgis NPL site. *See supra* at 2-4; *see also* Ex. D, Hayter Rep. at Opinion 1.

Given the iterative nature of CERCLA, Kirsch should have reasonably expected that its development timeline could be compromised by the pre-existing (if not fully characterized) environmental conditions at the Property. Kirsch presents no factual evidence countering Newell's evidence that Kirsch knew or should have known that the contamination it found on the Property posed unacceptable risk to groundwater and would require lengthy and significant response actions under CERCLA. *See supra* at 2-4. Principles of equity prevent Kirsch from recovering losses related to conditions it knew existed at the time of purchase.

**D. Kirsch's "Interpretation" of the Access Statute Fundamentally Alters Its Meaning.**

Kirsch seeks damages that are related to its stalled development, not compensation related to the access that the Court granted Newell to perform remediation. The Access Statute provides a procedure under which a court can grant access to land needed for remediation in exchange for an award of certain compensation.[8] In exchange for granting access, Section 324.20135a(1)(a) provides that a Court may require Newell to "[p]rovide compensation to the property owner . . . for damages **related to the granting of access to the property**, including

---

[7]     Because Kirsch declined to collect Rose & Westra's files – a motion to compel production of which was filed on June 30, 2016 – Newell possess only an incomplete picture as to what Kirsch knew leading up to the closing.

[8]     Section 324.20135a(1) provides that "[a] person who is liable under section 20126 . . . may file a petition . . . seeking access to the facility in order to conduct response activities approved by the department." There is no dispute among the parties that Newell is entitled to file a petition under this section. ECF No. 1 ¶ 102; ECF No. 8 ¶ 102.

compensation for loss of use of the property." (Emphasis added.)[9]  The parties' main

disagreement in this matter is to what this phrase means: Kirsch gives an expansive reading to

the phrase while Newell's is narrower.

Newell submits that its interpretation is the only proper reading of the phrase based on

the following: *first,* the language the Michigan Legislature chose when it passed this statute; and

*second*, the clear need for the statute, *e.g.*, to balance the social need to grant access necessary for

site remediation with the private need of individual landowner to quietly enjoy their land.  These

issues are discussed in turn.

### 1.    A plain reading Section 324.20135a(1) supports that Kirsch's claims are outside the scope of permissible compensation.

Section 324.20135(a)(1)(a) requires Newell to "[p]rovide compensation to the property

owner . . . for damages **related to the granting of access to the property**, including

compensation for loss of use of the property." There are no cases interpreting this statute.

The primary goal of statutory interpretation is to give effect to the intent of the

Legislature.  *Ford Motor Co. v. Woodhaven*, 475 Mich. 425, 438, 716 N.W.2d 247 (2006).

"[When] interpreting a statute a court should always turn to one cardinal canon before all others .

. . . [C]ourts must presume that a legislature says in a statute what it means and means in a statute

what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).  Indeed, "when the

---

[9]    Indeed, it may be that Kirsch misunderstands the language of the statute, which refers to the "granting of access" and not "access" broadly construed.  *See* ECF No. 8 at Counterclaim, Count I ("Kirsch is entitled to an order awarding it reasonable compensation for damages related to Newell's access to the Property . . . .").  Omitting the phrase "granting of" fundamentally changes the meaning of the statute.  "Courts of equity . . . must apply legislative enactments in accord with the plain intent of the legislature.  An argument that a statute as construed may . . . work great hardship is one that should be addressed to the legislature rather than the court."  *City of Lansing v. Twp. of Lansing*, 97 N.W.2d 804, 809 (Mich. 1959) (citations omitted).

words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.*

Three points are clear from the plain language of the statute:

***First***, the statute **does not** do the following: (1) provide any general authorization to sue regarding pre-existing losses related to land; (2) modify any time periods imposed by environmental regulators for the performance of investigation, characterization, or remediation activities; or (3) provide any concrete property right related to Brownfield tax grants (or anything else) which could be altered by the modifications of a pre-existing regulatory timeframe. Kirsch's claimed damages largely require this subsection to be read as doing one of these things and thus preserving Kirsch's expected return on its investment. [10]

