# EXHIBIT A

# In The Matter Of:

*Newell Rubbermaid, Inc. vs.*
*Kirsch Lofts, LLC*

*Scott Bosgraaf*
*April 13, 2016*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File BOSGRAAF_SCOTT.txt*
*Min-U-Script® with Word Index*

Page 1

1          THE UNITED STATES DISTRICT COURT
2          FOR THE WESTERN DISTRICT OF MICHIGAN
3                    SOUTHERN DIVISION
4
5   NEWELL RUBBERMAID, INC.,
6              Plaintiff,
7        vs.                    Civil Action No.
8                               1-cv-15-00597-RJJ
9   KIRSCH LOFTS, LLC,
10             Defendant.
11  _____
12
13
14       The Deposition of SCOTT BOSGRAAF,
15       Taken at 99 Monroe Avenue, N.W.,
16       Suite 975,
17       Grand Rapids, Michigan,
18       Commencing at 9:09 a.m.,
19       Wednesday, April 13, 2016,
20       Before Peggy S. Savage, CSR-4189, RPR.
21
22
23
24
25

Page 2

1  APPEARANCES:
2
3  J. MICHAEL SHOWALTER
4  Schiff Hardin, L.L.P.
5  233 S. Wacker Drive
6  Suite 6600
7  Chicago, Illinois 60606
8  (917) 224-0028
9  mshowalter@schiffhardin.com
10     Appearing on behalf of the Plaintiff.
11
12 DENNIS W. BILA, II
13 Bila & Associates, P.L.L.C.
14 4270 Cottontail Lane
15 Harbor Springs, Michigan 49740
16 (231) 838-5678
17 bila@bilalaw.com
18     Appearing on behalf of the Defendant.
19
20
21
22
23
24
25

Page 3

1   TABLE OF CONTENTS
2
3   WITNESS                         PAGE
4   SCOTT BOSGRAAF
5
6   **EXAMINATION BY MR. SHOWALTER:** 6
7
8   EXHIBITS
9
10  EXHIBIT                         PAGE
11  (Exhibits attached to transcript.)
12
13  DEPOSITION EXHIBIT 15            8
14  DEPOSITION EXHIBIT 16           17
15  DEPOSITION EXHIBIT 17           18
16  DEPOSITION EXHIBIT 18           46
17  DEPOSITION EXHIBIT 19           51
18  DEPOSITION EXHIBIT 20           57
19  DEPOSITION EXHIBIT 21           62
20  DEPOSITION EXHIBIT 22           63
21  DEPOSITION EXHIBIT 23           65
22  DEPOSITION EXHIBIT 24           66
23  DEPOSITION EXHIBIT 25           69
24  DEPOSITION EXHIBIT 26           71
25  DEPOSITION EXHIBIT 27           73

Page 4

1   DEPOSITION EXHIBIT 28           74
2   DEPOSITION EXHIBIT 29           77
3   DEPOSITION EXHIBIT 30           81
4   DEPOSITION EXHIBIT 31           83
5   DEPOSITION EXHIBIT 32           85
6   DEPOSITION EXHIBIT 33           86
7   DEPOSITION EXHIBIT 34           88
8   DEPOSITION EXHIBIT 35           93
9   DEPOSITION EXHIBIT 36           95
10  DEPOSITION EXHIBIT 37           98
11  DEPOSITION EXHIBIT 38          101
12  DEPOSITION EXHIBIT 39          103
13  DEPOSITION EXHIBIT 40          103
14  DEPOSITION EXHIBIT 41          107
15  DEPOSITION EXHIBIT 42          107
16  DEPOSITION EXHIBIT 43          109
17  DEPOSITION EXHIBIT 44          110
18  DEPOSITION EXHIBIT 45          111
19  DEPOSITION EXHIBIT 46          113
20  DEPOSITION EXHIBIT 47          114
21  DEPOSITION EXHIBIT 48          116
22  DEPOSITION EXHIBIT 49          116
23  DEPOSITION EXHIBIT 50          120
24  DEPOSITION EXHIBIT 51          123
25  DEPOSITION EXHIBIT 52          129

Case 1:15-cv-00597-RJJ   ECF No. 88-2,   PageID.1728   Filed 07/01/16   Page 4 of 14

Newell Rubbermaid, Inc. vs.                                                                 Scott Bosgraaf
Kirsch Lofts, LLC                                                                          April 13, 2016

Page 9

1  A.  I think previous to that.
2  Q.  It was in the past week?
3  A.  Yes.
4  Q.  In what context did you see this document?
5  A.  It was laying on my desk.
6  Q.  Did you review it?
7  A.  I scanned through it.
8  Q.  Did you review it in association with your counsel?
9  A.  No.
10 Q.  Did you do anything in particular to prepare for this
11    deposition today?
12 A.  I ate breakfast.
13 Q.  So you didn't review any documents specifically in
14    preparation for this deposition?
15 A.  No.
16 Q.  You did not talk to any other employees of Kirsch
17    Lofts or any other managers associated with Kirsch
18    Lofts about potential topics for this deposition?
19 A.  No.
20 Q.  Did you review Kirsch Lofts' discovery production in
21    this case?
22 A.  No.
23 Q.  Did you review any of the defendants which have been
24    produced to Kirsch Lofts in this case?
25 A.  I don't know if I understood that question.  Did you

Page 10

1     produce any defendants?
2  Q.  The plaintiff produced documents to Kirsch Lofts in
3     this case in preparation for this deposition.  Have
4     you reviewed any of those documents?
5  A.  No.
6  Q.  In general, have you reviewed any of those documents?
7  A.  Well, as they came in, I looked at them, but that has
8     been a while ago.
9  Q.  Have you looked at any of the documents in the
10    possession -- does Kirsch Lofts, LLC, have any
11    environmental consultants which have worked on
12    308 North Prospect, Sturgis, Michigan?
13 A.  Historically?
14 Q.  Yes.
15 A.  I believe two of them have.
16 Q.  Who are they?
17 A.  Equity Resources, Jeff Balgoyen being the principal;
18    Rose & Westra, Mark Westra.
19 Q.  Have you reviewed any of the documents in their
20    possession about this case?
21 A.  Not recently, but in the beginning, I would have.
22 Q.  Has anyone else contacted either plaintiff in this
23    case, plaintiff's law firm, which is Schiff Hardin,
24    LLP, or MDEQ on behalf of Kirsch Lofts?
25 A.  Has anybody contacted me?

