# EXHIBIT C

# In The Matter Of:

*Newell Rubbermaid, Inc. vs.*
*Kirsch Lofts, LLC*

*Mark A. Westra*
*June 17, 2016*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File WESTRA_MARK A..txt*
*Min-U-Script® with Word Index*

Page 1

```
 1              THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF MICHIGAN
 3                       SOUTHERN DIVISION
 4
 5   NEWELL RUBBERMAID, INC.,
 6              Plaintiff,
 7        vs.                    Civil Action No.
 8                               1-cv-15-00597-RJJ
 9   KIRSCH LOFTS, LLC,
10              Defendant.
11   _____
12
13
14        The Deposition of MARK A. WESTRA,
15        Taken at 99 Monroe Avenue, N.W.,
16        Grand Rapids, Michigan,
17        Commencing at 8:57 a.m.,
18        Friday, June 17, 2016,
19        Before Peggy S. Savage, CSR-4189, RPR.
```

Page 2

```
 1   APPEARANCES:
 2
 3   DENNIS W. BILA, II
 4   Bila & Associates, P.L.L.C.
 5   4270 Cottontail Lane
 6   Harbor Springs, Michigan 49740
 7   (231) 838-5678
 8   bila@bilalaw.com
 9        Appearing on behalf of the Plaintiff.
10
11   GABRIEL M. RODRIGUEZ
12   Schiff Hardin, L.L.P.
13   233 S. Wacker Drive
14   Suite 6600
15   Chicago, Illinois 60606
16   (917) 224-0028
17   grodriguez@schiffhardin.com
18        Appearing on behalf of the Defendant.
19
20   ALSO PRESENT:
21   Carl Gabriesle
22   Scott Bosgraaf
```

Page 3

```
 1   TABLE OF CONTENTS
 2   Witness                              Page
 3   MARK A. WESTRA
 4
 5   EXAMINATION
 6     BY MR. RODRIGUEZ: 4
 7
 8   EXHIBITS
 9   Exhibit                              Page
10   (Exhibit attached to transcript.)
11
12   DEPOSITION EXHIBIT 1                 11
13   DEPOSITION EXHIBIT 2                 34
14   DEPOSITION EXHIBIT 3                 41
15   DEPOSITION EXHIBIT 4                 58
16   DEPOSITION EXHIBIT 5                 62
17   DEPOSITION EXHIBIT 6                 66
18   DEPOSITION EXHIBIT 7                 85
19   DEPOSITION EXHIBIT 8                 87
20   DEPOSITION EXHIBIT 9                 91
```

Page 4

```
 1   Grand Rapids, Michigan
 2   Friday, June 17, 2016
 3     8:57 a.m.
 4
 5     MARK A. WESTRA,
 6   was thereupon called as a witness herein, and after
 7   having first been duly sworn or affirmed to testify to
 8   the truth, the whole truth and nothing but the truth,
 9   was examined and testified as follows:
10     EXAMINATION
11     BY MR. RODRIGUEZ:
12   Q.  Good morning, Mr. Westra.  We just met before we went
13       on the record.  My name is Gabe Rodriguez.  I'm the
14       attorney for Newell brands in this case.
15   A.  Nice to meet you, Gabe.
16   Q.  Before we get started, I just want -- you've been
17       deposed before; is that correct?
18   A.  I have.
19   Q.  How many times?
20   A.  Several.
21   Q.  More than five?
22   A.  Probably five to ten.
23   Q.  Okay.  And have you testified at trial?
24   A.  Yes.
25   Q.  Okay.  So you know the ground rules of a deposition?
```

Page 53

1    been done.  The leach study is the only
2    activity here that you've said or caused a
3    delay in the implementation of the soil
4    remedy; is that right?")
5        **MR. BILA:** Same objection.  You still can
6    answer.
7        **THE WITNESS:** As I said, the only thing
8    that has been accomplished is the leach study in the
9    multiple investigation reports over the last several
10   years.
11       **BY MR. RODRIGUEZ:**
12  Q.   And what was the cause of the delay?
13       **MR. BILA:** Same objection.  Go ahead.  You
14   can say it again.
15       **THE WITNESS:** The cause of the delay
16   appears to be the fact that the leach study, while
17   first attempting, and in my opinion attempted, in a
18   poorly-designed manner.
19       **BY MR. RODRIGUEZ:**
20  Q.   Which resulted in the delay?
21       **MR. BILA:** Objection.
22       **THE WITNESS:** Which resulted in a delay.
23       **BY MR. RODRIGUEZ:**
24  Q.   Are there other things that URS or Newell has done
25       that has caused the delay?

Page 54

1        **MR. BILA:** Go ahead.  It's asked and
2    answered, but you can say it again.
3        **THE WITNESS:** As I said, I believe the mere
4    fact the study was performed delayed remediation.  The
5    fact that it was poorly designed delayed its
6    submission, its final result.  And the fact that it
7    was poorly interpreted further delayed its result.
8    And I don't know how many other ways I can say it.
9        **BY MR. RODRIGUEZ:**
10  Q.   Okay.  A minute ago you said that other things could
11       have been done simultaneous with the leach study; is
12       that right?
13  **A.   Yes.**
14  Q.   Could you tell me what those things could have been --
15       that could have been done?
16  **A.   Certainly, the proposed hot spot and soil removal and**
17       **excavation could have been done.  The air sparge/SVE**
18       **system could have been designed, installed, and been**
19       **in several years of operation, maybe even nearing**
20       **either the current ROD objections or some alternate**
21       **proposed criteria if, in fact, the leach study and**
22       **submission is approved by MDEQ and EPA.**
23  Q.   At this point, however, MDEQ hasn't approved or
24       allowed any work to be done on that, have they?
25  **A.   I'm not aware that anybody's proposed any work for**

