# EXHIBIT F

## In The Matter Of:

*Newell Rubbermaid, Inc. vs.*
*Kirsch Lofts, LLC*

*David Meiri, Ph.D.*
*June 3, 2016*



**Bienenstock**
**NATIONWIDE COURT REPORTING & VIDEO**
www.bienenstock.com

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File MEIRI_PH.D._DAVID.txt*
*Min-U-Script® with Word Index*

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4   NEWELL RUBBERMAID, INC.,            )
 5        Plaintiff/Counter-Defendant,   )
 6     vs.                      )1:15 cv-00597-RJJ
 7   KIRSCH LOFTS, LLC,                  )
 8        Defendant/Counter-Plaintiff.  )   VOLUME I
 9
10       The discovery deposition of DAVID MEIRI, Ph.D.,
11   taken in the above-entitled cause, before
12   Barbara Manning, on the 3rd day of June, 2016, at the
13   hour of 1:06 p.m. at 233 South Wacker Drive,
14   Suite 6600, Chicago, Illinois, pursuant to notice.
15
23   Reported by:  Barbara Manning, CSR
24   License No.:  084-003277
```

Page 2

```
 1   APPEARANCES:
 2       BILA & ASSOCIATES, PLLC
         BY:  MR. DENNIS W. BILA, II
 3       321 Spring Street, Suite A
         Harbor Springs, Michigan  49740
 4       (231) 526-9678
             and
 5       GABRIELSE LAW, PLC
         BY:  MR. CARL J. GABRIELSE
 6       carl@gabrielselaw.com
         301 Hanover Boulevard, Suite 300
 7       Holland, Michigan 49423
         (616) 403-0374
 8
             Representing the
 9           Plaintiff/Counter-Defendant;
10
         SCHIFF HARDIN, LLP
11       BY:  MR. GABRIEL M. RODRIQUEZ
         grodriguez@schiffhardin.com
12       233 South Wacker Drive, Suite 6600
         Chicago, Illinois  60606
13       (312) 258-5516
14           Representing the
             Defendant/Counter-Plaintiff;
15
16       GOLDSTEIN & MC CLINTOCK, LLLP
         BY:  MR. DANIEL C. CURTH
17       danc@goldmclaw.com
         208 South LaSalle Street, Suite 1750
18       Chicago, Illinois  60604
         (312) 337-7700
19
             Representing the Deponent.
```

Page 3

```
 1                     I N D E X
 2   WITNESS                                      PAGE
 3   DAVID MEIRI, Ph.D.
 4       BY MR. BILA, II                           4
 5
 6                   E X H I B I T S
 7   NUMBER                                       PAGE
 8   Exhibit 1    Project Review and Financial    15
                  Meeting, 9-9-10
 9
     Exhibit 2    Evaluation of Remedial          59
10                Alternatives
11   Exhibit 3    Project Review Meeting, 2-11-11 63
12   Exhibit 4    Project Review Meeting, 12-5-11 69
13   Exhibit 5    Sturgis Master Schedule,        76
                  3-29-11
14
15   Exhibit 6    Letter from Mr. Meiri to        79
                  Mr. Franks dated 4-6-11
16   Exhibit 7    Project Tasks and Schedule,     82
                  5-10-11
17
18   Exhibit 8    Project Tasks and Schedule,     84
                  5-22-11
19   Exhibit 9    Project Tasks and Schedule,     85
                  6-9-11
20
21   Exhibit 10   Project Tasks and Schedule-NARA 86
22   Exhibit 11   Remediation Design and          89
                  Implementation Outline
```

Page 4

 1   (Witness sworn)
 2   DAVID MEIRI, Ph.D.
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5   EXAMINATION
 6   BY MR. BILA, II:
 7   Q. Mr. Meiri, we met briefly before the
 8   deposition. My name is Dennis Bila.
 9   A. **For the record I am Dr. Meiri, not Mr. Meiri.**
10   Q. Dr. Meiri, you were subpoenaed here today by
11   my client. Could you state your full name for the
12   record?
