# EXHIBIT L

**APPRAISAL REPORT:**

Kirsch Lofts
308 N. Prospect Street (Building) and 415
E. Main Street (Surface Parking Lot)
City of Sturgis
St. Joseph County, Michigan

# GENZINK APPRAISAL COMPANY

Market Analysis · Real Estate Appraisal · Consulting

May 20, 2016

Mr. J. Michael Showalter
Schiff Hardin
233 South Wacker Drive, Suite 6600
Chicago, IL  60606

RE:     Appraisal Report:  Kirsch Lofts, 308 N. Prospect Street (Building) and 415 E. Main Street
(Surface Parking Lot), City of Sturgis, St. Joseph County, Michigan.

Dear Mr. Showalter:

At your request, Genzink Appraisal Company prepared the attached appraisal for the referenced
property.  The intended users are Schiff Hardin and the United States District Court, Western
District of MichiganAppraisal Report.  The intended use is to provide an expert report for the
civil action between Plaintiff, Newell Rubbermaid Inc. v. Defendant Scott T. Bosgraff, and
Kirsch Lofts.

This is an Appraisal Report, which is intended to comply with the reporting requirements set
forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice.
The appraisers are not responsible for unauthorized use of this report.

Data, information and calculations leading to the value conclusion, and opinions are incorporated
in the report following this letter.  The report, in its entirety, including all assumptions and
limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed and
the reasoning leading to the opinions.  The analyses, opinions and conclusions were developed
based on, and this report has been prepared in conformance with, our interpretation of the
guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal
Practice (USPAP) and the requirements of the Code of Professional Ethics and Standards of
Professional Appraisal Practice of the Appraisal Institute.

In Michigan, appraisers are required to be licensed and are regulated by the Michigan
Department of Licensing and Regulatory Affairs, P.O. Box 30018, Lansing, Michigan 48909.

Mr. J. Michael Showalter
May 20, 2016
Page 2

It has been a pleasure to assist you in this assignment.  If you have any questions concerning the appraisal report, or if we can be of further service, please contact us at (616) 261-5000.

Sincerely,

**GENZINK APPRAISAL COMPANY**

Jeffrey G. Genzink, MAI
Certified General Real Estate Appraiser

jgg/ads

# TABLE OF CONTENTS

*SEC. I.  SUMMARY OF SALIENT FACTS* ................................................................. 1

*SEC. II.  SCOPE OF WORK* ............................................................................... 3

*SEC. III.  GENERAL DATA* ............................................................................... 7
Property Identification .................................................................................. 7
Legal Description .......................................................................................... 7
Ownership .................................................................................................... 7
Present Use and Occupancy of the Property .................................................. 7
Sales History of Property .............................................................................. 7
Zoning ......................................................................................................... 8
Assessed Value and Property Taxes ............................................................. 9
Neighborhood Data ...................................................................................... 10
Neighborhood Map ....................................................................................... 11

*SEC. IV.  DESCRIPTION OF PROPERTY* ........................................................... 13
Aerial View .................................................................................................. 13
Site Description ............................................................................................ 14
Sketch ......................................................................................................... 17
Building Description ...................................................................................... 18
Building Dimensions ..................................................................................... 20

*SEC. V.  VALUATION ANALYSIS* ..................................................................... 24
Market Analysis ........................................................................................... 24
Highest and Best Use – September 14, 2015 ................................................. 37
Cost Approach ............................................................................................. 40
Sales Comparison Approach – September 14, 2015 ....................................... 40
Sales Comparison Approach – January 29, 2016 .......................................... 45
Income Capitalization Approach ................................................................... 45
Reconciliation and Final Value Estimate ....................................................... 45
Exposure and Marketing Time ...................................................................... 46
Compensation – Draft license ad Release Agreement ................................... 47

*SEC. VI. CERTIFICATION* ............................................................................... 50

*SEC. VII. ASSUMPTIONS AND LIMITING CONDITIONS* ..................................... 51

*SEC. VIII.  ADDENDUM* .................................................................................. 53
Aerial View .................................................................................................. 54
Subject Photographs .................................................................................... 56
Assessment Records .................................................................................... 63
Regional Area Data ...................................................................................... 73
Legal Description .......................................................................................... 79
Flood Plain Map ........................................................................................... 81
Survey ......................................................................................................... 83
Building Sale Comparables ........................................................................... 85
Draft License and Release Agreement .......................................................... 101
Proposed Development Plans ....................................................................... 125
Appraiser Qualifications and Licenses .......................................................... 135
List of Testimony (Trials and Depositions) by Jeffrey G. Genzink, MAI .......... 138

## *SECTION I. SUMMARY OF SALIENT FACTS*



Aerial View

| | |
|---|---|
| **Location:** | 308 N. Prospect Street (Building) and 415 E. Main Street (Surface Parking Lot), City of Sturgis, St. Joseph County, Michigan |
| **Owner:** | Kirsch Lofts, LLC |
| **Type of Property:** | Shell Building |
| **Zoning:** | B-OS, Business Office Service |
| **Permanent Parcel Nos.:** | 052-200-024-00 and 052-250-028-00 |
| **Property Rights Appraised:** | Fee Simple Estate |
| **Site Description:** | The subject property is an irregular shaped, mostly level parcel. A railroad runs through the north portion of the subject property. There is 4.197 acres (182,842 SF) of net land area, excluding road right-of-way. There is a total of 543.89 feet of frontage along N. Prospect Street, 432.20 feet of street frontage along E. Hatch Street, 247.45 feet of street frontage along N. Fourth Street and 150.03 feet along E. Main Street. |

1

**Building Description:**        The subject property is improved with a shell building and parking lot.  The building improvements consist of a 3-story 103,337 SF shell building built in 1922.  The shell building contains a basement area for mechanicals that has not been included in the gross building area.

**Highest and Best Use:**
**"As Vacant"**                 Future residential development

**Highest and Best Use**
**"As Improved"**               Hold for future redevelopment

**Effective Dates of Value:**   September 14, 2015 and January 29, 2016

**Inspection Dates:**           March 2, 2015 and January 29, 2016

**Market Value:**
**"September 14, 2015"**        $390,000  (without consideration of the draft license and release agreement)
**"January 29, 2016"**          $390,000  (without consideration of the draft license and release agreement)

**Compensation for Access**
**(as determined by the Court):**
  **Engineering and Design**        $148
  **Phase 1**                      $18,056
  **Phase 2**                      $44,992
  **Phase 3**              +        $9,768
  **Total**                        $72,964

**Extraordinary Assumption:**   The market value opinion with an effective date of September 14, 2015 is based on the extraordinary assumption there were no significant changes to the site or building between the date of value (9/14/15) and the date of inspection (1/29/16). If this is incorrect, the value conclusion could be impacted.

**Hypothetical Condition:**     None

**Intended Users:**             Schiff Hardin and the United States District Court, Western District of Michigan

**Intended Use:**               To provide an expert report for the civil action between Plaintiff, Newell Rubbermaid Inc. v. Defendant Scott T. Bosgraff, and Kirsch Lofts .

**Appraisal File No.:**          3297-15

## *SECTION II.  SCOPE OF WORK*

***Property Identification:***  The subject property is located at the northwest corner of N. Prospect Street and E. Hatch Street, and the southwest corner of N. Prospect Street and E. Main Street, City of Sturgis, St. Joseph County, Michigan.  The common street address is 308 N. Prospect Street (Building) and 415 E. Main Street (Surface Parking Lot), Sturgis, Michigan.

***Extent of Inspection:***  Mr. Jeff Genzink, MAI and Ms. Michelle Bilardello completed an interior and exterior inspection of the subject property on January 29, 2016, accompanied by Mr. Gabriel Rodriguez, Partner, Schiff Hardin, Practice Group Leader, Environmental and Mr. Scott Bosgraaf, property owner.  On March 2, 2015, Ms. Bilardello also completed an inspection from the road.

***Project Information:***  The following information was relied upon for this appraisal:

1. Assessment records from the City of Sturgis (located in Addendum)
2. ALTA/ACSM Land Title Survey completed by Tri-Star Surveying, dated 5/19/1997 (located in addendum)
3. Floor plans and unit sizes from Scott Bosgraaf (located in Addendum and Bates #001511 – 001520, 001530, 001283 – 001285)
4. Project costs for Kirsch Lofts LLC provided by Scott Bosgraaf (Bates #000877, 000878, 001466 – 001470)
5. Conversation with Scott Bosgraaf at the on-site inspection as of 1/29/16
6. Deposition transcript of Scott Bosgraaf as of 4/13/16
7. Cost receipts by Bosgraaf Commercial LLC (Bates #001028-001046, 001050-001070, 001072-001084, 001098, 001015-001020)
8. Complaint dated 6/9/15
9. Draft License and Release Agreement, dated 2/26/2015 (located in Addendum)
10. Documents referenced herein and all of the following documents: (Bates #000871-000876, #001071, #001085-001087, #001265-001282, #001286-001290, #001471-001491, #001495-001506, #001283-001285, #001291-001444, #001447-001465, #000837-000843, #000862-000867, #000979-0001010, #00000444, #00000877, #00002119, #00002283, #00006396, #00007350, #00007463, #00007474, #001014-001020, #001028-001046, #001050-001070, #001072-001082, #001083-001084, #001098-001264, #001445-001446, #001466-001470, #000792-000809, #000877-000878, #000897-000916, #000924-000956, #001021-001027, #001047-001049,

#001088-001097, #001247, #001005, #000810-000824, #001247, #000825-000834, #000973-000978, #00000965, #00002147 and #00002188).

I reserve the right to supplement or modify this report and my findings to respond to any new or additional information that may become available after the date of this report and to rebut, as necessary, any opinions offered by the plaintiffs or their experts in this case.  And further, I reserve the right to use any parties' materials or documents as exhibits and may identify and use additional documents and materials to rebut any testimony of the plaintiffs or their experts.

***Effective Dates:***  September 14, 2015 and January 29, 2016

***Client:*** Schiff Hardin

***Intended Users:***  The primary intended users are Schiff Hardin and the United States District Court, Western District of Michigan.

***Intended Use:***  The intended use of the appraisal is to provide an expert report for the civil action between Plaintiff, Newell Rubbermaid Inc. v. Defendant Scott T. Bosgraff, and Kirsch Lofts.  The appraisal is not intended for any other use or to be relied upon by any other party.

***Type of Opinion:***  The type of opinion is market value.  The following definition was considered.

> The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> 1.  Buyer and seller are typically motivated;
>
> 2.  Both parties are well informed or well advised, and acting in what they consider their best interests;
>
> 3.  A reasonable time is allowed for exposure in the open market;
>
> 4.  Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

(Source: 12 C.F.R. Part 54.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, Apri19, 1992; 59 Federal Register 29499, June 7,1994)

***Draft License and Release Agreement Summary:***  In addition to the market value opinion, we have determined the compensation owed to the property owner (Kirsch Lofts, LLC) for the right to enter upon, conduct remediation, maintenance and other work as defined in the draft license and release agreement for 65 months beginning May 1, 2016.  As described in the report, we do not expect a significant change for compensation if access occurs between 2016 and 2020.  A complete copy of the draft license and release agreement is located in the Addendum.

***Property Rights Appraised:***  The ownership interest appraised is fee simple estate, which is defined as follows:

> Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

(Source: *The Dictionary of Real Estate Appraisal, 6th Edition,* 2015, Appraisal Institute, Chicago, Ill, p. 90).

***Extraordinary Assumption:*** The market value opinion with an effective date of September 14, 2015 is based on the extraordinary assumption there were no significant changes to the site or building between the date of value (9/14/15) and the date of inspection (1/29/16). If this is incorrect, the value conclusion could be impacted.

***Hypothetical Condition:*** None

***Type and Extent of Valuation Analysis Applied:*** To determine the market values of the fee simple estate, we relied upon the Sales Comparison Approach.  We considered, but did not develop the Income Capitalization Approach or the Cost Approach because they were not considered applicable to arrive at credible results.

***Type and Extent of Market Data Considered:***  The extent of collecting, confirming and analyzing the market data for use in the sales comparison approach was based upon the geographic boundaries of Southwest and Northwest Michigan.  Research sources included the

Genzink Appraisal Company internal database, public records, MLS data, CoStar Group Inc. and market participants.  The data was confirmed with public records, MLS and/or a third party such as a real estate broker or property owner where available.

***Type of Report:***  This is an Appraisal Report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice.  The appraiser is not responsible for any unauthorized use of this report.

The following appraisal sets forth the most pertinent data gathered, the techniques employed and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, our interpretation of the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP) and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

# SECTION III.  GENERAL DATA

## PROPERTY IDENTIFICATION

The subject property is located at the northwest corner of N. Prospect Street and E. Hatch Street, and the southwest corner of N. Prospect Street and E. Main Street, City of Sturgis, St. Joseph County, Michigan.  The common street address for the subject property is 308 N. Prospect Street (Building) and 415 E. Main Street (Surface Parking Lot), Sturgis, Michigan.

## LEGAL DESCRIPTION

The legal descriptions were obtained from public records and are located in the Addendum section of this report.

## OWNERSHIP

The owner is Kirsch Lofts, LLC.

## PRESENT USE AND OCCUPANCY OF THE PROPERTY

The subject property consists of a shell building, which is vacant and unoccupied.  There is no interior finish, windows, heating/cooling, plumbing fixtures or electrical fixtures in the building.

## SALES HISTORY OF THE PROPERTY

There have been no sales of the subject property in the last three years, and there are no known pending offers.

According to a warranty deed (Liber/Page 1539/909) dated July 10, 2009 a transfer occurred from 1983 Finance Company LC (grantor), to Kirsch Lofts, LLC (grantee) for $1.00. According to a Purchaser's Settlement Statement from Transnation Title Agency of Michigan (Bates # 000699), Escrow No. 7184WMSAX dated July 10, 2009, the total amount paid for the subject property, including settlement costs, closing fees, recording fees, tax stamps and back taxes, was $57,544.25.

The following table provides the marketing history of the subject property from August 2002 to June 2007, when the subject property was listed for sale.  The listing was published in the Michigan Information Center (formerly known as SWMRIC).

| Marketing History | | |
|---|---|---|
| Date | Activity | Listing Price |
| August 1, 2002 | Listing Began | $180,000 |
| December 2, 2002 | Price Change | $169,500 |
| July 26, 2003 | Listing Expired | $169,900 |
| July 29, 2004 | Listing Began | $99,900 |
| September 9, 2004 | Price Change | $89,900 |
| October 27, 2004 | Price Change | $79,900 |
| December 2, 2004 | Listing Expired | $79,900 |
| December 9, 2004 | Listing Began | $76,900 |
| February 2, 2005 | Listing Expired | $76,900 |
| June 22, 2005 | Listing Began | $85,000 |
| July 10, 2005 | Price Change | $75,000 |
| April 14, 2006 | Price Change | $65,500 |
| June 20, 2006 | Price Change | $46,000 |
| September 10, 2006 | Price Change | $43,000 |
| June 28, 2007 | Listing Expired | $43,000 |

## *ZONING*

The subject property is zoned B-OS, Business Office Service.  Permitted uses include office buildings for any of the following occupations: executive, administrative, professional, accounting, writing, clerical, stenographic, drafting and sales; medical office and dental offices, including clinics; facilities for human care such as hospitals, rest and convalescent homes; banks, credit unions, savings and loan associations, and similar uses, drive-through facilities as an accessory use only; laundry and dry cleaning; institutional or public services; personal service establishment including barber shops, beauty shops and health salons; off-street parking lots; business schools or private schools operated for profit; essential services; home occupations as provided and controlled in section 1.0401(B)(9); existing housing; mortuaries; accesssory structures and used customarily incident to the above permitted uses, provided such buildings and uses are located on the same zoning lot with permitted use.  Special exception uses include bed and breakfast; functional equivalent family; reasonable accommodation use; ministorage and warehousing; child care centers or day care center in accord with section 1.0602 and section 1.0603(M).

The zoning requirements applicable to the subject property are as follows:

| Zoning Requirements | | |
|---|---|---|
| | Zoning | Subject Property |
| Minimum Frontage | N/A | 543.89 feet - Conforms |
| Minimum Area | N/A | 4.197 acres - Conforms |
| Maximum Coverage | 40% | Conforms |
| Minimum Front Yard | 25 feet (1) | Conforms |
| Minimum Side Yard | 15 feet | Non-conforming |
| Minimum Rear Yard | 25 feet | Conforms |
| Building Height | 2 stories or 30 feet | 3 Stories, 37 Feet |

(1) Off-street parking shall be permitted to occupy a portion of the required front yard provided that there is maintained a minimum obstructed landscaped setback of 10 feet between the nearest point of the off-street parking area, exclusive of access driveways, and the nearest right-of-way line. (2) No side yards are required along the interior side lot lines of the district, except as otherwise specified in the building code, provided that if walls of structures facing such interior side lot lines contain windows or other openings, side yards of not less than 10 feet shall be provided.  On a corner lot which has a common lot line with a residential district, there shall be provided a setback of 20 feet on the side or residential street.  Where a lot borders on a residential district or a street, there shall be provided a setback of not less than 10 feet on the side bordering the residential district or street.

The subject is currently a legal non-conforming use because it does not meet the minimum lot side yard setback requirements or the maximum building height requirements.  If the property was demolished, and the owner desires to develop the site, the new developments would need to conform to the current zoning requirements.

The subject property was previously used as an industrial building.  According to Ms. Kara Falkenstein, Administrative Assistant, City of Sturgis Community Development, although the building is zoned Business Office Service, the City of Sturgis would consider other uses for the building.  A plan would need to be presented to the city, but they would consider a wide range of uses.  *The appraisal assumes that the property is in conformance with all other governmental regulations including building, fire and health code restrictions and requirements*

The City of Sturgis master plan designates the future land use of the subject property as Mixed Use/Single and Two Family Residential.

## *ASSESSED VALUE AND PROPERTY TAXES*

For property taxation purposes, the property is identified as permanent parcel nos. 052-200-024-00 and 052-250-028-00.  Property taxes for the subject property are based upon the State Equalized Value (SEV) since the definition of market value presumes the consummation of a sale.  Therefore, property taxes are estimated by multiplying the SEV by the millage rate per

$1,000 of SEV.  Also, there are some municipalities that charge an administration factor for collecting real property taxes.  The real property taxes for the subject property are estimated as follows:

| Assessed Value and Real Property Taxes | | |
|---|---|---|
| 2015 SEV | | |
| 052-200-024-00 | | $71,100 |
| 052-250-028-00 | + | $5,200 |
| Total SEV | | $76,300 |
| Tax Rate (2015) | x | 0.0591599 |
| Subtotal | | $4,514 |
| Administration Factor | x | 1.01 |
| Estimated Taxes | | $4,559 |

*City of Sturgis online tax information indicates there are no delinquent taxes against the property.*

## NEIGHBORHOOD DATA

The objective of a neighborhood analysis is to determine perceivable patterns of growth, structure and change that may detract from or enhance property values.  The following analysis describes neighborhood boundaries, transportation, public services, land uses and neighborhood life cycles.  A neighborhood map locating the subject property is provided on the following page.

*Neighborhood Boundaries:* The subject property is located in the City of Sturgis, St. Joseph County, Michigan.  The neighborhood boundaries are E. Lafayette Road (north), N. Lakeview Avenue (east), N. Nottawa Street (west) and E. Chicago Road (south).  The neighborhood is located approximately ¾ miles north of the central business district of the City of Sturgis.

*Transportation:*  There is a good network of primary and secondary roads serving the neighborhood.  N. Nottawa Street (M-66) is a primary north/south roadway.  E. Chicago Road (US-12) is a primary east/west travel route.

*Public Services:* Public services for the area include utilities, police and fire protection by the City of Sturgis.  The neighborhood is serviced by public utilities such as municipal water, sewer, public electric and telephone.

10

# Neighborhood Map



***Neighborhood Land Uses:***  The majority of the immediate neighborhood consists of single family residential homes.  The commercial properties are along E. Chicago Road (US-12) and N. Nottawa Street (M-66).  There are some industrial properties located across the street from the subject property along the railroad.

***Neighborhood Life Cycle:***  Neighborhoods and their land uses typically evolve through a four-stage life cycle that consists of 1) Growth – a period during which the market area gains public favor and acceptance; 2) Stability – a period of equilibrium without marked gains or losses; 3) Decline – a period of diminishing demand; and 4) Revitalization – a period of renewal, redevelopment, modernization, and increasing demand.  The subject's immediate neighborhood is considered to be in a stage of stability.

## *SECTION IV.  DESCRIPTION OF PROPERTY*

The subject property can best be visualized by the following aerial view.

**Aerial View**



Source: Pictometry (boundary lines estimated).  Photo Date is 2013

## SITE DESCRIPTION

The site description is based upon public records, an ALTA/ACSM survey completed by Tri-Star Surveying dated 5/19/97 and a physical inspection of the site.

*Location:* The subject property is located at the northwest corner of N. Prospect Street and E. Hatch Street, and the southwest corner of N. Prospect Street and E. Main Street, City of Sturgis, St. Joseph County, Michigan.  The common street address for the subject property is 308 N. Prospect Street (Building) and 415 E. Main Street (Surface Parking Lot), Sturgis, Michigan.

*Shape/Land Area:* An irregular shaped parcel that contains 4.197 acres (182,842 SF) of net land area, excluding road right-of-way.  The site has a total of 543.89 feet of frontage along N. Prospect Street, 432.20 feet of street frontage along E. Hatch Street, 247.45 feet of street frontage along N. Fourth Street and 150.03 feet along E. Main Street.

