# EXHIBIT Q

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Newell Rubbermaid, Inc.,

       Plaintiff,

v.                                       Civil Action No. 1-cv-15-00597-RJJ

Kirsch Lofts, LLC,

       Defendant.

---

**PLAINTIFF'S EXPERT REPORT**

**RICHARD A. BARR**

Respectfully submitted,

Dated:  May 19, 2016

Richard A. Barr

**INTRODUCTION**

I have been retained by Schiff Hardin, LLP, on behalf of Newell Products, Inc. ("Newell"), to provide input in the investigation and litigation of claims of financial losses due to the alleged delayed redevelopment of a property subject to a Consent Order for remediation of a Superfund site.

This report has been prepared to satisfy Rule 26 of the Federal Rules of Civil Procedure. My findings and their supporting facts are presented in the Opinions section of this report.

**A.     ISSUES TO BE ADDRESSED**

This report presents my findings, to a reasonable degree of certainty, based upon the results of my analysis of the facts in this case, applicable law and the testimony provided to date.

**B.     QUALIFICATIONS OF EXPERT**

A copy of my current Professional Profile, which contains materials called for in Rule 26 of the Federal Rules of Civil Procedure, is attached hereto as Exhibit A.

**C.     ADDITIONAL INFORMATION**

The list of my publications within the last 15 years is included in Exhibit B. I have not been retained as an expert witness within the last 4 years. In my role as expert in this case, Honigman Miller Schwartz and Cohn LLP is currently billing Newell at a rate of $525/hour for my services. My fees are the same for both deposition and trial time. Our fees are not contingent upon the content of my opinion.

In this report, I have relied upon my training, education, and experience and either partial or complete review of the documents listed in Exhibit C.

**D.     SUPPLEMENTAL TESTIMONY**

I reserve the right to supplement or modify this report and my findings to respond to any new or additional information that may become available after the date of this report and to rebut, as necessary, any opinions offered by the defendant or its experts in this case.

I may use all of the documents listed in Exhibit C or referenced within this report (including any documents referenced within those documents listed in Exhibit C or referenced within this report) as exhibits.  And further, I reserve the right to use any parties' materials or documents as exhibits and may identify and use additional documents and materials to rebut any testimony of the defendant or its experts.

**E.     FACTS**

The following is the information upon which I have formed my opinion. Except as indicated, I have no independent knowledge of the accuracy of the information but have assumed the accuracy of the information set forth below:

1.      On or about September 9, 2008, the Sturgis City Council adopted a brownfield plan (the "Brownfield Plan") for the property proposed at that time to be acquired by and redeveloped by Kirsch Lofts, LLC ("Kirsch Lofts"), located at 308 N. Prospect, Sturgis, Michigan (the "Property"). A copy of the Brownfield Plan is attached hereto as Exhibit D.

2.      Kirsch Lofts entered into a Brownfield Reimbursement Agreement with the City of Sturgis Brownfield Redevelopment Authority (the "BRA") on or about September 24, 2008. A copy of the Brownfield Reimbursement Agreement is attached hereto as Exhibit E.

3.      In 2008, Kirsch Lofts' representative submitted a Brownfield Redevelopment MBT Credit Application (the "Brownfield Tax Credit Application") to the Michigan Economic Growth Authority (the "MEGA") for approval of a "Brownfield Tax Credit." A copy of the Brownfield Tax Credit Application is attached hereto as Exhibit F.

4.      On or about October 10, 2008, the MEGA issued a Pre-Approval Letter, thereby approving the Brownfield Tax Credit Application (the "Pre-Approval Letter"). A copy of the Pre-Approval Letter is attached hereto as Exhibit G.

5.      Kirsch Lofts or the BRA submitted an Act 381 Work Plan to the MDEQ dated June 10, 2009 and revised July 31, 2009 and September 8, 2009 (the "MDEQ Work Plan"). A copy of the MDEQ Work Plan is attached hereto as Exhibit H.

6.      On or about September 22, 2009 and October 30, 2009, the Michigan Department of Environmental Quality (the "MDEQ") issued letters granting partial approval of the MDEQ Work Plan submitted by the BRA on behalf of Kirsch Lofts in connection with the Brownfield Plan. A copy of the two letters is attached hereto as Exhibit I.

7.      On or about October 14, 2008, the MEGA granted approval for the use of school taxes for the portion of activities to be conducted under the Brownfield Plan that were subject to approval by the MEGA.

8.     I have been advised that CapFund New Markets, LLC prepared a letter to Kirsch Lofts with respect to potential federal new markets tax credits. An unsigned and undated copy of this letter is attached hereto as Exhibit J.

9.     On or about July 10, 2009, Kirsch Lofts acquired the Property.

10.     On or about June 26, 2009, the Sturgis Brownfield Redevelopment Authority (the "BRA") and the MDEQ entered into a Brownfield Redevelopment Grant Contract (the "Brownfield Grant Agreement") with the MDEQ pursuant to which the MDEQ agreed to provide a grant of up to $1,000,000 to the BRA (the "MDEQ Grant") to pay or reimburse certain costs anticipated to be incurred by Kirsch Lofts at the Property. A copy of the Brownfield Grant Agreement is attached hereto as Exhibit K.

11.     On or about June 26, 2009, the BRA and the MDEQ entered into a Brownfield Redevelopment Loan Contract (the "Brownfield Loan Contract") pursuant to which the MDEQ agreed to advance up to $1,000,000 (the "MDEQ Loan") to the BRA to pay or reimburse certain costs anticipated to be incurred by Kirsch Lofts at the Property. A copy of the Brownfield Loan Contract is attached hereto as Exhibit L.

12.     I have assumed that the BRA and/or the City entered into one or more agreements with Kirsch Lofts pursuant to which the BRA and/or City would make available to Kirsch Lofts the proceeds received under the Brownfield Grant Agreement and the Brownfield Loan Agreement.

13.     I have been advised by Carrie Geyer of the MDEQ that the MDEQ disbursed the entire $1,000,000 available under the Brownfield Grant Agreement to the BRA or City.

4

14.     I have been advised by Carrie Geyer of the MDEQ and assumed that the City disbursed to Kirsch Lofts most, if not all, of the entire $1,000,000 of MDEQ Grant proceeds received by the BRA or the City from the MDEQ and $340,760 of MDEQ Loan proceeds (after credit for interest earned by the City of Sturgis) were received by the BRA or the City pursuant to the Brownfield Loan Agreement to reimburse a portion of Kirsch Lofts' project renovation costs. See Exhibit M.

15.     On or about January 27, 2010, the MDEQ notified Scott Bosgraaf that Kirsch Lofts should not proceed with certain activities at the Property.   A copy of the MDEQ notification is attached as Exhibit N.

16.     I have been advised that Kirsch Lofts proceeded with a portion of its intended renovations of the Property, but has not completed any of the proposed phases or the entire project.

17.     I have assumed that the BRA has not reimbursed Kirsch Lofts for any costs incurred by it under the Brownfield Plan.

18.     I have reviewed the Defendant's Expert Report of Arthur H. Siegal (undated) and submitted in connection with the above-captioned proceedings (the "Siegal Opinion").


F.     **STATEMENT OF OPINIONS**

I have been asked to opine on the economic development and other incentives approved by various agencies for the redevelopment of the Property by Kirsch Lofts, their approved value, their current status, their potential current value and the claim by Kirsch Lofts and in the Siegal Opinion of a claim of loss in the value of the incentives. My conclusion is that if the incentives

would have in fact been available as Kirsch Lofts expected, given the current state of the development, there is a loss in value of some of the incentives pursued for the project, and the loss in value is much less than claimed by Kirsch Lofts and in the Siegal Opinion, as explained below.

**1.      Brownfield Tax Credit.**

Conclusion: The claim in the Siegal Opinion of the loss of "roughly" $1,521,000 of value of the Brownfield Tax Credit overstates the net pre-tax value of the Brownfield Tax Credit that may have been available.  At most, the net pre-tax value of the Brownfield Tax Credit if the project was completed was between $1,120,366 and $1,197,120.   If Kirsch Lofts takes appropriate steps, it may be able to mitigate its damages and realize a portion of this credit even if it is not able to complete the entire project by October 10, 2018.

Analysis: The State of Michigan brownfield tax credit program at pertinent times allows for the approval of a Michigan business tax credit of up to 20% of the "eligible investment" paid or incurred in connection with certain approved "brownfield" projects. The Pre-Approval Letter approved the 20% Brownfield Tax Credit for the "eligible investment" made by October 10, 2018, subject to certain conditions contained in the Pre-Approval Letter and applicable law, and limited to $1,690,000.

The Siegal Opinion concludes that the originally approved Brownfield Tax Credit was worth "roughly" $1,521,000 and that none of this credit will be realized by Kirsch Lofts. The Siegal Opinion is not based on sufficient and appropriate facts and therefore overestimates the value of the potential Brownfield Tax Credit for the following reasons:

6

a.    Unsupported   Assumptions   Concerning   Project   Completion.    In
Section V(i), the Siegal Opinion assumes, based only on what he was
advised by Kirsch Lofts, that completion of the first phase of the project
will not occur until September 9, 2019, after what it states is a October 10,
2018 deadline to obtain a certificate of occupancy for the entire project
required to claim and retain the entire Brownfield Tax Credit.

i.    In Section V(i), the Siegal Opinion "expects" that the entire project
will not be completed until September 9, 2022 or later "based on
Kirsch Lofts' earlier development timeline" and states that even
that "seems highly unlikely" without providing a foundation for
that conclusion.

ii.    In Section V(j), the Siegal Opinion assumes that Kirsch Lofts "had
in 2010-2012 and has now the financial wherewithal to conduct the
intended redevelopment work on the Property." No support for this
conclusion is provided.

b.    Lack of Information on Actual Project Eligible Investment. Although the
2008 Brownfield Tax Credit Application estimated $8,450,000 of future
eligible investment, there is no indication in the Siegal Opinion of what
the actual eligible investment was expected to be upon project completion.
It is typical for a Brownfield Tax Credit Application to be based upon
early cost estimates which later are refined as project costs become better
defined and other sources, such as the MDEQ Grant and MDEQ Loan, are

7

identified. Applicants often provide high-end estimates because the applicable law (MCL 208.1437) normally does not permit an increase in the approved credit amount if actual costs exceed the original estimate. There is no penalty or other financial risk if the actual project costs are less than the original estimated amount.

c.   The Siegal Opinion ignores key issues and thus overstates the potential damages related to the brownfield tax credit.

i.   Overstatement of Maximum Available Brownfield Tax Credit. The Siegal Opinion inappropriately assumes that the project will incur the maximum $8,450,000 amount of eligible investment that is stated in the Pre-Approval Letter as the basis for his calculation of the Brownfield Tax Credit.  In addition, although the Pre-Approval Letter provided a pre-approval of a 20% credit based upon the total eligible investment expected as of that time to be made in the future during the long-term development of the project, the Brownfield Tax Credit Application does not appear to have considered that a portion of the expected project cost would not be considered "eligible investment" upon which a credit would be awarded pursuant to section 437(32)(d) of the Michigan Business Tax Act for the following reasons.

aa.   Kirsch Lofts' financial consultant, George L. Larimore, CPA, in 2010 estimated the "eligible investment" that

8

could be considered in the calculation of the pre-approved 20% Brownfield Tax Credit to be $7,895,969 (see page 5 of Exhibit O). This document indicated that of the total project cost of $9,818,437, only $7,895,969 would be considered eligible investment for calculation of the 20% Brownfield Tax credit, substantially less than the $8,450,000 eligible investment which the Siegal Opinion assumed.

bb. The Larimore 2010 estimate presumably incorporates the best available information available as of 2010 as Mr. Larimore should have then had access to current project cost information. It should therefore be considered as a starting point for the estimation of the maximum estimated available Brownfield Tax Credit that may have been available, but needs to be adjusted as follows:

    x. Although the general logic presented on page 3 of the Larimore 2010 estimate is correct, it comes to an incorrect conclusion because:

        (i) It includes $150,000 of Developer Fees in its calculations, contrary to the statutory prohibition on including developer fees as eligible investment which was enacted into law in 2008 (MCL 208.1437(32)(d)).

9

(ii)   It includes all $1,155,579 of the project's expected environmental costs in its calculations of the expected Brownfield Tax Credit, thus improperly including the portion of those costs which was either paid or intended to be paid with the expected $1,000,000 of MDEQ Loan proceeds or to be reimbursed with tax increment ("TIF") revenues under the Brownfield Plan. Table 1 of the MDEQ Work Plan indicates that of the total $2,029,600 of environmental and demolition costs, $1,000,000 would be paid from the $1,000,000 MDEQ Grant, another $1,000,000 would be paid from the MDEQ Loan proceeds (with the MDEQ Loan being repaid with TIF revenues under the Brownfield Plan), and the remaining $29,600 was to be paid by Kirsch Lofts and reimbursed with TIF revenues. None of these $2,029,600 of environmental costs described in the MDEQ Work Plan is eligible to be counted as eligible investment for the

10

calculation of the 20% Brownfield Tax Credit (MCL 208.1437(32)(d)).

y. In the event that the 2010 Larimore estimate also included the demolition or lead abatement project costs in its calculations, it is also incorrect because project costs paid with grant proceeds also are not eligible to be counted as basis for the Brownfield Tax Credit (MCL 208.1437(32)(d)). I did not reduce my estimate of the available Brownfield Tax Credit with regard to these costs.

d. <u>Overstatement of Likely Net Proceeds From Sale of Credits</u>. The Siegal Opinion on page 4 estimates that the Brownfield Tax Credits would be sold at a price between 90 and 95 cents on the dollar. My experience with brownfield tax credit sales between 2011 and 2013 is that the market price was closer to 84 to 91 cents on the dollar. This opinion is based upon my review of actual brownfield tax credit agreements for similar size credits between very creditworthy parties, including (i) a 2012 agreement for the sale of $950,000 of credits at the price of 87 cents on the dollar, (ii) a 2011 agreement for the sale of approximately $1,750,000 of credit at a price of 91 cents on the dollar, and (iii) a 2008 agreement to sell approximately $1,800,000 of credits for 84 cents on the dollar. The average price of these three sales was 87 cents on the dollar, prior to transaction costs. This is the

11

same sale discount factor used in the Larimore 2010 estimate discussed above.

e.     <u>Reference to Non-Existent Redemption Program</u>. The Siegal Opinion states on page 4 "[r]eportedly, the State of Michigan will also redeem [the brownfield tax] Credits due to the change in the MBT to the corporate income tax at the same rate", perhaps seeking to infer that the brownfield tax credits may have yet more value.  No such tax credit redemption authorization exists in Michigan law for this "reported" practice, nor have I have ever heard of such a provision from any source prior to reviewing the Siegal Opinion.

The factors described above need to be applied to the project's expected "eligible investment" to arrive at the expected value of the pre-approved Brownfield Tax Credit. Since there are various project costs utilized by Kirsch Lofts in its various documents produced in this proceeding and provided to me, I have applied the estimated project costs presented in two documents (Exhibits O and P) to determine the likely net pre-tax value that Kirsch Lofts may have realized from the brownfield tax credits had the project been completed as originally contemplated.  The Brownfield Tax Credits that may have been available have a pre-tax value of between $1,120,366 and $1,197,120. The explanation of these numbers follows.

The first estimate is based upon an assumption that the entire three-phase project could have been completed as described in the Brownfield Credit Application at the costs described in the Larimore documents attached hereto as Exhibit O, that Kirsch Lofts had the financial capacity to timely complete the project and that sufficient market conditions existed to support

the timely completion of the project. I estimate the net pre-tax value of the Brownfield Tax Credit that may have been realized by Kirsch Lofts to be $1,146,728, based upon $6,590,390 of eligible investment ($7,895,969 less $150,000 of Developer Fees less $1,155,579 of costs likely to be reimbursed under the Brownfield Plan), times the 20% tax credit rate, times an assumed 87 cents/dollar sale price. In addition, it is possible that a 2% to 5% tax credit broker commission would have been required to be paid for this transaction to locate a purchaser of the brownfield tax credits, possibly further reducing the net pre-tax brownfield tax credit proceeds that may have been available to $1,120,366 (based upon a 2% commission rate).

The preceding analysis is summarized as follows:

| Brownfield Tax Credit Estimates | |
|---|---|
| Total Costs | $7,895,969 |
| Less: Developer Fee | -$150,000 |
| Less: Environmental | -$1,155,579 |
| Equals: Eligible Investment | $6,590,390 |
| 20% credit | $1,318,078 |
| 87% sale proceeds | $1,146,728 |
| Reduced by possible 2% commission | $1,120,366 |

I was provided a second set of financial information that provided slightly higher project cost estimates and was presented on a project phase by phase basis (see Exhibit P; KIRSCHLOFTS000877). Since it is not possible to determine whether Exhibit O (the Larimore documents) or Exhibit P represents a more accurate set of project costs, I applied a similar analysis to the second set of costs and estimate that the net pre-tax Brownfield Tax Credit value that would have potentially been available to be between $1,169,600 and $1,197,120 presented below on a phase by phase and total basis:

13

**Brownfield Tax Credit Estimates**

| | Phase 1 | Phase 2 | Phase 3 | Total |
|---|---|---|---|---|
| Hard Costs | $3,689,100 | $1,871,300 | $2,691,100 | $8,251,500 |
| Less: Building and Land | -$30,000 | -$10,000 | -$10,000 | -$50,000 |
| Less: Demolition | -$700,000 | -$400,000 | -$400,000 | -$1,500,000 |
| Plus: Architect/Concept Fees | $121,000 | $22,000 | $22,000 | $165,000 |
| Plus: Survey, staking, engineering | $10,500 | $1,500 | $1,500 | $13,500 |
| Equals: Eligible Investment | $3,090,600 | $1,484,800 | $2,304,600 | $6,880,000 |
| 20% credit | $618,120 | $296,960 | $460,920 | $1,376,000 |
| 87% sale proceeds | $537,764 | $258,355 | $401,000 | $1,197,120 |
| Reduced by possible 2% commission | $525,402 | $252,416 | $391,782 | $1,169,600 |

d.  Disregard of Statutory Procedure to Seek Amendment of Preapproval Letter to Satisfy 10 Year Completion Deadline. On page 5, the Siegal Opinion states that none of the Brownfield Tax Credit can be claimed because the entire preapproved project will not be completed within 10 years of the date of the preapproval letter, or October 10, 2018. While the opinion correctly concludes that the 10 year completion deadline cannot be extended, it disregards or overlooks the language, also in the same section of the Michigan Business Tax Act, that authorizes the MEGA (and now by the Michigan Strategic Fund) to modify a brownfield tax credit preapproval letter to revise the definition of the approved project and thereby allow a brownfield tax credit to be issued for a portion of the originally approved project. No indication is provided that Kirsch Lofts ever requested that the MEGA amend the Pre-Approval Letter to require the completion of a portion of the project, such as Phase I or both Phase I and Phase II of the project (depending upon what work can be completed

14

by October 10, 2018), and then claim only the reduced credit related only to such portion of the project. Had Kirsch Lofts made such a request or if it makes such a request before October 10, 2018, it is possible that a modification of the pre-approval would be approved and that a reduced brownfield tax credit could be earned and retained for eligible investment made on work completed by that date.

Although Kirsch Lofts has not indicated what portion of the overall project can be completed by the October 10, 2018 statutory deadline to obtain a certificate of occupancy and otherwise be eligible to claim a brownfield tax credit for the approved project, it is possible that a brownfield tax credit could be obtained for the completed portion of the overall project. If Phase I is completed by this deadline, the amount of the pre-tax Brownfield Tax Credit that may be available can be estimated based upon the same limitations described above, resulting in a potentially available credit of $525,402, summarized as follows:[1]

| Brownfield Tax Credit Estimates | |
| --- | --- |
| | Phase 1 |
| Hard Costs | $3,689,100 |
| Less: Building and Land | -$30,000 |
| Less: Demolition | -$700,000 |
| Plus: Architect/Concept Fees | $121,000 |
| Plus: Survey, staking, engineering | $10,500 |
| Equals: Eligible Investment | $3,090,600 |
| 20% credit | $618,120 |
| 87% sale proceeds | $537,764 |
| Reduced by possible 2% commission | $525,402 |

---

[1] If a different portion of the project could be completed, the potentially available credit would be calculated the same way.

<u>Summary</u>:  The brownfield tax credit for the project had a net pre-tax value of not more than $1,120,366 and $1,197,120.  Kirsch Lofts could have and still can take steps to seek to mitigate any damages that it may otherwise realize by redefining the scope of the approved project.

**2.      Alleged Lost MDEQ Brownfield Loan Opportunity**.

I have been advised that Kirsch Lofts alleges that it lost the opportunity to obtain $672,424.80 of funding through the MDEQ Loan described above. I have confirmed with Carrie Geyer of the MDEQ that, although the MDEQ closed out the MDEQ Loan for this prior to disbursement of the entire $1,000,000 available under the loan, the MDEQ currently has sufficient funding available under its brownfield loan program to be able to and be willing to consider entering into a new loan by which it could advance the undisbursed portion of the MDEQ Loan should Kirsch Lofts demonstrate to the satisfaction of the MDEQ and the City of Sturgis that they should support the project in that way.

**3.      Brownfield Tax Increment Financing Claim:  $1,737,308.**

<u>Conclusion</u>: The Siegal Opinion does not address fundamentally important facts and, as a result, greatly overstates the claimed losses related to potential reimbursements that may have been available under the Brownfield Plan.

<u>Analysis</u>: The Siegal Opinion's deficiencies with respect to Kirsch Loft's claims of lost brownfield TIF losses include the following:

a.      <u>Failure to Recognize Flaws in the Approved Brownfield Plan Tax Projections</u>.

i.      The Siegel Opinion apparently assumed the accuracy of the Brownfield Plan's Exhibit B TIF Schedule and incorporated its tax projections for the

16

years 2009-2026 into its analysis to project tax capture for 2020-2037.[2] However, the Exhibit B TIF Schedule is based on material assumptions that are inconsistent with the text of the Brownfield Plan, testimony provided by Mr. Bosgraaf and Exhibit P or are not based on reasonable estimates of future taxable value and, therefore, overestimate future tax increment revenues to be available for reimbursement of Kirsch Lofts.

ii.    Errors in Future Taxable Values of Project.

    a.    Footnote 2 of the Exhibit B TIF Schedule states that taxable value estimates are based upon "planned improvements in 2010 ($6 million) and is increased by 2% per year for inflation." The taxable value estimates and the TIF revenue estimated to be created during the life of the Brownfield Plan therefore are inconsistent with section 3.0 of the Brownfield Plan, which indicates that while the construction of Phase I of the project was to be completed in 2010, "[p]hases II and III will follow based on absorption and economic activities" (presumably in future years). Scott Bosgraaf of Kirsch Lofts testified at his April 13, 2016 deposition that Phases II and III would follow many years later ("we sort of planned on starting in '9, finishing Phase I in early '11, wait a couple of years, spend a couple of years on the next phase, wait a couple of years, and

---

[2] Note, the Siegal Opinion omitted the tax capture originally projected for 2010 from its tax capture estimate table on page 7.

finish the next phase")[3], and Exhibit P sets forth projected costs based upon a phased development, thereby putting into question the fundamental assumption in Footnote 2 of the Brownfield Plan's Exhibit B TIF Schedule that $6 million of investment ever should have been projected to be completed by 2010.

b.  The Brownfield Tax Credit Application filed by Kirsch Lofts on or about October 1, 2008 described a three-phase project with a Phase I eligible investment of $3,900,000, well below the $6,000,000 investment indicated in Footnote 2 of the Brownfield Plan's Exhibit B TIF Schedule, supporting the conclusion that there was not a reasonable expectation of $6,000,000 being spent on the project by 2010.

c.  Exhibit B of the Brownfield Plan forecasts an increase in the 2011 taxable value equal to 50% of the assumed $6,000,000 of project costs to be completed by 2010. Even if the project was to be 100% completed by 2010, the 2011 taxable value assumption was not justified, as is often the case with renovation projects, because the taxable value of renovated property often does not increase by 50% of the project cost. The assumption that 50% of project cost is added to taxable value, and that new TIF revenues are generated based upon the application of the property tax millage rates to this

---

[3] See page 24, lines 10-24 of the Scott Bosgraaf April 13, 2016 deposition transcript.

increase in taxable value, is an error often observed in brownfield plan TIF projections.

d.    A more accurate practice in the preparation of brownfield plan TIF projections is to examine assessments of comparable properties when developing an estimated as-complete taxable value of the property. Once the estimated as-complete taxable value is properly estimated, the base taxable value as of the year of adoption of the brownfield plan (in this case, 2008) is subtracted from the as-completed taxable value to arrive at the incremental taxable value. The resulting estimated annual tax increments available for reimbursements are then determined by application of the capturable property tax millage rates to the incremental taxable value.

e.    Assuming that $3,900,000 was to be spent on building renovation by 2010 (as indicated in the Brownfield Tax Credit Application), it is my experience that often the incremental taxable value will not exceed and often will be less than 50% of this amount ($1,450,000), based upon market conditions and the proper application of Michigan property tax assessment requirements under the Michigan General Property Tax Act.

f.    It is noted that the estimated sale revenue from the projected sale of the Phase I condominium units after 7 years at one time was

19

projected to be $2,572,929 [KIRSCHLOFTS 000878]. Even though Kirsch Lofts indicated that it did not intend to sell any units prior to the end of 7 years (due to tax credit law limitations), the suggested Phase I sale revenue may support a total taxable value at the projected 2017 time of sale equal to 50% of this amount, or $1,376,464. After adjustment the 2017 projected sale price to estimate the 2011 value by application of the inflation rate assumed in the Brownfield Plan (2%/year), a 2011 taxable value of $1,222,261 can be inferred.  By subtraction of the 2008 base taxable value ($104,800) (see Exhibit B of the Brownfield Plan), the estimated expected incremental taxable value in 2011 can be estimated to more likely have been about $1,117,661 rather than $3,006,415 indicated on Exhibit B of the Brownfield Plan.

g.   The future taxable values should be projected to increase as and after Phase II and Phase III of the project are completed.

iii.   <u>Failure to Reduce the Amount of Costs Eligible For Reimbursement Under the Brownfield Plan</u>. The Siegal Opinion relies heavily on the terms of the Brownfield Plan and disregards the material adjustments to the tax projections made when the MDEQ Work Plan was submitted by the Sturgis Brownfield Redevelopment Authority to the MDEQ. The MDEQ Work Plan was partially approved by the MDEQ on September 22, 2009 and October 30, 2009 (see Exhibit I).   These revisions and the

20

corresponding communications between the MDEQ and Kirsch Lofts' representatives clearly demonstrate that Kirsch Lofts never had an expectation of receiving the amount of reimbursements assumed by the Siegal Opinion as being due to Kirsch Lofts ($1,823,250 of costs plus interest, for a total of $3,272,715).

a.   The fundamental flaw in this claim is that the applicable law, the Brownfield Redevelopment Financing Act, Act 381 of 1996, as amended ("Act 381"), allows for reimbursement only of costs actually incurred by the developer and not paid or reimbursed by other sources. The costs eligible for reimbursement were properly reduced in the MDEQ Work Plan to exclude $1,000,000 of project costs that were paid by the MDEQ Brownfield Grant.

b.   As indicated on Table 3 of the MDEQ Work Plan, the projections of reimbursements to be made to Kirsch Lofts with respect to MDEQ approval costs and other environmental costs were revised, as of September 8, 2009, to estimate that Kirsch Lofts may be entitled to reimbursement of only $29,600 of its MDEQ approved costs from the brownfield tax increment revenues and for reimbursement of payments made by Kirsch Lofts towards the MDEQ Loan, plus interest thereon. Removed from the reimbursements are the $1,000,000 of reimbursements for costs already paid by the MDEQ under the $1,000,000 MDEQ Grant. Also removed is a large portion of the over

21

$1,400,000 of interest originally projected in the Brownfield Plan to be paid to Kirsch Lofts over the life of the Brownfield Plan.

c.    Although the Brownfield Plan prepared by Kirsch Lofts' consultant and approved by the City also included the payment to Kirsch Lofts of interest at the rate of 6%/annum on its advances, the Siegal Opinion did not recognize that the MDEQ required that the interest rate be reduced from 6%/annum to 5%/annum.

d.    Exhibit Q is an estimated schedule of reimbursements of eligible costs that incorporates the various conclusions above.  The schedule demonstrates that Kirsch Lofts should have expected to receive final reimbursement of all of the potentially reimbursable costs plus interest by 2035, which is 3 years before the current 30-year deadline for final reimbursement under the Brownfield Plan.[4]

e.    The discussions on pages 6 and 7 of the Siegal Opinion concerning the expected delay in the effective reimbursement period is deficient for several reasons:

    i.    It states without support that the original brownfield plan tax increment projections in Exhibit B of the Brownfield Plan were "validated by the City and its assessor".

---

[4] Although Exhibit B to the Brownfield Plan suggests that the last year of reimbursement allowed is 2037, it should be 2038, which would be the 30th reimbursement year under the Brownfield Plan (MCL 125.2663(22)). The first year of tax capture was projected for 2009, the first tax year after the date of adoption of the plan.

ii.      It states on page 6 that there was no tax increment to capture prior to September 9, 2013. In fact, there was a small increase in taxable value of one or both tax parcels included in the Brownfield Plan from the base 2008 taxable values of $104,800 indicated in the Brownfield Plan (the two parcels' combined taxable value was $108,883 in 2009 and $120,100 in 2010).

iii.     It is inconsistent in its methodology for determining when tax increments will first be collected under the revised project timetable. For example, the Brownfield Plan projected that after two years of minimal tax increment collections, significant tax increment revenues would first be collected in the 2010 tax year (note the earlier comment about the error in this aspect of the projections). But the Siegal Opinion repeated this error on page 7 by ignoring the material tax increment revenues that would be first collected in 2020 and 2021 under the Siegal Opinion's assumption on page 7 that "the project is completed on or about September 9, 2019". In addition, 2019 tax increments also may be collected if the city assessor attributes increased value to the construction in progress as of December 31, 2018.

23

iv.        <u>Failure to Adjust Expected Tax Increments Due to Kirsch Lofts' Own Project Delays</u>. The Siegal Opinion assumes that the project would have proceeded and started generating TIF revenues based upon 100% completion of the project in 2010, which is the basis of the TIF projections in Exhibit B of the Brownfield Plan. However, Kirsch Lofts did not expect to complete the entire project by 2010, as Scott Bosgraaf of Kirsch Lofts testified in his April 13, 2016 deposition that "we sort of planned on starting in '9, finishing Phase I in early '11, wait a couple of years, spend a couple of years on the next phase, wait a couple of years, and finish the next phase" (Scott Bosgraaf deposition transcript, page 24, lines 10-14). Further, according to the Brownfield Plan, the MDEQ Work Plan, the Brownfield Tax Credit Application and the financial information attached hereto as Exhibit P, the project was going to be completed in three phases.  I understand that Kirsch Lofts actually purchased the property on July 10, 2009, putting the Brownfield Plan timetable into doubt and providing reason to update the brownfield tax increment projections to recognize changes in project timing and resulting adjustments in annual tax capture available for

24

reimbursement of eligible costs. Mr. Siegal failed to do this.

v. Kirsch Lofts Missed A Possible Opportunity To Avoid the Alleged Adverse Impact of the 30-Year TIF Tax Capture Limit. Upon learning from the MDEQ that it would encounter a delay in proceeding with the project (see Exhibit N), Kirsch Lofts could have evaluated the resulting impact to its development schedule and requested that the Brownfield Plan be amended to include a delay of up to 5 years in the commencement of the 30-year maximum tax capture period. In addition, prior to the adoption of the Brownfield Plan (including during Kirsch Lofts' conduct of environmental due diligence prior to its purchase of the Property), Kirsch Lofts could have requested a delay in the adoption of the Brownfield Plan and deferred the commencement of the 30-year maximum tax capture period applicable to the plan or it could have requested that the plan contain the 5-year deferral described above.

vi. The Siegal Opinion does not mention that section 13(22) of Act 381 authorizes an amendment to a brownfield plan to defer the beginning date of tax capture by up to 5 years if reimbursements of eligible activities have not yet begun.

25

Kirsch Lofts may be able to obtain approval from the Sturgis City Council of an amendment to the Brownfield Plan to revise the first year of tax capture from 2009 to 2014 and the final year of permitted tax capture from 2038 to 2043, thereby potentially eliminating any deficiency in reimbursements that Kirsch Lofts alleges is being caused due to delays in the project.  I have been advised by Andrew Kuk, Assistant City Manager of the City of Sturgis, that he does not believe any reimbursements of eligible activities have been made to Kirsch Lofts under the Brownfield Plan, so it may be legally possible to obtain this 5 year extension.   In addition, Kirsch Lofts could have chosen to defer adoption of the Brownfield Plan from late 2008 until it had completed its environmental due diligence of the Superfund site sufficiently to discover the contamination that was subsequently discovered and delayed the commencement of the 30-year duration of the TIF capture period of which it now complains.

vii.   The Siegal Opinion fails to apply a present value factor to its estimated lost reimbursement stream due to alleged reductions in tax increment revenues.  Therefore, the Siegal

26

Opinion overstates the alleged losses incurred by Kirsch

Lofts.

Exhibit Q presents my estimate of the reimbursements that would have been realized by Kirsch Lofts had the project been constructed as described by Mr. Scott Bosgraaf, and as originally submitted and approved by the City of Sturgis, the MDEQ and the MEGA, as described above. Based upon this estimate, I conclude that Kirsch Lofts would have received complete reimbursement by 2035 if the project had proceeded as originally approved for (a) all $579,124 of its costs that were not reimbursed with proceeds of the Brownfield Loan, (b) payments on the MDEQ Loan made directly or indirectly by Kirsch Lofts, and (c) $1,113,051 of interest.[5]

Exhibit R presents my estimate of the reimbursements that could be realized by Kirsch Lofts if a six-year delay of the project occurs as alleged by Kirsch Lofts and the Siegal Opinion, the project is then constructed in three phases as contemplated by Mr. Bosgraaf and in various documents and Kirsch Lofts obtains a 5-year deferral of the commencement of the maximum 30-year brownfield plan tax capture period, which has been legally permitted since the amendment of Act 381 by 2012 P.A. 502. Based upon these assumptions, I estimate that Kirsch Lofts would have been paid all amounts due it under the Brownfield Plan.

---

[5] I prepared my tax projections consistent with the incorrect assumption in Exhibit B of the Brownfield Plan that a Neighborhood Enterprise Zone certificate would be issued for a 10 year term. Under applicable law (MCL 207.782), such a certificate for a rehabilitation project may be issued for a term of between only 11 to 17 years. Had the certificate been issued as legally permitted, less reimbursements would have been available under the Brownfield Plan than currently indicated because less property taxes would have been paid and captured for the project.

If Kirsch Lofts does not obtain approval for a 5-year deferral of the commencement of the 30-year tax capture period, I estimate that there would be $646,786 of unreimbursed costs or accrued but unpaid interest at the end of 2043 that would not be paid to Kirsch Lofts under the Brownfield Plan.

Both sets of estimates are based upon the property being assessed from time to time based upon the sales prices presented in the sales proforma estimates set forth on Exhibit P (KIRSCHLOFTS000878).  The estimates also include other adjustments based upon the factors described above and the proper application of property tax rates under the OPRA and NEZ tax abatement programs described in the TIF projections included with the MDEQ Work Plan.

**4.  New Markets Tax Credit.**

Conclusion: The project likely was not eligible for New Markets Tax Credits and therefore Kirsch Lofts has not and will not incur any damages due to any alleged delay in completing the project. In the alternative, even if the project is eligible for New Markets Tax Credits, Kirsch Lofts has not demonstrated that it could have satisfied the requirements to obtain the benefit of these credits and, even if it did, the credits would have been worth less than claimed. Finally, Kirsch Lofts has not demonstrated that, if the project is eligible for these credits, it cannot obtain the credits now or in the future.

Analysis: The Siegal Opinion asserts $2,737,800 of lost value based upon claimed lost federal New Markets Tax Credits. However, it lacks important specifics and does not consider important factors that are critical to the determination of what, if any, value could have been realized by Kirsch Lofts pursuant to the federal New Markets Tax Credit program. The following

28

factors demonstrate that little or no value could have been realized by Kirsch Lofts, even under the most favorable of economic and other conditions.

     a.    <u>The Project Is Not Eligible for New Markets Tax Credits</u>. A fundamental requirement of the NMTC program is that the project must be for the benefit of a "qualified active low income business" ("QALICB"), as defined in section 45D(d)(3) of the Internal Revenue Code. To be a QALICB, a project must be a "qualified business", which in turn means that the project cannot be considered a "residential rental property" under section 168(e)(2)(A) of the Internal Revenue Code. A "residential rental property" is a building or structure if 80% or more of the gross rental income from the building or structure for a taxable year is rental income from dwelling units.

The project, as described in numerous project documents and Scott Bosgraaf's deposition testimony, included a Phase I that consisted of only residential apartments that would be rented for seven years. No other improvements were expected to be constructed and completed and capable of generating sufficient non-residential rental income until at least two to four years after the completion of Phase I. As such, the project's income would have consisted entirely of residential rental income and violated the 80% rule. Therefore, during the customary extensive due diligence process, CapFund, the tax credit investor or the leverage lender would have determined that NMTC are not legally available and the NMTC equity investment would not have been able to close and been funded. Therefore, no damages have been incurred with respect to NMTC.

29

      b.   <u>Kirsch Lofts Has Not Demonstrated That It Had Received An Allocation</u> <u>of NMTC</u>.  Even though Kirsch Lofts and the Siegal Opinion have relied upon a term sheet letter on the letterhead of CapFund New Markets, LLC (see Exhibit J), the letter is missing both a date and a signed signature page. It is impossible without a signed and dated term sheet letter to confirm what, if any, term letter was actually issued by CapFund New Markets, LLC, whether the letter merely was a draft provided for comment only, and whether CapFund considered itself bound to Kirsch Lofts. Further, even if the CapFund term sheet was properly issued, Kirsch Lofts has not provided any evidence that it had secured all three of the following other commitments that typically are essential to the closing of a NMTC transaction:

    1.    <u>Commitment of a lender to make a leverage loan</u>. A leverage loan is usually a key aspect of a NMTC transaction. In the event that an "inside" loan was to be made by Scott Bosgraaf, there would need to be financial liquidity sufficient to fund millions of dollars of qualified equity investment required under the proposed NMTC transaction, none of which can be repaid for seven years under NMTC regulations. I have not been made aware of any documentation of such a high level of liquidity in Kirsch Lofts, Scott Bosgraaf or any affiliates of either.

    2.    <u>Commitment from a tax credit investor</u>. A NMTC transaction cannot close without a tax credit investor who will advance funds to the project.  I have

been advised that Kirsch Lofts has not produced a commitment letter from or other documentation of a tax credit investor.

3. <u>Guarantor</u>. A NMTC transaction typically involves a requirement that a person or entity with strong credit provide a guaranty of performance of various obligations to the leverage lender and tax credit investor. I have not been made aware of any documentation of credit worthiness or willingness and ability to deliver such guaranties of Kirsch Lofts, Scott Bosgraaf, any affiliates of either, or any other person.

4. <u>Alternative NMTC Allocation</u>. Even assuming that the project could be found to qualify under the 80% gross rental test and obtain the required leverage loan, tax credit investor and guarantor(s), its apparently inability to comply with the June 30, 2010 closing deadline stated in the unsigned and undated CapFund letter did not preclude Kirsch Lofts from seeking and probably obtaining an extension of the closing deadline and/or from seeking NMTC allocation from CapFund or other community development entities ("CDEs") in 2010 or subsequent years. The NMTC tax credit program remains vibrant, with $7,000,000,000 of project allocation expected to be awarded later this year.  In each year from 2011 to 2015, billions of dollars of NMTC allocation have been awarded to projects in Michigan and across the country. If the Kirsch Lofts project was financially feasible and could satisfy the important Internal Revenue Code NMTC requirements (including the 80% test), it is likely that

31

CapFund or another CDE would have or still would seriously consider the project for an allocation of NMTC. Therefore, there is no basis to conclude that Kirsch Lofts has incurred any damages with respect to NMTC.

5. <u>Calculation of NMTC Benefits</u>. If the project was able to qualify for NMTC and satisfy the rigorous closing requirements of the NMTC program, it would have realized a benefit significantly less than predicted in the Siegal Opinion. There are several reasons for this:

a. The credit is calculated based upon the "Qualified Equity Investment" ("QEI"), not the maximum amount listed in an unsigned term sheet letter. George Larimore estimated the project's NMTC QEI to be $9,818,437 (see Exhibit O), compared to $10,800,000 used in the Siegal Opinion's calculations.

b. The amount realized from the credits generally is the result of multiplying the QEI by the 39% credit amount and then by the market price for the credit "sale." George Larimore applied a 65% market price as of 2010, which is appropriate.

c. The last step is to reduce the proceeds by the substantial transaction and ongoing monitoring, compliance accounting and reporting costs. Based upon my inquiry of professionals regularly involved in negotiating and closing New Markets Tax Credit sales, I estimate the transaction, compliance and other costs for this

project to reduce the potential net value of the NMTC to between 20% and 23% of the difference between the QEI and the tax credit equity investment proceeds (the "leverage"), calculated as follows:

| | |
|---|---|
| QEI: | $9,818,437 |
| Times credit rate: | x 39% |
| Times market investment rate: | x $0.65 |
| Equity proceeds: | $2,488,973 |

| | |
|---|---|
| QEI: | $9,818,437 |
| Less equity investment proceeds: | ($2,488,973) |
| Leverage | $7,329,464 |

| | |
|---|---|
| 20% - 23% Net Proceeds: | $1,465,892 to $1,685,776 |

The Siegal Opinion did not consider these costs.

d. The result of the preceding calculations is that I estimate that the net New Markets Tax Credits proceeds that may have become available to Kirsch Lofts, had it resolved all of the other NMTC issues described above, would have been not more than $1,465,892 to $1,685,776.

33

# EXHIBIT LIST

A.   Richard A. Barr Curriculum Vitae

B.   Richard A. Barr Publications

C.   List of Documents Relied Upon

D.   Amendment to Brownfield Plan

E.   Brownfield Reimbursement Agreement

F.   September 12, 2008 Letter from Jan L. Barger (Warner Norcross & Judd); Part I Brownfield Redevelopment MBT Credit Project Application

G.   October 10, 2008 Letter from James C. Epolito (MEDC)

H.   Act 381 Work Plan

I.   September 22, 2009 Letter from David A. Kline (DEQ); October 30, 3009 Letter from David A. Kline (DEQ)

J.   Cap Fund Letter

K.   Brownfield Redevelopment Grant Contract

L.   Brownfield Redevelopment Loan Contract

M.   MDEQ Loan History Schedule

N.   January 27, 2010 E-Mail From Robert Franks Re: Kirsch Lofts – Vapor Mitigation Evaluation & Soil Sampling Results

O.   Larimore Documents – Sources and Uses of Funds

P.   Project costs

Q.   Tax Projections (Original Schedule)

R.   Tax Projections (Delay)

# EXHIBIT A

# HONIGMAN.



# Richard A. Barr

Partner
Leader, Economic Development
Incentives; and Environmental
Practice Groups

2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
T: 313.465.7308
F: 313.465.7309
rbarr@honigman.com

**PRACTICES**

Real Estate

Environmental

Economic Development Incentives

Sustainability and Renewable Energy

Urban Redevelopment

Zoning and Land Use

Government Relations and Regulatory

---

Mr. Barr focuses his practice on environmental, economic development,
real estate and business law, and possesses significant knowledge
regarding the redevelopment of contaminated sites by utilizing federal,
state and local incentives.

- Facilitates Brownfield development in the presence of environmental
  roadblocks
- Structures complex brownfield plans, including multiple, layered state
  and local incentives
- Identifies and pursues tax abatements and other incentives for
  companies locating in Detroit and other communities
- Facilitates site selection and incentives package for multi-national
  companies seeking Michigan headquarters locations
- Assists clients on development and zoning issues
- Represents clean energy companies seeking federal, state and local
  support for Michigan manufacturing facilities
- Participates in Michigan Economic Development Corporation and
  Michigan Department of Environmental Quality stakeholder groups
  and outreach efforts

## Experience

- Actively involved in the legislative processes that resulted in the major
  overhaul of Michigan's primary environmental protection law (known
  as "Part 201") and the current Brownfield incentive programs, and
  served on the Environmental Advisory Rules Committee (established
  pursuant to Governor Rick Snyder's Executive Order 2011-5) and the
  Michigan Department of Environmental Quality Collaborative
  Stakeholder Initiative

**EDUCATION**

University of Michigan Law
School, J.D.

- *cum laude*

University of Michigan,
B.B.A.

- Accounting
- with *high distinction*

**BAR ADMISSIONS**

Michigan

**HONIGMAN**®

- Negotiated incentive package valued at more than $50 million for multi-national company investment in Michigan
- Completed CPA Examination

## Professional Affiliations

State Bar of Michigan

- Environmental Law Section
- Real Property Law Section
- Business Law Section

American Bar Association

State of Michigan Office of Regulatory Reinvention

- Environmental Advisory Rules Committee, 2011-present

Michigan Department of Environmental Quality

- Collaborative Stakeholder Initiative, 2012-2014

Detroit Regional Chamber of Commerce

- Environmental & Energy Policy Committee

Michigan Manufacturers Association

- Environmental Policy Committee

## Community

Hebrew Free Loan

- Board of Directors, 2011-present

Yad Ezra (Food Pantry)

- Director, 1991-present
- President, 1994-1995

## News & Resources

**Publications**

- Chapter 37 (Michigan) (2012)
  Chapter co-author
  *Implementing Institutional Controls at Brownfields and Other Contaminated Sites, American Bar Association, Second Edition*

**HONIGMAN**®

Richard A. Barr (Cont)

- MDEQ Seeking Major Overhaul of Michigan's Key Environmental Remediation and Brownfield Laws (October 2009)
  *State Bar of Michigan, Michigan Bar Journal, Volume 88, No. 10, P. 32*
- Challenging Times Call for Layered Incentives for Distressed Properties (October 2009)
  Co-author
  *State Bar of Michigan, Michigan Real Property Review*
- Deed Restrictions and Institutional Controls in Michigan (2003)
  Co-author
  *Implementing Institutional Controls at Brownfields and Other Contaminated Sites, American Bar Association*
- Brownfield Revitalization (December 2001)
  Co-author
  *Michigan Bar Journal*
- Brownfield Case Study-Southeast Oakland County, Michigan (June 2001)
  Co-author
  *The Michigan Environmental Professional*
- The 2000 Brownfield Amendments: How to Turn Contaminated, Blighted or Obsolete Property into Successful Brownfield Redevelopment Projects (Winter 2000)
  Co-author
  *State Bar of Michigan, Real Property Law Section Michigan Real Property Review*

**Seminars & Events**

- Planning for Your Personal Property Tax Exemption, Michigan Manufacturers Association, Webinar
  December 5, 2014, Co-presenter
- Tax Incentives to Enhance Facility Reuse and Value, Automation Alley Conference on Plant Closures and Decommissioning, Essential Environmental and Legal Considerations, Troy, MI
  September 21, 2010, Presenter
- Environmental Legal Aspects of Plant Decommissioning, Automation Alley Conference on Plant Closures and Decommissioning, Essential Environmental and Legal Considerations, Troy, MI
  September 21, 2010, Presenter
- Driving Environmental Progress, The Air & Waste Management Association's 102nd Annual Conference & Exhibition (ACE), Detroit, MI
  June 16, 2009, Participant



- Making Brownfield Redevelopment Work During Tough Economic Times: Leveraging Michigan Brownfield Incentives with Other Development Incentives, Annual Conference, Air & Waste Management Association, Detroit, MI
  June 16, 2009, Co-presenter
- Tax Credits and Incentives, Michigan Association of Certified Public Accountants West Michigan Tax Symposium, Grand Rapids, MI
  November 12, 2008
- MACPA Construction Industry Conference, Novi, MI
  October 30, 2008
- Leveraging Michigan's Brownfield Incentives with Other Development Incentives, U.S. EPA/ICMA Brownfields 2008 Conference, Detroit, Michigan
  May 6, 2008
- Current Status of Michigan Brownfield Redevelopment Incentives, Michigan Department of Environmental Quality Seminar
  February 5-6, 2008
- Honigman SBT Replacement Tax Seminar, Honigman Miller Schwartz and Cohn LLP, Novi, MI
  December 6, 2006

**Blogs**

- Michigan's Governor Snyder Signs Bill with Significant Amendments to Part 201, the Environmental Remediation Law
  January 18, 2015
- Michigan Department of Environmental Quality Launches Vapor Intrusion Pathway Site
  August 26, 2014

## Honors

- *The Best Lawyers in America*, 2010-2016
- *DBusiness*, Top Lawyers, 2010-2016
- Martindale-Hubbell AV® Preeminent™ Peer Review Rated
- *Michigan Super Lawyers,* 2006-2015
    - o   Named as one of the Top 100 *Michigan Super Lawyers,* 2008 and 2009
- Beta Gamma Sigma, 1978-present

# EXHIBIT B

# EXHIBIT B

## RICHARD A. BARR
## LIST OF PUBLICATIONS

**Publications**

- Chapter 37 (Michigan) (2012)
  Chapter co-author
  *Implementing Institutional Controls at Brownfields and Other Contaminated Sites, American Bar Association, Second Edition*

- MDEQ Seeking Major Overhaul of Michigan's Key Environmental Remediation and Brownfield Laws (October 2009)
  *State Bar of Michigan, Michigan Bar Journal, Volume 88, No. 10, P. 32*

- Challenging Times Call for Layered Incentives for Distressed Properties (October 2009)
  Co-author
  *State Bar of Michigan, Michigan Real Property Review*

- Deed Restrictions and Institutional Controls in Michigan (2003)
  Co-author
  *Implementing Institutional Controls at Brownfields and Other Contaminated Sites, American Bar Association*

- Brownfield Revitalization (December 2001)
  Co-author
  *Michigan Bar Journal*

- Brownfield Case Study-Southeast Oakland County, Michigan (June 2001)
  Co-author
  *The Michigan Environmental Professional*

- The 2000 Brownfield Amendments: How to Turn Contaminated, Blighted or Obsolete Property into Successful Brownfield Redevelopment Projects (Winter 2000)
  Co-author
  *State Bar of Michigan, Real Property Law Section Michigan Real Property Review*

# EXHIBIT C

# EXHIBIT C

## LIST OF DOCUMENTS RELIED UPON

1. Amendment to Brownfield Plan

2. Brownfield Reimbursement Agreement

3. September 12, 2008 Letter from Jan L. Barger (Warner Norcross & Judd); Part I Brownfield Redevelopment MBT Credit Project Application

4. October 10, 2008 Letter from James C. Epolito (MEDC)

5. Act 381 Work Plan

6. September 22, 2009 Letter from David A. Kline (DEQ); October 30, 3009 Letter from David A. Kline (DEQ)

7. CapFund Letter

8. Brownfield Redevelopment Grant Contract

9. Brownfield Redevelopment Loan Contract

10. Project Costs

11. January 27, 2010 E-Mail From Robert Franks Re: Kirsch Lofts – Vapor Mitigation Evaluation & Soil Sampling Results

12. Larimore Documents – Sources and Uses of Funds

13. Complaint

14. Defendant's Answer, Affirmative Defenses, Counterclaim, and Jury Demand

15. Plaintiff's Answer to Defendant's Counterclaim

21711479.1

16.     MEGA Brownfield Redevelopment MBT Credit Application – Part I (11 - Kirschlofts000837)

17.     Historic Preservation Certification Application Part 2 (13 - Kirschlofts000979)

18.     August 24, 2014 E-mail (14)

19.     Summary of Kirsch Project (29 - Kirschlofts001072)

20.     Manifests (31 – Kirschlofts001098)

21.     MEDC October 10, 2008 Letter to Scott Bosgraaf (32 – Kirschlofts001445)

22.     Kirsch, LLC Sources and Uses of Funds (33 – Kirschlofts001466)

23.     Amendment to Brownfield Plan (34 – Kirschlofts000792)

24.     Project Costs (35 – Kirschlofts000877)

25.     DEQ Brownfield Redevelopment Loan Contract (36 – Kirschlofts000897)

26.     Act 381 Work Plan (37 – Kirschlofts000924)

27.     September 12, 2008 Letter to MEDC/Part I Brownfield Redevelopment MBT Credit Project Application (43 – Kirschlofts000810)

28.     DNRE Brownfield Redevelopment Grant/Loan Contract (44 – Kirschlofts001247)

29.     May 5, 2013 E-mail regarding disbursement (46 )

30.     February 6, 2009 E-mail to John Hayes from Jan Barger with Development Agreement (49)

31.     Exhibit C – TIF Schedule and Sturgis Project Reimbursement Schedule Spreadsheets (Kirch_ESI_000006)

32.     Comments on DEQW Work Plan/Approvals Spreadsheet (Kirsch_ESI_000013)

33.     September 22, 2009 Letter From DEQ to John Hayes (Kirsch_ESI_000014)

21711479.1

34.     Kirsch Lofts/Prospect Project Amendment to the Brownfield Redevelopment Contract (Kirsch_ESI_000017)

35.     October 30, 2009 DEQ Letter to John Hayes (Kirsch_ESI_000073)

36.     Newell's Motion For Judgment On The Pleadings On The Issue of Kirsch's Claimed Damages

37.     Newell's Memorandum In Support of Motion For Judgment On The Pleadings On The Issue of Kirsch's Claimed Damages

38.     Kirsch Lofts' Response To Plaintiff's Motion For Summary Judgment

39.     Newell's Reply In Support of Its Motion For Judgment On The Pleadings On The Issue of Kirsch's Claimed Damages

40.     Property tax information for the Property available at the City of Sturgis website

41.     Laws and Regulations Referred to in our Opinion

42.     CDFI Fund Update, April 18, 2016

43.     Kirsch Lofts Construction Schedule, Document KIRSCH_ESI-000012

44.     Scott Bosgraaf Deposition Transcript, April 13, 2016

# EXHIBIT D

# AMENDMENT TO BROWNFIELD PLAN

308 North Prospect Street,
City of Sturgis,
St. Joseph County, Michigan

August 19, 2008

*Final*
*SB*
*9/9/08*



## EQUITY RESOURCE

## ENVIRONMENTAL

A-5792 143rd Avenue, Suite A
Holland, Michigan 49423

KIRSCHLOFTS000792

# CITY OF STURGIS
# BROWNFIELD REDEVELOPMENT AUTHORITY


# BROWNFIELD PLAN
# FOR THE
# KIRSCH LOFTS, LLC REDEVELOPMENT PROJECT


Prepared by:

Equity Resource Environmental
A-5792 143rd Avenue, Suite A
Holland, MI 49423
Contact Person:  Jeff Balgoyen
Phone:  616-392-6010
Website:  www.erenvironmental.com
E-Mail:  jeffbere@sbcglobal.net

KIRSCHLOFTS000793

308 North Prospect Street, Sturgis, Michigan

## TABLE OF CONTENTS

1.0 INTRODUCTION AND PURPOSE ................................................................................2

**DESCRIPTION OF THE PROJECT AND COSTS TO BE PAID THROUGH THE
BROWNFIELD PLAN (MCL 125.2663 (1)(A)**

2.0 PROPERTY INFORMATION ..........................................................................................2
    Property Identification ...............................................................................................2
3.0 PROPOSED REDEVELOPMENT ................................................................................2
    Site Description and Building Construction ...............................................................2
    Site and Infrastructure Improvements .......................................................................3
    Costs to be Paid through the Brownfield Plan ...........................................................3

4.0 ENVIRONMENTAL CONDITIONS .............................................................................4
    Identification of Property as a "Facility" ....................................................................4

5.0 BROWNFIELD PLAN ELEMENTS

   A.   Description of Costs to be Paid for with Tax Increment
       Revenues and Summary of Eligible Activities ....................................................4
   B.   Estimate of Captured Taxable Value and Tax Increment ....................................7
   C.   Method of Financing and Description of Advances by the Municipality ...............7
   D.   Maximum Amount of Note or Bonded Indebtedness .........................................8
   E.   Duration of Brownfield Plan ...............................................................................8
   F.   Estimated Impact of Tax Increment Financing on Revenues of Taxing
       Jurisdictions ......................................................................................................8
   G.   Legal Description, Property Map, Statement of Quality Characteristics and
       Personal Property ..............................................................................................8
   H.   Estimates of Residents and Displacement of Families ........................................9
   I.   Plan for Relocation of Displaced Persons ...........................................................9
   J.   Provision for Relocation Costs ...........................................................................9
   K.   Strategy for Compliance with Michigan's Relocation Assistance Law ...............10
   L.   Description of Proposed Use of Local Site Remediation Revolving Fund ...........10
   M.   Other Material that the Authority or Governing Body Considers Pertinent ...........10

**EXHIBITS**
   A.   Legal Description of Eligible Property
   B.   Brownfield Eligible Cost Detail
   C.   Tax Capture Schedule

## 1.0   Introduction and Purpose

The City of Sturgis established the City of Sturgis Brownfield Redevelopment Authority (the "Authority") by resolution pursuant to the Brownfield Redevelopment Financing Act. (Public Act 381 of 1996, as amended, M.C.L. §125.2651 et seq., ("Act 381"). The resolution was filed with the Michigan Department of State, Office of the Great Seal.

The purpose of this plan, to be implemented by the City of Sturgis, is to satisfy the requirements for a Brownfield Plan as specified in Act 381.

The Authority proposes to implement this Brownfield Plan ("Plan") in an effort to promote economic development and redevelopment within the City of Sturgis

## 2.0   Property Information

### Property Identification

The proposed Kirsch Lofts, LLC Project (the "Project") is to be located at 308 North Prospect Street and 418 East Main Street (Tax Parcel #'s 052-200-024-00 & 052-250-028-00), City of Sturgis, St. Joseph County, Michigan (the "Subject Property"). The Subject Property is currently improved, with three (3) connected industrial buildings. The Subject Property is accessible from North Prospect Street to the east, East Hatch Street to the south, Main Street to the north, and also from 4th Street, which dead-ends into the west side of the Subject Property. Both the legal description of the Subject Property and a map showing the location of the parcels are attached as Exhibit A.

## 3.0   Proposed Redevelopment

### Site Description and Building Construction

This Project proposes the redevelopment of the Subject Property, including the renovation and rehabilitation of the unoccupied, functionally obsolete industrial buildings. The new use will be both residential and mixed retail/commercial use.



The Project will create new jobs and housing, will result in a long term increase in the City's tax base, and the redevelopment of this vacant un-aesthetically pleasing building. The initial anticipated private investment is approximately $6.5 million.

**Site and Infrastructure Improvements**

New infrastructure improvements will occur to the existing infrastructure, which will provide municipal water, sanitary sewer, and municipal storm water service to the new residential condominiums and mixed residential condos/commercial use on the Subject Property. All three (3) connected industrial buildings located on the Subject Property will utilize municipal water and sanitary sewer, exclusively. Municipal water and sanitary sewer will enter the Subject Property from North Prospect Street to the east. Natural gas utilities will be brought in from North Prospect Street to the east and distributed throughout the development. The developer intends to carry the installation of infrastructure throughout the Subject Property so as to service all three (3) connected industrial buildings.

**Costs to be paid through the Brownfield Plan**

The overall estimated investment for the Project will be approximately $6.5 million. Construction activities are anticipated to commence in the spring of 2009, with anticipated completion of Phase I in summer of 2010. Phases II and III will follow based on absorption and economic activities. This Plan has been created to facilitate the redevelopment of the Subject Property to allow the City of Sturgis Brownfield Redevelopment Authority to utilize Tax Increment Financing ("TIF") to reimburse the Developer for the Eligible Activities identified within this Plan, and to allow the Developer to apply for a Michigan Business Tax Credit ("MBT").

## 4.0    Environmental Conditions and Basis of Eligibility

### 4.1    Existing Environmental Conditions and Identification of Property as a "Facility"

Groundwater underlying the Subject Property contains concentrations of Trichloroethane and Tetrachloroethene exceeding applicable Part 201 Risk Based Criteria. (Additional Phase II investigation activities are currently being completed to determine the historical impact of the Kirsch Company manufacturing operations on the Subject Property. Any additional due care or response activity costs will be supplemented to this Plan Amendment.) Therefore, the Subject Property is an "Eligible Property" as defined by Act 381, because it has been determined to be a "facility" as defined by Part 201 of the NREPA as a result of the described contamination.

## 5.0    Brownfield Plan Elements

**A. A description of costs intended to be paid for with tax increment revenues (MCLA 125.2663(1)(a)) and a brief summary of the Eligible Activities that are proposed for each Eligible Property. (MCLA 125.2663(1)(b))**

Kirsch Lofts, LLC is requesting that the City of Sturgis Brownfield Redevelopment Authority capture local taxes, school operating taxes, and state education tax millage for eligible activities at the Subject Property generated by the project to reimburse the cost of certain "Eligible Activities" as provided in this Plan, totaling $1,823,250. plus interest. A detailed list of these costs is attached as Exhibit B.

"Eligible Activities" are defined in Act 381 as meaning one or more of the following: (i) baseline environmental assessment activities; (ii) due care activities; and (iii) additional response activities. In addition, in qualified local governmental units such as the City of Sturgis, the Act includes the following additional activities under the definition of Eligible Activities: (A) infrastructure improvements that directly benefit eligible property; (B) demolition of structures that is not response activity under Part 201 of



**Amendment to Brownfield Plan**        Page 5 of 14

308 North Prospect Street, Sturgis, Michigan

NREPA; (C) lead or asbestos abatement; and (D) site preparation that is not response activity under Part 201 of NREPA. Table 1 below presents estimated costs of MDEQ and MEGA Eligible Activities which qualify for reimbursement from TIF.



Case 1:15-cv-00597-RJJ   ECF No. 88-18,  PageID.2134   Filed 07/01/16   Page 56 of 207

| Table 1 –Eligible Activities | |
| --- | --- |
| Task | Cost Estimate |
| 1.  Phase I, Phase II, BEA activities | $   10,000 |
| 2.  Demolition, including Lead and Asbestos abatement | 1,500,000 |
| 3.  Due Care Compliance | 2,500 |
| 4.  Site Preparation | 25,000 |
| 5.  Public Infrastructure | 30,000 |
| 6.  Preparation and development of Brownfield Plan | 7,500 |
| 7.  MEGA and MDEQ work plan preparation | 10,000 |
| 8.  MEGA and MDEQ work plan review | 2,000 |
| 9. Interest | Amount unknown |
| 10. Contingency (15%) | 236,250 |
| TOTAL | $ 1,823,250 |

The Eligible Activities estimated in Table 1 above include the following, plus interest at 6%:

1.      Initial Phase II identification of contamination of the Subject Property and ESAs associated with filing a Baseline Environmental Assessment with the Michigan Department of Environmental Quality.

2.      The existing, functionally obsolete industrial building will need to be internally demolished, including abatement of lead-based paints and asbestos-containing materials, prior to complete renovation.



3.     Activities will be required to prevent exacerbation of existing contamination, and to prevent others from coming into contact with the existing contamination.

4.     Site preparation activities will involve various earthwork, including grading and movement of soils.

5.     Infrastructure activities include streetscape improvements consisting of sidewalks, curb cuts, landscaping, etc.

6., 7., 8.     Costs will be incurred to prepare and develop this Brownfield Plan and required work plans for this Project as well as MDEQ and MEGA work plan review.

9.     Financing costs will be incurred relating to the eligible activities and interest expense at a rate of 6% per annum is requested.

10.     A 15% contingency factor is included to accommodate unexpected conditions during the course of this project.

**B. An estimate of the captured taxable value and tax increment revenues for each year of the Plan from each parcel of Eligible Property and in the aggregate. (MCLA 125.2663(1)(c))**

An estimate of the captured taxable value and tax increment revenues by year for real property is attached as Exhibit C.

**C. The method by which the costs of the Plan will be financed, including a description of any advances made or anticipated to be made for the costs of the Plan from the municipality. (MCLA 125.2663(1)(d))**


EQUITY RESOURCE
ENVIRONMENTAL

A-5792 143rd Avenue • Suite A • Holland, MI 49423
Phone: 616-392-6010 • Fax: 616-392-6080 • Website: crenvironmental.com

The costs of the Plan will be financed by Kirsch Lofts, LLC through loan financing for the development. Eligible Activities costs will be reimbursed through tax increments generated from the Subject Property.

**D. The maximum amount of the note or bonded indebtedness to be incurred, if any. (MCLA 125.2663(1)(e))**

The Authority does not anticipate incurring new bond indebtedness for this project.

**E. The duration of the Brownfield Plan, which shall not exceed the lesser of (1) the period required to pay for the Eligible Activities from tax increment revenues plus the period of capture authorized for the local site remediation revolving fund or (2) 35 years. (MCLA 125.2663(1)(f))**

The Subject Property will be subject to this Plan to the extent that all Eligible Activities undertaken in this Plan are repaid, but in no event will the Plan exceed the maximum duration provided for in (MCLA 125.2663(1)(f)).

**F. An estimate of the impact of tax increment financing on the revenues of all taxing jurisdictions in which the Eligible Property is located. (MCLA 125.2663(1)(g)**

Tabular estimates of the incremental tax increases are attached as Exhibit C.

**G. A legal description of each parcel of Eligible Property to which the Plan applies, a map showing the locations and dimensions of each Eligible Property, a statement of the characteristics that qualify the property as Eligible Property and a statement of whether personal property is included as part of the Eligible Property. (MCLA 125.2663(1)(h))**

1.      Legal Description:  See attached Exhibit A.

2.      Location and Site maps:  See Exhibit A.



**EQUITY RESOURCE ENVIRONMENTAL**                A-5792 143rd Avenue • Suite A • Holland, MI 49423
Phone: 616-392-6010 • Fax: 616-392-6080 • Website: erenvironmental.com

KIRSCHLOFTS000801

3.     Characteristics of Subject Property: The "Eligible Property" was historically used for manufacturing, warehouse and storage for many years. The buildings consist of several interconnected structures, some constructed as early as 1922. The Subject Property is currently vacant/unoccupied.  As a result of groundwater contamination from an adjoining parcel, the Subject Property is an MDEQ Part 201 "facility" as that term is defined in Section 20101 of NREPA.

4.     Personal Property:  New personal property placed in service at the Subject Property is included as part of the Eligible Property.

**H.  An estimate of the number of persons residing on each Eligible Property to which the Plan applies, and the number of families and individuals to be displaced, if any.  (MCLA 125.2663(1)(i))**

There are no person currently residing on the Subject Property; therefore, no individuals or families will be displaced.

**I.  A plan for establishing priority for the relocation of persons displaced by implementation of the Plan, if applicable.  (MCLA 125.2663(1)(j))**

This section is not applicable to this Project, as there are no persons residing on the Subject Property.

**J.  Provision for the costs of relocating persons displaced by implementation of the Plan, and financial assistance and other reimbursement of expenses, if any. (MCLA 125.2663(1)(k))**



This section is not applicable to this Project, as there are no persons residing on the Subject Property.

### K.  A strategy for compliance with the Michigan Relocation Assistance Act, if applicable. (MCLA 125.2663(1)(l))

This section is not applicable to this Project, as there are no persons residing on the Subject Property.

### L.  A description of the proposed use of the local site remediation revolving fund. (MCLA 125.2663(1)(m))

The local site remediation revolving fund will be used for purposes authorized under the Act.

### M.  Other material that the authority or governing body considers pertinent. (MCLA 125.2663(1)(n))

The Project involves the renovation and redevelopment of a functionally obsolete and contaminated manufacturing facility to create a newly renovated facility for housing and mixed use retail/commercial. The Project will create new jobs, will increase the city's tax base, and restore a vacant, unoccupied former industrial site to a new, productive use.

## Michigan Business Tax Credit

It is the intention of the Michigan Legislature to encourage redevelopment of brownfields using the Michigan Business Tax Credit ("MBT Credit") permitted under Act 36, Public Acts of 2007, as amended (the "MBT Act"). The MBT Credit is based upon 12.5% to 20% of the "Eligible Investment" costs incurred at the Subject Property. "Eligible Investment" means demolition, construction, restoration, alteration, renovation,


EQUITY RESOURCE
ENVIRONMENTAL

A-5792 143rd Avenue • Suite A • Holland, MI 49423
Phone: 616-392-6010 • Fax: 616-392-6080 • Website: erenvironmental.com

FTS000803

308 North Prospect Street, Sturgis, Michigan

or improvement of buildings on Eligible Property, and the addition of machinery, equipment, and fixtures to the Subject Property. The Eligible Investment made by a qualified taxpayer after approval of this Brownfield Redevelopment Plan, but not earlier than 90 days prior to the date of the preapproval letter from the Michigan Economic Growth Authority, may be used to calculate the MBT Credit.

Kirsch Lofts, LLC intends to apply for an MBT Credit at the Eligible Property pursuant to the MBT Act.

308 North Prospect Street, Sturgis, Michigan

## EXHIBIT A

### Subject Property Description

**Parcel #052-200-024-00**

BLK 55 EXCEPT W 131.33 FT LOT 9 & THAT PORTION OF 4TH T STREET VACATED N OF S LN LOT 15 BLK 6 ALSO LOTS 11,14,15,16, BLK 6. DRAKES 2ND. CITY OF STURGIS. THIS PARCEL BEING LOCATED WEST OF N. PROSPECT STREET. 30.5 FT TH SELY 30 FT M/L TO PT ON W LN OF 4TH ST 12 FT S OF POB TH N ALG W LN OF ST 12 FT TO POB. BEING A TRIANG PAR OUT OF NE COR LOT 15. DRAKES 2ND ADD. CITY OF STURGIS.

**Parcel #052-250-028-00**

LOTS 29 & 30 & 31 GREEN LAWN ADD. CITY OF STURGIS.



308 North Prospect Street, Sturgis, Michigan

## EXHIBIT B

## COST ESTIMATE SUMMARY

| DESCRIPTION OF COSTS | ESTIMATED COST |
|---|---|
| Pre-Brownfield Plan Amendment Environmental Activities.........................................................................$ | 10,000 |
| Demolition Activities .................................................$ | 1,500,000 |
| Due Care Compliance.....  ..............................................$ | 2,500 |
| Site Infrastructure..............................................................$ | 25,000 |
| Site Preparation...................................................................$ | 30,000 |
| Preparation and Development of Brownfield Plan ...... ..................$ | 7,500 |
| MEGA Work Plan Preparation.......... ...................................$ | 10,000 |
| MEGA Work Plan Review..................................................$ | 2,000 |
| Interest...................... .........................................................$ | UNK |

| | |
|---|---|
| **SUB TOTAL:** | **$1,587,000** |
| Contingency (15%): | $ 236,250 |
| Finance Costs (6%) | $ UNK |
| **GRAND TOTAL FOR ELIGIBLE ACTIVITIES:** | **$1,823,250** |

Case 1:15-cv-00597-RJJ   ECF No. 88-18,  PageID.2142   Filed 07/01/16   Page 64 of 207

308 North Prospect Street, Sturgis, Michigan

## EXHIBIT C

## Tax Table


EQUITY RESOURCE
ENVIRONMENTAL

A-5792 143rd Avenue • Suite A • Holland, MI 49423
Phone: 616-392-6010 • Fax:  616-392-6080 • Website:  erenvironmental.com

MRSC/RROFTS000807

# 1540523

**Exhibit B**
**TIF Schedule**

KIRBY-HI LOFTS000808

**AD VALOREM TAX - Real Property (Land, Residential and Commercial)**

| Operating Mills[1] | New TV[2] | Increase in TV | County 7.0414 | City 10.0285 | Intermediate School 2.7823 | Comm. College, library, transport. 4.1710 | Total Local Capture 24.0232 | Cumulative Local Capture | State Education 6.0000 | School Operating 17.6301 | Total School Capture 23.6301 | Cumulative School Capture | Annual Tax Capture 47.6533 | Cumulative Tax Capture |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base TV: $104,800 | | | | | | | | | | | | | | |
| 2008 | $104,800 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2009 | $106,896 | $2,096 | $4 | $6 | $2 | $2 | $14 | $14 | $13 | $37 | $50 | $50 | $63 | $63 |
| 2010 | $109,034 | $4,234 | $8 | $11 | $3 | $5 | $27 | $41 | $25 | $75 | $100 | $150 | $127 | $190 |
| 2011 | $3,111,215 | $3,006,415 | $12 | $17 | $5 | $7 | $41 | $82 | $6,518 | $19,154 | $25,672 | $25,822 | $25,714 | $25,904 |
| 2012 | $3,173,439 | $3,068,639 | $16 | $23 | $6 | $10 | $56 | $138 | $6,681 | $19,574 | $26,235 | $52,057 | $26,291 | $52,195 |
| 2013 | $3,236,908 | $3,132,108 | $21 | $29 | $8 | $12 | $71 | $209 | $6,807 | $20,002 | $26,809 | $78,866 | $26,880 | $79,075 |
| 2014 | $3,301,646 | $3,196,846 | $25 | $36 | $10 | $15 | $85 | $294 | $6,956 | $20,439 | $27,395 | $106,261 | $27,480 | $106,555 |
| 2015 | $3,367,679 | $3,262,879 | $30 | $42 | $12 | $17 | $101 | $395 | $7,108 | $20,885 | $27,992 | $134,253 | $28,093 | $134,648 |
| 2016 | $3,435,032 | $3,330,232 | $9,363 | $13,335 | $13 | $20 | $22,732 | $23,127 | $7,262 | $21,339 | $28,602 | $162,855 | $51,334 | $185,982 |
| 2017 | $3,503,733 | $3,398,933 | $11,458 | $16,318 | $15 | $23 | $27,814 | $50,941 | $7,420 | $21,803 | $29,223 | $192,078 | $57,037 | $243,020 |
| 2018 | $3,573,808 | $3,469,008 | $13,632 | $19,415 | $17 | $26 | $33,090 | $84,031 | $7,581 | $22,276 | $29,857 | $221,936 | $62,947 | $305,967 |
| 2019 | $3,645,284 | $3,540,484 | $24,930 | $35,506 | $9,851 | $14,767 | $85,054 | $169,085 | $21,243 | $22,759 | $44,002 | $265,938 | $129,055 | $435,022 |
| 2020 | $3,718,189 | $3,613,389 | $25,443 | $36,237 | $10,054 | $15,071 | $86,805 | $255,890 | $21,680 | $23,251 | $44,931 | $310,869 | $131,736 | $566,758 |
| 2021 | $3,792,553 | $3,687,753 | $25,987 | $36,983 | $10,260 | $15,382 | $88,592 | $344,481 | $22,127 | $23,753 | $45,879 | $356,748 | $134,471 | $701,229 |
| 2022 | $3,868,404 | $3,763,604 | $26,501 | $37,743 | $10,471 | $15,698 | $90,414 | $434,895 | $22,582 | $24,265 | $46,846 | $403,594 | $137,260 | $838,489 |
| 2023 | $3,945,772 | $3,840,972 | $27,046 | $38,519 | $10,687 | $16,021 | $92,272 | $527,168 | $23,046 | $24,787 | $47,833 | $451,427 | $140,105 | $978,595 |
| 2024 | $4,024,688 | $3,919,888 | $27,601 | $39,311 | $10,906 | $16,350 | $94,168 | $621,336 | $23,519 | $25,320 | $48,839 | $500,266 | $143,007 | $1,121,602 |
| 2025 | $4,105,182 | $4,000,382 | $28,168 | $40,118 | $11,130 | $16,686 | $96,102 | $717,438 | $24,002 | $25,863 | $49,865 | $550,132 | $145,967 | $1,267,569 |
| 2026 | $4,187,285 | $4,082,485 | $28,746 | $40,941 | $11,359 | $17,028 | $98,074 | $815,512 | $24,495 | $26,417 | $50,912 | $601,044 | $148,987 | $1,416,556 |
| 2027 | $4,271,031 | $4,166,231 | $29,336 | $41,781 | $11,592 | $17,377 | $100,086 | $915,598 | $24,997 | $26,983 | $51,980 | $653,024 | $152,066 | $1,568,622 |
| 2028 | $4,356,452 | $4,251,652 | $29,938 | $42,638 | $11,829 | $17,734 | $102,138 | $1,017,737 | $25,510 | $27,559 | $53,069 | $706,093 | $155,207 | $1,723,829 |
| 2029 | $4,443,581 | $4,338,781 | $30,551 | $43,511 | $12,072 | $18,097 | $104,231 | $1,121,968 | $26,033 | $28,147 | $54,180 | $760,273 | $158,411 | $1,882,241 |
| 2030 | $4,532,452 | $4,427,652 | $31,177 | $44,403 | $12,319 | $18,468 | $106,366 | $1,228,334 | $26,566 | $28,747 | $55,313 | $815,586 | $161,679 | $2,043,920 |
| 2031 | $4,623,101 | $4,518,901 | $31,815 | $45,312 | $12,571 | $18,846 | $108,544 | $1,336,878 | $27,110 | $29,359 | $56,469 | $872,055 | $165,013 | $2,208,933 |
| 2032 | $4,715,563 | $4,610,763 | $32,466 | $46,239 | $12,829 | $19,231 | $110,765 | $1,447,644 | $27,665 | $29,983 | $57,648 | $929,702 | $168,413 | $2,377,346 |
| 2033 | $4,809,875 | $4,705,075 | $33,130 | $47,185 | $13,090 | $19,625 | $113,031 | $1,560,675 | $28,230 | $30,620 | $58,850 | $988,553 | $171,881 | $2,549,227 |
| 2034 | $4,906,072 | $4,800,272 | $33,808 | $48,150 | $13,359 | $20,026 | $115,342 | $1,676,017 | $28,808 | $31,269 | $60,077 | $1,048,630 | $175,419 | $2,724,646 |
| 2035 | $5,004,193 | $4,899,393 | $34,499 | $49,134 | $13,632 | $20,435 | $117,699 | $1,793,716 | $29,396 | $31,932 | $61,328 | $1,109,957 | $179,027 | $2,903,673 |
| 2036 | $5,104,277 | $4,999,477 | $35,203 | $50,137 | $13,910 | $20,853 | $120,103 | $1,913,819 | $29,997 | $32,607 | $62,604 | $1,172,561 | $182,707 | $3,086,381 |
| 2037 | $5,205,383 | $5,101,583 | $35,922 | $51,161 | $14,194 | $21,279 | $122,556 | $2,036,375 | $30,609 | $33,286 | $63,906 | $1,236,467 | $186,461 | $3,272,842 |

[1] The tax levies are assumed to stay the same.
[2] Taxable value is based on planned improvements in 2010 ($6 million) and is increased 2% per year for inflation.
Assumes that 64% is homestead residential and 36% commercial.
Assumes OPRA for 10 years on commercial portion and NEZ for 10 years on residential portion.

KIRSCHLOFTS000809

# Sturgis Project
## Reimbursement Schedule (with NEZ and OPRA)

| Year | Local Increment Captured | School Increment Captured | Annual Tax Increment Captured (1) | Cumulative Tax Increment Captured | Amount Due Developer (2) | Interest on Balance Due (6.0%) (3) | Payments to Developer From Local Tax Capture | Payments to Developer from School Tax Capture | Balance Due Developer (Principal) |
|---|---|---|---|---|---|---|---|---|---|
| 2008 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2009 | $14 | $50 | $63 | $63 | $0 | $0 | $0 | $0 | $0 |
| 2010 | $27 | $100 | $127 | $190 | $0 | $0 | $14 | $50 | $0 |
| 2011 | $41 | $25,672 | $25,714 | $25,904 | $1,823,250 | $109,395 | $27 | $100 | $1,932,582 |
| 2012 | $56 | $26,235 | $26,291 | $52,195 | $1,932,582 | $115,955 | $41 | $25,672 | $2,022,823 |
| 2013 | $71 | $26,809 | $26,880 | $79,075 | $2,022,823 | $121,369 | $56 | $26,235 | $2,117,902 |
| 2014 | $85 | $27,395 | $27,480 | $106,555 | $2,117,902 | $127,074 | $71 | $26,809 | $2,218,096 |
| 2015 | $101 | $27,992 | $28,093 | $134,648 | $2,218,096 | $133,086 | $85 | $27,395 | $2,323,701 |
| 2016 | $22,732 | $28,602 | $51,334 | $185,982 | $2,323,701 | $139,422 | $101 | $27,992 | $2,435,030 |
| 2017 | $27,814 | $29,223 | $57,037 | $243,020 | $2,435,030 | $146,102 | $22,732 | $28,602 | $2,529,798 |
| 2018 | $33,090 | $29,857 | $62,947 | $305,967 | $2,529,798 | $151,788 | $27,814 | $29,223 | $2,624,549 |
| 2019 | $85,054 | $44,002 | $129,055 | $435,022 | $2,624,549 | $157,473 | $33,090 | $29,857 | $2,719,075 |
| 2020 | $86,805 | $44,931 | $131,736 | $566,758 | $2,719,075 | $163,144 | $85,054 | $44,002 | $2,753,164 |
| 2021 | $88,592 | $45,879 | $134,471 | $701,229 | $2,753,164 | $165,190 | $86,805 | $44,931 | $2,786,617 |
| 2022 | $90,414 | $46,846 | $137,260 | $838,489 | $2,786,617 | $167,197 | $88,592 | $45,879 | $2,819,343 |
| 2023 | $92,272 | $47,833 | $140,105 | $978,595 | $2,819,343 | $169,161 | $90,414 | $46,846 | $2,851,244 |
| 2024 | $94,168 | $48,839 | $143,007 | $1,121,602 | $2,851,244 | $171,075 | $92,272 | $47,833 | $2,882,213 |
| 2025 | $96,102 | $49,865 | $145,987 | $1,267,569 | $2,882,213 | $172,933 | $94,168 | $48,839 | $2,912,139 |
| 2026 | $98,074 | $50,912 | $148,987 | $1,416,556 | $2,912,139 | $174,728 | $96,102 | $49,865 | $2,940,900 |
| 2027 | $100,086 | $51,980 | $152,066 | $1,568,622 | $2,940,900 | $176,454 | $98,074 | $50,912 | $2,968,367 |
| 2028 | $102,138 | $53,069 | $155,207 | $1,723,829 | $2,968,367 | $178,102 | $100,086 | $51,980 | $2,994,403 |
| 2029 | $104,231 | $54,180 | $158,411 | $1,882,241 | $2,994,403 | $179,664 | $102,138 | $53,069 | $3,018,860 |
| 2030 | $106,366 | $55,313 | $161,679 | $2,043,920 | $3,018,860 | $181,132 | $104,231 | $54,180 | $3,041,580 |
| 2031 | $108,544 | $56,469 | $165,013 | $2,208,933 | $3,041,580 | $182,495 | $106,366 | $55,313 | $3,062,395 |
| 2032 | $110,765 | $57,648 | $168,413 | $2,377,346 | $3,062,385 | $183,744 | $108,544 | $56,469 | $3,081,126 |
| 2033 | $113,031 | $58,850 | $171,881 | $2,549,227 | $3,081,126 | $184,868 | $110,765 | $57,648 | $3,097,581 |
| 2034 | $115,342 | $60,077 | $175,419 | $2,724,646 | $3,097,581 | $185,855 | $113,031 | $58,850 | $3,111,554 |
| 2035 | $117,699 | $61,328 | $179,027 | $2,903,673 | $3,111,554 | $186,693 | $115,342 | $60,077 | $3,122,829 |
| 2036 | $120,103 | $62,604 | $182,707 | $3,086,381 | $3,122,829 | $187,370 | $117,699 | $61,328 | $3,131,171 |
| 2037 | $122,556 | $63,906 | $186,461 | $3,272,842 | $3,131,171 | $187,870 | $120,103 | $62,604 | $3,136,334 |
| | | | | | | $4,603,199 | $2,036,348 | $1,236,367 | |

(1) Assumes NEZ for 10 years on residential portion, OPRA for 10 years on commercial portion.

(2) Includes anticipated expenditure plus contingency as stated in Brownfield Plan.

(3) Interest on balance due is calculated on an annual basis.

# 1540523

# EXHIBIT E

*Final*

## BROWNFIELD REIMBURSEMENT AGREEMENT

THIS BROWNFIELD REIMBURSEMENT AGREEMENT (the "Agreement"), is made on September 24, 2008, by and between the **CITY OF STURGIS BROWNFIELD REDEVELOPMENT AUTHORITY**, an authority established pursuant to Act 381 of the Public Acts of 1996, as amended ("Act 381"), with offices at 130 N. Nottawa, Sturgis, Michigan 49091 (the "Authority"); and **KIRSCH LOFTS LLC**, a Michigan limited liability company, whose address is C/O Auto Sports Unlimited, Inc., 200 N. Franklin, Suite 100, Zeeland, Michigan 49464 (the "Developer").

### RECITALS

A.      In accordance with Act 381, the Authority has adopted a Brownfield Plan that the City Commission for the City of Sturgis has approved (the "Plan").

B.      The Developer owns real property located at 308 North Prospect Street and 418 East Main Street (the "Property"), which is legally described on the attached Exhibit A.   The Property is included in the Plan as an Eligible Property because it is a Facility due to the presence of certain hazardous substances as described in the Plan.

C.      The Developer plans to redevelop the Property by renovating and rehabilitating existing buildings into a mixed-use development containing residential, retail, and commercial space (the "Project").  Act 381 permits the use of Tax Increment Revenues to reimburse a property owner or developer for the costs of Eligible Activities on Eligible Property.  Act 381 also permits the use of Tax Increment Revenues to reimburse the MDEQ and MEGA for the actual costs to review a Work Plan.

D.      In constructing the Project, the Developer will incur costs in connection with Eligible Activities as identified in the Plan—which include Baseline Environmental Assessment Activities, Due Care Activities, Eligible Activities permitted by Section (m)(iv) of Act 381, and developing and preparing the Plan and the Work Plan—all of which will require the services of various contractors, engineers, environmental consultants, attorneys and other professionals (the "Eligible Costs").  The Eligible Costs, including contingencies, are estimated to be $1,821,250. In addition, the MDEQ and MEGA will incur costs to review the Work Plan (the "Work Plan Costs").  The Work Plan Costs will be $2,000.

E.      In accordance with Act 381 and the Plan, the parties desire to use the Tax Increment Revenues generated from the Local Taxes and Taxes Levied For School Operating Purposes imposed on the Property to reimburse the Developer for the Eligible Costs (including interest) and the MDEQ and MEGA for the Work Plan Costs.

F.      The parties are entering into this Agreement to establish the procedure for using Tax Increment Revenues to reimburse Eligible Costs (including interest) and the Work Plan Costs.

## AGREEMENT

Accordingly, the parties agree as follows:

1.      <u>The Plan</u>

The Plan is attached as Exhibit B and incorporated into this Agreement.

2.      <u>Term of Agreement</u>

The Authority shall capture Tax Increment Revenues under the Plan from real and personal property taxes on the Property until the earlier of:  (i) full reimbursement of the Work Plan Costs and the Developer's Eligible Costs (including interest) or (ii) 30 years after the date

2

the Authority begins capturing Tax Increment Revenues under the Plan. If this Agreement ends before the full reimbursement of all Work Plan Costs and the Developer's Eligible Costs (including interest), the last tax payment by the Authority shall be the summer and winter taxes distributed during the final year of this Agreement.

3.    Eligible Activities

The Developer will diligently pursue completion of the Eligible Activities set forth in the Plan. The parties recognize that before the date of this Agreement, Developer may have initiated Eligible Activities for which it may submit a Request for Cost Reimbursement for Eligible Activities according to paragraph 5 below. The Authority shall reimburse the Developer for Eligible Costs that were incurred before this Agreement if permitted under Act 381.

4.    Reimbursement Source

During the term of this Agreement, and except as set forth in paragraph 5 below, the Authority shall reimburse the Developer for its Eligible Costs (including interest) from the Tax Increment Revenues generated from Local Taxes and Taxes Levied For School Operating Purposes imposed on the Property and any personal property located on the Property.

5.    Reimbursement Process

(a)    On a quarterly basis, the Developer shall submit to the Authority a Request for Cost Reimbursement for Eligible Activities paid by the Developer during the prior period in the form attached as Exhibit C (the "Petition"). The Developer will identify on the Petition whether the Eligible Activities are: (1) Baseline Environmental Assessment Activities, (2) Due Care Activities, (3) Eligible Activities permitted by Section 2(m)(iv) of Act 381, or (4) developing and preparing the Plan and Work Plan. The Developer must also describe on the Petition each individual activity claimed as an Eligible Activity and the associated costs of each individual

3

activity.  The Developer will include with the Petition documentation sufficient to determine whether the costs incurred were for Eligible Activities, including proof of payment and detailed invoices.  A duly authorized representative of the Developer shall sign the Petition and swear to its accuracy in the presence of a notary.

(b)      The Authority shall review each Petition within 30 days after receiving it.  The Developer shall cooperate with the Authority's review by providing information and documentation to supplement the Petition as deemed reasonable and necessary by the Authority. The Authority shall identify in writing to the Developer any costs deemed ineligible for reimbursement and the basis for the determination.  The Developer then has forty-five (45) days to provide supplemental information or documents to the Authority demonstrating that the costs are eligible for reimbursement.

(c)      Twice a year, after the summer and winter taxes are captured and collected on the Property, the Authority shall pay all Tax Increment Revenues to the Developer as reimbursement for approved Eligible Costs according to the Plan and this Agreement.

(d)      Interest at the rate identified in the Plan shall accrue on the balance of the Developer's unreimbursed Eligible Costs computed annually.  Interest shall begin to accrue on the date that the Developer incurs the Eligible Costs.

(e)      If there are insufficient funds available from Tax Increment Revenues captured under subparagraph (c) at any given time to pay all the Developer's unreimbursed Eligible Costs, the Authority is not required to reimburse the Developer from any other source.  The Authority shall, however, make additional reimbursement payments toward the Developer's remaining unreimbursed Eligible Costs according to this Agreement as Tax Increment Revenues become available under subparagraph (c).

4

(f)     The Authority shall reimburse the Developer for Eligible Costs under this section as follows:

Checks payable to:              Kirsch Lofts LLC

Delivered to the following address:   C/O Auto Sports Unlimited, Inc.
                                      200 N. Franklin
                                      Suite 100
                                      Zeeland, Michigan 49464

                                      By first class mail.

6.   Legislative Authorization

This Agreement is governed by and subject to the restrictions set forth in Act 381. If there is legislation enacted in the future that alters or affects the amount of Tax Increment Revenues subject to capture, Eligible Properties, or Eligible Activities, then the Developer's rights and the Authority's obligations under this Agreement may be modified accordingly by agreement of the parties.

7.   Plan Modification

The parties may modify the Plan and this Agreement by mutual agreement to the extent allowed under Act 381.

8.   Notices

All notices shall be given by registered or certified mail addressed to the parties at their respective addresses as shown above. Any party may change the address by written notice sent by registered or certified mail to the other party.

9.   Assignment

The Developer may assign its interests under this Agreement upon at least thirty (30) days' prior written notice to the Authority.

10.     <u>Entire Agreement</u>

      This Agreement supersedes all agreements previously made between the parties relating to the subject matter.  There are no other understandings or agreements between them.

11.     <u>Non-waiver</u>

      No delay or failure by any party to exercise any right under this Agreement, and no partial or single exercise of that right, constitutes a waiver of that or any other right, unless otherwise expressly provided herein.

12.     <u>Headings</u> .

      Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

13.     <u>Governing Law</u>

      This Agreement shall be construed in accordance with and governed by the laws of the State of Michigan.

14.     <u>Counterparts</u>

      This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

15.     <u>Binding Effect</u>

      The provisions of this Agreement shall be binding upon and inure to the benefit of all of the parties and their respective heirs, legal representatives, successors, and assigns.

16.     <u>Definitions</u>

      (a)     "Baseline Environmental Assessment Activities" is defined by Section 2(d) of Act 381.

      (b)     "Brownfield Plan" is defined by Section 2(g) of Act 381.

6

(c)     "Due Care Activities" is defined by Section 2(k) of Act 381.

(d)     "Eligible Activities" is defined by Section 2(m) of Act 381.

(e)     "Eligible Property or Property" is defined by Section 2(n) of Act 381.

(f)     "Facility" is defined by Section 2(p) of Act 381.

(g)     "Local Taxes" is defined by Section 2(w) of Act 381.

(h)     "MDEQ" is defined as the Michigan Department of Environmental Quality.

(i)     "MEGA" is defined as the Michigan Economic Growth Authority or its designee.

(j)     "Tax Increment Revenues" is defined by Section 2(ee) of Act 381.

(k)     "Taxes Levied For School Operating Purposes" is defined by Section 2(gg) of Act
381.

(l)     "Work Plan" is defined by Section 2(hh) of Act 381.


[signature page to follow]

7

The parties have executed this Agreement on the date set forth above.

CITY OF STURGIS BROWNFIELD
REDEVELOPMENT AUTHORITY

By _____

Title _____


KIRSCH LOFTS LLC

By _____

Title _____

1578118-1

8

**Exhibit A**

Property Description

Property Address:        308 N. Prospect
                         Sturgis, Michigan

Tax Parcel Nos.:         052-200-024-00

Legal Description:

BLK 55 EXCEPT W 131.33 FT LOT 9 & THAT PORTION OF 4TH T STREET VACATED N
OF S LN LOT 15 BLK 6 ALSO LOTS 11, 14, 15, 16, BLK 6, DRAKES 2ND. CITY OF
STURGIS, THIS PARCEL BEING LOCATED WEST OF N. PROSPECT STREET, 30.5 FT
TH SELY 30 FT M/L TO PT ON W LN OF 4TH ST 12 FT S OF POB TH N ALG W LN OF
ST 12 FT TO POB, BEING A TRIANG PAR OUT OF NE COR LOT 15, DRAKES 2ND ADD.
CITY OF STURGIS.


Property Address:        415 E Main Street
                         Sturgis, Michigan

Tax Parcel Nos.:         052-250-028-00

Legal Description:

LOTS 29 & 30 & 31 GREEN LAWN ADD. CITY OF STURGIS.

**Exhibit C**

Brownfield Request for Cost Reimbursement
For Eligible Activities

Date: _____

Listed below are total costs expended for each Eligible Activity category for the expenses being submitted with this request. Attached is evidence of each cost item for each category including proof of payment and detailed invoices.

| | Eligible Activity Area | Eligible Cost |
|---|---|---|
| 1. | Phase I/Phase II/BEA | |
| 2. | Due care compliance | |
| 3. | Demolition, including lead and asbestos abatement | |
| 4. | Public infrastructure activities | |
| 5. | Brownfield plan/work plan preparation and agency review | |
| | Total Cost Reimbursement Request | |

I certify that the information submitted on and with this Request for Cost Reimbursement is accurate and is an eligible cost described in the amendment to the Brownfield Plan for this project approved by the City Commission of the City of Sturgis.

**Developer:** _____

**Signature:** _____

**Title:** _____

**Address:** _____

_____

_____

# EXHIBIT F



JAN L. BARGER, CPL, ESA
SENIOR PARALEGAL
616.752.2221
FAX 616.222.2221

jbarger@wnj.com

September 12, 2008

**VIA OVERNIGHT MAIL**

Mr. Peter Anastor
Michigan Economic Growth Authority
Michigan Economic Development Corporation
Brownfield Redevelopment
300 North Washington Square
Lansing, Michigan  48913

Re:    **MBT Credit Application**
       **Kirsch Lofts LLC**
       **308 N. Prospect, 418 E. Main**
       **Sturgis, Michigan**

Dear Peter:

       Enclosed for your review and consideration is an original and one copy of the Part I Brownfield Redevelopment MBT Credit Project Application for the Kirsch Lofts LLC project in Sturgis. The following documents are enclosed in support of this application:

1.      Phase II environmental report;

2.      Site maps;

3.      Site photographs; and

4.      Project proforma.

       If you have any questions or need additional information, please feel free to contact me.

Very truly yours,

Jan L. Barger

Enclosures
c    Mr. Scott Bosgraaf  w/enc.
     Mr. John Hayes w/o enc.

1583188



WARNER NORCROSS & JUDD LLP
ATTORNEYS AT LAW
900 FIFTH THIRD CENTER • 111 LYON STREET, N.W.
GRAND RAPIDS, MICHIGAN 49503-2487 • WWW.WNJ.COM

KIRSCHLOFTS000810

# Michigan Economic Growth Authority (MEGA)
## Michigan Economic Development Corporation
## Brownfield Redevelopment MBT Credit Application – PART I

**This application is in two parts:**

- To begin the application process, <u>Part I</u> should be submitted to MSHDA and MEDC staff for review. This review will determine if state-level brownfield incentives will be supported for the project. Those projects that are authorized to proceed to full application will receive a Brownfield Application Invitation Letter and Part II of the Application.
- If a Brownfield Application Invitation Letter is issued for the project, the applicant should proceed with the requirements for an administratively complete application.
- **IMPORTANT:** To be eligible for the credit any work or investment must begin after the approval date of the brownfield plan but in any event **NOT** earlier than 90 days prior to the date of the preapproval letter from the MEGA or MEGA Chairperson.

## REQUIREMENTS FOR PROJECT REVIEW & CONSIDERATION – APPLICATION PART I

- Part I of the Application
- Demonstration of Property Eligibility as follows:
  - ☐ Contaminated Facility: Phase I, II, and BEA for the subject property. Phase II BEA will be required with Part II of the Application.
  - ☐ Functionally Obsolete: Must be located in a Qualified Local Governmental Unit, or if applying for a credit of $200,000 or less, may be located within the boundaries of a Downtown Development Authority. A statement from a Level III or IV assessor attesting to the functionally obsolete status per 125.2652(r) must be attached. The affidavit should include information that supports the functionally obsolete determination. Highest and best use is not a deciding factor when determining functional obsolescence.
  - ☐ Blighted: Must be located in a Qualified Local Governmental Unit, or if applying for a credit of $200,000 or less, may be located within the boundaries of a Downtown Development Authority. A statement explaining how the property meets the standard for blighted property per 125.2652(e) must be attached.
- Pictures of the Site and detailed maps of the project showing parcel boundaries, project boundaries, existing and proposed building locations, and brownfield boundaries.
- If qualifying on the basis of location within a Downtown Development Authority (DDA), a map showing the boundaries of the DDA.

## REQUIREMENTS FOR INVITED PROJECTS – APPLICATION PART I & PART II

Applications **MUST** be administratively complete before they will be considered for approval. An original and <u>one</u> copy of the following items must be included:

- Part I and Part II of the Application, fully completed, with the seal of the municipal clerk affixed.
- Proof of Ownership (Recorded Deed), Lease (Executed by all parties), or Purchase or Lease Agreement (Executed by all parties).
- Approved Brownfield Plan designating the eligible property.
- Resolution approving the Brownfield Plan.
- Map identifying any other eligible property named in a Brownfield Plan in the city, village, or township.
- Itemized Lists of Eligible Investments, by Category.
- 3 years audited financial statements for each qualified taxpayer listed. If a qualified taxpayer cannot provide three years of financial statements, the following items must be attached:
  - ☐ An explanation of why financial statements are not available.
  - ☐ Alternate information describing the financial means and capacity of each qualified taxpayer or of affiliated entities that will assume financial responsibility for the items detailed in the Eligible Investment section.
- A schedule identifying the sources and uses of funds necessary to complete the project, including return on investment (ROI).
- Projection of operating expenses and income for the project for a sufficient number of years to demonstrate the project's economic viability. Provide any other information needed to support a conclusion that the project is economically sound.
- The applicable non-refundable application fee.

**FEES** - A non-refundable application fee is required with Part II of the application.

**For Credits based on Eligible Investment of $2 million or less "Mini" {MCL 208.1437(2)}** – A non-refundable application fee of $2,500 shall be submitted with the Application prior to consideration of an award by the MEGA chairperson. A check payable to the **Michigan Strategic Fund** must accompany this completed application if the application is to be considered administratively complete. No Administrative Fee is required for credits with Eligible Investment of $2 million or less.

**For Credits based on Eligible Investment over $2 million but $10 million or less "Small" {MCL 208.1437(3)}** - A non-refundable application fee of $5,000 shall be submitted with the Application prior to consideration of an award by the MEGA chairperson. A check payable to the **Michigan Strategic Fund** must accompany this completed application if the application is to be considered administratively complete. Prior to the issuance of a Certificate of Completion or a Component Certificate, an Administrative Fee of 1.4 percent of the amount of the pre-approval credit amount is due. The application fee will be applied to this fee, and will reduce the amount due. All remittances must be payable to the **Michigan Strategic Fund**.

**For Credits based on Eligible Investment greater than $10 million "Large" {MCL 208.1437(4)}** - A non-refundable application fee of $10,000 shall be submitted with the Application prior to consideration of an award by the MEGA. A check payable to the **Michigan Strategic Fund** must accompany this completed application if the application is to be considered administratively complete. An Administrative Fee of 7/10 of 1 percent (0.007) of the amount of the pre-approval credit amount, up to $100,000, also applies. One half of the Administrative Fee must be paid prior to the issuance of the pre-approval letter. The balance is due one year after the date of the pre-approval letter. Remittances must be payable to the **Michigan Strategic Fund**.

## APPLICATION SUBMISSION

Submit the Part I Application and required exhibits and attachments to:    Michigan Economic Growth Authority
Michigan Economic Development Corporation
Brownfield Redevelopment
300 North Washington Square
Lansing, MI  48913

MBT Part I.doc

KIRSCHLOFTS000811

Revised 4/23/2008

# Michigan Economic Growth Authority (MEGA)
## Michigan Economic Development Corporation
## Brownfield Redevelopment MBT Credit Application – PART I

| Project Name/Working Title | Eligible Property Address, City, Village, or Township, County |
|---|---|
| **Kirsch Lofts** | 308 N. Prospect Street and 418 E. Main Street |
| *(this name should be used consistently in all project correspondence, including TIF related requests)* | City of Sturgis, St. Joseph County |

## QUALIFIED TAXPAYER INFORMATION

### Qualified Taxpayer #1

| 1. Qualified Taxpayer Legal Name (business entity to receive tax credit) | 2. Employer Tax Identification Number (EIN) |
|---|---|
| Kirsch Lofts LLC | 26-2865985 |

| DBA/Trade Name (where applicable) | 3. Organization Type (check one) |
|---|---|

| Address (Street/P.O. Box/City, State and Zip Code) | |
|---|---|
| c/o Auto Sports Unlimited<br>200 N. Franklin<br>Suite 100<br>Zeeland, Michigan 49464 | ☐ Individual<br>☒ Limited Liability Company or Corporation<br>☐ Professional Corporation<br>☐ S Corporation<br>☐ Other Corporation<br>☐ Partnership/LLC Partnership<br>☐ Fiduciary |

4. Do you own or lease the eligible property? If "Yes", check the selection that applies. If you do not own or lease the property, you are not a qualified taxpayer and are not eligible for this credit. Documentation verifying ownership or lessee status must be attached when filing Part II.

☐ Own  ☐ Lease  ☒ Executed Agreement to Purchase or Lease

5. Has the Michigan Department of Environmental Quality ever sued or issued a unilateral order to you pursuant to Article 201 of the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.201.01 to 324.201.42 to compel response activity on or to the eligible property, or expended any state funds for response activity on or to the eligible property and demanded reimbursement for those expenditures from you?

☒ No  ☐ Yes  If "Yes", you are not a qualified taxpayer and are not eligible for this credit.

### Qualified Taxpayer #2

| 1. Qualified Taxpayer Legal Name (business entity to receive tax credit) | 2. Employer Tax Identification Number (EIN) |
|---|---|

| DBA/Trade Name (where applicable) | 3. Organization Type (check one) |
|---|---|

| Address (Street/P.O. Box/City, State and Zip Code) | |
|---|---|
| | ☐ Individual<br>☐ Limited Liability Company or Corporation<br>☐ Professional Corporation<br>☐ S Corporation<br>☐ Other Corporation<br>☐ Partnership/LLC Partnership<br>☐ Fiduciary |

4. Do you own or lease the eligible property? If "Yes", check the selection that applies. If you do not own or lease the property, you are not a qualified taxpayer and are not eligible for this credit. Documentation verifying ownership or lessee status must be attached when filing Part II.

☐ Own  ☐ Lease  ☐ Executed Agreement to Purchase or Lease

5. Has the Michigan Department of Environmental Quality ever sued or issued a unilateral order to you pursuant to Article 201 of the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.201.01 to 324.201.42 to compel response activity on or to the eligible property, or expended any state funds for response activity on or to the eligible property and demanded reimbursement for those expenditures from you?

☐ No  ☐ Yes  If "Yes", you are not a qualified taxpayer and are not eligible for this credit.

### Qualified Taxpayer #3

| 1. Qualified Taxpayer Legal Name (business entity to receive tax credit) | 2. Employer Tax Identification Number (EIN) |
|---|---|

| DBA/Trade Name (where applicable) | 3. Organization Type (check one) |
|---|---|

| Address (Street/P.O. Box/City, State and Zip Code) | |
|---|---|
| | ☐ Individual<br>☐ Limited Liability Company or Corporation<br>☐ Professional Corporation<br>☐ S Corporation<br>☐ Other Corporation<br>☐ Partnership/LLC Partnership<br>☐ Fiduciary |

4. Do you own or lease the eligible property? If "Yes", check the selection that applies. If you do not own or lease the property, you are not a qualified taxpayer and are not eligible for this credit. Documentation verifying ownership or lessee status must be attached when filing Part II.

☐ Own  ☐ Lease  ☐ Executed Agreement to Purchase or Lease

5. Has the Michigan Department of Environmental Quality ever sued or issued a unilateral order to you pursuant to Article 201 of the Natural Resources and Environmental Protection Act, 1994 PA 451, MCL 324.201.01 to 324.201.42 to compel response activity on or to the eligible property, or expended any state funds for response activity on or to the eligible property and demanded reimbursement for those expenditures from you?

☐ No  ☐ Yes  If "Yes", you are not a qualified taxpayer and are not eligible for this credit.

## Michigan Economic Growth Authority (MEGA)
### Michigan Economic Development Corporation
### Brownfield Redevelopment MBT Credit Application – PART I

**GENERAL PROJECT INFORMATION & DESCRIPTION**

**Project Contacts** - The Qualified Taxpayer authorizes MEGA staff to discuss the specifics of this project with these contacts.
Contacts must include one company contact and one local brownfield redevelopment authority contact.

| Name & Title | Address | Telephone & Fax | E Mail Address |
|---|---|---|---|
| Scott Bosgraaf, Member | 200 N. Franklin, Suite 100<br>Zeeland, Michigan | 616-748-5701<br>616-748-5702 | ScottB@asumi.org |
| John V. Byl, Attorney | Warner Norcross & Judd LLP<br>900 Fifth Third Center<br>111 Lyon Street NW<br>Grand Rapids, MI 49503 | 616-752-2149<br>616-222-2149 | JByl@wnj.com |
| John Hayes, Director | City of Sturgis<br>Economic Development<br>130 N. Nottawa<br>Sturgis, MI 49091 | 269-659-7233<br>269-659-7295 | JHaynes@ci.sturgis.mi.us |
| | | | |

**Applicant Information** - Describe the type of business, principal product or service, and give a brief history of the applicant(s) and parent corporate holding company, if any.

The applicant is a newly formed entity created for this project.  Its members are experienced builders who have completed several similar successful projects in Michigan.

**Provide a descriptive summary of the project, including the following information:**
- For a manufacturing project, a description of the product or service to be provided
- For retail, commercial, residential or mixed use projects, a description of the purpose or use and size of the development.  If mixed use, include the percentage of the mixed uses.
- The location of the proposed project (city, village, or township AND county)
- Whether the operation or development will be new, renovated, or an expansion of an existing operation or development
- The total number of permanent full-time jobs to be added as a result of the project (excluding construction and other indirect jobs)
- The average hourly wage of the new permanent full-time jobs at the project
- The total capital investment anticipated
- The total eligible investment anticipated

The project will completely renovate and restore the vacant, functionally obsolete three story building located at 308 N. Prospect and 418 E. Main, City of Sturgis, St. Joseph County, Michigan into mixed use residential and retail/commercial.  The project will include the internal demolition of the building, including lead and asbestos removal, and phased renovation.  The first phase is anticipated to be approximately 30,000 square feet of residential space (24-32 condominium units).  Associated parking will also be provided.  The total eligible investment for the first phase is expected to be approximately $3.9 million.

The second phase of the project will be the build out of an additional 30,000 square feet of commercial space, possibly some additional residential space and associated parking.  The eligible investment for the second phase is expected to be approximately $1.8 million.

The third phase will be the build out of the balance of the residential space (approximately 11-24 condominium units) and the associated parking.  The eligible investment for the third phase is expected to be approximately $2.75 million.

In addition to the construction jobs, the project is expected to ultimately create approximately 80 to 100 new full time jobs at an average hourly rate of $18.  The total capital investment is expected to be approximately $8.6 million.  The total eligible investment is expected to be approximately $8.45 million.

## Michigan Economic Growth Authority (MEGA)
### Michigan Economic Development Corporation
### Brownfield Redevelopment MBT Credit Application – PART I

**PROPERTY ELIGIBILITY**

Contamination – To the extent known, estimate the level and extent of contamination that will be alleviated by the Qualified Taxpayer's eligible activities. How much will due care and/or remediation costs associated with the project cost? Will a responsible party directly or indirectly benefit from this project? Will there be financial assistance for these activities? Are you also applying for a Brownfield TIF or other assistance? Include any information that is pertinent to environmental activities.

Both the soil and groundwater beneath the property are contaminated with trichloroethene and/or tetrachloroethane in excess of generic residental Part 201 criteria as a result of a nearby Superfund site known as the Sturgis Municipal Wells. Therefore, BEA and dure care activities will be required to identify the existing contamination and to prevent exposure to utility works, residents and users of the property. At this time, BEA and due care activities are estimated to be approximately $10,000. Brownfield TIF is being requested to reimburse these costs. No responsible party will directly or indirectly benefit from the project.

**Reuse or Redevelopment of Functionally Obsolete or Blighted Property**

| Will the project result in the reuse of vacant buildings or redevelopment of functionally obsolete or blighted property? | ☐ No | ☒ | Yes, explain:<br>1. What makes the property blighted or functionally obsolete<br>2. How and to what extent the project will alleviate these conditions. |
|---|---|---|---|

The project will reuse buildings constructed in the 1920's that are no longer suitable for their originally intended use. The buildings will be completely renovated so as to be suitable for their new intended use.

**PROJECT DETAILS**

| Date the Eligible Activity on the Eligible Property Began or the Estimated Date it Will Begin Pursuant to the Brownfield Plan | Estimated Date Planned Eligible Investment Will Begin on Project | Estimated Date of Completion of the Project (as described in the Project Description) |
|---|---|---|
| 10/08 | 1/09 | 12/15 |

| | | | | | |
|---|---|---|---|---|---|
| Manufacturing | Jobs Created | | Jobs Retained | | Average Hourly Wage | |
| Commercial/Retail | Jobs Created | 80-100 | Square Footage | 30,000 | Average Hourly Wage | $18/hour |
| Housing | Type of Units | Condos | Number of Units | 35-56 | Rental or Purchase Price | $775/mo to rent or $125,000 to purchase |
| Other (explain) | | | | | |

Document the basis of your employment estimates, and explain the temporary or permanent nature of jobs created.

Employee estimates are based on similar projects constructed by the developer. The jobs are expected to be permanent, full time positions.

| Will any of these jobs be relocated from another location? | ☒ No | ☐ Yes – Enter the address of the other location(s) affected |
|---|---|---|

| Will an unknown lessee create any of these jobs? | ☐ No | ☒ Yes |
|---|---|---|
| Is the eligible property located in an area of high unemployment? | ☐ No | ☒ Yes - Describe the extent of unemployment |

Nearly all of Michigan is currently an area of high unemployment and the Sturgis area is no exception. As of July 2008 Michigan's jobless rate was 9.1%. The jobless rate for the County of St. Joseph was 11.8%.

Other Development Plans - If the project is part of a larger development (e.g., the investment has already begun or will be completed in stages), provide a description of the larger development. Include the following information in your description of the larger development:
- The stage in which the eligible investment identified in this application will occur
- Whether future development will depend on or benefit from the eligible investment identified in this application. If future development is dependent, describe how and to what extent.

## Michigan Economic Growth Authority (MEGA)
### Michigan Economic Development Corporation
### Brownfield Redevelopment MBT Credit Application – PART I

| | | |
|---|---|---|
| **Approved Brownfield Plan** – Is the project area part of an approved brownfield plan? | ☐ Yes | ☒ **No** – Local Governmental Municipality **MUST** approve the Brownfield Plan before submission of Part II<br><br>If No, what date is the plan expected to be approved? <u>Sept. 24, 2008</u> |
| **Designated Zone** – Is the property located in an enterprise zone, renaissance zone, NEZ, federally designated empowerment zone, rural enterprise or enterprise community? | ☐ No | ☒ Yes - Which type of zone? |
| The project is expected to be in a NEZ. | | |

| | | |
|---|---|---|
| **Other Michigan Property** - Are you moving or will you be moving from another location in this state within the next 5 years as a result of the eligible investment? | ☒ No | ☐ Yes – Enter the address of the property from which you are moving |
| | | |

| | | |
|---|---|---|
| If moving from another Michigan property, has a new owner or occupant of that property been identified? | ☐ No – Why will your former location not become blighted or functionally obsolete? Do you have clean-up responsibility? | ☐ Yes – Identify the new owner or occupant |
| | | |

| | | |
|---|---|---|
| Was another site also considered for the project? | ☒ No – Why was this site selected? | ☐ Yes – Describe the alternate site(s) and the incentives for those alternatives. |
| The project was selected for its availability in an area needing rehabilitation, additional residential and commercial/retail space. | | |

| |
|---|
| **Public Benefit** - Describe the overall benefit to the public that will result from completion of this project. |
| The project will preserve and reuse an existing vacant, functionally obsolete building near downtown Sturgis, will provide residential units and commercial/retail space and will reuse a contaminated site.  It will create new jobs and will provide an increase to the City's tax base. |

| |
|---|
| **Other Factors** – The applicant may provide any other information that should be considered in evaluating this project. |
| |

KIRSCHLOFTS000815<br>Revised 4/23/2008

## Michigan Economic Growth Authority (MEGA)
### Michigan Economic Development Corporation
### Brownfield Redevelopment MBT Credit Application – PART I

| ELIGIBLE INVESTMENT | | | | |
|---|---|---|---|---|
| Will the project include an unknown lessee who will be making eligible investments? | ☐ | Yes - If yes, please indicate the investment in the table below | ☒ | No |

| MULTI-PHASE PROJECTS | | | | |
|---|---|---|---|---|
| Is this a multi-phase project as defined in MCL 208.1437(10)? | ☒ Yes | | ☐ No | |

**Investment Details and MBT Credit Request** - *Note that Eligible investment does not include certain soft costs as determined by the MEGA under MCL 208.1437 (32)(D). Only investment made by qualified taxpayers or lessees is eligible for a credit. To the extent any investment is reimbursed or subsidized by another party, it will not qualify for a credit. If investment by a lessee is included in the project, the project will not be complete until that investment is finished. If the lessee's investment is not included in the project, the lessee will not be eligible for credit on any investment that they make.*

*To enter information in Excel, double click the table below:*

| Phase I Eligible Investments | | |
|---|---|---|
| A. Demolition of Buildings | | |
| B. Site Improvements | | |
| C. New Construction | | |
| D. Restoration, Alteration, Renovation & Improvement of Buildings | Kirsch Lofts LLC | $3,900,000 |
| E. Addition of Machinery, Equipment & Fixtures (include only the cost of new M&E and/or M&E purchased from a used equipment broker) | | |
|     Purchased Machinery & Equipment & Fixtures | | |
|     Leased Machinery & Equipment & Fixtures | | |
| **Phase I Eligible Investment Subtotal** | | **$3,900,000** |
| Phase II (for multi-phase projects only) | | |
| A. Demolition of Buildings | | |
| B. Site Improvements | | |
| C. New Construction | | |
| D. Restoration, Alteration, Renovation & Improvement of Buildings | Kirsch Lofts LLC | $1,800,000 |
| E. Addition of Machinery, Equipment & Fixtures (include only the cost of new M&E and/or M&E purchased from a used equipment broker) | | |
|     Purchased Machinery & Equipment & Fixtures | | |
|     Leased Machinery & Equipment & Fixtures | | |
| hase II Eligible Investment Subtotal | | **$1,800,000** |
| Phase III (for multi-phase projects only) | | |
| A. Demolition of Buildings | | |
| B. Site Improvements | | |
| C. New Construction | | |
| D. Restoration, Alteration, Renovation & Improvement of Buildings | Kirsch Lofts LLC | $2,750,000 |
| E. Addition of Machinery, Equipment & Fixtures (include only the cost of new M&E and/or M&E purchased from a used equipment broker) | | |
|     Purchased Machinery & Equipment & Fixtures | | |
|     Leased Machinery & Equipment & Fixtures | | |
| Phase III Eligible Investment Subtotal | | **$2,750,000** |
| **TOTAL ELIGIBLE INVESTMENTS** | | **$8,450,000** |

| MBT CREDIT REQUEST | Cannot exceed 12.5% of Total Eligible Investment, or 20% for MEGA designated Urban Development Area Project (see Pg6) | $1,690,000 |
|---|---|---|

| Other Private Sector Contributions - Other than the investment identified in the Eligible Investment section, will there be any other private sector contribution to the project? | ☒ No | ☐ Yes – Please describe below |
|---|---|---|
| | | |

**Government Assistance or Special Designation** - List the type and dollar amount of any local, state or federal incentives associated with this project, including grants, loans, tax abatements and tax increment financing.

A request is being submitted for a Neighborhood Enterprise Zone designation. Additionally, brownfield TIF is being requested to assist with the extensive ($1.5 million) demolition and lead and asbestos abatement costs as well as BEA and due care costs.

# Michigan Economic Growth Authority (MEGA)
## Michigan Economic Development Corporation
## Brownfield Redevelopment MBT Credit Application – PART I

**Project Financing** – Explain the sources and uses of the financing that will be used to support the project. Attach additional pages, if needed.

The project will be financed with a combination of private funds and conventional bank financing.

**If the credits requested are greater than the applicant's Michigan Business Tax liability, explain how the credits will be used.**

It is anticipated that the applicant may use some of the MBT credit to offset their own MBT liability. Any excess credits will likely be assigned to a third party or refunded as provided in the statute.

| Does the project site have brownfield related activities or costs that you would not encounter on a greenfield site? | ☐ No – Why are incentives needed? | ☒ Yes – Describe the brownfield related activities and provide itemized estimates of the cost to address each of those items. These costs and any other issues you choose to discuss below will be considered when reviewing your incentives request. |
|---|---|---|

The site is located near a Superfund site known as the Sturgis Municipal Wells. As a result, the groundwater beneath the property is contaminated with trichloroethene and/or tetrachloroethane. As a result, the developer will be required to perform BEA activities prior to purchase of the property as well as due care compliance activities to ensure that residendents and users of the site will not come into contact with the contamination.

**MEGA DESIGNATED URBAN DEVELOPMENT AREA PROJECT** – For MEGA to consider an Urban Development Area Project it must be located in the downtown, traditional central business district, or traditional commercial corridor of a Qualified Local Government Unit or county seat.

| Would you like to be considered as a MEGA Designated Urban Development Area Project? | ☒ Yes - If yes, please indicate your reasoning below | ☐ No |
|---|---|---|

*Please indicate how the project contributes to all the following urban development objectives under MCL 208.1437(24):*
- Increases the density of the area by promoting multistory development
- Promotes mixed-use development and walkable communities
- Addresses areawide redevelopment and includes multiple parcels of property
- Addresses sustainable redevelopment (green redevelopment)
- Addresses underserved markets of commerce

As indicated above, this project will redevelop two parcels of property and an existing vacant, multistory building into mixed use residential and retail/commercial thus increasing the density of this walkable downtown area. It will bring both retail and residential options to the downtown area along with additional parking. Significant interior demolition activities will be required including the elimination of existing lead and asbestos. Reuse of the existing building will prevent the demolition and disposal of existing building materials and consumption of various new materials required for construction of a new building. It is hoped that the project will also spur additional development and services to support the presence of downtown residents.

The project has received support from the local community through approval of brownfield TIF and granting of a neighborhood enterprize zone status. This developer has successfully completed other similar redevelopment projects and is also in the process of acquiring a second redevelopment property within the city of Sturgis. It is estimated that this project will generate approximately 80-100 retail jobs with an average hourly wage of $18.

Additionally, a number of sustainability items will be implemented including integrated pest management, erosion control and landscape management plan, stormwater management, heat island reduction, ligh pollution reduction, minimum indoor plumbing fixture and fitting efficiency, water performance measurement, water efficient landscaping, optimization of energy efficiency performance (Energy Star 85), green cleaning policy, outdoor air introduction and exhaust systems, environmental tobacco smoke control, increased ventilation, reduced particles in air distribution, occupant controlled lighting, thermal comfort monitoring and similar green/sustainable items.

KIRSCHLOFTS000817



### Live Search Maps

**308 N Prospect St, Sturgis, MI 49091-1581**

Kirsch Lofts, LLC Project

NEW! Try Live Search 411
Dial 1-800-CALL-411 for latest info





KIRSCHLOFTS000818



**FIGURE 2. PLAT MAP**
**308 N. PROSPECT STREET**
**STURGIS, MICHIGAN**

FIRST NATIONAL ACCEPTANCE
COMPANY
STURGIS, MICHIGAN

ECT
Environmental Consulting & Technology, Inc.

KIRSCHLOFTS000819



FIGURE 3. BUILDING LAYOUT
308 N. PROSPECT STREET
STURGIS, MICHIGAN

FIRST NATIONAL ACCEPTANCE
COMPANY
STURGIS, MICHIGAN

This illustration also indicates the vicinity of the two sample locations.

KIRSCH COMPANY PLANT NO.1
MAIN PLANT

NORTH WING

SOUTH WING

WALKOVER

KB-1

W-42S

KIRSCHLOFTS000820







KIRSCHLOFTS000821







KIRSCHLOFTS000822

KIRSCHLOFTS000823

## Kirsch Lofts LLC
### PROJECT COSTS

| | | Phase 1 residential 24-32 units sell/rent SF 19,160 / 24,780 | | Phase 2 mixed use 3-13 units rentable SF 24,000 / 30,720 | | Phase 3 residential 11-24 units sell/rent 19,848 SF 19,848 |
|---|---|---|---|---|---|---|
| | | Total | $/SF | Total | $/SF | Total |
| **Hard Costs:** | | | | | | |
| General conditions, fees, environ. | | 150,000 | 6.05 | 50,000 | 1.63 | 125,000 |
| Building /land | | 30,000 | 1.21 | 10,000 | 0.33 | 10,000 |
| Demolition | 1,500,000 | 700,000 | 28.25 | 400,000 | 13.02 | 400,000 |
| bldg refinish (window, roofs, insulation etc) | | 756,900 | 30.54 | 410,000 | 13.35 | 590,000 |
| Appliances/plumbing/elect/cabinets/tops | | 657,800 | 26.55 | 321,000 | 10.45 | 634,500 |
| Painting, flooring, ceilings | | 673,000 | 27.16 | 411,000 | 13.38 | 608,400 |
| asphalt, paving/infrastructure/curb/drainage | | 381,700 | 15.40 | 153,800 | 5.01 | 130,500 |
| Audio, visual, access, security, fire detection | | 141,000 | 5.69 | 74,200 | 2.42 | 187,000 |
| Landscaping / Ext. Lights / Signage. | | 198,700 | 8.02 | 41,300 | 1.34 | 80,100 |
| Hard Costs Subtotal: | | 3,689,100 | $148.87 | $ 1,871,300 | 60.91 | 2,665,700 |
| | | | | | | |
| **Soft Costs:** | | | | | | |
| interest | | 485,000 | | 242,000 | 0.72 | 419,600 |
| Architect / Concept Fees: | | 121,000 | 4.88 | 22,000 | 0.05 | 22,000 |
| Survey, staking, engineering | | 10,500 | 0.42 | 1,600 | 0.49 | 1,500 |
| legal, brownfield, TIF, NEZ | | 35,000 | 1.41 | 15,000 | 0.36 | 90,000 |
| Building insurance | | 34,500 | 1.39 | 11,000 | 8.49 | 24,600 |
| Soft Costs Subtotal: | $ | 686,000 | 27.68 | $ 291,500 | | 493,700 |
| | | | | | | |
| **Total Hard and Soft Costs:** | | 4,375,100 | $176.56 | $ 2,162,800 | $ 70.40 | 3,159,400 |

KIRSCHLOFTS000824

| | total net | |
|---|---|---|
| **total project sales** | | |
| total cost | 9,722,700 | |
| brownfield TIF | -1,823,250 | |
| MBT credit (discount for actual dollar value) | -1,436,500 | |
| NEZ (computed into operating cost decrease/sales) | 0 | |
| total cost after available credits | 6,462,950 | |
| | | |
| **Sales proforma** | | |
| phase 1 sales | 2,572,929 | |
| phase 2 sales | 2,040,000 | |
| phase 3 sales | 2,637,387 | |
| advertisement and commissions | -277,440 | |
| total revenue | 6,972,876 | |
| | | |
| return on investment sales approach | 7.89% | |
| | | |
| | | |
| **total project rental** | | |
| total cost | 9,722,700 | |
| brownfield plan credit | -1,823,250 | |
| MBT credit (discount for actual dollar value) | -1,436,500 | |
| NEZ (computed into operating cost decrease/sales) | 0 | |
| total cost after available credits | 6,462,950 | |
| | | |
| **Rentals** | | |
| annual rental phase 1 | 168,130 | customer responsible for utilities and CAM cost, property tx taxes |
| Rental of office space @ 8.00 sq foot | 192,000 | customer responsible for all triple net expenses |
| annual rental phase 3 | 172,341 | customer responsible for utilities and CAM cost, property ta taxes |
| vacancy 15% | -79,870 | |
| rental fees/ commissions 6% | -31,948 | |
| repairs and maintenance | -7,500 | |
| Annual revenue | 413,153 | |
| annual return % on investment after credits | 6.39% | |

# EXHIBIT G



MICHIGAN ECONOMIC DEVELOPMENT CORPORATION

October 10, 2008

300 N. WASHINGTON SQ.
LANSING, MI 48913

CUSTOMER
ASSISTANCE CENTER
517 373 9808

WWW.THEMEDC.ORG

Mr. Scott Bosgraaf
Member
Kirsch Lofts, LLC
200 N. Franklin; Suite 100
Zeeland, Michigan 49464

Dear Mr. Bosgraaf:

The Brownfield Redevelopment Credit Project Pre-approval Application that was
submitted for the project located at 308 N. Prospect Street and 415 E. Main Street
(Parcel numbers: 052-200-024-00 and 052-250-028-00), Sturgis, Michigan, has
been approved as described in the application dated October 1, 2008. The project
number #S08-0025 has been assigned and should be referenced in all future
correspondence regarding this brownfield credit. Based on information provided on
the application, the taxpayer listed below is a qualified taxpayer under Public Act 36
of 2007, 208.1437(32)(I) as amended.

EXECUTIVE COMMITTEE
MATTHEW P. CULLEN
Chair
Rock Enterprises

PHILIP H. POWER
Vice-Chair
The Center for Michigan

JAMES C. EPOLITO
President and CEO

RICHARD E. BLOUSE JR. CCE
Detroit Regional Chamber
JOHN W. BROWN
Stryker Corporation
DR. DAVID E. COLE
Center for
motive Research
L. I W. COOLEY
Michigan Department of
Labor & Economic Growth
JOANN CRARY
Saginaw Future Inc.
DR. HAIFA FAKHOURI
Arab American and
Chaldean Council
STEVEN K. HAMP
Hamp Advisors, LLC
PAUL HILLEGONDS
DTE Energy Company
FREDERICK W. HOFFMAN
Chrysler, LLC
GEORGE W. JACKSON JR
Detroit Economic
Growth Corporation
MICHAEL J. JANDERNOA
Bridge Street Capital
Partners, LLC
BIRGIT M. KLOHS
The Right Place, Inc.
F. THOMAS LEWAND
Bodman LLP
DR. IRVIN D. REID
Wayne State University
MICHAEL B. STAEBLER
Pepper Hamilton LLP
DENNIS R. TOFFOLO
Oakland County
PETER S. WALTERS
Guardian Industries Corp.
TODD A. WYETT
Development, LLC

**Kirsch Lofts LLC**                          **EIN #: 26-2865985**

| | |
|---|---|
| Percentage of eligible investment used to determine the credit: | 20% |
| Maximum total eligible investment for the project: | $8,450,000 |
| Maximum total of all credits for the completed project: | $1,690,000 |

In order for Eligible Investment to qualify for the credit it must occur after September
24, 2008, the date of approval of the Brownfield Plan by the City of Sturgis. In
addition, the project must be completed not more than ten (10) years from the date
of this letter.

In order for a project to be considered complete, the qualified taxpayer must
complete the project as described in their Brownfield MBT Pre-Approval Application.
In addition, a valid Certificate of Occupancy (if applicable) must be issued by local
authorities for the project.

After completion of the project, the credit will be calculated based on documented
eligible investment made by the qualified taxpayer listed above. Any investment
made by an entity that is not the qualified taxpayer listed above is not eligible for tax
credits. It is strongly advised that detailed records are maintained for all investment
related to this project, including, but not limited to, invoices, contracts, purchase
orders and payments.

If any material or substantial change to the project occurs after the date of this letter,
an approval must be obtained from the Chairperson of the Michigan Economic
Growth Authority or his designee by filing a request to amend the Brownfield
Redevelopment MBT Credit Application. Any material or substantial change may
include, but is not limited to, a change in the project described in the application; a
change in project size and/or scope; a change in land use and/or project mix;
square footage; project costs; or changes in the qualified taxpayer investment in the
project. Finally, any approvals to amend the project must be obtained prior to
completion of the project.

Small Pre-Approval Letter
Kirsch Lofts LLC
October 10, 2008
Page 2 of 2

There will be an administrative fee that is 1.4 percent (1.4%) of the face value of the credit, minus the $5,000 paid application fee, which will be due when the Certificate of Completion for the project is requested.  For this project, the balance due is **$18,660.00**.  Checks should be made payable to the **Michigan Strategic Fund**.

If investment by an unknown lessee was included in the application, this lessee must be identified when the Certificate of Completion is requested.  The lessee must be certified as a qualified taxpayer at that time.

With the status of the project changing to a multiphase project, MCL Section 208.1437(10) requires that if all components of a multiphase project are not completed, then Kirsch Lofts LLC shall pay to the state treasurer, as a penalty, an amount equal to all the credits claimed and assigned for all components of the project.  The penalty also includes interest from the date the credit was claimed or assigned.

A Michigan Business Tax Brownfield Redevelopment Credit may not be taken until after a Certificate of Completion has been requested and issued.

If you have any questions regarding this matter please contact Mr. Joe Agostinelli at 517-241-7643.

Sincerely,

James C. Epolito, Chairperson
Michigan Economic Growth Authority

cc:  Michigan Department of Treasury – MBT Division
     John Byl, Warner Norcross & Judd
     John Hayes, Economic Development Director, City of Sturgis

# EXHIBIT H

# ACT 381
# WORK PLAN
# TO CONDUCT
# ELIGIBLE
# DEQ RESPONSE
# ACTIVITIES

# AND

# WORK PLAN
# TO CONDUCT
# ELIGIBLE
# GRANT AND LOAN
# ACTIVITIES

## KIRSCH LOFTS LLC
## STURGIS, MICHIGAN

**June 10, 2009**
**Revised July 31, 2009**
**Revised September 8, 2009**

KIRSCHLOFTS000924

# TABLE OF CONTENTS

**1.0   INTRODUCTION**
     1.1   Eligible Property Information
          a.  Location
          b.  Current Ownership
          c.  Proposed Future Ownership
          d.  Delinquent Taxes, Interest, and Penalties
          e.  Existing and Proposed Future Zoning
     1.2   Historical Use of Each Eligible Property
     1.3   Current Use of Each Eligible Property
     1.4   Proposed Redevelopment and Future Use
     1.5   Information Required by Section 15(15) of the Statute

**2.0   CURRENT PROPERTY CONDITIONS**
     2.1   Property Eligibility
     2.2   Summary of Environmental Conditions
     2.3   Summary of Functionally Obsolete and/or Blighted Conditions

**3.0   SCOPE OF WORK**
     3.1   Due Diligence
     3.2   Investigation
     3.3   Due Care
     3.4   Additional Response Activities
     3.5   Lead Abatement
     3.6   Asbestos Disposal
     3.7   Demolition
     3.8   Brownfield Plan Preparation, Work Plan Preparation, DEQ Work Plan Review
     3.9   Interest
     3.10  Contingency

**4.0   SCHEDULE AND COSTS**
     4.1   Schedule of Activities
     4.2   Estimated Costs

KIRSCHLOFTS000925

LIST OF EXHIBITS

**FIGURES**
Figure 1     Scaled Property Location Map
Figure 2     Surrounding Area Property Map
Figure 3     Site Photographs
Figure 4     Proposed Boring Locations


**TABLES**
Table 1      Eligible Activity Costs
Table 2      Tax Capture Schedule
Table 3      Interest Schedule


**ATTACHMENT**
Attachment 1  Vapor Barrier and Sub-Slab Passive Ventilation System Plans, Cross Sections, and Specifications

KIRSCHLOFTS000926

## 1.0   INTRODUCTION

### 1.1   Eligible Property Information

a.   Location

The eligible property is located at 308 North Prospect Street and 415 East Main Street in the City of Sturgis consisting of approximately 4.56 acres.  The tax parcel ID numbers for the property are 052-200-024-00 and 052-250-028-00.

b.   Current Ownership

The property was acquired by Kirsch Lofts LLC on July 10, 2009.  The contact person for the property is Scott Bosgraaf who can be contacted at 616-748-5701.

c.   Proposed Future Ownership

The property is expected to continue to be owned by Kirsch Lofts LLC.

d.   Delinquent Taxes, Interest, and Penalties

There are no known delinquent taxes, interest, or penalties.

e.   Existing and Proposed Future Zoning

The current zoning for the property is "BOS" (business, office, service) and is expected to remain the same.

### 1.2   Historical Use of Each Eligible Property

A portion of the existing building on the parcel at 308 North Prospect Street dates back to 1922 with subsequent expansions.  The property's  historical use was office and manufacturing.  The building is currently functionally obsolete and vacant. The property at 415 East Main Street is an asphalt parking lot.

### 1.3   Current Use of Each Eligible Property

The building on the parcel at 308 North Prospect Street is vacant and functionally obsolete. The property at 415 East Main Street is an asphalt parking lot.

### 1.4   Proposed Redevelopment and Future Use

The developer will demolish the interior and unusable portions of the existing building, including the abatement of lead and asbestos, at an estimated cost of $1.7 million and will then completely renovate and restore the building into mixed use residential and retail/commercial. In addition to the construction jobs, the project is expected to create approximately 80 to 100 new permanent jobs and provide 35-56 residential condominium/apartment units.  The total capital investment for the project is expected to be approximately $8.6 million.

### 1.5   Information Required by Section 15(15) of the Statute

The project will preserve and reuse a vacant, functionally obsolete building and will create retail/commercial space as well as 35-56 new condominium and/or apartment units.  It will

1

KIRSCHLOFTS000927

also create approximately 80 to 100 new permanent commercial retail jobs and many construction jobs.  The total capital investment for the project is expected to be approximately $8.6 million.  In reusing a functionally obsolete building the project will prevent the demolition and disposal of materials in a landfill and will reduce the amount of new construction material that would otherwise be required to construct a completely new building.  Additionally, a number of sustainability items will be implemented in the renovation of the building including integrated pest management, erosion control and landscape management plan, storm water management, heat island reduction, light pollution reduction, minimum indoor plumbing fixture and fitting efficiency, water performance measurement, water efficient landscaping, optimization of energy efficiency performance (Energy Star 85), green cleaning policy, outdoor air introduction and exhaust systems, environmental tobacco smoke control, increased ventilation, reduced particles in air distribution, occupant controlled lighting, thermal comfort monitoring and similar green/sustainable items.

Greenfield sites were not considered as the developer prefers to preserve and reuse existing buildings in urban settings.  This site is very challenged as a result of the age of the building and condition in which it was left by the prior users as evidenced by the photographs provided in Figure 3.  While not officially determined to be functionally obsolete by an assessor, due to its age and inadequacies it is unable to be used to adequately perform the function for which it was intended.  Brownfield TIF is being requested to assist with the demolition and lead and asbestos abatement activities as well as BEA and due care activities.

## 2.0   CURRENT PROPERTY CONDITIONS

### 2.1   Property Eligibility

The property is contaminated due to the presence of arsenic, benzo(a)fluoranthene, benzo(a)pyrene, copper, dibenzo(ah)anthracene, fluoranthene, indeno(1,2,3-cd)pyrene, mercury, phenanthrene, tetrachloroethene (PCE), trichloroethene (TCE), and zinc in the soil and groundwater at concentrations exceeding their respective generic residential cleanup criteria. As a result, the property is eligible for school tax capture under Act 381.

### 2.2   Summary of Environmental Conditions

The property is contaminated due to the presence of arsenic, benzo(a)fluoranthene, benzo(a)pyrene, copper, dibenzo(ah)anthracene, fluoranthene, indeno(1,2,3-cd)pyrene, mercury, phenanthrene, PCE, TCE, and zinc in the soil and groundwater at concentrations exceeding their respective generic residential cleanup criteria.

### 2.3   Summary of Functionally Obsolete and/or Blighted Conditions

While not officially determined to be functionally obsolete, due to its age and inadequacies it is unable to be used to adequately perform the function for which it was intended.

## 3.0   SCOPE OF WORK

The following MDEQ eligible activities will be performed.  A summary of the costs is presented on Table 1.

2

KIRSCHLOFTS000928

**3.1   Due Diligence**                                                                    **$5,000**

Kirsch Lofts, LLC has prepared an ASTM E1527-05 Phase I Environmental Site Assessment (ESA) prior to purchasing the Property. Due to the history of the Property, Kirsch Lofts, Inc. conducted soil sampling (Phase II ESA) which identified contamination. Within 45-days of its purchase, Kirsch Lofts, LLC will conduct a Baseline Environmental Assessment in accordance with MCL 324.20126. Tax increment financing (TIF) is requested for these expenditures estimated at $5,000.

**3.2   Investigation**                                                                    **$34,000**

Further investigation is necessary to assure that Kirsch Lofts, LLC complies with its Section 7a, Due Care obligations. Near surface soil contamination has been identified in areas which will be landscaped. Therefore, the investigation will include characterization of surface soil in areas which will not be covered with hard surfaces to address the direct contact pathway. Similarly, additional soil borings will be conducted in potential source areas to identify any immediate Due Care obligations.

Soil Investigation:

TCE and PCE have been found in soil near the building. In addition several other hazardous substances have been used throughout the Property, including chemicals associated with the former roll coating process, coal storage and use, and fuel oil. As discussed with the MDEQ, additional testing will be conducted to further address these other areas of the Property where hazardous substances were known to be utilized previously.

The VOC investigation will include soil borings and sampling. The soil borings will be performed with stainless steel hand augers and/or ATV/truck mounted direct push rig. If fill material and/or subgrade concrete which prevents these methods of drilling is encountered, hollow stem auger drilling methods will be used. Assuming that all soil borings are conducted using a direct push rig, soil will be collected continuously in acetate liners.

During drilling the soil types and characteristics will be logged and it will also be screened with a PID-unit. Aliquots of each soil sample will be preserved in the field with methanol and tested for both aromatic and chlorinated VOCs. Samples for laboratory testing will be selected based on PID screening, soil coloration, odor, and transition between soil (fill) types where contaminants tend to accumulate due to capillary pressure. The borings will be approximately 10 ft deep. Up to two soil samples per boring will be collected for VOCs, PNAs, and Michigan 10 metals (including fine/coarse grain lead analysis). All sampling methods, including collection of field blanks and duplications, will be conducted in accordance with MDEQ RRD Operational Memorandum No. 2.

The locations of the soil borings and associated samples will be based on the historical use of various portions of the site. For instance, more samples will be collected from around and under the southeastern portion of the building as this is the main location of the historical manufacturing operations and hazardous materials storage [this is also where more recently TCE was detected in shallow soil]. Samples will be collected near other suspected sources of contamination such as a former fuel oil AST, coal silo area, and boiler house areas.

Approximately 10 soil borings will be performed in total. The approximate locations of these borings is shown on Figure 4. Sample locations will include the former lacquer storage area (which will be razed during renovation, but is adjoining the eastern wing of the building), the former oil tank located in the former 4th Street right-of-way, the former coal storage area, etc. The estimated cost of the VOC investigation is $19,379. Loan funds will be used to cover the cost of these activities. A breakdown of the estimated cost is as follows:

3

## 3.1    Due Diligence                                                                    $5,000

*Phase 2 ERM Baseline Assessment*

Kirsch Lofts, LLC has prepared an ASTM E1527-05 Phase I Environmental Site Assessment (ESA) prior to purchasing the Property.  Due to the history of the Property, Kirsch Lofts, Inc. conducted soil sampling (Phase II ESA) which identified contamination.  Within 45-days of its purchase, Kirsch Lofts, LLC will conduct a Baseline Environmental Assessment in accordance with MCL 324.20126.  Tax increment financing (TIF) is requested for these expenditures estimated at $5,000.

## 3.2    Investigation                                                                    $34,000

Further investigation is necessary to assure that Kirsch Lofts, LLC complies with its Section 7a, Due Care obligations.  Near surface soil contamination has been identified in areas which will be landscaped.  Therefore, the investigation will include characterization of surface soil in areas which will not be covered with hard surfaces to address the direct contact pathway.  Similarly, additional soil borings will be conducted in potential source areas to identify any immediate Due Care obligations.

Soil Investigation:

TCE and PCE have been found in soil near the building.  In addition several other hazardous substances have been used throughout the Property, including chemicals associated with the former roll coating process, coal storage and use, and fuel oil.  As discussed with the MDEQ, additional testing will be conducted to further address these other areas of the Property where hazardous substances were known to be utilized previously.

The VOC investigation will include soil borings and sampling.  The soil borings will be performed with stainless steel hand augers and/or ATV/truck mounted direct push rig.  If fill material and/or subgrade concrete which prevents these methods of drilling is encountered, hollow stem auger drilling methods will be used.  Assuming that all soil borings are conducted using a direct push rig, soil will be collected continuously in acetate liners.

During drilling the soil types and characteristics will be logged and it will also be screened with a PID-unit.  Aliquots of each soil sample will be preserved in the field with methanol and tested for both aromatic and chlorinated VOCs.  Samples for laboratory testing will be selected based on PID screening, soil coloration, odor, and transition between soil (fill) types where contaminants tend to accumulate due to capillary pressure.  The borings will be approximately 10 ft deep.  Up to two soil samples per boring will be collected for VOCs, PNAs, and Michigan 10 metals (including fine/coarse grain lead analysis).  All sampling methods, including collection of field blanks and duplications, will be conducted in accordance with MDEQ RRD Operational Memorandum No. 2.

The locations of the soil borings and associated samples will be based on the historical use of various portions of the site.  For instance, more samples will be collected from around and under the southeastern portion of the building as this is the main location of the historical manufacturing operations and hazardous materials storage [this is also where more recently TCE was detected in shallow soil].  Samples will be collected near other suspected sources of contamination such as a former fuel oil AST, coal silo area, and boiler house areas.

Approximately 10 soil borings will be performed in total.  The approximate locations of these borings is shown on Figure 4.  Sample locations will include the former lacquer storage area (which will be razed during renovation, but is adjoining the eastern wing of the building), the former oil tank located in the former 4th Street right-of-way, the former coal storage area, etc.  The estimated cost of the VOC investigation is $19,379.  Loan funds will be used to cover the cost of these activities.  A breakdown of the estimated cost is as follows:

3

KIRSCHLOFTS000929

| Task | Units | No. of Units | Unit Cost | Line Total |
|---|---|---|---|---|
| Drilling ATV Rig | Day | 1 | $1,000.00 | $1,000 |
| Drilling Truck Rig | Day | 1 | $1,500.00 | $1,500 |
| Soil Testing (Full VOCs, PNAs, Metals) | Sample/QC | 24 | $357.50 | $8,580 |
| Sampling Supplies | Lump Sum | 1 | $420.00 | $420 |
| Mobilization and Sampling | Lump Sum | 1 | $3,522.00 | $3,522 |
| Reporting | Lump Sum | 1 | $3,920.00 | $3,920 |
| Misc. Expense (mileage, duplication, etc.) | Lump Sum | 1 | $437.00 | $437 |
| Total | | | | $19,379 |

The soil investigation will be completed early in the renovation process.

<u>Surface Soil Investigation</u>:

Near surface soil sampling will be performed to assess potential direct contact hazards. Since the construction will be performed in four phases, we anticipate that this sampling will also be performed in phases. We have included collection and testing of 20 surface soil samples for VOCs, PNAs, and MDEQ 10 metals to assess if (and where) clean soil cover is required. These samples will be taken from the proposed final grade on the architectural plans. In general, this will be close to the existing ground surface. The locations of the surface soil samples will be determined as the landscaping phases are finalized. Surface soil samples will only be collected from areas where landscaping will be present. The estimated cost of the surface soil sampling, testing, data reduction, and reporting is $14,958. Loan funds will be used to cover the cost of these activities. A breakdown of the estimated cost is as follows:

| Task | Units | No. of Units | Unit Cost | Line Total |
|---|---|---|---|---|
| Mobilization and Sampling (four rounds) | Lump Sum | 1 | $6,177.00 | $6,177 |
| MDEQ 10 Metals w/ f/c Pb | Sample | 28 | $140.00 | $2,800 |
| Full VOCs & PNAs | Samples/QC | 28 | $175.00 | $3,500 |
| Sampling Supplies and Equipment | Lump Sum | 1 | $645.00 | $645 |
| Data Reduction and reporting (four rounds) | Lump Sum | 1 | $814.00 | $814 |
| Misc. Expense (mileage, duplication, etc.) | Lump Sum | 1 | $1,021.50 | $1,022 |
| Total | | | | $14,958 |

**3.3   Due Care**                                                   **$414,000**

Due care activities will be required to prevent exacerbation of the existing contamination and to prevent employees and visitors from coming into direct contact with the existing contamination. These actions will include preparation of a due care plan, installation of clean soil cover in landscaped areas to prevent direct contact hazards, installation of clean soil beneath areas to be paved and presumptive mitigation of volatilization to indoor air hazards and implement any other mitigative measures necessary based on the results of the proposed investigation. The vapor mitigation will include both a robust vapor barrier and passive sub-slab depressurization system. Loan funds will be used to cover the cost of these activities.

An information package will be created and distributed to all contractors who may reasonably be expected to have exposure to known contamination during construction activity. Notices will also be provided to relevant easement/right-of-way holders. After receipt and evaluation

4

of the data from the proposed investigation, a Due Care Plan will be prepared and implemented for future maintenance staff, tenants, owners and future contractors.

Clean Soil:

For the sake of this work plan, it was assumed that all areas not to be covered with building or pavement contain hazardous substances above generic residential cleanup criteria for the direct contact exposure pathway . Removal of material would require excavation of soil, loading, transportation, and landfill disposal.  Since the depth of the contamination is unknown, the cost estimate was based on removal and replacement of approximately 1 foot of contaminated soil (which provides adequate clean soil cover).  It is estimated that excavation and disposal of soil followed by replacement with clean sand and topsoil would be approximately $15/yd$^2$ more than placement of the clean soil barrier only.  Therefore, excavation and off-site disposal of surficial soil is approximately three times the cost of placing clean soil fill over the affected areas.  Placement of clean fill is the recommended alternative.

The clean soil cover proposed includes 5" of clean sand and 4" of topsoil.  An area of approximately 5,000 yd2 may require this cover.  We have also included an area of 8,400 yd2 of clean soil below the pavement to minimize off-site disposal of soil which is not suitable for use as sub-base/base for the new pavement.  (Note that it is cheaper to import clean sand than it is to transport contaminated soil off-site.)  The estimated cost of the clean soil is $99,720 as detailed below.

| Task | Unit | No. of Units | Unit Cost | Line Total |
|---|---|---|---|---|
| Soil Cover: | | | | |
| Top Soil Delivered, Spread, Graded - 4" deep | yd2 | 4,889 | $4.24 | $20,730 |
| Sand, Delivered, Spread, Graded - 5" deep | yd2 | 4,889 | $3.18 | $15,547 |
| Parking Lot Base: | | | | |
| Sand and Topsoil Total Thickness 9" (See above) | yd2 | 8,403 | $7.55 | $63,443 |
| Total | | | | $99,720 |

Vapor Barrier:

Presumptive remedies will be designed and installed to mitigate the potential migration of trichloroethene vapors into the building.  These measures will include a vapor barrier and passive, sub-slab venting system.  The measures will be taken in all three wings of the building, approximately 27,150 ft2. After surface preparation, a spray-on asphaltic product will be installed over the existing floor.  Since the exact locations of interior walls will not be known when the vapor barrier will be installed, a 4" concrete floor will be poured directly on top of the vapor barrier.  This is thick enough to protect the vapor barrier when interior walls are anchored into the new floor.  Typical construction specifications call for placing fasteners for frame walls a minimum of 1" into the concrete.  These same specifications require the concrete thickness be three times the fastener depth.  Therefore, the minimum concrete thickness would be 3", but this leaves no margin for variation in the fastener depth due to the ramset settings, human operations, etc.  Therefore, 4" was selected to provide a reasonable safety margin to assure the integrity of the new floor.  Attachment 1 presents the specifications and product literature for the spray-on vapor barrier.    The estimated cost of the vapor barrier is $255,047 as detailed below.

| Task | Unit | No. of Units | Unit Cost | Line Total |
|---|---|---|---|---|
| Floor Preparation | ft2 | 27,150 | $1.25 | $33,938 |
| Perimeter Preparation | ft | 1,200 | $15.00 | $18,000 |

5

KIRSCHLOFTS000931

| Task | Unit | No. of Units | Unit Cost | Line Total |
|------|------|------|------|------|
| Vapor Barrier | ft2 | 27,150 | $3.00 | $81,450 |
| New Utility Penetrations - Waterstop | ea | 400 | $15.00 | $6,000 |
| Vapor Barrier Protection – New Concrete Floor | ft2 | 27,150 | $4.26 | $115659 |
| Total | | | | $255,047 |

### Passive Ventilation System:

Before the vapor barrier is installed, sub-slab piping for depressurization will be installed. Perforated PVC pipe will be installed in trenches. Geotextile fabric and pea-stone will be installed to protect the perforated pipe from soil. Solid pipe laterals will be run to turbine vents. Specifications and diagrams for the depressurization system are included as Attachment 1. Soils suitable for structural backfill/pipe bedding will be placed back into the utility trench close to its point of origin. Unsuitable soil or material could include stones, debris, roots as well as soil with high silt, clay or organic matter content. The determination will be made in the field by experienced contractors using visual observations and tactile characterization. If there is doubt, samples will be selected for geotechnical testing in a laboratory. The soil which cannot be placed back into the trench will be characterized and disposed off-site. Costs for concrete removal, concrete replacement, and other improvements associated with the depressurization system are based on values from RS Means, 2008* and the consultant's experience. The estimated cost of the sub-slab depressurization is $59,179.

| Task | Unit | No. of Units | Unit Cost | Line Total |
|------|------|------|------|------|
| Sawcut 6" slab | ft | 1,200 | $4.60 | $5,520 |
| Remove slab – 2' wide per foot of trench | ft2 | 1,200 | $6.00 | $7,200 |
| Excavation - trenching | yd3 | 500 | $5.00 | $2,500 |
| 6" PVC Pipe - buried | ft | 1,200 | $7.31 | $8,772 |
| Peastone and fabric wrap | ft | 1,200 | $1.00 | $1,200 |
| Soil Disposal same volume as pea stone + pipe 0.75 ft3/lineal foot | yd3 | 37 | $50.00 | $1,850 |
| Sand Backfill | yd3 | 70 | $7.50 | $525 |
| Soil Disposal | yd3 | 70 | $50.00 | $3,500 |
| Soil Characterization | ea | 1 | $1,000.00 | $1,000 |
| Replace concrete slab | ft2 | 1,200 | $4.26 | $5,112 |
| Ventilation piping 30' high – 8 locations | ft | 240 | $50.00 | $12,000 |
| 6" Laterals on Roof | ft | 35 | $200 | 7,000 |
| Turbine Vents | ea | 6 | $500.00 | $3,000 |
| Total | | | | $59,179 |

**3.4    Additional Response Activities**                                 **$32,000**

Near surface soil contamination has been identified in areas which will be landscaped. Therefore, spoils generated from tree planting, utility installation, etc. that can not be re-used on-site will be characterized for proper off-site disposal. Estimated disposal costs are also included in this item.

Previous investigations document the presence of surface soil with concentrations of hazardous substances exceeding generic residential direct contract criteria. Therefore, clean soil and/or landscaping mulch will be placed over the contaminated soil.

KIRSCHLOFTS000932

Loan funds will be used to cover the cost of these activities.

The proposed redevelopment will include installation of some underground utilities and tree planting. As much soil as possible will be replaced into the excavation, but some will ultimately be spoiled. Based on the testing performed to date, it appears likely that spoils from excavation will be contaminated. Therefore, the proposed work includes characterization of spoils for disposal. For the sake of this estimate, we presume that soil will be stockpiled on-site until the inventory is approximately 100 yd3. At that point, it will be characterized for disposal. The stockpile will be on asphalt or concrete and covered with tarp or plastic. Three TCLP samples are included. These will be composite samples of the material to be disposed off-site. Based on the preliminary plans, approximately 550 yd3 of soils will be removed for off-site disposal. Loan funds are requested for these activities. The estimated cost of the additional response activities is $31,000 as detailed below.

| Task | Unit | No. of Units | Unit Cost | Line Total |
|---|---|---|---|---|
| Landscaping: | | | | |
| Removal/Disposal 2yd3/tree | yd3 | 300 | $50.00 | $15,000.00 |
| Waste Characterization | ea | 3 | $1,000.00 | $3,000.00 |
| | | | | |
| Sewer Installation: | | | | |
| Contaminated Soil Removal 4 ft3 per ft of sewer | yd3 | 125 | $40.00 | $5,000.00 |
| Waste Characterization | Lump Sum | 2 | $1,000.00 | $2,000.00 |
| | | | | |
| Other Utility Installation: | | | | |
| Contaminated Soil Removal for other utilities - assume same as sewer | yd3 | 125 | $40.00 | $5,000.00 |
| Waste Characterization | Lump Sum | 2 | $1,000.00 | $2,000.00 |
| | | | | |
| Total | | | | $32,000.00 |

## 3.5  Lead Abatement                                                                                    $1,050,000

Significant lead abatement will be required. Lead abatement costs will include personal protective equipment for the workers, water blasting painted surfaces as well as characterization and disposal of the residuals. In areas where lead based paint can not be removed, it will be encapsulated. Encapsulation costs include surface preparation, the specialized coating, and associated labor.

Lead-based paint is found throughout the inside of the building. Much of the painted surface will be removed with the demolition debris, but lead paint is also present on the structural elements which will remain. The paint will be removed by water blasting down to the structural surface (brick, wood, etc.).

There is approximately 107,020 ft2 of lead painted surface which will be water blasted to remove lead paint at an estimated cost of $9.63/ft2 (RS Means, 2003*) which results in a cost of $1,030,600 plus personal protective equipment and supplies, $19,400. This brings the total cost estimated cost of the lead paint abatement to $1,050,000. A combination of grant and loan funds are requested for these activities.

## 3.6  Asbestos Disposal                                                                                  $21,600

There is a large amount of thermal system insulation and some other miscellaneous asbestos-containing materials in the building. These will all be removed during the internal

building demolition and renovation.  The asbestos-containing materials will be transported to a licensed Type II landfill approved for asbestos disposal.

Both thermal system asbestos insulation and vinyl-asbestos floor tile must be removed from the building.  Approximately 4,000 ft2 of floor tile, 6,500 ft of thermal system asbestos insulation (TSI) as well as associated fittings will be removed.  Assuming that the typical pipe size for the TSI is 8" Schedule 40 and it is covered with 2" thick insulation, there is approximately 270 yd3 of asbestos material to dispose.  Since the pipe will not stack uniformly within the covered containers, we assumed a 50% void area in the container.  This brings the volume of asbestos to be transported to approximately 540 yd3.  The typical cost for transporting and disposing bulk asbestos in covered containers is $40/yd3.  Therefore, the estimated cost of the asbestos disposal is $21,600.  Loan funds will be used to cover the cost of these activities.

| 3.7 | **Demolition** | **$188,530** |

Internal demolition activities will be required prior to renovation of the building for its new use.  Grant funds will be used to cover the costs included in this work plan.  Additional demolition costs will be required but have been approved by the MEGA Board for reimbursement through TIF capture.

The internal demolition costs to prepare the building for its new use over and above the lead abatement and asbestos disposal activities discussed above is estimated to be nearly $660,000.  Remaining available grant funds are requested for these activities.

| 3.8 | **Brownfield Plan and Work Plan Preparation/Review** | **$25,000** |

Preparation and development of the brownfield plan for approval by the City of Sturgis as well as preparation of this work plan and DEQ's work plan review fees are eligible activity costs.  It is anticipated that TIF will be used to cover the cost of these activities.

Preparation of the Sturgis Brownfield Plan amendment, this Work Plan, and MDEQ's review of this Work Plan are expected to be approximately $25,000.  Tax increment financing is requested for these activities.

| 3.9 | **Interest** | **Amount Unknown** |

Interest is requested for activities to be funded by the loan and TIF.  Table 2 is an estimated tax capture schedule which projects the DEQ TIF payments available for the costs included in this work plan.  Note that there will not be sufficient TIF capture to make the loan payments and the developer will therefore be required to seek private financing to fund the shortfall.  Interest at a rate of 5% is requested to compensate the developer for the interest on its private loan.  An estimated interest schedule is attached at Table 3.

| 3.10 | **Contingency** | **$260,870** |

A 15% contingency is requested for the grant, loan and TIF activities to accommodate unforeseen conditions encountered during the course of this project.

*RS Means, 2003.  Environmental Remediation Cost Data – Unit Price. 9th ed. Kingston, Massachusetts. ISBN 0-87629-689-4.

## 4.0   SCHEDULE AND COSTS

8

**4.1    Schedule of Activities**

Eligible activities are expected to commence in approximately July, 2009 and be completed by July, 2010 with the possible exception of some due care activities.

**4.2    Estimated Costs**

BEA, investigation, due care, additional environmental response actions, lead abatement, asbestos disposal and demolition activities will be required for the project as well as brownfield plan and Act 381 work plan preparation and review.  The total estimate of the eligible activities, including contingencies, is approximately $2,031,600 plus interest.

9

KIRSCHLOFTS000935

Figure 1 – Property Location Map



KIRSCHLOFTS000936

Figure 2 – Surrounding Area Property Map



KIRSCHLOFTS000937

Figure 3 – Site Photographs







3

KIRSCHLOFTS000938







KIRSCHLOFTS000939



KIRSCHLOFTS000940

KIRSCHLOFTS000941

## Table 2 – Tax Capture Schedule

**AD VALOREM TAX – Real Property (Land, Residential and Commercial)**

*Note: This is an extremely dense financial scan; many cell values are best-effort readings.*

| | | | Local Increment | | | | | | State/School Increment | | | | Total Tax Capture | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Mills[1]** | | | County | City | Intermediate School | Comm. College, library, transport. | Total Local Capture | Cumulative Local Capture | State Education | School Operating | Total School Capture | Cumulative School Capture | DEQ Portion (61.77%) of Annual Tax Capture | DEQ Portion (61.77%) of Cumulative Tax Capture |
| **Base TV[1]** | $104,800 | | 7.0414 | 10.0285 | 2.7823 | 4.1710 | 24.0232 | | 6.0000 | 17.6301 | 23.6301 | | | |
| | **New TV[2]** | **Increase in TV** | | | | | | | | | | | | |
| 2008 | $104,800 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2009 | $106,896 | $2,096 | $4 | $9 | $2 | $2 | $14 | $14 | $13 | $37 | $50 | $50 | $39 | $39 |
| 2010 | $109,034 | $4,234 | $8 | $11 | $3 | $5 | $27 | $41 | $25 | $75 | $100 | $150 | $79 | $118 |
| 2011 | $3,111,215 | $3,006,415 | $12 | $17 | $5 | $7 | $41 | $82 | $38 | $112 | $150 | $300 | $118 | $236 |
| 2012 | $3,173,439 | $3,068,639 | $16 | $23 | $6 | $10 | $56 | $138 | $51 | $149 | $200 | $500 | $158 | $394 |
| 2013 | $3,236,908 | $3,132,108 | $21 | $29 | $8 | $12 | $71 | $209 | $64 | $186 | $250 | $750 | $198 | $592 |
| 2014 | $3,301,646 | $3,196,846 | $25 | $36 | $10 | $15 | $85 | $294 | $76 | $224 | $300 | $1,050 | $238 | $830 |
| 2015 | $3,367,679 | $3,262,879 | $30 | $42 | $12 | $17 | $101 | $395 | $89 | $261 | $350 | $1,400 | $279 | $1,109 |
| 2016 | $3,435,032 | $3,330,232 | $9,363 | $13,335 | $13 | $20 | $22,732 | $23,127 | $6,518 | $19,154 | $25,672 | $27,072 | $15,883 | $16,001 |
| 2017 | $3,503,733 | $3,398,933 | $11,458 | $16,318 | $14 | $23 | $27,814 | $50,941 | $9,661 | $19,574 | $29,235 | $56,307 | $19,240 | $35,241 |
| 2018 | $3,573,808 | $3,469,008 | $13,532 | $19,415 | $17 | $28 | $33,090 | $84,031 | $9,807 | $20,002 | $29,809 | $86,116 | $18,414 | $53,655 |
| 2019 | $3,645,284 | $3,540,484 | $24,931 | $35,505 | $9,851 | $14,767 | $85,054 | $169,085 | $21,243 | $22,471 | $43,714 | $129,830 | $79,377 | $133,032 |
| 2020 | $3,718,189 | $3,613,389 | $25,443 | $36,237 | $10,054 | $15,071 | $86,805 | $255,890 | $21,680 | $22,934 | $44,614 | $174,444 | $81,374 | $214,406 |
| 2021 | $3,792,553 | $3,687,753 | $25,997 | $36,983 | $10,260 | $15,382 | $88,592 | $344,481 | $22,127 | $23,406 | $45,533 | $219,977 | $83,083 | $297,489 |
| 2022 | $3,868,404 | $3,763,604 | $26,501 | $37,743 | $10,471 | $15,698 | $90,414 | $434,895 | $22,582 | $23,888 | $46,470 | $266,447 | $84,796 | $382,285 |
| 2023 | $3,945,772 | $3,840,972 | $27,046 | $38,519 | $10,687 | $16,021 | $92,272 | $527,168 | $23,046 | $24,379 | $47,425 | $313,872 | $86,543 | $468,828 |
| 2024 | $4,024,688 | $3,919,888 | $27,601 | $39,311 | $10,906 | $16,350 | $94,188 | $621,336 | $23,519 | $24,880 | $48,399 | $362,271 | $88,336 | $557,164 |
| 2025 | $4,105,182 | $4,000,382 | $28,168 | $40,118 | $11,130 | $16,686 | $96,102 | $717,438 | $24,002 | $25,391 | $49,393 | $411,664 | $90,164 | $647,328 |
| 2026 | $4,187,285 | $4,082,485 | $28,746 | $40,841 | $11,359 | $17,028 | $98,074 | $815,512 | $24,495 | $25,912 | $50,407 | $462,071 | $92,029 | $739,357 |
| 2027 | $4,271,031 | $4,166,231 | $29,336 | $41,781 | $11,592 | $17,377 | $100,086 | $915,598 | $24,997 | $26,444 | $51,441 | $513,512 | $93,931 | $833,288 |
| 2028 | $4,356,452 | $4,251,652 | $29,938 | $42,638 | $11,830 | $17,729 | $102,138 | $1,017,737 | $25,510 | $26,986 | $52,496 | $566,008 | $95,872 | $929,160 |
| 2029 | $4,443,581 | $4,338,781 | $30,551 | $43,511 | $12,072 | $18,087 | $104,308 | $1,121,968 | $26,033 | $27,539 | $53,572 | $619,580 | $97,651 | $1,026,811 |
| 2030 | $4,532,452 | $4,427,652 | $31,177 | $44,403 | $12,319 | $18,468 | $106,366 | $1,228,334 | $26,566 | $28,103 | $54,669 | $674,249 | $99,566 | $1,126,377 |
| 2031 | $4,623,101 | $4,518,301 | $31,815 | $45,312 | $12,571 | $18,849 | $108,544 | $1,336,878 | $27,110 | $28,678 | $55,788 | $730,037 | $101,929 | $1,228,306 |
| 2032 | $4,715,563 | $4,610,763 | $32,468 | $46,239 | $12,829 | $19,231 | $110,765 | $1,447,644 | $27,665 | $29,265 | $56,930 | $786,967 | $104,029 | $1,332,335 |
| 2033 | $4,809,875 | $4,705,075 | $33,130 | $47,185 | $13,091 | $19,625 | $113,031 | $1,560,675 | $28,230 | $29,864 | $58,094 | $845,061 | $106,171 | $1,438,506 |
| 2034 | $4,906,072 | $4,801,272 | $33,808 | $48,150 | $13,359 | $20,028 | $115,408 | $1,676,017 | $28,808 | $30,474 | $59,282 | $904,343 | $108,356 | $1,546,862 |
| 2035 | $5,004,193 | $4,899,393 | $34,499 | $49,134 | $13,632 | $20,435 | $117,699 | $1,793,716 | $29,396 | $31,097 | $60,493 | $964,836 | $110,585 | $1,657,447 |
| 2036 | $5,104,277 | $4,999,477 | $35,203 | $50,137 | $13,910 | $20,853 | $120,103 | $1,913,819 | $29,997 | $31,732 | $61,729 | $1,026,565 | $112,658 | $1,770,105 |
| 2037 | $5,206,363 | $5,101,563 | $35,922 | $51,161 | $14,194 | $21,279 | $122,556 | $2,036,375 | $30,609 | $32,380 | $62,989 | $1,089,554 | $115,177 | $2,021,635 |

[1] The tax levies are assumed to stay the same.

[2] Taxable value is based on planned improvements in 2010 ($6 million) and is increased 2% per year for inflation.

Assumes that 64% is homestead residential and 36% commercial.

Assumes OPRA for 10 years on commercial portion and NEZ for 10 years on residential portion.

KIRSCHLOFTS000942

Table 3 – Interest Schedule

| Year | Local Increment Captured | School Increment Captured | Annual Tax Increment Captured [1] | Cumulative Tax Increment Captured | Amount Due Developer [2] | Interest on Balance Due (5.0%) [3] | Payments to Developer from Local Environmental Tax Capture | Payments to Developer from School Environmental Tax Capture | Loan Payments | Balance Due Developer (Principal) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2008 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2009 | $14 | $50 | $63 | $63 | $1,029,600 | $0 | $0 | $0 | $1,000,000 | $29,600 |
| 2010 | $27 | $100 | $127 | $190 | $29,600 | $1,480 | $8 | $31 | $0 | $31,041 |
| 2011 | $41 | $25,872 | $25,714 | $25,904 | $31,041 | $1,552 | $17 | $62 | $0 | $32,514 |
| 2012 | $56 | $26,235 | $26,291 | $52,195 | $32,514 | $1,626 | $26 | $15,858 | $0 | $18,257 |
| 2013 | $71 | $26,809 | $26,880 | $79,075 | $18,257 | $913 | $34 | $16,205 | $0 | $2,930 |
| 2014 | $85 | $27,395 | $27,480 | $106,555 | $2,930 | $146 | $44 | $16,560 | $0 | $2,930 |
| 2015 | $101 | $27,992 | $28,093 | $134,648 | $84,299 | $4,215 | $53 | $16,922 | ($97,826) | $84,299 |
| 2016 | $22,732 | $28,602 | $51,334 | $185,982 | $163,366 | $8,468 | $62 | $17,291 | ($97,826) | $169,366 |
| 2017 | $27,814 | $29,223 | $57,037 | $243,020 | $259,307 | $12,915 | $14,042 | $17,667 | ($97,826) | $258,307 |
| 2018 | $33,090 | $29,857 | $62,947 | $305,967 | $337,340 | $16,867 | $17,181 | $18,051 | ($97,826) | $337,340 |
| 2019 | $85,054 | $44,002 | $129,055 | $435,022 | $416,802 | $20,840 | $20,440 | $18,443 | ($97,826) | $416,802 |
| 2020 | $86,805 | $44,931 | $131,736 | $566,758 | $496,586 | $24,829 | $52,538 | $27,180 | ($97,826) | $496,586 |
| 2021 | $88,592 | $45,879 | $134,471 | $701,229 | $539,524 | $26,976 | $53,620 | $27,754 | ($97,826) | $539,524 |
| 2022 | $90,414 | $46,846 | $137,260 | $838,489 | $582,953 | $29,148 | $54,723 | $28,340 | ($97,826) | $582,953 |
| 2023 | $92,272 | $47,833 | $140,105 | $978,595 | $626,865 | $31,343 | $55,849 | $28,937 | ($97,826) | $626,865 |
| 2024 | $94,168 | $48,839 | $143,007 | $1,121,602 | $671,249 | $33,562 | $56,997 | $29,546 | $0 | $618,268 |
| 2025 | $96,102 | $49,865 | $145,967 | $1,267,569 | $618,268 | $30,913 | $58,168 | $30,168 | $0 | $560,846 |
| 2026 | $98,074 | $50,912 | $148,987 | $1,416,556 | $560,846 | $28,042 | $59,362 | $30,802 | $0 | $498,724 |
| 2027 | $100,086 | $51,980 | $152,066 | $1,568,622 | $498,724 | $24,936 | $60,581 | $31,448 | $0 | $431,632 |
| 2028 | $102,138 | $53,069 | $155,207 | $1,723,829 | $431,632 | $21,582 | $61,823 | $32,108 | $0 | $359,282 |
| 2029 | $104,231 | $54,180 | $158,411 | $1,882,241 | $359,282 | $17,964 | $63,091 | $32,781 | $0 | $281,374 |
| 2030 | $106,366 | $55,313 | $161,679 | $2,043,920 | $281,374 | $14,069 | $64,384 | $33,467 | $0 | $197,592 |
| 2031 | $108,544 | $56,469 | $165,013 | $2,208,933 | $197,592 | $9,880 | $65,703 | $34,167 | $0 | $107,603 |
| 2032 | $110,765 | $57,648 | $168,413 | $2,377,346 | $107,603 | $5,380 | $67,048 | $34,881 | $0 | $11,054 |
| 2033 | $113,031 | $58,850 | $171,881 | $2,549,227 | $11,054 | $553 | $7,646 | $3,961 | $0 | $0 |
| 2034 | $115,342 | $60,077 | $175,419 | $2,724,646 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2035 | $117,699 | $61,328 | $179,027 | $2,903,673 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2036 | $120,103 | $62,604 | $182,707 | $3,086,381 | $0 | $0 | $0 | $0 | $0 | $0 |
| 2037 | $122,556 | $63,906 | $186,461 | $3,272,842 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | $368,200 | $833,435 | $542,630 | | ($97,826) | |

[1] Assumes NEZ for 10 years for residential portion, OPRA for 10 years on commercial portion.
[2] Includes anticipated expenditure plus contingency as stated in Brownfield Plan.
[3] Interest on balance due is calculated on an annual basis.

Attachment 1

KIRSCHLOFTS000943

## *LIQUID BOOT®* Brownfield Membrane/Liner

### Section 2 | Version 4.0

These Specifications may have changed. Please contact CETCO Liquid Boot Company (CLB) at 714.384.0111 for the most recent version

**NOTE:** If the membrane is to also perform as a waterproofing membrane, <u>do not use this specification</u>. Use the standard LIQUID BOOT® fluid-applied waterproofing specification.

### PART 1 - GENERAL

1.01   **DESCRIPTION** - General and Supplementary Conditions and Division 1- General Requirements applies to this section. Provide gas vapor barrier as indicated, specified and required.

A.   Work in this section - principal items include:
   1.   Gas vapor barrier providing protection from the following gases: Methane, other Hydrocarbon vapors in concentrations up to 20,000ppm, Hydrogen Sulfide, Radon
   2.   Gas vapor barrier under single family homes.

B.   Related work **NOT** in this section: excavation and backfilling, parge coat on masonry to receive gas vapor barrier membrane, mortar beds or concrete toppings over gas vapor barrier membranes, latex waterproofing, damp-proofing, flashing and sheet metal, joint sealers, soil sterilant, gas collection systems, gas monitoring, and drainage.

1.02   **QUALITY ASSURANCE** - Gas vapor barrier contractor/applicator shall be trained and approved by gas vapor barrier manufacturer, CETCO Liquid Boot Company (CLB). A pre-installation conference shall be held prior to application of gas vapor barrier to assure proper substrate and installation conditions, to include contractor, applicator, architect/engineer and special inspector.

1.03   **SUBMITTALS** (Refer to section 01300 for procedures)

A.   Project Data - Submit manufacturer's product data and installation instructions for specific application.

B.   Samples - Submit representative samples of the following for approval:
   1.   Gas vapor barrier membrane material.
   2.   Protection Board and/or Protection Mat.
   3.   Prefabricated Drainage Mat.
   4.   Geotextiles

1.04   **DELIVERY, STORAGE AND HANDLING** - Deliver materials to site in original unbroken packages bearing manufacturer's label showing brand, weight, volume, and batch number. Store materials at site in strict compliance with manufacturer's instructions. Do not allow materials to freeze in containers.

1.05   **JOB CONDITIONS**

A.   Protect all adjacent areas not to receive gas vapor barrier.  Where necessary, apply masking to prevent staining of surfaces to remain exposed wherever membrane abuts to other finish surfaces.

B.   Perform work only when existing and forecasted weather conditions are within manufacturer's recommendations for the material and product used.

C.   Minimum clearance of required for application of product:  90° spray wand- 2 feet  /  Conventional spray wand- 4 feet.

D.   Ambient temperature shall be within manufacturers specifications. If winter conditions apply, we recommend the use space of heaters and necessary cover (i.e. visqueen) to bring the ambient temperature to at least +45°F until the protection course and structural slab rebar or a mudslab protection course has been placed.

E.   All plumbing, electrical, mechanical and structural items to be under or passing through the gas vapor barrier shall be positively secured in their proper positions and appropriately protected prior to membrane application.

F.   Gas vapor barrier shall be installed before placement of reinforcing steel. When not possible, all exposed reinforcing steel shall be masked by General Contractor prior to membrane application.

G.   Expansion joints must be filled with a conventional waterproof expansion joint material.

H.   Surface preparation shall be per manufacturer's specification.

1.06   **PRODUCT WARRANTY** - CETCO Liquid Boot Company (CLB) warrants its products to be free of defects. This warranty only applies when the LIQUID BOOT® is applied by CETCO Liquid Boot Company Approved Applicators and that the required respective CLB products (such as LIQUID BOOT® UltraDrain, LIQUID BOOT® UltraShield, LIQUID BOOT® BaseFabric and LIQUID BOOT® GeoVent) are used. As factors, which affect the

KIRSCHLOFTS000944

result obtained from this product, including weather, equipment utilized, construction, workmanship and other variables- are all beyond the manufacturer's control. CLB warrants only that the material conforms to its product specifications. Under this warranty CLB will replace at no charge any product not meeting these specifications within 12 months of manufacture, provided it has been applied in accordance with CLB's written directions for use recommended as suitable for this product. Warranties are available for a longer period upon request and mutual written consent. This warranty is in lieu of any and all other warranties expressed or implied (including any implied warranty of merchantability or fitness for a particular use), and CLB shall have no further liability of any kind including liability for consequential or incidental damages resulting from any defects or delays caused by replacement or otherwise.

## PART 2 - PRODUCTS

### 2.01    MATERIALS

A.    Fluid applied gas vapor barrier system - LIQUID BOOT®. A single course, high build, polymer modified asphaltic emulsion. Water borne and spray applied at ambient temperatures. A minimum thickness of 60 dry mils, unless specified otherwise as some cities and engineers may require a thicker membrane.  Non-toxic and odorless.  LIQUID BOOT® Trowel Grade has similar properties with greater viscosity and is trowel applied.  Manufactured by CETCO Liquid Boot Company, Santa Ana, CA (714) 384-0111.

C    Gas vapor barrier physical properties

| GAS VAPOR MEMBRANE | TEST METHOD | VALUE |
|---|---|---|
| Hydrogen Sulfide Gas Permeability | ASTM D1434 | None Detected |
| Benzene, Toluene, Ethylene, Xylene, Gasoline, Hexane, Perchloroethylene | ASTM D643, D412, D1434 (tested at 20,000 ppm) | Passed in gas permeability and weight change |
| Acid Exposure (10% H₂SO₄ for 90 days) | ASTM D543 | Less than 1% weight change |
| Radon Permeability | Tested by US Dept. of Energy | Zero permeability to Radon (222Rn) |
| Bonded Seam Strength Tests | ASTM D6392 | Passed |
| Micro Organism Resistance (Soil Burial)- average weight change, average tensile strength change, average tensile stress change, average elongation change, bonded seams, methane permeability | ASTM D4068-88 | Passed |
| Methane Permeability | ASTM 1434-82 | Passed |
| Oil Resistance Test- average weight change, average tensile strength change, average tensile stress change, average elongation change, bonded seams, methane permeability | ASTM D543-87 | Passed |
| Heat Aging- average tensile strength change, average tensile stress change, average elongation change, bonded seams | ASTM D4068-88 | Passed |
| Dead Load Seam Strength | City of Los Angeles | Passed |
| Environmental Stress-Cracking | ASTM D1693-78 | Passed |
| PCE Diffusion Coefficient | Tested at 6,000 mg/m³ | 2.74 x 10-14 m²/sec |
| TCE Diffusion Coefficient | Tested at 20,000 mg/m³ | 8.04 x 10-14 m²/sec |
| WATERPROOFING | TEST METHOD | VALUE |
| Soil Burial | ASTM E154-88 | Passed |
| Water Penetration Rate | ASTM D2434 | <7.75 x 10⁴ cm/sec |
| Water Vapor Permeability | ASTM E96 | 0.24 perms |
| Water Vapor Transmission | ASTM E96 | 0.10 grains/h-ft² |
| POTABLE WATER | TEST METHOD | VALUE |
| Toxicity Test | 22 CCR 66696 | Passed CCR Bioassay—Flathead Minnow |
| Potable Water Containment | ANSI/NSF 61 | NSF Certified for tanks >300,000 gal |
| GENERAL INFORMATION | TEST METHOD | VALUE |
| Coefficient of Friction- geotextile both sides | ASTM D5321 | 0.72 |
| Cold Bend Test | ASTM D146 | Passed. No cracking at –25°F |
| Freeze-Thaw Resistance (100 Cycles) | ASTM A742 | Meets criteria. No spalling or disbondment |
| Accelerated Weathering & Ultraviolet Exposure | ASTM D822 | No adverse effect after 500 hours |
| Hydrostatic Head Resistance | ASTM D751 | Tested to 135 feet or 60 p.s.i |
| Elongation | ASTM D412 | 1,332% - Ø reinforcement, 90% recovery |
| Elongation- 8oz. non-woven geotextile both sides | ASTM D751 | 100% (same as geotextile tested separately) |
| Tensile Strength | ASTM D412 | 56 p.s.i. without reinforcement |
| Tensile Strength-8oz. non-woven geotextile both sides | ASTM D751 | 196 p.s.i. (same as geotextile tested separately) |
| Tensile Bond Strength to Concrete | ASTM D413 | 2,556 lbs/ft² uplift force |
| Puncture Resistance-8oz. non-woven geotextile both sides | ASTM D4833 | 286 lbs. (Pecho Trowel- .196 in., same as geotextile tested separately) |
| Flame Spread | ASTM E 108 | Class A with top coat (comparable to UL790) |
| Electric Volume Resistivity | ASTM D257 | 1.91 x 10⁸ ohms-cm |

KIRSCHLOFTS000945

C.      Agency Approvals:
   - City of Los Angeles Research Report # 24860-Approved for "LIQUID BOOT® Membrane for Below-Grade Waterproofing and Gas Barrier"
   - United States Navy-Approved for "LIQUID BOOT® for Use World Wide to Waterproof Earth-Covered Steel Ammunition Storage"
   - NSF International-NSF/61 approved for "Potable Water Tank Liner"
   - Canadian Construction Materials Board-Approved for "Waterproofing and Damp proofing"
   - County of Los Angeles Department of public works-Approved for "LIQUID BOOT® Application as a Methane Gas Barrier"

D.      LIQUID BOOT® 500- Contact CETCO Liquid Boot Company before specifying or bidding LIQUID BOOT® 500 to insure LIQUID BOOT® 500 is appropriate for the project. LIQUID BOOT® 500 may be used in lieu of LIQUID BOOT® (described in section 2.01 B. above) where the membrane is not exposed to hydrostatic head pressure. The Agency Approvals in section 2.01 C above do not apply to LIQUID BOOT® 500. The physical properties for LIQUID BOOT® 500 are as follows:

   Note: LIQUID BOOT® 500 may tend to sag on vertical surfaces at higher ambient temperatures. When this condition occurs, use LIQUID BOOT® at these locations.

| WATERPROOFING | TEST METHOD | VALUE |
|---|---|---|
| Elongation | ASTM D412 | 800% |
| Bond Seam Strength Tests | ASTM D6392 | Passed |
| Methane Permeability | ASTM D1434 | None detected |
| Water Vapor Permeability | ASTM E96 | 0.18 perms |

   - Agency Approval- City of Los Angeles Research Report-RR 25549-Approved for "LIQUID BOOT® 500 Spray Applied Membrane for Below-Grade Waterproofing and Gas Barrier"

E.      Protection- On vertical surfaces, use LIQUID BOOT® UltraShield P-100 or other protections as approved by the manufacturer, project architect or engineer. On horizontal surfaces, use LIQUID BOOT® UltraShield G-1000 or other protections as approved by the manufacturer, project architect or engineer.

   Due to the diverse jobsite conditions, all protection materials must be approved by the membrane manufacturer, including the use of the LIQUID BOOT® UltraShield products.

F.      Prefabricated Drain Mat- On vertical surfaces, use LIQUID BOOT® UltraDrain 6200. On horizontal surfaces, use LIQUID BOOT® UltraDrain 6000

G.      Adhesive system for LIQUID BOOT® UltraShield and LIQUID BOOT® UltraDrain: Use LIQUID BOOT® UltraGrip.

H       Gas vapor vent piping- LIQUID BOOT® GeoVent system

I.      Base Geotextile- LIQUID BOOT® BaseFabric T-40 non-woven geotextile, unless otherwise specified and approved by membrane manufacturer. The heat-rolled side shall be the application surface. Some projects may require a heavier geotextile (LIQUID BOOT® BaseFabric T-60.)

J       Cold Joints, Cracks, Form Tie Holes: Covered with Hardcast CRT 1602 Tape 3" wide.

**PART 3 - EXECUTION**

3.01    EXAMINATION- All surfaces to receive gas vapor barrier shall be inspected and approved by the applicator at least one day prior to commencing work.

3.02    SURFACE PREPARATION- Provide 24 inch minimum clearance out from surfaces to receive the gas vapor barrier. The application surface shall be prepared and provided to the applicator in accordance with manufacturer's specifications listed below:

A.      Concrete/Shotcrete/Masonry- Concrete surfaces shall be light broom finish or smoother, free of any dirt, debris, loose material, release agents or curing compounds. Fill all voids more than 1/4 inch deep and 1/4 inch wide. Masonry joints, cold joints, and form joints shall be struck smooth. All penetrations shall be prepared in accordance with manufacturer's specifications. Provide a 3/4 inch minimum cant of LIQUID BOOT®, or other suitable material as approved by manufacturer, at all horizontal to vertical transitions and other inside corners of 120" or less. Allow to cure overnight before the application of LIQUID BOOT®. All cracks or cold joints greater than 1/16 inch must be completely grouted with non-shrink grout as approved by engineer. Install Hardcast reinforcing tape over all cold joints, cracks and form tie holes (after holes and cracks are grouted).

B       Dirt & Gravel- The sub-grade shall be moisture conditioned and compacted to a minimum relative compaction of 90 percent or as specified by civil/geotechnical engineer. The finished surface shall be smooth, uniform, free of debris and standing water. Remove all stones or dirt clods greater than 1/4 inch. (NOTE: Aggregate sub-bases shall be rolled flat, free from any protruding sharp edges.) Penetrations shall be prepared in accordance with manufacturer's specifications. All form stakes that penetrate the membrane shall be of rebar which shall be bent over and left in the slab. Trenches shall be cut oversize to accommodate gas vapor barrier membrane and protection course with perpendicular to sloped sides and maximum obtainable compaction. Adjoining grade shall be finish graded and compacted. Excavated walls shall be vertical or sloped back, free of rocks and protruding rocks. Specific sub-grade preparation shall be designed by a qualified civil or geotechnical engineer. If organic materials with potential for growth (ie: seeds or grasses) exist within the sub-base, spray apply soil sterilant at the sterilant manufacturer's recommended rate.

KIRSCHLOFTS000946

**3.03    INSTALLATION**

**3.03.10    INSTALLATION ON CONCRETE/SHOTCRETE/MASONRY  (Follow the procedures below carefully)**

A.    Refer to section 3.03.30, "Sealing Around Penetrations", for procedures to seal around penetrations.

B.    Provide a ¾" minimum cant of LIQUID BOOT®, or other suitable material as approved by manufacturer, at all horizontal to vertical transitions and other inside corners of 120° or less. Allow to cure overnight before the application of LIQUID BOOT®.

C.    Delineate a test area on site with a minimum dimension of 10 feet by 10 feet (3m by 3m). Apply LIQUID BOOT® to a thickness of 60 mils and let it cure for 24 hours. Observe for blisters. If minor or no blistering occurs, proceed to the next step. (See note regarding blisters). If significant blistering does occur, apply a thin (10 mil) tack coat of LIQUID BOOT® "A" side without catalyst to the entire concrete surface and allow to cure before proceeding. (See also information regarding blister repair)

D.    Spray apply LIQUID BOOT® to a 60 mil minimum dry thickness. Increase thickness to 100 dry mils if shotcrete is to be applied directly to membrane. If a second coat is required, remove any standing water from the membrane before proceeding with the second application.

E.    Do not penetrate membrane.  Keep membrane free of dirt and debris and traffic until a protective cover is in place. It is the responsibility of the General Contractor to insure that the membrane and the protection system are not penetrated.

F.    After membrane has cured and checked for proper thickness and flaws, install protection material pursuant to manufacturer's instructions
NOTE: All testing or inspection to be performed prior to placing protection course.

**NON-HORIZONTAL SURFACES:** Spray on non-horizontal surfaces should begin at the bottom and work towards the top. This method allows the product to adhere to the surface before having catalyst runoff.

**NOTE:** Due to the nature of concrete as a substrata, it is normal for some blistering to occur. This is caused by either concrete's tendency to off-gas or water that is temporarily trapped between the concrete and the membrane. With time and the applied pressure of backfill or over-slab, blisters will absorb into the concrete without detriment to the membrane. A small number of blister heads should be sampled and checked for proper membrane thickness. If the samples have the minimum required membrane thickness, then the remaining blisters should not be punctured or cut. If the samples have less than the minimum required membrane thickness, then the area can either be re-sprayed to obtain the proper thickness, or the blisters can be cut out and the area re-sprayed or patched with LIQUID BOOT® Trowel Grade.

**3.03.20    INSTALLATION ON DIRT SURFACES AND MUDSLABS**

A.    Roll out LIQUID BOOT® BaseFabric geotextile on sub-grade with the heat-rolled side facing up. Overlap seams a minimum of 6 inches. Lay geotextile tight at all inside corners. Apply a thin 10 mil tack coat of LIQUID BOOT® "A" side without catalyst within the seam overlap. Line trenches with geotextile extending at least six inches (6") onto adjoining sub-grade if slab and footings are to be sprayed separately. Overlap seams a minimum of 6 inches.  Lay geotextile tight at all inside corners. Apply a thin 10 mil tack coat of LIQUID BOOT® "A" side without catalyst within the seam overlap.

B.    Minimize the use of nails to secure the geotextile to the dirt subgrade. Remove all nails before spraying membrane, if possible. Nails that cannot be removed from the dirt subgrade are to be patched with geotextile or Hardcast reinforcing tape overlapping the nail head by a minimum of two inches (2"). Apply a thin tack coat of LIQUID BOOT® under the geotextile patch, when patching with geotextile.

C.    Refer to section 3.03.30, "Sealing Around Penetrations", for procedures to seal penetrations.

D.    Spray apply LIQUID BOOT® onto geotextile to a 60 mil minimum dry thickness. Increase thickness to 100 dry mils if shotcrete is to be applied directly to membrane. If a second coat is required, remove any standing water from the membrane before proceeding with the second application.

E.    Do not penetrate membrane. Keep membrane free of dirt, debris and traffic until a protective cover is in place. It is the responsibility of the General Contractor to insure that the membrane and the protection system are not penetrated.

F.    After membrane has cured and checked for proper thickness and flaws, install protection material pursuant to manufacturer's instructions.
NOTE: All testing or inspection to be performed prior to placing protection course.

**3.03.30    SEALING AROUND PENETRATIONS**

**3.03.31    OPTION 1**

A.    Clean all penetrations. All metal penetrations shall be sanded clean with emery cloth.

B.    For applications requiring LIQUID BOOT® BaseFabric geotextile, roll out geotextile on sub-grade with the heat-rolled side facing up, overlapping seams a minimum of six inches (6") Cut the geotextile around penetrations so that it lays flat on the sub-grade. Lay geotextile tight at all inside corners. Apply a thin (10 mil) tack coat of LIQUID BOOT® "A" side without catalyst within the seam overlap.

KIRSCHLOFTS000947

C. At the base of penetration install a minimum ¼ inch thick membrane cant of LIQUID BOOT®, or other suitable material as approved by manufacturer. Extend the membrane at a 60 mil thickness three inches (3") around the base of penetration and up the penetration a minimum of three inches (3"). Allow to cure overnight before the application of LIQUID BOOT® membrane. (See attached manufacturer's standard detail.)

D. Spray apply LIQUID BOOT® to an 80 mils minimum dry thickness around the penetration, completely encapsulating the collar assembly and to a height of one and one half inches (1 1/2") minimum above the membrane as described in 3.03.31 C above.  Spray apply LIQUID BOOT® to surrounding areas as specified for the particular application (SEE MANUFACTURER'S STANDARD DETAIL)

E. Allow LIQUID BOOT® to cure completely before proceeding to step "F".

F. Wrap penetration with polypropylene cable tie at a point two inches (2") above the base of the penetration.  Tighten the cable tie firmly so as to squeeze, but not cut, the cured membrane collar.

**3.03.32    OPTION 2 (For Gas Vapor Membrane Only)**

A. Clean all penetrations.  All metal penetrations shall be sanded clean with emery cloth.

B. For applications requiring LIQUID BOOT® BaseFabric geotextile, roll out geotextile on sub-grade with the heat-rolled side facing up, overlapping seams a minimum of six inches (6")   Cut the geotextile around penetrations so that it lays flat on the sub-grade. Lay geotextile tight at all inside corners  Apply a thin (10 mil) tack coat of LIQUID BOOT® "A" side without catalyst within the seam overlap

C. Spray apply LIQUID BOOT® to surrounding areas as specified for the particular application to a 80 mil minimum dry thickness.  At the base of penetration install a minimum 3/4 inch thick membrane cant of LIQUID BOOT®, or other suitable material as approved by manufacturer. Extend the membrane at 60 mil thickness up the penetration a minimum of three inches (3").  Allow to cure overnight before proceeding   to D (SEE MANUFACTURER'S STANDARD DETAIL)

D. Spray apply LIQUID BOOT® the membrane at an 60 mil thickness three inches (3") around the base of penetration and up the penetration, completely encapsulating the collar assembly, to a height of one and one half inches (1 1/2") minimum above the membrane as described in 3.03.32 C above. (SEE ATTACHED MANUFACTURER'S STANDARD DETAIL)

E. Allow LIQUID BOOT® to cure completely before proceeding to step "F".

F. Wrap penetration with polypropylene cable tie at a point two inches (2") above the base of the penetration.  Tighten the cable tie firmly so as to squeeze, but not cut, the cured membrane collar.

**3.04    FIELD QUALITY CONTROL-** Field Quality Control is a very important part of all LIQUID BOOT® applications. Applicators should check their own work for coverage, thickness, and all around good workmanship _before_ calling for inspections.

The membrane must be cured at least overnight before inspecting for dry-thickness, holes, shadow shrinkage, and any other membrane damage. If water testing is to be performed, allow the membrane to cure at least 72 hours prior to the water test. When thickness or integrity is in question the membrane should be tested in the proper manner as described below  However, over-sampling defeats the intent of inspections  Inspectors should always use visual and tactile measurement to guide them. Areas suspected of being too thin to the touch should be measured with the gauges to determine the exact thickness. With practice and by comparing tactile measurements with those of the gauges, fingers become very accurate tools.

**3.04.10    ON CONCRETE/SHOTCRETE/MASONRY & OTHER HARD SURFACES**

A. Membrane may be checked for proper thickness with a blunt-nose depth gauge, taking one reading every 500 square feet   Record the readings  Mark the test area for repair, if necessary

B. If necessary, test areas are to be patched over with LIQUID BOOT® to a 80 mils minimum dry thickness, extending a minimum of one inch (1") beyond the test perimeter

**3.04.20    ON DIRT AND OTHER SOFT SUBSTRATES**

A. Samples may be cut from the membrane and geotextile sandwich to a maximum area of 2 square inches  Measure the thickness with a mil-reading caliper, per 500 sq. feet. Deduct the plain geotextile thickness to determine the thickness of LIQUID BOOT® membrane  Mark the test area for repair.

B. Voids left by sampling are to be patched with geotextile overlapping the void by a minimum of two inches (2")  Apply a thin tack coat of LIQUID BOOT® under the geotextile patch. Then spray or trowel apply LIQUID BOOT® to a 60 mils minimum dry thickness, extending at least three inches (3") beyond geotextile patch.

**3.04.30    SMOKE TESTING FOR HOLES  (Optional) -** Holes or other breaches in the membrane can be detected by conducting a smoke test.  This involves pumping smoke under the membrane for a specified period of time, under a specified pressure, which varies from project to project.  Contact CLB for information about this test at 714-384-0111

KIRSCHLOFTS000948



KIRSCHLOFTS000949



KIRSCHLOFTS000950



KIRSCHLOFTS000951



KIRSCHLOFTS000952

July 14, 2009

RE:  Kirsch Loft Work Plan Review Comments

Dear John:

We have completed our review of the Kirsch Lofts work plan and offer the following comments regarding proposed tasks to be performed:

1.  All work proposed for demolition, lead abatement, and asbestos disposal is approved and work may begin on these tasks immediately.

2.  Regarding the investigation portion of the work plan, much more detail will be needed before we can give an approval, including:  a justification as to how the number of borings and samples were chosen, details on the exact locations of the borings and samples, how borings will be installed, and information regarding the QA/QC (duplicates, etc) for the sampling program.

3.  Regarding the soil gas sampling and vapor barrier construction to be performed, there are several issues that will need to be addressed prior to approval. Mr. Bosgraaf's environmental consultants should work directly with our indoor air specialist, Matt Williams (517-373-4821) to resolve these issues.  A summary of some of the issues of concern are as follows:
    • Because of variation seen in indoor air sampling, DEQ has identified the point of compliance for vapor intrusion to be in soil gas, below the foundation/slab of the building.  Considering this, it appears that an unnecessarily large number of indoor air samples are proposed (25 samples).  Two indoor air samples may be collected to assess past process spills that may affect indoor air quality.  However, these samples should not be used to determine compliance or background.
    • Flow rates for soil gas samples are not identified.
    • The work plan lacks detail regarding QA/QC (duplicates, etc) for the sampling program.
    • Tracer gas should be utilized during collection of soil gas samples.
    • Soil gas samples should be collected at a rate of less than 200 ml/minute.
    • If in deeper borings, it is determined that a shallow source may be present, a shallow soil gas sample should be collected in addition to the deeper soil sample.
    • We have comments on the plan for removal of the concrete floor, installation of the vapor barrier and sub-slab depressurization system.

In addition to the questions regarding specific project tasks, there were a number of questions regarding the administrative side of the project that also needed clarification. A summary of these issues follows:

1.  Will all of the activities being funded with the DEQ loan be reimbursed with TIF?  It was unclear in the work plan.

KIRSCHLOFTS000953

2. Please revise Table 1 so that it has three columns a separate one each for grant, loan and 381.  Include dollar amounts in the appropriate columns based on how each activity will be funded with totals on the bottom.  TIF costs should not exceed those approved in the brownfield plan.  This will help eliminate confusion on how each activity is being funded / reimbursed.

3. Interest rate is 1.5% (not 5) pursuant to the DEQ loan agreement.  Please explain why 5% was used.  Is financing other than the DEQ loan planned for this project?

4. Why is the TIF schedule in the work plan different from the one in the brownfield plan?  Which is the correct one?

5. Section 3.3 - Due Care:  withholding approval until the results of the site investigation are received and reviewed.

6. Section 3.4 – Additional Response Activities:  no information is provided regarding the clean soil cover/landscaping mulch activities and costs.

7. Work plan preparation:  $18,600 seems excessive.  Please justify.

8. From now on, please put all text in the Section 3 Scope of Work and not under the Table 1 Costs.

I would recommend that the developer's consultants resolve as many of the outstanding issues as possible this week by contacting Mr. Matt Williams on the indoor air issues and addressing as many of the administrative issues as possible.  Mr. Rob Franks is out of the office this week, and will be returning on July 20th.  It is our intent to hold a meeting here in Lansing July 20th, 21st, or 22nd to formally discuss the work plan.  Please let us know what dates and times will work best for you.

I understand that this process has been very frustrating, but please keep in mind that this is a very complicated Superfund site receiving $2 Million in state funding.  If you couple that with the chlorinated solvents, indoor air issues, and a residential reuse, you have some very cautious folks on our end.  Despite our concerns, we truly do want to see this project succeed.  Our hope is that you can get started with the demo, lead, and asbestos work while we are working out the details on the rest.

Should you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Carrie Geyer

KIRSCHLOFTS000954

July 20, 200[

RE: Kirsch Loft Work Plan Review Comments

Ali:

We have reviewed your administrative questions and provide responses below in anticipation of our meeting tomorrow.

1. Will all of the activities being funded with the DEQ loan be reimbursed with TIF? It was unclear in the work plan. As you know, loan payments are typically made directly from TIF capture. In this case, however, TIF projections reflect that there will be insufficient DEQ TIF capture to fully fund any of the loan payments. The developer has agreed to finance the shortfall in each year and be reimbursed for its payments through later TIF capture.

2. Please revise Table 1 so that it has three columns a separate one each for grant, loan and 381. Include dollar amounts in the appropriate columns based on how each activity will be funded with totals on the bottom. TIF costs should not exceed those approved in the brownfield plan. This will help eliminate confusion on how each activity is being funded / reimbursed.
   See the revised Table 1 attached which reflects the breakdown of DEQ related costs between the funding categories.

   The brownfield plan provided approval of $1,823,250 in TIF reimbursable costs (including MEGA costs). The DEQ work plan table requests $1,029,600 in DEQ related TIF reimbursable costs. Anticipated MEGA related TIF reimbursable costs include $30,000 for public infrastructure improvements and $519,524 for additional demolition work not covered by the loan plus contingency costs, etc. The total TIF reimbursable costs are $1,668,963.

3. Interest rate is 1.5% (not 5) pursuant to the DEQ loan agreement. Please explain why 5% was used. Is financing other than the DEQ loan planned for this project?
   As indicated above, the developer will be required to finance a portion of each of the DEQ loan payments and will not be reimbursed from TIF capture for his payments until much later. 5% interest is therefore being requested to assist the developer with its financing efforts.

4. Why is the TIF schedule in the work plan different from the one in the brownfield plan? Which is the correct one?
   The TIF schedules are the same except that the work plan TIF schedule reflects only the DEQ portion of the tax capture (61.69%) whereas the brownfield plan reflects 100% of the TIF capture (DEQ and MEDC portions). The difference in the DEQ work plan TIF schedule is the 38.31% of TIF capture to be used to reimburse the MEGA costs. Note the column headings for the final two columns of the TIF schedule attached to the work plan reflect only 61.69%.

5. Section 3.3 - Due Care: withholding approval until the results of the site investigation are received and reviewed. Understood.

6. Section 3.4 – Additional Response Activities: no information is provided regarding the clean soil cover/landscaping mulch activities and costs. The requested information will be provided.

7. Work plan preparation: $18,600 seems excessive. Please justify.

KIRSCHLOFTS000955

VNJ work plan preparation costs are already nearly $7,... . Their costs include preparation of an initial Act 381 w... pan last year, a meeting in Kalamazoo with DEQ regarding the work plan, work plan withdrawal, preparation of a combined Act 381/grant/loan work plan including another meeting in Kalamazoo and many discussions with the DEQ and consultant.

The consultant (Rose & Westra) has also incurred work plan preparation costs in the amount of nearly $12,000. Mark Westra attended DEQ meetings and had separate communications with DEQ as well. Mark also provided detailed work plan information regarding the additional investigation and due care work required for the project as well as cost estimates to perform the work.

Both WNJ and Rose & Westra will continue to incur work plan costs, both to respond to these DEQ requests and likely in the future as work progresses and additional final approvals are requested.

8. From now on, please put all text in the Section 3 Scope of Work and not under the Table 1 Costs. Understood. We will do so.

We look forward to discussing these and other items at our meeting tomorrow afternoon.

1687635 Table 1 Breakdown of Grant/Loan/TIF Costs:

| Task | Cost Estimate | Grant Funds | Loan/TIF Funds | TIF Only Funds |
|---|---|---|---|---|
| 1. Phase I, Phase II, BEA | $5,000 | | | $5,000 |
| 2. Investigation | 62,000 | | $62,000 | |
| 3. Due care compliance | 438,000 | | 438,000 | |
| 4. Additional response actions | 28,000 | | 28,000 | |
| 5. Lead abatement | 1,050,000 | 1,000,000 | 50,000 | |
| 6. Asbestos disposal | 21,600 | | 21,600 | |
| 7. Demolition | 139,530 | | 139,530 | |
| 8. Preparation and development of brownfield plan (TIF) | 5,000 | | | 5,000 |
| 9. DEQ work plan preparation (TIF) | 18,600 | | | 18,600 |
| 10. DEQ work plan review (TIF) | 1,000 | | | 1,000 |
| 11. Contingency (grant, loan, TIF) | 260,870 | | 260,870 | |
| 12. Interest (5%) | Unknown | | | |
| TOTAL | $2,029,600 | $1,000,000 | $1,000,000 | $29,600 |

KIRSCH-...0066

# EXHIBIT I



STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING



JENNIFER M. GRANHOLM
GOVERNOR

STEVEN E. CHESTER
DIRECTOR

September 22, 2009

Mr. John Hayes, Director
Economic Development
City of Sturgis Brownfield Redevelopment Authority
130 North Nottawa
Sturgis, Michigan 49091

Dear Mr. Hayes and the City of Sturgis Brownfield Redevelopment Authority:

SUBJECT:  Act 381 Work Plan Review for Kirsch Lofts, 308 N. Prospect,
          St. Joseph County, Sturgis, Michigan 49091

The Department of Environmental Quality (DEQ) Remediation and Redevelopment
Division (RRD) has completed review of the "Act 381 Work Plan to Conduct Eligible
DEQ Response Activities and Work Plan to Conduct Eligible Grant and Loan Activities"
for the Kirsch Lofts project, for the above referenced property which was submitted to
the DEQ on June 10, 2009, revised on July 31, 2009, and further revised on September
8, 2009, for approval pursuant to the Brownfield Redevelopment Financing Act, 1996
PA 381, as amended (Act 381), MCL 125.2665.

Upon consideration of relevant factors identified in Section 15 of Act 381, and based
upon representations and information contained in your submittals, the DEQ approves
the plan to conduct those due care activities contained in work plan task 3.2
(Investigation - $34,000) plus a pro-rated 15 percent contingency ($5,100).

The total amount of this work plan approved for reimbursement with tax increment
revenues, including taxes levied for school operating purposes, to conduct eligible
activities is limited to $39,100.  Of this amount no more than $19,394 shall be from
taxes levied for school operating purposes, which is the ratio of school taxes to local
taxes levied on the eligible property.

          $19,394 School Tax Capture 49.6 percent
        + $19,706 Local Tax Capture 50.4 percent
          $39,100 Total

The brownfield plan includes the use of school taxes for reimbursement of interest costs
associated with environmental response activities.  The cost associated with this
interest is not included in the amount above.  Section 13(17) states, in part, "If an
authority reimburses a person or entity under this section for an advance for the
payment or reimbursement of the cost of baseline environmental assessments, due
care, and additional response activities and interest thereon included in a work plan

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 2
September 22, 2009

approved by the department, the authority may capture taxes levied for school operating purposes and local taxes for the payment of that interest." Therefore, school taxes may be used for interest costs associated with the financing of activities approved by the DEQ.  The current state policy for reimbursement of interest with school taxes is simple (non-compounding) interest at a maximum rate of five percent; therefore, school taxes may be used for interest associated with the financing of the approved activities using that rate and method.

Because work plan task 3.1 (Due Diligence - $5,000) was conducted prior to this work plan approval, school taxes cannot be used for reimbursement of interest costs associated with this activity.

Pursuant to Section 15(10) of Act 381, the DEQ's approval or denial of a work plan or portion of a work plan is a final decision regarding the use of taxes levied for school operating purposes for reimbursement.

Act 381 allows local units of government to redevelop brownfield properties and to reimburse costs for eligible activities through tax increment financing.  Be advised that tax increment revenues, including school taxes, cannot be captured for eligible activities that are being funded with a Brownfield Redevelopment grant.  Accordingly, the amount of tax capture is limited to the costs of eligible activities that will be funded with tax increment revenues.

Please note that in making this determination, the DEQ is not making any findings about exemptions to liability under Part 201, Environmental Remediation, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA).  In addition, approval of your proposed due care investigative (Work Plan Task 3.2) activities is not a guarantee that the agency will issue an affirmative response to a petition for determination of due care adequacy upon their completion.

Only those activities undertaken <u>after</u> the date of this approval are eligible for reimbursement with taxes levied for school operating purposes.  If activities in addition to those approved above are determined to be necessary and/or if the approved costs will be exceeded, prior DEQ approval is necessary.  Please be advised that the amount of tax capture is limited to <u>actual</u> expenditures with the exception of excess capture allowed for deposit into the local site remediation revolving fund, if applicable.  Capture of tax increment revenues from the eligible property shall be in accordance with Section 13(2) of Act 381.  Adequate records should be maintained for auditing purposes and be made available to the state upon request.

All actions taken pursuant to this work plan must be undertaken in accordance with the requirements of all applicable or relevant and appropriate state and federal laws, rules, and regulations, including, but not limited to, Part 201 of the NREPA, the Part 201

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 3
September 22, 2009

Rules, and laws relating to occupational safety and health.  This approval does not obviate a person's obligation to obtain and maintain compliance with any permit or authorization required under state or federal laws.

A copy of all reports and findings must be furnished to the DEQ district office project manager.

Pursuant to Section 13(8) of Act 381, the DEQ may pursue cost recovery for response activity costs paid for with tax increment revenues from persons who are liable for the costs of the eligible activities at the eligible property.

The cost to the state for conducting this review will be determined and identified to you via separate correspondence for reimbursement as provided by Section 15(11) of Act 381.  Please contact this office if you have any questions, or if we can be of further assistance.  You may contact Mr. Robert L. Franks, Project Manager, RRD, Superfund Section, at 517-335-3392.

Sincerely,

David A. Kline
Grant and Technical Support Unit
Superfund Section
Remediation and Redevelopment Division
517-373-8354

cc:   Michigan Department of Treasury
      Mr. Peter Anastor, Michigan Economic Development Corporation
      Mr. John Byl, Warner, Norcross & Judd, LLP
      Mr. Mark Westra, Rose & Westra, Inc.
      Ms. Carrie Geyer, DEQ
      Ms. Michelle Stratz, DEQ (Project number 456567-81)
      Ms. Darlene Van Dale, DEQ
      Mr. Robert L. Franks, DEQ

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 4
September 22, 2009

**Addresses:**

**Michigan Department of Treasury**
Bureau of Local Government Services
Local Audit & Finance Division
1st Floor Austin Building
P.O. Box 30728
Lansing, MI 48909

**Mr. Peter Anastor**
Michigan Economic Development Corporation
300 N. Washington Square
Lansing, MI 48913



STATE OF MICHIGAN
DEPARTMENT OF ENVIRONMENTAL QUALITY
LANSING



JENNIFER M. GRANHOLM
GOVERNOR

STEVEN E. CHESTER
DIRECTOR

October 30, 2009

Mr. John Hayes, Director
Economic Development
City of Sturgis Brownfield Redevelopment Authority
130 North Nottawa
Sturgis, Michigan 49091

Dear Mr. Hayes and the City of Sturgis Brownfield Redevelopment Authority:

SUBJECT:   Act 381 Work Plan Review for Kirsch Lofts, 308 N. Prospect
              Sturgis, St. Joseph County, Michigan

The Department of Environmental Quality (DEQ) Remediation and Redevelopment Division
(RRD) has completed review of the work plan for "Act 381 Work Plan to Conduct Eligible DEQ
Response Activities and Work Plan to Conduct Eligible Grant and Loan Activities: for the Kirsch
Lofts project (Work Plan)", for the above reference property which was submitted to the DEQ on
June 10, 2009, revised on July 31, 2009, and further revised on September 8, 2009, for
approval pursuant to the Brownfield Redevelopment Financing Act, 1996 PA 381, as amended
(Act 381), MCL 125.2665.

Upon consideration of relevant factors identified in Section 15 of Act 381, and based upon
representations and information contained in your submittal, the DEQ conditionally approves the
plan to conduct the following tasks as discussed in the Work Plan:

Task 3.3 Due Care - $414,000
Task 3.4 Additional Response Activities - $31,000
Task 3.8 Brownfield Plan and Work Plan Preparation/Review - $25,000
Task 3.9 Interest (see discussion below)
Task 3.10 – 15 percent on tasks 3.3 and 3.4 - $66,750

The DEQ approval of these tasks is conditioned upon acceptance and incorporation of the DEQ
final responses to comments on the September 9, 2009, Work Plan, a copy of which is attached
to this letter.  Should the DEQ final responses not be accepted and incorporated into the Work
Plan and subsequent site redevelopment work, the DEQ approval of the above referenced tasks
becomes null and void.

The activities associated with Task 3.1 Due Diligence have already been conducted.  Pursuant
to Section 15(1)(a) of Act 381, this task may be reimbursed with school taxes without work plan
approval.  However, pursuant to Section 13(17), school taxes may not be used for
reimbursement of interest associated with this task.

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 2
October 30, 2009

The total amount of this Work Plan approved for reimbursement with tax increment revenues, including taxes levied for school operating purposes, to conduct eligible activities is limited to $536,750.  Of this amount no more than $266,228 shall be from taxes levied for school operating purposes, which is the ratio of school taxes to local taxes levied on the eligible property.

$266,228  School Tax Capture  49.6 percent
+ $270,522  Local Tax Capture  50.4 percent
$536,750  Total

The brownfield plan includes the use of school taxes for reimbursement of interest costs associated with environmental response activities.  The cost associated with this interest is not included in the amount above.  Section 13(17) states, in part, "If an authority reimburses a person or entity under this section for an advance for the payment or reimbursement of the cost of baseline environmental assessments, due care, and additional response activities and interest thereon included in a work plan approved by the department, the authority may capture taxes levied for school operating purposes and local taxes for the payment of that interest." Therefore, school taxes may be used for interest costs associated with the financing of activities approved by the DEQ.  The current state policy for reimbursement of interest with school taxes is simple (non-compounding) interest at a maximum rate of five percent; therefore, school taxes may be used for interest associated with the financing of the approved activities using that rate and method.

Pursuant to Section 15(10) of Act 381, the DEQ's approval or denial of a work plan or portion of a work plan is a final decision regarding the use of taxes levied for school operating purposes for reimbursement.

Act 381 allows local units of government to redevelop brownfield properties and to reimburse costs for eligible activities through tax increment financing.  Be advised that tax increment revenues, including school taxes, cannot be captured for eligible activities that are being funded with a Brownfield Redevelopment grant.  Accordingly, the amount of tax capture is limited to the costs of eligible activities that will be funded with tax increment revenues.

Please note that in making this determination, the DEQ is not making any findings about exemptions to liability under Part 201, Environmental Remediation, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA).  In addition, approval of your proposed activities is not a guarantee that the agency will issue an affirmative response to a petition for determination of adequacy upon their completion.

Only those activities undertaken after the date of this approval are eligible for reimbursement with taxes levied for school operating purposes.  If activities in addition to those approved above are determined to be necessary and/or if the approved costs will be exceeded, prior DEQ approval is necessary.  Please be advised that the amount of tax capture is limited to actual expenditures with the exception of excess capture allowed for deposit into the local site remediation revolving fund, if applicable.  Capture of tax increment revenues from the eligible property shall be in accordance with Section 13(2) of Act 381.  Adequate records should be maintained for auditing purposes and be made available to the state upon request.

All actions taken pursuant to this work plan must be undertaken in accordance with the requirements of all applicable or relevant and appropriate state and federal laws, rules, and

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 3
October 30, 2009

regulations, including, but not limited to, Part 201 of the NREPA, the Part 201 Rules, and laws relating to occupational safety and health.  This approval does not obviate a person's obligation to obtain and maintain compliance with any permit or authorization required under state or federal laws.

Pursuant to Section 13(8) of Act 381, the DEQ may pursue cost recovery for response activity costs paid for with tax increment revenues from persons who are liable for the costs of the eligible activities at the eligible property.

The cost to the state for conducting this review will be determined and identified to you via separate correspondence for reimbursement as provided by Section 15(11) of Act 381.

A copy of all reports and findings must be furnished to the DEQ project manager.  The project manager for this project is Mr. Robert L. Franks who can be reached at 517-335-3392.  Please contact this office if you have any questions, or if we can be of further assistance.

Sincerely,

David A. Kline, Chief
Grant and Technical Support Unit
Superfund Section
Remediation and Redevelopment Division
517-373-8354

Attachment
cc:   Mr. John Byl, Warner, Norcross & Judd, LLP
      Mr. Scott Bosgraaf, Kirsch Lofts, LLC
      Mr. Mark Westra, Rose & Westra, Inc.
      Michigan Department of Treasury
      Michigan Economic Development Corporation
      Ms. Carrie Geyer, DEQ
      Ms. Michelle Stratz, DEQ (Project Number 456567-81)
      Ms. Darlene Van Dale, DEQ
      Mr. Robert L. Franks, DEQ

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 4
October 30, 2009

## ATTACHMENT 1

### COMMENTS, RESPONSES, AND FINAL RESPONSES

### TO SEPTEMBER 8, 2009 WORK PLAN

The numbering convention for the comments below follow previous comment submittals by the Department of Environmental Quality (DEQ) and represent only those comments with outstanding issues.  For example, the first comment below is listed as DEQ General Comment #3.  The DEQ General Comments #1 and #2 have been satisfactorily addressed by Kirsch Lofts in prior Work Plan revisions and/or replies to DEQ Comments.  The past numbering convention was retained for consistency.

DEQ GENERAL COMMENT #3:  Any submitted due care plan must include details on:

☐  Methods of mitigation;

*Kirsch Lofts Response:  Methods of mitigation will be selected after the additional investigation is conducted and will be briefly described in the due care plan.*

**DEQ FINAL RESPONSE**:  A parties "due care" obligations begin at the time of the purchase.  Section 20107a of Part 201, Environmental Remediation, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended, specifically requires owners and operators to take due care measures to ensure that existing contamination on a property does not cause unacceptable risks and is not exacerbated.  The documentation of what activities were implemented and undertaken is the Section 7a Compliance Analysis.  The Section 7a Compliance Analysis does not need to be available to the DEQ until eight months of becoming the owner or operator of the facility.  Therefore it is still imperative to insure unacceptable exposures or exacerbation of contamination does not occur and that the onsite activities are incompliance with Section 20107a of Part 201.

☐  Installation and design of mitigation systems;

*Kirsch Lofts Response:  Details of the installation and design of mitigation systems are proposed to be presented in the engineering design plans rather than the due care plan as the anticipated audience for the due care plan is unlikely to need or understand the level of detail to be provided.*

**DEQ FINAL RESPONSE**:  In accordance with R 299.51003(5)(a) the Section 7a Compliance Analysis must contain a description of the measures that are required to mitigate any unacceptable exposures in compliance with R299.51013.  The DEQ agrees that the proposed installation and design of the mitigation system be included in an engineering design document; however, it must be included as an attachment to the Section 7a Compliance Analysis that can be made available in the future.

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 5
October 30, 2009

    ☐  Post-mitigation testing;

> *Kirsch Lofts Response*:  If any post-mitigation testing is required it will be detailed in the due care plan.

> **DEQ FINAL RESPONSE**:  Details must be included as part of the engineering design document that will be submitted for DEQ review and approval.  Final details of any on-going testing requirements will be included as part of the Section 7a Compliance Analysis.

    ☐  Operation, maintenance, and monitoring of mitigation systems;

> *Kirsch Lofts Response*:  These items will be detailed in the due care plan.

> **DEQ FINAL RESPONSE**:  Details must be included as part of the engineering design document that will be submitted for DEQ review and approval.  Final details of any on-going testing requirements will be included as part of the Section 7a Compliance Analysis.

    ☐  Any requirements for termination of mitigation system operations;

> *Kirsch Lofts Response*:  No mitigation system operations are currently anticipated but if they are required details will be included in the due care plan.

> **DEQ FINAL RESPONSE**:  Details must be included as part of the engineering design document that will be submitted for DEQ review and approval.  Final details of any on-going testing requirements will be included as part of the Section 7a Compliance Analysis.

    ☐  Documentation of compliance with the Michigan Air Pollution Control Rules.

> *Kirsch Lofts Response*:  We anticipate that documentation of such compliance will be presented in the design documents rather than the due care plan unless monitoring is necessary to comply in which case the monitoring requirements will also be included in the due care plan.

> **DEQ FINAL RESPONSE**:  Details must be included as part of the engineering design document that will be submitted for DEQ review and approval.  Final details of any on-going testing requirements will be included as part of the Section 7a Compliance Analysis.

**DEQ GENERAL COMMENT #5**:  Once a mitigation system is installed, an information package must be provided to the building's owner and tenants, to facilitate their understanding of the system's operation, maintenance, and monitoring requirements.

> *Kirsch Lofts Response*:  We agree that brief descriptions of the mitigation techniques are appropriate for distribution to all tenants and owners.  Operation, monitoring, and maintenance requirements, however, may be better suited for an audience that will be responsible for these tasks such as building maintenance

Mr. John Hayes
City of Sturgis Brownfield Redevelopment Authority
Page 6
October 30, 2009

*staff, etc.  Our goal is to place relevant information into users hands without
presenting so much detailed information that it will become burdensome and
therefore of no value if it is not reviewed and understood.*

**DEQ FINAL RESPONSE**:  In accordance with R 299.51003(5)(a) the Section 7a
Compliance Analysis must contain a description of the measures that are required
to mitigate any unacceptable exposures in compliance with R 299.51013.  The
DEQ would agree to a handout for distribution, as long as the document also
provides where the full the Section 7a Compliance Analysis can be viewed on-site.
Details of the monitoring program may need to be included if access is required.

DEQ SPECIFIC COMMENT #7:  Section 3.3, Due Care, Vapor Barrier, (Page 5) – *"Presumptive
remedies will be designed and installed to mitigate the potential migration of trichloroethene
vapors into the building.  These measures will include a vapor barrier and passive, sub-slab
venting system.  The measures will be taken in all three wings of the building, approximately
27,150 ft$^2$."*

More detail will be required in the due care plan concerning:
   a)   Installation and design of mitigation systems,
   b)   Post-mitigation testing,
   c)   Operation, maintenance, and monitoring of mitigation systems,
   d)   Termination of mitigation system operations, and
   e)   Documentation of compliance with the Michigan Air Pollution Control Rules.
  The DEQ is willing to assist throughout the design process to ensure that the work once
complete will meet your due care obligations.

*Kirsch Lofts Response:  Please refer to our response to General Comment #3.*

**DEQ FINAL RESPONSE**:  Please refer to our Final Responses relative to General
Comment #3.

DEQ Specific Comment #9:  Section 3.3, Due Care, Passive Ventilation System, (Page 5) –
*"Specifications and diagrams for the depressurization system are included as Attachment 1."*
All design and installation activities must be documented.  A post-mitigation testing plan is
required as a part of the Due Care Plan.  All documentation must be made available to the DEQ
upon request.  Details on the minimum objectives for post-mitigation testing associated with
specific mitigation methods are provided in the DEQ's Operational Memorandum 4,
Attachment 4 – Soil Gas and Indoor Air.

*Kirsch Lofts Response:  We believe the due care plan should be kept as user friendly
as possible and do not believe it is the appropriate document to present some of this
information.  The design and installation documentation will be filed separately from
the due care plan.  If post-installation testing is required (i.e. long term monitoring),
then the purpose, methods, frequency, etc. will be described in the due care plan.*

**DEQ FINAL RESPONSE**:  As stated above in General Comment #5, the DEQ
agrees to a handout to provide more generic information to prospective tenants;
however, full details must be kept in the Section 7a Compliance Analysis in a
location on-site that can made available upon request.

# EXHIBIT J



517.482.8555
Phone
517.482.8598
Fax
jhorner@capfund.net
www.capfund.net

Mr. Scott Bosgraaf
Bosgraaf Commercial, LLC
200 North Franklin
Zeeland, MI 49464

RE:    Kirsch Lofts & Kirsch Industrial Project

Dear Scott,

CapFund New Markets, LLC was created several years ago by the Great Lakes Capital Fund as a means to bring new community development financing to low income communities in the Great Lakes region. In addition to community development finance, the Great Lakes Capital Fund has raised over $1.6 billion in equity to finance the construction of affordable housing, provided over $50 million in predevelopment loans and grants, over $25 million in permanent lending to affordable multi-family developments and small businesses, and acted as an advocate for residents of low income communities throughout the region. Recently we were successful in obtaining a $28 million allocation of Federal New Markets Tax Credits (NMTC's) from the Community Development Financial Institutions Fund, a division of the Federal Department of Treasury.  Using this resource, we are committing up to $10.8 million of our Round 7 NMTC allocation to the Kirsch Lofts & Industrial Project based upon the information you have provided us.  This commitment will expire on July 31st 2010, unless a subsequent extension is granted.

## Terms

**Allocation Amount:**        $10,800,000 ("QEI") from our Round 7 allocation of $28 million awarded in 2009.

**Fees**

Upfront CDE Fee:        CapFund New Markets, LLC will charge a 5.0% fee at the time of closing (2.0% from the Investment Fund and 3.0% from the QEI) applied to the total NMTC allocation invested.  This equates to a total of $540,000.

Annual CDE Asset
Management Fee:        The CDE will receive a 50 basis point annual asset management fee (applied to the invested NMTC allocation) for each of the 7 years during the compliance period. The asset management fee will be paid by the QALICB quarterly in arrears. This equates to ($54,000) per year for each of the 7 years, with the first and final years pro-rated. The asset management fees shall be reserved as set forth in this paragraph. At closing, a new separate account will be established solely for the purpose of reserving the asset management fee for CapFund New Markets, LLC This account shall be pledged solely to CapFund New Markets,

LLC to secure the payment of the asset management fee. At closing, the first year's asset management fee ($54,000) shall be deposited in the account. In addition, on the first anniversary of closing, the remaining 6 years of asset management fee ($324,000) shall be deposited in the account. The obligation to deposit all amounts into the separate account shall be guaranteed by guarantors acceptable to CapFund New Markets, LLC in its sole discretion.

**NMTC Residual Repayment:**

The project will provide to CapFund New Markets a "Residual Repayment" of 2.0% of the QEI amount at the end of the 7 year compliance period which will be outside of the NMTC structure estimated to be $216,000. The Residual Repayment will be dedicated to fund a revolving loan fund used to bridge community development financing incentives in rural communities.

**Initial Deposit:**

CapFund New Markets, LLC requires the QALICB to deposit $30,000, upon execution of this term sheet. Should the project fail to close by the Closing Date as evidenced by the signing of final documents, funding of the QEI, and the closing draw: (a) $10,000 of the deposit may be retained by CapFund New Markets, LLC as consideration for our reservation and due diligence costs (e.g. site visit, project review, etc.); and (b) the remaining $20,000 will be applied toward the legal and third-party closing expenses incurred by CapFund New Markets, LLC with any excess funds to be returned to QALICB. If CapFund New Markets, LLC incurs any legal expenses in excess of $20,000, Borrower shall be obligated to reimburse CapFund New Markets, LLC for those additional expenses.

**Project Reserves:**

Reasonable reserves may be required based upon final underwriting of the Project.

**Transaction Expenses:**

The QALICB shall pay all transaction expenses, including legal costs of CapFund New Markets, LLC The parties acknowledge that we will seek to close the transaction by July 31st, 2010. If this NMTC transaction does not close by July 31st, 2010 (the "Closing Date") CapFund New Markets shall no longer be obligated to commit its allocation to this transaction. At its discretion, CapFund New Markets may provide an extension; an additional deposit, beyond the Initial Deposit below, may be required depending on the legal costs accrued by that date. Should CapFund New Markets legal counsel be requested to draft any of the transaction documents, rather than review documents prepared by other parties, the legal costs will be paid separately by QALICB and not billed through nor considered part of CapFund New Market's legal expenses.

**One-day Loan Expenses:**

If a one-day loan is needed for this transaction, the QALICB shall pay the one-day loan interest and fee expenses.



**Sub CDE Expenses:** The QALICB will be responsible for covering the annual audit, tax preparation costs, accounting, AUPs, CDE certifications, and any federal, state or local business taxes. If no semi-annual third party certifications are required by the investor then there shall be no need for that service or the cost associated with that service. Should it be required it will be a cost covered by the QALICB. The annual SUB-CDE Expense reimbursement available shall be capped at $20,000 with 4% annual compounded escalation adjustment available to cover costs, if necessary. If the interest rate on the QLICI increases or if investor makes other requirements on third-party needs for the SUB-CDE (e.g. third-party CDE Certification, etc.), CapFund New Markets, LLC has the right to adjust this cap prior to investment closing.

**Loan Servicing:** CapFund New Markets, LLC shall undertake the loan servicing of its allocation and the allocation of all other CDEs involved in this transaction at the agreed upon price of 11 basis points annually paid by the borrower per the terms of the QLICI loan agreement.

**Required Guarantees:** The QALICB and its principals will provide the customary real estate guarantees expected by NMTC investors, lenders, and CDE's, including but not limited to, construction guarantees, compliance guarantees, completion guarantees, environmental guarantees, and repayment guarantees. In addition, the QALICB and its principals will provide a guarantee to the investor and CapFund New Markets, LLC against any recapture of NMTC's due to loss of QALICB status and against any and all losses resulting from the negligence, recklessness or willful misconduct of the QALICB (or any affiliate thereof).

**Collaborative Publicity:** CapFund New Markets, LLC routinely creates press releases for each project in which we participate. QALICB permits CapFund New Markets, LLC to draft, reproduce and distribute publicity information about the project. QALICB shall similarly share financing-related press releases about the NMTC investment and incorporate CapFund New Markets, LLC feedback. Only approved quotes will be used by the parties and the parties will work collaboratively to get feedback from one another and be inclusive within their public relations outreach. No confidential information will be disclosed. Information contained in CapFund New Markets, LLC press releases typically includes: location, size and scope of the project, key stakeholders, and the anticipated and actual economic, social and environmental impacts of the project. It also lists funding sources and amounts, as well as the name of the various funders. The QALICB will also notify CapFund New Markets, LLC of any planned ground breaking or press conferences when such dates are first known and seek to be inclusive of CapFund New Markets, LLC along with all other funders.

**CDFI Reporting:** QALICB commits to working with CapFund New Markets, LLC with respect to CDFI reporting requirements, and as such, shall identify a Project Manager

whose responsibility shall be, on an as-needed basis, to gather and provide all data required to comply with CDFI Fund reporting requirements, including compliance, reporting and transactional level data needed to qualify and maintain QALICB compliance under the Community Investment Intelligence System (CIIS). CapFund New Markets, LLC, the QALICB, and the Investor commit to work collaboratively to collect all CIIS reporting data and loan structure information *prior to the close*; any information that cannot be collected prior to the close shall be jointly collected and confirmed within three weeks following the close.

**CapFund New Markets Community Impact Requirements:** The QALICB and CapFund New Markets, LLC shall also commit to work cooperatively in terms of identifying and implementing additional measures which may enhance the community and sustainability impacts of the project.

**Community, Economic/Fiscal and Environmental Impact Report:** The QALICB agrees to provide to CapFund New Markets, LLC A community impact report prepared by a reputable firm acceptable to CapFund New Markets on or before the closing date.

We very much look forward to working with you on this important and impactful project.

Sincerely,


Mark McDaniel
President
CapFund New Markets
1000 S. Washington, Suite 200
Lansing, MI 48910


[SIGNATURE PAGE FOLLOWS]

Kirsch Lofts & Industrial Term Sheet

4 | P a g e

# EXHIBIT K



## BROWNFIELD REDEVELOPMENT GRANT CONTRACT
BETWEEN THE
MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY
AND THE STURGIS BROWNFIELD REDEVELOPMENT AUTHORITY

This Grant Contract ("Contract") is made between the Michigan Department of Environmental Quality, Remediation and Redevelopment Division (hereafter "State"), and the Sturgis Brownfield Redevelopment Authority (hereafter "Grantee").

The purpose of this Contract is to provide funding in exchange for work to be performed for the project named below.  The State is authorized to provide grant assistance pursuant to *Part 196, Clean Michigan Initiative Implementation, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA)*.  Legislative appropriation of funds for grant assistance is set forth in *2004 PA 309*. This Contract is subject to the terms and conditions specified herein.

Project Name: **Kirsch Lofts/Prospect Project**             Project #: **456645-71**

Amount of Grant: **$1,000,000**                                          Tracking Code: **2009-1121**

Start Date (Date executed by DEQ):   **6-26-2009**        End Date:   **6-26-2011**

**GRANTEE CONTACT:**                                          **STATE'S CONTACT:**

John Hayes, Economic Development Director          Carrie L. Geyer, Grant Coordinator
Name/Title                                                               Name/Title

City of Sturgis                                                        DEQ – Remediation and Redevelopment Division
Organization                                                           Division/Bureau/Office

130 N. Nottawa Street                                            525 West Allegan Street, Constitution Hall, 4 South
Address                                                                   Address

Sturgis, Michigan  49091                                       Lansing, Michigan 48913
Address                                                                   Address

269-659-7223                                                         517-335-6871
Telephone number                                                  Telephone number

269-659-7295                                                         517-373-9657
Fax number                                                           Fax number

JHayes@ci.sturgis.mi.us                                       GeyerC1@michigan.gov
E-mail address                                                       E-mail address

38-6004653
Federal ID number

The individuals signing below certify by their signatures that they are authorized to sign this Grant Contract on behalf of their agencies, and that the parties will fulfill the terms of this Contract, including any attached appendices, as set forth herein.

FOR THE GRANTEE:

_____                    6/24/09
Signature of authorized official                             Date

John Wiedlea, President
Sturgis Brownfield Redevelopment Authority

FOR THE STATE:

_____                    6/26/09
Lynelle Marolf, Acting Division Chief                    Grant Execution Date
Remediation and Redevelopment Division
Michigan Department of Environmental Quality

## I. PROJECT SCOPE

This Contract and its appendices constitute the entire Contract between the State and the Grantee and may be modified only by written agreement between the State and the Grantee.

(A) The scope of this project is limited to the activities specified in Appendix A, and such activities as are authorized by the State under this Contract.  Any change in project scope requires prior written approval in accordance with Section III, Changes, in this Contract.

(B) By acceptance of this Contract, the Grantee commits to complete the project identified in Appendix A within the time period allowed for in this Contract and in accordance with the terms and conditions of this Contract.

## II. CONTRACT PERIOD

Upon signature by the State, the Contract shall be effective from the Start Date until the End Date on Page 1.  The State shall have no responsibility to provide funding to the Grantee for project work performed except between the Start Date and the End Date specified on Page 1.  Expenditures made by the Grantee prior to the Start Date or after the End Date of this Contract are not eligible for payment under this Contract.

## III. CHANGES

Any changes to this Contract other than budget line item revisions less than 20 percent of the budget line item shall be requested by the Grantee in writing, and approved in writing by the State.  The State reserves the right to deny requests for changes to the Contract or to the appendices.  No changes can be implemented without approval by the State.

## IV.  GRANTEE DELIVERABLES AND REPORTING REQUIREMENTS

The Grantee shall submit deliverables and follow reporting requirements specified in Appendix A of this Contract.

(A) The Grantee must complete and submit quarterly progress reports according to a form and format prescribed by the State and must include supporting documentation of eligible project expenses.  These reports shall be due according to the following:

| Reporting Period | Due Date |
| --- | --- |
| January 1 – March 31 | April 30 |
| April 1 – June 30 | July 31 |
| July 1 – September 30 | Before October 15* |
| October 1 – December 31 | January 31 |

*Due to the State's year-end closing procedures, there will be an accelerated due date for the report covering July 1 – September 30.  Advance notification regarding the due date for the quarter ending September 30 will be sent to the Grantee.  If the Grantee is unable to submit a report in early October for the quarter ending September 30, an estimate of expenditures through September 30 must be submitted to allow the State to complete its accounting for that fiscal year.

The forms provided by the State shall be submitted to the State's contact at the address on Page 1.  All required supporting documentation (invoices, proof of payment, etc.) for expenses must be included with the report.

(B) The Grantee shall provide a final project report in a format prescribed by the State.  The Grantee shall submit the final status report, including all supporting documentation for expenses, along with the final project report and any other outstanding products within 30 days from the End Date of the Grant.

(C) The Grantee must provide three (3) copies of all products and deliverables in accordance with Appendix A.

(D)  All products shall acknowledge that the project was supported in whole or in part by the Brownfield Redevelopment Grant and Loan Program, Department of Environmental Quality (DEQ), per the guidelines provided by the program.

(E) If 15 percent (15%) or more of the grant amount is expended in a single quarter, payment requests may be submitted once monthly during that quarter.

## V.  GRANTEE RESPONSIBILITIES

(A) The Grantee agrees to abide by all local, state, and federal laws, rules, ordinances, and regulations in the performance of this grant.

(B) All local, state, and federal permits, if required, are the responsibility of the Grantee.  Award of this grant is not a guarantee of permit approval by the State.

(C) The Grantee shall be solely responsible to pay all taxes, if any, that arise from the Grantee's receipt of this grant.

(D) The Grantee is responsible for the professional quality, technical accuracy, timely completion, and coordination of all designs, drawings, specifications, reports, and other services furnished by the Grantee or its subcontractor under this Contract.  The Grantee or its subcontractor shall, without additional compensation, correct or revise any errors, omissions, or other deficiencies in designs, drawings, specifications, reports, or other services.

(E) The State's approval of drawings, designs, specifications, reports, and incidental work, or materials furnished hereunder shall not in any way relieve the Grantee of responsibility for the technical adequacy of the work.  The State's review, approval, acceptance, or payment for any of the services shall not be construed as a waiver of any rights under this Contract, or of any cause of action arising out of the performance of this Contract.

(F) The Grantee acknowledges that it is a crime to knowingly and willingly file false information with the State for the purpose of obtaining this Contract or any payment under the Contract, and that any such filing may subject the Grantee, its agents, and/or employees to criminal and civil prosecution and/or termination of the grant.

## VI.  USE OF MATERIAL

Unless otherwise specified in this Contract, the Grantee may release information or material developed under this Contract, provided it is acknowledged that the State funded all or a portion of its development.

The State retains an irrevocable license to reproduce, publish, and use in whole or in part, and authorize others to do so, any copyrightable material submitted under this grant whether or not the material is copyrighted by the Grantee or another person.  The Grantee will only submit materials that the State can use in accordance with this paragraph.  Unless otherwise specified in this Contract, the Grantee may not patent products or processes developed under this Contract.

3

## VII. ASSIGNABILITY

The Grantee shall not assign this Contract or assign or delegate any of its duties or obligations under this Contract to any other party without the prior written consent of the State.  The State does not assume responsibility regarding the contractual relationships between the Grantee and any subcontractor.

## VIII. SUBCONTRACTS

The State reserves the right to deny the use of any consultant, contractor, associate, or other personnel to perform any portion of the project.  The Grantee is solely responsible for all contractual activities performed under this Contract.  Further, the State will consider the Grantee to be the sole point of contact with regard to contractual matters, including payment of any and all charges resulting from the anticipated Grant.  All subcontractors used by the Grantee in performing the project shall be subject to the provisions of this Contract and shall be qualified to perform the duties required.

## IX. NON-DISCRIMINATION

The Grantee shall comply with the Elliott Larsen Civil Rights Act, 1976 PA 453, as amended, MCL 37.2101 et seq, the Persons with Disabilities Civil Rights Act, 1976 PA 220, as amended, MCL 37.1101 et seq, and all other federal, state, and local fair employment practices and equal opportunity laws and covenants that it shall not discriminate against any employee or applicant for employment, to be employed in the performance of this Contract, with respect to his or her hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, because of his or her race, religion, color, national origin, age, sex, height, weight, marital status, or physical or mental disability that is unrelated to the individual's ability to perform the duties of a particular job or position.  The Grantee agrees to include in every subcontract entered into for the performance of this Contract this covenant not to discriminate in employment.  A breach of this covenant is a material breach of this Contract.

## X. UNFAIR LABOR PRACTICES

The Grantee shall comply with the Employers Engaging in Unfair Labor Practices Act, 1980 PA 278, as amended, MCL 423.321 et seq.

## XI. LIABILITY

(A) The Grantee, not the State, is responsible for all liabilities as a result of claims, judgments, or costs arising out of activities to be carried out by the Grantee under this Contract, if the liability is caused by the Grantee, any subcontractor, or anyone employed by the Grantee.

(B)  All liability as a result of claims, demands, costs, or judgments arising out of activities to be carried out by the State in the performance of this Contract is the responsibility of the State and not the responsibility of the Grantee if the liability is caused by any State employee or agent.

(C) In the event that liability arises as a result of activities conducted jointly by the Grantee and the State, in fulfillment of their responsibilities under this Contract, such liability is held by the Grantee and the State in relation to each party's responsibilities under these joint activities.

(D)  Nothing in this contract should be construed as a waiver of any governmental immunity by the Grantee, the State, its agencies, or their employees, respectively as provided by statute or court decisions.

## XII. CONFLICT OF INTEREST

No government employee, or member of the legislative, judicial, or executive branches, or member of the Grantee's Board of Directors, its employees, partner agencies, or their families shall benefit financially from any part of this Contract.

## XIII. ANTI-LOBBYING

If all or a portion of this contract is funded with state funds, then the Grantee shall not use any of the grant funds awarded in this contract for the purpose of lobbying as defined in the State of Michigan's lobbying statute, MCL 4.415(2). "'Lobbying' means communicating directly with an official of the executive branch of state government or an official in the legislative branch of state government for the purpose of influencing legislative or administrative action." The Grantee shall not use any of the grant funds awarded in this contract for the purpose of litigation against the State. Further, the Grantee shall require that language of this assurance be included in the award documents of all subawards at all tiers.

## XIV. DEBARMENT AND SUSPENSION

By signing this Contract, the Grantee certifies to the best of its knowledge and belief that it, its agents, and its subcontractors:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any federal department or the State.

(2) Have not within a three-year period preceding this Contract been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state, or local) transaction or contract under a public transaction, as defined in 45CFR1185; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property.

(3) Are not presently indicted or otherwise criminally or civilly charged by a government entity (federal, state, or local) with commission of any of the offenses enumerated in subsection (2).

(4) Have not within a three-year period preceding this Contract had one or more public transactions (federal, state, or local) terminated for cause or default.

(5) Will comply with all applicable requirements of all other state or federal laws, executive orders, regulations, and policies governing this program.

## XV. AUDIT AND ACCESS TO RECORDS

The State reserves the right to conduct a programmatic and financial audit of the project, and the State may withhold payment until the audit is satisfactorily completed. The Grantee will be required to maintain all pertinent records and evidence pertaining to the grant contract, including grant and any required matching funds, in accordance with generally accepted accounting principles and other procedures specified by the State. The State or any of its duly authorized representatives must have access, upon reasonable notice, to such books, records, documents, and other evidence for the purpose of inspection, audit, and copying. The Grantee will provide proper facilities for such access and inspection. All records must be maintained for a minimum of ten (10) years after the final payment has been issued to the Grantee by the State.

## XVI. INSURANCE

(A) The Grantee must maintain insurance or self-insurance that will protect it from claims that may arise from the Grantee's actions under this Contract, or from the actions of others for whom the Grantee may be held liable.

(B) The Grantee must comply with applicable workers' compensation laws while engaging in activities authorized under this Contract.

## XVII. OTHER SOURCES OF FUNDING

The Grantee guarantees that any claims for reimbursement made to the State under this Contract must not be financed by any source other than the State under the terms of this Contract. If funding is received through any other source, the Grantee agrees to delete from Grantee's billings, or to immediately refund to the State, the total amount representing such duplication of funding.

## XVIII. COMPENSATION

(A) A breakdown of costs allowed under this Contract is identified in Appendix A. The State will pay the Grantee a total amount not to exceed the amount on page one of this Contract, in accordance with Appendix A, and only for expenses incurred and paid. All other costs necessary to complete the project are the sole responsibility of the Grantee.

(B) Expenses incurred by the Grantee prior to the Start Date or after the End Date of this Contract are not allowed under the Contract, unless otherwise specified in Appendix A.

(C) The State will approve payment requests after approval of reports and related documentation as required under this Contract.

(D) The State reserves the right to request additional information necessary to substantiate payment requests.

(E) Payments under this Contract may be processed by Electronic Funds Transfer (EFT). The Grantee may register to receive payments by EFT at the Contract & Payment Express Web Site (http://www.cpexpress.state.mi.us).

(F) An amount equal to ten percent (10%) of the grant award will be withheld by the State until the project is completed in accordance with Section XIX, Closeout and Appendix A.

## XIX. CLOSEOUT

(A) A determination of project completion, which may include a site inspection and an audit, shall be made by the State after the Grantee has met any match obligations, satisfactorily completed the activities, and provided products and deliverables described in Appendix A.

(B) Upon issuance of final payment from the State, the Grantee releases the State of all claims against the State arising under this Contract. Unless otherwise provided in this Contract or by State law, final payment under this Contract shall not constitute a waiver of the State's claims against the Grantee.

(C) The Grantee shall immediately refund to the State any payments in excess of the costs allowed by this Contract.

XX.  **CANCELLATION**

This Contract may be canceled by the State, upon 30 days written notice, due to Executive Order, budgetary reduction, or other lack of funding, upon request by the Grantee, or upon mutual agreement by the State and Grantee.  The State reserves the right to provide just and equitable compensation to the Grantee for all satisfactory work completed under this Contract.

XXI.  **TERMINATION**

(A) This Contract may be terminated by the State as follows.

    (1) Upon 30 days written notice to the Grantee:

        a. If the Grantee fails to comply with the terms and conditions of the Contract, or with the requirements of the authorizing legislation cited on Page 1, or the rules promulgated thereunder, or other applicable law or rules.

        b. If the Grantee knowingly and willingly presents false information to the State for the purpose of obtaining this Contract or any payment under this Contract.

        c. If the State finds that the Grantee, or any of the Grantee's agents or representatives, offered or gave gratuities, favors, or gifts of monetary value to any official, employee or agent of the State in an attempt to secure a sub-contract or favorable treatment in awarding, amending, or making any determinations related to the performance of this Contract.

        d. During the 30-day written notice period, the State shall also withhold payment for any findings under subparagraphs a through c, above.

        e. If the Grantee or any subcontractor, manufacturer, or supplier of the Grantee appears in the register of persons engaging in unfair labor practices that is compiled by the Department of Energy, Labor, and Economic Growth, or its successor.

    (2)  Immediately and without further liability to the State if the Grantee, or any agent of the Grantee, or any agent of any subcontract is:

        a. Convicted of a criminal offense incident to the application for or performance of a State, public, or private contract or subcontract;

        b. Convicted of a criminal offense, including but not limited to any of the following: embezzlement, theft, forgery, bribery, falsification, or destruction of records, receiving stolen property, or attempting to influence a public employee to breach the ethical conduct standards for State of Michigan employees;

        c. Convicted under State or federal antitrust statutes; or

        d. Convicted of any other criminal offense that, in the sole discretion of the State, reflects on the Grantee's business integrity.

        e. Added to the federal or state Suspension and Debarment list.

(B) If a grant is terminated, the State reserves the right to require the Grantee to repay all or a portion of funds received under this Contract.

XXII.  **ACCESS AGREEMENTS**

A voluntary access agreement or court-ordered access must be secured by the Grantee prior to performance of the scope of work described in Appendix A for any portion of the project area or property where grant activities will be undertaken and that is not owned by the Grantee. Evidence of access must be provided to the State at its request.

## XXIII.  GRANT ADMINISTRATION

The use of a Grant Administrator to review work plans, reports, and other documents prepared by the Contractor(s), review invoices, write project status reports, and coordinate project activities and communications is eligible for reimbursement conditional upon the State's approval of a scope of work and budget prior to incurring grant administration costs.  Grant administration costs will be limited to three percent (3%) of the total grant amount.

## XXIV.  INELIGIBLE EXPENSES

Although the following costs may be related to the scope of work described in Appendix A, the following are ineligible for reimbursement under the grant:

Office equipment; software; insurance, except liability insurance required pursuant to this Agreement; taxes, except sales taxes; registrations, including registration of an underground storage tank; replacement or purchase of equipment; fees, including Baseline Environmental Assessment petition fees and late fees; drinking water supply replacement, as defined in 1990 AACS Rule 299.5401; operation and maintenance, as defined in 1990 AACS Rule 299.5103(d); restoration of property or infrastructure, unless included in Appendix A; fees for attorneys or legal advice; grant recipient staff time for application submittal; costs incurred for environmental activities under a local Brownfield Redevelopment Authority Plan; costs incurred for activities outside a State-approved work plan; labor overtime; and training.  Travel costs for either vehicle use or vehicle mileage will be reimbursed, but not both.  Other expenses may be determined ineligible in the course of invoice reviews.

## XXV.  BIDS, CONTRACTORS

(A) For contracts over $20,000, the Grantee shall provide, or cause to be provided, the qualifications of the selected contractor(s) to the State.  The State reserves the right to object to the selected contractor(s) or their qualifications.  If the State has objections, it will inform the Grantee in writing within 30 days of receipt of the selected contractor's qualifications.

(B) For any contract over $20,000, except professional services, the Grantee shall solicit, or cause to be solicited, bids from at least three qualified contractors.  The Grantee shall provide to the State, copies of all bids received.  If the contractor that submitted the lowest bid is not the contractor selected, the Grantee must submit written justification for the selection.

(C) Any contractor(s) retained for corrective action on regulated underground storage tanks shall be approved in accordance with Part 213, Leaking Underground Storage Tanks, and Part 215, Underground Storage Tank Financial Assurance, of the NREPA.

(D) Any contractor(s) retained for asbestos abatement shall possess appropriate qualifications to perform asbestos abatement.

(E) Contractor markup on subcontractors and equipment is limited to ten percent (10%) of the original cost.

## XXVI.  WORK PLANS AND PROJECT IMPLEMENTATION

(A) Prior to conducting any activities except property acquisition under the Contract, the Grantee or its contractor shall submit a detailed work plan to the State for its approval.  Work plans must include a description of the proposed activities, a budget, and a schedule for conducting the activities under Appendix A.  A supplementary work plan, budget, and schedule are required for each subsequent phase of work.  The Grantee and its contractor shall not proceed with grant-

8

funded activities until the State approves the work plan, budget, and schedule in writing.  The State may approve, modify and approve, or require amendments to the work plan.

(B) The Grantee or its contractor shall implement the work plan upon the State's written approval and according to the schedules contained therein.  Changes or additions to the work plan may be submitted in writing and are subject to approval by the State.  Changes to work plans without prior approval from the State, or performance of activities that are not part of an approved work plan or an amendment to a work plan, are considered ineligible expenses and may result in the Grantee being responsible for payment of unapproved activities.

## XXVII.   ECONOMIC DEVELOPMENT

(A) The Grant Recipient acknowledges by its signature of this Contract that there have been no material changes in the economic development proposal, property ownership, or other conditions of the property or project since the date the grant funds were awarded.

(B) In the event the proposed development changes or is not implemented, the Grantee shall immediately notify the State in writing and shall secure a new development project for the property within six (6) months after such notification.  The Grantee shall then notify the State in writing of the proposed development.  The alternate development project is also subject to approval by the State.

## XXVII.   OTHER TERMS AND CONDITIONS

(A)  The State may withhold the grant until the State determines that the Grantee is able to proceed with the project scope described in Appendix A, pursuant to Part 196, Section 19612(3), of the NREPA.

(B)  Following completion of the project, the State may conduct annual compliance inspections for two (2) years to determine whether the project is being maintained for the use specified in this Contract.

(C)  The Grantee acknowledges, by signature of this Contract, that the State is not obligated to provide additional funding for this project.  The Grantee shall assume responsibility for any additional environmental activity costs necessary to complete the project in excess of the approved Grant.

# APPENDIX A

**SITE NAME:** Kirsch Lofts/Prospect Project

**TRACKING CODE:** 2009-1121
**PROJECT #:** 456645-71 - Grant
456645-00 - Loan

**GRANTEE:** Sturgis Brownfield Redevelopment Authority
**COUNTY:** St. Joseph

**FUNDING:** $1,000,000 Clean Michigan Initiative (CMI) Brownfield Redevelopment Grant
$1,000,000 CMI Brownfield Redevelopment Loan

---

**FUNDING SOURCE:** Part 196, Clean Michigan Initiative Implementation, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA).  Legislative appropriation of funding assistance is set forth in 2004 PA 309.

**PROPERTY SIZE AND LOCATION:**  The Kirsch Lofts Development is located on approximately 4.6 acres at 301 North Prospect and 415 East Main Streets in Sturgis.  The property had previously been used for office, display, shipping, tooling, etc. by the Kirsch Manufacturing Company.  The site boundaries include East Main to the North, East Hatch Street to the South, and North Prospect to the East (see attached map, Figure 1)."

**SITE HISTORY, OWNERSHIP, AND ENVIRONMENTAL CONDITIONS:**  A historical review of previous property uses dates back to 1922 when the Kirsch Manufacturing Company constructed the oldest portions of the building.  The building was originally constructed for office space as well as employee recreation, which included a large indoor swimming pool, two regulation size bowling alleys, a kitchen and cafeteria, as well as an auditorium and rooftop garden.  The Kirsch Manufacturing Company reorganized and was renamed Kirsch Company in 1928, and the parcels were transferred to the new entity at that time.  The Kirsch Company continued to add parcels to the facility over the years, resulting in a large industrial complex that extended across North Prospect Street to the east where the majority of the manufacturing took place and where the source associated with the Superfund Site designation is located.

The Kirsch Company manufactured Kirsch window treatments, steel and wood curtain rods, and also produced air conditioning heat transfer units.  As indicated above, a portion of the building was utilized as the Kirsch Company headquarters.  Other portions of the building are believed to have been used for display, shipping, for the tooling of cutting parts, and cleaning and painting/lacquering of steel.

Title records reflect a deed in 1981 from Kirsch Company to Cooper Industries, which is when the Kirsch Company was acquired by Cooper Industries.  In 1997, Cooper Industries signed a quit claim deed to Kirsch Inc., when it sold the Kirsch Inc., division to Newell.  Cooper/Newell are responsible for the response activities associated with the ongoing Superfund cleanup at this site and are actively working with the Department of Environmental Quality (DEQ) Superfund staff to fulfill their cleanup responsibilities.

In 1998, the property was sold to WMU Properties.  It is believed that WMU Properties leased the property to others and perhaps used the property itself for approximately three years for storage of wood pallets and to turn the pallets into wood chips.  The 1999 Polk Directory shows a listing under Pallet Management, Inc., which is believed to be related to WMU.  In 2000, the

*6/24/2009*

Polk Directory listed Norton Frame Products Shop, Midwest Environmental and Recycling, Inc., at the address. In 2002, the Polk Directory reflected PMI Pallets and Skids. There was no listing for any entity in the directories from 2003 through 2007, and it is believed that the building was vacant during that time period. None of these entities remain viable, and the title shows a Sheriff's Deed on mortgage sale in 2000 and another in 2006, with the result being that the property is now owned by 1983 Finance Company, LC. Currently, Kirsch Lofts LLC has a purchase agreement in place to acquire the property as soon as grant and loan funding is approved for the project.

Both soil and groundwater beneath the property are contaminated with trichloroethene (TCE) and/or tetrachloroethane (PCE) in excess of generic residential Part 201 criteria. This contamination is believed to be attributable to the Sturgis Municipal Wells Superfund Site, the source of which is located on an adjacent former Kirsch property. The property to be redeveloped is considered to be part of the Superfund Site, though the primary contaminant source is located on the adjacent property. It is estimated that the responsible party has spent approximately $15,000,000 to date, to address cleanup of the site, with considerable work remaining. The ongoing work, which will continue to be paid for by the responsible party, includes the operation of a groundwater treatment system to remove PCE from the groundwater.

Preliminary samples taken surrounding the former Kirsch Headquarters building resulted in the detection of extremely high levels of PCE in the soils directly adjacent to the building. Further investigation needs to be undertaken to determine if this was an isolated incident or if significant contamination that had not previously been identified is present at this location. Therefore, additional site investigation is necessary on this site to determine the extent of contamination in specific areas of concern and to determine the appropriate due care response activities necessary for the redevelopment of this property.

In addition, lead is present inside the building in significant quantities, which would pose public health and safety issues should redevelopment of the building occur without lead abatement activities.

**JOB CREATION AND PRIVATE INVESTMENT:** The subject property will result in nearly $8,600,000 in private investment and is projected to create approximately 80 full-time permanent jobs.

The effect of the development on the community will be the removal of a blighted, unsafe property and the creation of a needed development that will increase the taxable value of the property by as much as $2.9 million.

**REDEVELOPMENT:** The proposed economic redevelopment for the project site will be a mixed-use residential and retail development. The development will incorporate both smart growth principals as well as principals of green sustainable development.

Specifically, the renovation of the former Kirsch Headquarters building will include approximately 30,000 square feet of retail space and approximately 35 condominium units. Three tenants have already been identified for the commercial portion of this project.

The project will provide for increased commercial/retail opportunities in the downtown area and promote the concept of walkable communities.

A proposed site plan for the redevelopment project is given in Figure 2.

*6/24/2009*

**GRANT AND LOAN PROJECT DESCRIPTION:**  The Brownfield Redevelopment Grant and Loan for the Kirsch Lofts Development will include additional assessment activities, demolition, and due care activities necessary for redevelopment of the property to occur.  All activities considered eligible for grant and loan funding will be activities determined to not be the responsibility of the liable party.

The proposed due care actions for the site, based on the currently available site information, may include such activities as additional investigation; the installation of exposure barriers; the installation of vapor barriers; and removal and disposal and/or treatment of impacted soil and groundwater encountered during construction.

Below is a description of the environmental work planned for the project.  Additional work will include lead abatement, disposal of asbestos, and internal building demolition.

<u>Volatilization to Indoor Air Pathway Concern</u>

Due to the proposed future use of the site, the volatilization to indoor air pathway needs to be adequately investigated prior to redevelopment.  To that end, a series of subslab vapor points will be installed and sampled immediately below the existing floor in the southern and eastern wings of the building.  Indoor air samples will be collected and correlated to the subslab soil gas concentrations to determine the presence of potential volatilization pathways.

In addition, soil borings in the courtyard of the building and under the slab will be performed in areas of historical solvent/paint storage.

Based on the results of the investigation, a vapor barrier under the southern and eastern wings of the building and a subslab depressurization venting system under the southern and eastern wings of the building will be designed and installed to mitigate this pathway, as necessary.

<u>Direct Contact Concern</u>

To determine the direct contact issues that could be associated with this site, surface soil samples from areas that will NOT be covered with building and pavement will be collected and analyzed.  These samples will be tested for volatile organic compounds, polynuclear aromatic hydrocarbons, and DEQ 10 metals.

It is currently proposed that clean soil (combination of sand and topsoil) will be placed as a cover over all portions of the property that are not covered by buildings.  Sampling results will provide a clearer understanding of the amount of cover required to meet the direct contact due care requirements of the site.

<u>Solid Waste Issues</u>

As some amount of soil will likely be spoiled during construction activities such as utility upgrades, tree planting, installation of vapor system, etc., the characterization, removal, disposal, and replacement of such soil may be required as a due care activity.

<u>Demolition</u>

Removal of lead from interior walls and surfaces, necessary for the redevelopment of the site, will be included in the work and considered as interior demolition.  The use of funding for the purpose of demolition requires that the site is a facility, the project has a committed developer, and that significant environmental work will be occurring as part of the project.  All three requirements are

*6/24/2009*

met for this project, making it eligible for demolition funding. Disposal of asbestos containing materials generated during the course of demolition activities is also considered to be an eligible activity.

**PROJECT BUDGET:** In addition to the broad budget items listed below, grant and loan funds may be used for work plan and budget development, bid solicitation, technical specifications, and other administrative tasks as approved by the DEQ grant coordinator. For grant eligibility, tasks not listed below must be approved prior to the performance of these tasks.

Prior to the start of any grant-eligible work, a work plan must be submitted to the DEQ for review and approval. Work performed outside of an approved work plan may not be eligible for grant reimbursement. Development of each work plan will be paid for under the budget items listed below. A budget of up to $1,000 is approved for the development of each required work plan. Work plans that will exceed $1,000 must receive specific approval, prior to the performance of the work, in order to be considered grant eligible.

| | | |
|---|---|---|
| Due Care Investigation and Assessment Activities | $62,000 | |
| Due Care Response Activities | $438,000 | |
| Demolition | $139,530 | |
| Lead Abatement | $50,000 | $1,000,000 |
| Disposal of Asbestos Containing Materials | $21,600 | |
| Other Environmental Response Actions | $28,000 | |
| Contingency | $260,870 | |
| **Total** | **$1,000,000** | **$1,000,000** |

**WORK PLANS:** Work plans shall include a detailed budget that breaks down the broad budget items listed above into specific work tasks, and a detailed schedule that shows when each work task will begin and how long each task is expected to take.

All work plans must be submitted and approved by the State prior to the start of the work identified within that work plan. Any activities conducted prior to receiving work plan approval may not be eligible expenses and may result in the Grantee/Borrower being responsible for payment of the unapproved activities.

**PROJECT SCHEDULE:** Work will be initiated on approved projects within two weeks of the State approval of the work plan unless otherwise acknowledged by the State. It is anticipated the project will proceed in accordance with the following schedule. A more detailed schedule shall be submitted as part of the work plan. The development build out is anticipated to be complete by 2012. The majority of grant and loan-related tasks should be complete by June 2010, with some remaining due care tasks to be implemented during the development.

6/24/2009

| | |
|---|---|
| Due Care Investigation and Assessment Activities | July 2009 – December 2009 |
| Due Care Response Activities | October 2009 – March 2010 |
| Demolition | June 2009 – August 2009 |
| Lead Abatement | June 2009 – August 2009 |
| Disposal of Asbestos Containing Materials | June 2009 - August 2009 |

**PROJECT DELIVERABLES:**  The Grantee/Borrower shall provide copies of all relevant environmental permits.

Progress reports are due quarterly and shall be submitted in accordance with DEQ requirements, providing a narrative description of the eligible activities that took place during the quarter.

The Grantee/Borrower shall provide two (2) copies of a final report to the State 45 days prior to the end date of this contract.  The report shall include a description of the work completed under the grant and loan.  Items to be included in the report include, but are not limited to:

- Before and after photographs of the project.
- Summary of the direct and indirect economic benefits provided to the community as a result of the project.
- The final total project cost and total amount of match spent/earned.
- Summary of grant and loan funded environmental work performed at the site.
- A project fact sheet in a format provided by the State.

The Grantee/Borrower shall provide two (2) paper copies and one (1) electronic copy of all deliverables produced using grant and loan funds, including plans, bids, proposals, advertisements, and progress reports.

6/24/2009

# Figure 1.
# Location of Kirsch Lofts Development



Page 6 of 7

6/24/2009

# Figure 2.
# Kirsch Lofts Development Site Plan



Page 7 of 7

6/24/2009

# EXHIBIT L



# BROWNFIELD REDEVELOPMENT LOAN CONTRACT
### BETWEEN THE
### MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY
### AND THE STURGIS BROWNFIELD REDEVELOPMENT AUTHORITY

This Loan Contract ("Contract") is made between the Michigan Department of Environmental Quality, Remediation and Redevelopment Division (hereafter "State") and the Sturgis Brownfield Redevelopment Authority (hereafter "Borrower").

The purpose of this Contract is to provide funding in exchange for work to be performed for the project named below. The State is authorized to provide Loan funding pursuant to *Part 196, Clean Michigan Initiative Implementation, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA)*. Legislative appropriation of funds for the loan program is set forth in **2004 PA 309**. This Contract is subject to the terms and conditions specified herein.

Project Name: **Kirsch Lofts/Prospect Project**  Project #: **456645-00**  Tracking Code: **2009-1121**
Loan Amount: **$1,000,000**  Loan Rate: <u>1.5 Percent</u>  Start Date (Date executed by State): **6-26-2009**
End Date: **6-26-2011**

**BORROWER'S CONTACT:**

John Hayes, Economic Development Director
Name/Title

City of Sturgis
Organization

130 N. Nottawa Street
Address

Sturgis, Michigan 49091
Address

269-659-7223
Telephone number

269-659-7295
Fax number

JHayes@ci.sturgis.mi.us
E-mail address

38-6004653
Federal ID number

**STATE'S CONTACT:**

Carrie L. Geyer, Grant Coordinator
Name/Title

DEQ – Remediation and Redevelopment Division
Division/Bureau/Office

525 West Allegan Street, Constitution Hall, 4 South
Address

Lansing, Michigan 48913
Address

517-335-6871
Telephone number

517-373-9657
Fax number

GeyerC1@michigan.gov
E-mail address

The individuals signing below certify by their signatures that they are authorized to sign this Loan Contract on behalf of their agencies, and that the parties will fulfill the terms of this Contract, including any attached appendices, as set forth herein.

FOR THE BORROWER:

_Signature_  6/24/09
Signature of authorized official          Date

John Wiedlea, President
Sturgis Brownfield Redevelopment Authority

FOR THE STATE:

_Signature_  6/26/09
Lynelle Marolf, Acting Division Chief          Loan Execution Date
Remediation and Redevelopment Division
Michigan Department of Environmental Quality

1

## I. PROJECT SCOPE

This Contract and its appendices constitute the entire Contract between the State and the Borrower and may be modified only by written Contract between the State and the Borrower.

(A) The scope of this project is limited to the activities specified in Appendix A, and such activities as are authorized by the State under this Contract. Any change in project scope requires prior written approval in accordance with Section III, Changes, in this Contract.

(B) By acceptance of this Contract, the Borrower commits to complete the project identified in Appendix A within the time period allowed for in this Contract and in accordance with the terms and conditions of this Contract.

## II. CONTRACT PERIOD

Upon signature by the State, the Contract shall be effective from the Start Date until the End Date on Page 1. The State shall have no responsibility to provide financial assistance to the Borrower for project work performed except between the Start Date and the End Date specified on Page 1. Expenditures made by the Borrower prior to the Start Date or after the End Date of this Contract are not eligible for payment under this Contract.

## III. CHANGES

Any changes to this Contract other than budget line item revisions less than 20 percent of the budget line item shall be requested by the Borrower in writing, and approved in writing by the State. The State reserves the right to deny requests for changes to the Contract or to the appendices. No changes can be implemented without approval by the State.

## IV. BORROWER DELIVERABLES AND REPORTING REQUIREMENTS

The Borrower shall submit deliverables and follow reporting requirements specified in Appendix A of this Contract.

(A) The Borrower must complete and submit quarterly progress reports according to a form and format prescribed by the State and must include supporting documentation of eligible project expenses. These reports shall be due according to the following:

| Reporting Period | Due Date |
| --- | --- |
| January 1 – March 31 | April 30 |
| April 1 – June 30 | July 31 |
| July 1 – September 30 | October 15 |
| October 1 – December 31 | January 31 |

The forms provided by the State shall be submitted to the State's contact at the address on Page 1. All required supporting documentation (invoices, proof of payment, etc.) for expenses must be included with the report.

(B) The Borrower shall provide a final project report in a format prescribed by the State. The Borrower shall submit the final status report, including all supporting documentation for expenses, along with the final project report and any other outstanding products within 30 days from the End Date of the Loan.

2

KIRSCHLOFTS000898
Rev. 6-4-09

(C) The Borrower must provide three (3) copies of all products and deliverables in accordance with Appendix A.

(D) All products shall acknowledge that the project was supported in whole or in part by the Brownfield Redevelopment Grant and Loan Program, Department of Environmental Quality (DEQ), per the guidelines provided by the program.

## V.  BORROWER RESPONSIBILITIES

(A) The Borrower agrees to abide by all local, state, and federal laws, rules, ordinances, and regulations in the performance of this loan.

(B) All local, state, and federal permits, if required, are the responsibility of the Borrower.  Award of this loan is not a guarantee of permit approval by the State.

(C) The Borrower shall be solely responsible to pay all taxes, if any, that arise from the Borrower's receipt of this loan.

(D) The Borrower is responsible for the professional quality, technical accuracy, timely completion, and coordination of all designs, drawings, specifications, reports, and other services furnished by the Borrower or its subcontractor under this Contract.  The Borrower or its subcontractor shall, without additional compensation, correct or revise any errors, omissions, or other deficiencies in designs, drawings, specifications, reports, or other services.

(E) The State's approval of drawings, designs, specifications, reports, and incidental work, or materials furnished hereunder shall not in any way relieve the Borrower of responsibility for the technical adequacy of the work.  The State's review, approval, acceptance, or payment for any of the services shall not be construed as a waiver of any rights under this Contract, or of any cause of action arising out of the performance of this Contract.

(F) The Borrower acknowledges that it is a crime to knowingly and willingly file false information with the State for the purpose of obtaining this Contract or any payment under the Contract, and that any such filing may subject the Borrower, its agents, and/or employees to criminal and civil prosecution and/or termination of the loan.

## VI.  USE OF MATERIAL

Unless otherwise specified in this Contract, the Borrower may release information or material developed under this Contract, provided it is acknowledged that the State funded all or a portion of its development.

The State retains an irrevocable license to reproduce, publish, and use in whole or in part, and authorize others to do so, any copyrightable material submitted under this loan whether or not the material is copyrighted by the Borrower or another person.  The Borrower will only submit materials that the State can use in accordance with this paragraph.  Unless otherwise specified in this Contract, the Borrower may not patent products or processes developed under this Contract.

## VII. ASSIGNABILITY

The Borrower shall not assign this Contract or assign or delegate any of its duties or obligations under this Contract to any other party without the prior written consent of the State.  The State does not assume responsibility regarding the contractual relationships between the Borrower and any subcontractor.

KIRSCHLOFTS000899
Rev. 6-4-09

## VIII. SUBCONTRACTS

The State reserves the right to deny the use of any consultant, contractor, associate, or other personnel to perform any portion of the project.  The Borrower is solely responsible for all contractual activities performed under this Contract.  Further, the State will consider the Borrower to be the sole point of contact with regard to contractual matters, including payment of any and all charges resulting from the anticipated Loan.  All subcontractors used by the Borrower in performing the project shall be subject to the provisions of this Contract and shall be qualified to perform the duties required.

## IX. NON-DISCRIMINATION

The Borrower shall comply with the Elliott Larsen Civil Rights Act, 1976 PA 453, as amended, MCL 37.2101 et seq, the Persons with Disabilities Civil Rights Act, 1976 PA 220, as amended, MCL 37.1101 et seq, and all other federal, state, and local fair employment practices and equal opportunity laws and covenants that it shall not discriminate against any employee or applicant for employment, to be employed in the performance of this Contract, with respect to his or her hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, because of his or her race, religion, color, national origin, age, sex, height, weight, marital status, or physical or mental disability that is unrelated to the individual's ability to perform the duties of a particular job or position.  The Borrower agrees to include in every subcontract entered into for the performance of this Contract this covenant not to discriminate in employment.  A breach of this covenant is a material breach of this Contract.

## X. UNFAIR LABOR PRACTICES

The Grantee shall comply with the Employers Engaging in Unfair Labor Practices Act, 1980 PA 278, as amended, MCL 423.321 et seq.

## XI. LIABILITY

(A) The Borrower, not the State, is responsible for all liabilities as a result of claims, judgments, or costs arising out of activities to be carried out by the Borrower under this Contract, if the liability is caused by the Borrower, any subcontractor, or anyone employed by the Borrower.

(B) All liability as a result of claims, demands, costs, or judgments arising out of activities to be carried out by the State in the performance of this Contract is the responsibility of the State and not the responsibility of the Borrower if the liability is caused by any State employee or agent.

(C) In the event that liability arises as a result of activities conducted jointly by the Borrower and the State, in fulfillment of their responsibilities under this Contract, such liability is held by the Borrower and the State in relation to each party's responsibilities under these joint activities.

(D) Nothing in this contract should be construed as a waiver of any governmental immunity by the Borrower, the State, its agencies, or their employees, respectively as provided by statute or court decisions.

## XII. CONFLICT OF INTEREST

No government employee, or member of the legislative, judicial, or executive branches, or member of the Borrower's Board of Directors, its employees, partner agencies, or their families shall benefit financially from any part of this Contract.

4

## XIII.  ANTI-LOBBYING

If all or a portion of this contract is funded with state funds, then the Borrower shall not use any of the loan funds awarded in this contract for the purpose of lobbying as defined in the State of Michigan's lobbying statute, MCL 4.415(2). "'Lobbying' means communicating directly with an official of the executive branch of state government or an official in the legislative branch of state government for the purpose of influencing legislative or administrative action." The Borrower shall not use any of the loan funds awarded in this contract for the purpose of litigation against the State. Further, the Borrower shall require that language of this assurance be included in the award documents of all subawards at all tiers.

## XIV.  DEBARMENT AND SUSPENSION

By signing this Contract, the Borrower certifies to the best of its knowledge and belief that it, its agents, and its subcontractors:

(1) Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from covered transactions by any federal department or the State.

(2) Have not within a three-year period preceding this Contract been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state, or local) transaction or contract under a public transaction, as defined in 45CFR1185; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property.

(3) Are not presently indicted or otherwise criminally or civilly charged by a government entity (federal, state, or local) with commission of any of the offenses enumerated in subsection (2).

(4) Have not, within a three-year period preceding this Contract, had one or more public transactions (federal, state, or local) terminated for cause or default.

(5) Will comply with all applicable requirements of all other state or federal laws, executive orders, regulations, and policies governing this program.

## XV.  AUDIT AND ACCESS TO RECORDS

The State reserves the right to conduct a programmatic and financial audit of the project, and the State may withhold payment until the audit is satisfactorily completed. The Borrower will be required to maintain all pertinent records and evidence pertaining to the loan contract, in accordance with generally accepted accounting principles and other procedures specified by the State. The State or any of its duly authorized representatives must have access, upon reasonable notice, to such books, records, documents, and other evidence for the purpose of inspection, audit, and copying. The Borrower will provide proper facilities for such access and inspection. All records must be maintained for a minimum of ten (10) years after the final payment has been issued to the Borrower by the State.

## XVI.  INSURANCE

(A) The Borrower must maintain insurance or self-insurance that will protect it from claims that may arise from the Borrower's actions under this Contract or from the actions of others for whom the Borrower may be held liable.
(B) The Borrower must comply with applicable workers' compensation laws while engaging in activities authorized under this Contract.

KIRSCHLOETS000901
Rev. 6-4-09

## XVII.  OTHER SOURCES OF FUNDING

The Borrower guarantees that any claims for reimbursement made to the State under this Contract must not be financed by any source other than the State under the terms of this Contract.  If funding is received through any other source, the Borrower agrees to delete from Borrower's billings, or to immediately refund to the State, the total amount representing such duplication of funding.

## XVIII.  COMPENSATION

(A) A breakdown of costs allowed under this Contract is identified in Appendix A.  The State will pay the Borrower a total amount not to exceed the amount on page one of this Contract, in accordance with Appendix A.  All other costs necessary to complete the project are the sole responsibility of the Borrower.

(B) Expenses incurred by the Borrower prior to the Start Date or after the End Date of this Contract are not allowed under the Contract, unless otherwise specified in Appendix A.

(C) Loan payments, or draws, are based on work plans and budgets submitted to and approved by the State.  The entire loan amount will not be disbursed at one time unless a single work plan for the full Loan amount is approved.  After the work plan and budget are approved, the Borrower will receive payment for the amount of the approved budget only.

(D) The State reserves the right to request additional information necessary to substantiate payment requests, before approving a Loan draw.

(E) All draws must be completed within two (2) years of the Loan Execution Date.

1.  If the project has not been completed after two (2) years, the Borrower may request in writing an extension of time to complete the project in accordance with Section III of this Contract. Request for an extension of time must be received by the State's Project Administrator 30 days prior to the Project End Date.
2.  If the entire amount of the approved loan is not drawn after two (2) years and the project work is completed, a new amortization schedule will be prepared reflecting the total amount drawn. The Loan Contract will be amended to incorporate the new repayment schedule.

## XIX.  CLOSEOUT

(A) A determination of project completion, which may include a site inspection and an audit, shall be made by the State after the Borrower has completed the project activities and provided all products and deliverables described in Appendix A.

(B) Upon issuance of final payment from the State, the Borrower releases the State of all claims against the State arising under this Contract.  Unless otherwise provided in this Contract, or by State law, final payment under this Contract shall not constitute a waiver of the State's claims against the Borrower.
(C) The Borrower shall immediately refund to the State any payments in excess of the costs allowed by this Contract including funds disbursed for activities deemed to be ineligible upon invoice review.

## XX.  CANCELLATION

This Contract may be canceled by the State, upon 30 days written notice, due to Executive Order, budgetary reduction, or other lack of funding, upon request by the Borrower, or upon mutual agreement by the State and Borrower.  The State reserves the right to provide just and equitable compensation to the Borrower for all satisfactory work completed under this Contract.

KIRSCHLOFTS000902
Rev. 6-4-09

## XXI. TERMINATION

(A) This Contract may be terminated by the State as follows.

   (1) Upon 30 days written notice to the Borrower:

      a. If the Borrower fails to comply with the terms and conditions of the Contract, or with the requirements of the authorizing legislation cited on Page 1, or the rules promulgated thereunder, or other applicable law or rules.

      b. If the Borrower knowingly and willingly presents false information to the State for the purpose of obtaining this Contract or any payment under this Contract.

      c. If the State finds that the Borrower, or any of the Borrower's agents or representatives, offered or gave gratuities, favors, or gifts of monetary value to any official, employee or agent of the State in an attempt to secure a subcontract or favorable treatment in awarding, amending, or making any determinations related to the performance of this Contract.

      d. During the 30-day written notice period, the State shall also withhold payment for any findings under subparagraphs a through c, above.

      e. If the Borrower or any subcontractor, manufacturer, or supplier of the Borrower appears in the register of persons engaging in unfair labor practices that is compiled by the Department of Energy, Labor, and Economic Growth, or its successor.

   (2) Immediately and without further liability to the State if the Borrower, or any agent of the Borrower, or any agent of any subcontract is:

      a. Convicted of a criminal offense incident to the application for or performance of a State, public, or private contract or subcontract;

      b. Convicted of a criminal offense, including but not limited to any of the following: embezzlement, theft, forgery, bribery, falsification, or destruction of records, receiving stolen property, or attempting to influence a public employee to breach the ethical conduct standards for State of Michigan employees;

      c. Convicted under State or federal antitrust statutes; or

      d. Convicted of any other criminal offense that, in the sole discretion of the State, reflects on the Borrower's business integrity.

      e. Added to the federal or state Suspension and Debarment list.

## XXII. ACCESS AGREEMENT

A voluntary access agreement or court-ordered access must be secured by the Borrower prior to performance of the scope of work described in Appendix A for any portion of the project area or property where loan activities will be undertaken and that is not owned by the Borrower.  Evidence of access must be provided to the State at its request.

## XXIII. BIDS, CONTRACTORS

(A) For contracts over $20,000 the Borrower shall provide, or cause to be provided, the qualifications of the selected contractor(s) to the State.  The State reserves the right to object to the selected contractor(s) or their qualifications.  If the State has objections, it will inform the Borrower in writing within thirty (30) days of receipt of the selected contractor's qualifications.

(B) For any contract over $20,000, except professional services, the Borrower shall solicit, or cause to be solicited, bids from at least three qualified contractors.  The Borrower shall provide to the State, copies of all bids received.  If the contractor that submitted the lowest bid is not the contractor selected, the Borrower must submit written justification for the selection.

KIRSCHLOFTS000903
Rev. 6-4-09

(C) Any contractor(s) retained for corrective action on regulated underground storage tanks shall be approved in accordance with Part 213, Leaking Underground Storage Tanks, and Part 215, Underground Storage Tank Financial Assurance, of the NREPA.

(D) Any contractor(s) retained for asbestos abatement shall possess appropriate qualifications to perform asbestos abatement.

## XXIV. WORK PLANS AND PROJECT IMPLEMENTATION

(A) Prior to conducting any activities except property acquisition under the Contract, the Borrower or its contractor shall submit a detailed work plan to the State for its approval. Work plans must include a description of the proposed activities, a budget and draw request, and a schedule for conducting the activities under Appendix A. A supplementary work plan, budget and draw request, and schedule are required for each subsequent phase of work. The Borrower and its contractor shall not proceed with loan-funded activities until the State approves the work plan, budget, and schedule in writing. The State may approve, modify and approve, or require amendments to the work plan.

(B) The Borrower or its contractor shall implement the work plan upon the State's written approval and according to the schedules contained therein. Changes or additions to the work plan may be submitted in writing and are subject to approval by the State. Changes to work plans without prior approval from the State, or performance of activities that are not part of an approved work plan or an amendment to a work plan, are considered ineligible expenses and may result in the Borrower being responsible for payment of unapproved activities.

## XXIV. INELIGIBLE EXPENSES

Although the following costs may be related to the scope of work described in Appendix A, the following are ineligible for reimbursement under the loan:

Office equipment; software; insurance, except liability insurance required pursuant to this Agreement; taxes, except sales taxes; registrations, including registration of an underground storage tank; replacement or purchase of equipment; fees, including Baseline Environmental Assessment petition fees, late fees and permit fees; drinking water supply replacement, as defined in 1990 AACS Rule 299.5401; operation and maintenance, as defined in 1990 AACS Rule 299.5103(d); restoration of property or infrastructure, unless included in Appendix A; fees for attorneys or legal advice; loan recipient staff time for application submittal; costs incurred for environmental activities under a local Brownfield Redevelopment Authority Plan; costs incurred for activities outside a State-approved work plan; labor overtime; and training. Travel costs for either vehicle use or vehicle mileage will be reimbursed, but not both. Other expenses may be determined ineligible in the course of invoice reviews.

## XXVI. OTHER TERMS AND CONDITIONS

(A) Contractor markup on subcontractors and equipment is limited to ten percent (10%) of the original cost.

(B) The use of a Loan Administrator to review work plans, reports, and other documents prepared by the Contractor(s), review invoices, write project status reports, and coordinate project activities and communications is eligible for reimbursement conditional upon the State's approval of a scope of work and budget prior to incurring loan administration costs. Loan administration costs will be limited to three percent (3%) of the total loan amount.

8

(C)  The State may withhold the loan until the State determines that the Borrower is able to proceed with the project scope described in Appendix A, pursuant to Part 196, Section 19612(3), of the NREPA.

(D)  Following completion of the project, the State may conduct annual compliance inspections for two (2) years to determine whether the project is being maintained for the use specified in this Contract.

(E)  The Borrower acknowledges, by signature of this Contract, that the State is not obligated to provide additional funding for this project.  The Borrower shall assume responsibility for any additional environmental activity costs necessary to complete the project and in excess of the approved Loan.

(F)  The Loan Recipient acknowledges by its signature of this Contract that there have been no material changes in the economic development proposal, property ownership, or other conditions of the property or project since the date the loan funds were awarded.  If the proposed development changes, the Borrower shall immediately notify the State in writing.

## XXVII. SUCCESSOR PARTIES

At any time, the Borrower may substitute any affiliate or successor in interest after a merger or consolidation or other legal act that transfers fiduciary responsibility of the Borrower through receivership, etc. for this Contract and all other documents related to the Loan.  Similarly, any statutory successor or successor agency named in an Executive Order of the Governor may be substituted for the Department of Environmental Quality in this Contract and all other documents related to the Loan.  Each party shall notify the other in writing of a substitution under this section.

## XXVIII. LOAN TERMS

(A)  Loans are required to be secured by a commitment of the local government's full faith and credit, through submission of a resolution with the Loan application, and attached to this Contract as Appendix C.  If the Borrower is a Brownfield Redevelopment Authority, established pursuant to the Brownfield Redevelopment Financing Act, 1996 PA 381, MCL 125.2651 to 125.2672, the commitment shall come from the entity that created the authority.  Payments on loans in default may be withheld from the local government's state revenue sharing payment.

(B)  Loan repayments are made in equal annual installments of principal and interest beginning not later than five (5) years after execution of this Contract and concluding not later than 15 years after the Loan Execution Date.  Appendix B contains the Amortization Schedule for this Loan.  There is no penalty for early repayment of the loan.  If the loan is repaid in full prior to the Interest Start Date, no interest shall be charged on the loan principle.

(C)  The interest rate established, when the loan is executed, will remain in effect throughout the term of the loan.

(D)  Interest on approved loans is fixed and is calculated under simple interest terms, based on a 360-day year.  Interest is charged on the remaining principle beginning five years from the Loan Execution Date.  See the attached Amortization Schedule in Appendix B of this Contract.

## XXIX. REPAYMENTS/DELINQUENCY/DEFAULTS

(A)  A Borrower may pay off a portion or the entire amount of the loan within the first five (5) years without interest or penalty.  Any partial payments made during the first five (5) years of the term of the Loan will reduce the principal amount of the Loan subject to interest beginning in year six (6).  If partial repayments are made during the first five (5) years, a new Amortization Schedule will be provided by the State to the Borrower reflecting those transactions and the new balance no later than 60 days prior

KIRSCHLOFTS000905
Rev. 6-4-09

to the sixth year anniversary of the Loan Contract.  No prepayment shall relieve the Borrower's obligation to make subsequent scheduled annual payments when due.

(B)  The Borrower shall remit annual payments by check made payable to: "State of Michigan." Checks shall be mailed to:  **Department of Environmental Quality, Office of Financial Management, Cashier's Office, P.O. Box 30657, Lansing, MI 48909.**  Checks shall be identified by project number and tracking code.

(C)  Annual payments unpaid 30 days after the annual due date shall be considered delinquent.

(D) A loan shall be considered in default when the annual payment remains unpaid 90 days after the annual due date.

(E)  Upon default, the Department of Treasury shall withhold from the Borrower state payments in amounts consistent with the repayment schedule of the Loan Contract until the Loan is repaid.  If the amount of the delinquent payment exceeds the quarterly revenue sharing payment, the Department of Treasury will be asked to reduce subsequent revenue sharing payments until the annual payment is paid in full.

KIRSCHLOFTS000906
Rev. 6-4-09

# APPENDIX A

**SITE NAME:** Kirsch Lofts/Prospect Project        **TRACKING CODE:** 2009-1121
                                                    **PROJECT #:** 456645-71 - Grant
                                                    456645-00 - Loan

**GRANTEE:** Sturgis Brownfield Redevelopment Authority
**COUNTY:**  St. Joseph

**FUNDING:**  $1,000,000 Clean Michigan Initiative (CMI) Brownfield Redevelopment Grant
              $1,000,000 CMI Brownfield Redevelopment Loan

---

**FUNDING SOURCE:** Part 196, Clean Michigan Initiative Implementation, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA). Legislative appropriation of funding assistance is set forth in 2004 PA 309.

**PROPERTY SIZE AND LOCATION:** The Kirsch Lofts Development is located on approximately 4.6 acres at 301 North Prospect and 415 East Main Streets in Sturgis. The property had previously been used for office, display, shipping, tooling, etc. by the Kirsch Manufacturing Company. The site boundaries include East Main to the North, East Hatch Street to the South, and North Prospect to the East (see attached map, Figure 1)."

**SITE HISTORY, OWNERSHIP, AND ENVIRONMENTAL CONDITIONS:** A historical review of previous property uses dates back to 1922 when the Kirsch Manufacturing Company constructed the oldest portions of the building. The building was originally constructed for office space as well as employee recreation, which included a large indoor swimming pool, two regulation size bowling alleys, a kitchen and cafeteria, as well as an auditorium and rooftop garden. The Kirsch Manufacturing Company reorganized and was renamed Kirsch Company in 1928, and the parcels were transferred to the new entity at that time. The Kirsch Company continued to add parcels to the facility over the years, resulting in a large industrial complex that extended across North Prospect Street to the east where the majority of the manufacturing took place and where the source associated with the Superfund Site designation is located.

The Kirsch Company manufactured Kirsch window treatments, steel and wood curtain rods, and also produced air conditioning heat transfer units. As indicated above, a portion of the building was utilized as the Kirsch Company headquarters. Other portions of the building are believed to have been used for display, shipping, for the tooling of cutting parts, and cleaning and painting/lacquering of steel.

Title records reflect a deed in 1981 from Kirsch Company to Cooper Industries, which is when the Kirsch Company was acquired by Cooper Industries. In 1997, Cooper Industries signed a quit claim deed to Kirsch Inc., when it sold the Kirsch Inc., division to Newell. Cooper/Newell are responsible for the response activities associated with the ongoing Superfund cleanup at this site and are actively working with the Department of Environmental Quality (DEQ) Superfund staff to fulfill their cleanup responsibilities.

In 1998, the property was sold to WMU Properties. It is believed that WMU Properties leased the property to others and perhaps used the property itself for approximately three years for storage of wood pallets and to turn the pallets into wood chips. The 1999 Polk Directory shows a listing under Pallet Management, Inc., which is believed to be related to WMU. In 2000, the

6/24/2009
KIRSCHLOFTS000907

Polk Directory listed Norton Frame Products Shop, Midwest Environmental and Recycling, Inc., at the address. In 2002, the Polk Directory reflected PMI Pallets and Skids. There was no listing for any entity in the directories from 2003 through 2007, and it is believed that the building was vacant during that time period. None of these entities remain viable, and the title shows a Sheriff's Deed on mortgage sale in 2000 and another in 2006, with the result being that the property is now owned by 1983 Finance Company, LC. Currently, Kirsch Lofts LLC has a purchase agreement in place to acquire the property as soon as grant and loan funding is approved for the project.

Both soil and groundwater beneath the property are contaminated with trichloroethene (TCE) and/or tetrachloroethene (PCE) in excess of generic residential Part 201 criteria. This contamination is believed to be attributable to the Sturgis Municipal Wells Superfund Site, the source of which is located on an adjacent former Kirsch property. The property to be redeveloped is considered to be part of the Superfund Site, though the primary contaminant source is located on the adjacent property. It is estimated that the responsible party has spent approximately $15,000,000 to date, to address cleanup of the site, with considerable work remaining. The ongoing work, which will continue to be paid for by the responsible party, includes the operation of a groundwater treatment system to remove PCE from the groundwater.

Preliminary samples taken surrounding the former Kirsch Headquarters building resulted in the detection of extremely high levels of PCE in the soils directly adjacent to the building. Further investigation needs to be undertaken to determine if this was an isolated incident or if significant contamination that had not previously been identified is present at this location. Therefore, additional site investigation is necessary on this site to determine the extent of contamination in specific areas of concern and to determine the appropriate due care response activities necessary for the redevelopment of this property.

In addition, lead is present inside the building in significant quantities, which would pose public health and safety issues should redevelopment of the building occur without lead abatement activities.

**JOB CREATION AND PRIVATE INVESTMENT:** The subject property will result in nearly $8,600,000 in private investment and is projected to create approximately 80 full-time permanent jobs.

The effect of the development on the community will be the removal of a blighted, unsafe property and the creation of a needed development that will increase the taxable value of the property by as much as $2.9 million.

**REDEVELOPMENT:** The proposed economic redevelopment for the project site will be a mixed-use residential and retail development. The development will incorporate both smart growth principals as well as principals of green sustainable development.

Specifically, the renovation of the former Kirsch Headquarters building will include approximately 30,000 square feet of retail space and approximately 35 condominium units. Three tenants have already been identified for the commercial portion of this project.

The project will provide for increased commercial/retail opportunities in the downtown area and promote the concept of walkable communities.

A proposed site plan for the redevelopment project is given in Figure 2.

6/24/2009
KIRSCHLOFTS000908

**GRANT AND LOAN PROJECT DESCRIPTION:**  The Brownfield Redevelopment Grant and Loan for the Kirsch Lofts Development will include additional assessment activities, demolition, and due care activities necessary for redevelopment of the property to occur.  All activities considered eligible for grant and loan funding will be activities determined to not be the responsibility of the liable party.

The proposed due care actions for the site, based on the currently available site information, may include such activities as additional investigation; the installation of exposure barriers; the installation of vapor barriers; and removal and disposal and/or treatment of impacted soil and groundwater encountered during construction.

Below is a description of the environmental work planned for the project.  Additional work will include lead abatement, disposal of asbestos, and internal building demolition.

Volatilization to Indoor Air Pathway Concern

Due to the proposed future use of the site, the volatilization to indoor air pathway needs to be adequately investigated prior to redevelopment.  To that end, a series of subslab vapor points will be installed and sampled immediately below the existing floor in the southern and eastern wings of the building.  Indoor air samples will be collected and correlated to the subslab soil gas concentrations to determine the presence of potential volatilization pathways.

In addition, soil borings in the courtyard of the building and under the slab will be performed in areas of historical solvent/paint storage.

Based on the results of the investigation, a vapor barrier under the southern and eastern wings of the building and a subslab depressurization venting system under the southern and eastern wings of the building will be designed and installed to mitigate this pathway, as necessary.

Direct Contact Concern

To determine the direct contact issues that could be associated with this site, surface soil samples from areas that will NOT be covered with building and pavement will be collected and analyzed.  These samples will be tested for volatile organic compounds, polynuclear aromatic hydrocarbons, and DEQ 10 metals.

It is currently proposed that clean soil (combination of sand and topsoil) will be placed as a cover over all portions of the property that are not covered by buildings.  Sampling results will provide a clearer understanding of the amount of cover required to meet the direct contact due care requirements of the site.

Solid Waste Issues

As some amount of soil will likely be spoiled during construction activities such as utility upgrades, tree planting, installation of vapor system, etc., the characterization, removal, disposal, and replacement of such soil may be required as a due care activity.

Demolition

Removal of lead from interior walls and surfaces, necessary for the redevelopment of the site, will be included in the work and considered as interior demolition.  The use of funding for the purpose of demolition requires that the site is a facility, the project has a committed developer, and that significant environmental work will be occurring as part of the project.  All three requirements are

6/24/2009
KIRSCHLOFTS000909

met for this project, making it eligible for demolition funding.  Disposal of asbestos containing materials generated during the course of demolition activities is also considered to be an eligible activity.

**PROJECT BUDGET:**  In addition to the broad budget items listed below, grant and loan funds may be used for work plan and budget development, bid solicitation, technical specifications, and other administrative tasks as approved by the DEQ grant coordinator.  For grant eligibility, tasks not listed below must be approved prior to the performance of these tasks.

Prior to the start of any grant-eligible work, a work plan must be submitted to the DEQ for review and approval.  Work performed outside of an approved work plan may not be eligible for grant reimbursement.  Development of each work plan will be paid for under the budget items listed below.  A budget of up to $1,000 is approved for the development of each required work plan.  Work plans that will exceed $1,000 must receive specific approval, prior to the performance of the work, in order to be considered grant eligible.

| | | |
|---|---|---|
| Due Care Investigation and Assessment Activities | $62,000 | |
| Due Care Response Activities | $438,000 | |
| Demolition | $139,530 | |
| Lead Abatement | $50,000 | $1,000,000 |
| Disposal of Asbestos Containing Materials | $21,600 | |
| Other Environmental Response Actions | $28,000 | |
| Contingency | $260,870 | |
| **Total** | **$1,000,000** | **$1,000,000** |

**WORK PLANS:**  Work plans shall include a detailed budget that breaks down the broad budget items listed above into specific work tasks, and a detailed schedule that shows when each work task will begin and how long each task is expected to take.

All work plans must be submitted and approved by the State prior to the start of the work identified within that work plan.  Any activities conducted prior to receiving work plan approval may not be eligible expenses and may result in the Grantee/Borrower being responsible for payment of the unapproved activities.

**PROJECT SCHEDULE:**  Work will be initiated on approved projects within two weeks of the State approval of the work plan unless otherwise acknowledged by the State.  It is anticipated the project will proceed in accordance with the following schedule.  A more detailed schedule shall be submitted as part of the work plan.  The development build out is anticipated to be complete by 2012.  The majority of grant and loan-related tasks should be complete by June 2010, with some remaining due care tasks to be implemented during the development.

6/24/2009
KIRSCHLOFTS000910

| | |
|---|---|
| Due Care Investigation and Assessment Activities | July 2009 – December 2009 |
| Due Care Response Activities | October 2009 – March 2010 |
| Demolition | June 2009 – August 2009 |
| Lead Abatement | June 2009 – August 2009 |
| Disposal of Asbestos Containing Materials | June 2009 - August 2009 |

**PROJECT DELIVERABLES:**  The Grantee/Borrower shall provide copies of all relevant environmental permits.

Progress reports are due quarterly and shall be submitted in accordance with DEQ requirements, providing a narrative description of the eligible activities that took place during the quarter.

The Grantee/Borrower shall provide two (2) copies of a final report to the State 45 days prior to the end date of this contract.  The report shall include a description of the work completed under the grant and loan.  Items to be included in the report include, but are not limited to:

- Before and after photographs of the project.
- Summary of the direct and indirect economic benefits provided to the community as a result of the project.
- The final total project cost and total amount of match spent/earned.
- Summary of grant and loan funded environmental work performed at the site.
- A project fact sheet in a format provided by the State.

The Grantee/Borrower shall provide two (2) paper copies and one (1) electronic copy of all deliverables produced using grant and loan funds, including plans, bids, proposals, advertisements, and progress reports.

6/24/2009
KIRSCHLOFTS000911

# Figure 1.
# Location of Kirsch Lofts Development



Page 6 of 7

8/24/2009

KIRSCHLOFTS000912

# Figure 2.
# Kirsch Lofts Development Site Plan



Page 7 of 7

6/24/2009

KIRSCHLOFTS000913

# APPENDIX B
## AMORTIZATION SCHEDULE

KIRSCHLOFTS000914

06/26/2009   Page 1

State of Michigan
Department of Environmental Quality
Remediation and Redevelopment Division

Kirsch Lofts/Prospect Project 2009-1121

Compound Period ........: Annual

Nominal Annual Rate ....:    1.500    %
Effective Annual Rate ...:  Undefined
Periodic Rate ...............:    1.5000   %
Daily Rate ...................:    0.00417 %

CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|-------|-----------|--------|--------|--------|----------|
| 1 Loan | 06/26/2014 | 1,000,000.00 | 1 | | |
| 2 Payment | 06/26/2014 | 97,826.45 | 11 | Annual | 06/26/2024 |

AMORTIZATION SCHEDULE - US Rule, 360 Day Year

| Date | Payment | Interest | Principal | Balance |
|------|---------|----------|-----------|---------|
| Loan 06/26/2014 | | | | 1,000,000.00 |
| 1 06/26/2014 | 97,826.45 | 0.00 | 97,826.45 | 902,173.55 |
| 2014 Totals | 97,826.45 | 0.00 | 97,826.45 | |
| 2 06/26/2015 | 97,826.45 | 13,532.60 | 84,293.85 | 817,879.70 |
| 2015 Totals | 97,826.45 | 13,532.60 | 84,293.85 | |
| 3 06/26/2016 | 97,826.45 | 12,268.20 | 85,558.25 | 732,321.45 |
| 2016 Totals | 97,826.45 | 12,268.20 | 85,558.25 | |
| 4 06/26/2017 | 97,826.45 | 10,984.82 | 86,841.63 | 645,479.82 |
| 2017 Totals | 97,826.45 | 10,984.82 | 86,841.63 | |
| 5 06/26/2018 | 97,826.45 | 9,682.20 | 88,144.25 | 557,335.57 |
| 2018 Totals | 97,826.45 | 9,682.20 | 88,144.25 | |
| 6 06/26/2019 | 97,826.45 | 8,360.03 | 89,466.42 | 467,869.15 |
| 2019 Totals | 97,826.45 | 8,360.03 | 89,466.42 | |
| 7 06/26/2020 | 97,826.45 | 7,018.04 | 90,808.41 | 377,060.74 |
| 2020 Totals | 97,826.45 | 7,018.04 | 90,808.41 | |
| 8 06/26/2021 | 97,826.45 | 5,655.91 | 92,170.54 | 284,890.20 |
| 2021 Totals | 97,826.45 | 5,655.91 | 92,170.54 | |
| 9 06/26/2022 | 97,826.45 | 4,273.35 | 93,553.10 | 191,337.10 |
| 2022 Totals | 97,826.45 | 4,273.35 | 93,553.10 | |
| 10 06/26/2023 | 97,826.45 | 2,870.06 | 94,956.39 | 96,380.71 |
| 2023 Totals | 97,826.45 | 2,870.06 | 94,956.39 | |
| 11 06/26/2024 | 97,826.45 | 1,445.74 | 96,380.71 | 0.00 |
| 2024 Totals | 97,826.45 | 1,445.74 | 96,380.71 | |
| Grand Totals | 1,076,090.95 | 76,090.95 | 1,000,000.00 | |

KIRSCHLOFTS000915

**APPENDIX C**
**LOCAL UNIT OF GOVERNMENT RESOLUTION**

PRESENTED: February 25, 2009

ADOPTED: February 25, 2009

RESOLUTION
BY THE CITY OF STURGIS

WHEREAS, Kirsch Lofts LLC and Kirsch Industrial Park LLC have proposed to redevelop parcels of land located at 308 N. Prospect, 415 E. Main and 210 Broadus Street, Sturgis, Michigan (the "Property"); and

WHEREAS, the Sturgis City Commission has approved a Brownfield Redevelopment Plan for the Property; and

WHEREAS, the Michigan Department of Environmental Quality provides loans and grants to communities through its Brownfield Redevelopment Loan and Grant programs for environmental response activities; and

WHEREAS, environmental response activities are necessary in order to use the Property for economic development; and

WHEREAS the Property is known to be contaminated; and

WHEREAS the proposed project will be undertaken if a loan and grant are awarded; and

WHEREAS the City of Sturgis commits to repaying a loan of up to $1,000,000 if one is approved and a loan agreement is executed by the City; and

WHEREAS, the proposed economic development is consistent with local development plans, zoning ordinances, and/or the master plan:

NOW, THEREFORE, BE IT RESOLVED THAT the Sturgis City Commission authorizes the City of Sturgis Brownfield Redevelopment Authority to apply for and secure a grant and loan for a maximum of $1,000,000 in grant funds and $1,000,000 in loan funds from, and enter into an appropriate grant and loan agreements with, the Michigan Department of Environmental Quality.

APPROVED BY STURGIS CITY COMMISSION

Kenneth D. Rhodes, City Clerk
February 25, 2009

1629943

# EXHIBIT M

State Of Michigan
Department of Environmental Quality
Remediation & Redevelopm ent Division Brownfield Grants and Loans          BRL

**2009-1121 City of Sturgis - Kirsch Lofts/Prospect Project #456645**

| Compound period | Annual |
|---|---|
| Annual rate | 1.5000% |
| Loan Award | $ 1,000,000 |

| PMT #/ Descr. | Transaction Date | Loan Draw amount | Interest | Principal | Unspent Loan Funds | Total Payment Amount | Principal Balance | Paid |
|---|---|---|---|---|---|---|---|---|
| Loan Execution | 06/26/09 | | | | | | | |
| Loan Draw W9211206 | 09/22/09 | 50,000.00 | | | | | 50,000.00 | |
| Loan Draw W0200002 | 10/01/09 | 39,100.00 | | | | | 89,100.00 | |
| Loan Draw W0203071 | 02/02/10 | 519,282.00 | | | | | 608,382.00 | |
| Return of Unspent F unds | 08/24/12 | | 417.43 | | 267,622.00 | 268,039.43 | 340,760.00 | |
| 1 | 06/26/14 | | 0.00 | 33,335.34 | 0.00 | 33,335.34 | 307,424.66 | ✓ |
| 2 | 06/26/15 | | 4,611.37 | 28,723.97 | 0.00 | 33,335.34 | 278,700.69 | ✓ |
| 3 | 06/26/16 | | 4,180.51 | 29,154.83 | 0.00 | 33,335.34 | 249,545.86 | |
| 4 | 06/26/17 | | 3,743.19 | 29,592.15 | 0.00 | 33,335.34 | 219,953.71 | |
| 5 | 06/26/18 | | 3,299.31 | 30,036.03 | 0.00 | 33,335.34 | 189,917.67 | |
| 6 | 06/26/19 | | 2,848.77 | 30,486.57 | 0.00 | 33,335.34 | 159,431.10 | |
| 7 | 06/26/20 | | 2,391.47 | 30,943.87 | 0.00 | 33,335.34 | 128,487.23 | |
| 8 | 06/26/21 | | 1,927.31 | 31,408.03 | 0.00 | 33,335.34 | 97,079.19 | |
| 9 | 06/26/22 | | 1,456.19 | 31,879.15 | 0.00 | 33,335.34 | 65,200.04 | |
| 10 | 06/26/23 | | 978.00 | 32,357.34 | 0.00 | 33,335.34 | 32,842.70 | |
| 11 | 06/26/24 | | 492.64 | 32,842.70 | 0.00 | 33,335.34 | 0.00 | |
| | | | 26,346.17 | 340,760.00 | 267,622.00 | 634,728.17 | | |

# EXHIBIT N

**Scott Bosgraaf**

| | |
|---|---|
| **From:** | Franks, Robert (DNRE) [FRANKSR1@michigan.gov] |
| **Sent:** | Wednesday, January 27, 2010 1:37 PM |
| **To:** | Scott Bosgraaf |
| **Cc:** | Mark Westra; John Hayes; Geyer, Carrie (DNRE); VanDale, Darlene  (DNRE); Kline, David (DNRE); Graff, Charles  (DNRE); Meschede, Louis; David_Meiri@URSCorp.com; Mike Miller |
| **Subject:** | Kirsch Lofts - Vapor Mitigation Evaluation & Soil Sampling Results |

Mr. Bosgraaf:

The purpose of this electronic communication is twofold.  First, we wish to address the Vapor Mitigation Evaluation submitted by Rose & Westra, Inc. on your behalf.  Secondly, we feel it necessary to address the results of the three rounds of soil sampling conducted in support of the Kirsch Lofts redevelopment project.

<u>Vapor Mitigation Evaluation</u>

With regard to the Vapor Mitigation Evaluation, the Michigan Department of Natural Resources and Environment (MDNRE) hereby gives tentative approval to move forward with that phase of the project. However, final approval cannot be provided until a detailed QA/QC plan is submitted to MDNRE for review and approval.  The vapor barrier shall not be constructed until the QA/QC plan is approved by the MDNRE.  We also request that additional information be provided to the MDNRE regarding the evaluation of the alternative liner systems.  Though we do not disagree with the ranking provided, it may be beneficial to the site to accept the higher ranked product as the cost differential was not significantly higher.  We also request that the text of the proposal be clarified with respect to the width of the building and the venting permeable material length of 25 feet (1/2 of the building width).

<u>Soil Sampling Analytical Results</u>

With regard to the soil sampling, MDNRE staff have evaluated the analytical results and have concluded that the TCE remaining in the soils on the west side of the former manufacturing plant represents a serious problem.  As you know, the entire facility that you are redeveloping is part of the Sturgis Municipal Wells Superfund site.  Part of the remedy for the Superfund site is to remove TCE in soil to levels protective of groundwater, which is 100 parts per billion (ppb).  Of the 42 soil samples analyzed for VOCs, 11 of those samples had TCE levels in excess of 1,000 ppb, with one sample at 14,000 ppb and another at 620,000 ppb. An additional six samples had TCE levels between 100 ppb and 1,000 ppb.  A copy of the soil sampling analytical results has been provided to the Superfund site potentially responsible party, Newell-Rubbermaid, and their representatives.  MDNRE has requested a meeting with Newell-Rubbermaid to discuss the situation, the implications of the analytical results, and potential next steps.

In light of this development, we request that you not move forward with the <u>Clean Soil</u> subtask of Task 3.3 Due Care in the approved Act 381 Work Plan, until a final decision is made as to the appropriate response in dealing with the TCE contaminated soils.

Please contact me if you wish to discuss these matters.  We would be happy to participate in a meeting if you so desire.

Robert L. Franks
Michigan Dept. of Natural Resources and Environment
Remediation and Redevelopment Division
Superfund Section
517-335-3392
franksr1@michigan.gov

1

# EXHIBIT O

# Kirsch LLC
## Sources and Uses of Funds
## Owner/Real Estate Entity

| Sources of Funds | | Industrial | | Lofts | | Total |
|---|---|---|---|---|---|---|
| **QLICI Loan Tranche A** | | | | | | |
| Leveraged Laon | $ | 8,681,939 | $ | 4,664,871 | $ | 13,346,810 |
| | | | | | | |
| **QLICI Loan Tranche A** | | | | | | |
| NMTC Equity | | 4,070,118 | | 2,488,725 | | 6,558,843 |
| Historic Tax Credit Equity | | 1,966,806 | | 1,290,942 | | 3,257,748 |
| Brownfiled Tax Credit Equity | | 1,338,434 | | 1,373,899 | | 2,712,333 |
| **Total QLICI Loan Tranche A** | | 7,375,358 | | 5,153,566 | | 12,528,924 |
| **Total Sources of Funds** | $ | 16,057,297 | $ | 9,818,437 | $ | 25,875,734 |

| Uses of Funds | | Industrial | | Lofts | | Total |
|---|---|---|---|---|---|---|
| **Acquisition - Building** | $ | 1,625,237 | $ | 530,485 | $ | 2,155,722 |
| Acquisition - Land | | 696,530 | | 227,351 | | 923,881 |
| **Construction** | | | | | | |
| Rehabilitation | | 10,244,800 | | 5,772,540 | | 16,017,340 |
| Utility Extension | | - | | 6,550 | | 6,550 |
| Streetscape Improvements/ Land improvements | | 540,000 | | 210,000 | | 750,000 |
| Appliances and Furnishings | | 70,000 | | 151,300 | | 221,300 |
| Developer Fee | | 150,000 | | 150,000 | | 300,000 |
| Construction Contingency | | 550,000 | | 400,000 | | 950,000 |
| **Architect, Engineering & Fees** | | - | | - | | - |
| Architectural | | 5,500 | | 50,000 | | 55,500 |
| Environmental | | 747,142 | | 1,155,579 | | 1,902,721 |
| **Construction Period Costs** | | | | | | |
| Builders Risk Insurance & General Liability | | 28,000 | | 12,000 | | 40,000 |
| Construction Interest | | 410,000 | | 410,000 | | 820,000 |
| Title Insurance | | 18,500 | | 11,000 | | 29,500 |
| Construction Loan Admin Fees | | 6,000 | | 6,000 | | 12,000 |
| **Financing Costs** | | | | | | |
| NMTC Allocation Fees | | 617,588 | | 377,632 | | 995,220 |
| Legal & Consulting - NMTC | | 250,000 | | 250,000 | | 500,000 |
| Legal & Consulting - Other | | 80,000 | | 80,000 | | 160,000 |
| Appraisal | | 8,000 | | 8,000 | | 16,000 |
| **Other Costs** | | | | | | |
| Leasing Fees - Retail | | - | | - | | - |
| Leasing Fees and Marketing - Apartments | | 10,000 | | 10,000 | | 20,000 |
| Interest During Lease Up | | - | | - | | - |
| **Total Uses of Funds** | $ | 16,057,297 | $ | 9,818,437 | $ | 25,875,734 |

Prepared by:
George L. Larimore, CPA

RE Sources and Uses
Page 1

Date 4/22/2010
Time 1:45 PM
KIRSCHLOFTS001466

## Kirsch LLC
## Industrial Tax Credit Equity
*Owner/Real Estate Entity*

| Federal Historic Tax Credits | | |
|---|---|---|
| Net Qualified Rehabilitation Expenditures | $ | 12,296,455 |
| Historic Credit Percentage | | 20.00% |
| Total Historic Tax Credits | | 2,459,000 |
| Percentage Allocated to Sub CDE | | 100.00% |
| Total Allocated to Sub CDE | | 2,459,000 |
| Percentage Allocated to Investment Fund | | 99.99% |
| Total Allocated to Investment Fund | | 2,458,754 |
| Percentage Allocated to Tax Credit Investor | | 99.99% |
| Total Allocated to Tax Credit Investor | | 2,458,508 |
| Price Per Credit | | 80.00% |
| Total Historic Tax Credit Equity | $ | 1,966,806 |

| Michigan Historic Tax Credits | | |
|---|---|---|
| Qualified Rehabilitation Expenditures | $ | 12,296,455 |
| Historic Credit Percentage | | 0.00% |
| Total Historic Tax Credits | | - |
| Percentage Allocated to Tax Credit Investor | | 100.00% |
| Total Allocated to Tax Credit Investor | | - |
| Price Per Credit | | 87.00% |
| Total Michigan Historic Tax Credit Equity | $ | - |

| New Markets Tax Credits | | |
|---|---|---|
| Total Qualified Investment | $ | 16,057,298 |
| Credit Percentage | | 39.00% |
| Total New Markets Tax Credits | | 6,262,346 |
| Percentage Allocated to Tax Credit Investor | | 99.99% |
| Total Allocated to Tax Credit Investor | | 6,261,720 |
| Price Per Credit | | 65.0000% |
| Total New Markets Credit Equity | $ | 4,070,118 |

| Michigan Brownfield Tax Credits | | |
|---|---|---|
| Net Eligible Investment | $ | 12,307,442 |
| Brownfield Credit Percentage | | 12.50% |
| Total Historic Tax Credits | | 1,538,430 |
| Percentage Allocated to Tax Credit Investor | | 100.00% |
| Total Allocated to Tax Credit Investor | | 1,538,430 |
| Price Per Credit | | 87.00% |
| Total Brownfield Tax Credit Equity | $ | 1,338,434 |

Prepared by:
George L. Larimore, CPA

RE Ind Tax Credit Allocations
Page 2

Date 4/22/2010
Time 1:45 PM
KIRSCHLOFTS001467

**Kirsch LLC**
**Lofts Tax Credit Equity**
*Owner/Real Estate Entity*

| Federal Historic Tax Credits | | |
|---|---:|---:|
| Net Qualified Rehabilitation Expenditures | $ | 8,069,352 |
| Historic Credit Percentage | | 20.00% |
| Total Historic Tax Credits | | 1,614,000 |
| Percentage Allocated to Sub CDE | | 100.00% |
| Total Allocated to Sub CDE | | 1,614,000 |
| Percentage Allocated to Investment Fund | | 99.99% |
| Total Allocated to Investment Fund | | 1,613,839 |
| Percentage Allocated to Tax Credit Investor | | 99.99% |
| Total Allocated to Tax Credit Investor | | 1,613,678 |
| Price Per Credit | | 80.00% |
| Total Historic Tax Credit Equity | $ | 1,290,942 |

| New Markets Tax Credits | | |
|---|---:|---:|
| Total Qualified Investment | $ | 9,818,437 |
| Credit Percentage | | 39.00% |
| Total New Markets Tax Credits | | 3,829,190 |
| Percentage Allocated to Tax Credit Investor | | 99.99% |
| Total Allocated to Tax Credit Investor | | 3,828,807 |
| Price Per Credit | | 65.0000% |
| Total New Markets Credit Equity | $ | 2,488,725 |

| Michigan Historic Tax Credits | | |
|---|---:|---:|
| Qualified Rehabilitation Expenditures | $ | 8,069,352 |
| Historic Credit Percentage | | 0.00% |
| Total Historic Tax Credits | | - |
| Percentage Allocated to Tax Credit Investor | | 100.00% |
| Total Allocated to Tax Credit Investor | | - |
| Price Per Credit | | 87.00% |
| Total Michigan Historic Tax Credit Equity | $ | - |

| Michigan Brownfield Tax Credits | | |
|---|---:|---:|
| Net Eligible Investment | $ | 7,895,969 |
| Brownfield Credit Percentage | | 20.00% |
| Total Historic Tax Credits | | 1,579,194 |
| Percentage Allocated to Tax Credit Investor | | 100.00% |
| Total Allocated to Tax Credit Investor | | 1,579,194 |
| Price Per Credit | | 87.00% |
| Total Brownfield Tax Credit Equity | $ | 1,373,899 |

Prepared by:
George L. Larimore, CPA

RE Lofts Tax Credit Allocation
Page 3

Date 4/22/2010
Time 1:45 PM
KIRSCHLOFTS001468

## Kirsch LLC
### Industrial Qualified Renovation and Eligible Basis
### Owner/Real Estate Entity

| | Total | Depreciation | Amortization | Capitalized | Qualified Rehab Expenses | Brownfield Eligible Investment |
|---|---|---|---|---|---|---|
| **Acquisition - Building** | $ 1,625,237 | $ 1,625,237 | $ - | $ - | $ - | $ - |
| Acquisition - Land | 696,530 | | | 696,530 | | |
| **Construction** | | | | | | |
| Rehabilitation | 10,244,800 | 10,244,800 | | | 10,244,800 | 10,244,800 |
| Utility Extension | - | | | | - | |
| Streetscape Improvements/ Land improvements | 540,000 | 540,000 | | | - | 540,000 |
| Appliances and Furnishings | 70,000 | 70,000 | | | - | 70,000 |
| Developer Fee | 150,000 | 150,000 | | | 150,000 | 150,000 |
| Construction Contingency | 550,000 | 550,000 | | | 550,000 | 550,000 |
| **Architect, Engineering & Fees** | | | | | | |
| Architectural | 5,500 | 5,500 | | | 5,500 | 5,500 |
| Environmental | 747,142 | 747,142 | | | 747,142 | 747,142 |
| **Construction Period Costs** | | | | | | |
| Builders Risk Insurance & General Liability | 28,000 | 28,000 | | | 28,000 | |
| Construction Interest | 410,000 | 410,000 | | | 410,000 | |
| Title Insurance | 18,500 | 18,500 | | | 18,500 | |
| Construction Loan Admin  Fees | 6,000 | 6,000 | | | 6,000 | |
| **Financing Costs** | | | | | | |
| NMTC Allocation Fees | 617,588 | 88,227 | 529,361 | | 88,227 | |
| Legal & Consulting - NMTC | 250,000 | 35,714 | 214,286 | | 35,714 | |
| Legal & Consulting - Other | 80,000 | 11,429 | 68,571 | | 11,429 | |
| Appraisal | 8,000 | 1,143 | 6,857 | | 1,143 | |
| **Other Costs** | | | | | | |
| Leasing Fees - Retail | - | | | | | |
| Leasing Fees and Marketing - Apartments | 10,000 | | | 10,000 | | |
| Interest During Lease Up | | | | | | |
| **TOTAL** | $ 16,057,298 | $ 14,531,692 | $ 819,075 | $ 706,530 | $ 12,296,455 | $ 12,307,442 |

Prepared by:
George L. Larimore, CPA

RE Industrial QRE
Page 4

Date 4/22/2010
Time 1:45 PM
KIRSCHLOFTS001469

### Kirsch LLC
### Lofts Qualified Renovation and Eligible Basis
### Owner/Real Estate Entity

| | Total | Depreciation | Amortization | Capitalized | Quailified Rehab Expenses | Brownfiled Eligible Investment |
|---|---|---|---|---|---|---|
| **Acquisition - Building** | $ 530,485.07 | $ 530,485 | $ - | $ - | $ - | $ - |
| Acquisition - Land | 227,351 | | | 227,351 | | |
| **Construction** | | | | | | |
| Rehabilitation | 5,772,540 | 5,772,540 | | | 5,772,540 | 5,772,540 |
| Utility Extension | 6,550 | 6,550 | | | - | 6,550 |
| Streetscape Improvements/ Land improvements | 210,000 | 210,000 | | | - | 210,000 |
| Appliances and Furnishings | 151,300 | 151,300 | | | - | 151,300 |
| Developer Fee | 150,000 | 150,000 | | | 150,000 | 150,000 |
| Construction Contingency | 400,000 | 400,000 | | | 400,000 | 400,000 |
| **Architect, Engineering & Fees** | | | | | | |
| Architectural | 50,000 | 50,000 | | | 50,000 | 50,000 |
| Environmental | 1,155,579 | 1,155,579 | | | 1,155,579 | 1,155,579 |
| **Construction Period Costs** | | | | | | |
| Builders Risk Insurance & General Liability | 12,000 | 12,000 | | | 12,000 | |
| Construction Interest | 410,000 | 410,000 | | | 410,000 | |
| Title Insurance | 11,000 | 11,000 | | | 11,000 | |
| Construction Loan Admin Fees | 6,000 | 6,000 | | | 6,000 | |
| **Financing Costs** | | | | | | |
| NMTC Allocation Fees | 377,632 | 53,947 | 323,685 | | 53,947 | |
| Legal & Consulting - NMTC | 250,000 | 35,714 | 214,286 | | 35,714 | |
| Legal & Consulting - Other | 80,000 | 11,429 | 68,571 | | 11,429 | |
| Appraisal | 8,000 | 1,143 | 6,857 | | 1,143 | |
| **Other Costs** | | | | | | |
| Leasing Fees - Retail | - | | | | | |
| Leasing Fees and Marketing - Apartments | 10,000 | | | 10,000 | | |
| Interest During Lease Up | | | | | | |
| **TOTAL** | $ 9,818,437 | $ 8,967,687 | $ 613,399 | $ 237,351 | $ 8,069,352 | $ 7,895,969 |

Prepared by:
George L. Larimore, CPA

RE Lofts QRE
Page 5

Date 4/22/2010
Time 1:45 PM
KIRSCHLOFTS001470

# EXHIBIT P

## Kirsch Lofts LLC
## PROJECT COSTS

| | | Phase 1 residential | | Phase 2 mixed use | | Phase 3 residential |
|---|---|---|---|---|---|---|
| | | 24-32 units sell/rent SF  19,160  24,780 | | 3-13 units rentable SF  24,000  sell/rent 30,720 | | 11-24 units sell/rent 19640  SF 19,640 |
| | | Total | $/SF | Total | $/SF | Total |
| **Hard Costs:** | | | | | | |
| General conditions, fees, environ. | | 150,000 | 6.05 | 50,000 | 1.63 | 125,000 |
| **Building /land** | 1,500,000 | 30,000 | 1.21 | 10,000 | 0.33 | 10,000 |
| **Demolition** | | 700,000 | 28.25 | 408,000 | 13.02 | 480,600 |
| bldg refinish (window, roofs, insulation etc) | | 756,900 | 30.54 | 410,000 | 13.35 | 598,600 |
| Appliances/plumbing/elect/cabinets/tops | | 657,800 | 26.55 | 321,000 | 10.45 | 834,500 |
| Painting, flooring, ceilings | | 673,000 | 27.16 | 411,000 | 13.38 | 883,400 |
| asphalt paving/infrastructure/curb/drainage | | 381,700 | 15.40 | 153,800 | 5.01 | 130,500 |
| Audio, visual, access, security, fire detection | | 141,000 | 5.69 | 74,200 | 2.42 | 137,000 |
| Landscaping / Ext. Lights / Signage: | | 198,700 | 8.02 | 41,390 | 1.34 | 60,100 |
| **Hard Costs Subtotal:** | | 3,689,100 | $148.87 | 1,871,300 | 60.91 | 2,881,100 |
| **Soft Costs:** | | | | | | |
| **Interest** | | 485,000 | | 242,000 | | 415,000 |
| Architect / Concept Fees: | | 121,000 | 4.88 | 22,000 | 0.72 | 22,000 |
| Survey, staking, engineering | | 10,500 | 0.42 | 1,500 | 0.05 | 1,500 |
| legal, brownfield, TIF, NEZ | | 35,000 | 1.41 | 15,000 | 0.49 | 30,000 |
| Building insurance | | 34,500 | 1.39 | 11,000 | 0.36 | 24,660 |
| **Soft Costs Subtotal:** | $   - | 686,000 | 27.68 | 291,500 | 9.49 | 493,760 |
| **Total Hard and Soft Costs:** | | 4,375,100 | $176.56 | $ 2,162,800 | $ 70.40 | 3,184,860 |

KIRSCHLOFTS000877

Case 1:15-cv-00597-RJJ   ECF No. 88-18,  PageID.2277   Filed 07/01/16   Page 199 of 207

| | total net | |
|---|---|---|
| total project sales | | |
| total cost | 9,722,700 | |
| brownfield TIF | -1,823,250 | |
| MBT credit (discount for actual dollar value) | -1,436,500 | |
| NEZ (computed into operating cost decrease/sales) | 0 | |
| total cost after available credits | 6,462,950 | |
| | | |
| Sales proforma | | |
| phase 1 sales | 2,572,929 | |
| phase 2 sales | 2,040,000 | |
| phase 3 sales | 2,637,387 | |
| advertisement and commissions | -277,440 | |
| total revenue | 6,972,876 | |
| | | |
| return on investment sales approach | 7.89% | |
| | | |
| total project rental | | |
| total cost | 9,722,700 | |
| brownfield plan credit | -1,823,250 | |
| MBT credit (discount for actual dollar value) | -1,436,500 | |
| NEZ (computed into operating cost decrease/sales) | 0 | |
| total cost after available credits | 6,462,950 | |
| | | |
| Rentals | | |
| annual rental phase 1 | 168,130 | customer responsible for utilities and CAM cost, property ta taxes |
| Rental of office space @ 8.00 sq foot | 192,000 | customer responsible for all triple net expenses |
| annual rental phase 3 | 172,341 | customer responsible for utilities and CAM cost, property ta taxes |
| vacancy 15% | -79,870 | |
| rental fees/ commissions 6% | -31,948 | |
| repairs and maintenance | -7,500 | |
| Annual revenue | 413,153 | |
| annual return % on investment after credits | 6.39% | |

KIRSCH LOFTS000878

# EXHIBIT Q

**Kirsch Lofts**

| | TV/Unit | Br Plan Capture Year / Projected Sale Price | OPRA Yrs. 1-6 | OPRA Yrs 7-10 | NEZ Rehab Yrs. 1-7 | PR NEZ Yr 8 | PR NEZ Yr 9 | PR NEZ Yr 10 | 2008 / 0 | 2009 / 1 | 201_ / 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Project Timing | | | | | | | | | | | |
| Taxable Value: Existing Parcels | | 104,800 | | | | | | | 104,800 | 108,883 | |
| Increase in Land Value | | | | | | | | | | 4,083 | |
| Number of Ph 1 Rental Units | | | | | | | | | | | |
| Taxable Value - Phase 1 Rental Units | 45,945 | | | | | | | | | | |
| Number of Sold Phase 1 Prin. Res. Units | | | | | | | | | | | |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 45,945 | 2,572,929 | | | | | | | | | |
| Commercial Square Footage | 24,000 | 2,040,000 | | | | | | | | | |
| Taxable Value-Commercial | 25 | | | | | | | | | | |
| Number of Ph 2 Rental Units | | | | | | | | | | | |
| Taxable Value - Phase 2 Rental Units | 75,674 | 2,572,929 | | | | | | | | | |
| Number of Sold Phase 2 Prin. Res. Units | | | | | | | | | | | |
| Taxable Value-Sold Phase 2 Prin. Res. Units | 80,306 | 2,637,387 | | | | | | | | | |
| Total taxable value: residential rental | | | | | | | | | | | |
| Total taxable value: Prin. Residential | | | | | | | | | | | |
| Total taxable value: commercial | | | | | | | | | | | |
| Incremental taxable value: land | | | | | | | | | | 1 | |
| Incremental taxable value: residential rental | | | | | | | | | | | |
| Incremental taxable value: Principal Residential | | | | | | | | | | | |
| Incremental taxable value: commercial | | | | | | | | | | | |
| Total Incremental Taxable Value | | | | | | | | | | 4,083 | |
| Assumed annual TV increase rate | | 2.00% | | | | | | | | | |

**Incremental Tax Estimates:**

| | PRE Rate | Full Millage | OPRA Yrs. 1-6 | OPRA Yrs 7-10 | NEZ Rehab Yrs. 1-7 | PR NEZ Yr 8 | PR NEZ Yr 9 | PR NEZ Yr 10 | 2008 / 0 | 2009 / 1 | 201_ / 2 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *School Taxes - Millage* | | | | | | | | | | | |
| School Operating | 0.00 | 18.00 | 9.00 | 18.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 73 | |
| State Educ Tax | 6.00 | 6.00 | 3.00 | 6.00 | 0.00 | 6.00 | 6.00 | 6.00 | | 24 | |
| Total Schools | 6.00 | 24.00 | 12.00 | 24.00 | 0.00 | 6.00 | 6.00 | 6.00 | | 98 | |
| *Local Taxes* | | | | | | | | | | | |
| Comm. College, library, transport. | 4.17 | 4.17 | 0.00 | 0.00 | 0.00 | 4.17 | 4.17 | 4.17 | | 17 | |
| City operating | 10.03 | 10.03 | 0.00 | 0.00 | 0.00 | 6.27 | 7.52 | 8.77 | | 41 | |
| County operating | 7.04 | 7.04 | 0.00 | 0.00 | 0.00 | 4.40 | 5.28 | 6.16 | | 29 | |
| Inter. Schools | 2.78 | 2.78 | 0.00 | 0.00 | 0.00 | 2.78 | 2.78 | 2.78 | | 11 | |
| Total Local | 24.02 | 24.02 | 0.00 | 0.00 | 0.00 | 17.62 | 19.76 | 21.89 | | 98 | |
| *Total School and Local Capturable* | 24.02 | 24.02 | 12.00 | 24.00 | 0.00 | 23.62 | 25.76 | 27.89 | 0 | 98 | |
| Annual Incremental Local/Non-School Taxes Captured | | | | | | | | | - | 98 | |
| Annual Incremental School Taxes Captured | | | | | | | | | - | 98 | |
| Total Annual Incremental Taxes Captured | | | | | | | | | - | 196 | |
| Cumulative Annual Incr. Local Taxes Captured | | | | | | | | | - | 98 | |
| Cumulative Annual Incr. School Taxes Captured | | | | | | | | | - | 98 | |
| Cumulative Total Incremental Taxes Captured | | | | | | | | | - | 196 | |
| Annual Taxes Available for Reimbursement | | | | | | | | | - | 196 | |
| Cumulative Taxes Available for Reimbursement | | | | | | | | | | 196 | |
| Cumulative Taxes Captured for Reimbursement | | | | | | | | | | 196 | |
| Eligible Costs ($29,600 DEQ + $549,524 MEGA + DEQ $1M loan with int.) | | 579,124 | | | | | | | | | |
| Interest Accrued | | 5% | | | | | | | | | |
| Cumulative Eligible Costs and Interest | | | | | | | | | | | |

| | Sale of residential | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Original Project Timing** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** |
| | 10 (T) | 11 (U) | 12 (V) | 13 (W) | 14 (X) | 15 (Y) | 16 (Z) | 17 (AA) | 18 (AB) | 19 (AC) |
| Taxable Value: Existing Parcels | 68,085 | 69,447 | 70,836 | 72,252 | 73,697 | 75,171 | 76,675 | 78,208 | 79,772 | 81,… |
| Increase in Land Value | | | | | | | | | | |
| Number of Ph 1 Rental Units | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 |
| Number of Sold Phase 1 Prin. Res. Units | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 1,477,743 | 1,507,298 | 1,537,444 | 1,568,193 | 1,599,557 | 1,631,548 | 1,664,179 | 1,697,463 | 1,731,412 | 1,766,… |
| Taxable Value-Commercial | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,… |
| Commercial Square Footage | | | | | | | | | | |
| Number of Ph 2 Rental Units | – | – | – | – | – | – | – | – | – | – |
| Taxable Value- Phase 2 Rental Units | – | – | – | – | – | – | – | – | – | – |
| Number of Sold Phase 2 Prin. Res. Units | – | – | – | – | – | – | – | – | – | – |
| Taxable Value-Sold Phase 2 Prin. Res. Units | – | – | – | – | – | – | – | – | – | – |
| Total taxable value: residential rental | 1,365,205 | 1,392,511 | 1,420,361 | 1,448,768 | 1,477,743 | 1,507,298 | 1,537,444 | 1,568,193 | 1,599,557 | 1,631,… |
| Total taxable value: Prin. Residential | 2,842,950 | 2,899,809 | 2,957,805 | 3,016,961 | 3,077,300 | 3,138,846 | 3,201,623 | 3,265,656 | 3,330,969 | 3,397,… |
| Total taxable value: commercial | 1,082,432 | 1,104,081 | 1,126,162 | 1,148,686 | 1,171,659 | 1,195,093 | 1,218,994 | 1,243,374 | 1,268,242 | 1,293,… |
| Total taxable value: land | | | | | | | | | | |
| Incremental taxable value: residential rental | | | | | | | | | | |
| Incremental taxable value: Principal Residential | 2,738,150 | 2,795,009 | 2,853,005 | 2,912,161 | 2,972,500 | 3,034,046 | 3,096,823 | 3,160,856 | 3,226,169 | 3,292,… |
| Incremental taxable value: commercial | 1,082,432 | 1,104,081 | 1,126,162 | 1,148,686 | 1,171,659 | 1,195,093 | 1,218,994 | 1,243,374 | 1,268,242 | 1,293,… |
| Total Incremental Taxable Value | 3,820,582 | 3,899,090 | 3,979,167 | 4,060,847 | 4,144,160 | 4,229,139 | 4,315,818 | 4,404,230 | 4,494,411 | 4,586,… |
| Assumed annual TV increase rate | | | | | | | | | | |
| **Incremental Tax Estimates:** | | | | | | | | | | |
| **School Taxes - Millage** | | | | | | | | | | |
| School Operating | 19,484 | 19,873 | 20,271 | 20,676 | 21,090 | 21,512 | 21,942 | 22,381 | 22,828 | 23,… |
| State Educ Tax | 22,923 | 23,395 | 23,875 | 24,365 | 24,865 | 25,375 | 25,895 | 26,425 | 26,966 | 27,… |
| Total Schools | 42,407 | 43,268 | 44,146 | 45,041 | 45,955 | 46,886 | 47,837 | 48,806 | 49,795 | 50,… |
| **Local Taxes** | | | | | | | | | | |
| Comm. College, library, transport. | 11,421 | 16,263 | 16,597 | 16,938 | 17,285 | 17,640 | 18,001 | 18,370 | 18,746 | 19 |
| City operating | 17,162 | 32,095 | 36,329 | 40,724 | 41,560 | 42,412 | 43,281 | 44,168 | 45,072 | 45 |
| County operating | 12,050 | 22,535 | 25,508 | 28,594 | 29,181 | 29,779 | 30,389 | 31,012 | 31,647 | 32 |
| Inter. Schools | 7,618 | 10,848 | 11,071 | 11,298 | 11,530 | 11,767 | 12,008 | 12,254 | 12,505 | 12 |
| Total Local | 48,252 | 81,741 | 89,505 | 97,555 | 99,556 | 101,597 | 103,680 | 105,804 | 107,970 | 110 |
| **Total School and Local Capturable** | 90,659 | 125,009 | 133,651 | 142,596 | 145,511 | 148,484 | 151,517 | 154,610 | 157,765 | 160 |
| Annual Incremental School Taxes Captured | 42,407 | 43,268 | 44,146 | 45,041 | 45,955 | 46,886 | 47,837 | 48,806 | 49,795 | 50 |
| Total Annual Incremental Taxes Captured | 90,659 | 125,009 | 133,651 | 142,596 | 145,511 | 148,484 | 151,517 | 154,610 | 157,765 | 160 |
| Cumulative Annual Incr. School Taxes Captured | 117,976 | 161,244 | 205,390 | 250,431 | 296,386 | 343,273 | 391,109 | 439,915 | 489,710 | 540 |
| Cumulative Total Incremental Taxes Captured | 166,878 | 291,887 | 425,538 | 568,134 | 713,645 | 862,128 | 1,013,645 | 1,168,255 | 1,326,020 | 1,487 |
| Annual Taxes Available for Reimbursement | 90,659 | 125,009 | 133,651 | 142,596 | 145,511 | 148,484 | 151,517 | 154,610 | 157,765 | 160 |
| Cumulative Taxes Captured for Reimbursement | 166,878 | 291,887 | 425,538 | 568,134 | 713,645 | 862,128 | 1,013,645 | 1,168,255 | 1,326,020 | 1,487 |
| Eligible Costs ($29,600 DEQ + $549,524 MEGA + DEQ $1M Loan with int.) | 97,826 | 97,826 | 97,826 | 97,826 | 97,826 | 97,826 | 97,826 | 97,826 | 97,826 | |
| Interest Accrued | 57,802 | 61,051 | 62,744 | 64,090 | 65,056 | 65,925 | 66,688 | 67,338 | 62,974 | 58 |
| Unreimbursed Eligible Costs, and interest | | | | | | | | | | |

# Kirsch Lofts

| Original Project Timing | 27 | 28 | 29 | 30 | Totals |
|---|---|---|---|---|---|
| | 2035 | 2036 | 2037 | 2038 | |
| Taxable Value: Existing Parcels | 95,335 | 97,242 | 99,187 | 101,171 | |
| Increase in Land Value | | | | | |
| Number of Ph 1 Rental Units | | | | | |
| Number of Ph 2 Rental Units | | | | | |
| Taxable Value- Phase 1 Rental Units | | | | | |
| Number of Sold Phase 1 Prin. Res. Units | 28 | 28 | 28 | 28 | |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 2,069,197 | 2,110,581 | 2,152,793 | 2,195,849 | |
| Commercial Square Footage | 24,000 | 24,000 | 24,000 | 24,000 | |
| Taxable Value-Commercial | 1,515,666 | 1,545,980 | 1,576,899 | 1,608,437 | |
| Number of Ph 2 Rental Units | 17 | 17 | 17 | 17 | |
| Taxable Value- Phase 2 Rental Units | 1,911,619 | 1,949,851 | 1,988,848 | 2,028,625 | |
| Number of Sold Phase 2 Prin. Res. Units | 17 | 17 | 17 | 17 | |
| Total taxable value: residential rental | 1,515,666 | 1,545,980 | 1,576,899 | 1,608,437 | |
| Total taxable value: Prin. Residential | 3,980,816 | 4,060,432 | 4,141,641 | 4,224,474 | |
| Total taxable value: commercial | 1,515,666 | 1,545,980 | 1,576,899 | 1,608,437 | |
| Incremental taxable value: residential rental | 1,515,666 | 1,545,980 | 1,576,899 | 1,608,437 | |
| Incremental taxable value: Principal Residential | 3,876,016 | 3,955,632 | 4,036,841 | 4,119,674 | |
| Incremental taxable value: commercial | 1,515,666 | 1,545,980 | 1,576,899 | 1,608,437 | |
| Total Incremental Taxable Value | 5,391,682 | 5,501,612 | 5,613,740 | 5,728,111 | |
| Assumed annual TV increase rate | | | | | |

| Local Taxes | | | | | |
|---|---|---|---|---|---|
| Incremental Tax Estimates: | | | | | |
| *School Taxes - Millage* | | | | | |
| School Operating | 27,282 | 27,828 | 28,384 | 28,952 | 559,033 |
| State Educ Tax | 32,350 | 33,010 | 33,682 | 34,369 | 612,944 |
| Total Schools | 59,632 | 60,837 | 62,067 | 63,321 | 1,171,976 |
| Comm. College, library, transport. | 22,489 | 22,947 | 23,415 | 23,892 | 408,563 |
| City operating | 54,070 | 55,173 | 56,297 | 57,444 | 961,443 |
| County operating | 37,965 | 38,739 | 39,529 | 40,334 | 675,066 |
| Inter. Schools | 15,001 | 15,307 | 15,619 | 15,937 | 272,535 |
| Total Local | 129,525 | 132,166 | 134,860 | 137,608 | 2,317,607 |
| *Total School and Local Capturable* | 189,158 | 193,004 | 196,927 | 200,928 | 3,489,584 |
| Annual Incremental Local/Non-School Taxes Captured | 129,525 | 132,166 | 134,860 | 137,608 | 2,317,607 |
| Annual Incremental School Taxes Captured | 59,632 | 60,837 | 62,067 | 63,321 | 1,171,976 |
| Total Annual Incremental Taxes Captured | 189,158 | 193,004 | 196,927 | 200,928 | 3,489,584 |
| *Cumulative Annual Incr. Local Taxes Captured* | 1,912,973 | 2,045,140 | 2,180,000 | 2,317,607 | 2,317,607 |
| *Cumulative Annual Incr. School Taxes Captured* | 985,752 | 1,046,589 | 1,108,656 | 1,171,976 | 1,171,976 |
| *Cumulative Total Incremental Taxes Captured* | 2,898,725 | 3,091,729 | 3,288,655 | 3,489,584 | 3,489,584 |
| Annual Taxes Available for Reimbursement | 189,158 | 193,004 | 196,927 | 200,928 | 3,489,584 |
| Cumulative Taxes Captured for Reimbursement | 2,898,725 | 3,091,729 | 3,288,655 | 3,489,584 | 3,489,584 |

| Eligible Costs ($29,600 DEQ + $549,524 MEGA + DEQ $1M loan with int.) | | | | | 1,655,210 |
|---|---|---|---|---|---|
| Interest Accrued | 3,891 | | | | 1,136,075 |

# EXHIBIT R

**Erloch Lofts**

**2 Year Delay in Project Timing and 5 more years**

| | TV/Unit | | | Br Plan Capture Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
| | | | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | |
| Taxable Value: Existing Parcels | 104,800 | | | 104,800 | 108,883 | 120,100 | 112,500 | 69,200 | 69,200 | 62,900 | 64,158 | 65,441 | |
| Increase in Land Value | | | | | 4,083 | 15,300 | 7,700 | 0 | 0 | 0 | | | |
| Number of Ph 1 Rental Units | | | | | | | | | | | | | |
| Taxable Value-Phase 1 Rental Units | 45,945 | | | | | | | | | | | | |
| Number of Sold Phase 1 Prin. Res. Units | | | | | | | | | | | | | |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 45,945 | | | | | | | | | | | | |
| Commercial Square Footage | 24,000 | | | | | | | | | | | | |
| Taxable Value-Commercial | 24,000 | | | | | | | | | | | | |
| Number of Ph 2 Rental Units | 25 | | | | | | | | | | | | |
| Taxable Value-Phase 2 Rental Units | 75,674 | | | | | | | | | | | | |
| Number of Sold Phase 2 Prin. Res. Units | | | | | | | | | | | | | |
| Taxable Value-Sold Phase 2 Prin. Res. Units | 80,306 | | | | | | | | | | | | |
| Total taxable value: residential rental | | | | | | | | | | | | | |
| Total taxable value: Prin. Residential | | | | | | | | | | | | | |
| Total taxable value: commercial | | | | | | | | | | | | | |
| Incremental taxable value: land | | | | | 4,083 | 15,300 | 7,700 | | | | | | |
| Incremental taxable value: residential rental | | | | | | | | | | | | | |
| Incremental taxable value: Principal Residential | | | | | | | | | | | | | |
| Incremental taxable value: commercial | | | | | 4,083 | 15,300 | 7,700 | | | | | | |
| Total Incremental Taxable Value | | | | | | | | | | | | | |
| Assumed annual TV increase rate | | 2.00% | | | | | | | | | | | |

**Incremental Tax Estimates:**

| | PRE Rate | Full Millage | OPRA Yrs 1-6 | OPRA Yrs 7 | NEZ Rehab Yrs 1-7 | PR NEZ Yr 8 | PR NEZ Yr 9 | PR NEZ Yr 10 |
|---|---|---|---|---|---|---|---|---|
| School Taxes - Millage | | | | | | | | |
| Total Operating | 0.00 | 18.00 | 9.00 | 18.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| State Educ Tax | 6.00 | 6.00 | 3.00 | 6.00 | 0.00 | 6.00 | 6.00 | 6.00 |
| Total Schools | 6.00 | 24.00 | 12.00 | 24.00 | 0.00 | 6.00 | 6.00 | 6.00 |
| Local Taxes | | | | | | | | |
| Comm, College, library, transport. | 4.17 | 4.17 | 0.00 | 0.00 | 0.00 | 4.17 | 4.17 | 4.17 |
| City operating | 10.03 | 10.03 | 0.00 | 0.00 | 0.00 | 6.27 | 7.52 | 8.77 |
| County operating | 7.04 | 7.04 | 0.00 | 0.00 | 0.00 | 4.40 | 5.28 | 6.16 |
| Total School | 2.78 | 2.78 | 0.00 | 0.00 | 0.00 | 2.78 | 2.78 | 2.78 |
| Total Local | 24.02 | 24.02 | 0.00 | 0.00 | 0.00 | 17.62 | 19.76 | 21.89 |
| Total School and Local Capturable | 30.02 | 48.02 | 12.00 | 24.00 | 0.00 | 23.62 | 25.76 | 27.89 |

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|
| Total Operating | 73 | 275 | 139 | | | | | |
| State Educ Tax | 24 | 92 | 46 | | | | | |
| Total Schools | 98 | 367 | 185 | | | | | |
| Comm, College, library, transport. | 17 | 64 | 32 | | | | | |
| City operating | 41 | 153 | 77 | | | | | |
| County operating | 29 | 108 | 54 | | | | | |
| Total School | 11 | 43 | 21 | | | | | |
| Total Local | 98 | 368 | 185 | | | | | |
| Total School and Local Capturable | 196 | 735 | 370 | | | | | |

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Incremental Local/Non-School Taxes Captured | | 98 | 368 | 185 | 651 | 651 | 651 | 651 | |
| Annual Incremental School Taxes Captured | | 98 | 367 | 185 | 650 | 650 | 650 | 650 | |
| Total Annual Incremental Taxes Captured | | 196 | 735 | 370 | 1,301 | 1,301 | 1,301 | 1,301 | |
| Cumulative Annual Incr. Local Taxes Captured | | 98 | 466 | 651 | 651 | 651 | 651 | 651 | |
| Cumulative Annual Incr. School Taxes Captured | | 98 | 465 | 650 | 650 | 650 | 650 | 650 | |
| Cumulative Total Incremental Taxes Captured | | 196 | 931 | 1,301 | 1,301 | 1,301 | 1,301 | 1,301 | |
| Annual Taxes Available for Reimbursement | | 196 | 735 | 370 | 1,301 | 1,301 | 1,301 | 1,301 | |
| Cumulative Taxes Captured for Reimbursement | | 196 | 931 | 1,301 | 1,301 | 1,301 | 1,301 | 1,301 | |

| | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Eligible Costs ($29,600 DEQ + $549,524 MEGA + DEQ $327,575.30 Loan and assumed 2nd of $672,424.88 Loan with int.) | 33,335 | 33,335 | 33,335 | 33,335 | 612,509.34 |
| Interest Accrued | | | | 1,667 | 3,417 |
| Unreimbursed Eligible Costs and Interest | | | | 68,337 | 664,214 |
| Cost Reimbursements Paid | | | | | |
| Interest Paid | | | 33,335 | 66,671 | 679,130 |
| Ending Unreimbursed Costs | | | | 1,667 | |
| Ending Accrued Interest | | | | | 5,084 |

| | | |
|---|---|---|
| Projected Sale Price | | |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 2,572,929 | |
| Taxable Value-Commercial | 2,040,000 | |
| Taxable Value-Phase 2 Rental Units | 2,572,929 | |
| Taxable Value-Sold Phase 2 Prin. Res. Units | 2,637,287 | |

OEQ Loan 1 pmt
OEQ Loan 2 Est.

$33,335.34 2014-2024
64,490.66 2022-2032

OEQ/MEGA Costs: 5%

579,124

051816

**Elrach Lofts**
**# Year Delay in Project Timing and 5 more years**

| Row | Label | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (Year index) | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 5 | Taxable Value: Existing Parcels | 66,750 | 68,085 | 69,447 | 70,836 | 72,252 | 73,697 | 75,171 | 76,675 | 78,208 | 79,772 | 81,368 | 82,995 | 84,655 | 86,348 | 88,075 | 89,837 |
| 6 | Increase in Land Value | | | | | | | | | | | | | | | | |
| 7 | Number of Ph 1 Rental Units | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 |
| 8 | Taxable Value-Phase 1 Rental Units | 1,286,465 | 1,312,194 | 1,338,438 | 1,365,206 | 1,392,511 | 1,420,361 | 1,448,768 | 1,477,743 | 1,507,298 | 1,537,444 | 1,568,193 | 1,599,557 | 1,631,548 | 1,664,179 | 1,697,463 | |
| 9 | Number of Sold Phase 1 Prh. Res. Units | | | | | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 28 |
| 10 | Taxable Value-Sold Phase 1 Prh. Res. Units | | | | 1,020,000 | 1,040,400 | 1,061,208 | 1,082,432 | 1,104,081 | 1,126,162 | 1,148,686 | 1,171,659 | 1,195,093 | 1,218,994 | 1,243,374 | 1,268,242 | 1,697,463 |
| 11 | Commercial Square Footage | | | | | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| 12 | Taxable Value: Commercial | | | | | 1,312,194 | 1,338,438 | 1,365,206 | 1,392,511 | 1,420,361 | 1,448,768 | 1,477,743 | 1,507,298 | 1,537,444 | 1,568,193 | 1,599,557 | 1,268,242 |
| 13 | Taxable Value-Phase 2 Rental Units | 1,286,465 | 1,312,194 | 1,338,438 | 1,365,206 | 1,392,511 | 1,420,361 | 1,448,768 | 1,477,743 | 1,507,298 | 1,537,444 | 1,568,193 | 1,599,557 | 1,631,548 | 1,664,179 | 1,697,463 | 1,599,557 |
| 18 | Total taxable value: residential rental | | | | 1,020,000 | 1,040,400 | 1,061,208 | 1,082,432 | 1,104,081 | 1,126,162 | 1,148,686 | 1,171,659 | 1,195,093 | 1,218,994 | 1,243,374 | 1,268,242 | 3,297,019 |
| 20 | Total taxable value: commercial | | | | | 2,813,974 | 2,870,254 | 2,927,659 | 3,186,212 | 3,045,936 | 2,986,212 | 2,881,412 | 2,941,136 | 3,002,055 | 3,064,192 | 3,127,572 | 3,192,219 |
| 22 | Incremental taxable value: land | | | | | 1,061,208 | 1,082,432 | 1,104,081 | 1,126,162 | 1,148,686 | 1,171,659 | 1,195,093 | 1,218,994 | 1,243,374 | 1,268,242 | 1,343,374 | 1,268,242 |
| 23 | Incremental taxable value: residential rental | 1,181,665 | 1,207,394 | 1,233,638 | 1,260,406 | 2,307,711 | 2,355,961 | 2,405,176 | 2,765,454 | 2,822,859 | 2,881,412 | 2,941,136 | 3,002,055 | 3,064,192 | 3,127,572 | 3,192,219 | 4,460,461 |
| 27 | Total Incremental Taxable Value | 1,181,665 | 1,207,394 | 1,233,638 | 1,260,406 | 3,317,711 | 3,376,561 | 3,446,384 | 3,791,607 | 3,869,535 | 3,949,021 | 4,030,098 | 4,112,796 | 4,197,148 | 4,283,187 | 4,370,946 | 4,460,461 |
| 31 | School Taxes - Millage | | | | | 18,360 | 18,727 | 19,104 | 19,464 | 19,873 | 20,271 | 20,676 | 21,090 | 21,512 | 21,942 | 22,381 | 22,828 |
| 32 | State Educ Tax | | | | 6,120 | 6,242 | 6,367 | 6,485 | 23,217 | 23,694 | 24,181 | 24,677 | 25,183 | 25,699 | 26,226 | 26,763 | |
| 34 | Total Schools | | | | 24,480 | 24,970 | 25,469 | 25,469 | 43,091 | 43,965 | 44,857 | 45,767 | 46,695 | 47,641 | 48,606 | 49,591 | |
| 37 | Comm. College, Library, transport. | | | | | 11,300 | 11,535 | 11,774 | 16,810 | 16,400 | 17,154 | 17,506 | 17,865 | 18,231 | 18,605 | | |
| 38 | City operating | | | | | 16,981 | 20,800 | 24,770 | 40,416 | 40,416 | 41,245 | 42,091 | 42,954 | 43,834 | 44,732 | | |
| 39 | County operating | 651 | 651 | 651 | 651 | 11,923 | 14,605 | 17,392 | 28,378 | 28,960 | 29,554 | 30,160 | 30,778 | 31,408 | 651 | | |
| 40 | Inter. Schools | 650 | 650 | 650 | 650 | 7,258 | 7,694 | 7,854 | 11,213 | 11,443 | 11,678 | 11,919 | 12,165 | 12,410 | 650 | | |
| 41 | Total Local | 1,301 | 1,301 | 1,301 | 1,301 | 47,741 | 89,974 | 97,724 | 96,816 | 98,803 | 100,829 | 102,896 | 105,004 | 107,155 | 1,301 | | |
| 62 | Annual Incremental Local/Non-School Taxes Captured | | | | 24,480 | 24,970 | 25,469 | 54,634 | 61,791 | 61,791 | 98,803 | 102,896 | 105,004 | 105,004 | 107,155 | | |
| 63 | Annual Incremental School Taxes Captured | 34,211 | 37,588 | 41,134 | 44,858 | 48,767 | 42,233 | 43,091 | 45,767 | 45,767 | 45,767 | 46,695 | 47,741 | 46,695 | 64,491 | 64,491 | 64,491 |
| 64 | State Annual incremental Taxes Captured | 751,760 | 822,683 | 897,152 | 975,345 | 1,057,648 | 1,182,442 | 1,449,915 | 1,492,428 | 1,528,900 | 1,552,498 | 1,542,816 | 564,159 | 553,611 | 69,701 | 70,200 | 70,689 |
| 65 | Cumulative Annual Incr. Local Taxes Captured | 651 | 651 | 651 | 651 | 50,100 | 50,750 | 75,569 | 103,025 | 164,816 | 261,632 | 360,434 | 461,263 | 564,159 | 669,163 | 776,318 | |
| 66 | Cumulative Annual Incr. School Taxes Captured | 650 | 650 | 650 | 650 | 25,130 | 76,239 | 127,602 | 204,858 | 204,858 | 249,715 | 295,481 | 342,176 | 389,817 | 438,423 | 488,021 | |
| 67 | Cumulative Total Incremental Taxes Captured | 1,301 | 1,301 | 1,301 | 1,301 | 25,781 | 50,750 | 76,239 | 265,918 | 305,674 | 301,522 | 611,637 | 803,439 | 953,976 | 1,107,587 | 1,264,332 | |
| 68 | Taxes Available for Reimbursement | 1,301 | 1,301 | 1,301 | 1,301 | 25,781 | 50,750 | 76,239 | 166,134 | 166,194 | 105,756 | 141,347 | 144,569 | 147,523 | 150,537 | 153,611 | 156,746 |
| 70 | Eligible Costs ($25,600 DDQ + $849,524 MEGA + DEQ $382,575.30 Loan | | | | | | | | | | | | | | | | |
| 72 | Annual Unreimbursed Eligible Costs and Interest | 712,465 | 745,001 | 779,136 | 812,471 | 821,327 | 894,183 | 966,540 | 941,158 | 899,893 | 822,711 | 742,632 | 659,599 | 573,553 | 484,433 | 392,178 | |
| 73 | Cost Reimbursement Paid | 39,294 | 76,882 | 118,016 | 162,874 | 211,641 | 263,290 | 321,163 | 453,566 | 523,281 | 594,439 | 665,297 | 735,693 | 805,658 | 874,409 | 942,351 | |

051316

Einch Lofts
8 Year Delay in Project Timing and 5 more years

| | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | |
| Taxable Value Existing Parcels | 94,633 | 93,466 | 95,335 | 97,242 | 99,187 | 101,171 | 103,194 | 105,258 | 107,363 | 109,510 | 111,700 | |
| Increase in Land Value | | | | | | | | | 458 | 4,710 | 6,901 | |
| Number of Ph 1 Rental Units | | | | | | | | | | | | |
| Taxable Value-Phase 1 Rental Units | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 |
| Number of Sold Phase 1 Prin. Res. Units | 1,731,412 | 1,766,040 | 1,801,361 | 1,837,388 | 1,874,136 | 1,911,619 | 1,949,851 | 1,988,848 | 2,028,625 | 2,069,197 | 2,110,581 | 2,110,581 |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 |
| Commercial Square Footage | 1,293,607 | 1,319,479 | 1,345,868 | 1,372,786 | 1,400,241 | 1,428,246 | 1,456,811 | 1,485,947 | 1,515,666 | 1,545,980 | 1,576,899 | 1,576,899 |
| Taxable Value-Commercial | | | | | | | | | | | | |
| Taxable Value-Phase 2 Rental Units | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Number of Ph 2 Rental Units | 1,631,548 | 1,664,179 | 1,697,463 | 1,731,412 | 1,766,040 | 1,801,361 | 1,837,388 | 1,874,136 | 1,911,619 | 1,949,851 | 1,988,848 | 1,988,848 |
| Taxable Value-Phase 2 Rental Units | | | | | | | | | | | | |
| Number of Sold Phase 2 Prin. Res. Units | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Taxable Value-Sold Phase 2 Prin. Res. Units | 3,362,960 | 3,430,219 | 3,498,823 | 3,568,800 | 3,640,176 | 3,712,979 | 3,787,239 | 3,862,984 | 3,940,243 | 4,019,048 | 4,099,429 | 4,099,429 |
| Total taxable value: residential rental | 1,293,607 | 1,319,479 | 1,345,868 | 1,372,786 | 1,400,241 | 1,428,246 | 1,456,811 | 1,485,947 | 1,515,666 | 1,545,980 | 1,576,899 | 1,576,899 |
| Incremental taxable value: land | | | | | | | | | 2,563 | | | 2,563 |
| Incremental taxable value: residential rental | | | | | | | | 458 | | | 6,901 | 6,901 |
| Incremental taxable value: Principal Residential | 3,258,160 | 3,325,419 | 3,394,023 | 3,464,000 | 3,535,376 | 3,608,179 | 3,682,439 | 3,756,184 | 3,835,443 | 3,914,248 | 3,994,629 | 3,994,629 |
| Incremental taxable value: commercial | 1,293,607 | 1,319,479 | 1,345,868 | 1,372,786 | 1,400,241 | 1,428,246 | 1,456,811 | 1,485,947 | 1,515,666 | 1,545,980 | 1,576,899 | 1,576,899 |
| Incremental Taxable Value | 4,551,767 | 4,644,898 | 4,739,892 | 4,836,786 | 4,935,617 | 5,036,426 | 5,139,250 | 5,244,589 | 5,353,673 | 5,464,938 | 5,578,429 | 5,578,429 |
| Assumed annual TV increase rate | | | | | | | | | | | | |

**Incremental Tax Estimates:**

| School Taxes - Millage | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Operating | 23,285 | 23,751 | 24,226 | 24,710 | 25,204 | 25,708 | 26,223 | 26,755 | 27,328 | 27,912 | 28,508 | 530,344 |
| State Educ Tax | 27,311 | 27,869 | 28,439 | 29,021 | 29,614 | 30,219 | 30,836 | 31,468 | 32,122 | 32,790 | 33,471 | 574,439 |
| Total Schools | 50,596 | 51,620 | 52,665 | 53,731 | 54,818 | 55,927 | 57,058 | 58,223 | 59,450 | 60,702 | 61,979 | 1,104,783 |

**Local Taxes**

| Comm, College, Library, Transport. | 18,985 | 19,374 | 19,770 | 20,174 | 20,586 | 21,007 | 21,436 | 21,875 | 22,330 | 22,794 | 23,268 | 372,493 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| City operating | 45,647 | 46,581 | 47,534 | 48,506 | 49,497 | 50,508 | 51,539 | 52,595 | 53,689 | 54,805 | 55,943 | 874,940 |
| County operating | 32,051 | 32,707 | 33,375 | 34,058 | 34,754 | 35,463 | 36,188 | 36,929 | 37,697 | 38,481 | 39,280 | 614,329 |
| State Educ Tax | 12,666 | 12,933 | 13,188 | 13,457 | 13,732 | 14,013 | 14,299 | 14,592 | 14,900 | 15,165 | 15,521 | 248,475 |
| Total Local | 109,348 | 111,585 | 113,867 | 116,195 | 118,569 | 120,991 | 123,461 | 125,992 | 128,612 | 131,295 | 134,012 | 2,110,236 |
| Total School and Local Capturable | 159,944 | 163,205 | 166,532 | 169,926 | 173,387 | 176,918 | 180,519 | 184,215 | 188,063 | 191,987 | 195,991 | 3,215,019 |

| Annual Incremental Local/Non-School Taxes Captured | 109,348 | 111,585 | 113,867 | 116,195 | 118,569 | 120,991 | 123,461 | 125,992 | 128,612 | 131,295 | 134,012 | 2,110,236 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Annual Incremental School Taxes Captured | 50,596 | 51,620 | 52,665 | 53,731 | 54,818 | 55,927 | 57,058 | 58,223 | 59,450 | 60,702 | 61,979 | 1,104,783 |
| Total Annual Incremental Taxes Captured | 159,944 | 163,205 | 166,532 | 169,926 | 173,387 | 176,918 | 180,519 | 184,215 | 188,063 | 191,987 | 195,991 | 3,215,019 |
| Cumulative Annual Incr. Local Taxes Captured | 885,666 | 997,251 | 1,111,119 | 1,227,314 | 1,345,883 | 1,466,874 | 1,590,335 | 1,716,327 | 1,844,939 | 1,976,225 | 2,110,236 | 2,110,236 |
| Cumulative Annual Incr. School Taxes Captured | 538,610 | 590,230 | 642,895 | 696,626 | 751,444 | 807,371 | 864,429 | 922,652 | 982,102 | 1,042,804 | 1,104,783 | 1,104,783 |
| Cumulative Total Incremental Taxes Captured | 1,424,276 | 1,587,481 | 1,754,013 | 1,923,939 | 2,097,327 | 2,274,245 | 2,454,764 | 2,638,979 | 2,827,041 | 3,019,029 | 3,215,019 | 3,215,019 |
| Cumulative Taxes Available for Reimbursement | 1,424,276 | 1,587,481 | 1,754,013 | 1,923,939 | 2,097,327 | 2,274,245 | 2,454,764 | 2,638,979 | 2,827,041 | 3,019,029 | 3,215,019 | 3,215,019 |
| Cumulative Taxes Captured for Reimbursement | | | | | | | | | | | | |

| Eligible Costs ($26,600 DEQ + $549,524 MEGA + DEQ $327,575.30 Loan | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| and assumed 2nd $672,424.80 Loan with int.) | 66,726 | 62,066 | 57,609 | 51,532 | 45,613 | 39,224 | 32,339 | 24,930 | 16,966 | 8,411 | - | 1,347,168 |
| Unreimbursed Eligible Costs and Interest | 1,401,256 | 1,303,378 | 1,197,181 | 1,082,181 | 957,868 | 823,704 | 679,126 | 523,537 | 356,288 | 176,637 | - | |
| Interest Paid | 159,944 | 163,205 | 169,030 | | | | | | | | | 1,655,210 |
| Cost Reimbursements Paid | | | 97,503 | 169,926 | 173,387 | 176,918 | 180,519 | 184,215 | 188,063 | 176,637 | | 1,347,168 |
| Ending Unreimbursed Costs | 232,235 | 69,030 | | | | | | | | | | |
| Ending Accrued Interest | 1,009,077 | 1,071,143 | 1,030,649 | 912,255 | 784,480 | 646,786 | 498,606 | 339,322 | 168,226 | | 0 | |

051816