# EXHIBIT R

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Newell Rubbermaid, Inc.,

       Plaintiff,

v.                                   Civil Action No. 1-cv-15-00597-RJJ

Kirsch Lofts, LLC,

       Defendant.

---

## SUPPLEMENT TO PLAINTIFF'S EXPERT REPORT

### RICHARD A. BARR

Respectfully submitted,

Richard A. Barr

Dated: June 17, 2016

1

**INTRODUCTION**

This Supplement to Plaintiff's Expert Report ("Supplement") provides additional and revised information to address information provided by Defendants after the issuance of my May 19, 2016 report.  In particular, this Supplement considers information disclosed by Mr. Bosgraaf during his June 6, 2016 deposition and contained in Exhibits 58 and 61, each dated 6/9/16.

1.    Brownfield Tax Increment Financing Claim. Section 3 of my Report, commencing on page 16, is supplemented with the following information:

(a)    I have modified my calculations set forth in Exhibits Q and R of my Report based upon the construction schedule revealed in Exhibit 61. The attached revised Exhibits Q and R reflect the "Original Construction Schedule" and the impact of a 7 year delay to the "Proposed Construction Schedule (Newell delay)" described on Exhibit 61.

(b)    The results of the updating of Exhibits Q and R is that the conclusions set forth on page 22 and starting in the first complete paragraph of page 27 and continuing through the first paragraph of page 28 of my Report are revised to read as follows:

(Page 22, para. d):

"d.  Exhibit Q is an estimated schedule of reimbursements of eligible costs that incorporates the various conclusions above.  The schedule demonstrates that Kirsch Lofts should have expected to receive final reimbursement of all of the potentially reimbursable costs plus interest by 2035, which is 3 years before the current 30-year deadline for final reimbursement under the Brownfield Plan."[footnote omitted]

(pages 27 and 28):

"Exhibit Q presents my estimate of the reimbursements that would have been realized by Kirsch Lofts had the project been constructed as described by Mr. Scott Bosgraaf, and as originally submitted and approved by the City of Sturgis, the MDEQ and the MEGA, as described above. Based upon this estimate, I conclude that Kirsch Lofts would have received complete reimbursement by 2035 if the project had proceeded as originally approved for (a) all $579,124 of its costs that were not reimbursed with proceeds of the Brownfield Loan, (b) payments on the MDEQ Loan made directly or indirectly by Kirsch Lofts, and (c) $851,133 of interest." [footnote omitted]

3

"Exhibit R presents my estimate of the reimbursements that could be realized by Kirsch Lofts if a seven-year delay of the project occurs as alleged by Kirsch Lofts and the Siegal Opinion, the project is then constructed in three phases as contemplated by Mr. Bosgraaf and in various documents and Kirsch Lofts obtains a 5-year deferral of the commencement of the maximum 30-year brownfield plan tax capture period, which has been legally permitted since the amendment of Act 381 by 2012 P.A. 502. Based upon these assumptions, I estimate that Kirsch Lofts would have been paid all amounts due it under the Brownfield Plan.

If Kirsch Lofts does not obtain approval for a 5-year deferral of the commencement of the 30-year tax capture period, I estimate that there would be $143,434 of unreimbursed costs or accrued but unpaid interest at the end of 2043 that would not be paid to Kirsch Lofts under the Brownfield Plan."

(c)    Exhibit 58 omits any reference to the receipt of MDEQ Loan proceeds which are described in my Report and considered in my estimates of tax increment and tax credit values, even though what appears to be corresponding invoices from Bosgraaf Commercial that likely were paid

from MDEQ Loan proceeds are listed. The Act 381 Work Plan refers to the MDEQ Loan and other documents refer to the reduced interest rate approved for school tax purposes with respect to funds advanced under the MDEQ Loan. Further, costs that are or will be paid by others, including tax increment proceeds under a brownfield plan, are not eligible investment for purposes of the MBT Brownfield Tax Credit.

2.  <u>New Markets Tax Credits Claim</u>. Section 4 of my Report, commencing on page 28, is supplemented with the following information:

(a)  Exhibit 61, prepared by or for Kirsch Lofts, confirms that the project was intended to be constructed over a 6 year timeframe (from 2010 to 2016), but Kirsch Lofts claims that it lost an opportunity to obtain the benefits of New Markets Tax Credits valued in the June 12, 2016 revised Expert Report of Arthur Siegal as being worth at least $1,873,800. A project that has a construction period extending over six years will not qualify for New Markets Tax Credits because it won't satisfy the requirement of Treas. Reg. §1.45D-1(c)(5)(iv) that qualified equity

investments be made within 12 months after funds are received from the tax credit investor.

(b)     Exhibit 58 discloses the payment of a $10,000 "MMF Application Fee", which after investigation I have assumed represents the payment of a $10,000 reservation fee to Michigan Magnet Fund ("MMF"), a second CDE from whom Kirsch Lofts apparently sought an allocation of New Market Tax Credits. Upon inquiry of a representative of MMF, Albert Bogdan, I learned that MMF issued a reservation letter to Kirsch Industrial or a related Kirsch entity on February 25, 2010 (about one month after the January 27, 2010 e-mail from the MDEQ concerning site conditions (see Exhibit N to my Report)).

(c)     Mr. Bogdan indicated that he did not believe that discussions with Kirsch ever proceeded to the stage where an evaluation of the possible problem with compliance with the 80% non-residential income requirement was evaluated by MMF nor that the multi-year nature of the project was evaluated for possible non-compliance with Internal Revenue Code requirements under the New Markets Tax Credit program. I also learned that Kirsch failed to satisfy

6

the requirements of the MMF reservation letter and failed to respond to requests for information from MMF. Among other deficiencies in Kirsch satisfying the requirements of the MMF reservation letter, Mr. Bogdan reported to me that Kirsch failed to demonstrate its ability to obtain the leverage loan or other financial support for the proposed New Markets transaction and to complete the required complete application for the New Markets Tax Credit allocation.

(d)    MMF refused to refund Kirsch the $10,000 reservation fee indicated on Exhibit 58, despite a request from Mr. Bosgraaf. MMF terminated its reservation letter (see minutes of MMF'S January 19, 2011 Board of Directors meeting, page 19, attached as Exhibit S hereto).

(e)    I understand that Exhibit 58 has been described by Scott Bosgraaf to represent all out of pocket costs of Kirsch Lofts for the project. The absence of an indication on Exhibit 58 that Kirsch Lofts paid CapFund the $30,000 deposit required by the terms of the purported terms sheet from CapFund (undated and unsigned) is further reason to doubt that CapFund ever was committed or ready to proceed with

7

closing of the New Markets Tax Credit transaction, contrary to the claim of Kirsch Lofts.

**B.    SUPPLEMENTAL TESTIMONY**

I reserve the right to supplement or modify this report and my findings to respond to any new or additional information that may become available after the date of this report and to rebut, as necessary, any opinions offered by the defendant or its experts in this case.

Exhibit Q (revised)

| | | By Filer Capture Year | | | |
|---|---|---|---|---|---|
| Kitsch Lots | | | Projected | | |
| Original Project Timing | | | Sale Price | | |
| Rev June 16, 2016; res phase, OPRA/NEZ staged | TV/Unit | | | | |
| Taxable Value: Existing Parcels | | 104,800 | | | |
| Increase in Land Value | | | | | |
| Number of Ph 1 Rental Units | | 28 | | | |
| Number of Ph 1 Rental Units | | | | | |
| Taxable Value- Phase 1 Rental Units | 45,945 | | 2,572,929 | | |
| Number of Sold Phase 1 Prin. Res. Units | | | | | |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 45,945 | | | | |
| Phase 2 Commercial Square Footage | | 24,000 | 2,040,000 | | |
| Taxable Value-Phase 2 Commercial | 42.50 | | | | |
| Number of Ph 3 Rental Units | | 17 | | | |
| Number of Sold Phase 3 Prin. Res. Units | 75,674 | | 2,572,929 | | |
| Taxable Value-Sold Phase 3 Prin. Res. Units | | | | | |
| Total taxable value: commercial | | | | | |
| Total taxable value: Residential | | | | | |
| Total taxable value: commercial | | | | | |
| Total taxable value: land | | | | | |
| Incremental taxable value: commercial | | | | | |
| Incremental taxable value: residential rental | | | | | |
| Incremental taxable value: Principal Residential | | | | | |
| Incremental taxable value: commercial | | | | | |
| Total Incremental Taxable Value | | | | | |
| Assumed annual TV increase rate | | 2.00% | | | |

| Kirsch Lots | | |
|---|---|---|
| Original Project Timing |
| rev June 16, 2010; res phase, OPRA/ORE2 staged |
| Simple Interest |
| Taxable Existing Parcels |
| Increase in Land Value |
| Number of Ph 1 Rental Units |
| Number of Sold Phase 1 Prin. Res. Units |
| Unsubsidized Eligible Comm'l Units |
| Taxable Value-Sold Phase 1 Prin. Res. Units |
| Interest Paid Residential |
| Taxable Value-Phase 2 Commercial |
| Taxable Value-Phase 2 Commercial Square Footage |
| Number of Ph 3 Rental Units |
| Taxable Value-Phase 3 Rental Units |
| Number of Sold Phase 3 Prin. Res. Units |
| Total taxable value Ph.3, Residential |
| Total taxable value commercial |
| Total taxable value: land |
| Incremental taxable value |
| Incremental taxable value: residential |
| Incremental taxable value: residential Principal Residential |
| Incremental taxable value: commercial |
| Total Incremental Taxable Value |
| Assumed annual TV increase rate |
| Incremental Tax Estimates: |
| School Taxes - Millage |
| School Operating |
| State Educ Tax |
| Total Schools |
| Local Taxes |
| Comm., College, Library, transport. |
| City operating |
| County operating |
| Inter. Schools |
| Total Local and Total Capturable |
| Annual Incremental Local/Non-School Taxes Captured |
| Cumulative Annual Incl. Local Taxes Captured |
| Annual Incremental Taxes Captured |
| Total Annual Incremental Taxes Captured |
| Cumulative Annual Incl. Local Taxes Captured |
| Cumulative Annual Incl. School Taxes Captured |
| Cumulative Total Incremental Taxes Captured |
| Annual Taxes Available for Reimbursement |
| Cumulative Taxes Captured for Reimbursement |
| Eligible Costs ($250,000 DDA + $549,524 MEGA + OECD $1M Loan with Int.) |
| Simple Interest Applied |
| Repayment of Ph 1 Loan incl. interest |
| Increase of Ph 1 Loan and Interest |
| Cost Reimbursements Paid |
| Balance of Accrued Unpaid Interest |
| Ending Unreimbursed Costs |
| Ending Accrued Interest |

