# EXHIBIT T

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**NEWELL RUBBERMAID, INC.,**

Plaintiff/Counter-Defendant,

v.

**KIRSCH LOFTS, LLC,**

Defendants/Counter-Plaintiffs.

Case No. 1:15-cv-00597-RJJ
Judge Robert J. Jonker

## DEFENDANT'S EXPERT REPORT

### Arthur H. Siegal

**I.   CURRICULUM VITAE**

*See* attached Exhibit A.

**II.   PUBLICATIONS**

See attached Exhibit B

**III.   CASES TESTIFIED (DEPOSITION OR TRIAL – LAST FIVE YEARS)**

*Franklin Z Adell Trust UAD July 17, 2012 v Adell Broadcasting Corporation STN.Com and Birmingham Properties*, Oakland County Circuit Court, Case No. 10-114792-CZ

**IV.   COMPENSATION**

My compensation to act as an expert witness, including the preparation of this report and testimony at deposition and/or trial, is at a rate of $410.00 per hour plus out-of-pocket expenses.

## V.    FACTS

What follows is the information upon which I have formed my opinion. I have no independent knowledge of the accuracy of the information, but have assumed that the documents and information provided by Scott T. Bosgraaf on behalf of Kirsch Lofts LLC regarding the facts are accurate. I have assumed that:

a. In 2008, Kirsch Lofts obtained approval of a Brownfield Plan by the City of Sturgis Brownfield Redevelopment Authority (BRA), the Michigan Department of Environmental Quality and the Michigan Strategic Fund and/or the Michigan Economic Growth Authority Board. The Plan is attached as Exhibit C.

b. Kirsch Lofts entered into a Brownfield Reimbursement Agreement with the BRA on or about September 24, 2008. The Brownfield Reimbursement Agreement is attached as Exhibit D.

c. In 2008, Kirsch Lofts submitted a Brownfield Redevelopment Credit Pre-approval Application to the Michigan Economic Development Corporation (MEDC). A portion of the Application is attached as Exhibit E.

d. On October 10, 2008, the MEDC granted a pre-approval of the Application. A copy of the pre-approval is attached as Exhibit F.

e. At some point prior to July 31, 2010, Kirsch Lofts requested a commitment from CapFund New Markets, LLC of an allocation of Federal New Market Tax Credits which was approved. The approval is attached as Exhibit G.

f. All of the above documents relate to the property located at 308 N. Prospect Street in Sturgis Michigan (the Property).

g. Kirsch Lofts purchased the Property in 2009 and was capable of conducting the intended redevelopment of the Property and prevented from redeveloping the Property by Newell Rubbermaid, Inc. (Newell) because of contamination of the Property for which Newell was liable under MCL 324.20126.

h. The proposed redevelopment of the Property will not be completed by October 10, 2018 because of the time necessary to conduct remediation sufficient to permit the intended redevelopment of the Property and the time necessary to conduct the redevelopment work.

i. The earliest date I expect the first phase of the project to be completed is September 9, 2019, although completion by that date is, according to Kirsch Lofts, unlikely based

on the current status of Newell's remediation efforts. Based on Kirsch Lofts' earlier development timeline, the earliest I expected the entire project to be completed is September 9, 2022, although, again, given the current status of Newell's remediation efforts, that seems highly unlikely.

j. Kirsch Lofts had in 2010-2012 and has now the financial wherewithal to conduct the intended redevelopment work at the Property.

## VI. STATEMENT OF OPINIONS

I have been asked to opine on the incentives approved for the redevelopment of the Property, their approved value, their current condition and their current value. My conclusion is that the delay in the completion of the project has resulted in a loss in value to Kirsch Lofts of at least $4,626,908 as described below.

