# EXHIBIT U

# In The Matter Of:

*Newel Rubbermaid, Inc. vs.*
*Kirsch Lofts, LLC*

*Arthur Siegal*
*June 13, 2016*



**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File SIEGAL_ARTHUR.txt*
*Min-U-Script® with Word Index*

Case 1:15-cv-00597-RJJ   ECF No. 88-22, PageID.2399   Filed 07/01/16   Page 3 of 12

Newel Rubbermaid, Inc. vs.
Kirsch Lofts, LLC
Arthur Siegal
June 13, 2016

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2          IN THE WESTERN DISTRICT OF MICHIGAN
 3                   SOUTHERN DIVISION
 4
 5   NEWELL  RUBBERMAID, INC.,
 6              Plaintiff,
 7     vs.              Case No. 1:15-cv-00597 RJJ
 8                   Hon.  Robert J. Jonker
 9   KIRSCH LOFTS , LLC,
10              Defendant.
11   _____/
12
13
14        The Deposition of ARTHUR SIEGAL,
15        Taken at 27777 Franklin Road,
16        Southfield, Michigan,
17        Commencing at 10:11 a.m.,
18        Monday, June 13, 2016,
19        Before Nora Morrissy, CSR-2642.
20
21
22
23
24
25
```

Page 2

```
 1   APPEARANCES:
 2
 3   JOSHUA R. MORE
 4   Schiff Hardin
 5   233 South Wacker Drive
 6   Suite 6600
 7   Chicago, Illinois 60606
 8   312.258.5769
 9   jmore@schiffhardin.com
10        Appearing on behalf of the Plaintiff.
11
12   DENNIS W. BILA II
13   Bila & Associates, PLLC
14   4270 Cottontail Lane
15   Harbor Springs, Michigan 49740
16   231.838.5678
17   bila@bilalaw.com
18        Appearing on behalf of the Defendant.
19
20   ALSO PRESENT:
21   Scott Bosgraaf, Carl Gabrielse
22
23
24
25
```

Page 3

```
 1   TABLE OF CONTENTS
 2
 3   Witness                       Page
 4   ARTHUR SIEGAL
 5
 6   EXAMINATION
 7   BY MR. MORE: 7
 8
 9   EXHIBITS
10
11   Exhibit                       Page
12   (Exhibits attached to transcript.)
13
14   DEPOSITION EXHIBIT 1              9
15   DEPOSITION EXHIBIT 2              9
16   DEPOSITION EXHIBIT 3             33
17   DEPOSITION EXHIBIT 4             57
18   DEPOSITION EXHIBIT 5             68
19   DEPOSITION EXHIBIT 6             82
20   DEPOSITION EXHIBIT 7             84
21   DEPOSITION EXHIBIT 8             98
22   DEPOSITION EXHIBIT 9             98
23   DEPOSITION EXHIBIT 10            98
24   DEPOSITION EXHIBIT 11            98
25   DEPOSITION EXHIBIT 12            98
```

Page 4

```
 1   DEPOSITION EXHIBIT 13            99
 2   DEPOSITION EXHIBIT 14           101
 3   DEPOSITION EXHIBIT 15           124
 4   DEPOSITION EXHIBIT 16           160
 5   DEPOSITION EXHIBIT 17           196
 6   DEPOSITION EXHIBIT 18           209
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 1:15-cv-00597-RJJ   ECF No. 88-22, PageID.2400   Filed 07/01/16   Page 4 of 12

| Newel Rubbermaid, Inc. vs.<br>Kirsch Lofts, LLC | Arthur Siegal<br>June 13, 2016 |
|---|---|

## Page 21

1  see or did he identify the documents that he was going
2  to send you?
3  A.  I believe he identified the documents.
4  Q.  And at any point in time did you ask for additional
5  documents?
6  A.  I may have asked if there were additional documents
7  that ought to be provided.  I don't remember if I
8  asked for specific documents.
9  Q.  Okay.  So, you relied upon Mr. Bosgraaf to identify
10  what documents you should review in preparation for
11  your expert reports?
12  A.  With respect to the factual underpinnings of the case,
13  yes.
14  Q.  Okay.  Do you have a list of the documents that
15  Mr. Bosgraaf provided to you?
16  A.  I do not have a list.  Certainly I could prepare one.
17  The -- I would say at least for the initial report I
18  believe all of the appendices were all of the
19  documents that were provided.  I'm not positive of
20  that but I believe that to be the case.
21  Q.  That was going to be my next question.  Thank you.
22  A.  Sure.
23  Q.  And then in connection with your second expert report
24  it contains the same appendices, correct, you're
25  incorporating by reference the same documents?