The simple language of the relevant subsection makes it clear that it does not provide a general authorization for damage claims related to a party's expectations as to when remediation might be complete.[11]  The standard canon of interpretation, *expressio unius est exclusio alterius* ("the express mention of one thing excludes all others"), drives this point home.[12]  It characterizes the general practice that "'when people say one thing they do not mean something else.'" *Feld v. Robert & Charles Beauty Salon*, 435 Mich. 352, 362 (1990) (quoting 2A Sands, Sutherland Statutory Construction [4th ed.] § 47.24).  The plain language of the statute provides

---

[10]     Indeed, it is inarguable that Newell accessing the Property pursuant to the Court's 2015 order is not the reason why the project has stalled.  The development project was stalled long before the Court ordered access occurred.

[11]     Certainly, factual disputes between the parties exist as to why and how remediation could have occurred.  However, concluding that the statute does not provide a general cause of action related to remediation damages requires neither an evaluation of why Kirsch's physical construction activities stopped in 2010, nor any evaluation of whether Newell could or should have acceded to Kirsch's demands for broader compensation earlier.

[12]     This canon has been described as "a rule of construction that is a product of logic and common sense."  *Hoerstman Gen. Contracting Inc. v. Hahn*, 474 Mich. 66, 74 (2006).

"compensation for loss of use" only "related to the granting of access."  The Court should follow the Legislature's explicit choice to limit damages to those "related to the granting of access."

*Second*, the plain language of the stature provides that any damages **must be** "related to the granting of access," and **not** to "access" generally.  Michigan courts, like courts elsewhere, use dictionaries to evaluate the meaning of legislative acts.  *See, e.g.*, *Wheaton v. McCarthy*, 800 F.3d 282, 287 (6th Cir. 2015) ("In determining [a term's ordinary] meaning, dictionaries are a good place to start" (internal quotation marks omitted)).  "Related" means "connected by a reason of an established or discoverable relation."  *See* Merriam-Webster Dictionary, located at http://www.merriam-webster.com/dictionary/related.  In turn, "granting of access," building on the preceding subsection of the statute, relates to court involvement, fitting in with the whole of the statutory subsection.  Interconnected statutory language is to be read as part of a common legislative framework. *Waltz v. Wyse*, 460 Mich. 642, 665-66 (2004).  Kirsch's claimed damages run back **six years** before Newell's Complaint initiated this case.  Damages occurring years before an event cannot be said to be "related" to it.[13]

Kirsch has not shown that its claimed damages were caused by the Court granting Newell access to the Property in 2015,[14] or that it will suffer damages in the future as a result of the Court's access order. If Kirsch is allowed to recover damages unrelated to the grant of access,

---

[13]    Kirsch halted all physical construction activities at the Property by winter 2010. ECF No. 8 ¶ 44.

[14]    Indeed, Kirsch denies that it has suffered **any** damages as a result of the physical grant of access. Ex. A, Bosgraaf Day 1 at 118:5-119:3.

then the statute essentially has no time limitation, which cannot be what the Legislature intended because it materially alters the function of the statute.[15]

*Third*, the Legislature intentionally positioned the phrase "compensation for loss of use" subordinate to a "grant of access." When "interpreting a statute, we [must] avoid a construction that would render part of the statute surplusage or nugatory.'" *Robinson v. City of Lansing*, 486 Mich. 1, 21 (2010) (citation omitted) (alterations in original). Kirsch's claimed damages require the Court to replace the primary phrase "granting of access" with the subordinate phrase, "compensation for loss of use." Doing this effectively cuts the phrase "the granting of access" from the relevant subsection.[16] This is inherently improper, and Kirsch's claimed damages that flow from it must fail as a matter of law.