Page 11

1  Q.  Has anybody contacted any of them on Kirsch Lofts'
2     behalf?
3  A.  You're asking me if anybody from those three entities
4     has contacted Kirsch Lofts or myself on Kirsch Lofts'
5     behalf?
6  Q.  Has anybody from Kirsch Lofts -- you're here today
7     speaking on behalf of Kirsch Lofts; do you understand
8     that?
9  A.  I do.
10 Q.  Who -- have any of these consultants, so Rose &
11    Westra, Equity Resources, spoken with people from EPA
12    about 308 North Prospect?
13 A.  I don't know.
14 Q.  Has any attorney -- have any of these -- has Equity
15    Resources or Rose & Westra contacted MDEQ on your
16    behalf?
17 A.  I don't know.  Well, actually, I'm sure they are,
18    because they've been part of the conversations of
19    ongoing matters, so ...
20 Q.  Have you looked for any written or electronic
21    communications between either of these environmental
22    consultants and any regulatory agency related to
23    308 North Prospect in preparation for this deposition?
24 A.  Not in preparation for this deposition.
25 Q.  When is the last time you looked at communications?

Page 12

1  A.  When you guys asked us to produce documentation.
2  Q.  Has any attorney worked for Kirsch Lofts regarding
3     308 North Prospect?
4  A.  Has any attorney what?
5  Q.  Worked.
6  A.  For Kirsch Lofts?
7  Q.  Sure.
8  A.  Yes.
9  Q.  Who?
10 A.  Dennis Bila, Mark Hunting, Scot Reynolds, Robb
11    Wardrop.
12 Q.  What about the law firm of Warner, Norcross & Judd?
13 A.  Warner, Norcross & Judd, I'm sorry.  Going way back.
14 Q.  Have any of these attorneys spoken with or
15    corresponded with plaintiff in this matter on your
16    behalf?  Your being Kirsch Lofts, LLC.
17 A.  I'm guessing they probably all have.
18 Q.  Have you reviewed any correspondence involving any of
19    these attorneys and plaintiff in this matter?
20 A.  If I was copied on it, I was.
21 Q.  But you have not reviewed any correspondence in
22    preparation for this deposition?
23 A.  Other than what I've seen previously, I didn't
24    re-review anything.
25 Q.  Have any of these attorneys that we discussed, so

### Page 21

1  him make the determination of what's in your mind.
2     **THE WITNESS:** Kirsch Lofts didn't go to
3  high school, either.
4     **BY MR. SHOWALTER:**
5  Q. Well, I did ask where you went to high school.
6  A. You, I, yeah, this ought to be fun.
7     **MR. BILA:** Well, let's make it clear.
8  Either he's always Kirsch Lofts or you're going to
9  tell him when he's Scott Bosgraaf.
10    **MR. SHOWALTER:** That sounds fair.
11    **MR. BILA:** Okay.
12    **MR. SHOWALTER:** He's here to speak on
13 behalf of Scott Bosgraaf. So when I use terms like
14 you today, let's assume that I mean Kirsch Lofts.
15    **THE WITNESS:** When you say you, I'm
16 supposed to be Kirsch Lofts? You just said when I was
17 you, I was supposed to be me; therefore, the high
18 school thing. So which one is it?
19    **BY MR. SHOWALTER:**
20 Q. As your attorney and I just discussed, when we use
21 terms like you, we are referring to Kirsch Lofts,
22 which is the entity which you are here to --
23 A. Okay.
24 Q. -- testify on behalf of today; does that sound fair?
25 A. Yes.

### Page 22

1  Q. Why Sturgis?
2  A. It fits what I do.
3  Q. And by I there, you mean Scott Bosgraaf?
4  A. Oh, I'm sorry. It fits with what Scott Bosgraaf does.
5  Q. What was attractive about that marketplace for Scott
6  Bosgraaf to get involved in?
7  A. It had a building. The building was available. It
8  was a facility that had the right census track. It
9  was rural. It had a city that was looking for
10 redevelopment that I believe called me to come down
11 and look at it, so they were inviting. The DEQ liked
12 it, which changed acronyms quite a few times but in my
13 mind still the DEQ. The MDEC liked it. The local
14 political presence liked it. And it fit similar to
15 other stuff I had done in the past.
16 Q. Were studies, market studies, completed by Kirsch
17 after Kirsch's organization?
18 A. I believe I had market studies that were done not by
19 Kirsch but by the city, which I think we've already
20 given you in this case.
21 Q. Do you remember when those market studies were
22 prepared?
23 A. I don't. Not off the top of my head.
24 Q. What did you intend to build in Sturgis?
25 A. The plans that we've already given you.

### Page 23

1  Q. How many units?
2  A. I'd have to look at the plans again to know the exact
3  count.
4  Q. What type of use?
5  A. It was mixed use, some residential and some commercial
6  aspects.
7  Q. What was the projected sale price of each residential
8  unit?
9  A. I'd have to look at the pro formas again that we've
10 given you already.
11 Q. What was the sale price of each commercial unit?
12 A. Same answer.
13 Q. What was the projected development schedule for Kirsch
14 Lofts?
15 A. That I recall as being three phrases. Each phase
16 takes approximately a year to build, and then
17 there's -- I think I planned a two-year gap in-between
18 phases.
19 Q. So from the time the project -- from the time Kirsch
20 was organized in 2008, can you walk me through the
21 timeline from the start of the project to the
22 completion as it was originally envisioned?
23 A. I think so. You find the property. You go after the
24 credits and incentives that are available. You build
25 your pro formas. You do your engineering and design