Page 55

1    them to approve.
2   Q.   Okay.  Well, we'll get to that.  Let's turn to your
3        involvement with the site when you first became
4        involved with the site.  You were initially retained
5        by Kirsch Lofts to do due diligence on the property;
6        is that right?
7   **A.   Correct.**
8   Q.   And you did -- well, tell me when is it that you were
9        retained by Kirsch Lofts.
10  **A.   I don't recall exactly, but the reference material**
11       **should have -- we issued Phase I assessments and**
12       **baseline environmental assessments in July and**
13       **September of 2009.  So I would say anywhere from mid**
14       **to late 2008 through spring of 2009 would have been**
15       **our first involvement.**
16  Q.   And you were brought in to replace another firm?
17  **A.   Supplement or replace, yes.**
18  Q.   Okay.  That was ERE?
19  **A.   Yes.**
20  Q.   They had done a Phase I and a Phase II for the Kirsch
21       Lofts for this project?
22  **A.   Yes.**
23  Q.   Do you know why you were brought in?
24  **A.   I can speculate, but I don't think I was ever told**
25       **why.**

Page 56

1   Q.   Why do you think you were brought in?
2   **A.   Because we'd done other due diligence projects for**
3        **affiliates for Kirsch Lofts, LLC.  And, personally, I**
4        **believe we can do it better than ERE or our**
5        **competition, quite frankly.**
6   Q.   And do you recall what the scope of services you were
7        asked to do after you first were retained?
8   **A.   We did prepurchase due diligence with the Phase I**
9        **assessment, we did post-purchase baseline**
10       **environmental assessment, and we also did Brownfield**
11       **consultation.**
12  Q.   Okay.  And one of the first things you would have done
13       was reviewed the Phase I and Phase II that ERE had
14       done?
15  **A.   Yes.**
16  Q.   And do you recall whether -- the conclusions of those
17       reports?
18  **A.   I don't.  Basically, ERE stated the obvious, as we**
19       **did, that the site is part of an NPL site and,**
20       **therefore, contamination is known or likely to be**
21       **present.**
22  Q.   Okay.  Do you recall any other -- those are recognized
23       environmental conditions, right?
24  **A.   Correct.**
25  Q.   Which means what?

Page 57

1  A. Means, paraphrasing, the presence or likely presence
2  of hazardous substances and petroleum products
3  effectively in concentrations that may pose a threat
4  to human health or the environment.
5  Q. So I think there's a sentence in there that says de
6  minimis conditions are not recognized environmental
7  conditions; is that right?
8  A. Correct.
9  Q. Okay. And you said that there was -- that the ERE
10 Phase I identified that it was an NPL site?
11 A. Correct.
12 Q. And there was a history of industrial processes on the
13 site?
14 A. Yes.
15 Q. And that there was a history of use of TCE on -- on
16 the property?
17 A. Yes.
18 Q. And that TCE was the principal contaminate of concern
19 at the NPL site?
20 A. I don't know whether they made that conclusion or not.
21 Q. Okay. Fair enough. The Phase I recommended a Phase
22 II?
23 A. They may -- they either recommended or they did one.
24 I'm not sure if the text of the Phase I recommended a
25 Phase II or not.

Page 58

1  Q. Okay. But they did do a Phase II?
2  A. Yes.
3  Q. And you're familiar with that Phase II?
4  A. I am.
5  Q. You reviewed it?
6  A. I reviewed it, used the information from it during our
7  due diligence and baseline assessment, yes.
8  Q. Okay. I want to show you the pieces of that.
9     MARKED FOR IDENTIFICATION
10    DEPOSITION EXHIBIT 4
11    10:30 a.m.
12    MR. BILA: Can we take a quick break?
13    THE WITNESS: We're off the record?
14    MR. RODRIGUEZ: Yeah.
15    (Back on the record at 10:31 a.m.)
16    (Back on the record at 10:41 a.m.)
17    BY MR. RODRIGUEZ:
18 Q. I'm going to show you what I've marked as Westra
19 Number 4. And I'm showing you, asking you, do you
20 recognize Westra 4?
21 A. Yes.
22 Q. What is it?
23 A. It's the Phase II assessment that Equity Resource
24 Environmental, ERE, performed for the property in
25 2008.

Page 59

1  Q. Okay. And it's -- it's not the entire report,
2  although I have it if you need it.
3  A. It is not. It is a table summarizing portions of the
4  soil test results and a figure showing where samples
5  were collected relative to the buildings and property
6  line.
7  Q. Okay. So just looking at this Table 3 of Exhibit --
8  you said it was 4, right?
9  A. 4.
10 Q. Can you -- can you tell me how many samples were
11 analyzed by ERE for TCE in their Phase II
12 investigation?
13 A. Six samples are reported on Table 3.
14 Q. And how many of those samples detected TCE?
15 A. Four.
16 Q. And how many of those detections were over the 100
17 part per billion cleanup level?
18 A. All four.
19 Q. And can you -- and how many of those are -- two of
20 those -- well, why don't you tell me which soil
21 borings samples exceeded.
22 A. SB-2, SB-9, SB-10, and SB-11.
23 Q. And the values at SB, can you -- can you also give me
24 the values reported there?
25 A. In order, 160, 1,000, 2,800, and 14,000 micrograms per

Page 60

1  kilogram.
2  Q. Okay. And can you -- can you then turn to the figure.
3  And while -- while looking at the table, can you just
4  find on the figure where those soil borings were and
5  just circle the borings?
6     MR. RODRIGUEZ: And for the record, he's
7  circling with a pen. Okay. Thank you.
8     THE WITNESS: Today is the 15th?
9     COURT REPORTER: 17th.
10    MR. RODRIGUEZ: And for the record, you've
11 dated and initialed the exhibit.
12    BY MR. RODRIGUEZ:
13 Q. That soil sampling -- those soil sampling results have
14 not delineated the extent of contamination; is that
15 right?
16 A. Correct.
17 Q. And one of the conclusions of this report was that a
18 baseline environmental assessment should be performed;
19 is that right?
20 A. I don't recall, but I -- if I had been drafting it,
21 that would have been a recommendation but would not
22 have been presented in the report.
23 Q. Okay. If I showed you a report, would that refresh
24 your recollection?
25 A. Sure.