13   A. **David Meiri, M-e-i-r-i.**
14   Q. And with whom do you work?
15   A. **AECOM, A-E-C-O-M.**
16   Q. And what does AECOM do?
17   A. **It's engineering consulting company.**
18   Q. And how long have you worked for AECOM?
19   A. **AECOM bought URS. So it's about ten years.**
20   Q. And is that with AECOM or with AECOM/URS?
21   A. **AECOM/URS.**
22   Q. And what did you do -- who did you work
23   before that merger -- who -- what did you do prior to
24   ten years ago?
25   A. **RETEC, R-E-T-E-C.**

Case 1:15-cv-00597-RJJ   ECF No. 88-7,  PageID.1803   Filed 07/01/16   Page 4 of 7

Newell Rubbermaid, Inc. vs.
Kirsch Lofts, LLC
David Meiri, Ph.D.
June 3, 2016

Page 21

1  A.  Yes, you can say.
2  Q.  And you glanced at some of the records that
3  you produced.  Did you pull any specific records out
4  and review them in any greater detail?
5  A.  I did not.
6  Q.  And when you say you produced records, did
7  you individually produce records or did you direct
8  staff to do it?
9  A.  I don't quite follow your question.
10 Q.  Sure.  You said you produced some records.
11 Did you personally pull those records and produce them
12 or did you direct a staff member to pull certain
13 records and produce them?
14 A.  I did it.
15 Q.  Were the records that you produced stored
16 electrically or in boxes?  How are they maintained?
17 A.  Electronically.
18 Q.  And how were you able to figure out what to
19 produce?  Did you search through electric folders?  Is
20 there one folder that has everything in it, and you
21 just produced everything?
22 A.  We had a project file electronically, very
23 well organized, and I just have familiarity, enough
24 familiarity, of this project that I can look in the
25 folder directory.  And I can pull up the document so

Page 22

1  for me it's pretty clear, a very simple road map
2  there.
3  Q.  There are more than one of these types of
4  presentations.  Was it a rolling document that you
5  updated each time or did you create a new one from
6  scratch every time?
7     MR. CURTH:  Objection to form.
8     THE WITNESS:  This is a mix of both.
9     BY MR. BILA, II:
10 Q.  All right.  Would you please turn to page 17
11 of Exhibit 1.  The top line reads -- top two lines
12 read, "Kirsch source area soil investigation and
13 results."
14    Were you involved in the -- did an
15 investigation take place?
16 A.  Pardon me?
17 Q.  Did an investigation actually take place?
18 A.  Yes.
19 Q.  Were you involved in that investigation?
20 A.  Yes.
21 Q.  What was your role?
22 A.  Project manager.
23 Q.  So you oversaw the people who undertook the
24 investigation?
25 A.  To some degree.

Page 23

1  Q.  Do you know when -- it says this
2  investigation -- it says, "Investigation from May
3  through August, 2010."  Is that accurate?
4  A.  As far as my recollection, yes.
5  Q.  What was the investigation?
6  A.  As is stated here, soil investigation.
7  Q.  And what did you have to do?
8  A.  Collect soil samples.
9  Q.  From where?
10 A.  From the Kirsch source area.
11 Q.  From this report or anything in it can you
12 point to me a specific area where the investigation
13 took place?
14 A.  If you look on slide number 11, if you see
15 the former Kirsch source area, it's the red shaded
16 area on both side of Prospect.
17 Q.  And what did the investigation entail.  I
18 know you said soil sampling, but how do you do that?
19 A.  Normally we are using sort of delivery in
20 deriving a sample, can be stainless steel, a tube if
21 you will, and drive it to the ground and displace the
22 soil until it's inside the hollow, in the tube that is
23 hollow.  So soil enter from the bottom.
24    Then we retrieve the tube.  We open it and
25 inspect and take, collect, sample and send to the

Page 24

1  laboratory.
2  Q.  And then for this particular investigation,
3  is that what you did?
4  A.  In a very broad sense.  It's a little more
5  complicated than I had described, but usually we use
6  auger in order to drive.
7     Inside the auger you have this tube, but
8  essentially we are driving a sample into the ground to
9  different depths.
10    And we collect the sample, retrieve from
11 certain depths, collect the sample and inspect and
12 ship it to the laboratory.