*Ingress/Egress:*  The subject property has access to E. Hatch Street, N. Prospect Street, N. Fourth Street and E. Main Street.

*Topography:*  The subject site is mostly level and according to the U.S. Fish & Wildlife Service National Wetlands Inventory online map, there are no apparent wetlands.  A wetlands map is provided below.



Source: U.S. Fish and Wildlife National Wetlands Inventory Mapping (boundary lines estimated)

**Flood Plain:** According to the National Flood Insurance Program map, Community Panel No. 26149C0350D (June 4, 2010), the subject property is located within Flood Zone X, areas determined to be outside the 0.2% annual chance floodplain.  A flood plain map locating the subject property is located in the Addendum section of this report.

**Soil Types:** The appraisal assumes that the soils are suitable to support current and future site and building improvements.

**Utilities:** Public water, sanitary sewer, electric and telephone service are available to the property.

**Site Improvements:**  The site improvements consist of parking lots and grassy areas.

**Off-Site Improvements:** E. Hatch Street, N. Prospect Street, N. Fourth Street and E. Main Street are two-lane, asphalt-paved roadways.

**Easements:**  According to public records, there was one easement located on the subject property, which has been released:

- There is an easement to construct, replace, repair (including reconstruction), maintain, comply with federal and state orders, judgments and requests and the Consent Decree entered in Frank J. Kelley, et al. vs. Cooper Industries, Inc. in the United States District Court for the Western District of Michigan, Southern Division Case NO. 5-93-CV-157 respecting the pollution control system(s) within the Easement, dated October 1, 1998 (Liber/Page: 863/47-51).
- There is release of the easement which was dated October 1, 1998.  The release of easement was filed June 17, 2014 (Liber/Page: 1747/929).

The appraisal assumes there are no easements that adversely affect the property.

**Hazardous Waste or Property Contamination:**  The opinions in this report are based upon the current condition of the subject property as of the effective dates of value.  The current owner is not responsible for the remedial action plan.  It is my understanding that the current owner completed the asbestos abatement and lead paint removal in 2009 and 2010.  As provided in the Complaint, a historical summary of the ground water contamination on the subject property is as

15

follows:

- The subject property is a former manufacturing facility.  The facility used industrial solvents, which resulted in releases of contaminants into the soil and groundwater at Kirsch Plant.  The contamination was discovered in 1982.
- In 1991, the U.S. EPA issued a Record of Decision (ROD) specifying certain remedial activities for the site.
- In 1992, Cooper Industries recorded with the Register of Deeds of St. Joseph County, Michigan a Notice stating that the subject property was contaminated, subject to a federal Administrative Order and undergoing remediation activities.
- In 1997, pursuant to a stock purchase agreement, Newell acquired the subject property.
- In 1998, Newell sold the property to WMU Properties, a Michigan co-partnership for a total price of $190,000.
- In 2008, Kirsch Lofts conducted an environmental investigation which showed the property was contaminated and subject to remediation activities being performed.
- In 2009, Kirsch Lofts purchased the subject property for re-development into condominiums.
- In 2011, the Michigan DEQ directed Newell to complete additional investigation and remediation to address the soils at the site.
- In 2012, Newell submitted a conceptual plan for the remediation of soil contamination which was approved by the Michigan DEQ.

Two monitoring wells are located on the subject property around the exterior of the building improvements.  Intrusive work cannot occur within a 5 foot radius of the monitoring well.

A trench with a 4-inch or 6-inch perforated horizontal pipe will be installed within a portion of the center of the first floor of the building.  Once installation is completed, this trench will be filled and the floor will be filled in to seal the trench.  This piping will be used for active remediation.  Intrusive work cannot be performed within 5 feet of this trench on either side.

One treatment building and one blower building will be constructed on the Property (308 N. Prospect).

A sketch identifying the expected location of the monitoring wells, the underground piping,

treatment building and blower building is as follows.  According to legal counsel, the location of the blower building is expected to be located next to the treatment building (the sketch is incorrect).

## Sketch

(Source: URS, Job No. 25366459, dated July 21, 2014)



*Other:* To our knowledge there are no encroachments, easements or encumbrances that adversely affect the property, and the appraisal assumes that none exist.

## BUILDING DESCRIPTION

The building description was based upon public records, various information provided by the client and Mr. Scott Bosgraaf, and a physical inspection of the building.

*Size/Age:* The building improvements consist of a shell building. There is no interior finish, windows, heating/cooling, plumbing fixtures or electrical fixtures in the building. According to public records, portions of the building were built in 1922. The year built for some of the building was not available. The following table provides the building area breakdown for the building.

| Building Area | |
|---|---|
| Area | SF |
| First Floor | 35,885 |
| Second Floor | 33,726 |
| Third Floor | +33,726 |
| Total Building Area | 103,337 |

*Condition:* The subject property consists of a shell building, which is considered to be in fair condition at the time of inspection.

According to Mr. Scott Bosgraaf, the following work was completed in 2009 and 2010:

- Sandblasting within the interior of the building
- Demolition and media blasting
- Floors repaired where needed
- New roof covering on building (except lean-to)
- Tuck-pointing concrete block and brick
- Interior wood framing (partial)
- Windows are built, but they are off-site

*Foundation/Floor:* Poured concrete foundation and reinforced concrete on compacted fill.

*Frame:* Class C construction, steel and wood frame.

18

***Exterior Walls:***  The exterior walls of the commercial building consist of brick.  There are no windows in the building.

***Building Height:***  The first and second floor ceiling height is 12 feet.  The third floor ceiling height is 13 feet.

***Loading Docks/Drive-In Doors:***   There are two drive-in doors and two loading docks.

***Roof:***  Rubber roof membrane roof covering, supported by a mixture of steel truss and wood beam.

***Mechanical:***  There is no heating or cooling system in the building.

***Plumbing:***  There are no plumbing fixtures in the building.

***Electrical:***  There are no electrical fixtures in the building.

***Interior Layout/Finishes:*** The interior is unfinished with a mixture of concrete and wood floor (second and third floor), exposed ceiling and decorative brick walls. Some interior framing has been constructed.

***Building Dimensions:***  The building dimensions for the subject property are located on the following pages.

## Building Dimensions – First Floor



## Building Dimensions – Second Floor



# Building Dimensions – Third Floor



***Proposed Development Plan:***  The following summary table provides a description of the proposed development of Kirsch Lofts.  The floor plans and specifications of Phase 1 and 2 are located in the Addendum.  Mr. Bosgraaf stated that Phase 3 would be a residential use (Bates # 000877), however he did not provide specific floor plans or specifications for the Phase 3 development.

| Kirsch Lofts - Proposed Development | | | |
|---|---|---|---|
| Phase | First Floor | Second Floor | Third Floor | Amenities |
| 1 | Residential 1 BR, 2 BR Units | Residential 1 BR, 2 BR Units | Residential 1 BR, 2 BR Units | Indoor Pool, Exterior Patio, Workout area, Courtyard |
| 2 | Commercial 10,000 SF/Floor | Commercial 10,000 SF/Floor | Commercial 10,000 SF/Floor | Proposed Deli & Restaurant, Elevator, Bathrooms |
| 3 | Residential | Residential | Residential | N/A |

# SECTION V.  VALUATION ANALYSIS

## MARKET ANALYSIS

The current owner has proposed a mixed use development at the subject property, which includes redevelopment of the industrial building for residential and commercial uses.

The following ESRI map shows the boundaries for the City of Sturgis.



A summary of the total population, households and median household income for the City of Sturgis and St. Joseph County is provided in the following tables.

| Total Population | | | | |
|---|---|---|---|---|
| Year | City of Sturgis | % Annual Change | St. Joseph County | % Annual Change |
| 2010 | 10,994 | n/a | 61,295 | n/a |
| 2015 | 11,007 | 0.0% | 61,781 | 0.2% |
| 2020 | 11,097 | 0.2% | 62,630 | 0.3% |

Source: 2010 U.S. Bureau of the Census and ESRI forecasts for 2015 and 2020.

| Total Households | | | | |
|---|---|---|---|---|
| Year | City of Sturgis | % Annual Change | St. Joseph County | % Annual Change |
| 2010 | 4,088 | n/a | 23,244 | n/a |
| 2015 | 4,103 | 0.1% | 23,543 | 0.3% |
| 2020 | 4,137 | 0.2% | 23,887 | 0.3% |

Source: 2010 U.S. Bureau of the Census and ESRI forecasts for 2015 and 2020.

| Median Household Income | | | | |
|---|---|---|---|---|
| Year | City of Sturgis | % Annual Change | St. Joseph County | % Annual Change |
| 2010 | - | - | - | - |
| 2015 | $36,444 | - | $42,995 | - |
| 2020 | $40,877 | 2.4% | $50,422 | 3.5% |

Source: 2010 U.S. Bureau of the Census and ESRI forecasts for 2015 and 2020.

According to the ESRI forecasts, population and total households are forecasted to have nominal increases.  Median household income is projected to increase at a slightly lower rate in the City of Sturgis in comparison to St. Joseph County.  As shown in the following breakdown of households by income, 65.8% of the households have an income less than $50,000 and 84.5% earn less than $75,000.

| Households by Income | | |
|---|---|---|
| Annual Household Income | Number of Households | Percent |
| <$49,999 | 2,703 | 65.8% |
| $50,000 -$74,999 | 765 | 18.6% |
| $75,000 -$99,999 | 357 | 8.7% |
| $100,000 -$149,999 | 170 | 4.1% |
| $150,000 -$199,999 | 81 | 2.0% |
| $200,000+ | 29 | 0.7% |
| | 4,105 | |

Source: ESRI forecasts for 2015

25

A summary of housings units by occupancy for the City of Sturgis is provided in the following table.

| Housing Units Summary | | | | |
|---|---|---|---|---|
| | 2015 | | 2020 | |
| Occupancy Status | No. of Units | Percent | No. of Units | Percent |
| Owner Occupied | 2,333 | 50.8% | 2,402 | 52.0% |
| Renter Occupied | 1,755 | 38.2% | 1,701 | 36.8% |
| Vacant | 507 | 11.0% | 518 | 11.2% |
| | 4,595 | | 4,621 | |

Source: ESRI forecasts for 2015 and 2020.

According to the previous summary table, the number of owner occupied units is projected to increase, while the number of renter occupied units will decrease.  The total number of units is forecasted to increase by 26 over the five year period and the number of vacant units is forecasted to increase by 9.  Therefore, the forecasted increase of occupied units is 17 units, equivalent to 3.4 new units per year for the five year period.

**<u>Single Family Residential Market Analysis</u>**

The following section will provide an overview of the single family residential market for the City of Sturgis.  The single family residential sales are from the Southwest Michigan (SWMRIC) MLS and are based upon the following search parameters.

- Sale dates from January 1, 2007 through December 31, 2015
- Located in the City of Sturgis

A summary of the search results is provided in the following tables and charts.

26

| SWMRIC MLS Residential Sales Summary | |
|---|---|
| Year | Number of Sales |
| 2007 | 141 |
| 2008 | 98 |
| 2009 | 138 |
| 2010 | 118 |
| 2011 | 128 |
| 2012 | 139 |
| 2013 | 137 |
| 2014 | 102 |
| 2015 | 147 |



| SWMRIC MLS Residential Sales Summary | |
|---|---|
| Year | Median Sale Price |
| 2007 | $75,000 |
| 2008 | $73,000 |
| 2009 | $44,728 |
| 2010 | $42,850 |
| 2011 | $48,000 |
| 2012 | $46,000 |
| 2013 | $60,000 |
| 2014 | $69,900 |
| 2015 | $67,000 |



| SWMRIC MLS Residential Sales Summary | |
|---|---|
| Year | Median Size Above Grade(SF) |
| 2007 | 1,327 |
| 2008 | 1,373 |
| 2009 | 1,224 |
| 2010 | 1,290 |
| 2011 | 1,385 |
| 2012 | 1,300 |
| 2013 | 1,330 |
| 2014 | 1,332 |
| 2015 | 1,260 |



27

| SWMRIC MLS<br>Residential Sales Summary | |
| --- | --- |
| Year | Median $/SF Above Grade |
| 2007 | $58 |
| 2008 | $52 |
| 2009 | $37 |
| 2010 | $35 |
| 2011 | $33 |
| 2012 | $39 |
| 2013 | $41 |
| 2014 | $56 |
| 2015 | $50 |



| SWMRIC MLS<br>Residential Sales Summary | |
| --- | --- |
| Year | Median Year Built |
| 2007 | 1945 |
| 2008 | 1950 |
| 2009 | 1950 |
| 2010 | 1951 |
| 2011 | 1945 |
| 2012 | 1945 |
| 2013 | 1948 |
| 2014 | 1950 |
| 2015 | 1954 |



As shown in the previous tables and charts, the range of single family residential sale indicators from 2007 through 2015 are as follows:

- The number of sales per year ranged from 98 to 147 sales per year.
- Median sale price has ranged from of $42,850 to $75,000.  The median sale price has been increasing from 2010 to 2014.  However, there was a decline from 2014 to 2015 of -4%.
- The median size for a single family home (above grade square feet) ranged from 1,260 SF to 1,385 SF.
- The median sale price/SF (above grade) ranged from $33/SF to $58/SF. The median sale price has been increasing from 2010 to 2014.  However, there was a decline from 2014 to 2015 of
  -11%.
- Median year built is 1945 to 1954.

28

Also, we have researched single family home sales that were built from 2004 to 2015, located in the City of Sturgis.  The single family residential sales are from the Southwest Michigan (SWMRIC) MLS. A summary of the search results is provided in the following table.

| Single Family Home Sales - Built since 2004 | | | | | |
|---|---|---|---|---|---|
| Address | Price | SF Above Grade | Year Built | Sold Date | Price/SF (Above Grade) |
| 1113 S Merribe Street | $138,000 | 1,400 | 2005 | 2/11/2015 | $98.57 |
| 903 Independence | $188,000 | 2,580 | 2006 | 8/6/2013 | $72.87 |
| 610 Wilson Avenue | $108,900 | 2,291 | 2009 | 8/30/2013 | $47.53 |
| 1421 S Merribe Street | $149,900 | 1,780 | 2004 | 4/24/2012 | $84.21 |
| 700 Hampshire | $149,000 | 2,050 | 2009 | 6/22/2011 | $72.68 |
| 704 Friar Tuck | $169,000 | 2,128 | 2005 | 5/5/2008 | $79.42 |

- There are 6 sales that range in sales price from $108,900 to $188,000, which is equivalent to $47.53/SF to $98.57/SF, or a median of $76.14/SF
- The size for above grade square feet ranges from 1,400 SF to 2,580 SF.

## Residential Condominiums Market Analysis

The following section will provide an overview of the residential condominium market for the City of Sturgis.   The residential condominium sales are included in the previous sales analysis from the SWMRIC MLS.  A summary of our finding are as follows:

- From 2007 through 2015, there were three condominium unit sales and seven expired listings.
- The three sales were located in Stone Cliff Condominiums and the sale prices ranged from $12,000 to $39,900.  Two sales occurred in 2009 and indicate sale prices of $12,000 to $19,000.  One sale occurred in 2013 at a sale price of $39,900.
- The size of the condominium units (above grade square feet) range from 828 SF to 1,000 SF.
- The year built is 1975.
- Ms. Kara Falkenstein, City of Sturgis Community Development Administrative Assistant, stated that there has been no new construction for residential condominiums in the City of Sturgis from 2007 to the current date.  The only proposed condominium development in the City of Sturgis since 2007 is Kirsch Lofts.

29

- From 2007 to 2015 there has been no new construction, and minimal demand for residential condominium units.
- According to the Brownfield Redevelopment M BT Credit Application (Bates #000814) for the subject property, the type of proposed housing was condominiums, the total number of units is 35 to 50 and the purchase price would be $125,000.  The estimated date of construction was from October 2008 to December 2015.
- According to the proposed square footage (Bates #001285) the range of size for the living units for phase 1 is 775 SF to 2,050 SF, or an average of 1,224 SF /unit.  Based upon a proposed asking price of $125,000, the sale price is equivalent to $102/SF.

The market data from 2007 to 2015 indicates that residential condominiums were not in demand and the proposed asking price of $125,000 is significantly greater than the residential condominium sales that have sold in the City of Sturgis ($12,000 to $39,900).  Also, the proposed average asking price/SF for the subject property is $102/SF, which is significantly greater than the average condominium sale price of $24.90/SF.  The proposed condominium asking price also greatly exceeds the median sale price ($67,000) and median price/SF above grade living area ($50/SF) of a single family residence in that sold 2015.

The primary demand generator for real estate development is the increase in population and household income. As stated previously, the City of Sturgis population and median household income from 2015 to 2020 will have minimal growth.  Therefore, we do not expect a significant improvement to the residential condominium market into the foreseeable future.

**Apartments Market Analysis**

The following section will provide an overview of the apartment market for the City of Sturgis.   As of 2016, there are two new mixed use developments in Downtown Sturgis currently under construction, which include residential apartments.  A description of each project is as follows:

- Moso Village will include four one-bedroom (approximately 640 SF) and eight two-bedroom (approximately 840 SF) units.  Phase 1 is approximately 30,000 SF of office and retail space, and 10,000 SF of apartments. The apartments will be completed in June 2016. They received 10 applications to rent and 4 of the units are leased.  The current occupancy rate is 33%.

- 107-113 W. Chicago Road will have 11 apartments that range in size from 600 SF to 1,700 SF. Of the 11 units, 2 units are approximately 600 SF, 8 units are 1,100 to 1,300 SF and 1 unit is 1,700 SF. The units are located on the 2nd and 3rd floor above the first floor commercial space and will be completed in June 2016. Approximately half of the units were leased as of May 2016.  The current occupancy rate is 50%.

Both properties are located in the downtown district.  There are two existing conventional apartment projects located in the City of Sturgis, which are Colonial Crest and Stoughton Estates.  They contain a total of 168 units and were built in 1965 and 1995.  The current occupancy rate is 96% and 100%.  The remaining apartment projects in the City of Sturgis are subsidized.

A summary of the rental rates for Moso Village, 107-113 W. Chicago Road, Colonial Crest, and Stoughton Estates are provided below.

| Sturgis Apartment Rental Rate Summary – May, 2016 | | | | |
|---|---|---|---|---|
| Apartment Name | No. of Units | Unit Type | Unit Size (SF) | Monthly Rent |
| Moso Village | 4 | 1 BR/1 BA | 640 | $750 |
| Moso Village | 8 | 2 BR/2 BA | 840 | $950 |
| 107-113 Chicago Rd. | 11 | N/A | 600 to 1,700 | $700 to $1,200 |
| Colonial Crest | 26 | 1 BR/1BA | 700 | $475 |
| Colonial Crest | 22 | 2 BR/1BA | 900 | $550 |
| Stoughton Estates | 5 | 1 BR/1 BA | 700 | $720 |
| Stoughton Estates | 115 | 2 BR/1 BA | 960 | $755 to $830 |

As stated in the previous summary table, the existing units in the City of Sturgis (168 units, or 88% of the total supply, including those being constructed) have rental rates from $475/month to $830/month. The confirmation source for Moso Village indicated he has had more interest for the units priced at $750/month.

In addition to the apartment rent and occupancy data in the City of Sturgis, we have relied upon the Property Management Association of West Michigan (PMAWM) apartment market survey.  The survey area which includes the City of Sturgis changed from 2011 to 2012.  Survey results for the first quarter 2010 and first quarter 2011 include Kalamazoo, Calhoun and St. Joseph Counties. Survey results for the second quarter 2012 through first quarter 2016 include Kalamazoo, Barry and St. Joseph Counties.  The result of the survey is as follows:

| PMAWM Apartment Survey | | | | |
|---|---|---|---|---|
| Date | Survey Area | Average Rental Rate | Total Occupancy | Total Units Surveyed |
| 1 Q 2010 | (1) | $721 | 86% | 9,794 |
| 1 Q 2011 | (1) | $716 | 90% | 10,419 |
| 2 Q 2012 | (2) | $706 | 95% | 10,865 |
| 1 Q 2013 | (2) | $672 | 93% | 10,894 |
| 1 Q 2014 | (2) | $676 | 93% | 7,142 |
| 1 Q 2015 | (2) | $739 | 95% | 10,787 |
| 1 Q 2016 | (2) | $797 | 96% | 10,355 |

(1) Kalamazoo, Calhoun and St. Joseph Counties
(2) Kalamazoo, Barry and St. Joseph Counties

The survey indicates that the rental rates declined from 2010 to 2013 ($721/month to $672/month), and increased from 2014 to 2016 ($676/month to $797/month).

According to the Brownfield Redevelopment MBT Credit Application (Bates #000814) for the subject property, the proposed rental rate is $775/month.  However, the size range of the units is 775 SF to 2,050 SF (Bates # 001285) and it's unlikely that the proposed rental rate is $775/month for all unit sizes.  In addition the PMAWM apartment survey states that the proposed rent ($775/month) is not reached until 2016.  From 2010 to 2015 the proposed rental rate is below the average market rental rate.  According to the market data, the proposed rent will exceed the market rents from 2010 to 2015 and the proposed units will likely remain vacant during that period

The primary demand generator for real estate development is the increase in population and household income. As stated previously, the City of Sturgis population and median household income from 2015 to 2020 will have minimal growth.  Given the size of the proposed project for the subject property we do not expect a significant improvement to the apartment market to support an additional 35 to 56 units.  The proposed units would increase the total supply of conventional apartments by additional 18% to 29%.