| # | A | AM | AN | AO |
|---|---|---|---|---|
| 1 | Kirsch Lofts | | | |
| 2 | | | | |
| 3 | Original Project Timing | | | |
| 4 | (rev June 15, 2016; res phase, GPFA/NEZ capped | 29 | 30 | |
| 5 | | 2037 | 2038 | Totals |
| 6 | Taxable Value: Existing Parcels | | | |
| 7 | Increase in Land Value | 99,187 | 101,171 | |
| 8 | Number of Ph's Rental Units | | | |
| 9 | Taxable Value- Phase 1 Rental Units | | | |
| 10 | Number of Sold Phase 1 Prin. Res. Units | 28 | 28 | |
| 11 | Taxable Value-Sold Phase 1 Prin. Res. Units | 2,152,793 | 2,195,849 | |
| 12 | Phase 2 Commercial Square Footage | | | |
| 13 | Taxable Value-Phase 2 Commercial | | | |
| 14 | Number of Ph 3 Rental Units | | | |
| 15 | Taxable Value-Phase 2 Commercial | 1,608,437 | 1,640,606 | |
| 16 | Number of Ph 3 Rental Units | | | |
| 17 | Taxable Value-Phase 3 Prin. Res. Units | 17 | 17 | |
| 18 | Number of Sold Phase 3 Prin. Res. Units | | | |
| 19 | Taxable Value-Sold Phase 3 Prin. Res. Units | 1,911,619 | 1,949,851 | |
| 20 | Total taxable value: residential rental | | | |
| 21 | Total taxable value: Prin. Residential | 4,064,412 | 4,145,700 | |
| 22 | Total taxable value: commercial | 1,608,437 | 1,640,606 | |
| 23 | Incremental taxable value: land | | | |
| 24 | Incremental taxable value: residential rental | | | |
| 25 | Incremental taxable value: Principal Residential | 3,955,612 | 4,040,900 | |
| 26 | Incremental taxable value: commercial | 1,608,437 | 1,640,606 | |
| 27 | Total Incremental Taxable Value | 5,568,049 | 5,681,506 | |
| 28 | Assumed annual TV increase rate | | | |
| 29 | Incremental Tax Estimates: | | | |
| 30 | School Taxes - Millage | | | |
| 31 | School Operating | 28,952 | 29,531 | 520,317 |
| 32 | State Educ Tax | 34,037 | 34,718 | 555,377 |
| 33 | Total Schools | 62,989 | 64,249 | 1,075,694 |
| 34 | | | | |
| 35 | Local Taxes | | | |
| 36 | Comm. College, library, transport. | 23,661 | 24,135 | 370,265 |
| 37 | City operating | 56,830 | 58,028 | 867,717 |
| 38 | County operating | 39,945 | 40,744 | 609,256 |
| 39 | Inter. Schools | 15,784 | 16,099 | 246,989 |
| 40 | Total Local | 136,380 | 139,006 | 2,094,228 |
| 41 | Total School and Local Capturable | 199,369 | 203,254 | 3,169,922 |
| 42 | Annual Incremental Local/Non-School Taxes Captured | 136,380 | 139,006 | 2,094,228 |
| 43 | Annual Incremental School Taxes Captured | 62,989 | 64,249 | 1,075,694 |
| 44 | Total Annual Incremental Taxes Captured | 199,369 | 203,254 | 3,169,922 |
| 45 | Cumulative Annual Incr. Local Taxes Captured | 1,955,223 | 2,094,228 | 2,094,228 |
| 46 | Cumulative Annual Incr. School Taxes Captured | 1,021,445 | 1,075,694 | 1,075,694 |
| 47 | Cumulative Total Incremental Taxes Captured | 2,966,668 | 3,169,922 | 3,169,922 |
| 48 | Annual Taxes Available for Reimbursement | 199,369 | | |
| 49 | Cumulative Taxes Captured for Reimbursement | 2,966,668 | 3,169,922 | 3,169,922 |
| 50 | Eligible Costs ($75,000 DEQ + $549,526 MEGA + DEQ $1M Loan with int.) | | | |
| 51 | Simple Interest Accrued | | | 1,655,210 |
| 52 | Unreimbursed Eligible Costs and Interest | | | 959,366 |
| 53 | Cost Reimbursements Paid | | | |
| 54 | Balance of Accrued Unpaid Interest | | | 1,655,210 |
| 55 | Interest Paid | | | |
| 56 | Ending Unreimbursed Costs | | | 959,366 |
| 57 | Ending Accrued Interest | | | |
| 60 | KL616 | | | |

Exhibit R (revised)

**Ritsch Lofts**

7 years delay and 5 more years
rev June 16, 2016; rev phase, OPRA/NEZ staged

| Row Label | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| Taxable Value: Existing Parcels | 104,800 | 108,883 | 120,100 | 112,500 | 69,200 | 69,200 | 62,900 | 64,158 | 65,441 | 66,750 | 68,085 |
| Increase in Land Value | | 4,083 | 15,300 | 7,700 | 0 | 0 | | | | | |
| Number of Phs 1 Rental Units | | | | | | | | | | | 28 |
| Taxable Value- Phase 1 Rental Units | | | | | | | | | | | 1,286,465 |
| Total Incremental Taxable Value | | 4,083 | 15,300 | 7,700 | | | | | | | 1,181,665 |

Incremental Tax Estimates:

| | PRE Rate | Full Millage | OPRA Yrs. 1-6 | OPRA Yrs 7-10 | NEZ Rehab. Yrs. 1-7 | PR NEZ Yr 8 | PR NEZ Yr 9 | PR NEZ Yr 10 |
|---|---|---|---|---|---|---|---|---|
| School Oper / Millage | | 18.00 | 9.00 | 18.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| School Operating | 6.00 | 6.00 | 3.00 | 6.00 | 0.00 | 6.00 | 6.00 | 6.00 |
| State Educ Tax | 6.00 | 6.00 | 3.00 | 6.00 | 0.00 | 6.00 | 6.00 | 6.00 |
| Total Schools | 6.00 | 24.00 | 12.00 | 24.00 | 0.00 | 6.00 | 6.00 | 6.00 |

| | PRE Rate | Full Millage | | | | PR NEZ Yr 8 | PR NEZ Yr 9 | PR NEZ Yr 10 |
|---|---|---|---|---|---|---|---|---|
| Comm, College, Library, transport. | 4.17 | 4.17 | | | | 4.17 | 4.17 | 4.17 |
| City operating | 10.03 | 10.03 | | | | 6.27 | 7.52 | 8.77 |
| County operating | 7.64 | 7.64 | | | | 4.40 | 5.28 | 6.16 |
| Inter. Schools | 2.78 | 2.78 | | | | 2.78 | 2.78 | 2.78 |
| Total Local | 24.62 | 24.62 | | | | 17.62 | 19.76 | 21.89 |
| | | 48.62 | | | | 23.62 | 25.76 | 27.89 |

| | School tax % | 39.4% | 50% | 2.0% |
| Local tax % | 60.6% | 6.0% | 3.6% |
| Wt. Avg. | | 5.61% |

Kirsch Lots — tax increment financing projection spreadsheet

| A | ... |
|---|---|
| **Kirsch Lots** | |
| 7 years delay and 5 more years | |
| for June 15, 2016; no phase. OPRA/DEQ staged | |
| Taxable Value: Existing Parcels | |
| Increase in Land Value | |
| Number of Ph 1 Rental Units | |
| Taxable Value Phase 1 Rental Units | |
| Number of Sold Phase 1 Prim. Res. Units | |
| Taxable Value-Sold Phase 1 Prim. Res. Units | |
| Phase 2 Commercial Square Footage | |
| Taxable Value-Phase 2 Commercial | |
| Number of Ph 3 Rental Units | |
| Taxable Value-Phase 3 Prin. Res. Units | |
| Number of Sold Phase 3 Prin. Res. Units | |
| Taxable Value-Sold Phase 3 Prin. Res. Units | |
| Total taxable value: commercial | |
| Incremental taxable value: land | |
| Incremental taxable value: commercial | |
| Incremental taxable value: residential rental | |
| Incremental taxable value: commercial | |
| Total Incremental Taxable Value | |
| Assumed annual TV increase rate | |
| **Incremental Tax Estimates:** | |
| School Taxes - Millage | |
| Operating | |
| State-Educ Tax | |
| Total Schools | |
| Local Taxes | |
| Comm, College, Library, transport. | |
| City operating | |
| Incremental operating | |
| Inter. Schools | |
| Total Local | |
| Total School and Local Capturable | |
| Annual Incremental Local/Non-School Taxes Captured | |
| Annual Incremental School Taxes Captured | |
| Total Annual Incremental Taxes Captured | |
| Cumulative Annual Incr. Local Taxes Captured | |
| Cumulative Annual Incr. School Taxes Captured | |
| Cumulative Annual Incr. Total Taxes Captured | |
| Annual Taxes Available for Reimbursement | |
| Cumulative Taxes Captured for Reimbursement | |
| Eligible Costs ($29,600 DEQ + $549,524 MEGA + DEQ $1M Loan with | |
| Simple Interest Accrued | |
| Unreimbursed Eligible Costs and Interest | |
| Reimbursement Paid | |
| Interest Paid | |
| Ending Unreimbursed Costs | |
| Ending Accrued Interest | |