### 1. Brownfield MBT Credit

**Conclusion: The Credit Pre-Approval would have been worth at least $1,521,000 to Kirsch Lofts and that entire amount has been lost as a result of the delay in conducting the redevelopment work at the Property.**

**Analysis:** The Brownfield MBT Credit program allows developers to apply for a credit against the former Michigan Business Tax calculated based on a percentage of the cost of certain eligible investments in a project (including demolition, construction, restoration, alteration, renovation, or improvement of buildings or site improvements on eligible property and the addition of machinery, equipment, and fixtures to eligible property) and upon completion of the project, a credit would be issued to the developer based on the amount expended as an eligible investment. MCL 208.1437(29)(d).

Thus, if approved, a brownfield MBT credit would allow a developer to reduce its tax burden, effectively reducing its cost of development. The Michigan Business Tax has since been replaced by the Michigan Corporate Income Tax. There are still some businesses paying the MBT, and so, there would be, and have been in prior years, a market of businesses willing to

3399633.v6                                    3

purchase these Brownfield MBT Credits at a discount, typically at a price of between 90 and 95 cents on the dollar. Reportedly, the State of Michigan will also redeem these Credits due to the change from the MBT to the corporate income tax at the same rate. In fact, the statute provides

> "Beginning on and after April 8, 2008, if the credit allowed under this section for the tax year exceeds the qualified taxpayer's tax liability for the tax year, the qualified taxpayer may elect to have the excess refunded at a rate equal to 85% of that portion of the credit that exceeds the tax liability of the qualified taxpayer for the tax year and forgo the remaining 15% of the credit and any carryforward."

MCL 208.1437(18). This effectively sets a floor of 85% for the market for these credits. Therefore, the 90% figure is appropriate.

The October 10, 2008 MEDC letter to Kirsch Lofts, Exhibit F, entitled Kirsch Lofts to claim a Brownfield MBT Credit of at most $1,690,000. This figure was set in the MEDC Pre-approval letter based on 20% of an anticipated total investment eligible for credit under MCL 208.1437. As stated in the MEDC letter, in order to qualify for the credit, "the project must be completed not more than ten (10) years from the date of this letter." This is consistent with, and required by MCL 208.1437(1). Note that this 10 year period may not be extended. MCL 208.1437(9). Completion is defined in the MEDC letter as completion of the project as described in the pre-approval application and receipt of a Certificate of Occupancy. This is consistent with MCL 208.1437(10). The application, Exhibit E, described the redevelopment project as a three phase project expected to incur eligible investments totaling $8,450,000 over the three phases.

Eligible investment is defined as "any demolition, construction, restoration, alteration, renovation, or improvement of buildings or site improvements on eligible property and the addition of machinery, equipment, and fixtures to eligible property after the date that eligible activities on that eligible property have started pursuant to a brownfield plan ... if the costs of the eligible investment are not otherwise reimbursed to the taxpayer...." MCL 208.1437(32) (d).

Therefore, assuming that Kirsch Lofts spent at least the $8,450,000 on eligible expenses, and assuming that Kirsch Lofts intended to sell the MBT Credits rather than using them itself, the Credit would have had a value of roughly $1,521,000 on the market (using the conservative 90% discount factor).

Therefore, assuming that Kirsch Lofts could complete the project in full by October 10, 2018, at a cost of at least $8,450,000 for restoration, alteration, renovation and improvement of the buildings, the MBT Credit should be worth at least $1,521,000. However, it appears that the full project may not be completed by October 10, 2018.

If one or more phases of the project could be completed in full before October 10, 2018, Kirsch Lofts could technically claim or sell a pro-rated credit but, pursuant to the statute, if all components of a multiphase project are not completed by 10 years of the issue date of the pre-approval letter, then the qualified taxpayer, in this instance, Kirsch Lofts would be required to "pay to the state treasurer, as a penalty, an amount equal to the sum of all credits claimed and assigned for all components of the multiphase project and no credits based on that multiphase project shall be claimed after that date by the qualified taxpayer or any assignee of the qualified taxpayer." The penalty would also be subject to interest on the amount of the credit claimed or assigned at the rate set pursuant to MCL 205.23(2), beginning on the date that the credit for that component was claimed or assigned. In short, Kirsch Lofts would be obligated to pay to the State the amount of any credit actually claimed plus interest, meaning that Kirsch Lofts would actually lose money. The value of the preapproval has been reduced to zero.