## Page 22

1  A.  That's correct.
2  Q.  So, for your second report it relies upon the same set
3  of documents as your first report?
4  A.  As well as referring to the documents that Mr. Barr
5  appended, that's right.
6  Q.  And the documents that you refer to in your second
7  report that Mr. Barr appended -- attached to his
8  expert report, the first time you saw those documents
9  was in connection with Mr. Barr's report?
10  A.  Except for the ones that were appended to my original,
11  yes, that's correct.
12  Q.  Thank you.  Besides working on this case, have you
13  ever done any other work for Mr. Bosgraaf?
14  A.  No.
15  Q.  Besides asking Mr. Bosgraaf if there were any other
16  documents in general, do you recall ever asking for
17  any specific information from him?
18  A.  As I think I testified before, we certainly did
19  discuss the documents that were provided to make sure
20  that I understood what they were and the context of
21  those documents and the content of those documents.
22  Q.  Okay.  Let's turn to Page 2 of Siegal 2.  I'd like you
23  to look at item G.
24  A.  Yes.
25  Q.  What is the basis for your conclusion that Kirsch

## Page 23

1  Lofts was capable of conducting the intended
2  redevelopment?
3  A.  I believe I asked Mr. Bosgraaf that question and
4  that's what I was told.
5  Q.  What do you mean by capable of conducting the intended
6  redevelopment?
7  A.  That they had both the experience and the economic or
8  fiscal wherewithal to be able to finance and build the
9  project.
10  Q.  Did you ask to see any supporting financial documents?
11  A.  No, I did not.
12  Q.  Then you go on to say that Kirsch Lofts was prevented
13  from redeveloping the property by Newell Rubbermaid
14  because of contamination of the property.
15      What is your basis for concluding that
16  Kirsch Lofts was prevented from redeveloping the
17  property by Newell Rubbermaid?
18  A.  Again I believe that was told to me by Mr. Bosgraaf
19  and it was my understanding that was to be an
20  assumption for the purposes of this expert report.
21  Q.  That was an assumption Mr. Bosgraaf asked you to make?
22  A.  Either he or his counsel.
23  Q.  What do you mean by prevented?
24  A.  That they were unable to conduct the development and
25  proceed with their planned development because there

## Page 24

1  were environmental issues that needed to be resolved
2  that had not been resolved.
3  Q.  Okay.  Let's look at item I on Page 2.
4  A.  Yes.
5  Q.  What development time line are you referring to?
6  A.  I'm not sure I understand the question.
7  Q.  So, item I reads the earliest date I expect the first
8  phase of the project to be completed is September 9th,
9  2019.
10      What's the basis for that?
11  A.  Well, I think I may have asked the question of
12  Mr. Bosgraaf, my understanding was that the project
13  was to be developed in three phases and I think I
14  asked the question how soon do you think you could
15  complete the entire project assuming you got started
16  relatively quickly, and how quickly would you be able
17  to finish the first phase.
18      I don't know that I broke it down into
19  phases one, phase two and phase three.  I think I
20  asked about completing the entire project and
21  completing phase one of the project, and I believe
22  that I was provided that date by I think it was a
23  rough estimate but I think it was an estimate from
24  Mr. Bosgraaf.
25  Q.  And if you turn the page over you'll see paragraph I

Case 1:15-cv-00597-RJJ  ECF No. 88-22, PageID.2401  Filed 07/01/16  Page 5 of 12

| Newel Rubbermaid, Inc. vs.<br>Kirsch Lofts, LLC | Arthur Siegal<br>June 13, 2016 |
|---|---|

Page 37

1  respect to tax credits or not?
2     **MR. MORE:** You'll have a chance to ask him
3  --
4     **MR. BILA:** I'm not going to let him answer
5  --
6     **MR. MORE:** You're not going to let him
7  answer a question relating to a publication he issued
8  recently, 2014, June 2nd --
9     **BY MR. MORE:**
10 Q.  I'm sorry, what's the date on this?
11 A.  I believe it was December 30th of 2013.
12    **MR. MORE:** December 30th, 2013, that's
13 discussing how brownfield tax credits and incentives
14 are being used by developers?
15    **MR. BILA:** If you ask him questions about
16 how brownfield tax credits are being used by
17 developers, I'm okay with that.  If you're going to
18 ask him about the construction of projects or whether
19 as an environmental lawyer he has an opinion as to
20 whether or not construction can proceed, I'm going to
21 say no.
22    **MR. MORE:** I've moved off that line of
23 questioning, you already instructed him not to.  I'm
24 asking specifically about the language he uses in this
25 article and what it means.

Page 38

1     **MR. BILA:** As long as all your questions
2  assume they relate specifically to tax credits
3  discussed in one and two and nothing more or nothing
4  less.
5     **BY MR. MORE:**
6  Q.  What do you mean by a small project versus a large
7  project?
8  A.  I can't necessarily give you a specific measurement,
9  but certainly as I'm talking about large projects I'm
10 talking about if you read the rest of the post, the
11 Packard plant in Detroit which is a very large piece
12 of land, very large factory, many environmental
13 issues.  The Uniroyal site which has been sitting
14 waiting for development for some 30 years, again, a
15 large site, significant contamination, much
16 complexity, and I noted that DTE, this is again
17 two-and-a-half years ago, had sold a plant in Michigan
18 to a developer and again a large facility, again, I
19 couldn't tell you acreage of any one of those three,
20 and acreage alone is not necessarily a determining
21 factor of whether I would consider something to be low
22 hanging fruit, and I'm putting that in quotes, or not.
23 It's just one factor to take into consideration.
24 Q.  Thank you.  And you explained some of the other
25 factors.  The second sentence -- I'm sorry -- the