### 2. The context in which Section 324.20135a(1) was enacted likewise renders Kirsch's claimed damages outside those which are available.

A second factor favoring Newell's construction of this subsection is that it represents what amounts to a change to the common law of trespass to balance the quasi-eminent domain aspects of the broader Access Statute, and should thus be construed narrowly. *E.g.*, *Nation v. W.D.E. Elec. Co.*, 454 Mich. 489, 504 (1997) (citing cases). Courts assume that the Legislature acts deliberately when it changes pre-existing common law rights and obligations; courts are not to add additional progressive policy preferences into the mix. *Id.* ("Where there is doubt

---

[15] Indeed, "caused" would be an inappropriate term in this circumstance because the proximate "cause" of events like groundwater monitoring or installation of a remediation system would not be "granting of access," it would likely be a suggestion by regulators that the event should happen. "Related to the granting of access" may be the narrowest plausible term because "granting of access" subsumes the regulatory demand (*i.e.* "[a] person who is liable under section 20126 . . . may file a petition") generating liability in MCL Section 324.20135a(1).

[16] The Court's Order on Stay, ECF No. 48, notes that "'loss of use of property' . . . is fairly open-ended." *Id.* at 3. While the phrase may be rendered open-ended when out of context, the Legislature structured the subsection's provisions – and made grammatical choices related to 324.20135a(1) – which render it more narrow, and not ambiguous, when read in its context.

17

regarding the meaning of such a statute, it is to be given the effect which makes the least rather than the most change in the common law") (internal citation omitted).  If the Legislature wanted – as Kirsch would have it – to create a new tort which could result in damages exponentially higher than the value of the land and with no temporal limitation – something unique among causes of action – it would have said so.  It didn't.

The Access Statute is an equitable statute with one provision that allows for limited reimbursement related to access granted under the Access Statute.  Awarding Kirsch's claimed damages would require the Court to allow damage claims which are supported only by the inference that some access to the Property *might someday* be necessary.  These "*might someday access*" damages are fundamentally at odds with damages typically awarded at trespass, which are – for a permanent trespass – the diminution in value of the property itself, as represented by the value without the encroachment minus the value with the encroachment.  *See Kratze v. Indep. Order of Oddfellows, Garden City Lodge No. 11*, 442 Mich. 136, 150 (1993); *see also Bayley Prods., Inc. v. Am. Plastic Prods. Co*., 30 Mich. App. 590, 598 (1971) ("It is the settled law of [Michigan] that the measure of damages to real property, if permanently irreparable, is the difference between its market value before and after the damage . . . [I]f the injury is reparable, and the expense of repairs is less than the market value, the measure of damage is the cost of the repairs.").

Here, the "damage" caused by Newell's access to the Property – and not by contamination Kirsch should have realized posed a burden to its development schedule – is limited in scope such that Kirsch claims Newell's access since September has not injured it. *See* fn.14.  Accordingly, it should be treated like a minor encroachment, and Kirsch should be awarded, at most, the value of a license granted to Newell to use the land for the sole and

temporary purpose of completing the remediation, which Newell's expert has estimated to be $72,964 (which Kirsch has presented no evidence to rebut). *See Kratze*, 442 Mich. at 151 (awarding trespass plaintiff only the value of the 1.2 square feet of land covered by the encroachment where "the encroachment did not devalue the property.").

Alternatively, Kirsch's damages should be capped as the difference between the value of the land prior to granting access to Newell and the value of the land after granting access to Newell. *See Kratze*, *supra*; *see also Szymanski v. Brown*, 221 Mich. App. 423, 430-31, 562 N.W.2d 212, 216 (1997) ("Damages in an action for trespass to land generally are measured by the difference between the value of the land before the harm and the value after the harm."). Again, Kirsch has not offered any evidence that Newell's accessing the Property has diminished the value of the Property and, accordingly, Newell is entitled to summary judgment under this measure of damages.