### Page 24

1  work. You get the credits. You do some environmental
2  work; your Phase I, your Phase II, your BEA. Kind of
3  a requirement of the credits, it has to be, typically,
4  a facility or a functioning, obsolete building to meet
5  some of the credits. You do a demolition side. You
6  do the construction side. And in this case, you do
7  the rental side for over seven years, and then you
8  start selling it or you keep it as a rental property
9  in a portfolio.
10    Construction-wise, I think we sort of
11 planned on starting in '9, finishing Phase I in early
12 '11, wait a couple of years, spend a couple of years
13 on the next phase, wait a couple of years, and finish
14 the next phase.
15 Q. So what year would you have estimated completion at
16 the time the project started?
17 A. What year would I have -- sorry. I don't know if I
18 caught your question.
19 Q. When the project started, when did you think you would
20 be done with all three phases?
21 A. Well, '16. '16, early '17 at the latest.
22 Q. You indicated as part of this process you were
23 supposed to complete documents called a Phase I and a
24 Phase II and a BEA. What are those documents?
25 A. They're environmental surveys for, maybe, the lack of

Case 1:15-cv-00597-RJJ   ECF No. 88-2,   PageID.1730   Filed 07/01/16   Page 6 of 14

Newell Rubbermaid, Inc. vs.                                                          Scott Bosgraaf
Kirsch Lofts, LLC                                                                    April 13, 2016

Page 29

1  purchased it?
2  A.  It was a building that appeared -- from historical
3  documents and pictures that I've seen used to be their
4  headquarters, and that was in about 2/3 of the
5  building, the north section and the piece that runs
6  parallel to Prospect, and then the parcel that is to
7  the south was open, like it was used for probably
8  warehousing and maybe some special interest projects.
9  I mean, it's a lot of dividing walls and ceilings and
10 lights and furniture and carpet and electrical and
11 safe and mailboxes and doors and all that other stuff
12 in it at the time.
13 Q.  What happened to all that stuff?
14 A.  It was demoed and removed.
15 Q.  Did you sell any of it?
16 A.  No.  I think it pretty much all went in the dumpster.
17 Q.  How was the purchase price of the building determined?
18 A.  I don't think that it -- I never made an offer.  I
19 think the people that owned it told me what it would
20 take to buy the property, and I think it was just
21 paying the past due property taxes and a nominal fee
22 as long as we would redevelop it.
23 Q.  What was the nominal fee?
24 A.  I don't know.  I'd have to look at the closing
25 documents, which we've already provided.

Page 30

1  Q.  But you didn't look at them in preparation for this
2  deposition today?
3  A.  I looked at them in 2008, '9.
4  Q.  What was the condition on the property on
5  September 5th, 2015?
6  A.  September 5th, 2015?
7  Q.  Or anytime in late 2015 is fine.
8  A.  Probably pretty similar to what it is today.
9  Q.  Are you aware of any changes to the building since
10 late 2015?
11 A.  No.
12 Q.  Has there been any vandalism to the property?
13 A.  There's vandalism on a constant.  I mean, we're down
14 there all the time removing graffiti and fixing
15 windows that are knocked down or fences that are cut
16 or doors that are broken into.
17 Q.  Have you produced records related to the costs during
18 this litigation?
19 A.  I believe so.  Yeah, what I have.  Most of the work
20 that's -- taking care of that stuff is either done by
21 myself or my wife.
22 Q.  Has there been any theft to the property since late
23 2015?
24 A.  Yes.  Well, I mean, I don't know if it happened before
25 or after 2015.  I can tell when we were demoing down

Page 31

1  there, we had a whole semi construction trailer
2  emptied out of tools.  After that, the theft would
3  probably be concluded to the wiring that was through
4  the building for the temporary lighting is now
5  missing.
6  Q.  Have any improvements been added to the property since
7  late 2015?
8  A.  Since late 2015?  Other than just, in my mind,
9  improvements would be removing the air-stripping tower
10 that Newell had on the property.  I don't know if that
11 was '15 or '14, but that clearly was an improvement.
12 I mean, we're down there scraping the property and
13 cleaning the fence line up and cutting the tress and
14 mowing the lawn and stuff.  If you want to be that
15 nominal for improvements, obviously, that's always
16 been improving.  But, otherwise, there hasn't been any
17 construction change on it, because the last
18 construction work would have been done when we were
19 doing the demo work and the beginning of access
20 corridors back in, probably, '10, 2010.
21 Q.  Can you tell me a little bit about the condos that
22 Kirsch planned?
23 A.  You have the drawings.
24 Q.  You're not prepared -- can you tell me anything about
25 the quality of the finishes that you were planning?

Page 32

1  A.  Oh.  Every project I've done is always the same.
2  Granite countertops, stainless steel appliances, wood
3  floors, drywall walls.  Walls are based on a 2-by-6
4  plate offset, centered 2-by-4s, 24-inch spacing,
5  two -- two layers of drywall on one side of the
6  dividing walls, a single layer on the other side,
7  5/8 on both.  That's my barrier between units.  Steel
8  entry doors to give me my fire rating for doors.
9  Inside would have nickel hardware doorknobs, hinges,
10 and whatnot.  Maybe an open layout, like a loft.  And
11 you have the floor plans and stuff, because we've
12 already produced them in this particular thing.
13 Q.  What was your target demographic?
14 A.  I am -- all of the projects I've done have -- well,
15 once I was starting to do a project for student
16 housing, but it turned out to be everybody but.  In
17 the past, I don't know that I had demographics.  In
18 this particular project, it would need to be a rental
19 for over seven years first to work its way through
20 credits, and then I would eventually start selling
21 them.
22 Q.  What would the target market be?
23 A.  As far as what type of person?
24 Q.  Sure.
25 A.  Anybody.

Page 33

1 Q. What would the target price be for, say, a one-bedroom
2  unit?
3    MR. BILA: For sale or rental?
4    MR. SHOWALTER: Both.
5    BY MR. SHOWALTER:
6 Q. First for rental.
7 A. I'd have to look at the economics again that we've
8  already provided, because I don't know that I
9  remember, and I'd probably mix it up with some other
10  projects.
11 Q. But you're not prepared to testify about that today?
12 A. Other than the documents that I already produced to
13  you.
14 Q. As a developer, how do you determine whether a project
15  is feasible? I'm asking this question to Scott
16  Bosgraaf now, not Kirsch.
17 A. I mean, I've always done stuff in rural areas for the
18  most part. Actually, always in rural areas. I look
19  at what market rents are and market sales, typically,
20  because I'm doing something completely different than
21  what's already in the area. So I'll look at a single
22  family, smaller house in the area, and I'll compare
23  our units, maybe not by square foot, because you get a
24  lot more out of a condo that's built into a loft
25  project, like square foot, than what you do in a