Case 1:15-cv-00597-RJJ   ECF No. 88-4,   PageID.1748   Filed 07/01/16   Page 6 of 13

Newell Rubbermaid, Inc. vs.                                        Mark A. Westra
Kirsch Lofts, LLC                                                  June 17, 2016

Page 61

1  Q.  I'm not going to mark this.  I'm not going to have
2  you -- if you look at that and see if that refreshes
3  your recollection of what the recommendation was.
4  A.  On page 9 of 12, second full paragraph, therefore, ERE
5  recommends a baseline environmental assessment (BREEA)
6  be completed for the subject property to address
7  liability issues associated with the potential future
8  purchases and/or operation of a known facility.
9  Q.  Thank you.  What's the date of that report?
10 A.  September 2nd, 2008.
11 Q.  Thanks.  And so you were retained sometime after they
12 completed that report; is that right?
13 A.  Yes.
14 Q.  So can you tell me what you did when you were first
15 retained?  What was the first task that you did?
16 A.  I don't recall specifically, but normally it would be
17 to read pre-existing documents, the Phase I, Phase II,
18 and potentially supporting documents.
19 Q.  And in this project, you -- you said you did a Phase I
20 of your own?
21 A.  Yes.
22 Q.  You did a BEA?
23 A.  We did.
24 Q.  And you did soil testing?
25 A.  We did do soil testing.

Page 62

1  Q.  You did more than one testing of that; is that right?
2  A.  Yes.
3  Q.  Okay.  Do you remember when the first testing of that
4  took place?
5  A.  I don't without referring to our tables --
6  Q.  All right.
7  A.  -- a report.
8  Q.  Okay.  Let me show you what I'm going to mark as
9  Westra 5.
10     MARKED FOR IDENTIFICATION
11     DEPOSITION EXHIBIT 5
12     10:49 a.m.
13     BY MR. RODRIGUEZ:
14 Q.  Why don't you take a look at Westra 5.  And can you
15 tell me whether you recognize Exhibit 5?
16 A.  It appears to be an excerpt from our baseline
17 environmental assessment performed in 2009.
18 Q.  And that's a -- that's a group exhibit; is that right?
19 A.  I'm sorry?
20 Q.  There are a number of pages to it?
21 A.  Yes.
22 Q.  Can you identify each of them, each page on that?
23 A.  Pages 1 and 2 is a table summarizing soil test
24 results, page 3 is explanatory to the soil test
25 results summary, and the fourth page is our Figure 1,

Page 63

1  which presents soil boring locations relative to the
2  buildings and property lines.
3  Q.  Can you tell from the exhibit when you collected the
4  soil data?
5  A.  Yes.
6  Q.  And how do you determine that?
7  A.  In each column where soil tests results are presented,
8  third row down is sampling date.
9  Q.  And the date that this testing was done, this sampling
10 event, was what?
11 A.  November 6, 2008.
12 Q.  So this would have been a couple of months, give or
13 take, after the ERE Phase II?
14 A.  Yes.
15 Q.  Okay.  And can you -- can you tell me how many
16 samples -- during this event -- how many samples were
17 analyzed for TCE?
18 A.  Ten.
19 Q.  And of those ten, how many detected TCE?
20 A.  Eight.  Correct that.  Nine detected values for TCE.
21 Q.  And how many exceeded the Superfund cleanup level of
22 100 ppb?
23 A.  Seven.
24 Q.  Okay.  And how many of these exceeded the standard by
25 at least a factor of ten?

Page 64

1  A.  Six.
2  Q.  Now, there's a figure in there, as well; isn't that
3  right?
4  A.  Yes.  Page 4.
5  Q.  Can you -- like you did with the ERE, can you just go
6  through and circle each of the locations that had
7  exceedances of TCE?
8     The -- the testing that you did in November
9  of 2008, did that fully delineate the extent --
10 lateral and vertical extent of the contamination at
11 the site?
12 A.  No.  It was not designed to.
13 Q.  Okay.  Now, these -- this data and this figure were
14 included as an appendix to your Phase I report; is
15 that right?
16 A.  I doubt it would have been in the Phase I report, but
17 these are -- similar tables and figures would have
18 been in the baseline assessment.
19 Q.  Okay.
20 A.  It could have been in the Phase I, but it more likely
21 would be in the baseline assessment.
22 Q.  Okay.  And I'm just going to show you this so you can
23 refresh your memory.  We won't -- we won't necessarily
24 mark this.  Would looking at your Phase I help you
25 remember whether it was included in the Phase I?  That

## Page 65

1  is your Phase I report, isn't it?
2  A.  It appears to be, yes.  Table 1 appears to come from
3     Appendix J -- or it would be a portion of Appendix J,
4     Phase I report.
5  Q.  So the data was presented in the Phase I --
6  A.  Yes.
7  Q.  -- is that right?
8     And the Phase I report was dated July 10,
9     2009?
10 A.  Yes.
11 Q.  And -- and that was the day that the Kirsch Lofts
12    closed on the property; is that right?
13 A.  I don't know.
14 Q.  Okay.  You did do additional testing after this Phase
15    I; is that right?
16 A.  I believe so, yes.
17 Q.  And that additional testing, the purpose of that
18    additional testing was what?
19 A.  I don't recall.
20 Q.  Okay.  Do you remember when you did it?
21 A.  Not without referring to the documents, no.
22 Q.  Do you recall whether it was done -- it was done after
23    the Phase I report was prepared?
24 A.  I believe so, yes.
25 Q.  Okay.