13 Q.  Do you know how many samples you retrieved
14 for this investigation?
15 A.  I don't remember.
16 Q.  Do you know who owned the property at the
17 time you were performing this investigation?
18    MR. CURTH:  Objection, foundation, form.
19    THE WITNESS:  I know that whatever we did we had
20 access to the property whoever the owner at the time.
21    BY MR. BILA, II:
22 Q.  Do you know whether or not you had to go to
23 the owner to get access or did you have another route?
24 A.  We have another route.
25 Q.  What was that other route?

Case 1:15-cv-00597-RJJ   ECF No. 88-7,  PageID.1804   Filed 07/01/16   Page 5 of 7

Newell Rubbermaid, Inc. vs.
Kirsch Lofts, LLC
David Meiri, Ph.D.
June 3, 2016

Page 25

1  A.  The legal.  I go to the legal department, to
2  Newell Rubbermaid legal.
3  Q.  And I guess do you know whether -- let me
4  rephrase that.
5     Do you know whether the owner provided you
6  with access on each occasion or whether you had a
7  legal right through an easement to get access to the
8  site?
9  A.  I don't know.
10 Q.  Were you ever denied access to the site?
11    MR. CURTH: Objection, foundation.
12    THE WITNESS: As I said before, we -- I
13 personally, we, the company, we do it.  I am going to
14 my client, and this is the client responsibility to
15 provide me the access.  That's the end of my
16 responsibility.
17    BY MR. BILA, II:
18 Q.  Sure.  And I am asking -- I am being very
19 specific in that question.
20    Did you ever go to the site and have someone
21 deny you access?
22    MR. CURTH: Objection, foundation.
23    THE WITNESS: The answer is no.  I wouldn't go to
24 a site if I don't have any access before I go to the
25 site.

Page 26

1     BY MR. BILA, II:
2  Q.  Would you please turn to page 19.  And I
3  don't believe it's numbered, but it precedes 20.
4  A.  Got it.
5  Q.  19 suggests that 43 borings were advanced.
6  Does that -- would that most likely be accurate for
7  the west parcel of the property?
8  A.  Yes.
9  Q.  And it says most borings were from zero to
10 60 feet.  Were borings done at deeper depths?
11 A.  No, not in this particular phase, no.
12 Q.  Do you know what the results of the
13 investigation were, and feel free to review your
14 report?  And I might direct you to page 20 if that
15 helps -- or pages.  Let me rephrase that question.
16    Take a look at pages 20, 21 and 22, and tell
17 me if you can address my question, what the results of
18 the investigation revealed?
19 A.  As you see here, the result reveal that you
20 have certain level of TCE and PCE and certain depths
21 from zero to 60 feet below grade over the parcel.
22 Q.  Do you recall as we sit here today what the
23 contamination levels -- what you believe the
24 contamination levels were prior to this investigation?
25 A.  I don't.

Page 27

1  Q.  Do you recall as we sit here today whether or
2  not this investigation revealed something that you
3  believed was new information?
4  A.  Let me answer by this.  Every time you
5  collect sample you get a new information so this is no
6  different from any other boring that I do.
7     If I knew before, I wouldn't do the boring.
8  I don't know before, and that's why we do this.
9  Q.  And that's fair.  So let's just focus on the
10 west parcel.
11    Did the soil borings that you did on the west
12 parcel reveal that there had been a change from what
13 you had previously understood the contamination levels
14 to be?
15 A.  There is no answer to this because I have no
16 information before.  I was not involved in any
17 investigation on the west parcel before.  So I have no
18 opinion what was before and what would be after.
19 Q.  So your first knowledge of any contamination
20 on the west side, on the west parcel, was when this
21 investigation was done?
22 A.  Yes.
23 Q.  Would you please turn to page 23.  This page
24 is entitled Kirsch Source Area Remedial Alternatives
25 Evaluation.  Do you see that?

Page 28

1  A.  Yes.
2  Q.  Were different technologies being considered
3  to remediate the contamination?
4     MR. CURTH: Objection, foundation.
5     THE WITNESS: Yes.
6     BY MR. BILA, II:
7  Q.  Who was the one who was making the
8  determination as to which technology would be best
9  suited for this site?