## Commercial and Office

Commercial and office use in the City of Sturgis is concentrated along Chicago Road (US-12) and Centerville Road (M-66), located south of Chicago Road.  Downtown Sturgis is located along Chicago Road, east of Centerville Road.  The City of Sturgis aerial view (below) and land use map (next page) show the concentration of commercial and office use along Chicago Road (US-12) and Centerville Road (M-66).  The primary land use that surrounds the subject property is residential as shown in the following aerial view and existing land use map.

32

**Aerial View**



Source: Pictometry

**Existing Land Use Map**



Source: City of Sturgis

To analyze the commercial market for the subject area, we completed a search for commercial sales and leases using the SWMRIC MLS, based on the following parameters:

- Located in City of Sturgis, Michigan
- All building sizes
- Sale/lease date January 1, 2007 to May 18, 2016, and current listing as of May 18, 2016

Based on the previous parameters, there are 21 sales and 13 current listings.  A summary of the building sales and listings using the published data on the MLS listings is provided as follows:

| MLS Summary - Commercial and Office Building Sales | | | |
|---|---|---|---|
| Sale Date | Sale Price | GBA (SF) | $/SF |
| 5/21/2007 | $165,000 | Not Avail. | - |
| 6/29/2007 | $125,000 | 5,000 | $25 |
| 10/25/2007 | $22,000 | 2,500 | $9 |
| 4/25/2008 | $300,000 | 23,138 | $13 |
| 5/8/2008 | $75,000 | 24,320 | $3 |
| 10/30/2008 | $100,000 | Not Avail. | - |
| 2/17/2009 | $125,000 | 6,400 | $20 |
| 8/1/2009 | $68,000 | Not Avail. | - |
| 8/23/2010 | $10,000 | 6,156 | $2 |
| 6/15/2011 | $60,000 | 5,600 | $11 |
| 7/14/2011 | $15,000 | 1,100 | $14 |
| 12/20/2011 | $95,000 | 5,365 | $18 |
| 7/2/2012 | $65,000 | 1,274 | $51 |
| 10/29/2012 | $216,000 | 4,400 | $49 |
| 4/29/2013 | $67,457 | 4,000 | $17 |
| 10/4/2013 | $50,000 | 480 | $104 |
| 12/3/2013 | $150,000 | 3,108 | $48 |
| 1/2/2014 | $75,000 | Not Avail. | - |
| 1/28/2015 | $82,000 | 1,200 | $68 |
| 5/6/2015 | $850,000 | 12,078 | $70 |
| 12/7/2015 | $125,000 | 4,374 | $29 |
| | | | |
| Status | List Price | GBA (SF) | $/SF |
| Listing | $57,900 | Not Avail. | - |
| Listing | $59,900 | 2,400 | $25 |
| Listing | $69,900 | Not Avail. | - |
| Listing | $90,000 | 4,704 | $19 |
| Listing | $99,000 | 2,700 | $37 |
| Listing | $109,000 | 3,301 | $33 |
| Listing | $215,000 | 3,848 | $56 |
| Listing | $235,000 | 1,742 | $135 |
| Listing | $249,000 | Not Avail. | - |
| Listing | $295,000 | 4,374 | $67 |
| Listing | $325,000 | 2,300 | $141 |
| Listing | $395,000 | 3,348 | $118 |
| Listing | $490,000 | 20,068 | $24 |

Based on market research, there has been minimal new demand for commercial and office use in the City of Sturgis.   As of 2016, there is one mixed use development in Downtown Sturgis, which is currently under construction.  The project is known as MOSO Village and will include 12 apartments and commercial space located on two floors.  The project is located in downtown Sturgis. Approximately 4,000 SF is owner occupied, 7,600 SF is leased, and 8,000 SF is vacant and available for lease.

According to the proposed subject property floor plan for phase 2 (Bates #001086), the commercial space is 22,440 SF.  The subject property is not located in downtown Sturgis, or along Chicago Road (US-12) or Centerville Road (M-66).  Also, the surrounding land uses are residential and do not complement a multi-story commercial use.  Furthermore, there is no market evidence that the market will absorb 22,440 SF of proposed commercial space.

As stated in the regional area data (located in the Addendum), the unemployment rate for St. Joseph County in 2011 was 10.4%, which has decreased to 4.3% in 2015.  Even though the unemployment rate has improved from 2011 to 2015, there was minimal new demand for commercial and office use in the city of Sturgis.

### Industrial

The City of Sturgis has good proximity to the I-80/90 east/west corridor, which is a desirable travel route for industrial users.  To analyze the industrial market for the subject area, we completed a search for industrial sales and leases using the SWMRIC MLS, based on the following parameters:

- Located in St. Joseph County, Michigan
- Gross building area greater than 10,000 SF
- Sale/lease date January 1, 2007 to May 18, 2016
- Current listing as of May 18, 2016

Based on the previous parameters, there are 19 sales and 2 current listings.  A summary of the building sales and listings using the published data on the MLS listings is provided as follows.

| MLS Summary - Industrial Building Sales | | | | |
|---|---|---|---|---|
| Sale Date | City | Sale Price | GBA (SF) | $/SF |
| 1/29/2007 | White Pigeon | $268,000 | 47,118 | $6 |
| 7/6/2007 | White Pigeon | $369,000 | 24,000 | $15 |
| 7/12/2007 | White Pigeon | $375,000 | 51,242 | $7 |
| 1/14/2008 | Sturgis | $247,500 | 26,000 | $10 |
| 9/18/2009 | Colon | $130,000 | 25,000 | $5 |
| 3/1/2010 | Centreville | $80,000 | 25,000 | $3 |
| 11/5/2010 | Sturgis | $110,000 | 10,990 | $10 |
| 2/22/2011 | Three Rivers | $135,000 | 16,500 | $8 |
| 6/30/2011 | Sturgis | $350,000 | 47,000 | $7 |
| 11/3/2011 | Three Rivers | $142,500 | 20,500 | $7 |
| 4/19/2012 | White Pigeon | $215,000 | 24,000 | $9 |
| 4/24/2012 | Sturgis | $25,000 | 10,990 | $2 |
| 1/3/2013 | Colon | $105,900 | 25,000 | $4 |
| 1/21/2013 | Three Rivers | $165,000 | 14,500 | $11 |
| 12/6/2013 | Sturgis | $125,000 | 30,000 | $4 |
| 12/30/2013 | White Pigeon | $99,750 | 39,600 | $3 |
| 7/15/2014 | Constantine | $1,300,000 | 238,000 | $5 |
| 3/27/2015 | Sturgis | $24,000 | 10,990 | $2 |
| 8/24/2015 | Sturgis | $570,000 | 33,776 | $17 |
| | | | | |
| Status | City | List Price | GBA (SF) | $/SF |
| Listing | Constantine | $179,000 | 19,091 | $9 |
| Listing | Mendon | $349,000 | 11,500 | $30 |

The search resulted in two closed leases and one active lease, which indicates industrial buildings over 10,000 SF in this area are primarily owner occupied.

The building sales and leases are 1-story, generally have ceiling heights of from 16 feet and above and the building shapes are mostly square or rectangular.  The subject property consists of a 3-story, shell building which contains 103,337 SF.  The first and second floor ceiling height is 12 feet.  The third floor ceiling height is 13 feet.  The building is U-shaped.

Based on the industrial market analysis, it is our opinion an industrial use is not suitable at the subject property due to the existing physical characteristics (3-story, 12 to 13 foot ceiling height, and a U-shaped building) that can't be changed.

## HIGHEST AND BEST USE - *September 14, 2015*

Highest and best use analysis is important in the appraisal process because it provides the foundation as to how to proceed with the valuation of the property. It provides the basis on which the subject value is estimated, because the market data used to determine value for the subject is predicated on the property's highest and best use.

In highest and best use analysis, reasonable alternative uses for the property are explored within a framework of legal, physical and economic parameters.

The definition of highest and best use that follows is taken from *The Dictionary of Real Estate Appraisal, 6th Edition, Page 109*.

> The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.

The highest and best use of the appraised property is that use which is legally permissible, physically possible and provides the highest return. With improved properties, a conclusion of the highest and best use is made both as vacant, and as improved. The analysis assuming an improved property as vacant is done to test and provide support for the concluded highest and best use as improved.

### Highest and Best Use as Vacant:

*Legal Permissible Use:* The subject property is zoned B-OS, Business Office Service. By providing a separate area for such uses, these essential facilities are kept from encroaching in areas or districts where they would be incompatible. Permitted uses include office buildings for any of the following occupations: executive, administrative, professional, accounting, writing, clerical, stenographic, drafting and sales; medical office and dental offices, including clinics; facilities for human care such as hospitals, rest and convalescent homes; banks, credit unions, savings and loan associations, and similar uses, drive-through facilities as an accessory use only; laundry and dry cleaning; institutional or public services; personal service establishment including barber shops, beauty shops and health salons; off-street parking lots; business schools or private schools operated for profit; essential services; home occupations as provided and controlled in section 1.0401(B)(9); existing housing; mortuaries; accesssory structures and used customarily incident to the above permitted uses, provided such buildings and uses are located on the same zoning lot with permitted use. Special exception uses include bed and breakfast; functional equivalent family; reasonable

accommodation use; ministorage and warehousing; child care centers or day care center in accord with section 1.0602 and section 1.0603(M).

The subject property was previously used as an industrial building.  According to Ms. Kara Falkenstein, Administrative Assistant, City of Sturgis Community Development, although the building is zoned Business Office Service, the City of Sturgis would consider other uses for the site, including the previous industrial use.  A plan would need to be presented to the city, but they would consider a wide range of uses.

The City of Sturgis master plan designates the future land use of the subject property as Mixed Use/Single and Two-Family Residential.

*Physical Possible Use:* The subject site is an irregular shaped parcel that contains 4.197 acres (182,842 SF) of net land area, excluding road right-of-way.  The site has a total of 543.89 feet of frontage along N. Prospect Street, 432.20 feet of street frontage along E. Hatch Street, 247.45 feet of street frontage along N. Fourth Street and 150.03 feet along E. Main Street.  Public water, sanitary sewer, electric and telephone service are available to the property (at the road).

*Financial Feasibility/Maximum Profitability*:  As stated in the market analysis, the location of the subject property is not suitable for commercial or office use because it is not located along a primary thoroughfare such as Chicago Road (US-12) or Centerville Road (M-66), and the surrounding land use is primarily residential.  Although there is an industrial property located near the subject property, the surrounding land use is primarily residential and development of the subject property, as vacant, for industrial use is not complementary to the residential use, as industrial users prefer to be located near other industrial users.  Based upon the market analysis, it is our opinion that the highest and best use of the subject site, as vacant, is for future residential development when demand exists.

**Highest and Best Use as Improved:**
The subject property consists of a shell building, which is vacant and unoccupied.  There is no interior finish, windows, heating/cooling, plumbing fixtures or electrical fixtures in the building. The current owner has proposed a mixed use development at the subject property, which includes redevelopment of the building for residential and commercial use.

Commercial and Office

As stated in the market analysis, commercial and office use in the City of Sturgis is concentrated along Chicago Road (US-12) and Centerville Road (M-66), located south of Chicago Road.  There has been minimal new demand for commercial and office use in the City of Sturgis.   The subject property is not located in downtown Sturgis, or along Chicago Road (US-12) or Centerville Road (M-66).  Also, the surrounding land uses are residential and do not complement a multi-story commercial use. Furthermore, there is no market evidence that the market will absorb 22,440 SF of proposed commercial space.  Therefore, it is our opinion that commercial and office use is not the highest and best use of the subject property, as improved.

Industrial

As stated in the market analysis, an industrial use is not suitable at the subject property due to the existing design and layout of the building (3-story, 12 to 13 foot ceiling height, and a U-shaped building).  The current demand for industrial buildings consist of a 1-story structure, ceiling height of 16 feet and above and a building layout that is mostly square or rectangular.  Therefore, it is our opinion an industrial use is not the highest and best use of the subject property, as improved.

Residential

As previously discussed, there was a minimal increase in population from 2010 to 2015 of 13 persons, and the population in 2020 is projected to increase by 90 persons (0.2%).  There are approximately 500 vacant housing units, which is approximately 11% of the total units.

According to the Brownfield Redevelopment MBT Credit Application (Bates #000814) for the subject property, the proposed rental rate is $775/month.  However, the size range of the units is 775 SF to 2,050 SF (Bates # 001285) and it's unlikely that the proposed rental rate is $775/month for all unit sizes.  As stated in the market analysis, the PMAWM apartment survey states that the proposed rent ($775/month) is not reached until 2016.  From 2010 to 2015 the proposed rental rate is below the average market rental rate.  According to the market data, the proposed rent will exceed the market rents from 2010 to 2015 and the proposed units will likely remain vacant during that period

The primary demand generator for real estate development is the increase in population and household income. As stated previously, the City of Sturgis population and median household income from 2015 to 2020 will have minimal growth.  Given the size of the proposed project for the subject property we do not expect a significant improvement to the apartment market to support an

additional 35 to 56 units. The proposed units would increase the total supply of conventional apartments by additional 18% to 29%.

Based upon the previous analysis, the highest and best use of the subject property, as improved, is to hold for future redevelopment.

## COST APPROACH

The cost approach involves estimating the current replacement or reproduction cost of building and site improvements, subtracting depreciation and adding land value. The building improvements are greater than 50 years old. The year built is 1922. As the age of the building increases the process of estimating accrued depreciation becomes less reliable. Due to the subject's age, the cost approach is not applicable.

## SALES COMPARISON APPROACH - September 14, 2015

The sales comparison approach involves the search for sales of similar type property, analyzing the sales, and estimating a value for the subject based on the analysis. The principle of substitution is particularly relevant in this approach whereby the theory is that value is controlled by prices paid for similar properties having like utility.

The analysis process involves making adjustments to the sale prices of comparable properties for differences in the "elements of comparison" between the comparables and the appraised property. The elements of comparison include property rights conveyed, financing terms, conditions of sale, expenditures immediately after the sale, market conditions, location, physical characteristics, use, economic characteristics, zoning, highest and best use and non-realty components of value. Adjustments to the comparables are usually made on a percentage or dollar basis and are applied to a unit rate of comparison, such as sale price per square foot of land or building area, or some other appropriate unit. The unit rate determined to be most applicable in making comparisons between the comparables and the subject is price per square foot of the building improvements.

The extent of collecting, confirming and analyzing the building sale comparables for use in the appraisal is based upon the geographic boundaries of Southwest and Northwest Michigan. Research sources included the Genzink Appraisal Company database, MLS data, CoStar Group, Inc. and market participants. The data was typically confirmed with a third party such as a real estate broker or property owner, when available.

We have selected four comparable properties, which are considered similar to the subject property. There are three sold comparables and one current listing.  The following page provides a summary chart of the adjustments for the comparable properties.  A map locating the comparable properties and a description of each property is located in the Addendum section of this report.

## Summary of Adjustments - Building Sales

| | Subject | Comp No. 1 | Comp No. 2 | Comp No. 3 | Comp No. 4 |
|---|---|---|---|---|---|
| Comparable Reference No. | | 3008031 | 3008730 | 3008708 | 3008729 |
| **Location** | | | | | |
| Street Number | 308 | 86 | 401 | 400 | 455 |
| Street Name | N. Prospect Street | S. Division Street | N. Cochran Avenue | Bryant Street | E. Water Street |
| City/Township | City of Sturgis | City of Battle Creek | City of Charlotte | City of Kalamazoo | Village of Constantine |
| County | St. Joseph | Calhoun | Eaton | Kalamazoo | St. Joseph |
| **Sales Data** | | | | | |
| Property Rights | fee simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Financing Terms | cash | Cash | Cash | Cash | Cash |
| Conditions of Sale | arm's length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| Sale Price | | $330,000 | $25,000 | $360,000 | $179,000 |
| Cash Price | | $330,000 | $25,000 | $360,000 | $179,000 |
| Sale Date | 9/14/2015 | 11/20/2015 | 7/10/2014 | 6/30/2014 | Current Listing |
| **Site Description** | | | | | |
| Access | average | average | average | average | average |
| Visibility | average | average | average | average | average |
| Physical Location | Corner | Corner | Interior | Cul-de-sac | Interior |
| Land area (Acres) | 4.197 | 2.006 | 1.293 | 1.504 | 2.941 |
| Land area (SF) | 182,842 | 87,399 | 56,319 | 65,527 | 128,113 |
| Shape | Irregular | Irregular | Irregular | Irregular | Irregular |
| Topography | Mostly Level | Mostly Level | Mostly Level | Mostly Level | Mostly Level |
| Zoning | BOS; Business Office Space | I-1; Industrial | I-2; General Industrial District | M-1; Manufacturing, Limited | Industrial |
| **Building Description** | | | | | |
| Year Built | 1922 | 1930 | 1900 | 1906 | 1900 |
| Condition | Fair | Fair | Fair | Average | Fair |
| Gross Building Area (SF) | 103,337 | 89,117 | 37,310 | 61,050 | 24,800 |
| Number of Stories | 3 | 4 | 2 | 3 | 1-2 |
| Class of Construction | C, Masonry Frame | C, Masonry Frame | C, Masonry Frame | C, Masonry Frame | C, Masonry Frame |
| Highest and Best Use | Hold for future redevelopment | Light Industrial | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development |
| **Units of Comparison** | | | | | |
| Price/SF | | $3.70 | $0.67 | $5.90 | $7.22 |
| Land to building ratio | 1.77 | 0.98 | 1.51 | 1.07 | 5.17 |
| **Adjustments** | | | | | |
| Market Conditions | 0.0% | 0.00 | 0.00 | 0.00 | 0.00 |
| Adjusted for Market Conditions | | $3.70 | $0.67 | $5.90 | $7.22 |
| Location | | -0.10 | 0.00 | -0.25 | 0.00 |
| Access | | 0.00 | 0.00 | 0.00 | 0.00 |
| Visibility | | 0.00 | 0.00 | 0.05 | 0.00 |
| Year Built/Condition | | 0.10 | 0.10 | -0.05 | 0.10 |
| Gross Building Area (SF) | | 0.00 | -0.10 | -0.05 | -0.10 |
| Current Listing | | 0.00 | 0.00 | 0.00 | -0.35 |
| Net adjustment | | 1.00 | 1.00 | 0.70 | 0.65 |
| Gross adjustment | | 0.20 | 0.20 | 0.40 | 0.55 |
| Indication of value (Price/SF) | | $3.70 | $0.67 | $4.13 | $4.69 |

## *Discussion of the Adjustments*

A discussion of the adjustment analysis for differences with the subject follows.

***Property Rights Conveyed:*** An adjustment is required if the property rights for the comparable properties are different from the subject.  Comparable Nos. 1, 2 and 3 are fee simple transaction.  Comparable No. 4 is a current listing and assumes fee simple property rights.  Therefore, no adjustment was required for Comparable Nos. 1 through 4.

***Financing Terms:*** Comparable Nos. 1, 2 and 3 were sold or assumed to be sold based upon cash terms or cash equivalent terms.  Comparable No. 4 is a current listing and assumes cash terms or cash equivalent terms.  Therefore, no adjustment was required for Comparable Nos. 1 through 4.

***Condition of Sale:*** This category requires that each comparable property must be an arm's length transaction.  Comparable Nos. 1, 2 and 3 were considered to be arm's length transactions.  Comparable No. 4 is a current listing and assumes an arm's length transactions.  Therefore, no adjustment was required for Comparable Nos. 1 through 4.

***Market Conditions:*** This element of comparison considers changes in market conditions between the sale date of the comparable and the date of value for the subject.  Comparable Nos. 1, 2 and 3 were recent sales.  Comparable No. 4 is a current listing.  Therefore, no adjustment was required for Comparable Nos. 1 through 4.

***Location:***  This adjustment considers the surrounding neighborhood.  The subject's immediate neighborhood is considered to be in a stage of stability.  Comparable Nos. 1 and 3 are located in the City of Battle Creek and the City of Kalamazoo, which is considered superior to the subject location and a downward adjustment is required.  Comparable Nos. 2 and 4 are located in the City of Charlotte and the Village of Constantine, which is considered similar to the subject and no adjustment is required.

***Access:***  This adjustment considers the overall accessibility and ease to get to the subject site.  The subject is considered to have average access.  Comparable Nos. 1 through 4 are similar to the subject and no adjustment is required.

***Visibility:***  This adjustment is primarily a function of visibility along primary thoroughfares.  Properties with visibility from primary roadways are typically preferred.  The subject has a corner location and has visibility on N. Prospect Street, S. Main Street and E. Hatch Street.  Comparable

Nos. 1, 2 and 4 are considered similar to the subject and no adjustment is required.  Comparable No. 3 is located on a cul-de-sac, which is considered inferior and an upward adjustment is required.

*Year Built/Condition:* This is a composite adjustment considering both the average age of the improvements and their condition.  The subject property consists of a shell building. There is no interior finish, windows, heating/cooling, plumbing fixtures or electrical fixtures in the building. According to public records, portions of the building were built in 1922.  The year built for some of the building was not available. The current owner has sandblasted the interior, repaired floors where needed, installed a new roof covering on the building (except lean-to), tuck-pointing the concrete block and brick, and partially completed some interior wood framing. Even after the improvements, the building is not move-in ready, but the interior is demolished and is ready for development. Therefore, it is considered to be in fair condition.