**Kirsh Lofts**

7 years delay and 5 more years
inc June 16, 2016; no phase; OPRA/NEZ staged

| | AM | AN | AO | AP | AQ | AR | AS | AT |
|---|---|---|---|---|---|---|---|---|
| | 29 | 30 | 31 | 32 | 33 | 34 | 35 | |
| | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | Totals |
| Taxable Value: Existing Parcels | 99,187 | 101,171 | 103,194 | 105,258 | 107,363 | 109,510 | 111,701 | |
| Increase in Land Value | | | | | | | | |
| Number of Ph 1 Rental Units | | | | | | | | |
| Taxable Value- Phase 1 Rental Units | | | | | | | | |
| Number of Sold Phase 1 Prin. Res. Units | 28 | 28 | 28 | 28 | 28 | 28 | 28 | |
| Taxable Value-Sold Phase 1 Prin. Res. Units | 1,874,136 | 1,911,619 | 1,949,851 | 1,988,848 | 2,028,625 | 2,069,197 | 2,110,581 | |
| Phase 2 Commercial Square Footage | | | | | | | | |
| Taxable Value-Phase 2 Commercial | 1,400,241 | 1,428,246 | 1,456,811 | 1,485,947 | 1,515,666 | 1,545,980 | 1,576,899 | |
| Number of Ph 3 Rental Units | | | | | | | | |
| Taxable Value-Ph 3 Rental Units | 17 | 17 | 17 | 17 | 17 | 17 | 17 | |
| Number of Sold Phase 3 Prin. Res. Units | 1,664,179 | 1,697,463 | 1,731,412 | 1,766,040 | 1,801,361 | 1,837,388 | 1,874,136 | |
| Taxable Value-Sold Phase 3 Prin. Res. Units | | | | | | | | |
| Total taxable value: residential rental | | | | | | | | |
| Taxable taxable value: Prin. Residential | 1,400,241 | 1,428,246 | 1,456,811 | 1,485,947 | 1,515,666 | 1,545,980 | 1,576,899 | |
| Total taxable value, commercial | | | | | | | | |
| Incremental taxable value: land | | | | | | | | |
| Incremental taxable value: residential rental | | | | | | | | |
| Incremental taxable value: Principal Residential | 3,538,315 | 3,609,081 | 3,681,263 | 3,754,888 | 3,829,986 | 3,906,586 | 3,984,717 | |
| Incremental taxable value: commercial | 1,400,241 | 1,428,246 | 1,456,811 | 1,485,947 | 1,515,666 | 1,545,980 | 1,576,899 | |
| Total Incremental Taxable Value | 4,938,556 | 5,037,327 | 5,138,074 | 5,240,835 | 5,345,652 | 5,452,565 | 5,561,616 | |
| Assumed annual TV increase rate | | | | | | | | |
| **Incremental Tax Estimates:** | | | | | | | | |
| *School Taxes : Millage* | | | | | | | | |
| School Operating | 55,160 | 25,708 | 26,223 | 26,747 | 27,282 | 27,828 | 166,112 | 683,341 |
| State Educ Tax | 29,631 | 20,039 | 20,828 | 21,445 | 32,074 | 21,691 | 68,037 | 495,632 |
| Total Schools | 84,791 | 45,748 | 57,051 | 58,192 | 59,356 | 49,519 | 234,159 | 1,181,974 |
| *Local Taxes* | | | | | | | | |
| Comm. College, library, transport. | 20,599 | 21,031 | 21,431 | 21,860 | 22,297 | 22,743 | 23,198 | 322,469 |
| City operating | 49,556 | 50,517 | 51,527 | 52,558 | 53,609 | 54,681 | 55,775 | 752,798 |
| County operating | 34,774 | 35,470 | 36,179 | 36,903 | 37,641 | 38,394 | 39,162 | 528,569 |
| Inter. schools | 13,741 | 14,015 | 14,295 | 14,582 | 14,873 | 15,171 | 15,474 | 215,106 |
| Total Local | 118,640 | 121,033 | 123,433 | 125,502 | 128,420 | 130,988 | 133,608 | 1,818,943 |
| Total School and Local Capturable | 203,431 | 166,760 | 180,484 | 184,094 | 187,776 | 180,508 | 367,767 | 3,000,916 |
| Annual Incremental Local/Non-School Taxes Captured | 118,640 | 121,033 | 123,433 | 125,502 | 128,420 | 130,988 | 133,608 | 1,818,943 |
| Annual Incremental School Taxes Captured | 84,791 | 45,748 | 57,051 | 58,192 | 59,356 | 49,519 | 234,159 | 1,181,974 |
| Cumulative Annual Incr. Local Taxes Captured | 203,431 | 166,760 | 180,484 | 184,094 | 187,776 | 180,508 | 367,767 | 3,000,916 |
| Cumulative Annual Incr. School Taxes Captured | 1,055,580 | 1,176,592 | 1,000,025 | 1,425,927 | 1,554,347 | 1,685,335 | 1,818,943 | |
| Cumulative Total Incremental Taxes Captured | 677,749 | 722,697 | 780,248 | 838,840 | 898,296 | 947,814 | 1,181,974 | |
| Annual Taxes Available for Reimbursement | 1,733,329 | 1,900,289 | 2,080,773 | 2,264,867 | 2,452,642 | 2,631,149 | 3,000,916 | |
| Cumulative Taxes Captured for Reimbursement | 30,+11 | 166,760 | (23,094 | 124,094 | 187,776 | (82,507 | 367,767 | 3,000,916 |
| Eligible Costs ($29,600 DEQ + $549,524 MEGA + DEQ $1M loan with int.) | 1,713,529 | 1,900,289 | 2,080,773 | 2,264,867 | 2,452,642 | 2,633,149 | 3,000,916 | |
| Simple Interest Accrued | 7,015 | | | | | | | 1,655,210 |
| Unreimbursed Eligible Costs and Interest | 1,614,252 | 1,410,822 | 1,244,061 | 1,063,577 | 879,484 | 691,708 | 511,201 | 1,488,770 |
| Cost Reimbursements Paid | 125,482 | | | | | | | 1,655,210 |
| Interest Paid | 77,949 | 166,760 | 180,484 | 184,094 | 187,776 | 180,507 | 367,767 | 1,345,336 |
| Ending Unreimbursed Costs | | | | | | | | 143,434 |
| Ending Accrued Interest | 1,410,822 | 1,244,061 | 1,063,577 | 879,484 | 691,708 | 511,201 | 143,434 | 143,434 |

<u>Exhibit S</u>

21945587.1

*Kirsch p.19*

# MINUTES OF MEETING OF THE BOARD OF DIRECTORS OF

# MICHIGAN MAGNET FUND

### January 19, 2011

A meeting of the Board of Directors of Michigan Magnet Fund, a Michigan non-profit corporation (*"MMF"* or the *"Corporation"*) on behalf of itself and a manager of the following limited liability companies and subsidiary CDE's: Michigan Magnet Fund A, LLC; Michigan Magnet Fund B, LLC; Michigan Magnet Fund C, LLC; Michigan Magnet Fund D, LLC; Michigan Magnet Fund E, LLC; Michigan Magnet Fund F, LLC; Michigan Magnet Fund G, LLC; Michigan Magnet Fund H, LLC; Michigan Magnet Fund I, LLC; Michigan Magnet Fund J, LLC; MMF AA CDE, LLC; MMF BB CDE, LLC; MMF CC CDE, LLC; MMF DD CDE, LLC; MMF EE CDE, LLC; MMF FF CDE, LLC; MMF HH CDE, LLC; MMF JJ CDE, LLC; and MMF KK CDE, LLC was held on January 19, 2011 via teleconference. The following Board members participated: Ted Rozeboom (*"Rozeboom"*), Loomis, Ewert, Parsley, Davis & Gotting P.C., Mary King as proxy for Dave Blaszkiewicz (*"Blaszkiewicz"*), Detroit Investment Fund; Karl Dorshimer (*"Dorshimer"*) Lansing EDC, JoAnn Crary (*"Crary"*), Saginaw Future, Inc.,. Albert Bogdan as proxy for Mark Morante (*"Morante"*) MEDC, Jeff Sykes (*"Sykes"*), MSHDA, Mark McDaniel (*"McDaniel"*), Great Lakes Capital Fund; Richard Hosey (*"Hosey"*), Bank of America, Kara Wood (*"Wood"*), City of Grand Rapids, K. Scott Flemming (*"Flemming"*), Lansing EDC. Jason Paulateer (*"Paulateer"*), PNC CDC; Dennis West (*"West"*), Northern Initiatives and Tim Herman (*"Herman"*), Genesee Regional Chamber of Commerce. The following guests also participated: Albert Bogdan (*"Bogdan"*), Charles A. Fiedler (*"Fiedler"*), Rick Labor (*"Labor"*) and Jacob Horner (*"Horner"*).

Bogdan organized the agenda for the meeting and assembled a Board Package (the *"Package"*) which was distributed to the Board members via the Corporation's secured web page. It was determined that a quorum (at least eight members) was present and the meeting was called to order at 4:00 p.m. and hearing no objection, commenced with the meeting.

## I.     APPROVAL OF AGENDA

The first order of business was approval of the agenda. Upon motion duly made, seconded  and unanimously adopted the agenda was approved.

## II.    APPROVAL OF MINUTES

The nest order of business was the approval of minutes from the prior Board meeting. Upon motion duly made by Wood, seconded by Herman and unanimously adopted, it was:

**BE IT RESOLVED,** that the minutes from the December 17, 2010 Board of Directors meeting are approved.

### III.   FINANCIAL REPORT

The next order of business was the financial statement as of December 31, 2010.  Labor presented a draft unaudited income statement and balance sheet for the Corporation. No action was required or taken.