Mr. Barr asserts that Kirsch Lofts could've sought an amendment to the MBT Credit pre-approval to make the project smaller, so that something could be salvaged of the credit – with no

3399633.v6                                                5

estimate of how much. Amendments are possible, MCL 208.1437(9). However, the MEDC adopted a policy regarding tax credit amendment policy in August of 2015 which sets 4 criteria:

    1. Meets current goals;

    2. Creates jobs or private investments;

    3. Spreads out or reduces impact on credits; and

    4. Firm lending commitments in place and are ready to begin construction.

While the administrative process to ask for an amendment is not well laid out and is likely to be cumbersome and difficult, due to the environmental problems at the Property, I conclude that Kirsch Lofts is not presently "ready to begin construction" and so no request would be entertained, let alone granted. Further, as Mr. Barr acknowledges, under the law, even an amended project that is reduced in scope would still need to be completed before October 10, 2018 and I assume that, given the project still has no firm start date, Phase I would not be completed until September 9, 2019, after the expiration of the 10 year period.

### 2. Brownfield Tax Increment Financing

**Conclusion: The value of the Brownfield TIF has been reduced by at least $1,232,108 from $3,441,028 in reimbursements through 2037 to, at most $2,208,920. This value will continue to decline if project completion is delayed beyond September of 2019 and will be significantly more ($792,376 more) if an extension on the date tax capture begins is not granted.**

**Analysis:** The Brownfield Redevelopment Financing Act, 1996 PA 381, MCL 125.2651, *et seq* (Act 381) allows communities to capture the increase in property taxes generated by a development over and above the taxes generated prior to development and use them to reimburse qualified property developers for expenses of certain eligible activities including plan preparation, baseline environmental assessment preparation, "due care activities, and response activities. For communities, like Sturgis, that fall on a list of qualifying communities, Exhibit H,

demolition, lead and asbestos abatement, site preparation work and public infrastructure are also eligible for reimbursement. MCL 125.2651(n). Thus, if approved, a brownfield TIF results in a series of payments directly to the developer, effectively reducing its cost of development.

The Brownfield Plan and Reimbursement Agreement make clear that, pursuant to Act 381, Kirsch Lofts was entitled to reimbursement of up to $1,823,250 in expenses of eligible activities plus simple interest at a rate of 6%[1]. Exhibits C and D.

Based on the approved Brownfield Plan, Kirsch Lofts expected to be reimbursed a total of $3,272,715 from 2008 until 2037 and Kirsch Lofts' calculation of expected taxes captured (which were validated by the City and its assessor) would have been sufficient to make those payments. Mr. Barr correctly notes that Kirsch Lofts' tax tables incorrectly began counting the 30 years in 2008 – the year that the Brownfield Plan was approved. That table should have accounted for tax capture running from 2009 – 2038 (30 years) as Mr. Barr correctly notes. As a result, Kirsch Lofts would have received another $168,313 (continuing the roughly 2% increase in value and taxes laid out in the Brownfield Plan - a 2% increase over $165,013 – the taxes projected in the Brownfield Plan for 2037) in reimbursement for that 30th year and so Kircsh Lofts' total expected reimbursement would have been $3,441,028 and this is what its loss should be measured against.

However, Mr. Barr's calculations appear to assume that Kirsch Lofts would not have been reimbursed any money from that 30th year because he assumes that Kirsch Lofts would not have had enough eligible expenses to be reimbursed. I assume that Kirsch Lofts would have had more than sufficient eligible expenses as reflected in its Brownfield Plan.