Page 39

1  following sentence which I believe is the third
2  sentence reads this makes sense because for all
3  incentives available at the end of the day if you
4  rehab a building that no one wants to occupy, the
5  incentives available won't make the difference.
6     What incentives are you referring to there?
7  A.  Certainly I'm referring to things like the brownfield
8  TIF.  I may have been referring to the brownfield MBT
9  credits although I believe at that time the credit
10 program had been -- that the state was no longer
11 approving new brownfield MBT credits.  Certainly I was
12 also thinking about state grants, state loans, those
13 kind of programs that are available.
14 Q.  Why does it not make sense to rehab a building that no
15 one wants to occupy?
16    **MR. BILA:** I'm going to object to form and
17 foundation.  Again it's outside the scope for what
18 this witness was retained.
19    **BY MR. MORE:**
20 Q.  Go ahead.
21 A.  I guess in short developers can go out and rehab
22 buildings or sites but if they are in locations that
23 no one wants to be in ultimately the incentives, the
24 credits, all those programs are not going to make the
25 product or the project necessarily profitable.

Page 40

1  Developers go into these projects to make money and
2  yes, you can get certain dollars back but generally a
3  developer who is developing a site needs to make sure
4  that the project is occupyable, and that's true for
5  nonbrownfield sites as well as brownfields, the point
6  is that the brownfield credits don't make such a
7  significant difference that most developers are going
8  to say yeah, I'll have a property that will sit there
9  and be valueless because no one wants to be there even
10 though I've invested all this money and I've gotten
11 some incentives or credits or, you know, other
12 incentive-like programs to support my development.
13 Q.  The following paragraph that begins with so, would you
14 just read that to yourself, please?
15 A.  Okay.
16 Q.  What do sound economies have to do with a state's
17 brownfield programs?
18    **MR. BILA:** Again before you answer I'm
19 going to object to form and foundation.  This is
20 outside the scope of what he's been asked to opine on
21 in this case and I'm going to tell him not to answer
22 at this point.
23    **MR. MORE:** So, he's not giving an opinion
24 as to when brownfields tax credits are available?
25    **MR. BILA:** That's not the question.

Page 53

1  longer is accepting those applications, they are no
2  longer granting those pre-approvals, so, this is going
3  to be a bit sketchy, but basically you would have a
4  conversation with your client and their environmental
5  consultant and maybe somebody from their construction
6  folks or their engineer, their architects, somebody
7  who is going to be able to quantify a cost involved in
8  the project.
9     First to confirm the property is eligible,
10 that it qualifies for the program.  Might research the
11 community and the statute to determine what level of
12 credit because it could vary depending on where the
13 properties were, and also timing.
14    You'd sit down and look -- quantify the
15 costs that you thought would be eligible, and confirm
16 with the client make sure they include them if they
17 were not certain about whether or not they should be
18 included, you suggest that they be included because
19 it's difficult to amend these things, fill out the
20 necessary paperwork, perhaps have some conversations
21 with local and state folks to make sure that the
22 project was one that would be well received and then
23 complete the paperwork and submit it.
24 Q. Okay.  From your answer I understand you to be saying
25    typically you working in conjunction with the

Page 54

1  contractor, environmental consultant and/or the
2  developer are making the determination as to which
3  costs are eligible investments, is that right?
4  A. Which costs would be eligible investments, yes.
5  Q. And ultimately is that a determination that is
6     typically made by you?
7  A. I think -- as I said I think it's a joint discussion
8     but if there's a cost that I think is not eligible, I
9     would say so.
10 Q. Okay.  And what level of information do you need or
11    detail of information do you need to make that
12    determination as to what costs are eligible
13    investments?
14 A. Basically you ask questions regarding what the costs
15    are going to be and what they are going to be used for
16    and you compare it to the statutory standards.
17 Q. Do you inquire as to the source of funds to pay for
18    those costs?
19 A. I typically would not ask if my clients had their
20    financing prearranged if that's what you're asking.
21 Q. Do you inquire as to whether or not any of those costs
22    are going to be paid for by a grant?
23 A. Yes, typically you would ask that question.
24 Q. Do you typically inquire as to whether or not those
25    costs are going to be reimbursed from a TIF?

Page 55

1  A. Yes, you would ask that question, I would ask that
2     question as well.
3  Q. And why would you ask those two questions?
4  A. Statute provided that costs are not eligible if they
5     are effectively not borne by the developer.
6  Q. The actual brownfield tax credit that is awarded, is
7     that based on the estimates set forth in the
8     brownfield tax credit application?
9  A. It's based on the actual expenses incurred subject to
10    the approval grant, the pre-approval grant which are
11    based on those costs.  Again if you go over what's
12    been pre-approved unless you get your approval amended
13    which is no easy feat, you're limited based on the
14    estimates.
15    If you spend less, then you get less.  Let
16    me just be clear, I'm saying if you spend less than
17    the estimated amount, the pre-approved amount, then
18    you receive less based on the formula prescribed in
19    the statute.
20 Q. That situation you just described which is that the
21    application sets a ceiling for the amount of credit
22    one can be awarded in essence, does that create a
23    scenario where there's an incentive to overestimate
24    costs in a brownfield application?
25    MR. BILA: Objection.  Form.