### E. Kirsch's Alleged Lost Profits and Incentives Damages Are Too Speculative to be Awarded as a Matter of Law.

Summary judgment also is appropriate for the separate reason that Kirsch's alleged damages all assume the speculative success of a hypothetical development that will take years to complete. Even if those damages were recoverable as "compensation" under the Access Statute (they are not), Kirsch's alleged damages are too speculative to be recovered under Michigan law.

In Michigan, damages must be proven "subject to a reasonable degree of certainty" and "cannot be based solely on mere conjecture or speculation." *Dehna v. Jacob,* 179 Mich. App. 545, 549 (1989) (citing *Bonelli v. Volkswagen of America, Inc.,* 166 Mich. App. 483, 511 (1988)). "A court should grant summary judgment if a plaintiff has not presented evidence to take the fact of lost profits beyond the realm of speculation." *Fredonia Farms, LLC v. Enbridge Energy Partners, L.P.,* No. 12-CV-1005, 2014 WL 3573723, at *9 (W.D. Mich. July 18, 2014)

19

(Quist J.) (citing *Murray v. Wolverine Pipe Line Co.,* No. 257121, 2005 WL 3556148, at *2

(Mich. Ct. App. Dec. 29, 2005)).  As explained below, the Court should grant summary

judgment to Newall on Kirsch's damages claims.

     *Fredonia Farms* is instructive.  In that case, the court granted summary judgment to

defendant in a negligence and nuisance action on the issue of whether the developer plaintiff

could recover lost profits after an oil spill prevented him from developing his land into a

community vineyard.  In so holding, the court stated that:

> In the end, the Zinnyard was simply a novel concept that did not have the chance
> to develop. The Zinnyard had not obtained necessary permits, begun construction,
> planted a single grape, or made a single sale. The Court recognizes that Plaintiffs
> lost the opportunity to develop that concept through no fault of their own.
> However, even if Plaintiffs were "robbed of the opportunity forever to attain the
> profits that [they] would have made from selling parcels, selling homes, and
> running a series of operating businesses," as Falanga has asserted . . . that does
> not necessarily mean that they may be compensated for the loss of that
> opportunity. ***To obtain damages for their lost opportunity, Plaintiffs must
> demonstrate with reasonable certainty that the project would have gone to
> market, and that it would have been profitable***. They have not done so.

*Fredonia Farms,* 2014 WL 3573723, at *8 (emphasis added); *see also Joerger v. Gordon Food

Serv., Inc.*, 568 N.W.2d 365, 369-70 (Mich. App. 1997) ("If the business . . . has not had such a

history as to make it possible to prove with reasonable accuracy what its profits have been in

fact, the profits prevented are often but not necessarily too uncertain for recovery.") (citation

omitted); *Booker v. Ralston Purina Co*., 699 F.2d 334, 336 (6th Cir. 1983) (No recovery for lost

profits where "[n]ot unlike a new business, the product had yet to prove itself as a winner and

therefore profitable.") (applying Tenn. Law).

     Similarly, *Kratze* involved a trespass lawsuit by a plaintiff developer who sought

damages, including alleged losses from his inability to develop his property, as result of

defendant's trespass.  The Michigan Supreme Court stated that a landowner could not recover for

lost profits from the potential development because *"damages based on a business not yet in existence, should not have been awarded." See Kratze*, 442 Mich. at 151 n.16 (emphasis added).

Like the plaintiffs in *Kratze* and *Fredonia*, Kirsch has failed to demonstrate its alleged lost profits and other damages stemming from the operation of a non-existent business with reasonable certainty.  Kirsch's alleged damages claims are based on the speculative premises that (1) Kirsch Lofts would have been built absent Newell's need for access; and (2) Kirsch Lofts would have been commercially successful. *See, e.g*., Ex. P, Third Suppl. Disclosures (claiming nearly $6 million damages based on lost tax credits and incentives); Ex. T, Second Siegal Report at 11 (claiming $4.6 million in damages based on lost tax credits and incentives); *see also* Ex. S, April 11, 2016 Expert Report of Arthur Siegal ("First Siegal Rep.") at 3 (loss of credits opinion assumes that Kirsch Lofts had in 2010-2012 and has now the financial wherewithal to do cut the intended redevelopment work at the property); Ex. T, Second Siegal Rep. at 3 (same).