Page 34

1  freestanding home. And then rental sizes, typically,
2  I'll get 20 or 30 percent more than whatever anybody
3  else is getting in a duplex or not, apartment complex
4  in the area, sometimes 50 percent more, historically.
5 Q. What condo developments has Scott Bosgraaf been
6  involved with since 2005?
7 A. Since 2005?
8 Q. (Nodded.)
9 A. Condos.
10 Q. Or rental units. I mean, I guess apartments broadly
11  construed.
12 A. I've never done apartments, so that's an easy answer.
13 Q. How do you define apartments?
14 A. Something that, in my mind, would be a big box that
15  has a bunch of little units inside of it, but it has
16  one deed or one track parcel number that's assigned to
17  it.
18 Q. What about condos?
19 A. I've done a lot of condos.
20 Q. Since 2005, what condo has Scott Bosgraaf worked on?
21 A. Woodard, Baker, Central, Chris Craft, JLF, Kirsch.
22  Condos. I think those are the ones that I can
23  actually remember creating condo docs for.
24 Q. Which of these projects is Scott Bosgraaf still
25  associated with?

Page 35

1 A. Am I what?
2 Q. Still associated with.
3 A. Well, I think I'm associated with all of them because
4  I built them all. But as far as still have units to
5  sell, Woodard.
6 Q. What happened to Baker?
7 A. I sold -- well, actually, all of them are sold at this
8  point.
9 Q. Did you sell all of them?
10 A. Directly, probably 70 percent of it. Indirectly,
11  30 percent of it.
12 Q. What do you mean by indirectly?
13 A. I got into a fight with my lender years ago, and they
14  finished the sales off for me. I didn't get into a
15  fight. I guess we got into a disagreement.
16 Q. What about Central?
17 A. I think I've sold every unit that ever has been sold
18  there, and then the same lender sold the rest of the
19  units.
20 Q. Did this lender just retake possession of the
21  property, foreclose on you?
22 A. Correct.
23 Q. And that's true for Baker, too?
24 A. Same answer.
25 Q. What about Chris Craft?

Page 36

1 A. I sold everything there other than one unit, and the
2  lender sold that unit.
3 Q. So Chris Craft was foreclosed on, too?
4 A. Correct.
5 Q. What about -- is the next one JLF?
6 A. Correct. JLF. I was holding that in a portfolio.
7  No, I sold it in a trust. The lender eventually did
8  sell it, but I'm thinking I don't know that I intended
9  to ever sell any condos out of that, even though it
10  was a condo.
11 Q. What did you intend to do with it?
12 A. It was just a rental property, portfolio property.
13 Q. How did the demographics of these projects compare to
14  Kirsch, so just target market?
15 A. As far as the customer.
16 Q. Customer and community in which they're located.
17 A. Pretty much identical.
18 Q. What was the sellout period like for these
19  developments?
20 A. Everyone is different, because everyone had different
21  tax credits which typically are determined by census
22  track numbers and what area you're in. Like Woodard
23  can't be sold yet, because it's still going through
24  its depreciation pieces of the tax credits for New
25  Market Tax Credits and historic, so it still can't

Page 37

1  sell. Baker didn't have new markets there to start so
2  it didn't meet the census track. So that had a sell
3  option, even though initially I didn't intend to sell
4  any of them, but everybody wanted to buy them, so we
5  ended up selling them.
6  Q. For Kirsch, was parking included?
7  A. Parking is -- it's like a condominium development.
8  Parking is a common element.
9  Q. And were there garages?
10 A. Oh, the units with garages, they'd be included in the
11 unit.
12 Q. And what percentage of those units had garages or were
13 to have garages?
14 A. I'd have to look at the drawings again.
15 Q. Is there a bus line that runs through the Kirsch
16 development?
17 A. I've been there when a school bus comes by, but I
18 haven't really paid attention if there's a bus line
19 that comes by.
20 Q. So you're not aware of whether Sturgis has public
21 buses or not?
22 A. Don't know.
23 Q. Can you give me a general understanding of what this
24 case is about?
25 A. A general understanding. Well, we bought a piece of

Page 38

1  property -- Kirsch bought a piece of property, went
2  through all the motions I already described, planned
3  on and still plans on developing the project. My
4  environmental consultants found contamination that
5  Newell's consultants were unable to find or --
6  Q. Can I pause you for a second?
7  A. Sure.
8  Q. Was that contamination discovered before or after you
9  closed on the property?
10 A. I'd say probably both.
11 Q. What do you mean by that?
12 A. Well, I mean we found enough contamination to
13 determine it to be a facility so I could go after my
14 Brownfield credits that I needed. And in preparation
15 for our BEA, who Jeff Balgoyen was going to do
16 originally, we brought it to the attention of the DEQ,
17 because we were going to do a review BEA, and they
18 asked to get a second -- strongly encouraged me to get
19 a second party's review of a Phase II, which brought
20 in Rose & Westra, and he did soil borings and
21 identified as much or more contamination or hot spots.
22 And I think Balgoyen's probably was preclosing.
23 Westra might be after closing.
24 Q. So your testimony is that Kirsch was not aware of
25 Westra's soil boring results until after the close?

Page 39

1  A. I don't know without looking at the dates on the
2  reports, but -- whether he was before or after.
3    And then we identified it. Had the little
4  meeting in Sturgis. Brought Newell down there and
5  their consultants. Identified what had to be done.
6  They needed some access to the property. We,
7  obviously, started working on an access agreement. I
8  think John Byl actually was one of the first people.
9  Actually, myself with Mike and then John Byl with
10 Gabe. They came down, spent a summer there drilling
11 the place into Swiss cheese, inside and outside, with
12 mobile apps and rigs. Identified the volume of
13 contamination. And then instead of coming in and
14 digging it out and putting their air sparging system
15 in it, they've spent the last six years trying to come
16 up with a better plan or a plan that has -- requires
17 less work.
18 Q. If you knew that there were issues with the soil
19 before the closing, why did you close?
20 A. The issues with the soil were standard operating
21 procedure. Every facility, I think, I ever bought is
22 a facility. And, typically, I mean, it's an object.
23 If you are mindful and determined to clean it up, you
24 can fix it.
25 Q. What was the reason that Kirsch was identified as a