## Page 66

1  A.  Are we done with 5?
2  Q.  Yeah.
3     MARKED FOR IDENTIFICATION
4     DEPOSITION EXHIBIT 6
5     10:59 a.m.
6     BY MR. RODRIGUEZ:
7  Q.  I'm going to show you what's been marked as Westra 6.
8     And can you tell me what Westra 6 is?
9  A.  It is an excerpt from our September 4th, 2009 baseline
10    environmental assessment, appears to be a DEQ district
11    office copy.
12 Q.  Okay.  And do you see there the date that the DEQ
13    received it?
14 A.  October 28th, 2009.
15 Q.  And the report says that it was prepared on September
16    4th?
17 A.  Yes.
18 Q.  Are you -- do you know why it was -- there was such a
19    lag between the preparation of this report and its
20    submission to the State?
21 A.  I don't know for this example, but I can tell you it's
22    very common to be several weeks or months between
23    completing the document and submission to the agency.
24 Q.  Okay.  And were you the one that submitted it?
25 A.  It would have been our office that submitted it.

## Page 67

1  Q.  Would have submitted it to the State?
2  A.  Correct.
3  Q.  Okay.  The BEA, can you explain to me what the purpose
4     of this document is?
5  A.  The purpose of the BEA is to obtain cleanup liability
6     protection under Michigan law analogous to the bona
7     fide prospective purchaser exemption under federal
8     law.
9  Q.  And is that the -- is that its sole purpose?
10 A.  From a legal perspective, I believe it is, yes.
11 Q.  What other perspective would you --
12 A.  From a technical perspective, it doesn't include
13    required information, summary of test results, as well
14    as the Phase I assessment.
15 Q.  Required information, required for what?
16 A.  For -- required at the time by rule by the agency to
17    be included in the baseline -- as the baseline
18    environmental assessment.
19 Q.  And this rule was a rule for the liability protection?
20 A.  It was a rule -- yes.  It was a rule defining the
21    contents of the BEA for liability protection.
22 Q.  Apart from liability protection, is there any other
23    purpose for a baseline environmental -- this baseline
24    environmental assessment?
25 A.  It may be used for other purposes, but it wouldn't be

## Page 68

1     created for other purposes.
2  Q.  Okay.  And so if you just open it up and turn to page
3     2.  So if -- if you go down there, third paragraph
4     down in that introduction, I think you're summarizing
5     here, in this introduction, the findings of your -- on
6     this baseline environmental assessment.  It basically
7     says here that the property was -- was part of the
8     former Kirsch plant, right?
9  A.  Yes.
10 Q.  And it also concludes, in that last sentence of that
11    third paragraph, the soil and groundwater
12    contamination associated with these historical
13    operations is well documented?
14 A.  Correct.
15 Q.  And that would have been referring to the ERE results
16    as well as the November 2008 results that you had
17    done?
18 A.  And I believe even some prior testing that had been
19    done several years before that.
20 Q.  Okay.  And what is that testing?
21 A.  A State contractor, SEG, did at least one boring, I
22    believe, way back in the '90s that found TCE and PCE.
23 Q.  Is that referenced anywhere in your report?
24 A.  I'm not sure.
25 Q.  Let me direct your attention to the last paragraph of

Page 69

1   the introduction.
2   A.   Okay.
3   Q.   Can you read that?
4   A.   Collection and analysis of soil samples from the
5       property confirmed releases of hazardous substances
6       associated with the historical uses of the property.
7       The results of the sampling and chemical analysis
8       confirmed the property is a "Facility," as defined by
9       Part 201 of NREPA, as amended.
10  Q.   And that's the principal conclusion of this document;
11      is that right?
12  A.   I --
13  Q.   Let me rephrase. You had mentioned a minute ago that
14      liability protection is probably the -- the reason
15      that this BEA is created; is that right?
16  A.   Correct.
17  Q.   And is this conclusion, this last sentence of the
18      introduction, is that relevant -- how is that relevant
19      to that purpose?
20  A.   A BEA only provides liability protections for
21      properties that meet the definition of facility under
22      Part 201.
23  Q.   And what -- what would meet that definition?
24  A.   Properties that have hazardous substances or petroleum
25      products above Michigan's current generic residential

Page 70

1       cleanup criteria.
2   Q.   And -- and the BEA, the soil results that were
3       reported in the BEA, would have established that this
4       property meet the definition of a facility under State
5       law?
6   A.   Correct. That was identified in the previous exhibit.
7   Q.   That that testing that we looked at --
8   A.   Correct.
9   Q.   -- would have established that this was a facility?
10  A.   Right. Exhibit -- testing summarized on Exhibit --
11      did we mark the ERE? Exhibits 4 and 5.
12  Q.   Okay. So at the time you prepared this document, the
13      testing you had done and that had been done by ERE had
14      confirmed that this facility qualified -- that this
15      property qualified as a facility under the B- -- under
16      Michigan law?
17  A.   Correct.
18  Q.   Okay. At that time, however, you had not fully
19      delineated the extent of contamination; is that right?
20  A.   That's correct, we hadn't attempted to.
21  Q.   Okay. And the -- so at the time that -- that this
22      report was submitted, additional investigation was
23      going to be needed; is that correct?
24  A.   It wouldn't have been needed for liability protection.
25  Q.   Would additional investigation have been required for

Page 71

1       the Superfund process?
2   A.   If it was a PRP, then the agency may have required
3       further investigation, yes.
4   Q.   Would further investigation have been required for
5       purposes of the development project?
6   A.   It may have, yes.
7   Q.   Under what circumstances would that have been
8       required?
9   A.   To -- during redevelopment, you almost certainly have
10      to modify building infrastructure, underground
11      utilities might remove or replace or alter
12      landscaping, which would mean excavation or at least
13      movement of soil, and the continuing obligations under
14      CERCLA or due care under Part 201 may require
15      demonstrations that that be done so as not to
16      exacerbate the existing contamination.
17  Q.   That's all true if you know where the contamination is
18      located; isn't that right?
19  A.   The requirements are there whether you know where --
20      as long as you know contamination is present, you have
21      your continuing obligations and due care requirements.
22  Q.   But it would -- but you would need to do additional
23      testing just to know if you had any other exposure
24      areas; isn't that correct?
25  A.   That would be site specific.