10 A.  Ultimately it would be the Michigan DEQ, the
11 agency.
12 Q.  Who compiled these different technologies for
13 this report?
14 A.  My company.
15 Q.  And was that based on something that you
16 personally recommended or was it something that
17 some -- an underling brought to you and said here is
18 the different alternatives that we have available to
19 us?
20 A.  I personally.
21 Q.  And it says several technologies were
22 considered.  Who was doing the considering?
23 A.  My staff.
24 Q.  So you met with your staff.  You proposed
25 several different technologies, and then together as a

Case 1:15-cv-00597-RJJ   ECF No. 88-7,  PageID.1805   Filed 07/01/16   Page 6 of 7
Newell Rubbermaid, Inc. vs.
Kirsch Lofts, LLC

David Meiri, Ph.D.
June 3, 2016

Page 85

1  everything accordingly.  So as I say earlier, these
2  are dynamic processes.  When we prepare the schedule,
3  we don't have all of the pieces.
4     You get another piece of information, you
5  update the schedule and everything is shifting.  So I
6  think that's the same year, I believe.
7     (Whereupon, Exhibit
8     No. 9 was marked for
9     identification.)
10    BY MR. BILA, II:
11 Q.  We are now looking at Exhibit 9 which is an
12 updated project task schedule dated June 9, 2011,
13 true?
14 A.  Yes.
15 Q.  And as of as shown on line 30, the system
16 was still supposed to be -- the SVE system was still
17 supposed to be operational by August 6, 2012?
18 A.  What line are you?
19 Q.  30.
20 A.  Yes.
21 Q.  So at least as of the date of all of the
22 schedules that we have just looked at, you had
23 scheduled the SVE system to be operational no later
24 than August 6, 2012?
25 A.  Yes.

Page 86

1     (Whereupon, Exhibit
2     No. 10 was marked for
3     identification.)
4     BY MR. BILA, II:
5 Q.  I have just shown you Exhibit 10 which is a
6 Project Tasks and Schedule - NARA.  What does NARA
7 stand for?
8 A.  I don't recall.
9 Q.  I was hoping to try and determine the date
10 this schedule was prepared, and I want you to look at
11 line four.
12 A.  Yep.
13 Q.  And first I want to see if there is a typo
14 here.  The start date says, 9-11-2012, one day to
15 complete, finish date Tuesday 9-11-2012.
16    Is it likely that this report was prepared on
17 9-10 based on that and that was just a typo, Tuesday,
18 9-10 or Tuesday, 9-11.
19    I am just trying to find out when this report
20 was generated, and I was wondering if that helped you
21 to know.
22 A.  I don't see any date in the report so I
23 cannot say.
24 Q.  Do you think it was prepared on
25 September 11th or the 10th?

Page 87

1 A.  I cannot answer this.
2 Q.  The leachate study that was to be performed
3 which is discussed at line seven --
4 A.  Yes.
5 Q.  -- now has a start date of April 29, 2013.
6 Do you see that?
7 A.  Yes.
8 Q.  Every other document that we have looked at
9 so far has moved the leachate test a few days but
10 always kept them in the year 2011.
11    Now you are moving it out one-and-a-half
12 years all of a sudden.  Do you recall what prompted
13 that?
14 A.  Number three.
15 Q.  "MDEQ approves revised plans for an
16 additional" -- "for additional response activities"?
17 A.  You really have to read one through three
18 together.
19 Q.  Okay.  So number one, "Notice of additional
20 response activities received from MDEQ," April, 2011,
21 true?
22 A.  Correct.
23 Q.  Do you recall what the additional response
24 activities were?
25 A.  Yes.

Page 88

1 Q.  What were they?
2 A.  Michigan DEQ by the statute of the superfund
3 required us to complete additional -- basically was
4 ordered to complete the additional activity.
5     And that's the trigger, the process for us to
6 put together a plan, and it took us to get this plan
7 approved for additional activity by September 11,2012.
8     So this is required, mandated by the EPA, and
9 we completed this and approved on September 11, '12.
10 Q.  And it shows zero days to complete, start
11 date 9-11-2012.  That's because it was already done?