Comparable No. 1 has structural issues, but has had some recent improvements.  Comparable No. 2 is an older building with exposed ceilings and walls.  Comparable No. 4 has a renovated apartment on the second floor, but the first floor has not been renovated and has exposed walls and ceilings. Therefore, Comparable Nos. 1, 2 and 4 are considered to be in fair condition with no recent renovation, and an upward adjustment is required.  Comparable No. 3 has had renovations to half of the building.  It is considered move-in ready and in average condition.  Therefore, a downward adjustment is required.

*Building Size:* Generally, smaller buildings will sell at higher unit rates than larger properties because of the higher demand for smaller properties (a smaller equity investment is required).  The subject property contains 103,337 SF of gross building area.  Comparable No. 1 is considered similar and no adjustment is required.  Comparable Nos. 2, 3 and 4 have less gross building area and a downward adjustment is required.

*Current Listing:* Comparable Nos. 4 is a current listing.  This adjustment takes into consideration the amount and number of price reductions.  Comparable No. 4 has been listed for sale since November 25, 2014 and the listing price has been reduced twice.  The original listing price was $210,000, and then reduced to $199,000, then reduced to $189,000 and again to $179,000.  The listing price for Comparable No. 4 is still above market and a downward adjustment is required.

*Summary:*  Before adjustments, Comparable Nos. 1 through 4 indicates a range in sale price from $25,000 to $360,000.  The following table provides a range of value for the subject property based upon Comparable Nos. 1 through 4 after adjustments.

44

| Value Range Indicators | | |
| --- | --- | --- |
| (Applied to 103,337 SF at subject property) | | |
| Comparable No. | Unit Rate | Indicated Value |
| 2 | $0.67 | $69,236 |
| 1 | $3.70 | $382,347 |
| 3 | $4.13 | $426,782 |
| 4 | $4.69 | $484,651 |

Comparable Nos. 1 and 3 were given the most emphasis. Comparable Nos. 2 and 4 were given secondary consideration. The indicated value of the fee simple estate, *without consideration of the draft license and release agreement,* **as** of September 14, 2015 is $390,000. This is equivalent to $3.77/SF.

## SALES COMPARISON APPROACH - January 29, 2016

The client has also requested an opinion of market value as of the date of inspection, which is January 29, 2016. We have assumed that there have been no legal, financial, or physical changes to the site or building from September 14, 2015 to January 29, 2016. Furthermore, the market conditions have not changed either. Therefore, the indicated value of the fee simple estate *without consideration of the draft license and release agreement,* as of January 29, 2016, is $390,000. This is equivalent to $3.77/SF.

## INCOME CAPITALIZATION APPROACH

The income approach to value converts anticipated future benefits of ownership, typically income received during a holding period, into a value estimate. The anticipated future income is converted, or discounted, to a present value by applying an appropriate capitalization or yield rate. The subject property is located in a residential and industrial area; however, the subject property is a shell building, with concrete floors and open ceilings and walls. The income capitalization approach was not completed for this appraisal because of the lack of comparable data that would accurately reflect the characteristics of the subject property.

## RECONCILIATION AND FINAL VALUE ESTIMATE

The purpose of this Appraisal Report is to determine the market value of the fee simple estate, without consideration of the draft license and release agreement as of September 14, 2015 and January 29, 2016 based upon the condition of the building as of those dates. The indicated market value, by approach, and date of value is as follows:

|  | September 14, 2015 | January 29, 2016 |
|---|---|---|
| Cost Approach | n/a | n/a |
| Sales Comparison Approach | $390,000 | $390,000 |
| Income Capitalization Approach | n/a | n/a |

Based upon the previous analyses, the market value of the fee simple estate, ***without consideration of the draft license and release agreement,*** as of September 14, 2015 is $390,000.

Based upon the previous analyses, the market value of the fee simple estate, ***without consideration of the draft license and release agreement,*** as January 29, 2016 is $390,000.

*The market value opinion with an effective date of September 14, 2015 is based on the extraordinary assumption there were no significant changes to the site or building between the date of value (9/14/15) and the date of inspection (1/29/16). If this is incorrect, the value conclusion could be impacted.*

## EXPOSURE AND MARKETING TIMES

The exposure times for the comparable properties (refer to the sales comparison approach) to the subject are summarized in the following table.

| Exposure Time Examples | | | | |
|---|---|---|---|---|
| Comp No. | Location | Listing Date/Price | Sale Date/Price | Time Period |
| 1 | 86 S. Division Street Battle Creek, MI | 5/1/2012 $449,000 | 11/20/2015 $330,000 | 42 months |
| 2 | 401 N. Cochran Avenue Kalamazoo, MI | 7/12/2013 $89,900 | 7/10/2014 $25,000 | 12 months |
| 3 | 400 Bryant Street Kalamazoo, MI | 6/30/2014 $360,000 | 6/30/2014 $360,000 | N/A |
| 4 | 455 E. Water Street Village of Constantine, MI | 11/25/2014 $210,000 | Current Listing N/A | 15 months |

These sales required exposure periods from between 12 and 42 months before sales were completed.  The time period covered by the comparables is from May 2012 to November 2015, and would reflect supply and demand factors during this time period.  It is reasonably probable that a sale of the appraised property could be consummated within a 12 to 42 month period assuming

46

adequate, sufficient and reasonable marketing.  This includes both the exposure time prior to the date of value, and a required marketing period after the date of value.

## *COMPENSATION – DRAFT LICENSE AND RELEASE AGREEEMENT*

Within this section of the report, we will estimate the compensation for the draft license to access the subject property for Newell Rubbermaid (Newell) for the right to enter upon and conduct remediation, maintenance, and other work on the property.   A complete copy of the draft license and release agreement is located in the Addendum.  The remediation plan includes four access periods.

The compensation is based upon gaining access to the subject property in 2016. We do not expect a significant change in the market conditions or the subject property during the access period.  The primary demand generator for real estate development is the increase in population and household income. As stated in the market analysis, the City of Sturgis population and median household income from 2015 to 2020 will have minimal growth.  Therefore, we do not expect a significant change for compensation if access occurs between 2016 and 2020.  If the highest and best use of the subject property changes during the access period (65 months), the compensation will need to be revised.

Compensation for the draft license and release agreement is estimated on a daily rental basis.  The rental rate is calculated by multiplying the market value by an overall capitalization rate, plus operating expenses to arrive at a daily rental rate.  If the highest and best use changes during the access period (65 months) then the compensation will change.  The calculation for the daily rental rate is provided in the following table.

| Daily Rental Rate for Access | | |
|---|---|---|
| Market Value of Subject Property | | $390,000 |
| Capitalization Rate | × | 9.0% |
| Annual NOI | | $35,100 |
| | | |
| Operating Expenses | | |
|    Real Property Taxes | | $4,559 |
|    Insurance | | $6,200 |
|    Management | | $8,267 |
| Annual Operating Expenses | + | $19,026 |
| | | |
| Total Annual Gross Rent | | $54,126 |
| | | |
| Daily Gross Rent | | $148 |

47

The compensation for each access period is estimated as follows:

1.  Engineering and Design Access - A temporary, *non-exclusive* draft license for one full day between May 1, 2016 and May 31, 2016.  The calculation is as follows.

| Engineering and Design Access | | |
|---|---|---|
| Daily Rental Rate | | $148 |
| No. of Days | × | 1 |
| Total | | $148 |

2.  Phase I Access Period – A temporary, *exclusive* draft license commencing on August 1, 2016 and continuing through November 30, 2016.  The exclusive draft license may prohibit any and all persons from occupying or otherwise gaining access to the east portion of the subject property, where the building improvements are located.  There are 122 days in this access period.  The calculation is as follows.

| Phase 1 Access Period | | |
|---|---|---|
| Daily Rental Rate | | $148 |
| No. of Days | × | 122 |
| Total | | $18,056 |

3.  Phase II Access Period – A temporary, *non-exclusive* draft license for Newell to access the subject property with persons and equipment commencing on December 1, 2016 through January 31, 2021, to perform Phase II work on the subject property, along with the right to record a restrictive covenant against the property prohibiting excavation in certain areas. Newell shall have the right to access and enter the property on weekdays between the hours of 6:00 am and 8:00 pm.  Newell anticipates entering the subject property on a daily basis for the period December 1, 2016 to January 31, 2017, three days per week from February 1, 2017 to July 31, 2017, and one day per week from August 1, 2017 through January 31, 2021.  There are 304 days in this access period.  The calculation is as follows.

| Phase 2 Access Period | | |
|---|---|---|
| Daily Rental Rate | | $148 |
| No. of Days | × | 304 |
| Total | | $44,992 |

4.  Phase III Access Period – A temporary, *non-exclusive* draft license for Newell to gain access to and the right to ender the subject property with persons and equipment commencing on June 1,

2021 and continuing through August 31, 2021, to perform Phase III work on the subject property.  Newell anticipates entering the subject property a minimum of three times per week from June 1, 2021 to August 31, 2021 on weekdays.  The Phase III work may limit owner's access to portions of the subject property for a period not to exceed 14 days, to allow for completion of the Phase III work.  Although Newell anticipates entering the subject property a minimum of three times per week, they have the right to enter during all weekdays. There are 66 weekdays in this period.  The calculation is as follows:

| Phase 3 Access Period | | |
|---|---|---|
| Daily Rental Rate | | $148 |
| No. of Days | × | 66 |
| Total | | $9,768 |

The compensation owed to the property owner (Kirsch Lofts, LLC) for the right to enter upon, conduct remediation, maintenance and other work as defined in the draft license and release agreement for 65 months beginning May 1, 2016 is:

| Compensation for Access | | |
|---|---|---|
| Phase | | |
| Engineering and Design | | $148 |
| Phase 1 | | $18,056 |
| Phase 2 | | $44,992 |
| Phase 3 | + | $9,768 |
| Total | | $72,964 |

# SECTION X.  CERTIFICATION

The undersigned certify that, to the best of their knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon the developing or reporting of predetermined results.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal, such as the outcome of this case in which this report will be relied upon.  Our compensation is based upon the following hourly rates: $190/hour (Principal), $140 (Senior Associate), and $50 (Administrative Assistant).  Services required subsequent to completing the appraisal, which include but are not limited to, depositions and expert testimony will be billed at an hourly rate of $190/hour.

- The reported analyses, opinions and conclusions were developed, and this report has been prepared in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

- We have completed a personal inspection of the property that is the subject of this report.

- No one other than Ms. Michelle Y. Billardello, State Certified General Appraiser (Mich. ID# 1201071240) and Michael A. Tyska, MAI, State Certified General Appraiser (Mich. ID# 1201071392) provided significant assistance to the person signing this report.

- We have not provided appraisal services for the subject property within the past three years.

- That the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, Jeffrey G. Genzink, MAI has completed the continuing education program of the Appraisal Institute.

- As of the date of this report, Michael A. Tyska, MAI has completed the continuing education program of the Appraisal Institute, and Michelle Y. Bilardello has completed the Standards and Ethics Education Requirements for Candidates/Practicing Affiliates of the Appraisal Institute.

Jeffrey G. Genzink, MAI
Certified General Real Estate Appraiser

50

# SECTION XI.  ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report has been made with the following general assumptions and limiting conditions:

- No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations.  Title to the property is assumed to be good and marketable unless otherwise stated.

- The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

- Responsible ownership and competent property management are assumed.

- The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

- All engineering studies are assumed to be correct.  The plot plans and illustrative material in this report are included only to help the reader visualize the property.

- It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable.  No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

- It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the appraisal report.

- It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless nonconformity has been identified, described, and considered in the appraisal.

- It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.

- It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

- The appraiser, by reason of this appraisal, is not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.

### ASSUMPTIONS AND LIMITING CONDITIONS *(cont.)*

- Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization.  The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

- Possession of this report, or a copy thereof, does not carry with it the right of publication.

- Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser.

- The Americans with Disabilities Act (ADA) became effective January 26, 1992.  The appraiser has not made a specific compliance survey or analysis of the property to determine whether or not it is in conformity with the various detailed requirements of ADA.  It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act.  If so, this fact could have negative impact upon the value of the property.  Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

## *SECTION VI. A D D E N D U M*

**Aerial View**
**Subject Photographs**
**Assessment Records**
**Regional Area Data**
**Legal Description**
**Flood Plain Map**
**Survey**
**Building Sale Comparables**
**Draft License and Release Agreement**
**Proposed Development Plans**
**Appraiser Qualifications and Licenses**
**List of Testimony (Trials and Depositions) by**
**Jeffrey G. Genzink, MAI**

Aerial View



Source: Pictometry

Subject Photographs

**SUBJECT PHOTOGRAPHS**
TAKEN BY: JGG  PHOTO DATE: 1/29/2016



Street view of Hatch Street facing west.



Street view of Hatch Street facing east.



Street view of Fourth Street facing north.



Street view of N. Prospect Street facing north.



Street view of N. Prospect Street facing south.



Parking lot facing southwest.

**SUBJECT PHOTOGRAPHS**
TAKEN BY: JGG  PHOTO DATE: 1/29/2016



South boundary of parking lot facing east.



Street view of Main Street facing west.



View of building facing southeast.



View of building facing northeast.



View of building facing east.



View of building facing north.

**SUBJECT PHOTOGRAPHS**
TAKEN BY: JGG  PHOTO DATE: 1/29/2016



View of building facing southwest.



View of building facing west.



View of location of 1st monitoring well.



View of location of 2nd monitoring well.

**SUBJECT PHOTOGRAPHS**
TAKEN BY: JGG  PHOTO DATE: 1/29/2016



First Floor Pool.



First Floor.



First Floor.



Ceiling of First Floor.



First Floor.



Stairs from First Floor to Second Floor.

**SUBJECT PHOTOGRAPHS**
TAKEN BY: JGG  PHOTO DATE: 1/29/2016



Second Floor.



Second Floor.



Second Floor.



Stairway.



Second Floor



Second Floor Ceiling.

**SUBJECT PHOTOGRAPHS**
TAKEN BY: JGG PHOTO DATE: 1/29/2016



Third Floor.



Third Floor.



Third Floor.



Third Floor windows.



Third Floor Ceiling.



Third Floor.

Assessment Records

## General Property Information

**City of Sturgis**

[Back to Non-Printer Friendly Version]   [Send To Printer]

**Parcel:** 052 200 024 00  **Unit:** CITY OF STURGIS  **Data Current As Of:** 4/20/2016 9:37:52 PM

### Property Address [collapse]

308 N PROSPECT
STURGIS, MI 49091

### Owner Information [collapse]

KIRSCH LOFTS, LLC
148 S. RIVER AVE, SUITE 100
HOLLAND, MI 49423

**Unit:** 052

### Taxpayer Information [collapse]

SEE OWNER INFORMATION

### General Information for Tax Year 2016 [collapse]

| | | | |
|---|---|---|---|
| **Property Class:** | 301 - INDUSTRIAL | **Assessed Value:** | $75,200 |
| **School District:** | 75010 - 10 STURGIS | **Taxable Value:** | $54,110 |
| **State Equalized Value:** | $75,200 | **Map #** | 27 |
| **USER NUM IDX** | 0 | **Date of Last Name Chg:** | 09/11/2012 |
| | | **Date Filed:** | |
| | | **Notes:** | N/A |
| **Historical District:** | N/A | **Census Block Group:** | N/A |

| Principal Residence Exemption | June 1st | Final |
|---|---|---|
| **2016** | 0.0000 % | - |
| **2015** | 0.0000 % | 0.0000 % |

| Previous Year Info | MBOR Assessed | Final S.E.V. | Final Taxable |
|---|---|---|---|
| **2015** | $71,100 | $71,100 | $53,949 |
| **2014** | $53,100 | $53,100 | $53,100 |

### Land Information [collapse]

| | Frontage | | Depth |
|---|---|---|---|
| **Lot 1:** | 0.00 Ft. | | 0.00 Ft. |
| **Lot 2:** | 0.00 Ft. | | 0.00 Ft. |
| **Lot 3:** | 0.00 Ft. | | 0.00 Ft. |
| **Total Frontage:** | 0.00 Ft. | **Average Depth:** | 0.00 Ft. |

**Total Acreage:** 3.66
**Zoning Code:**

| | | |
|---|---|---|
| **Total Estimated Land Value:** | $31,763 | **Mortgage Code:** |
| **Land Improvements:** | $0 | **Lot Dimensions/Comments:** |
| **Renaissance Zone:** | NO | |
| **Renaissance Zone Expiration Date:** | | |

64

## Legal Information for 052 200 024 00 [collapse]

BLK 55 EXCEPT W 131.33 FT LOT 9 & THAT PORTION OF 4TH T STREET VACATED N OF S LN LOT 15 BLK 6 ALSO LOTS 11,14,15,16, BLK 6. DRAKES 2ND. CITY OF STURGIS. THIS PARCEL BEING LOCATED WEST OF N. PROSPECT STREET. 30.5 FT TH SELY 30 FT M/L TO PT ON W LN OF 4TH ST 12 FT S OF POB TH N ALG W LN OF ST 12 FT TO POB. BEING A TRIANG PAR OUT OF NE COR LOT 15. DRAKES 2ND ADD. CITY OF STURGIS.

## Sales Information

5 sale record(s) found.

| Sale Date | Sale Price | Instrument | Grantor | Grantee | Terms Of Sale | Liber/Page |
|---|---|---|---|---|---|---|
| 07/10/2009 | $3,000.00 | WD | 1983 FINANCE COMPANY, LLC | KIRSCH LOFTS, LLC | NOT TYPICAL | 1539/909 |
| 07/27/2007 | $0.00 | QC | ROSE LAND & FINANCE CORP | 1983 FINANCE COMPANY, LLC | NOT TYPICAL | 1466/705 |
| ➕ 11/30/2006 | $0.00 | SD | DREWER DUSTIN N | ROSE LAND & FINANCE CORP | FORECLOSURE | 1410/560 |
| 03/31/2005 | $50,000.00 | WD | GPE INC | DREWER DUSTIN N | ARMS LENGTH | 1356/013 |
| 03/01/2005 | $0.00 | QC | FIRST NATIONAL BANK OF AMERICA | GPE INC | ARMS LENGTH | 1356/011 |

**Disclaimer:** BS&A Software provides this Web Site as a way for municipalities to display information online and is not responsible for the content or accuracy of the data herein. This data is provided for reference only and WITHOUT WARRANTY of any kind, expressed or inferred. Please contact your local municipality if you believe there are errors in the data.
Privacy Policy

# Building Information

**City of Sturgis**

[Back to Non-Printer Friendly Version]    [Send To Printer]

**Parcel:** 052 200 024 00

---

**9 building(s) found.**

| Description ↑ | Floor Area | Yr Built | Est. TCV |
|---|---|---|---|
| ⊟ Commercial/Industrial Building 1 - Office Building | 28875 Sq. Ft. | 1922 | $62,827 |

### General Information

| | | | |
|---|---|---|---|
| Floor Area: | 28875 Sq. Ft. | Estimated TCV: | $62,827 |
| Occupancy: | Office Building | Class: | C |
| Stories Above Ground: | 3 | Average Story Height: | 9 |
| Basement Wall Height: | N/A | | |
| Year Built: | 1922 | Year Remodeled: | 1959 |
| Percent Complete: | 100% | Heat: | Package Heating & Cooling |
| Physical Percent Good: | 42% | Functional Percent Good: | 30% |
| Economic Percent Good: | 50% | Effective Age: | 70 yrs. |

| Description | Floor Area | Yr Built | Est. TCV |
|---|---|---|---|
| ⊟ Commercial/Industrial Building 2 - Industrial, Light Manufacturing | 20460 Sq. Ft. | 1922 | $18,724 |

### General Information

| | | | |
|---|---|---|---|
| Floor Area: | 20460 Sq. Ft. | Estimated TCV: | $18,724 |
| Occupancy: | Industrial, Light Manufacturing | Class: | C |
| Stories Above Ground: | 3 | Average Story Height: | 9 |
| Basement Wall Height: | N/A | | |
| Year Built: | 1922 | Year Remodeled: | 1959 |
| Percent Complete: | 100% | Heat: | Space Heaters, Gas with Fan |
| Physical Percent Good: | 37% | Functional Percent Good: | 30% |
| Economic Percent Good: | 50% | Effective Age: | 62 yrs. |

| Description | Floor Area | Yr Built | Est. TCV |
|---|---|---|---|
| ⊟ Commercial/Industrial Building 3 - Warehouse, Storage | 10179 Sq. Ft. | 0 | $5,600 |

### General Information

| | | | |
|---|---|---|---|
| Floor Area: | 10179 Sq. Ft. | Estimated TCV: | $5,600 |
| Occupancy: | Warehouse, Storage | Class: | C |
| Stories Above Ground: | 3 | Average Story Height: | 9 |
| Basement Wall Height: | N/A | | |
| Year Built: | 0 | Year Remodeled: | 0 |
| Percent Complete: | 100% | Heat: | Space Heaters, Gas with Fan |
| Physical Percent Good: | 37% | Functional Percent Good: | 30% |
| Economic Percent Good: | 50% | Effective Age: | 62 yrs. |

| Description | Floor Area | Yr Built | Est. TCV |
|---|---|---|---|
| ⊟ Commercial/Industrial Building 4 - Warehouse, Storage | 38280 Sq. Ft. | 0 | $20,366 |