### IV.   HEART OF THE CITY HEALTH CENTER PROJECT- NMTC PROJECT FINANCING AND RELATED ACTIONS

The next order of business was resolution to transfer $9,000,000 of NMTC sub-allocation to the MMF EE CDE to provide $8,775,000 in QLICI loans to the Heart of the City Health Center in Grand Rapids, Michigan. Following discussion and upon motion duly made by Wood, seconded by McDaniel, and unanimously adopted (Paulateer abstaining), it was:

### A.   Background

**WHEREAS,** Michigan Magnet Fund (the "*Corporation*"), is a Michigan nonprofit corporation, organized on a directorship basis and tax-exempt under Sections 501(c)(3) and 509(a) of the Internal Revenue Code of 1986, as amended (the "*Code*"); and

**WHEREAS,** the Fifth Amended and Restated Bylaws of the Corporation provide for a Board of Directors, Officers, and an Executive Committee and sets forth their duties and authority; and

**WHEREAS,** the Corporation has been certified as a Community Development Entity ("*CDE*") under Section 45D of the Code by the Community Development Financial Institutions ("*CDFI*") Fund; and

**WHEREAS,** on November 3, 2009, MMF EE CDE, LLC ("*MMF CDE*") was formed as a Michigan limited liability company by filing Articles of Organization pursuant to Act Number 23 of the Michigan Public Acts of 1993, as amended (the "*MI LLC Act*"); and

**WHEREAS,** as of November 3, 2009, an initial Operating Agreement for MMF CDE was entered into by and between the Corporation and AAB Development Strategies, LLC, a Michigan limited liability company (the "*Withdrawing Member*"), as the initial members; and

**WHEREAS,** MMF CDE has been certified as a CDE by the CDFI Fund; and

**WHEREAS,** the Corporation is the managing member of MMF CDE; and

**WHEREAS,** effective January 12, 2010, the Corporation entered into a New Markets Tax Credit ("*NMTC*") Allocation Agreement (the "*MMF Allocation Agreement*"), as amended, whereby the Corporation received an allocation of new markets tax credits under Section 45D of the Code from the CDFI Fund in the seventh round of the NMTC program (CY 2009) in amount of $60,000,000 (the "*MMF NMTC Allocation*"); and

2

**WHEREAS,** the MMF Allocation Agreement requires that the Corporation invest in qualified projects within the State of Michigan and which meet other economic development and job creation criteria established by the Corporation.

**B.      Description of the Project**

**WHEREAS,** Cherry Stone LLC ("***Cherry Stone***"), a Michigan limited liability company, is a wholly owned subsidiary of Heart of the City Health Center, a Michigan nonprofit corporation ("***HOTCHC***") and a disregard entity for federal income tax purposes; and

**WHEREAS,** HOTCHC is owned by Cherry Street Services, Inc. d/b/a Cherry Street Health Services, a Michigan nonprofit corporation ("***Cherry Street***") and Touchstone innovarè, a Michigan nonprofit corporation ("***Touchstone***"; and together with Cherry Street, the "***Sponsors***"); and

**WHEREAS,** HOTCHC is a "qualified active low income community business" (as such term is defined in under Section 45D of the Code) (the "***QALICB***"); and

**WHEREAS,** Cherry Stone intends new construction of an approximately 80,000 square foot two-story building and supportive approximately 420-space parking structure to consolidate the operations of three non-profit community-based health care providers, being Cherry Street, Touchstone and Proaction Behavioral Health Alliance, to provide a blend of primary health care, dental, pharmacy, mental and behavioral health services all within a single facility and located on certain real property with an address of 100 Cherry Street S.E., Grand Rapids, Michigan 49503 (the "***Project***"), which Project is designed to provide a minimum of 141 new jobs; and

**WHEREAS,** the Project is located in a designated Brownfield site and Cherry Stone desires to obtain the benefit of the Brownfield credit available upon completion of the Project; and

**WHEREAS,** the Corporation has entered into a Reservation Letter with Cherry Street (the "***Reservation Letter***"), as amended to reserve a total of Nine Million Dollars ($9,000,000) of the MMF NMTC Allocation to the MMF CDE for the Project providing that certain terms and conditions be met; including but not limited to conditions related to timing of payment of "qualified equity investments" (as such term is defined in Section 45D of the Code) ("***QEI***") to MMF CDE and qualified low-income community investment (as such term is defined in Section 45D of the Code) (the "***QLICI***") in the QALICB; and

**WHEREAS,** the proposed Project is located within United States population census tract number 26081002100 which is a "qualified low income community" (as such term is defined under Section 45D of the Code) and eligible for NMTC and must meet the investment criteria as set forth in the MMF Allocation Agreement, including flexible rate and terms, and other economic development and job creation criteria established by the Corporation; and

**WHEREAS,** HOTCHC and Cherry Stone, jointly and severally (collectively, the "***Borrowers***") have determined that it is desirable and in the best interests of the Borrowers and the Project to procure financing to complete development and construction of the Project from an investor and lenders (the "***Project Financing***"); and

436288

**WHEREAS,** Touchstone will enter into a State law ground lease of the real property to HOTCHC; and

**WHEREAS,** HOTCHC will enter into a State law ground lease of the real property to Cherry Stone, and

**WHEREAS,** the MMF CDE is a subsidiary allocatee and is a party to the MMF Allocation Agreement; and

**WHEREAS,** on or about January 26, 2011 (the "*Closing Date*"), HOTCHC Investment Fund LLC, a Delaware limited liability company (the "*Fund*") will use the proceeds of a leverage loan of approximately $6,578,342 from Sponsors and an equity contribution of approximately $2,421,658 from PNC New Markets Investments Partners, LLC ("*NMI*"), with the proceeds of an equity investment into NMI from PNC Bank, National Association, a national banking association ("*PNC*") to make a QEI in MMF CDE in the amount of $9,000,000; and

**WHEREAS,** the QEI from MMF CDE in the aggregate amount of approximately $9,000,000 will be used to fund a QLICI loan by the MMF CDE. Specifically, on the Closing Date, MMF CDE will advance QLICI loan proceeds in the aggregate amount of $8,775,000 to the Borrowers represented by QLICI Loan Note (Tranche A) in the approximate amount of $5,867,868, QLICI Loan Note (Tranche B) in the approximate amount of $710,474 and QLICI Loan Note (Tranche C) in the approximate amount of $2,196,658, collectively the "*Notes*": and

**WHEREAS,** on the Closing Date, 100% of the QLICI loan proceeds will be directed to Cherry Stone and HOTCHC for uses in connection with the Project; and

**WHEREAS,** in connection with the Project Financing, the Borrowers will obtain an unsecured direct loan from the Sponsors in the amount of approximately $9,450,147 (the "*Sponsor Loan*"); and

**WHEREAS,** in connection with the Project Financing, the Corporation will enter into a Loan Disbursement Servicing Agreement (the "*Disbursing Agreement*"), which provides, in relevant part, for the Bank to act as disbursing agent of MMF CDE for the QLICI loan; and

**WHEREAS,** in connection with the Project Financing, the servicing of the QLICI loan will be conducted by Great Lakes Capital Fund ("*GLCF*") pursuant to a Servicing Agreement between the Corporation and GLCF (the "*Servicing Agreement*"); and

**WHEREAS,** in connection with the Project Financing, a subordination agreement (the "*Subordination Agreement*") will be entered into by and among the Borrowers, MMF CDE, and the Sponsors, which provides, in relevant part, that upon default the MMF CDE Loan will be first priority. However, the Loan Agreement, the Mortgages (as defined in the Loan Agreement) and the Security Agreement (as defined in the Loan Agreement) will require the subordination of QLICI Loan Note (Tranche B) and QLICI Loan Note (Tranche C) of the QLICI Loan upon payment of the QLICI Loan Note (Tranche A).

**WHEREAS,** the parties have certified that the QLICI loan to the Borrowers meet the flexible terms requirements of the MMF Allocation Agreement; and

436288

**WHEREAS,** upon the issuance by the Michigan Economic Growth Authority of the Michigan Business Tax Brownfield Redevelopment Credit Certificate of Completion for Cherry Stone under Section 208.147 of the Michigan Business Tax Act, Cherry Stone will be dissolved and all rights, asset and liabilities of the Project will be transferred to HOTCHC which will then become the sole Borrower and continue as the QALICB, which event is to occur on or before June 30, 2012; and

**WHEREAS,** in connection with the Project Financing, the Corporation will receive certain fees to include: (i) asset management fee of 2.5% of the MMF CDE QEI; (ii) an annual new markets compliance fee of 0.6% based on MMF CDE QEI payable monthly, (iii) audit and tax fee of $13,000 per year payable in the first quarter; (iv) payment of extraordinary expenses; (v) a loan servicing fee of $13,162.50 per annum payable monthly at $1,096.87 per month; and (vii) closing costs, all of which will be evidenced by the Fee Agreement (MMF CDE) (the *"Fee Agreement"*) and other agreements signed by the party to be bound and in the case of the foregoing items (ii) and (iii), will be guaranteed by the Sponsors; and

**WHEREAS,** PNC will act as a disbursing agent for the Corporation and all disbursements will need to be approved by the Corporation; and

**WHEREAS,** HOTCHC has offered to make a donation in an amount based on the increase in value of the Project upon completion of the seven-year NMTC compliance period to the Michigan Magnet Fund's Economic Development Fund which will evidenced by the Fee Agreement.

### C.     Transfer of Sub-Allocation to the Project

**WHEREAS,** based on the foregoing, the Corporation is willing to sign on behalf of itself and as managing member of MMF CDE a Sub-Allocation Agreement (MMF CDE) (the *"Sub-Allocation Agreement"*) and sub-allocate the amount of $9,000,000 of the Corporation's NMTC Allocation to MMF CDE (the *"Sub-Allocation"*); and

**WHEREAS,** the Corporation is willing to sign the MMF CDE Operating Agreement of MMF CDE and any related documents; and

**WHEREAS,** on or about the Closing Date, the Corporation shall make a capital contribution to MMF CDE in the approximate amount of $900 into MMF CDE; and

**WHEREAS,** the Corporation is also willing to sign in its capacity as Managing Member of the MMF CDE, that certain QLICI Loan Agreement with the QALICB (the *"Loan Agreement"*) and applicable related documents; and

**WHEREAS,** the Corporation wishes to authorize other actions in order to further the successful development and operation of the Project.