---

[1] Mr. Barr says that the State criteria for school tax capture is 5% - he is correct but that does not apply to the local tax capture which was approved as 6%. The 381 Work Plan submitted to the State recognized this and called for a

3399633.v6                                7

However, pursuant to MCL 125.2663(22), the duration of the tax capture cannot last longer than 30 years from the beginning date of the capture of tax increment revenues for the eligible property and the beginning date for capture may not be later than 5 years after the date of the resolution including the eligible property in the brownfield plan.

Mr. Barr raises the point that under subsection 22, Kirsch Lofts could have asked for a five year extension on the start date for the capture. He is correct on that as the statute provides:

> "The duration of capture of tax increment revenues under a brownfield plan for a particular eligible property shall not exceed the lesser of the period authorized under subsections (4) and (5) or 30 years from the beginning date of the capture of tax increment revenues for that eligible property. The beginning date of capture of tax increment revenues for an eligible property shall not be later than 5 years following the date of the resolution including the eligible property in the brownfield plan. The authority may amend the beginning date of capture of tax increment revenues for a particular eligible property to a date not later than 5 years following the date of the resolution including the eligible property in the brownfield plan...."

Therefore, the latest the period of capture would have begun (even though there was no tax increment to capture at that time) was with the tax year beginning January 1, 2013 and it would have ended in 2042. Assuming that: (1) Kirsch Lofts could get the plan amendment, which is entirely hypothetical; (2) the first phase of the project is not completed until September 9, 2019; and (3) the tax increment generation predicted in the Brownfield Plan would occur on the schedule that Plan predicted, only deferred (from 2010 to 2020), the amount of capture would be reduced because the tax increment capture would occur from 2020 until 2042 – 23 years instead of 30 and there would be effectively no capture from 2013 through 2019, meaning effectively only 23 years of capture. If no extension is granted, the capture would be only 18 years and would be significantly less as the last five years of capture are the highest available due to the expiration of the NEZ and OPRA and the expected increase in property values.

---

5% cap on interest. Barr Exhibit H. In any event, as Kirsch Lofts will not be fully reimbursed, I view this

Given the passage of time and assuming that the project is completed on or about September 9, 2019, Kirsch Lofts is expected to receive the following reimbursements assuming that the assessment and taxes follow the pattern outlined in the Brownfield Plan:

| Year | Payments from Local Tax Capture | Payments from School Tax Capture | Annual Total |
|---|---|---|---|
| 2020 | $ 14 | $ 50 | $ 64 |
| 2021 | 27 | 100 | 127 |
| 2022 | 41 | 25,672 | 25,713 |
| 2023 | 56 | 26,235 | 26,291 |
| 2024 | 71 | 26,809 | 26,880 |
| 2025 | 85 | 27,395 | 27,480 |
| 2026 | 101 | 27,992 | 28,093 |
| 2027 | 22,732 | 28,602 | 51,334 |
| 2028 | 27,814 | 29,223 | 57,037 |
| 2029 | 33,090 | 29,857 | 62,947 |
| 2030 | 85,054 | 44,002 | 129,056 |
| 2031 | 86,805 | 44,931 | 131,736 |
| 2032 | 88,592 | 45,879 | 134,471 |
| 2033 | 90,414 | 46,846 | 137,260 |
| 2034 | 92,272 | 47,833 | 140,105 |
| 2035 | 94,168 | 48,839 | 143,007 |
| 2036 | 96,102 | 49,865 | 145,967 |
| 2037 | 98,074 | 50,912 | 148,986 |
| 2038 | 100,086 | 51,980 | 152,066 |
| 2039 | 102,138 | 53,069 | 155,207 |
| 2040 | 104,231 | 54,180 | 158,411 |
| 2041 | 106,366 | 55,313 | 161,679 |
| 2042 | 108,544 | 56,469 | 165,013 |
| Total | $ 1,336,877 | $ 872,053 | $ 2,208,920 |

differential as immaterial.