Page 56

1  A. Typically my experience is to say to my clients you
2     should estimate reasonably but if you're in a range,
3     could be this much, it could be that much, you should
4     estimate to the high end.
5     BY MR. MORE:
6  Q. Thank you.  And that is to ensure the greatest
7     probability of receiving as much tax credit that's
8     available?
9  A. That's correct.
10 Q. Am I correct that no one knows for certain what the
11    actual brownfield tax credit will be until the project
12    is complete?
13 A. Subject to the limit in the pre-approval, yes, I would
14    say that's correct.  You know what it won't be more
15    than but you don't know if it will be that amount or
16    less depending on what gets spent.
17 Q. Okay.  Do you have any experience with calculating
18    brownfield tax credits once the project is complete?
19 A. No.
20 Q. Do you have any experience with identifying eligible
21    investments -- I'm just going to give you the statute
22    reference here.  MCL 2008.1437 after a project is
23    complete.
24 A. Are you asking me if I've evaluated whether
25    expenditures qualify as eligible expenses?

Page 157

1  the assumed two percent rate is and as a result there
2  would be -- there could be I guess I should say
3  additional tax capture as a result of that after such
4  bump and it would not necessarily show up in the table
5  right away because this table assumes that there's
6  going to be tax abatements on the commercial and the
7  residential portion for ten years.
8     So, while you might see an increase in
9  value in the left-hand column, that may not show up
10 particularly as an increase in tax capture in the
11 right-hand column right away.
12 Q. Would your opinion change if the six million dollar
13 investment contemplated in Exhibit E to Exhibit 15
14 were to occur in 2012 as opposed to 2010?
15 A. I'm assuming the investment and the improvement in the
16 property and its value correlates to the increase --
17 the three million dollar increase in taxable value
18 shown in the table in 2011, so the question is if
19 there was no investment or improvement in the property
20 such that its value increased until 2016 --
21 Q. Sure.
22 A. Then I would expect you would see the taxable value
23 and the increase in taxes and the total tax capture
24 all be deferred so you could effectively slide the
25 table down so that you'd see the bump, the three

Page 158

1  million dollar bump in 2017 and that taxable year, and
2  I assume also all of the other -- the OPRA and NEZ
3  would similarly be slid down so effectively, literally
4  you could probably just simply where it says 2011 just
5  add five to everything all the way down.
6  Q. Yes. Same would hold true if it turns out that in
7  fact Kirsch Lofts didn't expect to complete the six
8  million dollars in improvements until 2012, you would
9  just add then two to each of these numbers, correct?
10 A. Correct.
11 Q. For the year?
12 A. Correct.
13 Q. You'd just shift --
14 A. Give or take, but yes, that's right. I don't know
15 that you'd see the slight taxable value increases in
16 2009 and 2010 the way you did, but yes, that's what I
17 would do.
18 Q. Did you do anything to confirm that the OPRA and NEZ
19 tax abatements were approved?
20 A. I did not independently verify them. I spoke to
21 Mr. Bosgraaf who told me that he believed that they
22 would be in place at the time that the development was
23 completed and that they would run from that period
24 forward.
25 Q. Did he give you evidence to substantiate that opinion

Page 159

1  of his?
2  A. I was not given documentation on that.
3  Q. As you sit here today do you feel that you were
4  provided all of the documentation necessary to form
5  your opinions? Strike that. I'm going to ask it this
6  way.
7     After issuing your first report -- let me
8  ask it this way.
9     Were you provided sufficient documents to
10 issue your first expert report?
11 A. I think I was, yes. I think upon getting Mr. Barr's
12 report he raised a couple of interesting hypotheticals
13 and a couple of interesting points. Frankly I caught
14 a math mistake going through my report, it's a small
15 one, but it's on the next page or page after that on
16 the table that was included, but for the most part I
17 think I was provided adequate information but I think
18 Mr. Barr raised a couple of interesting points that I
19 thought merited consideration, and as you pointed out
20 resulted in my second report, my supplemental report
21 actually reducing two of the three numbers that I
22 calculated that added up to the total estimated loss.
23 Q. That's as a result of Mr. Barr's report providing you
24 with additional information that Mr. Bosgraaf
25 withheld?

Page 160

1  A. No, I wouldn't say it was additional information. I
2  think he raised the opportunity and I discussed it
3  with Mr. Bosgraaf of getting a five-year extension
4  which was something that we have not talked about
5  previously and to be conservative I thought it was
6  worth including, and Mr. Barr raised the issue
7  regarding the actual amount of the transactional costs
8  on the new market tax credits that we discussed
9  previously and those were included as well.
10 Q. Okay.
11 A. Other than that, no, I don't believe I was withheld
12 any information that was pertinent or necessary to my
13 reaching my conclusions.
14 Q. I'd like to hand you now what we'll mark as Exhibit
15 16.
16    MARKED FOR IDENTIFICATION
17    DEPOSITION EXHIBIT 16
18    3:54 p.m.
19    **BY MR. MORE:**
20 Q. I've handed you what is now marked as Exhibit 16. It
21 is the Act 381 work plan. Have you seen this document
22 before?
23 A. I have.
24 Q. Did you consider this document in forming any of your
25 opinions?

| Newel Rubbermaid, Inc. vs. | Arthur Siegal |
| Kirsch Lofts, LLC | June 13, 2016 |