Arthur Siegal, Kirsch's expert, admitted that a development like Kirsch Lofts must be commercially successful in order to realize the credits and incentives that make up the bulk of Kirsch's damages claims:

> [D]evelopers can got out and rehab buildings or sites ***but if they are in locations that no one wants to be in ultimately the incentives, the credits, all those programs are not going to make the product or the project necessarily profitable***.

Ex. U, Arthur Siegal Dep. Tr. ("Siegal Dep.") at 39:21-25 (emphasis added); *see also id*. at 56:10-14 (admitting developers do not know how many MBT credits they will receive until construction is complete).

However, Kirsch has presented no evidence that its proposed development was in a "location [anyone] wants to be in," or that it otherwise would have been successful (or even completed) absent Newell's need for access.  To the contrary, Mr. Bosgraaf could not point to

21

any market studies or other analysis supporting the viability of the proposed development.  *See, e.g.*, Ex. A, Bosgraaf Day 1 at 32:13-25 (Mr. Bosgraaf admitted that he had no knowledge of Kirsch's target market or demographics); *see also id*. at 37:15:22 (Mr. Bosgraaf did not know whether a public bus ran through the proposed development).[17]  He also admitted that at least three of his last six condo developments have been foreclosed upon, casting serious doubt on his *ipse dixit* assertions that the project would have been successful.  *See id.*  at 34:20-36:4l; *see also Fredonia Farms*, 2014 WL 3573723, at *8 ("Whether Plaintiffs would have successfully completed all the steps necessary to open the Zinnyard and found buyers, let alone made the whole development profitable, is a matter of pure speculation.").

For his part, Siegal repeatedly admitted he did nothing to verify Kirsch's assertions regarding the hypothetical success of the project.  *See* Ex. U, Siegal Dep.at 23:5-11 (did not ask to see any financial documents supporting the assumption that Kirsch had the financial wherewithal to complete the development); *id*. at 196:12-16, 199:120-200:4 (did not verify that Kirsch had obtained capital investment necessary for receipt of  New Market Tax Credits); *id*. at 56:10:14 (did not verify that Kirsch would have had maximum number of eligible investments under MBT credit pre-approval); 158:18-24 (did not verify that certain tax abatements had been approved).  Such baseless "expert" testimony cannot create "reasonable certainty" under Michigan law.  *See, e.g., Murray*, 2005 WL 3556148, at *2 (reasonable certainty not created by the "affidavit of a certified public accountant averring that Murack Lodge 'would have been profitable' during the eighteen-month period during which its opening was allegedly delayed by defendant's negligence" where "[t]he affidavit, however, is devoid of any evidence to support

---

[17]     Kirsch did produce market studies conducted by the City of Sturgis.  *See* Ex. A, Bosgraaf Day 1, at 22:16-23.  However, Kirsch has presented no testimony explaining how those studies link to the purported profitability of the proposed development.  *See id*.

such a conclusion . . . and plaintiffs presented no other data to support their claim that Murack Lodge would have been profitable during the period in question."); *see also Fredonia Farms*, 2014 WL 3573723, at *8 (reasonable certainty standard not met where "Plaintiffs have failed to provide a single market study demonstrating that they would have been able to find buyers for the Zinnyard lots.").