Page 40

1  facility; was it soil contamination or something else,
2  initially?
3  A. Well, I mean, we did a Phase I. We did a Phase II.
4  They drilled it. They came up with some hot spots,
5  which I needed to call it a facility, and kind of the
6  end of the story.
7  Q. The hot spots were the soil or something else in the
8  original BEA?
9  A. I'd have to read the BEA again. But in my mind, it
10 would have been what we found. I mean, I realize they
11 were pumping some groundwater on the property, because
12 they were cleaning groundwater that flowed under the
13 property. But meeting with Mike Miller on the site,
14 he had told me that that was going to be discontinued
15 and removed from the property by the time we started
16 our project. Otherwise, we'd have to put Christmas
17 lights on it.
18 Q. Did Kirsch's environmental consultants or attorneys
19 speak with the regulators about what they thought
20 about the property before the property closed?
21 A. Oh, yes.
22 Q. And what did they tell Kirsch?
23 A. Again, I'm sure they talked to him, because I've read
24 emails and stuff that have gone back and forth, but I
25 didn't listen in on conference calls that I wasn't

Page 41

1  invited to.
2  Q.  But you haven't -- haven't sought to track that
3  information down in preparation for this deposition?
4  A.  I didn't go and talk to the attorneys and ask them
5  what conversations they had with people from the city
6  or the state.  I only know what I've seen in emails
7  and read in reports.
8  Q.  Did Kirsch pull the attorneys' file and see what
9  communications they had with outside attorneys as part
10  of this litigation?
11  A.  Only those included in their billing.
12  Q.  So it's possible attorneys could have had
13  conversations with regulators that Kirsch has no
14  awareness of?
15  A.  Attorneys on this particular project?
16  Q.  Yes.
17  A.  I'm sure they worked on other projects.  They could
18  have talked to regulators about anything.
19  Q.  And what about this project?
20  A.  I think I was pretty heavy deep into it.  So I'm
21  thinking I'm probably pretty aware of what
22  communications went back and forth.  Since we did have
23  a DEQ loan and a grant fund going on at the same time,
24  there were daily conversations with some individuals
25  over there.

Page 42

1  Q.  Have you ever reviewed any of these materials in
2  preparation for this deposition?
3  A.  Just back when they originally were taking place.
4  Q.  So, no, not in preparation for this deposition?
5  A.  No, I didn't go back through mounds of paperwork to
6  study for today's exam.
7  Q.  So, again, what -- who have you talked with at
8  regulatory agencies about the property?
9  A.  I talked to Rob Franks, obviously.  Carrie Geyer.
10  Regulatory, that would not include credit people,
11  right?  That would just be regulatory related to
12  contamination?
13  Q.  Sure.
14  A.  I would think those two would be the key people that I
15  would have talked to.
16  Q.  Well, then, what about credit people that you've
17  talked to about the property?
18  A.  I've already given you all the credit pieces, but, I
19  mean, you get the City of Sturgis.  You get the MDEC.
20  You get some New Market Tax Credit people.  The
21  historic people, Antonio and Bill.  I think those are
22  pretty much the key people.  Might be their helpers or
23  associates that might have filled in some blanks from
24  time to time.
25  Q.  What seed money did Scott Bosgraaf contribute to

Page 43

1  Kirsch at the outset of this process?
2  A.  What seed money?
3  Q.  What was the starting pool to get this -- who funded
4  Kirsch?
5  A.  Probably my wife and I.
6  Q.  How much did you contribute?
7  A.  I think we produced that already.  That would be
8  identified in what we've got invested in the project.
9  I think there's somewhere between two and three
10  million bucks.
11  Q.  And that's --
12     MR. BILA:  I don't want to -- just so we're
13  clear, when you say him and he says his wife, I just
14  want to make sure you're including him as trusts.
15     THE WITNESS:  Correct.  Isn't that what I
16  just said?
17     MR. BILA:  Yeah, I didn't -- I wasn't sure.
18     THE WITNESS:  I'm sorry.  If I didn't -- my
19  wife and I both have some trusts, so ...
20     BY MR. SHOWALTER:
21  Q.  How much additional money have these trusts or you or
22  your wife contributed to Kirsch since 2008?
23  A.  Since 2008?
24  Q.  Yep.
25  A.  I think I just answered that question.  We produced it

Page 44

1  already.  Somewhere between two and three million
2  bucks.
3  Q.  Did -- does Kirsch have any other -- did anyone else
4  contribute money to the Kirsch entity?
5  A.  Well, I mean, the DEQ loan, DEQ grant, and then the
6  number I gave you is taking those as an offset.  So,
7  you know, add another million 350 to the number I gave
8  you.
9  Q.  Did you, your wife, or any trust provide a personal
10  guarantee related to Kirsch?
11  A.  No.
12  Q.  How does Kirsch relate to other entities that Scott
13  Bosgraaf controls?
14  A.  I don't think it does.  It's a new LLC.
15  Q.  Are any Kirsch employees paid by entity -- are there
16  any employees shared between Kirsch and other Bosgraaf
17  entities?
18  A.  Kirsch doesn't have any employees.
19  Q.  Does Kirsch use, as part of any informal arrangement,
20  any other employees paid by an entity such as ASU
21  Benefits?
22  A.  Again, Kirsch doesn't have any employees.
23  Q.  Who pays Carl Gabrielse?
24  A.  He's a contractor, and I think my wife pays him right
25  now.  I mean, other entities that I have paid Carl

Page 49

1 they are the responsible parties to make sure that
2 everybody is safe and well.
3 Q. In this Phase I, were soil -- was soil contamination
4 identified which exceeded a regulatory screening
5 level?
6 A. In this Phase I?
7 Q. Yes.
8 A. It says -- do you want me to read conclusions drawn
9 from Phase I or --
10 Q. You can if you want. I'm just asking you the question
11 in general right now.
12 A. Well, Phase I says that soil gas is detected at
13 numerous locations throughout the city, the highest
14 concentration being found on property -- on property
15 of Kirsch Company Plant Number 1. I think,
16 realistically, that's probably the east side of the
17 road.
18 Q. What do you mean by the east side of the road?
19 A. The other side of the street that I'm on. Plant 1 was
20 on both sides of the street, and there was a catwalk
21 that used to go back and forth between the two of
22 them. But most of your work, your client's work, has
23 always been on the east side of the street. I don't
24 think a lot of the information that's in here is
25 related to work that they did on the east side of the