Page 72

1   Q.   I'm talking about this site.
2   A.   And you may. It would depend on the location of your
3       activities relative to what you already know is
4       contaminated.
5   Q.   At the point that you submitted this report, you
6       didn't know whether there was substantial
7       contamination on other parts of the facility that
8       might require additional work by the developer, did
9       you?
10  A.   I'm not sure whether we would have had the development
11      plan, which would have been the second component of
12      that analysis or not. One component is obviously what
13      you know. The other component is what you need to
14      know, which would be based on your development plan.
15  Q.   Um-hum. At the time, though, that you prepared this,
16      you didn't know the answer to the question of how much
17      additional contamination there was on the site?
18  A.   No.
19  Q.   Or whether there was any potential exposure to
20      users that would -- people that would be on the
21      property after the development project was completed?
22  A.   We would know there would be potential exposure. We
23      wouldn't necessarily know if there would be actual
24      exposure.
25  Q.   Well, until you know where the contamination is

Page 73

1   located, you can't really answer any of those
2   questions, can you?
3   A.  Of course.
4   Q.  So there would have been additional investigation that
5   would have been necessary for purposes of the
6   development project; isn't that right?
7   A.  Again, I'm going to go back to the same statement.
8   You would evaluate the information that you have
9   versus the information you need relative to the
10  proposed development.  If you're doing nothing with
11  the building and you're not going to disturb any of
12  the soil, you may have the answer to that question
13  with the information in a BEA or you may not.
14  Q.  In this BEA, did you have enough information to
15  conclude that you didn't need any more investigation
16  for purposes of the development?
17  A.  I don't know.  I'd have to go back in time, so I don't
18  know.
19  Q.  Well, you -- you have not delineated the lateral
20  extent of contamination with the testing that you had
21  done as of July 10, 2009, when you completed the
22  Phase I report; is that right?
23  A.  Yes.
24  Q.  So -- and you had not completed vertical extent --
25  delineated the vertical extent of the contamination on

Page 74

1   the site; isn't that right?
2   A.  That's correct.
3   Q.  So that beginning develop- -- so you -- beginning
4   development on the report without knowing that there
5   was -- whether there was additional contamination on
6   the property, is that something that the developer
7   could have done at that point?
8   A.  Again, it depends on its development plan.  The
9   majority of time the vertical extent of contamination
10  is meaningless to redevelopment.  The horizontal
11  extent is more likely to be relevant.  But, again, if
12  you're not disturbing, say, an area underneath the
13  parking lot, you may not need to know where the
14  contamination starts and stops.
15  Q.  Well, the vertical extent would be meaningless if --
16  if it weren't a federal Superfund site; is that right?
17  A.  My understanding of your phrasing of your question had
18  nothing to do with whether it was a Superfund site.
19  You were asking about redevelopment.
20  Q.  I'm actually asking about this site.
21  A.  Again, as a non-liable party, there's no burden on a
22  re- -- a redeveloper to determine the extent of
23  contamination, unless it's required for him to meet
24  his continuing obligations or due care.
25  Q.  So long as he was protecting himself from liability,

Page 75

1   the additional testing would not have presented a risk
2   to him or his project?  Or the lack of information,
3   rather.
4   A.  Again, he would only need to know the horizontal and
5   vertical extent of contamination such that it would be
6   necessary to assess potential or actual exposures
7   either during construction or, you know, during reuse
8   of the -- final reuse of the development.
9   Q.  Leaching to groundwater is the principal exposure risk
10  that was in play at this time for the Superfund site;
11  isn't that right?
12  A.  It is the most stringent of the ROD-required cleanup
13  goals, but it is irrelevant to redevelopment.
14  Q.  But it is driving the remedy of the Superfund site?
15  A.  It's part of what would be driving the remedy, yes.
16  Q.  Well, it's the cleanup objective that is being used is
17  the migration of groundwater components to the soil
18  cleanup?
19  A.  For the TCE and the PCE, that's correct.
20  Q.  So at the time then that -- while you didn't know the
21  conditions at depth, there was -- you did know that
22  there was a Superfund process going on --
23  A.  Yes.
24  Q.  -- isn't that correct?
25      And you had reviewed the ROD and amended

Page 76

1   ROD before you prepared the Rose & Westra Phase I
2   report?
3   A.  I doubt we looked at the ROD in any significant
4   detail.  The ROD apparently applied to the eastern
5   property and it did set cleanup goals for both soil
6   and groundwater, but we wouldn't have spent much time
7   on the ROD.  It was directed at the PRP, not the
8   redevelopment.
9   Q.  So if the ROD -- so the fact that the ROD, in your
10  view, applied to the eastern parcel, that was a
11  relevant consideration in the determination as to
12  whether you really needed to do any further
13  investigation on the western parcel?
14  A.  No.  Again, any additional investigation on the
15  western parcel would have been driven by our
16  redevelopment information needs, not the ROD.
17  Q.  Okay.  So the ROD then, the fact that it was a
18  Superfund site that you were developing on, it was
19  inconsequential to the decision making as to whether
20  additional testing was going to be needed?
21  A.  Inconsequential for additional testing for
22  redevelopment, that's correct.
23  Q.  The discovery of the soil contamination on the western
24  parcel at near surface -- near the surface was a
25  new -- new information; wasn't it?