12 A.  Well, I didn't want to break it down so
13 basically to keep it short I put a zero day, but
14 basically this is kind of -- you notice this is
15 landmark, basically milestone, completed notice.
16 Q.  But it was already done?
17 A.  I believe from my recall I think
18 September 11, '12 -- I will have to look in the
19 record, but I believe this was the date it was
20 approved, I believe.  And I have to look, and you
21 probably have the document, too, so you can tell.
22 Q.  Well, that's why I am getting -- so some
23 additional response activities were received from the
24 MDEQ in April, 2011.  Newell submitted its response in
25 August, 2012.

Page 97

**THE WITNESS:** The simple answer to this is for to review the process when the work plan was submitted, when the work plan was approved, when the field were conducted and the well was completed.

Whereas, the report was submitted and where the report was approved, and that's really we follow -- that's the line of the timeline. There is no magic to this.

**BY MR. BILA, II:**

Q. I am not saying there is magic. I am saying I don't understand it. It says, "Newell submitted" -- this is line two on Exhibit 10.

"Newell submit to MDEQ, revised plan for additional response." That was done on August 22, 2012. And 20 days or so later, "The MDEQ approved the plan."

So it took them 20 days to approve it, true, or so? I am not saying exact number.

A. Not true.

Q. How many days did it take them between the time Newell submitted the revised plan for additional response until MDEQ approved the revised plan for additional response?

A. You have to read between one to two, what happened between one to two. What is missing here is

Page 98

we did not capture on this every single event.

We submitted to the agency work plan and revised the work plan and perhaps a second revision.

What you see in number two is a revised plan. It does not tell you how many revisions we had before we got to this number two. My point between one to two a lot of life happen.

Q. Yes.

A. So by the time you got to two, the report was basically completed to the satisfaction if you will of the agency.

Therefore, it took them only a few days to approve these. But it took us over a year from April 11 to August 12 to get the plan almost approved.

Q. So what your testimony is you got -- number one, notice of additional response activities were received from the MDEQ on April 27, 2011 and you -- I'm sorry. Newell submitted a revised plan 16 months later?

**MR. RODRIGUEZ:** Objection.

**THE WITNESS:** No, totally incorrect.

**BY MR. BILA, II:**

Q. How many months elapsed between the time Newell received the notice of additional response activities received from MDEQ set forth in line item

Page 99

one and the time Newell responded by submitting to MDEQ a revised plan for additional response set forth in line item two?

**MR. CURTH:** Objection, form, mischaracterizes the exhibit.

**THE WITNESS:** This is the easiest question you asked me so far. When you receive this additional activity, agency give you a deadline to submit the response, and you will respond to number one on time.

I don't have this captured in this Exhibit No. 10. We submitted the response on time. Agency went back and forth, back and forth, and by August, 2012 we reach to acceptable version of this.

So what you don't see here and is not captured here is the number of duration that took place between one to two. So to say that Newell submitted the response in August is completely and totally incorrect.

**BY MR. BILA, II:**

Q. So on line two when you said, "Newell submits to MDEQ revised plan for additional response on August 22, 2012," that's totally and completely incorrect?

A. This is not the fist response.

Q. I didn't say it was.

Page 100

A. No. But you said it took Newell to respond year-and-a-half, and when I say to you that we did respond to the agency on time based on their timeline.

Q. Do you recall was there a timeline August 22, 2012 or something before that?

A. Much earlier we responded to this.

Q. That wasn't my question. You said you responded to a deadline -- by a deadline that they had set. Do you recall what that deadline was?

A. No.

Q. So the record will show that you -- or Newell submitted revised plans for additional responses prior to August, 2012, but there were many of them and this was just the culmination?

A. Correct. This is my record. This is something I kept for myself. I keep to myself only the final, the revision. I don't keep track -- I keep track. You probably have a copy of all of them.

But I for my schedule I keep the final one. This I keep. But I have in my record which I am sure that you have all of the different iteration.

Q. And I am not trying to trick you or trap you. I am trying to figure out what these reports mean.

So as I understand it now, Newell received a response -- or received a notice of an additional