### General Information

| | | | |
|---|---|---|---|
| Floor Area: | 38280 Sq. Ft. | Estimated TCV: | $20,366 |
| Occupancy: | Warehouse, Storage | Class: | C |
| Stories Above Ground: | 3 | Average Story Height: | 9 |
| Basement Wall Height: | N/A | | |
| Year Built: | 0 | Year Remodeled: | 0 |
| Percent Complete: | 100% | Heat: | Space Heaters, Gas with Fan |

| | | | |
|---|---|---|---|
| **Physical Percent Good:** | 37% | **Functional Percent Good:** | 30% |
| **Economic Percent Good:** | 50% | **Effective Age:** | 62 yrs. |

---

⊟ Commercial/Industrial Building 5 - Warehouse, Storage     2800 Sq. Ft.     0     $1,607

### General Information

| | | | |
|---|---|---|---|
| **Floor Area:** | 2800 Sq. Ft. | **Estimated TCV:** | $1,607 |
| **Occupancy:** | Warehouse, Storage | **Class:** | C |
| **Stories Above Ground:** | 1 | **Average Story Height:** | 10 |
| **Basement Wall Height:** | N/A | | |
| **Year Built:** | 0 | **Year Remodeled:** | 0 |
| **Percent Complete:** | 100% | **Heat:** | Space Heaters, Gas with Fan |
| **Physical Percent Good:** | 37% | **Functional Percent Good:** | 30% |
| **Economic Percent Good:** | 50% | **Effective Age:** | 62 yrs. |

---

⊟ Commercial/Industrial Building 6 - Warehouse, Storage     2030 Sq. Ft.     0     $1,464

### General Information

| | | | |
|---|---|---|---|
| **Floor Area:** | 2030 Sq. Ft. | **Estimated TCV:** | $1,464 |
| **Occupancy:** | Warehouse, Storage | **Class:** | C |
| **Stories Above Ground:** | 1 | **Average Story Height:** | 10 |
| **Basement Wall Height:** | N/A | | |
| **Year Built:** | 0 | **Year Remodeled:** | 0 |
| **Percent Complete:** | 100% | **Heat:** | Space Heaters, Gas with Fan |
| **Physical Percent Good:** | 37% | **Functional Percent Good:** | 30% |
| **Economic Percent Good:** | 50% | **Effective Age:** | 62 yrs. |

---

⊟ Commercial/Industrial Building 7 - Warehouse, Storage     3379 Sq. Ft.     0     $2,059

### General Information

| | | | |
|---|---|---|---|
| **Floor Area:** | 3379 Sq. Ft. | **Estimated TCV:** | $2,059 |
| **Occupancy:** | Warehouse, Storage | **Class:** | C |
| **Stories Above Ground:** | 1 | **Average Story Height:** | 10 |
| **Basement Wall Height:** | N/A | | |
| **Year Built:** | 0 | **Year Remodeled:** | 0 |
| **Percent Complete:** | 100% | **Heat:** | Space Heaters, Gas with Fan |
| **Physical Percent Good:** | 37% | **Functional Percent Good:** | 30% |
| **Economic Percent Good:** | 50% | **Effective Age:** | 62 yrs. |

---

⊟ Commercial/Industrial Building 8 - Warehouse, Storage     2022 Sq. Ft.     0     $1,205

### General Information

| | | | |
|---|---|---|---|
| **Floor Area:** | 2022 Sq. Ft. | **Estimated TCV:** | $1,205 |
| **Occupancy:** | Warehouse, Storage | **Class:** | C |
| **Stories Above Ground:** | 1 | **Average Story Height:** | 10 |
| **Basement Wall Height:** | N/A | | |
| **Year Built:** | 0 | **Year Remodeled:** | 0 |
| **Percent Complete:** | 100% | **Heat:** | Space Heaters, Gas with Fan |
| **Physical Percent Good:** | 37% | **Functional Percent Good:** | 30% |
| **Economic Percent Good:** | 50% | **Effective Age:** | 62 yrs. |

---

⊟ Commercial/Industrial Building 9 - Warehouse, Storage     11889 Sq. Ft.     0     $4,842

## General Information

| | | | |
|---|---|---|---|
| **Floor Area:** | 11889 Sq. Ft. | **Estimated TCV:** | $4,842 |
| **Occupancy:** | Warehouse, Storage | **Class:** | C |
| **Stories Above Ground:** | 3 | **Average Story Height:** | 10 |
| **Basement Wall Height:** | N/A | | |
| **Year Built:** | 0 | **Year Remodeled:** | 0 |
| **Percent Complete:** | 100% | **Heat:** | Space Heaters, Gas with Fan |
| **Physical Percent Good:** | 37% | **Functional Percent Good:** | 30% |
| **Economic Percent Good:** | 50% | **Effective Age:** | 62 yrs. |

**\*\*Disclaimer:**  BS&A Software provides this Web Site as a way for municipalities to display information online and is not responsible for the content or accuracy of the data herein.  This data is provided for reference only and WITHOUT WARRANTY of any kind, expressed or inferred.  Please contact your local municipality if you believe there are errors in the data.

Privacy Policy





**Disclaimer:** BS&A Software provides this Web Site as a way for municipalities to display information online and is not responsible for the content or accuracy of the data herein. This data is provided for reference only and WITHOUT WARRANTY of any kind, expressed or inferred. Please contact your local municipality if you believe there are errors in the data.
Privacy Policy

Powered By:


# General Property Information

**City of Sturgis**

[Back to Non-Printer Friendly Version]   [Send To Printer]

**Parcel:** 052 250 028 00  **Unit:** CITY OF STURGIS  **Data Current As Of:** 4/20/2016 9:37:52 PM

## Property Address [collapse]

415 E MAIN STREET
STURGIS, MI 49091

## Owner Information [collapse]

KIRSCH LOFTS LLC
148 S. RIVER AVE STE 100
HOLLAND, MI 49423

**Unit:** 052

## Taxpayer Information [collapse]

SEE OWNER INFORMATION

## General Information for Tax Year 2016 [collapse]

| | | | |
|---|---|---|---|
| **Property Class:** | 302 - INDUSTRIAL | **Assessed Value:** | $5,200 |
| **School District:** | 75010 - 10 STURGIS | **Taxable Value:** | $5,200 |
| **State Equalized Value:** | $5,200 | **Map #** | 27 |
| **USER NUM IDX** | 0 | **Date of Last Name Chg:** | 11/23/2013 |
| | | **Date Filed:** | |
| | | **Notes:** | N/A |
| **Historical District:** | N/A | **Census Block Group:** | N/A |

| Principal Residence Exemption | June 1st | Final |
|---|---|---|
| **2016** | 0.0000 % | - |
| **2015** | 0.0000 % | 0.0000 % |

| Previous Year Info | MBOR Assessed | Final S.E.V. | Final Taxable |
|---|---|---|---|
| **2015** | $5,200 | $5,200 | $5,200 |
| **2014** | $9,800 | $9,800 | $9,800 |

## Land Information [collapse]

| | Frontage | | Depth |
|---|---|---|---|
| **Lot 1:** | 150.00 Ft. | | 153.00 Ft. |
| **Lot 2:** | 0.00 Ft. | | 0.00 Ft. |
| **Lot 3:** | 0.00 Ft. | | 0.00 Ft. |
| **Total Frontage:** | 150.00 Ft. | **Average Depth:** | 153.00 Ft. |

**Total Acreage:** 0.53
**Zoning Code:**

| | | | |
|---|---|---|---|
| **Total Estimated Land Value:** | $10,496 | **Mortgage Code:** | |
| **Land Improvements:** | $0 | **Lot Dimensions/Comments:** | |
| **Renaissance Zone:** | NO | | |
| **Renaissance Zone Expiration Date:** | | | |

**Legal Information for 052 250 028 00** [collapse]

LOTS 29 & 30 & 31 GREEN LAWN ADD. ALSO VACATED ALLEY ADJACENT TO S SIDE OF LOTS 29, 30, & 31. CITY OF STURGIS.

## Sales Information

5 sale record(s) found.

| Sale Date | Sale Price | Instrument | Grantor | Grantee | Terms Of Sale | Liber/Page |
|---|---|---|---|---|---|---|
| 07/10/2009 | $3,000.00 | WD | 1983 FINANCE COMPANY LLC | KIRSCH LOFTS LLC | NOT TYPICAL | 1539/909 |
| 07/27/2007 | $0.00 | QC | ROSE LAND & FINANCE CORP | 1983 FINANCE COMPANY LLC | NOT TYPICAL | 1466/705 |
| 11/30/2006 | $0.00 | SD | DREWER DUSTIN N | ROSE LAND & FINANCE CORP | FORECLOSURE | 1410/560 |
| 03/31/2005 | $0.00 | WD | GPE INC | DREWER DUSTIN N | ARMS LENGTH | 1356/013 |
| 03/01/2005 | $0.00 | QC | FIRST NATIONAL BANK OF AMERICA | GPE INC | NOT TYPICAL | 1356/011 |

**\*\*Disclaimer:** BS&A Software provides this Web Site as a way for municipalities to display information online and is not responsible for the content or accuracy of the data herein. This data is provided for reference only and WITHOUT WARRANTY of any kind, expressed or inferred. Please contact your local municipality if you believe there are errors in the data.
Privacy Policy

Regional Area Data

## Regional Area Map



Copyright © and (P) 1988–2006 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Portions © 1990–2006 InstallShield Software Corporation. All rights reserved. Certain mapping and direction data © 2005 NAVTEQ. All rights reserved. The Data for areas of Canada
includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for Ontario. NAVTEQ and NAVTEQ ON
BOARD are trademarks of NAVTEQ. © 2005 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc.

## *2015 Regional Area Data*

### *Introduction:*

St. Joseph County is located in the south central area of Michigan, northeast of South Bend, Indiana and south of Kalamazoo.  The City of Sturgis is the largest metropolitan area in the county and the Village of Centreville is the county seat.  The remainder of the county is primarily agricultural.

### *Transportation:*

Interstate 94 is a four-lane highway servicing St. Joseph County.  US 12 is an east/west travel route, which connects I-94 near New Buffalo with Detroit.  US 131 is a north/south four-lane highway servicing St. Joseph County.

The nearest airport is the Kalamazoo/Battle Creek International Airport which has domestic flights from Kalamazoo, Michigan.  The airport services general aviation and local private pilots flying for personal, business or recreation.

### *Population:*

Between 2010 and 2015, the population for St. Joseph County and the United States increased slightly, compared to the negative growth that occurred in the State of Michigan.  The ESRI forecast indicates a continued increase in population in St. Joseph County over the next five years as shown in the following table.

| Population | | | | | | |
|---|---|---|---|---|---|---|
| Area | 2010 [1] | 2015 [2] | Total % Change | Average Annual % Change | 2020 [2] | Total % Change | Average Annual % Change |
| St. Joseph County | 61,295 | 61,781 | 0.28% | 0.09% | 62,630 | 0.34% | 0.07% |
| State of Michigan | 9,883,640 | 9,870,786 | -0.13% | -0.04% | 9,944,000 | 0.74% | 0.15% |
| United States | 308,745,538 | 318,536,439 | 3.17% | 1.06% | 330,622,575 | 3.79% | 0.76% |

[1] 2010 Census
[2] ESRI Forecast

*Regional Area Data - Page 2*

## *Employment:*

The St. Joseph County employment base is relatively diversified, with a heavier emphasis on manufacturing when compared to the national average.  The following table provides a breakdown of major industry employers:

| 2015 Major Industry Employers | | | |
|---|---|---|---|
| Industry | St. Joseph County | State of Michigan | United States |
| Agriculture, Forestry, Fishing and Hunting | 2.7% | 1.0% | 0.8% |
| Mining | 0.2% | 0.1% | 0.2% |
| Utilities | 0.3% | 0.2% | 0.2% |
| Construction | 9.0% | 8.7% | 8.5% |
| Manufacturing | 6.0% | 4.3% | 3.4% |
| Wholesale Trade | 4.2% | 3.8% | 3.9% |
| Retail Trade | 14.6% | 15.0% | 14.9% |
| Transportation/Warehousing | 2.8% | 2.2% | 2.4% |
| Information | 1.5% | 1.8% | 1.9% |
| Finance/Insurance | 7.1% | 7.2% | 7.4% |
| Real Estate/Rental/Leasing | 4.9% | 4.8% | 5.4% |
| Professional, Scientific and Technical Services | 5.1% | 8.2% | 8.6% |
| Management of Companies/Enterprises | 0.1% | 0.1% | 0.1% |
| Admin., Support and Waste Mgmt Services | 3.2% | 4.3% | 4.2% |
| Educational Services | 3.2% | 2.7% | 2.5% |
| Health Care/Social Assistance | 6.3% | 8.3% | 7.7% |
| Arts/Entertainment/Recreation | 1.9% | 2.0% | 1.9% |
| Accommodation/Food Services | 5.9% | 6.5% | 6.8% |
| Other Services | 14.2% | 12.8% | 12.4% |
| Public Administration | 5.2% | 3.6% | 3.5% |

Source: ESRI Forecast

Unemployment rates (not seasonally adjusted) for St. Joseph County and the State of Michigan decreased from 2010 to 2015.  In the United States the unemployment rates also decreased from 2011 to 2015.  St. Joseph County has maintained an unemployment rate similar to the national average for the past three years, and below the unemployment rate in the state of Michigan.  The following table provides the annual historical unemployment rates and the chart provides the monthly historical unemployment rates.

| Unemployment - Not Seasonally Adjusted | | | | | |
|---|---|---|---|---|---|
| | 2011 Annual | 2012 Annual | 2013 Annual | 2014 Annual | 2015 Annual |
| St. Joseph County | 10.4% | 8.5% | 7.7% | 5.6% | 4.3% |
| State of Michigan | 10.4% | 9.1% | 8.8% | 7.2% | 5.4% |
| United States | 8.9% | 8.1% | 7.4% | 6.2% | 5.3% |

Source: Michigan Department of Energy, Labor & Economic Growth



Unemployment Rates (Not Seasonally Adjusted)

## Income:

The median household income in St. Joseph County has increased at a slightly higher rate than the State of Michigan and the national average.  Median household income data is provided in the following table:

77

*Regional Area Data - Page 4*

| Median Household Income | | | | |
|---|---|---|---|---|
| Area | 2015 [1] | 2020 [2] | Total % Change | Average Annual % Change |
| St. Joseph County | $42,995 | $50,422 | 17.8% | 3.56% |
| State of Michigan | $49,402 | $56,701 | 14.8% | 2.95% |
| United States | $53,217 | $60,683 | 14.0% | 2.81% |

[1] 2010 Census
[2] ESRI Forecast

## Housing Units:

The following table considers housing data for permanent residents in St. Joseph County.  There was a slight increase in the total housing units, renter occupied housing units and vacant housing units from 2010 to 2015, while the owner occupied units decreased slightly.  It is likely that the increase in vacant units is due to the large amount of foreclosures of property in the last few years.

| Total Housing Units - St. Joseph County | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2010 [1] | | 2015 [2] | | Total % change | Average Annual % change | 2020 [3] | | Total % change | Average Annual % change |
| Occupied -Owner | 17,523 | 63.1% | 17,470 | 61.8% | -0.3% | -0.10% | 17,700 | 62.04% | 0.2% | 0.05% |
| Occupied -Renter | 5,721 | 20.6% | 6,073 | 21.5% | 6.2% | 2.05% | 6,187 | 21.26% | -1.2% | -0.24% |
| Vacant | 4,534 | 16.3% | 4,728 | 16.7% | 4.3% | 1.43% | 4,741 | 16.70% | -0.3% | -0.06% |
| Total | 27,778 | | 28,271 | | 1.8% | 0.59% | 28,224 | | -0.2% | -0.03% |

[1] 2010 Census
[2] ESRI Forecast

## Summary:

St. Joseph County is located in close proximity to major markets, including Kalamazoo and South Bend, Indiana.  It is well served by a good network of highways and other modes of transportation. The heavier emphasis on manufacturing and education in the employment base has been challenged by the Great Recession both statewide and nationally.  However, there has been some positive news for St. Joseph County as well. South Bend, Indiana will be home to a new FedEx Distribution Center. The City of Sturgis will see the groundbreaking of a new Meijer store.  There is also a plan to rehabilitate downtown structures.  There is a new Wings, Etc. restaurant anchoring a redevelopment project that is anticipated to include office, retail, and residential apartment units on the upper floors. The Moso Village Project anticipates Phase one to be a 40,000 SF mixed use building with office, retail and restaurant space.  Two locally owned businesses are also expanding their manufacturing base in Sturgis, including Burr Oak Tool & Gauge and Sturgis Molded Products.  A new senior center, The Doyle Center will be constructed, with opening anticipated in summer of 2015.

Legal Description

The property is located in City of Sturgis, St. Joseph County, Michigan and is described as follows:

Parcel Number 052-200-024-00

BLK 55 EXCEPT W 131.33 FT LOT 9 & THAT PORTION OF 4TH T STREET VACATED N OF S LN LOT 15 BLK 6 ALSO LOTS 11,14,15,16, BLK 6. DRAKES 2ND. CITY OF STURGIS. THIS PARCEL BEING LOCATED WEST OF N. PROSPECT STREET. 30.5 FT TH SELY 30 FT M/L TO PT ON W LN OF 4TH ST 12 FT S OF POB TH N ALG W LN OF ST 12 FT TO POB. BEING A TRIANG PAR OUT OF NE COR LOT 15. DRAKES 2ND ADD. CITY OF STURGIS.

Parcel Number 052-200-028-00

LOTS 29 & 30 & 31 GREEN LAWN ADD. ALSO VACATED ALLEY ADJACENT TO S SIDE OF LOTS 29, 30, & 31. CITY OF STURGIS.

Flood Plain Map





OTHER AREAS

ZONE X          Areas determined to be outside of the 0.2% annual chance floodplain.

Survey



Building Sale Comparables

## Building Sale Comparables Map



Copyright © and (P) 1988–2006 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Portions © 1990–2006 InstallShield Software Corporation. All rights reserved. Certain mapping and direction data © 2005 NAVTEQ. All rights reserved. The Data for areas of Canada
includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for Ontario. NAVTEQ and NAVTEQ ON
BOARD are trademarks of NAVTEQ. © 2005 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc.

# Improved - Sale - Light Industrial
## COMPARABLE # 3008031



View of property facing northwest.

| | |
|---|---|
| Photo Date: | 3/2/2015 |
| Taken By: | MYB |

**LOCATION**

| | |
|---|---|
| Street Number: | 86 |
| Street Name: | S. Division Street |
| City or Township: | City of Battle Creek |
| County: | Calhoun |
| State: | MI |
| Tax ID Number: | 52-2020-00-054-0; 52-2020-00-016-0; 52-2020-00-049-0 |

**SALE INFORMATION**

| | |
|---|---|
| Sale Date: | 11/20/2015 |
| Sale Price: | $ 330,000.00 |
| Cash Price: | $ 330,000.00 |
| Seller: | Norman Produce Co, Inc. |
| Buyer: | Schweitzer Incorporated |
| Marketing Time (Months): | 42 |
| Listing Price: | $ 449,000.00 |
| Date of Listing: | 5/1/2012 |
| Comments: | This was the sale of two parcels. One is improved with a building, the other is a triangular shaped parcel across the street. |
| | Listing History |
| | 5/2012 - $595,000 |
| | 4/2014 - $449,000 |

**INSTRUMENT**

| | |
|---|---|
| Type of Instrument: | Warranty Deed |
| Liber: | 4015 |
| Page: | 237 |
| Date Recorded: | 12/10/2015 |

(Continued)  Comparable #   3008031    Page 2

## FINANCING
| | |
|---|---|
| Financing: | Cash |

## BUILDING DESCRIPTION
| | | |
|---|---|---|
| Use by Buyer: | Industrial | |
| Occupancy: | Single Occupant, Owner Occupied | |
| Class of Construction: | C, Masonry Frame | |
| Condition: | Fair | |
| Exterior Wall Covering: | Brick | |
| Year Built: | 1930 | |
| Office Area (Sq Ft): | 5,000 | (5.6%) |
| Industrial Area (Sq Ft): | 84,117 | (94.4%) |
| GBA (Sq Ft): | 89,117 | |
| Loading Docks: | 9 | |
| Number of Stories: | 4 | |
| Exterior Building Height (Ft): | 14 | |
| Craneway: | No | |
| Rail Access: | Yes | |
| Comments: | There were renovations in 1973.  This building is food grade quality.  There is 15,700 SF of freezer space and 6,000 feet of cooler space.  There is a newer 37,500 SF warehouse area with docks and a newer roof.  There is also a 2,500 Lb freight elevator and 9 various sized docks. | |
| | According to the buyer's broker, half of the building with multiple stories had some structural flooring issues.  The cost of repairs was unknown. | |

## LAND DESCRIPTION
| | | |
|---|---|---|
| Net Land Area: | 87,399 Sq Ft | 2.006 Acres |
| Primary Frontage (Ft): | 256.840 | |
| Cross Street: | Southwest corner of S.Division Street and E. Fountain Street | |
| Physical Location: | Corner | |
| Shape: | Irregular | |
| Topography: | Mostly Level | |
| Environmental Contamination: | Yes | |
| Easements: | There was a possible easement issue with the railroad which is adjacent to the property, but it did not impact the sales price. | |
| Comments: | Parcel No. 2020-00-054 is 1.895 acres and has 256.84 feet of frontage along S. Division Street and 399.04 feet of frontage along E. Fountain Street. Parcel Nos. 2020-00-049-00 and 2020-00-016-0 are 0.112 acres and have 165 feet of frontage along S. Division Street. | |
| | A Phase 2 was performed and the buyer's broker couldn't remember the extent of the contamination, however no immediate remediation was required. | |
| | According to the DEQ Environmental Mapper, there are two underground storage tanks on the property. | |

## ZONING & UTILITIES
| | |
|---|---|
| Current Zoning: | I-1; Industrial |
| Water: | Public |
| Sewer: | Public |
| Gas: | Natural |
| Electricity: | Public |

## HIGHEST AND BEST USE
Light Industrial

## REAL PROPERTY RIGHTS
Fee Simple

## CONDITION OF SALE
Arm's Length

(Continued)  Comparable #   3008031     Page 3

## UNITS OF COMPARISON

Physical Characteristics

| | |
|---|---|
| Price/Sq Ft GBA: | $ 3.70 |
| Price/Truck Dock: | $ 36,667 |
| Office Area % GBA: | 5.6% |
| Land to Building Ratio: | 0.98 : 1 |

## SOURCE

| | |
|---|---|
| Contact: | MLS #14051784 |
| | Matthew Callander, Buyer's Broker (2/5/2016) |
| | Callander Commercial |
| | 269-384-8368 |
| Confirmation Date: | 3/3/2015 |
| Appraiser: | MYB 3297 |
| Reconfirmation Date: | 2/5/2016 |
| Reconfirmation Appraiser: | MYB 3297 |

**ADDITIONAL PHOTOS**



Aerial view from Calhoun County GIS.