**NOW, THEREFORE,** the following Resolutions have been duly made, seconded and adopted:

436288

**IT IS RESOLVED,** that the Corporation approves the Project and that MMF CDE shall be transferred a NMTC Allocation in the amount of $9,000,000; and

**IT IS FURTHER RESOLVED,** that the Corporation is authorized and affirmed to participate in and act as the managing member of MMF CDE pursuant to the MMF CDE Operating Agreement and to acquire and hold up to a 0.01% interest in MMF CDE pursuant to the MMF CDE Operating Agreement; and

**IT IS FURTHER RESOLVED,** that the Sub-Allocation Agreement which transfers the amount of $9,000,000 of MMF's NMTC Allocation to MMF CDE, is in all respects approved and adopted; and

**IT IS FURTHER RESOLVED,** that any one Officer or member of the Executive Committee, is authorized, on behalf of the Corporation, as the managing member of MMF CDE, any time after the adoption of this resolution and outside further action by or authority or direction from the Board of Directors of the Corporation, to execute all necessary documents and to take such other acts as may be necessary, convenient or appropriate to accomplish the actions envisioned above, including but not limited to the MMF CDE Operating Agreement, the Indemnification Agreement, the Loan Agreement, the Subordination Agreement, the Environmental Indemnity Agreement, the Fee Agreement, the Disbursing Agreement, and any other documents thereto and in general, to effectuate the Corporation's desire to support and participate in the Project; and

**IT IS FURTHER RESOLVED,** that any one Officer or member of the Executive Committee, is also authorized, on behalf of the Corporation, as managing member of MMF CDE, to negotiate and make such changes and modifications in documents, and actions envisioned above, including the dollar amounts (as long as the amount of the NMTC transfer to MMF CDE, is not changed, except for an increase of up to 10% based on financial projections) and to execute and deliver such further instruments, certificates, term sheets, reservation letters and documents as they shall determine to be necessary, appropriate or desirable to carry out the intent of these resolutions with respect to any aspect of the Corporation's participation in the Project, any such determination to be conclusively presumed by the doing and performing of any act or thing, or the preparing and executing of any such instrument, certificate, term sheet, reservation letter or document, and any actions taken with respect thereto are hereby ratified and affirmed by the Board of Directors of the Corporation; and

**IT IS FURTHER RESOLVED,** that the Chief Business Development Officer is authorized to approve all disbursements after inspection, review and recommendation by PNC; and

**IT IS FURTHER RESOLVED,** that the foregoing resolutions replace in their entirety all prior resolutions of the Board of Directors with regard to the subject matter hereof; and

**IT IS FURTHER RESOLVED,** that if the Project Financing does not close by the February 28, 2011, the Corporation may, in its sole discretion, withdraw its Sub-Allocation whereupon the Corporation and MMF CDE will have no further obligations in connection with the Project Financing.

6

436288

## V. LOFTS ON LUDINGTON PROJECT - NMTC PROJECT FINANCING AND RELATED ACTIONS

The next order of business was the Lofts on Ludington Project. Bogdan reported that this mixed use project was ready to close when the tax credit investor (UPS) recruited by Enhanced Capital (EHC), the syndicator, withdrew from the Project without giving any reasons or notice. Bogdan reported that the MMF has recruited The Bank of Holland (TBOH) to provide the Federal NMTC and Federal Historic Tax Credit investment. EHC will provide the State tax credit investment. We are awaiting the final financial projections from Plante Moran. The developer, bank and the MMF have worked to change the numbers to make them work. All professionals have agreed to cap their costs, EHC has dropped their fee, and the consultant hired by the developer has agreed to a substantial cut in fees. TBOH increased contingencies and reserves to protect their investment and have agreed to accelerate their tax credit payments. The end result is that we have been able to reduce total cost and accelerate payments. TBOH would like to close this month. Following discussion and upon motion duly made by McDaniel, seconded by Paulateer, and unanimously adopted (Rozeboom and Sykes abstaining), it was:

### A. Background

**WHEREAS,** Michigan Magnet Fund (the "*Corporation*"), is a Michigan nonprofit corporation, organized on a directorship basis and tax-exempt under Sections 501(c)(3) and 509(a) of the Internal Revenue Code of 1986, as amended (the "*Code*"); and

**WHEREAS,** the Fifth Amended and Restated Bylaws of the Corporation provide for a Board of Directors, Officers, and an Executive Committee and sets forth their duties and authority; and

**WHEREAS,** the Corporation has been certified as a Community Development Entity ("*CDE*") by the Community Development Financial Institutions ("*CDFI*") Fund; and

**WHEREAS,** on November 3, 2009, MMF BB CDE, LLC ("*MMF CDE*") has been formed as a Michigan limited liability company by filing Articles of Organization pursuant to Act Number 23 of the Michigan Public Acts of 1993, as amended (the "*MI LLC Act*"); and

**WHEREAS,** MMFCDE has been certified as a CDE by the CDFI Fund; and

**WHEREAS,** the Corporation is the managing member of MMFCDE; and

**WHEREAS,** as of November 3, 2009, an initial Operating Agreement for MMFCDE pursuant to MI LLC Act was entered into by and between the Corporation and AAB Development Strategies, LLC, a Michigan limited liability company (the "*Withdrawing Member*"), as the initial members; and

**WHEREAS,** effective January 12, 2010, the Corporation entered into a New Markets Tax Credit Allocation Agreement (the "*MMF Allocation Agreement*"), as amended, whereby the Corporation received an allocation of new markets tax credits ("*NMTC*") under Section 45D of the Code, as amended from the CDFI Fund in the seventh round of the NMTC program (CY 2009) in amount of $60,000,000 (the "*MMF NMTC Allocation*"); and

7

436288

**WHEREAS,** the MMF Allocation Agreement requires that the Corporation invest in qualified projects within the State of Michigan and which meet other economic development and job creation criteria established by the Corporation; and

**B.    Description of the Project**

**WHEREAS,** Lofts Owner, LLC, a Michigan limited liability company, is the qualified low-income community business (as such term is defined in Section 45D of the Code) (the "*QLICB*") and master lessor of the Delta building intended for mixed-use rehabilitation of historic building consisting of approximately 4,178 square feet of commercial retail space and approximately 15,644 square feet of residential facilities composing 15 residential units located at 1615 Ludington Street, City of Escanaba, Michigan 49829 (the "*Project*"); and

**WHEREAS,** Swanee, Inc., a Michigan corporation ("*Sponsor*"), is the sponsor of the Project; and

**WHEREAS,** the QLICB has determined that it is desirable and in the best interests of the QLICB and the Project to procure financing to complete development and construction of the Project from investors and lenders in the approximate amount of $5,000,000 (the "*Project Financing*"), including loans and equity investments with favorable terms from MMFCDE through the NMTC program; and

**WHEREAS,** the Corporation has entered into a Reservation Letter with the QLICB (the "*Reservation Letter*") to reserve a total of Three Million Eight Hundred Thousand Dollars ($3,800,000) of the MMF NMTC Allocation to the MMFCDE for the Project providing that certain terms and conditions be met, including but not limited to conditions related to timing of payment of "qualified equity investments" (as such term is defined in Section 45D of the Code) ("*QEI*") to MMFCDE and qualified low-income community investment (as such term is defined in Section 45D of the Code) (the "*QLICI*") in the QLICB; and

**WHEREAS,** to facilitate the Project Financing following the unexpected withdraw of NMTC and Federal Historic Tax Credit investor which delayed the closing of the Project Financing, the Board of Directors approved an additional $200,000 of MMF's NMTC Allocation to a total of $4,000,000 for the Project Financing which increase has been accepted by the Sponsor; and

**WHEREAS,** the proposed Project is located within United States population census tract number 26041971000 which is a "qualified low income community" (as such term is defined in Section 45D of the Code) and eligible for NMTC and must meet the investment criteria as set forth in the MMF Allocation Agreement by having an area median family income that does not exceed 70% of statewide median income  and being located in a nonmetropolitan Area census tract and other economic development and job creation criteria established by the Corporation; and

**WHEREAS,** the MMF CDE is a subsidiary allocatee and is a party to the MMF Allocation Agreement; and

8

**WHEREAS,** in connection with the Project Financing the Corporation will receive certain fees to include: (i) asset management fee of 2.5% of the MMF CDE QEI; (ii) a 0.6% new markets compliance fee based on MMFCDE QEI, (iii) audit and tax fee of $13,000 per year; (iv) payment of extraordinary expenses; (v) a donation by the QLICB to the Corporation in the amount of $75,000 payable $15,000 per year over a term of five years starting at the end of the Tax Credit Investment Period (as defined below), and (vi) closing costs; all of which will be evidenced by the CDE Payment Agreement; and

**WHEREAS,** Lofts on Ludington Investment Fund, LLC, a Delaware limited liability company (the "*Investment Fund*") is the investment fund formed for the Project; and

**WHEREAS,** Lofts Manager, LLC, a Michigan limited liability company (the "*Manager*"), whose manager is the Developer, is the sub master tenant of the Project; and

**C.     Transfer of Sub-Allocation to the Project**

**WHEREAS,** in order to facilitate closing of the Project Financing, the Bank of Holland, a subsidiary of Lake Michigan Financial Corp. or one or more of its affiliates and/or nominees (the "*Investor*") is willing to participate in the Project Financing as the NMTC and Federal Historic Tax Credit equity investor which along with the increased NMTC Allocation and an increase in State Tax Credit equity will require a new set of the Financial Projections for the Project Financing (the "*Financial Projections*") with such Financial Projections, subject to review and approval by the Corporation; and

**WHEREAS,** Manager has agreed to make loans to the Investment Fund in the initial principal amount of $1,500,000 (or such other amount as set forth in the Financial Projections) ("*Leverage Loan #1*") and in the initial principal amount of $525,000 ("*Leverage Loan #2*"); and Developer has agreed to make loans to the Investment Fund in the principal amount of $240,000 ("*Leverage Loan #3*"), in the initial principal amount of $525,000 ("*Leverage Loan #4*"), and in the initial principal amount of $36,700 (or such other amount as set forth in the Financial Projections) ("*Leverage Loan #5*") (collectively, the "*Leverage Loans*"). The original source of the Leverage Loans are federal and state funds provided to the City of Escanaba, Michigan municipal corporation (the "*City*") and a $1,500,000 (or such other amount as set forth in the Financial Projections) loan from First Bank, Upper Michigan, a Michigan banking corporation ("*First Bank*");  and

**WHEREAS,** the Leverage Loans are evidenced by the Leverage Loan Agreement (the "*Leverage Loan Agreements*") and are subject to the terms of an Upper-Tier Intercreditor Agreement which sets forth the priority among the Leverage Loans (the "*Intercreditor Agreement*"); and