Consequently, the value of the Brownfield TIF has been reduced to, at most $2,208,920 (and possibly $792,376 less if no extension is granted) in reimbursements compared with $3,441,028. The value of the Brownfield TIF will continue to decline if the completion of the first phase of the project is delayed beyond September 9, 2019.

### 4. New Market Tax Credits

**Conclusion: The Credit Pre-Approval would have been worth at least $1,873,800 to Kirsch Lofts and that entire amount has been lost as a result of the delay in conducting the redevelopment work at the Property.**

**Analysis:** Created in 2000, the New Markets Tax Credit (NMTC) program serves as a vehicle to attract investment capital into low-income neighborhoods that have been left behind by the traditional private marketplace. The Treasury Department administers the program through its Community Development Financial Institution Fund (CDFI Fund). The NMTC Program is a fairly complicated program which involves entities. The CDFI Fund allocates tax credit authority to Community Development Entities (CDEs) through a competitive application process. Once that occurs, CDEs offer tax credits to investors in exchange for equity in the CDE. Using the capital from these equity investments, CDEs can make loans and investments to businesses operating in low-income communities on better rates and terms and more flexible features than the market. In return, investors receive a 39% tax credit based on the amount of the investment over 7 years.

In this instance, CapFund New Markets, LLC, acting as a CDE committed to fund $10.8 Million to the project net of certain fees. Kirsch Lofts anticipated making its investment through the CDE, which would enable it to obtain a credit of 39% over the first seven years of the project. Kirsch Lofts anticipated "selling" the credit stream to an investor in order to realize the value of

the credit. Due to the seven year credit period, the expectation would be that the credit would be discounted by 35%. Kirsch Lofts would still retain its investment in the CDE which would retain its investment in the project.

As indicated in the letter, this commitment was only valid through July 31, 2010 and based on the fact that the project was stalled as of June of, 2010, it is my understanding that CapFund terminated their commitment and the $10.8 Million in funding was withdrawn.

The value of the credit lost would be 39% of the $10.8 Million or $4,212,000 multiplied by 65% for a total value lost of $2,737,800 (not counting transactional costs, accounting). Mr. Barr estimates those transactional costs to be in excess of $1.5 Million or roughly 14% of the qualified investment. Based on my research, a more realistic figure is between 5 and 8% of the qualified investment. In this instance, assuming the high end, that would mean a reduction in the net to Kircsh Lofts of some $864,000. Reducing the amount of the credit by these conservative estimated costs equals $1,873,800. Obviously, if the credit could be liquidated with a lesser discount or the fees negotiated downward, that would have resulted in a greater value that was lost due to the New Market Tax Credits not moving forward.

**Conclusion**

Therefore, in total, I conclude that the delay has resulted in the loss to Kirsch Lofts of at least $4,626,908 calculated as $1,521,000 (due to the loss of the Brownfield MBT Credit) + $1,232,108 (due to the loss of at least 6 years of the Brownfield TIF and likely continuing to grow) +$1,873,800 (due to the loss of the New Market Tax Credit Financing). These are quantifiable income streams that are no longer available to Kirsch Lofts due to the delays involved and would have reduced Kirsch Lofts' costs to develop, reducing the risks inherent in

the development process and improving chances of success as each of those programs is designed to do.

This analysis does not include: (1) interest on an MDEQ loan or the interest free loss of use of MDEQ loaned funds totaling roughly $700,000 for five years; (2) transactional costs that will be likely higher due to the passage of time; (3) increased costs of construction; (4) the time value of money (except where certain streams are assumed to be factored such as the MBT and NMTC credits); (5) Kirsch Lofts' carrying costs during the period of delay or any other factors not discussed above.

Respectfully submitted,

June 12, 2016

*[signature]*

Arthur H. Siegal

JAFFE RAITT HEUER & WEISS, P.C.