Page 181

1  additional years at the back end?
2  A.  Yeah.
3  Q.  Okay.  So, what I'd like you to do is can we take a
4  break, I want to use the restroom.  I'd like to give
5  you an opportunity to correct your table.
6  A.  Sure.
7      (Recess taken at 4:28 p.m.)
8      (Back on the record at 4:35 p.m.)
9      BY MR. MORE:
10 Q.  Mr. Siegal, we took a break so you could confer and
11  evaluate whether the tables set forth on Exhibit 9
12  should be revised to properly or to consistently track
13  the pattern outlined in the brownfield plan as we
14  discussed in my prior questioning.
15 A.  Yes.
16 Q.  What have you determined?
17 A.  Well, two things.  One is, and this seems to be sort
18  of a consistent issue with this -- with this schedule
19  that is attached to Exhibit 15 or the schedules is
20  that as Mr. Barr pointed out they started too early,
21  and as Mr. Bosgraaf has explained to me on more than
22  one occasion, the NEZ and the OPRA tax abatement would
23  not kick in until he had a certificate of occupancy.
24  I don't think that's properly reflected in the
25  original reimbursement schedule.

Page 182

1      Just like Mr. Barr identified that the
2  original reimbursement schedule would have started in
3  2009 or, I'm sorry, tax -- the TIF table would have
4  started in 2009 and gone through 2038, I think that
5  there's an error embedded in the original schedules
6  that were prepared back in 2009 where they assumed
7  that the NEZ would kick in in 2009 or 2008 and that
8  the OPRA would as well, and as you pointed out
9  correctly, this is not an error, this is in here, that
10  the tax rate would go up in -- or the taxes collected,
11  excuse me, and captured would go up in 2011 through
12  2038.
13      You are I think correct that the -- if I
14  was going to -- and given the opportunity I would
15  correct my table to reflect that the first year of TIF
16  capture would be 2020 and I would basically delete
17  years 2020 and 2021 in my table and I would add two
18  more years at the back end, calculate it out what --
19  estimated what those should be dollar-wise in terms of
20  capture and reimbursement, but similarly there would
21  be a reduction in the table which I have not
22  calculated to reflect the NEZ and the OPRA because
23  you'd have to start in years 2020 as well and since we
24  have now taken two years off, you would have to add
25  two years of NEZ and OPRA at the back end in years

Page 183

1  2028 and 2029 which are shown here as 2030 and 2031 if
2  that makes sense.
3      So, what you'd see is less tax capture in
4  the beginning but more at the back end.  As a result I
5  don't think there's a significant swing.  There is a
6  swing of what would be captured and what would be
7  reimbursed assuming that you as this does that you get
8  the five-year extension.
9      There's a lot of math here.
10 Q.  And you haven't done any of that math, correct?
11 A.  I have not done any of that math.  I relied on the
12  table that was provided.  Its embedded errors with the
13  one I corrected which was the start year as Mr. Barr
14  pointed out, I think are still here and as you pointed
15  out I did not include the NEZ or OPRA for the full ten
16  years because I effectively assumed that that's where
17  we started -- that 2020 was effectively 2009 and
18  you're right, it should have been 2011.
19 Q.  Okay.  I don't disagree that the TIF schedule and the
20  reimbursement schedule attached to Exhibit 15 has a
21  series of errors embedded in it.  I think there may be
22  more than what you just articulated.
23      Nonetheless, you've chosen to rely on those
24  two tables and base your opinion solely upon those two
25  tables.

Page 184

1      My question to you is now how would your
2  opinion change?  This section here is a million some
3  odd dollar opinion.
4  A.  Yes.
5  Q.  Okay?  And you're relying upon these tables.  You've
6  acknowledged that two more years should be added and
7  in your original opinion, your supplemental opinion
8  you determined that this TIF schedule and
9  reimbursement schedule associated with Exhibit 15 were
10  sufficient to rely upon.
11 A.  Yes.
12 Q.  I don't want to -- I want you to amend your opinion to
13  reflect the error that you've admitted occurred which
14  is that the significant -- the 25 thousand 672 dollars
15  or the total annual total of 25 thousand 713 dollars
16  should have occurred in 2020, not 2022 and you should
17  be adding to the end of your table two more years, and
18  let me just point you to those two years and see if I
19  get it right, okay?
20      According to the reimbursement schedule
21  which forms the basis for your table on Page 9 year
22  2042 coincides with year 2031, is that correct?
23 A.  Yes.
24 Q.  Okay.  So, if we added two more years as you've
25  indicated would be appropriate assuming, you know,

Page 185

1  making the same assumptions as when you formed this
2  opinion, we would add 168 thousand and 413 dollars,
3  correct?
4  A.  Yes.
5  Q.  And we should add 171 thousand 881 dollars, correct?
6  A.  That's correct.
7  Q.  Let's just do the math.  Have you already done the
8  math?
9  A.  I have.
10 Q.  Wonderful.  Tell me now is it your opinion -- tell me
11 what the math is.
12 A.  First of all interestingly enough I don't think I even
13 called this to anyone's attention previously, the two
14 percent figure which is supposedly what's embedded in
15 here is actually more than two percent as far as I can
16 tell, it's 2.05 percent or something like that which
17 is -- accounts for a small discrepancy, but basically
18 if you take the two years which is 168 thousand 413
19 dollars and 171 thousand 881, you add them together,
20 by my math that's 340 thousand 294 dollars more of
21 additional tax capture.
22 Q.  And, therefore, the damages that you estimate could be
23 available associated with the brownfield tax increment
24 financing should be reduced by an additional 340
25 thousand 294 dollars, correct?