Kirsch has likewise failed to rebut the extensive evidence presented by Newell that casts serious doubt as to the development's potential for success, particularly given the minimal demand for condos in Sturgis. *See supra* at 6-7; *see also* Ex. L, Genzink Rep. at 30 ("From 2007 to 2015 there are has been no new construction, and minimal demand for residential condominium units" and Kirsch's proposed asking price "is significantly greater than the residential condominium sales that have sold in the City of Sturgis"); *id*. (Genzink does "not expect a significant improvement to the residential condominium market in the foreseeable future."); *id*. at 32 ("[Kirsch's] proposed rent will exceed the market rents from 2010 to 2015 and the proposed units will likely remain vacant during that period."); *id*. at 35 ("there has been minimal new demand for commercial and office use in the City of Sturgis[.]"); *id*. at 39 ("The primary demand generator for real estate development is the increase in population and household income … [T]he City of Sturgis population and median household income from 2015 to 2020 will have minimal growth."); *id*. at 39-40 (the highest and best use of the Property "is to hold for future redevelopment.").  Kirsch's failure to rebut, or even address, Genzink's testimony leaves open no issue of material fact as to the potential success of the Property and, thus, as to Kirsch's (lack of) entitlement to damages tied thereto.

Finally, even if the project *had* been successful (and Kirsch has presented no evidence that it would have been), Newell has presented evidence that the hypothetical credits and

incentives to which Kirsch claims it would be entitled are worth far less than Kirsch says they are.  *See*, *e.g.*, Ex. Q, Barr Rep. at 8-10 (Siegal overstates eligible investment for MBT credits); *id*. at 11-12 (Siegal overstates sale value of MBT credits); *id*. at 19-20 (Siegal overstates taxable value for purposes of Brownfield TIF calculations)[18]; *id*. at 31-32 (Siegal failed to account for transactional costs in calculating NTMCs).  Indeed, with respect to New Market Tax Credits, Kirsch's proposed development cannot even legally qualify.  *See* Ex. R, Barr Suppl. Rep. at  5 ("A project that has a construction period extending over six years will not qualify for New Markets Tax Credits because it won't satisfy the requirement of Treas. Reg. §1.45D-1(c)(5)(iv).").

In short, Kirsch has not, and cannot, establish its damages claims with reasonable certainty under Michigan law.  Accordingly, no material issue of fact exists with respect to the issue of damages and summary judgment should be granted to Newell.

**F.     The Court Should Enter Judgment in Newell's Favor Because Kirsch Has Failed to Present Any Evidence of Recoverable Damages.**

Kirsch, had its opportunity to state a valid claim for compensation but chose not to do so. Because Kirsch has not proven that his claimed damages flow from the Court granting Newell access to the Property in 2015, the Court should enter judgment in Newell's favor.  Alternatively, the Court should award Kirsch a damages figure that is commensurate with the amount for a 65-month license to access the Property for the estimated time that it will take to perform the environmental remediation: $72,964.00.

---

[18]     During his deposition in this matter, Siegal admitted that the TIF Schedule and the corresponding Reimbursement Schedule on which he relied contained numerous errors and that the lost TIF Financing damages estimate in the Second Siegal Report needed to be revised to correct those errors, which Siegal admitted were "not inconsequential." Ex. U, Siegal Dep. at 189:9-13 (errors "not inconsequential); 183: 11-19; 187:18-188:1 (TIF Financing opinion is "not accurate" and "does need to be revised.").

IV.     **CONCLUSION**

For the reasons set forth herein, and for such other reasons as may be apparent to the

Court, Newell's Motion for Summary Judgment Should be granted.

Respectfully submitted this 1st day of July 2016.

**SCHIFF HARDIN LLP**
 _/s/_ J. Michael Showalter
**Gabriel M. Rodriguez**
grodriguez@schiffhardin.com
**Joshua More**
jmore@schiffhardin.com
**J. Michael Showalter**
mshowalter@schiffhardin.com
233 South Wacker Drive, Suite 6600
Chicago, IL  60606
Phone: (312) 258-5500
Facsimile: (312) 258-5600


*Attorneys for Plaintiff*