Page 50

1 street. So when it talks about through the city and
2 then plant 1, I think it's usually talking about the
3 east side, because everybody, including us, was a bit
4 surprised when we actually were drilling and found
5 contamination on my side of the street, including your
6 client. If you remember Rob's DEQ email that said
7 that's a problem.
8 Q. So that was the first indication that Kirsch had that
9 there was a problem on the east side of the street --
10 or the west side of the street?
11 A. That the source material was coming from our side of
12 the street, not actually from the east side of the
13 street.
14 Q. So you're testifying that Kirsch's position is that it
15 could not have discovered, before 2010, that there was
16 a problem with soil in the area that a problem is
17 known now?
18 A. I think that we all knew that there was obviously some
19 soil contamination at that site, which it needed to be
20 in my world. But to the extent that it was
21 contaminated, nobody knew that extent until we did the
22 work.
23 Q. But you knew that there was a problem --
24 A. Oh, yeah, definitely.
25 Q. -- which needed to be characterized?

Page 51

1 A. Characterized and put through a Phase I, Phase II, and
2 a BEA, not remediated.
3 Q. In 2008?
4 A. Correct.
5 Q. Can we go to the next document?
6 A. Pardon me?
7 Q. Can we go to the next document?
8 A. Sure.
9 Q. Can we look at the -- can you actually hold on a
10 second? Give me a second and I'll ask some questions.
11 A. You let me know.
12    THE WITNESS: While you're doing that, can
13 I go to the restroom?
14    MR. SHOWALTER: Yes. Let's go off the
15 record.
16 (Off the record at 10:23 a.m.)
17 (Back on the record at 10:24 a.m.)
18 BY MR. SHOWALTER:
19 Q. I'll draw your attention to a document.
20    MARKED FOR IDENTIFICATION
21    DEPOSITION EXHIBIT 19
22    10:25 a.m.
23 BY MR. SHOWALTER:
24 Q. I'll point your attention to a document marked as
25 Exhibit 19. Have you seen that document before?

Page 52

1 A. I have.
2 Q. When did you first see this document?
3 A. Likely when you prepared it and delivered it to our
4 office.
5 Q. Did you review it at that time?
6 A. I'm sure I did.
7 Q. Did you review its conclusions?
8 A. You have to point me to the page so I can look again.
9 Q. 208.
10 A. Would that be your Bates stamp number?
11 Q. That would be -- it's actually your Bates stamp
12 number, I think.
13 A. Oh.
14 Q. And it's kind of hard to see, because it's --
15 A. Yep, I see it.
16 Q. Let me know when you've had a chance to look at this.
17 A. I have seen this before.
18 Q. Just in common terms, what does this document
19 conclude?
20 A. That they drilled a bunch of soil borings and they're
21 identifying the metals and chemicals that they found
22 in the soils.
23 Q. And what did those include?
24 A. There's a train track next door, so arsenic, which I
25 would expect. Benzofluoranthene -- where was I --

Page 101

1  was leaking when I bought it.
2  Q. Do you know what the National Contingency Plan is?
3  A. No, I don't.
4  Q. I'll pass you the next one, Exhibit 38.
5      MARKED FOR IDENTIFICATION
6      DEPOSITION EXHIBIT 38
7      11:51 a.m.
8      MR. BILA: Do you want the one you wrote
9  on?
10     MR. SHOWALTER: No, that's fine. I've
11 already violated my obsessive tendencies about these
12 documents.
13     BY MR. SHOWALTER:
14 Q. Have you seen this document before?
15 A. I have. It's been produced in this matter recently.
16 Q. Do you know why Robert Franks expresses that he's
17 becoming increasingly concerned about the lack of
18 activity by the developer, Mr. Bosgraaf, the Kirsch
19 Lofts project?
20 A. Probably. Because at this point, we had ceased
21 working on the project because we couldn't go any
22 further.
23 Q. Do you know why your consultant, Mark Westra, did not
24 respond to Rob Franks request for an update?
25 A. I have no idea why, what respond -- or if he didn't

Page 102

1  respond.
2  Q. Are you aware that Rob Franks reports he told Mark
3  Westra that the only activity that could not be
4  conducted as part of the redevelopment right now is
5  construction of the vapor barrier?
6  A. No. But that would stop the whole project, about the
7  dig and haul and the vapor barrier.
8  Q. Were you surprised that Franks indicated why
9  Mr. Bosgraaf has stopped all work on the project,
10 especially to the north building, which is not located
11 on top of contaminated soil and does not need a vapor
12 barrier is beyond me?
13 A. I think Rob Franks doesn't understand construction and
14 development, would be my guess. Because if you've
15 been out to the facility, you'd realize there's walls
16 standing in the first phase and all of the stairwells
17 are built and stuff, but our next piece would start
18 putting windows in the building. If I can't put the
19 vapor barrier in, I can't put any plumbing or any
20 utilities in the ground. I can't have Newell come out
21 quick and do their 90-day work that they supposedly
22 are going to do and do their dig and haul. I can't
23 put in parking lots, sidewalks, landscaping, access to
24 the building, yes.
25 Q. Is that true for the north building, true?