Page 77

1  A.  People acted like it was, but, again, I don't know why
2  it was, because contamination had been documented by
3  the State's contractor at least a decade before.
4  Q.  But the levels that were discovered by you in your due
5  diligence were considerably higher than anything that
6  was found by the SEG; isn't that right?
7  A.  That's correct.
8  Q.  And the lateral extent of contamination was something
9  that you -- you had not defined either by the time
10 that you prepared your Phase I?
11 A.  Correct.
12 Q.  Given the results that you had in hand as a result of
13 the November 2008 testing and the ERE Phase II
14 results, did you expect that DEQ might want additional
15 investigation done?
16 A.  By whom?  Directed at whom?
17 Q.  Did they want additional -- to anyone.
18 A.  I -- again, I can't speak for the agency.  I wouldn't
19 try to project what the agency would ask of the
20 various parties.
21 Q.  Well, you're very experienced in due diligence
22 matters.  I'm trying to figure out what you would have
23 expected at that time.
24 A.  I mean, I would hope, as a taxpayer of the State, that
25 they would ask the liability party or PRP to address

Page 78

1  the contamination that's part of the Superfund site.
2  Q.  And at that time, wasn't there a work plan already in
3  the works for doing additional testing after closing
4  of the acquisition --
5  A.  I --
6  Q.  -- by the developer?
7  A.  A work plan?  There would have been -- there may have
8  been a Brownfield benefit package being created that
9  would have contained additional testing to support
10 redevelopment.
11 Q.  So there was a work plan for additional testing to be
12 done after the acquisition of the property?
13 A.  It would have been created at some point.  I don't
14 remember the sequence.
15 Q.  But there was a work plan to do additional testing
16 after the close of the acquisition?
17 A.  I'm going to re-say, I do not remember the sequence it
18 would have been created or drafted at some point.
19 When, relative to the acquisition, I don't recall.
20 Q.  Was that proposed or requested by the agency?
21 A.  No.
22 Q.  Okay.  And so in your opinion, you don't know whether
23 additional investigation would have been warranted or
24 necessary from a risk management perspective?
25 A.  From a redevelopment perspective, I will state for the

Page 79

1  third, maybe fourth or fifth time, that you would look
2  at the development plan and what you would be
3  disturbing and doing for redevelopment relative to the
4  information available and then decide what, if any,
5  information is necessary to support that
6  redevelopment.
7  Q.  Would it have been foreseeable that additional testing
8  might be necessary to characterize the site?
9  A.  Yes.
10 Q.  I'm going to ask you to look at page 10 of -- of the
11 exhibit.  Can you review the second paragraph of that,
12 that's on that page?
13 A.  Hmm-mmm.
14 Q.  So -- and this is a conclusion that you made, at the
15 time that this document was prepared, that there was
16 the likelihood of other contamination?
17 A.  That is a generic paragraph that would have been in
18 any of our BEAs prior -- including this one -- prior
19 to changing the rules, changing the content of the
20 BEAs, because it is a statement of fact.  We never
21 have sampled all the property soil or groundwater on
22 the property.  You cannot test for every chemical that
23 exists.  Therefore, when this was a required section
24 of the BEA, statement of fact in every one that we
25 did.

Page 80

1  Q.  So you're saying this was generic and it really didn't
2  have any particular meaning in this particular BEA?
3  A.  It had meaning in every BEA we did and it applied to
4  this case, like others.  You cannot test for every
5  compound that exists.  There are not cleanup criteria
6  for every compound or element that exists, and we
7  can't test all the soil and groundwater.  So no matter
8  how much testing you do, you don't have perfect
9  information.
10 Q.  Now, so the -- the fact that you had the majority of
11 the samples that you had done during your due
12 diligence, had discovered elevated levels of TCE, the
13 contaminate of concern at the Superfund site, in
14 excess of a cleanup criteria, and had not fully
15 delineated the contamination on this site, you're
16 saying that you could not reasonably anticipate that
17 additional investigation was going to be required by
18 the State?
19 A.  I didn't say that.  I said -- you know, there would be
20 two routes that additional investigation may be
21 necessary; one is for redevelopment and one may be for
22 agency enforcement.
23 Q.  And could you foresee that there would be additional
24 testing done for purposes of agency enforcement?
25 A.  For both, as I just said.

Page 81

1 Q. There would be, in this particular case, given the
2 results that you had in hand on July 10, 2009 --
3 A. As I --
4 Q. -- you could reasonably foresee that there would be
5 additional testing required under the Superfund
6 process?
7 MR. BILA: Objection, form, and asked and
8 answered, but go ahead and say it once again for the
9 12th time.
10 THE WITNESS: As I said, as a taxpayer of
11 the State, I would hope the agency would enforce
12 against the liable parties.
13 BY MR. RODRIGUEZ:
14 Q. That's not the question. The question is: Could you
15 reasonably foresee that they were going to require
16 additional substantial testing based on the conditions
17 that were reported in your Phase I?
18 MR. BILA: Same objection.
19 THE WITNESS: You're asking me to put
20 myself in the mind of people that, quite frankly, I'm
21 often not good at predicting. If I had been in their
22 position, I would require additional testing, but
23 that's not what you're asking.
24 BY MR. RODRIGUEZ:
25 Q. I'm asking you whether you could have reasonably