# Improved - Sale - Mixed-Use Development
## COMPARABLE # 3008730



View of property facing west.

## LOCATION

| | |
|---|---|
| Street Number: | 401 |
| Street Name: | N. Cochran Avenue |
| City or Township: | City of Charlotte |
| County: | Eaton |
| State: | MI |
| Tax ID Number: | 200-012-400-216-00 |

## SALE INFORMATION

| | |
|---|---|
| Sale Date: | 7/10/2014 |
| Sale Price: | $ 25,000.00 |
| Cash Price: | $ 25,000.00 |
| Seller: | Dennis and Cathy Bytwerk |
| Buyer: | 401 N. Cochran LLC |
| Marketing Time (Months): | 12 |
| Listing Price: | $ 89,900.00 |
| Date of Listing: | 7/12/2013 |
| Comments: | According to the Application for Obsolete Property Rehabilitation Exemption Certificate filed by the property owner, the estimated cost of rehabilitation for the property is $45,000. |

## INSTRUMENT

| | |
|---|---|
| Type of Instrument: | Warranty Deed |
| Liber: | 2527 |
| Page: | 0976 |
| Date Recorded: | 7/23/2014 |

## FINANCING

| | |
|---|---|
| Financing: | Cash |

## BUILDING DESCRIPTION

| | |
|---|---|
| Use by Buyer: | Undisclosed |
| Occupancy: | Single Occupant, Owner Occupied |
| Class of Construction: | C, Masonry Frame |
| Condition: | Fair |
| Exterior Wall Covering: | Brick |
| Year Built: | 1900 |
| GBA (Sq Ft): | 37,310 |
| Number of Stories: | 2 |
| Exterior Building Height (Ft): | 12 |
| Comments: | The buyer said there is no heating or cooling in the building.  He said his plans are yet to be determined, but he plans to redevelop the property.  He said the building is approximately 37,000 SF. |
| | The MLS listing shows a new furnace is in the building.  The interior has unfinished wood floors and exposed walls and ceilings. |
| | Year built was estimated. |
| | Mr. Greg Goodshow, City Manager for the City of Charlotte said no plans have been brought to the city for this property. (3/3/2015) |

## LAND DESCRIPTION

| | |
|---|---|
| Net Land Area: | 56,319 Sq Ft          1.293 Acres |
| Primary Frontage (Ft): | 166.000 |
| Cross Street: | West side of N. Cochran Avenue, north of E. Stoddard Street |
| Physical Location: | Interior |
| Shape: | Irregular |
| Topography: | Mostly Level |
| Environmental Contamination: | None Known |
| Comments: | According to the DEQ Environmental Mapper, there is no known environmental contamination. |
| | The buyer did not want to answer questions regarding easements or environmental contamination. |

## ZONING & UTILITIES

| | |
|---|---|
| Current Zoning: | I-2; General Industrial District |
| Master Plan: | Manufacturing and Industrial |
| Water: | Public |
| Sewer: | Public |
| Gas: | Natural |
| Electricity: | Public |

## HIGHEST AND BEST USE

Mixed-Use Development

## REAL PROPERTY RIGHTS

Fee Simple

## CONDITION OF SALE

Arm's Length

## UNITS OF COMPARISON

### Physical Characteristics

| | |
|---|---|
| Price/Sq Ft GBA: | $ 0.67 |
| Land to Building Ratio: | 1.51 : 1 |

(Continued)  Comparable #   3008730   Page 3

**SOURCE**

| | |
|---|---|
| Contact: | Anthony Faulkner, Buyer |
| | 269-208-0866 |
| | Public Records |
| | CoStar |
| | PTA |
| | MLS#49943 |
| Confirmation Date: | 3/5/2015 |
| Appraiser: | MYB 3297 |
| Reconfirmation Date: | 5/11/2016 |
| Reconfirmation Appraiser: | MYB 3297 |
| Comments: | Attempts to contact the listing broker, Terry Shellhorn (Century 21 Looking Glass) were unsuccessful. |

**ADDITIONAL PHOTOS**



Aerial view from Eaton County GIS.

# Improved - Sale - Mixed-Use Development
## COMPARABLE # 3008708



View of propety facing west from Bryant Street

Photo Date:              3/2/2015
Taken By:                MYB

## LOCATION
Street Number:           400
Street Name:             Bryant Street
City or Township:        City of Kalamazoo
County:                  Kalamazoo
State:                   MI
Tax ID Number:           06-27-212-002

## SALE INFORMATION
Sale Date:               6/30/2014
Sale Price:              $ 360,000.00
Cash Price:              $ 360,000.00
Seller:                  Kalamazoo Realty Investments, LLC
Buyer:                   400 Bryant, LLC
Listing Price:           $ 360,000.00
Date of Listing:         6/30/2014

## INSTRUMENT
Type of Instrument:      Warranty Deed
Date Recorded:           7/22/2014
Document Number:         2014-023703

## FINANCING
Financing:               Cash

**BUILDING DESCRIPTION**

| | |
|---|---|
| Use by Buyer: | Owner Occupied |
| Occupancy: | Single Occupant, Owner Occupied |
| Class of Construction: | C, Masonry Frame |
| Condition: | Average |
| Exterior Wall Covering: | Brick |
| Year Built: | 1906 |
| GBA (Sq Ft): | 61,050 |
| Number of Stories: | 3 |
| Exterior Building Height (Ft): | 35 |
| Comments: | Renovations had been  made to half of the building.  There are three levels plus a newer addition.  There are wood floors on all upper two levels and there is a freight elevator and bus bar on two floors.  The addition has 18' ceilings and a cement floor. |

The listing agent said half the building was newer and the other half was older.  The building used to be a lot of office space with some warehouse.  He did not think anyone would use this building for an industrial use.

According to a representative for the buyer, when they purchased the building, they planned to redevelop it into office space and some outdoor space.  They do not know how much they will spend on redevelopment and are still in the early stages of deciding what to do with the property.

According to the Kalamazoo City Assessor's office, no permits have been filed for this property, and she is unsure what the buyer's intended use is.

**LAND DESCRIPTION**

| | |
|---|---|
| Net Land Area: | 65,527 Sq Ft              1.504 Acres |
| Primary Frontage (Ft): | 173,040.000 |
| Cross Street: | West side of Bryant Street, north of E. Alcott Street |
| Physical Location: | Cul-de-sac |
| Shape: | Irregular |
| Topography: | Mostly Level |
| Environmental Contamination: | Yes |
| Comments: | According to a representative for the buyer, there is a little contamination on the site.  This is not a Brownfield site, however they are looking into it. |

According to the DEQ Environmental Mapper, this is a Baseline Environmental Assessment Site.

**ZONING & UTILITIES**

| | |
|---|---|
| Current Zoning: | M-1; Manufacturing, Limited |
| Water: | Public |
| Sewer: | Public |
| Gas: | Natural |
| Electricity: | Public |

**HIGHEST AND BEST USE**          Mixed-Use Development

**REAL PROPERTY RIGHTS**          Fee Simple

**CONDITION OF SALE**          Arm's Length

**UNITS OF COMPARISON**

Physical Characteristics
| | |
|---|---|
| Price/Sq Ft GBA: | $ 5.90 |
| Land to Building Ratio: | 1.07 : 1 |

(Continued)  Comparable #   3008708   Page 3

**SOURCE**

| | |
|---|---|
| Contact: | Brian Schultz, Listing Agent |
| | Callander Commercial |
| | 269-365-4165 |
| | MLS#14037816 |
| | PTA |
| | Representative for buyer (Jeff Nicholson) who wanted to remain confidential |
| | 269-383-5775 |
| Confirmation Date: | 3/5/2015 |
| Appraiser: | MYB 3297 |

**ADDITIONAL PHOTOS**



Aerial view from Kalamazoo County GIS.

# Improved - Sale - Mixed-Use Development (Lead)
## COMPARABLE # 3008729



View of property facing north.

## LOCATION

| | |
|---|---|
| Street Number: | 455 |
| Street Name: | E. Water Street |
| City or Township: | Village of Constantine |
| County: | St. Joseph |
| State: | MI |
| Tax ID Number: | 043-080-013-00 |

## SALE INFORMATION

| | |
|---|---|
| Sale Date: | Current Listing |
| Sale Price: | $ 179,000.00 |
| Cash Price: | $ 179,000.00 |
| Seller: | Aaron and Justine Cullifer |
| Listing Price: | $ 179,000.00 |
| Date of Listing: | 11/25/2014 |
| Comments: | According to the listing agent, they have had a few inquiries.  Based on the zoning and master plan, she sees this as being purchased by an industrial user who could live on the second floor while they start up their business. |

Listing history:
11/2014 - $210,000
2/2015 - $199,000
10/2015 - $189,000
11/19/2015 - Expired Listing
12/1/2015 - $179,000

## FINANCING

| | |
|---|---|
| Financing: | Cash |

## BUILDING DESCRIPTION

| | |
|---|---|
| Occupancy: | Single Occupant, Owner Occupied |
| Class of Construction: | C, Masonry Frame |
| Condition: | Fair |
| Exterior Wall Covering: | Brick |
| Year Built: | 1900 |
| GBA (Sq Ft): | 24,800 |
| Number of Stories: | 2 |
| Comments: | Year built was estimated.  The second floor is an apartment with hardwood floors and stainless steel appliances.  The first floor is open warehouse space with concrete floors, exposed ceiling and walls. |
| | According to the listing broker, there was a fire in one of the rear buildings.  She said structurally the building is ok and the roof and walls are not damaged.  She is not sure of the SF of the damage, but it is not a large area.  The building is still usable.  The fire damage was there when the sellers purchased the property. |

## LAND DESCRIPTION

| | |
|---|---|
| Net Land Area: | 128,113 Sq Ft          2.941 Acres |
| Primary Frontage (Ft): | 351.170 |
| Cross Street: | North side of E. Waters at Station Street |
| Physical Location: | Interior |
| Shape: | Irregular |
| Topography: | Mostly Level |
| Environmental Contamination: | None Known |
| Easements: | According to the DEQ Environmental Mapper, there is no known environmental contamination on this site. |

## ZONING & UTILITIES

| | |
|---|---|
| Current Zoning: | Industrial |
| Master Plan: | Industrial |
| Water: | Well |
| Sewer: | Septic |
| Gas: | Natural |
| Electricity: | Public |

## HIGHEST AND BEST USE

Mixed-Use Development

## CONDITION OF SALE

Arm's Length

## UNITS OF COMPARISON

Physical Characteristics

| | |
|---|---|
| Price/Sq Ft GBA: | $ 7.22 |
| Land to Building Ratio: | 5.17 : 1 |

## SOURCE

| | |
|---|---|
| Contact: | MLS# 14063665 & 15061517 |
| | Heather Martell, Listing Agent |
| | Martell Realty, Inc. |
| | 269-389-9910 |
| Confirmation Date: | 3/3/2015 |
| Appraiser: | MYB 3297 |
| Reconfirmation Date: | 5/19/2016 |
| Reconfirmation Appraiser: | MYB 3297 |

Draft License and Release Agreement

## <u>LICENSE AND RELEASE AGREEMENT</u>

This License and Release Agreement ("Agreement") is entered into as of the ___ day of _____, 2015, between (i) Newell Rubbermaid Inc. ("Newell") and (ii) Kirsch Lofts, LLC ("Kirsch Lofts") and Scott T. Bosgraaf ("Bosgraaf"). Kirsch Lofts and Bosgraaf may sometimes be referred to as "Owners."

Whereas, Kirsch Lofts owns a parcel of real estate commonly known as 308 N. Prospect Street, located in the City of Sturgis, St. Joseph County, Michigan  49091, Tax Parcel number 052-200-024-00, and which is legally described as set forth in **<u>Attachment A</u>** (the "Property"); and

Whereas, the Property was at one time a part of a manufacturing facility owned and operated by the Kirsch Division of Cooper Industries, Inc ("Cooper Industries"), which facility was known as the Kirsch Plant No. 1; and

Whereas, the Kirsch Plant No. 1 used industria l solvents, which resulted in releases of contaminants into the soil and groundwater at Kirsch Plant No. 1, including but not limited to the Property; and

Whereas,  in 1982, the United States Environm ental Protection Agency ("U.S. EPA") discovered contamination in the soil and groundwat er at the Kirsch Plant No. 1, including the Property; and

Whereas, in 1984,  the U.S. EPA placed the Sturgis Municipal Well Field Site ("Site") on the National Priorities List ("NPL"), which included Kirsch Plant No. 1 and the Property, and

Whereas, in 1991, the U.S. EPA issued a Record of Decision ("ROD") specifying certain remedial activities for the Site, and which was later modified pursuant to an amendment to the ROD signed by EPA in 1996 ("the 1996 ROD Amendment"); and

Whereas, in 1992, Cooper Industries recorded w ith the Register of Deeds of St. Joseph County, Michigan a Notice stating that the Property was (i) contaminated;  (ii) subject to a federal Administrative Order issued under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sections 9601, et seq.   ("CERCLA"); and (iii) undergoing rem ediation activities under CERCLA; and

Whereas, in 1996, Cooper Industries agreed to a Consent Decree with the Michigan DEQ, which was entered by the U.S. District Court for the Western District of Michigan  (Case Number 5:96-CV-157)("Consent  Decree"), wherein Coope r  Industries agreed to perform       soil and groundwater remedies consistent with the ROD and 1996 ROD Amendment; and

Whereas, in 1997, Newell Co., now known as Newell, acquired the Kirsch business from Cooper Industries through the acquisition of shares of Kirsch Inc., a newly created company that had previously received an assignm ent of the assets  and liabilities of the Kirsch division of Cooper Industries, including assignment of the obligations associated with the Consent Decree; and

1

Whereas, in 1998, Newell sold the Property to WMU Properties, a Michigan co-partnership, having disclosed that the Property had been impacted by contaminants and was part of a CERCLA site undergoing remediation activities, for a total purchase price of $200,000.00; and

Whereas, in 2008, Kirsch Lofts conducted its own environmental investigations of the Property, including soil and groundwater testing which showed the Property was contaminated and subject to remediation activities being performed by Newell pursuant to CERCLA with oversight from the Michigan DEQ; and

Whereas, on or about July 10, 2009, Kirsch Lofts acquired the Property from 1983 Finance Company, LC, a limited liability company, for $3,000.00; and

Whereas, Kirsch Lofts took preliminary steps towards re-development of the Property into residential loft apartments or condominiums; and

Whereas, by letter dated April 14, 2011, the Michigan DEQ, under authority of the Consent Decree, directed Newell to take Additional Response Activities with respect to soil and groundwater contamination at the Site, including the Property; and

Whereas, in August 2012, Newell submitted a conceptual plan for the remediation of soils and groundwater, entitled *Revised Plan for Additional Response Activities at Sturgis Municipal Well Field Superfund Site, Sturgis, Michigan*, which was approved by the Michigan DEQ on September 11, 2014; and

Whereas, Newell, with the approval of Michigan DEQ, conducted studies to determine whether alternative soil cleanup objectives are appropriate for the Property, which are currently under review and consideration by Michigan DEQ; and

Whereas, the ROD and 1996 ROD Amendment will be subject to further amendment if the alternative soil cleanup objectives are approved for the Project; and

Whereas, Newell will require access to the Property beginning in May 2016, and continuing in various discrete periods of time thereafter to execute the Project; and

Whereas, Newell first requested access to the Property to conduct the Project by letter dated August 24, 2014.

**NOW, THEREFORE,** in consideration of the execution of this Agreement and the obligations of the Parties set forth in this Agreement, the receipt and sufficiency of which is hereby acknowledged, and the Parties agree as follows:

## I.     DEFINITIONS

For purposes of this Agreement:

"Access" shall mean the rights to enter upon, and conduct remediation, maintenance, and other work, as defined in this Agreement, to take place within the Access Period.

2

103

"Access Parties" shall mean Newell, and its authorized agents, contractors, and subcontractors, along with representatives of the Michigan DEQ and the U.S. EPA.

"Access Period" shall mean the period of time from May 1, 2016 to January 31, 2021, and shall refer to the entirety of the access periods granted herein, including the Engineering and Design Access Period, Phase I Access Period, Phase II Access Period, Phase III Access Period, and any extensions under this Agreement determined to be necessary by mutual agreement of the Parties.

"Claims" means legal and administrative claims, liabilities, penalties, fines, judgments, forfeitures, losses, expenses (including, but not limited to, reasonable attorneys' fees, consultant fees, expert fees and court costs), and costs.

"Consent Decree" shall refer to the federal judicial settlement agreement entered into between Cooper Industries and the Michigan DEQ on October 25, 1996, in the United States District Court, Western District of Michigan, and the related RODs entered by U.S. EPA, for the performance of response activities at the Site pursuant to Part 201 of the Natural Resources and Environmental Protection Act, as amended, and the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, which became binding on Newell as a result of Newell Co.'s purchase of the Kirsch Inc. business in 1997.

"Digging" means the break up or moving of earth with a tool, machine, hands, or other mechanism.

"East Portion" means the east portion of the Property, as defined herein, as more specifically depicted on Attachment B-2.

"Excavation Restrictive Covenant" means a written covenant executed by Owners and recorded by Newell against the Property prohibiting on the area where remediation system piping will be located (i) any excavation in such area, and (ii) any surface activity in such area that might damage or otherwise compromise the remediation system piping.

"Groundwater Restrictive Covenant" means a written covenant executed by Owners and recorded by Newell against the Property, prohibiting the extraction of groundwater at or from the Property, except for groundwater that may be extracted for the purpose of treatment, sampling, or monitoring required under the Consent Decree or by any state or federal agency, and which remain shall remain in effect until Michigan DEQ or U. S. EPA deems such a restrictive covenant is no longer necessary.

"Kirsch Site" means the site of the former Kirsch Plant No. 1 facility, the soil in areas adjacent to it, and any groundwater impacted by the Kirsch Plant No. 1.

"Newell" shall mean Newell Rubbermaid Inc., a corporation organized under the laws of the state of Delaware with its principal place of business in Atlanta, Georgia, and its successors and assigns.

"Michigan DEQ" means the Michigan Department of Environmental Quality.

3

"O&M Maintenance Work Plan" means a work plan that will be developed by Newell in order to comply with the ongoing operation and maintenance requirements of the Consent Decree and other obligations as may be set forth by U.S. EPA or the Michigan DEQ.

"Parties" refers to the Owners and Newell collectively.

"Person" means an individual, partnership, corporation, government entity, association, or legal entity of any kind, nature, or description.

"Phase I Work" means all actions to be taken by Newell necessary to execute the Remedial Work Plan, incorporated by reference herein, including but not limited to: the construction, installation, and startup of remediation systems and equipment, and conducting of removal and remediation activities. Without limiting the generality of the foregoing, remediation systems and equipment to be installed will include a soil vapor extraction (SVE) system designed and installed by Newell in accordance with the Approved Plan..

"Phase II Work" means the work to be performed in order to execute the O&M Maintenance Work Plan, incorporated by reference herein, including but not limited to: performance of routine operation and maintenance, unscheduled repairs and maintenance, and preparation to decommission equipment.

"Phase III Work" means the work required to decommission or remove remediation systems and structures, including but not limited to: removal of the building, equipment, and substructures; site restoration activities, and other tasks as may be necessary to ensure the completion of Newell's obligations under the Consent Decree.

"Project" means the actions to be taken by Newell at the Property to address past releases of hazardous substances from the former Kirsch facility into the environment, including but not limited to the activities to be performed during the Engineering and Design Access Period, Phase I Work, Phase II Work, Phase III Work, and Sampling Activities.  The Project may include but not necessarily be limited to (i) removal of impacted soils; (ii) site restoration activities; (iii) recording of use restrictions and limitations, easements and covenants and agreements, including without limitation an Excavation Restrictive Covenant and a Groundwater Restrictive Covenant; and (iv) any other actions deemed by Newell to be necessary  or appropriate to execute any of the foregoing actions or any other obligations as may be set forth by U.S. EPA or the Michigan DEQ.