**WHEREAS,** the Leverage Loans are further evidenced by Leverage Loan Note #1, Leverage Loan Note #2, Leverage Loan Note #3, Leverage Loan Note #4, and Leverage Loan Note #5 (collectively, the "*Leverage Loan Promissory Notes*"); and

**WHEREAS,** the Investor will make an equity investment in the Investment Fund of $1,173,300 to include NMTC equity of $1,014,000 and an initial Federal Historic Tax Credit

9

equity of $159,300 (or such other amount as set forth in the Financial Projections) (the "*Initial Equity Investment*"); and

**WHEREAS,** the Investment Fund will use the proceeds of the Leverage Loans in the aggregate sum of $2,826,700 together with the Initial Equity Investment to make one or more "qualified equity investments" within the meaning of Section 45D of the Code (the "*QEI*") in MMF CDE in the amount of $4,000,000 in MMF CDE in exchange for a 99.99% membership interest in MMF CDE (the "*CDE Membership Interest*") of which $100,000 will be used by MMF CDE to pay an Asset Management Fee to the Corporation, leaving a balance of $3,900,000 for making a QLICI; and

**WHEREAS,** Leverage Loan #1 shall be reduced by an equity investment by Enhanced Tax Credit Holding, LLC, a Louisiana limited liability company ("*ETCH*") attributed to State Historic Tax Credit Equity and equity investment by the Investor attributed to Federal Historic Tax Credit Equity as set forth in the Financial Projections and by increasing Leveraged Loan #5 as set forth in the Financial Projections, for total reduction of $1,210,000 to $290,000 with such repayments dollar for dollar used to reduce the loan from the Manager who in turn will reduce the loan from First Bank; and

**WHEREAS,** the Investment Fund under each of the Pledge Agreements, will grant with respect to each corresponding Leverage Loan a security interest in and lien on the Investment Fund's right, title and interest in and to one hundred percent (100%) of the CDE Membership Interest, now owned or hereafter acquired; and

**WHEREAS,** the relative priority of the security interest in the CDE Membership Interest is governed by the Intercreditor Agreement executed by the Manager, Developer, and the Investment Fund; and

**WHEREAS,** Lofts Master Tenant, LLC, a Michigan limited liability company (the "*Tenant*"), is the master lessee of the Project; and

**WHEREAS,** in order to further facilitate the Project Financing, the Corporation has agreed to become a non-managing member of the Investment Fund pursuant to the terms of an Operating Agreement which includes indemnification of the Corporation and its officers, directors and agents; and

**WHEREAS,** in order to further facilitate the Project Financing, the Corporation as managing member of the MMFCDE has agreed that the MMFCDE shall become a non-managing member of the Tenant and that the MMFCDE shall at closing make a QLICI equity contribution in the Tenant as set forth in the Financial Projections that will keep its equity investment in the QALICB to less than 50% and

**WHEREAS,** in order to further facilitate the Project Financing and operation of the Project, the Corporation has also agreed as managing member of the MMFCDE to five QLICI loans made by MMFCDE to the QLICB in an aggregate amount up to $3,615,000 (or such other amount as set forth in the Financial Projections), in the amounts as set forth in this paragraph (or such other amounts as set forth in the Financial Projections): (i) a loan from the MMFCDE in the initial principal amount of $1,500,000 (the "*CDE A Loan*") which upon completion of

436288

construction will be reduced by $1,210,000 to $290,000 by direct or indirect investment of State and Federal Tax Credit equity, (ii) a loan from the MMFCDE in the initial principal amount of $525,000 (the "*CDE B Loan*"), (iii) a loan from the MMFCDE in the aggregate principal amount of $240,000 (the "*CDE C Loan*"), (iv) a loan from the MMFCDE in the initial principal amount of $525,000 (the "*CDE D Loan*") and (v) a loan from the MMFCDE (the "*CDE E Loan*") which will increase upon completion of construction after the availability of Federal and State Tax Credit equity in order to permit the reduction of CDE A Loan to $290,000. The CDE A Loan, the CDE B Loan, the CDE C Loan, the CDE D Loan, and CDE E Loan are referred herein, collectively, as (the "*CDE Loans*"), and are evidenced by that certain CDE Loan Agreement which provides for standard and customary terms for a construction project, including provisions regarding insurance and indemnification of the Corporation (including officers, directors and agents) and MMFCDE, (the "*CDE Loan Agreement*") and are subject to a CDE Subordination Agreement which sets forth the priority among the CDE Loans (the "*Subordination Agreement*"); and

**WHEREAS,** the CDE Loans are further evidenced by CDE Note A, CDE Note B, CDE Note C, CDE Note D and CDE Note E dated as of even date herewith (the "*CDE Notes*") between MMFCDE and the QLICB with respect to the CDE Loans (collectively the "*CDE Promissory Notes*") and related documents; and

**WHEREAS,** in connection with the Project Financing, the Corporation will enter into a First Amended and Restated Operating Agreement (the "*MMFCDE Operating Agreement*"); pursuant to the terms of an Operating Agreement which includes indemnification of the Corporation and its officers, directors and agents; and

**WHEREAS,** in connection with the Project Financing, the Corporation will enter into a Servicing Agreement, which provides, in relevant part, for First Bank, to act as servicer of the CDE Loans for a fee paid by the QLICB; and

**WHEREAS,** in connection with the Project Financing, the Corporation will enter into a Disbursing Agreement, which will be entered into by and between the Corporation, the QLICB, the City and First Bank which provides, in relevant part, for First Bank, to act as disbursing agent of the CDE Loans, subject to City approval with regard to compliance with governmental requirements; and

**WHEREAS,** the Corporation as managing member of the MMFCDE is willing to sign an Operating Agreement whereby the MMFCDE becomes a non-managing member of Tenant; and

**WHEREAS,** based on the foregoing, the Corporation is willing to sign on behalf of itself and as managing member of MMFCDE a NMTC Transfer Agreement transferring the amount of $4,000,000 of the Corporation's NMTC Allocation to MMFCDE; and

**WHEREAS,** the Corporation is willing to sign the MMFCDE Operating Agreement by and among the Corporation, the Investment Fund and Withdrawing Member and any related documents; and

11

436288

**WHEREAS,** the Corporation is also willing to sign in its capacity as managing member of the MMFCDE, the CDE Loan Agreement, CDE Notes and applicable related loan documents; and

**WHEREAS,** the Corporation is also willing to sign, on behalf of itself and in its capacity as managing member of the MMFCDE, a CDE Recapture Indemnity, in favor of ETCH (the "*CDE Recapture Indemnity*") and applicable related documents; and

**D.     Indemnification**

**WHEREAS,** on February 9, 2006, the Board of Directors of the Corporation approved a policy on indemnification by the Corporation for gross negligence, willful misconduct and fraud which included a cap on monetary damages to fees paid or to be paid to the Corporation in connection with participation in a NMTC project; and

**WHEREAS,** the Investor in connection with the Project, requires unlimited indemnification by the Corporation and MMFCDE for the gross negligence, fraud, willful misconduct, malfeasance, material violation of any law, breach of any material provision of the MMFCDE Operating Agreement or any material breach of the representations contained in the MMFCDE Operating Agreement (collectively, the "*Bad Acts*"); and

**WHEREAS,** the Corporation's liability for any other acts or omissions other than Bad Acts will remain caped at the sum of fees paid or to be paid to the Corporation in connection with participation in the Project; and

**E.     Exit and Donation**

**WHEREAS,** at the end of the Tax Credit Investment Period (as defined in the MMFCDE Operating Agreement), Leverage Loan #1 will have a remaining principal balance as set forth in the Financial Projections; Leverage Loan #2 will have a remaining principal balance of $525,000 (or such other amount as set forth in the Financial Projections); Leverage Loan #3 will have a remaining principal balance of $240,000 (or such other amount as set forth in the Financial Projections); Leverage Loan #4 will have a remaining principal balance of $525,000 (or such other amount as set forth in the Financial Projections) and Leverage Loan #5 will have a remaining principal balance as set forth in the Financial Projections; and

**WHEREAS,** pursuant to the Option Agreement between Sponsor and Investor (the "*Option Agreement*"), the Sponsor has the right to purchase the Investor's membership interest in the Investment Fund thereby becoming the 100% member and manager of the Investment Fund (replacing the Corporation as manager); and

**WHEREAS,** following the end of the Tax Credit Investment Period pursuant to Section 8.06 of the MMFCDE Operating Agreement, the Corporation as manager of the MMFCDE, in its sole discretion may cause the MMFCDE to redeem the Investment Fund's membership interest. Pursuant to Section 11.10 of the MMFCDE Operating Agreement, the MMFCDE may be dissolved upon the request of the Corporation; and

12

**WHEREAS,** it is expected that MMFCDE will elect to dissolve itself as described above, and liquidate its assets and that the Investment Fund will assume MMFCDE's interest under the CDE A Loan, CDE B Loan, CDE C Loan, CDE D Loan and CDE E Loan and that the Sponsor, as manager, will then dissolve the Investment Fund; and

**WHEREAS,** upon dissolution of MMFCDE and Investment Fund as described above, then Investment Fund will satisfy its obligation to the Sponsor and the Manager under the Leverage Loans by assigning MMFCDE's rights with regard to the CDE Loans and to further assign its rights pursuant to the CDE Note and related loan documents to the Sponsor and the Manager; and

**WHEREAS,** the Corporation wishes to authorize other actions in order to further the successful development and operation of the Project.