Page 186

1  A.  No, because you have to take into account the NEZ and
2  OPRA abatements which apply to an extra two years as
3  well.
4  Q.  Where in this schedule did you ever take into account
5  the NEZ and the OPRA abatements?
6  A.  They are embedded in the numbers.  If you look at the
7  top of the table, the reimbursement schedule, it says
8  with NEZ and OPRA.
9     Those are assumed here as well and you can
10 see that in 2018 to 2019 there's a significant uptick
11 in the local and school tax increment captured.
12 That's as a result of the NEZ and OPRA peeling off.
13 Q.  You accounted for that, that's in your schedule
14 currently occurring in the draft which we know the
15 dates are all wrong, but on Page 9 that occurs for
16 2029 and 2030, you've already accounted for that.
17 A.  But if you are starting -- what was 2022 for my -- if
18 you are starting with 2020, the NEZ and OPRA don't
19 kick in until you have a certificate of occupancy.
20    So, there's two years of additional
21 abatement because if you count through those number of
22 years, you get to as you pointed out to 2029, that's
23 one, two, three, four, five, six, seven, eight years.
24    So, in what I had as 2029 which you would
25 have as 2027 --

Page 187

1  Q.  Not I would have, you agree it should be 2027?
2  A.  I agree.  You have two more years where you would not
3  have the capture of 85 -- I'm sorry -- 129 thousand
4  and 131 thousand at those levels, you'd be capturing
5  them at approximately close to half of that amount.
6  Q.  Now I think I understand what you're saying.  Because
7  the NEZ and OPRA occur within a ten-year period.  Once
8  we shift to these numbers to properly reflect the
9  assumptions you've made, you have to also adjust the
10 NEZ and OPRA.
11 A.  Correct.
12 Q.  Do you have sufficient information to do so?
13 A.  Not while I'm sitting here, no.
14 Q.  Do you have -- was it -- was sufficient information
15 provided to you that would enable you to do that?
16 A.  I think I would have to get additional information on
17 exactly how the NEZ and OPRA were calculated.
18 Q.  So, as we sit here today, am I correct then that your
19 brownfield TIF opinion is incorrect, it needs to be
20 revised?
21 A.  I think it does need to be revised, yes.
22 Q.  And it's just flat out wrong?
23 A.  It's not accurate.  I don't know that it's flat out
24 wrong.
25 Q.  I'm sorry.  That was an exaggeration.  It's not

Page 188

1  accurate.  I appreciate that.  Correct?
2  A.  Correct.
3     MR. MORE:  Counsel, do you plan on
4  submitting another expert report on this opinion?
5     MR. BILA:  We'll have to talk about, but
6  that would be my guess.
7     MR. MORE:  I'm going to reserve then the
8  right --
9     BY MR. MORE:
10 Q.  If I asked you questions about your TIF opinion, it
11 would be about an opinion that is inaccurate, correct,
12 an opinion that you want -- it's an opinion that is
13 incorrect?
14 A.  Well, the math needs to be adjusted.  The points in
15 the opinion relating to the process I think are
16 largely -- not largely, I think are completely
17 accurate which is, if I may, relates to the five-year
18 extension which may or may not happen which is a
19 possibility and the number of years of capture I think
20 are correct.
21 Q.  Okay.  I appreciate that.  Then let's go forward and
22 then we'll deal with the numbers if we need another
23 deposition, and maybe we'll do it at the end, I'll
24 reserve the right on that piece should you supplement
25 your reports to provide a new table, okay?

### Page 189

1 **MR. BILA:** And to the extent your experts
2 that we've deposed ever decide to correct their
3 reports to accurately reflect them, I trust that you
4 will give us the opportunity to redepose them?
5 **MR. MORE:** Yeah, to the extent someone
6 corrects a word like increase or decrease, that's
7 obviously not something we'll talk about. I think --
8 **BY MR. MORE:**
9 Q. Let me ask you this, Mr. Siegal, would you consider
10 this to be a material change in the estimation of the
11 dollar amount that should be awarded Mr. Bosgraaf?
12 A. I have to do the math but I think, yeah, it's not
13 inconsequential.
14 **MR. MORE:** Okay. So, if we had the same,
15 we can then discuss it.
16 **MR. BILA:** Perfect.
17 **BY MR. MORE:**
18 Q. You note that a five-year extension could be available
19 if applied, however, it appears that you are only
20 applying a four-year extension, four years from the
21 date the capture first occurs.
22 Why not five years?
23 A. Well, the reason for that is that the statute provides
24 that you can get a -- the beginning date of capture of
25 the tax revenues won't begin more than five years

### Page 190

1 following the date of the resolution that adopted the
2 brownfield plan.
3 The date of that adoption as you pointed
4 out is 2008, September of 2008 we understand.
5 So, that means that the tax capture can't
6 begin after September of 2008. Since you don't
7 calculate taxes on a daily or monthly basis, you
8 calculate them on an annual basis, you have to start
9 with the prior year.
10 Q. Okay.
11 A. You have to start with basically January 1st or
12 December 31st --
13 Q. Of '09?
14 A. Well, no. You can't -- let me go back. You can't
15 start the capture more than five years from the date
16 of the resolution. The resolution is September of
17 2008. So, that means you can't start -- if you were
18 going to start on the five-year anniversary, it would
19 be September of 2013.
20 Q. Correct. Let's --
21 A. But since you don't start calculating taxes based on a
22 piecemeal basis, on a pro rata basis, you do it on a
23 calendar year basis, you've got to start with the end
24 of the prior year. You've got to go back to basically
25 the end of 2012 and start your tax capture with