Page 103

1  A. Yes. I can't do anything. So after we stood walls up
2  and went as far as we could, then we had to quit.
3      MR. SHOWALTER: We'll tag the next one
4  Exhibit 39.
5      MARKED FOR IDENTIFICATION
6      DEPOSITION EXHIBIT 39
7      11:54 a.m.
8      BY MR. SHOWALTER:
9  Q. Have you ever seen this document before?
10 A. Not before it was produced recently. I'm assuming the
11 handwriting is either Newell's or somebody's --
12 Newell's associate.
13 Q. I would assume it's somebody from DEQ given that the
14 DEQ produced this.
15 A. Then you know more than I know. It only confirms what
16 I just told you earlier.
17     MR. SHOWALTER: I'll tag this as
18 Exhibit 40.
19     MARKED FOR IDENTIFICATION
20     DEPOSITION EXHIBIT 40
21     11:55 a.m.
22     BY MR. SHOWALTER:
23 Q. And I'm going to represent to you that these numbers
24 on the top of this come from a federal court filing
25 system, and this is a document that Kirsch has filed

Page 104

1  in this matter, which is why this -- these numbers are
2  here at the top of the page.
3  A. Okay.
4  Q. And the reason it starts on page 2 is I omitted a
5  sheet that said exhibit whatever.
6  A. Okay.
7  Q. Have you ever seen this document before?
8  A. I think I have. I think I've seen a lot of them that
9  look like this.
10 Q. Why did Kirsch submit this in support of its response
11 to Newell's motion --
12 A. I don't know. You have to ask my counsel.
13 Q. Does Kirsch have an opinion as to what this document
14 says or how it relates to actions in this matter?
15     MR. BILA: From a legal standpoint, I'm
16 going to object to the question. Go ahead, Scott, you
17 can answer if you know.
18     THE WITNESS: I'm going to need to take a
19 minute to review this.
20     MR. SHOWALTER: Go ahead. I'm not even
21 halfway done.
22     THE WITNESS: I think this document just
23 shows Newell's own consultant's estimates of costs and
24 time periods that it takes to do different types of
25 remediation on the site after some investigative work

Page 117

1 I've ever seen this one.
2 Q. Well, take a second and have a look at it.
3 A. Okay. Yeah, this one I have not seen before this, but
4 it has the same letterhead and the makeup of the
5 earlier letters that went back and forth. And it's
6 not addressed to me anymore.
7    MR. BILA: And I'm going to state something
8 for the record, just because I think I know what might
9 have happened. I was on vacation out of the country
10 the 30th to the 8th. And when I got back, there was a
11 note taped to my door that said my postman tried to
12 deliver a certified letter, but no one was home to get
13 it. And I have -- when I got back, I immediately came
14 down here. Well, I spent the weekend at my house and
15 then came down here. My guess is, and I don't know
16 this for a fact, that this letter is sitting in my
17 post office and that I haven't gotten it yet either.
18 So I'm guessing that he hasn't seen it. Because based
19 on the date and the certified and I haven't gone and
20 picked up my certified letter, I'm guessing that's
21 where it is. But that's just to help you out to
22 understand.
23    MR. SHOWALTER: So will you represent that
24 you did forward it to him via email?
25    MR. BILA: If I got it via email -- let me

Page 118

1 look. I didn't forward it -- I didn't get a hard copy
2 of it. Let me look.
3    THE WITNESS: All right. I've read it.
4    BY MR. SHOWALTER:
5 Q. So if Newell's consultants were going to be on your
6 property on April 18, 2016, setting apart sort of lost
7 profits issues, they're going to be there for two
8 hours, what cost is Kirsch going to incur to
9 facilitate that?
10 A. For taking samples of groundwater?
11 Q. Sure.
12 A. I don't know that we are going to have any issues with
13 you taking samples of groundwater, because that's not
14 the contamination or the issue that's holding us up.
15 I don't even know what the date is today.
16    THE WITNESS: What is the date today?
17    COURT REPORTER: The 13th.
18    THE WITNESS: The 13th. So this hasn't
19 happened yet.
20    BY MR. SHOWALTER:
21 Q. But I'm saying theoretically, if you had to look at it
22 and say what's this going to cost Kirsch.
23 A. Just probably manpower to go there and open up the
24 place and hang out while they're doing their work and
25 close it back up when we leave. Because this is just

Page 119

1 simply monitoring the existing groundwater wells.
2 This is not cleaning up the contamination that's
3 holding us up.
4 Q. But until this litigation was filed, was Kirsch
5 permitting testing like this in, say, 2015?
6 A. I believe that we've always allowed, multiple years,
7 where you came in and tested groundwater until we
8 believe you were acting in bad faith negotiating an
9 access agreement, and then I think that was about two
10 occasions where we tried to shut off the access to
11 force you back to the table.
12 Q. When was that?
13 A. There's letters that go back and forth that describe
14 that. I think you even showed me one of them earlier
15 today or at least the results, one of them.
16 Q. So I'm going to hand you a copy of the complaint in
17 this matter. And, again, the complaint is the
18 complaint that was filed in federal court so it's got
19 these weird numbers at the top.
20 A. Okay.
21 Q. And if you can, can you just try to ignore those, and
22 I'm going to ask you the narrow question of whether
23 these letters, which are at the end, from Exhibit B
24 to -- gosh --
25 A. To clarify, this is your complaint?

Page 120

1 Q. This will be our complaint.
2 A. Okay.
3 Q. We're not going to finish with it here, but I'm just
4 trying to get -- deal with admissibility and
5 authenticity.
6 A. Sure.
7    MR. BILA: And by the way, for the record,
8 I did not forward the April 5, 2016 letter to Scott
9 Bosgraaf by email.
10    MR. SHOWALTER: If you could do that, that
11 would be much appreciated.
12    BY MR. SHOWALTER:
13 Q. -- to Exhibit S. So it's from -- I'll hand you right
14 here where they are.
15 A. Okay.
16 Q. I'll get this marked as a complaint, and you can start
17 reading. Marked as an exhibit.
18    MARKED FOR IDENTIFICATION
19    DEPOSITION EXHIBIT 50
20    1:12 p.m.
21    MR. SHOWALTER: You can give that to him.
22 It's all the same. I'm just trying to speed the
23 process along.
24    THE WITNESS: Are you sure? All right.
25 And what do you want me to do with it?