Page 82

1 foreseen it given the conditions on the property.
2 Now, you're an expert in this area or holding yourself
3 out to be an expert in this area. I just want to know
4 whether you foresaw that additional testing was going
5 to be required of the Superfund party?
6 MR. BILA: And he's answered that a dozen
7 times.
8 MR. RODRIGUEZ: He has not answered the
9 question.
10 MR. BILA: He has. He said he can't -- we
11 can read them back. He said if it was up to me, I
12 would have required it, but it's not up to me, and I
13 can't predict what the State will do. As a taxpayer,
14 I would like them to take that next step, but I'm not
15 going to guess what the State wants. That's what he
16 said over and over.
17 BY MR. RODRIGUEZ:
18 Q. So the question -- the question still stands. Did you
19 reasonably foresee -- could you reasonably foresee
20 that additional testing was going to be required?
21 MR. BILA: Same objection.
22 THE WITNESS: And as I said, I can see two
23 routes where it could have been or would have been
24 required. One of them might be by us recommending it,
25 based on redevelopment plans. The other would be at

Page 83

1 the request -- euphemistic demand of the agency.
2 BY MR. RODRIGUEZ:
3 Q. And they would have demanded -- they would have
4 demanded additional testing?
5 MR. BILA: Objection, form. He can't
6 predict that. Go ahead.
7 THE WITNESS: As I said, if I had been in
8 their position, I would have, but I -- I do not
9 predict the agencies, because I'm wrong time and time
10 again.
11 BY MR. RODRIGUEZ:
12 Q. So you did not then advise Kirsch Lofts that there was
13 a possibility that there would be additional
14 investigation being done as a result of the findings;
15 is that right?
16 MR. BILA: Objection, form, but go ahead.
17 You can answer.
18 THE WITNESS: Possibility? I probably did,
19 but I don't -- as far as how foreseeable it would be,
20 you know, again, I wouldn't have ruled it out or said
21 it was definite.
22 BY MR. RODRIGUEZ:
23 Q. So you're saying you're not sure whether you advised
24 about the possibility of additional response
25 activities being required of the Superfund party as a

Page 84

1 result of the testing that you had done?
2 A. I don't know if that was advice that was sought.
3 Q. So if Mr. Bosgraaf didn't ask, you wouldn't have told
4 him?
5 A. I wouldn't say that either. You're asking for me to
6 speculate or recall a nuance of one of hundreds of due
7 diligence projects over nearly a decade. Ask a
8 question I can answer.
9 Q. Well, I'm just asking you whether you told him --
10 A. I told you I don't know.
11 Q. -- that there's a risk his project might get delayed?
12 Did you advise him of that?
13 MR. BILA: Objection, form. You can go
14 ahead.
15 THE WITNESS: I don't know.
16 BY MR. RODRIGUEZ:
17 Q. You don't -- you don't know whether you told him?
18 A. I don't.
19 Q. So -- so in your experience as a due diligence
20 professional, would you say that the presence of TCE
21 at levels exceeding ten times the applicable cleanup
22 objective on a Superfund site that hasn't been fully
23 delineated would constitute a red flag?
24 A. A red flag for what?
25 Q. For potential delay and additional investigation or

Page 85

1  remediation that might be required.
2    MR. BILA: By whom?  Objection, form.
3    THE WITNESS: Would you restate the
4  question, please?
5    BY MR. RODRIGUEZ:
6  Q.  In your experience as a due diligence professional,
7  would you say that the presence of TCE at levels
8  exceeding ten times the applicable cleanup objective
9  at a Superfund site, and that has not been fully
10  delineated, would not have resulted in substantial
11  additional investigation and future remediation?
12  A.  I think it could.  And as I said, I would hope that it
13  would trigger additional investigation and, if
14  necessary, response.
15  Q.  You're familiar -- do you recall the January 27, 2010
16  email from Rob Franks; do you know?
17  A.  I have no idea, sir.
18  Q.  All right.
19    MARKED FOR IDENTIFICATION
20    DEPOSITION EXHIBIT 7
21    11:29 a.m.
22    BY MR. RODRIGUEZ:
23  Q.  Focusing your attention to the bottom half of this
24  email.  This was an email from DEQ advising you
25  that -- that the discovery of the TCE on the western

Page 86

1  parcel represented a serious problem; is that right?
2    MR. BILA: Objection, form, go ahead.  You
3  can still answer.
4    THE WITNESS: I -- definition of serious
5  problem, they're -- they're simply saying they're
6  conditionally approving part of our proposed work and
7  asking that we not do part of other proposed work.
8    BY MR. RODRIGUEZ:
9  Q.  Can you read out loud the first sentence of that
10  paragraph after Soil Sampling and Analytical Results?
11  A.  With regard to soil sampling, MDNRE staff have
12  evaluated the analytical results and have concluded
13  that the TCE remaining in the soils on the west side
14  of the former manufacturing plant represents a serious
15  problem.
16  Q.  And then -- then skip down to the second paragraph of
17  that section.
18  A.  In light of this development, we request that you not
19  move forward with the Clean Soil subtask of Task 3.3
20  Due Care in the approved Act 381 Work Plan, until a
21  final decision is made as to the appropriate response
22  in dealing with the TCE contaminated soils.
23  Q.  So -- so this is -- this is DEQ telling you that in
24  his words, not your words, his words, he's calling the
25  results of the testing a serious problem?

Page 87

1  A.  Correct.
2  Q.  And saying that there was going to have to be a
3  time -- some time taken here to figure out an
4  appropriate response in dealing with the soils; is
5  that right?
6    MR. BILA: Objection, form.  Go ahead.  You
7  can still answer.
8    THE WITNESS: I believe the question is as
9  to an appropriate response dealing with the TCE
10  contaminated soil.
11    BY MR. RODRIGUEZ:
12  Q.  And --
13    MR. BILA: Are you done with this
14  Exhibit 6?
15    MR. RODRIGUEZ: Yeah.
16    MARKED FOR IDENTIFICATION
17    DEPOSITION EXHIBIT 8
18    11:33 a.m.
19    MR. BILA: I think we are on 8.
20    MR. RODRIGUEZ: Are we?
21    THE WITNESS: Yes.
22    BY MR. RODRIGUEZ:
23  Q.  I'm going to show you what's been marked as Exhibit 8,
24  ask you to take a look at it.
25  A.  Okay.