"Property" refers to that real estate commonly known as 308 N. Prospect St., City of Sturgis, St. Joseph County, Michigan  49091 (Tax Parcel number 052-200-024-00) owned by Kirsch Lofts, LLC.  The Property is legally described as set forth in Attachment A.

"Released Parties" means Newell, and its officers, directors, subsidiaries, contractors, agents, and employees.

"Remedial Work Plan" means the detailed work plan and specific schedule to be developed in accordance with the Approved Plan.

4

"Approved Plan" means the Revised Plan fo r Additional Response Activities at Sturgis Municipal Well Field Superfund Site, Sturgis, Michigan, approved by the Michigan DEQ on September 11, 2012.

"U.S. EPA" means the United States Environmental Protection Agency.

"Weekday" means Monday, Tuesday, Wednesday, Thursday, or Friday.

## II. ACCESS

1. **Terms of Access.** The terms of the access discussed in this Article II shall be subject to the further details specified in Articles III, IV, and V of this Agreement.

2. **Engineering and Design Access**. Owners hereby grant the Access Parties a temporary, non-exclusive license to access the Property, including the interior and exterior of the buildings located thereupon, with persons and equipment for one full day between May 1, 2016 to May 31, 2016 (hereinafter the "Engineering and Design Access Period"). For purposes of this paragraph, the term Access Parties shall include potential bidders for contracting, subcontracting and other work to be performed on the Project. The exact date for th e Engineering and Design Access Period shall be agreed upon by the Parties no later than April 30 2016, and shall take place on a Weekday between the hours of 6:00 A.M. and 8:00 P.M. EDT. Fo r the avoidance of doubt, Owners' access to the Property will not be affected during the Engineering and Design Access Period, except to the extent necessary to ensure compliance with any site specific health and safety plan required for this period.

3. **Phase I Access Period**. Owners hereby grant the Access Parties a tem porary, exclusive license to access the Property with persons and equipment commencing on August 1, 2016 and continuing through November 30, 2016, to perform the Phase I Work at the Property (hereinafter the "Phase I Access Period"). This license shall e xpire and become absolutely null and void on and after November 30, 2016. The Parties agree that, during the Phase I Access Period, Newell may, in its sole discretion, prohibit any and all Pers ons, including, but not lim ited to Owners, from occupying, entering or otherwise gaining access to the East Portion of the Property (except as expressly set forth below). During such Phase I Access Period (and only during this period), any occupancy or access by Owners to the Property sh all be permitted only with the prior written consent of and subject to any reasonable and necessary conditions established by Newell, including without limitation the requirement that Owners read and comply with the applicable OSHA Health and Safety Training standards and any site-speci fic health and safety plan im plemented in connection with this Project. Owners shall coope rate fully with Newell to prohibit any and all Persons from occupying, entering or gaining access to the East Portion of the Property during such Phase I Access Period (except as expressly set forth below). Notwithstanding the above, during this Phase I Access Period, Bosgraaf and his designees shall be permitted entry to the Property, at least once a week for a period of at least one hour on each occasion, on a Weekday during the hours from 5:00 P.M. to 7:00 P.M. EDT, pursuant to a schedul e to be jointly established in advance by the Parties. If no such schedule is jointly established by the Parties, access shall occur on each Friday during the Phase I Access Period for two hours on each occasion 5:00 P.M. to 7:00 P.M. EDT.

4. **Phase II Access Period**. Owners hereby grant the Access Parties a tem porary and non-exclusive license in order to access the Prope rty with persons and equipm ent commencing on

5

December 1, 2016, through January 31, 2021, to perform the Phase II Work on the Property, along with the right to record a restrictive covenant against the Property prohibiting excavation in certain areas, as further defined in Section II.5 below (h ereinafter the "Phase II Access Period"). This license shall expire and become absolutely null and void on and after January 31, 2021. The Parties agree that, during the Phase II Access Period, Newell shall have the right to access and enter the Property on Weekdays between the hours of 6:00 A.M. and 8:00 P.M. EDT. Without limiting the generality of the foregoing, Newell anticipates entering the Property: (i) on a daily basis for the period December 1, 2016 to January 31, 2017; (ii) three days per week from February 1, 2017 to July 31, 2017; and (iii) one day per week from August 1, 2017 and continuing through January 31, 2021. Newell warrants that during the Phase II Access Period, the Owners' access to and quiet enjoyment of the Property will not be af fected, with the exception of the terms of the restrictive covenants referred to in Sections II.5. and II.7 below.

5.    *Excavation Restrictive Covenant.* Newell shall have the right at the beginning of the Phase II Access Period to record an Excavation Restrictive Covenant against the Property. The Excavation Restrictive Covenant shall be removed and terminated of record at the commencement of the Phase III Access Period (as defined below). Owners shall cooperate fully with Newell to prevent all Persons from violating the Excavation Restrictive Covenant during such Phase II Access Period.

6.    *Phase III Access Period.* Owners hereby grant the Acce ss Parties a temporary and non-exclusive license in order to gain access to and th right to enter upon the Property with persons and equipment commencing on June 1, 2021 and continuing through August 31, 2021, to perform the Phase III Work on the Property (hereinafter the "Phase III Access Period"). This license shall expire and become absolutely null and void on and after August 31, 2021. The Parties agree that, during the Phase III Access Period, Newell shall have regular, periodic access to the Property on Weekdays between 6:00 A.M. and 8:00 P.M. EDT. Without limiting the generality of the foregoing, Newell anticipates entering the Property a minimum of three times per week from June 1, 2021 to August 31, 2021. The Phase III Work may limit Owners' access to portions of the Property for a period not to exceed fourteen (14) days, to allow for com pletion of the Phase III W ork. Newell agrees to provide written notice to Owners at least sixty (60) days in advance of the beginning of the proposed period of limited access for Owners. Owners shall be provided with notice of any changes to such period of limited access as soon as practicable, but under no circumstances with less than 24 hours' notice.

7.    *Groundwater Restrictive Covenant.* Prior to the termination of the Access Period, Newell will record a Groundwater Restrictive Covenant against the Property. The Groundwater Restrictive Covenant and all of the terms herein shall run with the land.

8.    *Irrevocable Licenses.* The licenses granted to the Access Parties in this Article II shall be irrevocable during the applicable Access Period each license is in effect. The licenses and Access shall run with the Property and shall inure to the benefit of and be binding upon Owners, Newell and their respective successors (including without limitation any and all successors to Owners in title to the Property) and assigns, including any entity w ith which any corporate party m ay merge or consolidate or to which it m ay transfer substantially all of its assets. If the Property is hereafter divided into two or more parts by separation of ownership or lease, each portion of such property shall be subject to the burdens of the licenses and the rights and restrictions created hereby. Newell

6

shall have the right to record a Memorandum of Agreement in the form shown on **Attachment C** attached hereto against the Property following the execution of this Agreement.

## III.    REMEDIAL CONSTRUCTION PROJECT

1.       ***Construction of Treatment Buildings***. Owners acknowledge that one treatment building and one blower building will be constructed on the Property.  The approximate areas in which the treatment building and blower building will be constructed are indicated on **Attachment B** hereto. Power to the treatment system and blowers will be separately metered and paid for by Newell, and Newell shall have the right to tap into existing electrical power lines at the Property and/or lay new electrical power lines at the Property for connection to the treatment system and blowers.

2.       ***Installation of Sub-surface Piping***. Piping for the SVE system will be located sub-surface, beneath the existing buildings on the Property and the courtyard area, as depicted in Attachment B and will consist of both horizontal and vertical piping.  For piping to be located immediately beneath the building, the piping will be installed through the existing trenches in the building slab.  For piping in the courtyard area, the top 2 feet of soil in the courtyard will be excavated and removed as part of the Project.  The horizontal piping will be installed approximately 4 feet below grade and the vertical piping will be terminated approximately 1 foot below grade.  The piping will remain below the ground surface at such depths, and will not daylight until reaching the blower building.  The Parties agree to coordinate activities with respect to installation of the SVE piping and Owners' utility trenches. Unless otherwise advised, Newell will install the SVE piping not less than 30 inches below ground surface.

3.       ***Concrete/Soil Removal***. Any soil excavated as part of the Project, including soil excavated as contemplated by Section III.2 of this Agreement, will be disposed offsite by Newell.

## IV.    WORK PLAN AND PROJECT SCHEDULE

1.       ***Remedial Work Plan.*** Newell shall develop the Remedial Work Plan to comply with its obligations under the Consent Decree and the Approved Plan.  Newell shall provide a copy of the approved Remedial Work Plan to Owners upon request.   In finalizing the schedule to be incorporated in the Remedial Work Plan, Newell shall use reasonable efforts to accommodate scheduling requests of the Owners.

2.       ***Compliance with Laws.*** Newell shall conduct all activities associated with the Project in compliance with all applicable laws and in a       safe and workmanlike manner,  shall exercise reasonable care to avoid injury to persons or damage to the Property, and shall use commercially reasonable efforts to perform the Project in accordance with the schedule in the Remedial Work Plan.

## V.    RESTORATION OF PROPERTY

1.       ***Building and Pipeline Removal***.  During the Phase III Work, Newell will abandon in place the underground piping installed as part of the Project. Abandonment shall be accomplished by cutting off above-ground pipe and plugging the below-ground piping end points.  In addition, Newell will breakdown and remove any buildings or structures erected on the Property for the

7

Project, remove equipment and materials brought onto the Property for the Project, and remove any waste that may have been generated by its activities during the Project.

2. ***Soil & Vegetation Removal.*** The Parties acknowledge that the Project will include, but not be limited to, the removal of the top two (2) feet of soil in the courtyard at the Property as well as any soil excavated during the installation of piping and piping vaults, as described in Section III.3 above. Except for conditions resulting from causes other than the Project, Newell shall restore the Property, at Newell's sole cost and expense, to substantially the same condition in which it was in immediately prior to August 1, 2016, including any vegetation affected by the Project, such restoration to be done with the same or like-quality material or vegetation. Notwithstanding the foregoing, Owners acknowledge that Newell m ay decide to remove mature trees or shrubs if preserving such plants is economically impracticable. Newell shall replace any trees and shrubs with the same or similar quality plants, provided that such trees or shrubs may not be as mature or developed as the plants being replaced. Newell shall have no further responsibility to Owners for any soil and vegetation restoration.

3. ***Reasonable Care.*** During all work on the Property by Newell contem plated by this Agreement, including the Project, Newell shall be responsible for keeping the Property in clean and reasonably neat condition. Except for conditions resulting from causes other than the Project, Newell shall promptly repair at its sole expens e any and all dam age to the Property, whether to structures, fixtures, streets, curbs, gutters, automobiles, and any other areas or items or structures of any nature located on the Property. On or before August 1, 2016, or the date of this Agreem ent, whichever is later, at a time to be agreed upon by the Parties, Newell shall be allowed to conduct, at its expense, an inspection to document the condition of the Property prior to the commencement of the Project. Owners and their representatives sha ll have the right to be present at any such inspection. Newell may photograph or videotape the Property, or any portion thereof, as part of the inspection.

4. ***Notice of Project Completion***. Within thirty (30) days after the Project is completed to the satisfaction of the Michigan DEQ and U.S. EPA, Newell shall notify Owners, in writing, that it has completed the Project.

## VI. INSURANCE

1. ***Newell's Insurance Obligation.*** Newell shall maintain (or cause to be maintained) general liability and property dam age (casualty) insurance (including autom obile liability) covering all actions and operations on the Property by Newell and/or its contractors, agents or em ployees, in connection with this Agreement, all of which policies shall carry commercially reasonable limits and deductibles.

2. ***Owners' Obligation.*** Owners shall maintain (or cause to be maintained) general liability and property damage (casualty) insurance (including automobile liability) covering all actions and operations on the Property by Owners, in connection with this Agreement, all of which policies shall carry commercially reasonable limits and deductibles.

## VII. USE RESTRICTIONS AND LIMITATIONS

8

1.      **_Recording of the Declaration._**  Owners have been advised that, at the completion of the Project, certain restrictions and limitations will be placed on the current and future use of the Property, including but not limited to any institutional controls required by the Michigan DEQ or U.S. EPA.  Such restrictions and limitations may prohibit the Digging in soils beneath certain depths on the Property, and will be imposed through the recording by Newell of a Declaration of Covenants and Agreements with the Register of Deeds of St. Joseph County, Michigan in the form shown on **Attachment D** attached hereto (hereafter referred to as "the Declaration").  Owners agree that the recording of such limitations or restrictions by Newell, at Newell's sole expense, is acceptable to Owners, and that they shall execute the Declaration within 30 days of the Declaration being presented to them, provided that the Declaration to be executed and recorded is similar in substance to and with no material deviations from the form attached as **Attachment D** hereto.

2.      **_No Dig Provision_**.  Newell shall have no liability arising on account of or brought on account of any injury to any person or persons or property, or loss of life, to the extent that such Claims, damages or causes of action for damages are caused by the Digging of Owners or Owners' contractors, agents or employees.

## VIII.   LICENSE FEE

1.      **_Payment._**  Within ten days of the execution of this Agreement by the Parties, Newell shall pay to Owners the sum of _____ Dollars ($_____ USD) in cash ("the License Fee"). The License Fee is a material consideration for this Agreement.  No other sums shall be due or paid in exchange for the Access agreed upon herein to permit Newell to perform and complete the Project.

## IX.   OWNERS' OBLIGATIONS

1.      **_Owners' Representations and Warranties._**  Owners represent and warrant that, as of the date of this Agreement, (1) the Property is owned by Kirsch Lofts, LLC in fee simple; (2) no Person other than the Owners has any fee simple interest in the Property; and (3) Owners have full power and authority to enter into this Agreement and each of the promises, covenants, releases and undertakings of any kind made by the Owners herein, without requiring approvals or consents of any other Person.  If any of the representations or warranties set forth in this paragraph is inaccurate, upon Newell's request, Owners and each of them will comply with Newell's request to execute, acknowledge, initial, and deliver to Newell any document which Newell deems necessary to effectuate fully the promises, covenants, releases and undertakings made by Owners herein.

2.      **_Owners' Obligation Duty to Warn._**  Owners shall have a duty to warn the Access Parties of any known dangers or dangerous conditions on the Property.

3.      **_Cooperation._**  Owners shall cooperate with reasonable requests to execute documents contemplated or made necessary by the obligations set forth this Agreement, including without limitation the timely execution of the Excavation Restrictive Covenant, the Groundwater Restrictive Covenant, and the Memorandum of Agreement identified in Article XI below, or any other document necessary for Newell to complete its obligations under this Agreement or the Consent Decree.

9

4.     ***Non-interference.***  Owners agree not to interf ere with Newell's ef forts to perform and complete the Project. Without limiting the generality of the foregoing, Owners agree not to disturb, construct anything within ten (10) feet or on top of, restrict access to, move, or damage any of the following: structures, buildings, pipes, equipment, raw materials, or other items as may be brought onto or erected on the Property by Newell in order  to perform the Project or any other obligation under this Agreement.

5.     ***General Release.*** In consideration of Newell's obligations hereunder, Owners fully release, remise and absolutely and forever discharge and c ovenant not to sue the Released Parties, of and from any and all Claims, demands, cause and causes of action, injuries and damages, and expenses of every kind and nature whatsoever arising fr om or relating in the grant of access under this Agreement, which Owners have or m ay in the future have, direct or indirect, in law or in equity, against the Released Parties, for, upon or by reason of anything undertaken, done, or omitted to be done, in connection with the Access granted under this Agreement.  Notwithstanding the above, any obligations set forth in this Agreem ent or in a ny exhibits or attachm ents hereto, are not hereby released or discharged in any manner.

6.     ***Acknowledgement.*** Owners acknowledge having read and understood the provisions of this Agreement and the General Release set forth in Section IX.5 above, and represent that the execution of this release constitutes the Owners' knowi ng and voluntary act, m ade without coercion or intimidation. Owners enter into this Agreement relying on their own investigation and judgment. Owners are represented by counsel, and they have di scussed the terms hereof with their counsel. Owners understand that the General Release set  forth in Section IX.5 above is binding upon the Owners and each of their agents, heirs, devisees, executors, administrators, successors and assigns. OWNERS ACKNOWLEDGE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS MADE BY NEW ELL OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, OR REPRESENTATIVES IN ENTERING INTO THIS AGREEMENT.

7.     ***Owners' Indemnity.***  Notwithstanding anything in this Agreem ent to the contrary, the Owners, and each of them, agree to indemnify, defend and hold the Released Parties, and each of them, harmless from any and all Claims, costs, losses, judgments, or expenses of any kind, including but not limited to attorneys' fees, expert or consultant fees and court costs, that any of them might suffer as a result of (a) a breach of the representations, warranties, duties and obligations set forth in this Article IX, or any other obligation of Owners set forth in this Agreement, or (b) or any act or omission of Owners and/or Owners' contractors, agents or employees.

8.     ***Newell's Obligation to Indemnify***. Newell shall indem nify, hold harm less and defend Owners from and against, and shall promptly reimburse Owners with respect to, any and all Claims, arising on account of, or brought on account of any injury to any person or persons or property, or loss of life, to the extent that such Claims, damages or causes of action for damages are caused by the  negligent acts or om issions of Newell and/or  Newell's contractors, agents or em ployees, performed under this Agreement. However, this indemnification obligation is subject to and limited by the No Dig Provision in Section VII.2 above.

X.     CONFIDENTIALITY

10

1.  ***Agreement and Exhibits***.  This Agreement and its terms are confidential and neither the terms of this Agreement, nor the terms or circumstances related to its negotiation, execution, or implementation, or communications generated in connection therewith (collectively, "Confidential Information") shall be disclosed in any way to any Person or invoked by the Parties hereto in any proceeding or for any purpose, except as may be allowed under this Agreement.

2.  ***Permitted Disclosures***.  Notwithstanding the foregoing, (a) Owners may disclose that Owners have agreed to allow Newell to perform the Project, and to record the Memorandum of Agreement, Restrictive Covenants and Declaration, and that the Parties have reached a mutually satisfactory resolution of any and all claims between them; (b) Newell may disclose any information that it deems must be submitted to the Michigan DEQ pursuant to the terms of this Agreement, the Consent Decree, or applicable law; and (c) Newell may disclose information that it deems necessary or advisable to disclose to contractors involved in the Project.

3.  ***Disclosure in Event of Dispute; Other Permitted Disclosures.***  The Parties may disclose Confidential Information (i) in a legal action between the Parties to this Agreement for breach of, or otherwise to enforce the terms of, this Agreement or any attachments or exhibits hereto; (ii) subject to Section X.4 below, in response to a judicial order or request from a local state or federal regulatory agency compelling disclosure or as may otherwise be required by law or regulation or be necessary to defend or assert claims by or against any party hereto in a judicial proceeding; (iii) to insurers of Newell; (iv) to parent, subsidiary, affiliate, associated, or parent companies of the Parties and their counsel or to the children or heirs of the Owners; and (v) to the experts, consultants, bankers, accountants, tax preparers or auditors of or counsel to the Parties upon their request, provided, however, that each Party agrees that it shall ensure that disclosure of Confidential Information to any of the Persons identified in (iii), (iv) and (v) above shall not result in further disclosure by any of those Persons.

4.  ***Request for Disclosure***.  In the event that Owners receive a legal request or order for the disclosure of Confidential Information, Owners shall immediately notify Newell of such request or order.  Newell shall be given a full opportunity to take any steps it deems necessary or appropriate to limit disclosure through appropriate protective orders. If Newell is unable to secure such protective order or other similar means to limit disclosure of Confidential Information, Owners may disclose such Confidential Information as may be necessary to comply with the legal request or order.

## XI.    MEMORANDUM OF AGREEMENT

1.  ***Binding.***  Each term of this Agreement, and all attachments and exhibits, are binding upon each of the Parties that have signed this Agreement and their respective agents, attorneys, heirs, devisees, transferees, successors and assigns.

2.  ***Covenant Appurtenant***.  All existing and as amended terms of this Agreement shall run with the Property.  Accordingly, the Parties agree that a Memorandum of Agreement substantially similar to the form shown on **Attachment C** attached hereto shall be executed by the Parties at the time this Agreement is executed and recorded by Newell, at Newell's sole expense.

## XII.    MISCELLANEOUS

11

1.      *Formation and Use.* Nothing contained in this Agreement is or shall be deemed to be an admission, acknowledgment, or evidence that any Party hereto has breached any obligation, engaged in any wrongdoing or misconduct, or incurred any liability of any kind. This Agreement is the product of arms-length negotiations. This Agreement does not and is not intended to create any rights in any Persons other than the Parties and their respective successors, transferees, and assigns, and no other Person shall have any legally enforceable rights hereunder, except as expressly set forth herein or in the Declaration attached hereto.

2.      *Entire Agreement*. This Agreement supersedes all prior communications regarding the matters contained herein between the signatories hereto and their representatives. This Agreement, together with its attachments and exhibits, are an integrated agreement and contains the entire agreement regarding the matters herein between the Parties hereto. **NO REPRESENTATIONS, WARRANTIES, OR PROMISES HAVE BEEN MADE OR RELIED ON BY ANY PARTY HERETO OTHER THAN AS SET FORTH HEREIN**. This Agreement was drafted by counsel for the Parties hereto, and there shall be no presumption or construction against any Party.

3.      *Signatory Authority.* Each Party represents and warrants that the Person signing below has the authority to execute this Agreement on behalf of and to bind such Party.