**NOW, THEREFORE,** the following Resolutions have been duly made, seconded and adopted:

**IT IS RESOLVED,** that the Corporation approves the Project and that MMFCDE shall be transferred a NMTC Allocation in the amount of $4,000,000; and

**IT IS FURTHER RESOLVED,** that the Corporation is authorized and affirmed to participate in and act as the managing member of MMFCDE pursuant to the MMFCDE Operating Agreement and to acquire for $400 and to hold up to a 0.01% interest in MMFCDE pursuant to the MMFCDE Operating Agreement; and

**IT IS FURTHER RESOLVED,** that the Corporation is authorized and affirmed to participate in and act as the managing member of the Investment Fund pursuant to the Operating Agreement of the Investment Fund which provides for a management fee of $6,500 per year (or such other amount as set forth in the Financial Projections) plus any required audit and tax fee; and

**IT IS FURTHER RESOLVED,** that the Chief Business Development Officer is authorized to approve all disbursements after inspection, review and commendation by First Bank; and

**IT IS FURTHER RESOLVED,** that the MMFCDE is authorized and affirmed to participate in and act as the non-managing member of the Tenant pursuant to the Operating Agreement of the Tenant and to acquire and hold up to a 100% interest in the Tenant pursuant to the MMFCDE Operating Agreement; and

**IT IS FURTHER RESOLVED,** that the NMTC Transfer Agreement which transfers the amount of $4,000,000 of MMF's NMTC Allocation to MMFCDE is in all respects approved and adopted; and

**IT IS FURTHER RESOLVED,** that any one Officer or member of the Executive Committee, is authorized, on behalf of the Corporation, as the managing member of MMFCDE and as manager of the Investment Fund, any time after the adoption of this resolution and outside further action by or authority or direction from the Board of Directors of the Corporation, to

13

execute all necessary documents and to take such other acts as may be necessary, convenient or appropriate to accomplish the actions envisioned above, including but not limited to the MMFCDE Operating Agreement, the Operating Agreement of the Master Tenant, the Operating Agreement of the Investment Fund, the CDE Recapture Indemnity, the CDE Loan Agreement, the Leverage Loan Agreements, the Leverage Loan Promissory Notes, Security Agreement, Bank Account Pledge Agreement, Bank Account Control Agreement, Assignment of Project Documents, Environmental Indemnity Agreement, Disbursing Agreement, Servicing Agreement, Completion Guaranty, the CDE Payment Agreement, the Intercreditor Agreement, the Subordination Agreement and any other documents thereto and in general, to effectuate the Corporation's desire to support and participate in the Project; and

IT IS FURTHER RESOLVED, that any one Officer or member of the Executive Committee, is also authorized, on behalf of the Corporation, as managing member of MMFCDE and as manager of the Investment Fund, to negotiate and make such changes and modifications in documents, and actions envisioned above, including the dollar amounts (as long as the amount of the NMTC transfer to MMFCDE, is not changed, except for an increase of up to 10% based on financial projections) and to execute and deliver such further instruments, certificates, and documents as they shall determine to be necessary, appropriate or desirable to carry out the intent of these resolutions with respect to any aspect of the Corporation's participation in the Project, any such determination to be conclusively presumed by the doing and performing of any act or thing, or the preparing and executing of any such instrument, certificate or document, and any actions taken with respect thereto are hereby ratified and affirmed by the Board of Directors of the Corporation; and

IT IS FURTHER RESOLVED, that approval by the Board of Directors of the foregoing actions is contingent upon a closing with the QLICB by February 28, 2011.

## VI. WHIRLPOOL CORPORATION NEW HEADQUARTERS-TRANSFER OF $19,000,000 of NMTC ALLOCATION

Bogdan reported the Whirlpool Project has been excruciating slow. The MMF had recruited two Federal NMTC investors (PNC and Chase) with substantial proposals with the full intent of closing in 2010. The leveraged debt was to be provided by Whirlpool Corporation. PNC offered MMF $8 million of their own allocation to put toward this project. Both offered 74 cents for the NMTC equity purchase. The MMF had supported the PNC proposal since it would permit us to invest in an additional project. However, Whirlpool has not initiated discussions with the two parties until last week. Chase has increased the amount of their offer for the NMTC equity purchase. Whirlpool has indicated that they will make their decision by January 28, 2011.The proposed resolution to allow transfer of $19,000,000 to the MMF DD CDE. Following discussion and upon motion duly made by Crary, seconded by Flemming, and unanimously adopted, it was:

### A. Background

WHEREAS, Michigan Magnet Fund (the "*Corporation*"), is a Michigan nonprofit corporation, organized on a directorship basis and tax-exempt under Sections 501(c)(3) and 509(a) of the Internal Revenue Code of 1986, as amended (the "*Code*"); and

14

436288

**WHEREAS,** the Fifth Amended and Restated Bylaws of the Corporation provide for a Board of Directors, Officers, and an Executive Committee and sets forth their duties and authority; and

**WHEREAS,** the Corporation has been certified as a Community Development Entity ("**CDE**") by the Community Development Financial Institutions ("**CDFI**") Fund; and

**WHEREAS,** on November 3, 2009, MMF DD CDE, LLC ("**MMFCDE**") has been formed as a Michigan limited liability company by filing Articles of Organization pursuant to Act Number 23 of the Michigan Public Acts of 1993, as amended; and

**WHEREAS,** as of November 3, 2009, an initial Operating Agreement for MMFCDE was entered into by and between the Corporation and AAB Development Strategies, LLC, a Michigan limited liability company, as the initial members; and

**WHEREAS,** MMFCDE has been certified as a CDE by the CDFI Fund; and

**WHEREAS,** the Corporation is the managing member of MMFCDE; and

**WHEREAS,** effective January 12, 2010, the Corporation entered into a New Markets Tax Credit ("**NMTC**") Allocation Agreement (the "**MMF Allocation Agreement**"), as amended, whereby the Corporation received an allocation of new markets tax credits under Section 45D of the Code from the CDFI Fund in the seventh round of the NMTC program (CY 2009) in amount of $60,000,000 (the "**MMF NMTC Allocation**"); and

**WHEREAS,** the MMF Allocation Agreement requires that the Corporation invest in qualified projects within the State of Michigan and which meet other economic development and job creation criteria established by the Corporation.

**B.      Description of the Project**

**WHEREAS,** Whirlpool QALICB, LLC (or such other name selected), a limited liability company to be formed (the "**QALICB**"), a "qualified active low income community business" (as such term is defined in under Section 45D of the Code) is an affiliate of Whirlpool Corporation, a Delaware corporation (the "**Sponsor**"); and

**WHEREAS,** QALICB will be the owner of approximately 13 acres of land located 660 West Main Street, City of Benton Harbor, Michigan, intended for construction of a 250,000 square foot office building which will serve as the new headquarters for the Sponsor expected to create or retain jobs within the State of Michigan (the "Project"); and

**WHEREAS,** the proposed Project is located within United States population census tract number 26021000400 which is a "qualified low income community" (as such term is defined under Section 45D of the Code) and eligible for NMTC and must meet the investment criteria as set forth in the MMF Allocation Agreement by being located in a census tract with poverty levels in excess of 30% and other economic development and job creation criteria established by the Corporation; and

436288

**WHEREAS,** the Corporation has entered into a Reservation Letter with the Sponsor the "*Reservation Letter*") to reserve a total of Twenty Five Million Dollars ($25,000,000) of the MMF NMTC Allocation to the MMFCDE for the Project providing that certain terms and conditions be met; including but not limited to conditions related to timing of payment of "qualified equity investments" (as such term is defined in Section 45D of the Code) to MMFCDE and qualified low-income community investment (as such term is defined in Section 45D of the Code) in the QALICB; and

**WHEREAS,** an affiliate of PNC Bank, National Association ("*PNC*"), a national banking association. has offered to  transfer a total of Eight Million Dollars ($8,000,000) of their own NMTC allocation for the Project providing that certain terms and conditions be met which will allow the Corporation to reduce its reservation from  $25,000,00 to  $19,000,000; and

**WHEREAS,** the Sponsor has determined that it is desirable and in the best interests of itself, the QALICB and the Project to procure financing to complete development and construction of the Project from investors and lenders (the "*Project Financing*"), including loans and equity investments with favorable terms from the MMFCDE  through the NMTC program; and

**WHEREAS,** the MMFCDE is a subsidiary allocatee and is a party to the MMF Allocation Agreement.

**B.    Transfer of MMF's NMTC Allocation**

**WHEREAS,** the Sponsor is currently negotiating with PNC and JPMorgan Chase Bank, N.A, a national banking association regarding the terms of the Project Financing; and

**WHEREAS,** pending a decision by the Sponsor as to the source, terms and conditions of the Project Financing such decision to be concurred with by the Corporation pursuant to the terms of the Reservation Letter,  the Corporation desires to transfer $19,000,000 of MMF's NMTC Allocation to MMFCDE; and

**WHEREAS,** it is anticipated that upon a decision by the Sponsor as to the source, terms and conditions of the Project Financing, there will be a need for a supplement Board resolution to approve the Project Financing along with authorizations to further the closing of the Project.

**IT IS RESOLVED,** that the MMF transfer $19,000,000 of MMF's NMTC Allocation to MMFCDE; and

**NOW, THEREFORE,** the following Resolutions have been duly made, seconded and adopted:

**IT IS RESOLVED,** that the Corporation approves the Project and that MMF CDE shall be transferred a NMTC Allocation in the amount of $10,000,000; and

**IT IS FURTHER RESOLVED,** that the Corporation is authorized and affirmed to participate in and act as the managing member of MMF CDE pursuant to the MMFCCCDE

16

Operating Agreement and to acquire and hold up to a 0.01% interest in MMF CDE pursuant to the MMFCCCDE Operating Agreement; and

**IT IS FURTHER RESOLVED,** that the Sub-Allocation Agreement which transfers the amount of $10,000,000 of MMF's NMTC Allocation to MMF CDE, is in all respects approved and adopted; and

**IT IS FURTHER RESOLVED,** that any one Officer or member of the Executive Committee, is authorized, on behalf of the Corporation, as the managing member of MMF CDE, any time after the adoption of this resolution and outside further action by or authority or direction from the Board of Directors of the Corporation, to execute all necessary documents and to take such other acts as may be necessary, convenient or appropriate to accomplish the actions envisioned above, including but not limited to the MMFCCCDE Operating Agreement, the Indemnification Agreement, the Loan Agreement, the Intercreditor Agreement, the Environmental Indemnity Agreement, the Fee Agreement, the Disbursing Agreement, and any other documents thereto and in general, to effectuate the Corporation's desire to support and participate in the Project; and

**IT IS FURTHER RESOLVED,** that any one Officer or member of the Executive Committee, is also authorized, on behalf of the Corporation, as managing member of MMF CDE, to negotiate and make such changes and modifications in documents, and actions envisioned above, including the dollar amounts (as long as the amount of the NMTC transfer to MMF CDE, is not changed, except for an increase of up to 10% based on financial projections) and to execute and deliver such further instruments, certificates, term sheets, reservation letters and documents as they shall determine to be necessary, appropriate or desirable to carry out the intent of these resolutions with respect to any aspect of the Corporation's participation in the Project, any such determination to be conclusively presumed by the doing and performing of any act or thing, or the preparing and executing of any such instrument, certificate, term sheet, reservation letter or document, and any actions taken with respect thereto are hereby ratified and affirmed by the Board of Directors of the Corporation; and

**IT IS FURTHER RESOLVED,** that the Board of Directors of the Corporation approves an exemption to the Indemnification Policy whereby the Corporation's liability for Bad Acts and Qualification Failure in connection with the Project, shall allow unlimited indemnification for Bad Acts and Qualification Failure; and

**IT IS FURTHER RESOLVED,** that consistent with the Indemnification Policy, the Corporation's liability for acts and omissions other than Bad Acts and Qualification Failure shall continue to be capped at the sum of fees received or to be received in connection with the Project; and

**IT IS FURTHER RESOLVED,** that the foregoing resolutions replace in their entirety all prior resolutions of the Board of Directors with regard to the subject matter hereof; and

**IT IS FURTHER RESOLVED,** that if the Project Financing does not close by the March 31, 2011, the Corporation may, in its sole discretion, withdraw its Sub-Allocation

17

whereupon the Corporation and MMF CDE will have no further obligations in connection with the Project Financing.