### Page 191

1 January of 2013. You can't start in September of
2 2013, you've got to start with January. That's where
3 your year is lost.
4 Q. A whole nine months are lost under that approach
5 whereas if you started your capture in December of
6 2013, nothing would be lost?
7 A. You're correct, but the statute says you can't start
8 your capture more than five years from the date of the
9 resolution. Five years from the date of the
10 resolution if you went to December of 2013, that would
11 -- you'd lose -- you'd be past that five-year date.
12 Q. Okay. So, let's just agree for the sake of this
13 discussion September of 2013, and you get a 30-year
14 capture period, correct?
15 A. That's correct.
16 Q. Well, September of 2013 30 years would put you in
17 August, correct, of 2043?
18 A. Yeah.
19 Q. Right. You stop at 2042.
20 A. That's because we are starting with January of 2013.
21 Q. Yeah, but now you've -- your client would inure that
22 tax benefit would be realized, and he would get
23 reimbursed on it through August of 2043, would he not?
24 He would get at least the partial year?
25 A. No, I don't believe he would. The way I've always

### Page 192

1 seen it done it's done on a calendar basis. There's
2 not a pro rata, partial year calculation of this.
3 That's why it says it's not later than five years
4 following the date of the resolution.
5 It doesn't say up to five years or five
6 years on an extension, and it's based on the way the
7 taxes are assessed.
8 Q. Let's assume there's no extension and we are in
9 September of 2008. Then in reality -- it just seems
10 internally inconsistent because you've acknowledged --
11 let's just assume September of 2008 it's approved.
12 A. Correct.
13 Q. The 30 years from September of 2008 would put you in
14 August of 2039, correct?
15 A. You are starting in September of 2008? It would put
16 you in August of 2037.
17 Q. Okay. Have you ever worked on or been associated with
18 a request for an extension?
19 A. I have not.
20 Q. Okay. So, your opinions regarding how it would be
21 applied is not based on your own personal experience,
22 is that correct?
23 A. It's based on my understanding of the law.
24 Q. It's based on your reading of the law?
25 A. Correct.

Page 193

1 Q. Let's turn to your new markets tax opinion which
2 begins on Page 10 of your supplemental report, Exhibit
3 2.
4 A. Correct.
5 Q. Have you ever worked on a project where new market tax
6 credits were involved?
7 A. I have worked on a couple of projects where new market
8 tax credits were considered or applied for, but I have
9 not worked on one where the credits were actually
10 granted, no.
11 Q. What was your role in connection with those projects?
12 A. I was advising clients with respect to a variety of
13 incentives in putting together the packages and
14 posturing them for development and as I said those
15 projects did not go forward.
16 Q. Were you advising those clients in connection with the
17 new market tax credits they were considering?
18 A. In part, yes.
19 Q. And describe for me the part.
20 A. Basically they were asking me how the program worked
21 and how they would realize funds out of it and based
22 on my understanding of the program having read about
23 it, read various treasury documents and other
24 documents on it, and I think maybe one or two phone
25 calls with some folks who have been involved in the

Page 194

1 program, I explained to them how it worked and how
2 would it would go forward and as I said the project
3 was never realized so we didn't pull it all the way
4 through.
5 Q. Are any of your partners here at Jaffe familiar with
6 new market tax credits program?
7 A. I believe at least one other lawyer, Deb Baughman is
8 familiar with the new market tax credit program, yes.
9 Q. Do you know whether or not Miss Baughman has ever been
10 involved in a new market tax credit that went beyond
11 just the initial kind of scoping phase like you were
12 describing you've been involved in?
13 A. I don't know.
14 Q. Okay.
15 A. We talked about the program not in the context of this
16 case, we talked about the program previously but I
17 honestly don't know the answer to your question
18 whether or not she's taken one to fruition.
19 Q. So, do I understand correctly you've never been
20 involved in a new market tax credit that has actually
21 closed?
22 A. Correct.
23 Q. How many times have you been involved in providing
24 advice as to a general description of the program as
25 you've described?

Page 195

1 A. Probably four or five times. As I said there were two
2 projects in particular that I remember we specifically
3 had kind of a strong conversation, serious
4 conversations about.
5 Q. Would you explain to me the process for obtaining a
6 new market tax credit in general terms like you did
7 the Superfund process?
8 A. This is actually more complicated as far as I'm
9 concerned than the Superfund project -- process.
10 Basically there are credit allocations that are made
11 by treasury that are available. They go to community
12 groups or community investment entities that then can
13 make investments in projects in urban typically
14 economically depressed areas.
15     As a result, there is a credit that is
16 given to them that they can utilize for -- effectively
17 in exchange for and in support of those kinds of
18 investments.
19 Q. Okay. Have you ever negotiated the fees associated
20 with a new market tax credit?
21 A. No, I have not.
22 Q. Have you ever negotiated the terms an a new market tax
23 credit?
24 A. No, I have not.
25 Q. Have you ever seen a new market tax credit term sheet?