Page 121

1   BY MR. SHOWALTER:
2   Q.  I want you just to take a look at them and see if they
3   are what they appear to be, do you remember receiving
4   them, are there any of them that jump out at you as
5   being -- we can take 30 minutes and walk through each
6   individual letter, but I don't know that anybody's
7   interest is served doing that.
8   A.  I know just by the mere fact of holding onto it it
9   isn't all the letters that went back and forth.
10  Q.  Okay.  But those appear to be many of the letters?
11  A.  So far I'm only on one and then the one response.  I
12  don't know if that relates to this one.  No, it
13  doesn't.  They don't appear to be in chronological
14  order.  And it is not all of the emails that went
15  back -- or all of the letters or emails that went back
16  and forth.
17  Q.  Well, let's say it's not all.  Are those letters that
18  went back and forth?
19  A.  Yes, they appear to be.  And you do know that you,
20  obviously, have a bunch of these letters that you
21  thought you mailed to me, but it was found out later
22  by your office, by a Debbie Martin, I think is her
23  name, that they didn't actually get mailed, so she
24  emailed them to me all together in one email, if that
25  helps.  So saying that you gave them to me on this

Page 122

1   year or this date is probably not going to be
2   accurate, because I do remember that quite clearly.
3   And she kept emailing me going, didn't you get our
4   letters?  I haven't gotten a letter from you, period.
5   We were talking on the phone.  She said, well, let me
6   send them to you in an email.  What's your email
7   address?  So she sent me three letters at once.  And
8   I'm guessing a little bit on Debbie Martin, but I
9   think that's her name.  Does she work in your office?
10  Q.  Mr. Rodriguez's assistant.
11  A.  Perfect.  My memory is good today.  Yeah, these look
12  like some of the letters.  Okay.  I've looked.  Is
13  this the access agreement, though, that I made or is
14  this the one that you guys made?  Because mine had all
15  of the changes on it from your agreement.
16  Q.  I can't say from this far away.
17  A.  Normally, it would track the changes, and I don't
18  remember what I changed anymore, but you sent me an
19  access agreement and I made it that it would apply to
20  our property and would be applicable to what I would
21  accept, but I don't know which one this is.  And your
22  document is not tracking the changes.
23  Q.  I believe that is the access agreement that we
24  provided to you.  Is that Exhibit Q?
25  A.  Pardon me?

Page 123

1   Q.  Which exhibit was it?
2   A.  Well, it's attached to something.  It does say draft
3   on the top, June 25, and I realize we never finalized
4   anything.
5   Q.  So that was a draft that Newell provided to you?
6   A.  You did in a Word document and then I marked it up and
7   then sent it back.  Oh, my email says that.  Well,
8   your email responds to my marked-up version.  Okay.
9       MR. SHOWALTER:  Can I tab this as
10  Exhibit 51?
11      MARKED FOR IDENTIFICATION
12      DEPOSITION EXHIBIT 51
13      1:17 p.m.
14      THE WITNESS:  Okay.
15      BY MR. SHOWALTER:
16  Q.  Have you ever seen this document before?
17  A.  I believe so.  Yeah, I believe it.
18  Q.  Can I point you to paragraph 35?
19  A.  Is it numbered?
20  Q.  Yep.
21  A.  Okay.
22  Q.  It's page 11.
23  A.  Okay.
24  Q.  Paragraph 35, the first part of that is a copied-over
25  version from the complaint.  So the bottom part, the

Page 124

1   bolded, is Kirsch's response --
2   A.  Okay.
3   Q.  -- and I'd like to talk about that.
4   A.  Sure.
5   Q.  So paragraph 35, Newell alleges:  Prior to its
6   purchase, Kirsch Lofts was not only on notice of the
7   environmental status of the property as a Superfund
8   site, but also of the environmental condition of the
9   property.  So was -- and you say denied as untrue.
10  A.  Sure.
11  Q.  Was Kirsch aware at the time it purchased the property
12  that the property was located on a Superfund site?
13  A.  Yes.
14  Q.  At the time the property purchase closed, was Kirsch
15  aware that there was significant soil-based TCE
16  contamination on the property?
17  A.  Kirsch would have been acknowledgeable what was
18  already given to you in its Phase II report done by
19  Rose & Westra and done by ERE, Equity Resource
20  Environmental, in 2008 and 2009.  Yes.
21  Q.  And would Kirsch have also had discussion with
22  Michigan state regulators about soil contamination by
23  that time?
24  A.  Definitely, because it was part of our grant and loan
25  process as far as our 381 work plan, but other

Page 161

1  media blasting.  All the holes in the building have
2  been filled.  The floors have been leveled.
3  Q.  What kind of -- what kind of units is it set up for
4  right now?
5  A.  It's only Phase I, part of the commercial piece.  It's
6  just framed in right now.  So residential in Phase I,
7  and it's office and a coffee shop, a Biggby's, and a
8  restaurant, in Phase II.
9  Q.  What is built today?  I mean, I know there's like --
10 A.  Standing walls.
11 Q.  Yeah.
12 A.  Framed in.  Outlines I'm talking about that matches
13 those plans I gave you.
14     MR. SHOWALTER: Okay.  Let's go off the
15 record.  Let me take five minutes.
16     THE WITNESS: Sure.
17     (Off the record at 2:15 p.m.)
18     (Back on the record at 2:22 p.m.)
19     BY MR. SHOWALTER:
20 Q.  Do you recall having any conversation with Robert
21 Franks where you indicated that John Byl had told you
22 that there was no way that this project will get built
23 for a long time?
24 A.  Are you asking me -- who's saying this now?
25 Q.  You --

Page 162

1  A.  Okay.
2  Q.  -- said to Franks that John Byl had told you that the
3  project wouldn't get built for a long time.
4  A.  No.  I think I did have a conversation -- I mean, I
5  talked to John Byl -- or not John Byl -- Rob Franks a
6  lot, and I do remember John Byl early on telling me
7  that Newell Rubbermaid will decide when you're going
8  to build this project, and it may be with no delay and
9  it may be a long time.  You are at their disposal.
10     MR. SHOWALTER: Okay.  Nothing further.
11     THE WITNESS: Okay.
12     (The deposition was concluded at 2:23 p.m.
13 Signature of the witness was not requested by
14 counsel for the respective parties hereto.)

Page 163

CERTIFICATE OF NOTARY
STATE OF MICHIGAN )
                  ) SS
COUNTY OF OTTAWA  )

         I, PEGGY S. SAVAGE, certify that this
deposition was taken before me on the date
hereinbefore set forth; that the foregoing questions
and answers were recorded by me stenographically and
reduced to computer transcription; that this is a
true, full and correct transcript of my stenographic
notes so taken; and that I am not related to, nor of
counsel to, either party nor interested in the event
of this cause.




                    _____
                    PEGGY S. SAVAGE, CSR-4189, RPR
                         Notary Public,
                    Ottawa County, Michigan.
         My Commission expires:  7-13-19