Page 88

1  Q.  Okay.  There are two -- two emails in this exhibit,
2  both from Mr. Franks; isn't that right?
3  A.  Yes.
4  Q.  So the one I want to focus on is the March 22 email.
5  This email was directed to Mr. Bosgraaf; isn't that
6  right?
7  A.  Yes.
8  Q.  You were copied on it; is that right?
9  A.  Yes.
10  Q.  And it advises you that the State is going to require
11  additional soil investigation of the Superfund party;
12  is that right?
13  A.  Yes.
14  Q.  And it advises you that there is going to be remedial
15  action following -- necessary following that
16  investigation; is that right?
17  A.  The appropriate remedial action.
18  Q.  Would be necessary.
19  A.  Okay.  So I -- I mean, you're asking me now to jump
20  into his mind what it means?
21  Q.  I'm asking you what the exhibit says.
22  A.  It says the remedial action.  It doesn't say will be
23  necessary.  It says the appropriate remedial actions.
24  Q.  Why don't you go ahead and read the sentence.
25    MR. BILA: Which sentence?

Page 89

1     MR. RODRIGUEZ: The one that he just read
2  from.
3     THE WITNESS: Final approval to move
4  forward with construction of a vapor barrier cannot be
5  provided until such time as the soil TCE/PCE
6  investigation has been conducted by Newell Rubbermaid
7  and the -- the appropriate remedial actions have been
8  determined by DNRE.
9     BY MR. RODRIGUEZ:
10 Q.  So this was -- this was apprising the developer that
11   there was going to be investigation and remediation
12   necessary before he could move forward with his
13   project; is that right?
14 A.  I would say it was advising him that investigation
15   would be required and remedial actions might be
16   necessary. We often investigate sites and determine
17   no additional action is necessary.
18 Q.  Is that what he said?
19 A.  No. He said the appropriate remedial action.
20 Q.  But this did put you on notice that the project was
21   going to be delayed as a result of future -- the need
22   for future testing and remediation, if necessary?
23 A.  At least portions of the project, yes.
24 Q.  Okay. And were you then familiar with the work plan
25   that was done by URS to do the additional

Page 90

1  investigation?
2 A.  I don't know if we reviewed that document or not.
3 Q.  But you know it happened?
4 A.  I know the work was eventually conducted and,
5   therefore, I presume under the CERCLA process a work
6   plan had been drafted and approved.
7 Q.  Okay. And -- and that work was -- took place over the
8   course of 2010?
9 A.  I believe I have in the expert report exhibit for work
10  conducted in 2010, yes.
11 Q.  And the results of that testing that was done during
12  the course of 2010, that was the -- the results of
13  that report -- that testing you obviously have seen,
14  because you included it in your expert report; is that
15  right?
16 A.  Yes. I believe that summary --
17 Q.  That's the December 2010 report?
18 A.  Correct. I believe the summary is all I've seen, but
19  I have seen that summary.
20 Q.  And -- and the -- and the testing that was conducted
21  over the course of 2010, that was work that was
22  required by this -- by the DEQ?
23 A.  I can't -- as I said, I did not see -- I do not
24  believe I saw the work plan, and those would have been
25  communications primarily between other parties. I

Page 91

1  neither agree nor disagree with your statement.
2 Q.  Okay. The conclusion of the investigation was -- or
3  the culmination would have been December of 2010, I
4  think you said.
5     The next step, did you ever see the notice
6  of additional response activities that was issued by
7  the State?
8 A.  I -- I don't know.
9 Q.  Let me show it to you.
10    MARKED FOR IDENTIFICATION
11    DEPOSITION EXHIBIT 9
12    11:40 a.m.
13    THE WITNESS: We're done with 8?
14    MR. RODRIGUEZ: Yep.
15    BY MR. RODRIGUEZ:
16 Q.  Have you ever seen this letter?
17 A.  I may have. I -- I don't recall.
18 Q.  What does this letter appear to you to be?
19 A.  It's a request for work plan for additional
20  investigation, pilot studies, engineering design,
21  construction implementation, monitoring operation and
22  maintenance, and any other aspect needed to address
23  soil contamination in conformance with industry
24  standard practice and the requirements of the Consent
25  Decree.

Page 92

1 Q.  And he invokes the Consent Decree; is that right?
2 A.  With industry standard -- standard industry practice
3   and requirements of the Consent Decree.
4 Q.  If you look at page 2, first paragraph under Results
5   of Soil Investigations and Request For Additional
6   Response Activities.
7 A.  I believe that's what I just read.
8 Q.  Is that what you read? And you begin there with the
9   second sentence of that sentence -- of that section.
10 A.  The plan must also contain a schedule.
11 Q.  The second sentence of the first paragraph under
12  Results of Soil Investigations --
13 A.  I'm sorry. I was reading from the second paragraph.
14  Studies conducted on both the east and west sides of
15  Prospect Street reveal widespread TCE and/or PCE
16  contamination in excess of the ROD Amendment mandated
17  cleanup standards.
18 Q.  And can you continue through the next sentence,
19  please?
20 A.  Because of this and because the ROD Amendment requires
21  remediation of these contaminants to levels protective
22  of groundwater, the MDEQ hereby invokes provisions of
23  Section VI, Additional Response Activities, of the
24  October 25, 1996 Consent Decree. (Consent Decree 5:96
25  dash Charlie Victor dash 157 (Frank J. Kelley v Cooper