4.      *Choice of Law.* This Agreement shall be interpreted under the laws of the State of Michigan, excluding its choice of law rules, provisions and principles.

5.      *Amendment.* This Agreement may not be amended or modified except by a written instrument signed by the Parties.

6.      *Headings.* The headings of paragraphs are designed to facilitate ready reference to subject matter and shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Agreement.

7.      *Notices.* Any statements, communications, or notices to be provided pursuant to this Agreement shall be sent by certified mail, return receipt requested, and by facsimile to the attention of the Persons indicated below, until such time as notice of any change of the Person to be notified or change of address is forwarded in writing to all Parties:

                    If to Newell:          Kristin Jones
                                           Attention:  General Counsel

                    with a copy
                    to counsel:            Gabriel M. Rodriguez, Esq.
                                           Schiff Hardin LLP
                                           233 S. Wacker Drive, Suite 6600
                                           Chicago, IL 60606

                    If to Owners:          Scott T. Bosgraaf
                                           Kirsch Lofts, LLC
                                           148 South River Avenue, Ste. 100
          Holland,                                 Michigan  49423

12

8.      ***Counterparts.*** This Agreement may be executed in any number of counterparts and by each Party hereto, each of which when so executed and delivered shall be deemed to be an original, and all of which taken together shall constitute but one and the same instrument.

*[signature and notary pages follow]*

13

**IN WITNESS WHEREOF**, the Parties have executed this Agreement individually or by their duly authorized representatives.

KIRSCH LOFTS, LLC

By: _____

Date:_____

Subscribed and sworn to before me this
_____ day of _____, 2015.


_____ Notary Public

My commission expires: _____

SCOTT T. BOSGRAAF

_____

By _____

Date:_____

Subscribed and sworn to before me this
_____ day of _____, 2015.


_____ Notary Public

My commission expires: _____

[*signature and notary page follows*]

14

115

**IN WITNESS WHEREOF**, the Parties have executed this Agreement individually or by their duly authorized representatives.

NEWELL-RUBBERMAID

By:_____

Printed:_____

Title:_____

Date:  _____

Subscribed and sworn to before me this
_____ day of _____, 2015.

My commission expires: _____

   Notary Public

15

## ATTACHMENT A
## <u>PROPERTY DESCRIPTION</u>

The property commonly known as 308 N. Prosp ect, Sturgis, MI 49091, with tax parcel number 75-052-200-024-00, is legally described as:

Block 55 except W 131.33 feet Lot 9 and that portion of 4TH T Street vacated N. of S. Lane Lot 15, Block 6 also Lots 11, 14, 15, 16, Block 6, Drakes 2ND, City of Sturgis. This parcel being located West of N. Prospect St., 30.5 feed thence Southeasterly 30 feet M/L to Point on West Line of 4TH St. 12 Feet South of POB Thence North along West Line of St. 12 feet to POB. Being a TRIANG par out of NE COR Lot 15.  Drakes 2ND Addition City of Sturgis.

16

## ATTACHMENT B
## <u>DEPICTION OF TREATMENT BUILDING AND BLOWER BUILDING AREAS</u>

**See attached.**

17

**ATTACHMENT B-1**
**DEPICTION OF AREAS OF PIPING FOR SVE SYSTEM**

**See attached.**

18

**ATTACHMENT C**
**FORM OF MEMORANDUM OF AGREEMENT**

_____

This space is for RECORDER'S USE ONLY

_____

**THIS MEMORANDUM OF AGREEMENT** is made and entered into as of _____, 2015 by and between Kirsch Lofts, LLC (the "Kirsch Lofts") and Scott T. Bosgraaf ("Bosgraaf") (together  the "Owners") and Newell-Rubbermaid  of Delaware [Newell Rubbermaid  Inc.?] ("Newell").

1.     <u>License to Access Premises</u>.  Upon and subject to the terms and conditions of that certain  License and Release Agreement, dated _____, 20154 ("Agreement"), by and between Owners and Newell, to which reference is hereby made for the full terms and conditions thereof, Owners, for themselves and for their successors and assigns, have conveyed and granted a limited license (the "License") to Newell and its successors and assigns, for access to and the right to perform certain work on that certain real estate commonly known as 308 N. Prospect St., Sturgis, Michigan  49091, as described in the legal description attached hereto ("Premises"), during certain time periods and subject to certain limitations and restrictions set forth in the Agreement.

2.     <u>Term</u>.  The cumulative term of the License under the Agreement is a period of 4 years, 6 months, commencing on August 1,  2016 and extending through January 31, 2021.  In addition, the Agreement provides that Newell may have a one-day license in May 2016 in order to complete certain engineering and design phase of the work contemplated in the Agreement.  The time period in which the License is in effect is referred to herein as the "Term."

3.     Irrevocable Nature of License.  The License is irrevocable during the Term.

4.     License Runs With the Premises.  The License shall run with the Premises during the Term and shall inure to the benefit of and  be binding upon Owners, Newell and their respective successors (including without limitation any and all successors to Owners in title to the Property) and assigns, including any entity with which any corporate party may merge or consolidate or to which it may transfer substantially all of its assets.  If the Premises is hereafter divided into two or more parts by separation of ownership or lease, each portion of such property shall be subject to the burdens of the licenses and the rights and restrictions created hereby.  Upon the expiration of the Term at 11:59 p.m. local time on January 31, 2021, the License shall automatically expire and be of no further force or effect.

19

5.    Agreement Not Memorandum Controls.  To the extent of any conflict, inconsistency or ambiguity between this Mem orandum of Agr eement and the term s of the Agreem ent, the Agreement shall control.

6.    Governing Law.  This Mem orandum of Agreement shall be governed by and interpreted in accordance with the laws of the State of Michigan, excluding its choice of law, rules, provisions and principles.

7.    Counterparts.  This Memorandum of Agreement may be executed in any number of counterparts and on separate counterparts, each of  which shall be an original but all of which together shall constitute one and the same instrument.

**THIS MEMORANDUM OF AGREEMENT** has been executed by the parties as of the day and year first above written.

| KIRSCH LOFTS, LLC | NEWELL RUBBERMAID, INC. [?] |
|---|---|
| By: _____ <br> Its: _____ | By: _____ <br> Its: _____ |
| _____ <br> Scott T. Bosgraaf | |

20

## **ACKNOWLEDGMENTS**

STATE OF _____)_____

COUNTY OF _____) ) SS.

        This instrument was signed and acknowledged before me on _____, 2015 by _____ and _____ for the purposes stated herein.

        **WITNESS** my hand and official seal.

                By: _____
                          Notary Public

My Commission expires:

STATE OF _____)_____

COUNTY OF _____)_____ ) SS.

        This instrument was signed and acknowledged before me on _____, 2015 by _____the _____ of Newell Rubbermaid, Inc. [?] for the purposes stated herein.

        **WITNESS** my hand and official seal.

                By: _____
                          Notary Public

My Commission expires:

This instrument prepared by
and after recording return to:

Gabriel Rodriguez
Schiff Hardin LLP
233 South Wacker Drive
Suite 6600
Chicago, Illinois 60606

21

**Exhibit A to Memorandum of Agreement**

**Legal Description of Premises**

The property commonly known as 308 N. Prosp ect, Sturgis, MI 49091, with tax parcel number 75-052-200-024-00, is legally described as:

Block 55 except W 131.33 feet Lot 9 and that portion of 4TH T Street vacated N. of S. Lane Lot 15, Block 6 also Lots 11, 14, 15, 16, Block 6, Drakes 2 ND, City of Sturgis. This parcel being located West of N. Prospect St., 30.5 feed thence Southeasterly 30 feet M/L to Point on West Line of 4TH St. 12 Feet South of POB Thence North along West Line of St. 12 feet to POB. Being a TRIANG par out of NE COR Lot 15. Drakes 2ND Addition City of Sturgis.

22

## ATTACHMENT D
## **FORM OF DECLARATION OF COVENANTS AND AGREEMENTS**

See attached.

10808-1130
CH2\16043103.2

23

Proposed Development Plans

# Commercial *Commercial*

*Opportunity knocks. There are some exciting concepts coming to Sturgis and you could be a part of them. Want to have built-in clients right outside your doors? Contact us for more details about design-build leases.*

**Commercial opportunities include (but not limited to):**
*Restaurant*
*Deli/Coffee Shop*
*Banquet Facility*
*Salon*
*Retail Store*
*Law Office*
*Real Estate Agent Office*
*Insurance Agent Office*
*Graphic Designer Office*
*Photographer*

# Community



*www.kirschlofts.com*
Justin Misner       Lynne Sluiter
616.292.8922       616.836.2753
justin@asumi.org  lynne@asumi.org

126

KIRSCHLOFTS001513

# Amenities
## Amenities

*E*xperience the benefits of loft living to the fullest at Kirsch Lofts. Low maintenance living, indoor pool, private patios, expansive ceilings, fresh finishes, convenient amenities, and much more, plus you will be helping the environment by living in a newly renovated building.

Live, work, and play at a place you call home. After a long days work take a dip in the pool or relax and grill a burger on your patio. Not in the mood to cook? No problem, enjoy the convenience of a restaurant in your building. Wish to be pampered? We have you covered: rejuvenate your senses in the spa, Need to get some more work done? Fortunately, you have a business center steps away from your front door.

By living at Kirsch Lofts you will have several things to look forward to.  There are amenities that living in a loft will provide to every tenant.

## Living Green

Living in a building that already exists is a huge start to helping save precious land and extra materials that go into building from the ground up. Not to mention the construction methods that will be used and the waste to be diverted from the landfill. No VOC paint (no stinky chemicals), re-use of several materials from the building and in general put back to use or repurposed, lower utility costs because you share walls = less energy used. For more information on how Bosgraaf Commercial is green see *www.greencommitted.com*

## Saving Green

The cost of living at Kirsch Lofts will be a pleasant surprise.
Not only is your rent going to be affordable, but you will have low utility costs too. The electric forced air furnace and air conditioners are energy efficient, so on top of saving energy by sharing walls, you have entered into lower utility costs.
Kirsch Lofts is part of the Neighborhood Enterprise Zone (NEZ) which means this saves you $$. Here's a brief description: NEZ is a zone created by local and state governments to freeze taxes for a period of time from any improvements made to the property, usually in a neighborhood (or

building in this case) that needs rehabilitation.

## Being Green

You will benefit from saving gas by not driving as much. The amenities are across the courtyard.
**Amenities will include**
•Restaurant
•Deli
•Banquet Facility
•Commercial Businesses (potential tenants include: law firm, salon, real estate agent, photographer, retail sales, and more)
•Free Wi-Fi
•Swimming Pool
•Workout Area
•Patio
•Parking
•plus more
**Loft Amenities will include**
•Electric Appliances
•Electric Heat
•Wood floors throughout
•Stainless Steel Appliances including refrigerator, range/oven, microwave, dishwasher
•Washer/Dryer
•Garbage Disposal
•Tub/Shower enclosures
•Satin Nickel Fixtures and Hardware

*www.kirschlofts.com*
Justin Misner       Lynne Sluiter
616.292.8922       616.836.2753
justin@asumi.org  lynne@asumi.org

KIRSCHLOFTS001514



# Kirsch Lofts

*308 prospect*
*sturgis, michigan*

entry · entry · entry

entry · entry · entry

workout area

indoor pool

patio

elevator

## loft finishes
wood & tile flooring
custom trim
solid wood doors

## utilities
electric heat
electric appliances
free wifi through-out

## on site amenities
indoor pool area
exterior patio
workout area
landscaped interior courtyard

## bathrooms
some units feature double sinks
granite or marble countertops
nickel finish hardware throughout
storage utility closet
tub/shower enclosures

## kitchens
energy star appliances including
refrigerator
electric range/oven
dishwasher
overhead microwave/hood
garbage disposals
premium cabinets
granite or marble countertops
nickel finish cabinet hardware

# first floor
## residential

north
residential
commercial
residential



# Kirsch Lofts

## 308 prospect
## sturgis, michigan

*patio*

*patio*   *entry*

## loft finishes
wood & tile flooring
custom trim
solid wood doors

## utilities
electric heat
electric appliances
free wifi through-out

## on site amenities
indoor pool area
exterior patio
workout area
landscaped interior courtyard

## bathrooms
some units feature double sinks
granite or marble countertops
nickel finish hardware throughout
storage utility closet
tub/shower enclosures

## kitchens
energy star appliances including
refrigerator
electric range/oven
dishwasher
overhead microwave/hood
garbage disposals
premium cabinets
granite or marble countertops
nickel finish cabinet hardware

## second floor
## residential



# Kirsch Lofts

**308 prospect**
**sturgis, michigan**

*patio*

*patio*

*patio*   *patio*   *patio*

*patio*

*entry*

## loft finishes
wood & tile flooring
custom trim
solid wood doors

## utilities
electric heat
electric appliances
free wifi through-out

## on site amenities
indoor pool area
exterior patio
workout area
landscaped interior courtyard

## bathrooms
some units feature double sinks
granite or marble countertops
nickel finish hardware throughout
storage utility closet
tub/shower enclosures

## kitchens
energy star appliances including
refrigerator
electric range/oven
dishwasher
overhead microwave/hood
garbage disposals
premium cabinets
granite or marble countertops
nickel finish cabinet hardware

*north*

*residential*

*commercial*

*residential*

# third floor
## residential

130

# Kirsch Lofts

*308 prospect*
*sturgis, michigan*



commercial space with
up to 10,000sf. per floor

entry

proposed
deli

entry

elevator

entry

proposed
restaurant

proposed
banquet
facility

patio

entry

entry

*conceptual plan, subject to change

future
residential
space

## commercial finishes
existing wood floors
large new insulated windows

## utilities
separate utilities
separate climate controlled
free wi-fi through-out

## on site amenities
proposed deli space
proposed restaurant
landscaped interior courtyard
elevator access to all commercial floors
shared toilet rooms on each floor



commercial

residential

residential

north

# first floor
## commercial

# Kirsch Lofts

**308 prospect**
**sturgis, michigan**



*elevator*

*enclosed walkway*

*commercial space with*
*up to 10,000sf. per floor*

*future*
*residential*
*space*

## commercial finishes
existing wood floors
large new insulated windows

## utilities
separate utilities
separate climate controlled
free wi-fi through-out

## on site amenities
proposed deli space
proposed restaurant
landscaped interior courtyard
elevator access to all commercial floors
shared toilet rooms on each floor



*commercial*
*residential*
*residential*

*north*

# second floor
## commercial

132

# Kirsch Lofts

**308 prospect**
**sturgis, michigan**



*elevator*  *enclosed walkway*

*commercial space with*
*up to 10,000sf. per floor*

*patio*  *patio*

*future*
*residential*
*space*

## commercial finishes
existing wood floors
large new insulated windows

## utilities
separate utilities
separate climate controlled
free wi-fi through-out

## on site amenities
proposed deli space
proposed restaurant
landscaped interior courtyard
elevator access to all commercial floors
shared toilet rooms on each floor



*north*

# third floor
## commercial

# Kirsch Lofts

*308 prospect*
*sturgis, michigan*



*Existing Railroad Tracks*

*Existing Three Story Building*
*Phase 1 Residential*

*Existing Three Story Building*
*Phase 1 Commercial*

*Existing Three Story Building*
*Phase 2 Residential*

*North Prospect Street*

*North Fourth Street*

E A S T    H A T C H    S T R E E T

*north*

*no scale*

## site plan
### phases

134

Appraiser Qualifications and Licenses

## *QUALIFICATIONS OF*
## *JEFFREY G. GENZINK, MAI*

**APPRAISAL EMPLOYMENT:**

Genzink Appraisal Company, Grand Rapids, Michigan
Owner (2001-current).

Genzink Sabin Group, Grand Rapids, Michigan
Partner (1998-2000).

The Oetzel-Williams Group, Lansing, Michigan
Real Estate Appraiser (1990-1997).

**EDUCATION:**

Bachelor of Arts Degree with Major in Business Administration and Sociology,
Calvin College, Grand Rapids, Michigan, 1988

**APPRAISAL EDUCATION:**

Numerous courses, seminars and continuing education classes taken through the
Appraisal Institute and American Real Estate and Appraising Institute. A detailed
completed course list is available upon request.

**COURT EXPERIENCE:**

Court Qualified as an Expert Witness in Michigan Tax Tribunal, Berrien
County Circuit Court, Ottawa County Circuit Court, Kalamazoo County Circuit
Court, Kent County Circuit Court and Lapeer County Circuit Court

**PROFESSIONAL ACTIVITIES:**

Board Member, Commercial Alliance of Realtors of West Michigan, 2011-2014
Great Lakes Chapter; Alternate Regional Representative, 2007
Great Lakes Chapter; Regional Representative, 2004
Leadership Development & Advisory Council; Member - Second Year, 2001
Great Lakes Chapter; Candidate Guidance Chair – General, 2000
Young Advisory Council; Member - First Year, 1998

**LICENSES AND PROFESSIONAL AFFILIATIONS:**

MAI, Appraisal Institute, Certification No. 11133.
Certified General Real Estate Appraiser - Michigan, No. 1201002640
Licensed Real Estate Broker - Michigan No. 6501238572
Commercial Alliance of Realtors, Broker Member
Grand Rapids Association of Realtors, Broker Member
Michigan Association of Realtors, Broker Member
National Association of Realtors, Broker Member
International Right of Way Association, No. 7926553

RICK SNYDER
GOVERNOR

# STATE OF MICHIGAN
# DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU

L871164

### CERTIFIED GENERAL APPRAISER
### LICENSE

JEFFREY GLENN GENZINK
1009 44TH STREET SW
SUITE 107
GRAND RAPIDS  MI  49509

| PERMANENT I.D. NO. | EXPIRATION DATE | AUDIT NO |
|---|---|---|
| 1201002640 | 07/31/2017 | 2961985 |

THIS DOCUMENT IS DULY ISSUED
UNDER THE LAWS OF THE STATE
OF MICHIGAN

List of Testimony (Trials and Depositions) by
Jeffrey G. Genzink, MAI

# List of Trials and Depositions  - Jeff Genzink, MAI

| Job No. | Property Name | General Information | Date Completed |
|---|---|---|---|
| 2583  -12 | Holiday Inn - Grand Haven & Spring Lake - Trial | Full service hotel | 5/15/2012 |
| | 940        West Savidge Street | | |
| | Village of Spring Lake | **Case Information:**  Parties:  Grand Haven Investment, LLC (Petitioner) vs Spring Lake Township (Respondent)<br>MTT Docket No. 364917<br>Michigan Tax Tribunal | |
| 2730  -12 | Ship-N-Shore Storage - Williwaw Holdings, LLC (Deposition) | Mini Storage | 10/24/2012 |
| | 16712        120th Avenue | | |
| | Crockery Township | **Case Information:**  Parties:  Michigan Department of Transportation (Petitioner) vs Williwaw Holdings, LLC (Respondent)<br>Case No. 11-02561-CC<br>20th Judicial Circuit County Probate | |
| 2799  -13 | Trial - Van Eerden Food Service | | 2/14/2013 |
| | 650        Ionia Avenue, SW and 615 S. Division Avenue, SW | | |
| | City of Grand Rapids | **Case Information:**  Parties:  Vanco, I, LLC (Petitioner) vs City of Grand Rapids (Respondent)<br>MTT Docket No. 397653<br>Michigan Tax Tribunal | |
| 2809  -13 | Forest Lake Mobile Home Park - Trial | 220 homesite manufactured home community (221 homesites less 1 unusable homesite) | 6/25/2013 |
| | 17147        148th Avenue | | |
| | Spring Lake Township | **Case Information:**  Parties:  Elmcrest Partners, LLC (Petitioner) vs Charter Township of Ypsilanti (Respondent)<br>MTT Docket No. 327926<br>Michigan Tax Tribunal | |

| Job No. | Property Name | General Information | Date Completed |
|---------|---------------|---------------------|----------------|
| 3184 -14 | Boar's Head Provisions Company, Inc. - Deposition | refrigerated warehouse | 7/11/2014 |
| | 296        Roost Avenue | | |
| | Holland Township | Case Information:   Parties:  L J & S Development LLC (Petitioner) vs Boars Head Provisions Company Inc., a Delaware corporation (Respondent)<br>Case No. 13-3511-DZ<br>20th Judicial Circuit for the County of Ottawa Specialized Business Docket | |
| 3268 -14 | Auto Zone #2263 - Trial | commercial building | 2/11/2015 |
| | 415        W. State Street | | |
| | City of Hastings | Case Information:   Parties:  Autozone Stores, Inc. (Petitioner) vs City of Hastings (Respondent)<br>MTT Docket No. 451218<br>Michigan Tax Tribunal | |
| 3281 -15 | Pro Build/Timber Roots Deposition | four commercial buildings and a shed | 3/19/2015 |
| | 7105        E. Pickard Road (M-20) | | |
| | Chippewa Township | Case Information:   Parties:  Michigan Department of Transportation (Petitioner) vs Pro Build Real Estate Holdings, LLC and Pro Build Company, LLC, dba Timber Roots (Respondent)<br>Civil Action No. 14-11327-CC<br>Circuit Court for the Count of Isabella | |
| 3373 -15 | Industrial Building - Trial | five industrial buildings, some built in sections over a number of years | 8/28/2015 |
| | 128        E. Slosson Avenue | | |
| | City of Reed City | Case Information:   Parties:  Yoplait USA - General Mills (Petitioner) vs City of Reed City (Respondent)<br>MTT Docket No. 455313<br>Michigan Tax Tribunal | |