## VII.  STATUS REPORTS AND RELATED ACTION

The next order of business was status reports and related actions.

**A.  Current Round Projects.** Bogdan included in the Package a summary chart of current round projects which is pasted in its entirety below. Bogdan  provided and update on each of these projects.

| Project | Total Cost | Total QEI | MMF QEI | Status |
|---|---|---|---|---|
| Michigan Motion Picture Studio – Pontiac | $59 million | $59 million | $12 million | MMPS received the film tax credit from the state permitting it provide the leveraged loan to the Investment Fund and permit MMF to transfer the QLICI to Michigan Motion Picture Studio. |
| Lofts on Ludington - Escanaba | $5.1 million | $4.0 million | $4.0 million | Resolution provided to Board |
| Verso Quinnesec Alternative Energy Project - Quinnesec | $49 million | $32 million | $10.0 million | Closed |
| Whirlpool –Benton Harbor | $69 million | $25 million | $19 million | Resolution provided to Board |
| Heart of the City Health Center - Grand Rapids | $26 million | $9.0 million | $9.0 million | Resolution provided to Board. On fast track - projections complete. Term Sheet to be completed - target close is 1/25/2011 |
| Subtotal | $207.1 million | $129.0 million | $54.0 million | |

**B.  Prior Round Projects.**

1. Studio One Project

Fiedler reported that  settlement has been reached by Studio One Apartments, LLC ("***Studio One***") in the  Joseph  Sciamanna  construction lien litigation in the amount of $125,000 to be paid $60,000 by the Title Company and $65,000 by Studio One.  Payments will be made over the next three months and the construction lien will be released with the last payment. Under the terms of the settlement, Studio One will be allowed to pursue Mike Houseman for reimbursement of the $65,000, but does not expect to collect much if anything. Since, Michigan Magnet Fund H, LLC is a also a named defendant (along with Fifth Third Bank and Wayne State University) the Corporation, as manager of MMF H needs to sign a the settlement documents. There are no  settlement funds coming  from MMF H or the Corporation, the President is authorized under general authority granted by the Board under the Bylaws to sign the settlement documents. No action was required or taken.

2. East Forest Art Project

18

436288

Bogdan reported that the MMF has initiated meetings with East Forest Art Project ("*EFAP*") to determine a course of action. EFAP did not receive any rent payment last year and has booked only two months of rent receivable from the Gallery. The EFAP now has a liquor license. The SEVA Restaurant is under construction using a loan from DIF and should open in March. The MMF has asked the bank to fund the state tax credit purchases directly to the CDE and has informed EFAP that the funds will not be released until the MMF has an indication as to when EFAP will be current with its debt service payments. The MMF has also informed EFAP that they need up to date financials and pro forma's and that we will meet with them on a monthly basis to review financials and obtain assurances that payments are being made properly.

### 3. Kirsh Industry

This is a project approved by the Board for which we issued a Reservation Letter. The Developer never completed the full application and could not raise the necessary leveraged debt. We were originally told that the Developer would finance the leveraged debt. The Developer has been unresponsive to phone calls. After all of the milestones in the Reservation Letter had passed, we informed Mr. Bosgraat that the Reservation has been terminated. The MMF has denied Mr. Bosgraph's request that his Reservation Fee be returned. .

### 4. Pipeline Projects

Bogdan provides a list of several potential projects in various stages of activity. Bogdan reported that the Corporation is not performing any due diligence on these projects pending any CDFI Fund additional award of NMTC. .

## VIII.   NMTC LEGISLATION STATUS

Bogdan reported that the president signed the bill to extend the NMTC program through 2010 and 2011 at a level of $3.5 billion per year as we meet. The CDFI Fund has scored all of the applicants and has selected the awardees. They did it assuming a $5 billion per year authorization and appropriation. The NMTC Coalition voted to keep the number of winners the same and to reduce the amount of the awards to each winner. The CDFI Fund has indicated that they will announce the winners in February. Michigan should be in the cat bird seat as the Chair of Ways and Means moves from Michiganian Sander Levin to Michiganian Dave Camp. Donna Gambrell, CDFI Fund Director indicated in her speech that her two main priority cities in the nation are New Orleans and Detroit. Bogdan reported setting up a meeting for Blaszkiewicz and Olga Savich and possible a person from the Mayors' Office and me to meet with Donna Gambrell in DC on February 28th to discuss what the MMF can do to collect the funds for the City. Bogdan noted that Dave Dworkin now heads up their Capital Magnet Fund

## IX.   INPUT FROM LOW-INCOME REPRESENTATIVES AND OTHER BUSINESS

There followed a request for input from low-income representatives and barring none and there being no further business to come before this meeting, upon motion duly made, seconded and unanimously adopted, it was adjourned at about 4:35 p.m.

Respectfully submitted,

19

436288

_____

Mark Morante, Secretary

436288

**Purchase of Property/General**

| | | | |
|---|---|---|---|
| Purchase Price | $ | 58,544.25 | 000699 |
| Warner Norcross (Matter #128564) | $ | 53,131.42 | 001066 |

**Brownfield TIF**

| | | | |
|---|---|---|---|
| Warner Norcross (Matter #129721) | $ | 11,016.06 | 001066 |
| Equity Resource Environmental | $ | 11,942.50 | 001015-001024 |
| Rose & Westra, Inc. | $ | 40,541.31 | 001038-001046 |
| DEQ Work Plan Review | $ | 18,188.34 | 001062 |

**Credit Application Fees**

| | | | |
|---|---|---|---|
| MBT Credit Application Fee | $ | 5,000.00 | 001025-001026 |
| Historic Credit Application Fee | $ | 2,500.00 | 001059 |
| MMF Application Fee | $ | 10,000.00 | 001058 |

**DEQ Loan/Grant**

| | | | |
|---|---|---|---|
| Bosgraaf Commercial (Sep 16, 2009) | $ | 1,002,919.56 | 001028 |
| Bosgraaf Commercial (Dec 16, 2009) | $ | 39,100.00 | 001052 |
| Bosgraaf Commercial (Dec 28, 2009) | $ | 49,080.44 | 001053 |
| Bosgraaf Commercial (Jan 15, 2010) | $ | 188,530.00 | 001054 |
| Bosgraaf Commercial (Jan 15, 2010) | $ | 16,472.00 | 001056 |
| Bosgraaf Commercial (Jul 22, 2010) | $ | 46,658.00 | 001061 |

**Demolition**

| | | | |
|---|---|---|---|
| Bosgraaf Commercial (Dec 16, 2009) | $ | 460,646.64 | 001050-001051 |
| Bosgraaf Commercial (Dec 28, 2010) | $ | 433,960.47 | 001084-001065 |
| Quality Environmental Services | $ | 41,180.00 | 001049 |

**Construction**

| | | | |
|---|---|---|---|
| Bosgraaf Commercial (Dec 28, 2010) | $ | 800,107.20 | 001063 |

**Payments Received**

| | | | |
|---|---|---|---|
| DEQ Grant | $ | (1,000,000.00) | 001072 |
| DEQ Loans | $ | - | |
| **TOTAL OUT OF POCKET COSTS:** | **$** | **2,289,518.19** | |

**Carrying Costs**

| | | |
|---|---|---|
| Interest on Costs at 7.8% (Jan 1, 2011 - Dec 31, 2016) | $ | 1,071,494.51 |



EXHIBIT
5-8
6-9-16 RB

Original contruction Schedule

| Year | Construction cost | | Proposed construction schedule (Newell delay) | | | |
|------|------|------|------|------|------|------|
| | | | | | | Construction cost |
| 2010 | $3,900,000.00 | | | | | |
| 2011 | | **1.60%** | * | | | |
| 2012 | | **2.10%** | * | | | |
| 2013 | $1,800,000.00 | **4.10%** | * | | | |
| 2014 | | **4.40%** | * | | | |
| 2015 | | **4.50%** | * | | | |
| 2016 | $2,750,000.00 | 4.00% | # | | | |
| 2017 | | 4.00% | # | 2017 # | 24.70% | $4,863,300.00 |
| Oct 10 2018 | $8,450,000.00 | 4.00% | # | | | |
| 2019 | | 4.00% | # | | | |
| 2020 | | 4.00% | # | 2020 # | 33.00% | $2,394,000.00 |
| 2021 | | 4.00% | # | | | |
| 2022 | | 4.00% | # | | | |
| 2023 | | 4.00% | # | 2023 # | 32.00% | $3,630,000.00 |
| | | | | | | $10,887,300.00 |

Increase in construction cost due to delay     **$2,437,300.00**

\*     **Turner Bldg cost experience**
\#     **Average future calculation**

Turner Building Cost Index
MBT Mega credit     000841



EXHIBIT
tabbies'
Lol
10-9-16 DB