Page 196

1 A. Yes, I have.
2 Q. When?
3 A. I believe there is one on this particular project that
4 was provided to me and I think on one other -- one of
5 the other projects that didn't come to fruition I
6 believe I did.
7 Q. And on that other project do you recall whether that
8 term sheet was dated?
9 A. I don't.
10 Q. Do you recall whether or not it was signed?
11 A. I don't.
12 Q. What is the basis for your opinion that CapFund
13 committed to fund 10.8 million dollars to the project
14 net of certain fees?
15 A. Based on the document that was appended to my report,
16 term sheet.
17 Q. Let's turn to that. It's Exhibit G? F, correct?
18 A. No, it's G.
19 Q. I'm going to hand you --
20     MR. MORE: I'd like to you mark that as
21 Exhibit 17.
22     MARKED FOR IDENTIFICATION:
23     DEPOSITION EXHIBIT 17
24     4:59 p.m.
25     BY MR. MORE:

Page 197

1  Q. Mr. Siegal, is this a copy of Exhibit G from your
2  report?
3  A. It certainly appears to be, yes.
4  Q. And is there anything other than Exhibit G that you
5  rely upon to form your new market tax credit opinion?
6  A. Other than publicly available documents that I've
7  reviewed?
8  Q. Yes, thank you.
9  A. No, there's nothing else.
10 Q. Did you have any conversations with Mr. Bosgraaf
11 regarding your new market tax credit opinion?
12 A. Yes, I did. He informed me that he had worked on a
13 similar -- as I testified previously he had worked on
14 a similar project around the same time as this one
15 that did receive a new market tax credit and we had
16 discussed that as well.
17 Q. And what were the -- what was the specifics of that
18 conversation?
19 A. I don't remember all of the specifics. I do recall
20 him telling me about it, telling me that it was done I
21 think with the same folks with a similar letter and
22 that he proceeded with that one to fruition and that
23 the costs of compliance accounting and transactions
24 were not in the range of a million or more dollars but
25 were significantly less.

Page 198

1  Q. So, that conversation with Mr. Bosgraaf regarding your
2  new market tax credit opinion occurred after you
3  issued your initial report?
4  A. I think there was more than one conversation and I
5  think there was at least one before the -- my original
6  opinion was issued, and there was definitely one that
7  was after that one was issued and before the second
8  opinion was issued.
9  Q. And the conversation relating to the costs associated
10 with the new market tax credit that you had with
11 Mr. Bosgraaf, when did that occur?
12 A. I believe it was Friday.
13 Q. Okay. You did not discuss the fees and costs
14 associated with the new market tax credit with
15 Mr. Bosgraaf in connection with your initial report,
16 correct?
17 A. I think we discussed the fact of them but not the
18 amount.
19 Q. Okay. Can you tell me what the date is of this new
20 market tax credit commitment letter as you described
21 it?
22 A. Can I tell you the date that the letter was issued?
23 Q. Yeah.
24 A. I cannot. I can only tell you it was issued I believe
25 before July 31st of 2010 because that date is

Page 199

1  referenced in the letter. As to exact date of
2  issuance, no, I do not know.
3  Q. Can you tell me who signed the document?
4  A. The document is not signed. It is set up for
5  signature by Mr. Mark McDaniel who is the president of
6  CapFund New Markets in Lansing, Michigan, and it says
7  signature page follows, so, there may be a further
8  page that was not attached that was in fact signed but
9  there is no signature on this document.
10 Q. What would you expect to find on that signature page
11 follows?
12 A. A signature.
13 Q. Would you also expect there to be a countersignature
14 accepting the terms of this engagement?
15 A. Possibly.
16 Q. Would that surprise you if there were one?
17 A. It wouldn't surprise me if there was a place for a
18 countersignature. Whether or not there was a
19 countersignature, I don't know.
20 Q. And in fact you don't know whether or not this is a
21 letter from CapFund New Markets?
22 A. I only know what it appears to be which is exactly
23 that.
24 Q. Have you asked for a copy of a signature page?
25 A. I asked if I had a complete copy of the letter and I

Page 200

1  was told this is all that was available, all that was
2  in existence or that was in hand.
3     When I asked Mr. Bosgraaf is this all there
4  is, he said yes, this is all I have.
5  Q. Did you evaluate whether or not the project as
6  described to you would qualify for a new market tax
7  credit?
8  A. I relied on the letter which indicated that there was
9  a commitment of up to 10.8 million of their new market
10 tax credit allocation to the Kirsch Lofts project
11 based on the information that Mr. Bosgraaf apparently
12 had provided, and I believe I asked Mr. Bosgraaf what
13 information -- I don't think I asked him what
14 information he provided but I think I asked him what
15 qualified and he had told me as I testified earlier
16 that the project was a combined -- phase one in
17 particular, was combined residential and commercial
18 project, but I did not do an independent evaluation of
19 its qualifications.
20 Q. Would you have expected that Mr. Bosgraaf would have
21 sought this new market tax credit -- I think you
22 testified to this, before July 1st, 2010, right?
23 A. Yes. I'm saying yes, with respect to the date, not
24 with respect to the question.
25 Q. Okay. And his description of the project as he